UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br><br>Plaintiff, )<br><br>v. )<br><br>FRANCISCO ILLARRAMENDI, and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC, )<br><br>Defendants, )<br><br>and )<br><br>MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP, )<br><br>Relief Defendants. ) | Civil Action No. |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR EMERGENCY RELIEF**

Plaintiff Securities and Exchange Commission respectfully submits this memorandum of law in support of its emergency application to prevent the further misappropriation of assets by Defendants Francisco Illarramendi ("Illarramendi") and Michael Kenwood Capital Management, LLC ("MK Capital Management") and to recover proceeds of the fraud received by Relief Defendants Michael Kenwood Asset Management, LLC ("MK Asset Management"), MK Energy and Infrastructure LLC ("MK Energy") and MKEI Solar, LP ("MKEI Solar").

## PRELIMINARY STATEMENT

Illarramendi is the majority owner and control person of a group of affiliated entities (the "MK Entities") organized under the name The Michael Kenwood Group, LLC (the "MK Group"), a Stamford, Connecticut-based holding company. Through one of the MK Entities, namely MK Capital Management, Illarramendi advises several hedge funds, including the Short Term Liquidity Fund, I, Ltd. (the "Short Term Liquidity Fund") and MK Venezuela, Ltd. (the "MK Venezuela Fund") (collectively, the "Funds"). The current approximate value of the Short Term Liquidity Fund, according to counsel for the MK Group, is $540 million. The investors in the Funds are off-shore individuals and entities, including a pension fund for a foreign corporation (the "Pension Fund"). Indeed, the Pension Fund is the source of approximately 90% of the monies invested in the Funds.

Since at least 2009, Illarramendi and MK Capital Management have improperly and illegally invested at least $53 million of the Funds' assets, by first transferring those assets into bank accounts controlled by Illarramendi, then investing the assets in risky and illiquid private equity ventures, including small companies in early stage development. Moreover, Illarramendi misappropriated the Funds' assets by causing fund adviser MK Capital Management to use those assets to purchase interests in private companies for the benefit of Illarramendi and other entities

that he controls. This self-dealing created an undisclosed conflict of interest and was in breach of Illarramendi's fiduciary duty to the Funds.

The Defendants' conduct has created the risk of imminent harm to the Funds. Absent emergency relief, as much as $5 million in additional investor funds could be placed at risk. The Commission staff has recently learned that one of the private equity investments (the "Nuclear Energy Company") is expecting a cash infusion of $5 million from Defendants during the month of January to pay operating expenses. Although counsel has advised that neither Illarramendi nor any of the MK Entities intend to provide the monies to the Nuclear Energy Company, there is no formal agreement or Court order to prevent the Defendants from providing the already-promised cash infusion.

As a result, the Commission seeks emergency relief to protect investors and preserve the status quo, including an asset freeze over all assets controlled by the Defendants and the Relief Defendant. In addition, the Court should appoint a Receiver to take immediate possession of the assets of the Defendants and the Relief Defendants, locate additional assets, and take other actions to preserve the status quo. The Commission also seeks verified accountings, the repatriation of assets, and an injunction against further violations.

## STATEMENT OF FACTS

The evidence supporting this emergency application is set forth in the Declaration of Sofia Hussain executed on January 13, 2011 ("Hussain Decl.") and the attached Exhibits A through F, which are true copies of documents obtained by the Commission staff during the course of the Commission staff's investigation of the Defendants that led to this action.

This evidence is summarized below.

### Illarramendi Uses $53 Million in Investor Funds to Make Private Equity
### Investments in the Names of Accounts That He Personally Controlled

Beginning in late 2009, Illarramendi made multiple multi-million dollar investments in private equity ventures using investor funds from hedge funds that he controlled: namely, the MK Venezuela Fund and the Short Term Liquidity Fund (collectively, the "Funds").

One of Illarramendi's largest investments was in a West Coast-based nuclear energy company (the "Nuclear Energy Company") in the early development stage for products not expected to be saleable until 2014. Hussain Decl. at ¶11. Between April 2010 and November 2010, Illarramendi invested approximately $23 million from the Funds into the Nuclear Energy Company, which were exchanged for shares registered in the name of MK Asset Management. Hussain Decl. at ¶10.

In addition, Illarramendi authorized the transfer of approximately $20 million from the Short Term Liquidity Fund's bank account to pay for shares in a manufacturing company that is in the early-development stage of creating zero-emissions mass transportation alternatives (the "Clean Transportation Manufacturer"). Hussain Decl. at ¶¶12-13. Illarramendi also authorized the transfer of approximately $4 million from the Short Term Liquidity Fund's bank account to pay for shares in a developmental stage energy technology company (the "Technology Company"). Hussain Decl. at ¶14-15. These shares were registered to MKEI Solar. Hussain Decl. at ¶14. Finally, Illarramendi authorized the transfer of $6.7 in investor funds to a Spanish steel company, which paid for shares registered in the name of MK Energy. Hussain Decl. at ¶16.

Notwithstanding his fiduciary duty to the Funds, Illarramendi caused the shares for those private entities to be held in the names of companies that he personally controlled. Hussain Decl. at ¶¶10-16. In total, Illarramendi authorized the transfer of approximately $53 million

3

from the Funds to purchase shares in private equity ventures in the names of companies that he

personally controlled between 2009 and November 2010.  Hussain Decl. at ¶¶10-16.

## Illarramendi Makes False and Misleading Statements to Investors Regarding Liquidity and Use of Investor Funds

The private equity investments made by Illarramendi with investor funds were wholly

inconsistent with the representations made by Illarramendi, the MK Venezuela Fund and the

Short Term Liquidity Fund to investors in the Funds at the time the investments in the Funds

were made.  With regard to the Short Term Liquidity Fund (and as the fund's name necessarily

implies), the Private Offering Memorandum contemplated that the investments in said fund

would be short-term in nature:

> While the Fund may, from time to time, invest in longer-term securities, its primary
> investment strategy seeks to take advantage of products offered in the global fixed
> income and derivatives markets to generate gains through short-term (under one year)
> investments[.] . . . [T]he Investment Manager may pursue any strategies, employ any
> investment techniques and purchase any type of security it considers appropriate to
> achieve the investment objective of the Fund, *as long as they are constrained to fixed
> income securities and derivatives referencing fixed income securities.*

Private Offering Memorandum, p. 19, ¶ 2.1-2.2 (attached hereto as Exhibit B) (*emphasis added*).

Moreover, consistent with the goals of a self-described short term liquidity fund, the Private

Offering Memorandum provided that investors may generally redeem their investments upon 30

days' notice.  Exhibit B, p. 11.

Significantly, the Private Offering Memoranda for the Funds nowhere provide for loans

to be made to the advisor or entities under common ownership or control of the adviser.  The

Private Offering Memoranda for each of the Funds – the Short Term Liquidity Fund and the MK

Venezuela Fund – do permit directors to enter into arrangements with the Funds, but only if they

promptly provide notice to the investors.  Hussain Decl. at ¶18.

4

## Illarramendi Belatedly Claims that His Private Equity Investments
## with Investor Funds Were "Loans"

During this investigation, Illarramendi, through counsel, informed Commission staff that in fact, the $53 million in investor funds transferred to private equity investments constituted "loans" from the Funds to the advisor, of which he is a majority owner. Hussain Decl. at ¶19. However, Illarramendi, through counsel, advised Commission staff that investors were not specifically informed of the "loans" used to make the private equity investments. Hussain Decl. at ¶20.

Moreover, Illarramendi has also acknowledged through counsel that – with one exception – the purported "loans" from the Funds to entities controlled by Illarramendi were never documented. Hussain Decl. at ¶20. Indeed, Commission staff have been advised by counsel to Illarramendi that loan documents only exist for the investment in the Clean Transportation Manufacturer, which was due to be repaid to the Short Term Liquidity Fund in November 2010 at LIBOR plus 9%. Hussain Decl. at ¶21. Counsel has advised that these terms were subsequently extended through January 2011. Id.

Despite Illarramendi's claims, the Commission has interviewed several investors in the Funds – none of whom knew about the Funds making loans to Illarramendi or related entities. Hussain Decl. at ¶22-23. The Commission staff has interviewed an executive at the Public Pension Fund (the "Public Pension Fund Executive"). Hussain Decl. at ¶22. The Public Pension Fund Executive indicated that he was aware that Illarramendi was investing certain of the pension funds in private equity transactions. Id. However, the Public Pension Fund Executive was not aware that any of the pension funds were used to make loans. Id.

In addition, Commission staff has interviewed two other investors in the Short-Term Liquidity Fund ("Investor A and Investor B"). Hussain Decl. at ¶23. Investor A advised

Commission staff that he was unaware of his funds being used for private equity investments. Id. He stated that his understanding was that his funds would be used solely for short term currency transactions involving Venezuelan bonds. Id. Investor B advised Commission staff that he was unaware of his funds being used for private equity investments. Id. He stated that his understanding was that his funds would be used solely to purchase dollar denominated government bonds. Id.

## ARGUMENT

### I.   DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS

15 U.S.C. § 77t(b) and Section 21(d) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78u(d), entitle the Commission to temporary and injunctive relief against future securities law violations upon a "substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975). It need not show irreparable injury, a balance of equities in its favor, or the unavailability of remedies at law. *Id.* at 808; *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980); *SEC v. Graystone Nash, Inc.*, 820 F. Supp. 863, 875 n.13 (D.N.J. 1993), *rev'd on other grounds*, 25 F.3d 187 (3d Cir. 1994). Instead, the Commission need only make a "proper showing" of violative activity to obtain a temporary restraining order or preliminary injunction against statutory violations. *See SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *Mgmt.*

6

*Dynamics*, 515 F.2d at 807; *Bonastia*, 614 F.2d at 912 ("reasonable likelihood" of repetition must be shown).

The Commission meets this standard without difficulty under these circumstances. Illarramendi and MK Capital Management violated the antifraud provisions of the Advisers Act of 1940 (the "Advisers Act"). Many of the acts underlying the violations are ongoing and, if a temporary restraining order is not entered, the Defendants' conduct will continue to harm existing investors.

### A. The Commission Has Made a Substantial Showing that the Defendants Violated The Antifraud Provisions of the Advisers Act.

Section 206 of the Advisers Act prohibits fraud by investment advisors. The Defendants are "investment advisers," as defined by Advisers Act Section 202(a)(11). MK Capital Management is the named investment adviser to the Funds, and Illarramendi owns and controls MK Capital Management. Thus, they can be charged with direct violations of the Advisers Act. *See In the Matter of John J. Kenny and Nicholson/Kenny Capital Management, Inc.*, Advisers Act Release No. 2128 (May 14, 2003), at n. 54 and accompanying text (finding that chairman, CEO and co-owner of adviser was an adviser) (*citing*, as examples, *SEC v. Berger*, 244 F. Supp.2d 180,  (S.D.N.Y. 2001) (finding associated person liable under §§ 206(1) and 206(2) based on control of investment adviser), *aff'd on other grounds*, 2003 U.S. App. LEXIS 3562 (2d Cir. Feb. 27, 2003).

Sections 206(1) and 206(2) of the Advisers Act prohibit fraudulent conduct by investment advisers. The Supreme Court has interpreted Sections 206(1) and 206(2) to impose a fiduciary duty on investment advisers, requiring an affirmative obligation of utmost good faith, and full and fair disclosure of all material facts to an investment adviser's clients, as well as an affirmative obligation to employ reasonable care to avoid misleading its clients. *SEC v. Capital*

*Gains Research Bureau*, 375 U.S. 180, 194 (1963). This fiduciary duty requires investment advisers to act for the benefit of their clients, and precludes investment advisers from using their clients' assets to benefit themselves. Scienter is necessary to violate Section 206(1) of the Advisers Act, but scienter is not required to prove violations of Section 206(2) of the Advisers Act. *See Steadman v SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981). For purposes of Sections 206(1) and 206(2), the advisor's client is the fund and not the investors in the fund. *See Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006).

Here, Illarramendi and MK Capital Management engaged in a practice and course of business that operated as a fraud and deceit upon the Funds. Specifically, since at least late 2009, the Defendants have misappropriated Fund assets by transferring those assets to bank accounts that Illarramendi personally controlled, and making unauthorized investments in risky and illiquid private equity ventures. Among other things, these transfers of funds violated the Private Offering Memoranda governing the Funds and were done with absolutely no disclosure to the clients. Most significantly, the $53 million in investor funds were placed in the names of entities that Illarramendi personally controlled – not in the names of the Funds. These actions constituted self-dealing that breached the Defendants' fiduciary duty to the Funds.

The fact that Illarramendi now claims that these transfers of investor assets were "loans" does not undo the substantial harm to investors caused by this fraudulent practice, nor does it lessen the urgency for emergency action. Indeed, where the Nuclear Energy Company has advised the Commission staff that it will face bankruptcy absent a cash infusion from the Defendants, the Defendants have a substantial incentive to continue funneling investor funds into the Nuclear Energy Company and the other private equity ventures, in hopes of stanching the potential losses that could result from the Nuclear Energy Company declaring bankruptcy.

8

Thus, in violation of Sections 206(1) and 206(2), the Defendants failed to act for the benefit of the Funds by, among other things, investing in assets in the names of entities controlled by Illarramendi, investing in what they knew were risky and illiquid assets, despite their agreement to place the funds in short-term and liquid investments; failing to disclose "related party" transactions; and failing to document the purported loans made by the Funds for the benefit of Illarramendi. *See, e.g., SEC v. Trabulse*, 526 F. Supp. 2d 1008, (N.D. Cal. 2007) (finding manager of fund violated Sections 206(1) and 206(2) of the Advisers Act when he used fund monies for his personal expenses). Moreover, with respect to Section 206(1), Illarramendi and MK Capital Management acted with the requisite scienter because, among other things, they personally directed the Funds' use of proceeds, and therefore must have known that the proceeds were not being used for the purposes disclosed to investors.[2]

The Defendants further violated Section 206(4) of the Advisers Act, which prohibits investment advisors from engaging in any "act, practice or course of business which is fraudulent, deceptive, or manipulative" in interstate commerce. 15 U.S.C. §80b-6(4). Rule 206(4)-8 promulgated thereunder defines as a fraudulent practice an investment adviser's making false statements of material fact to any investor or prospective investor in a pooled investment vehicle, or failing to state material facts necessary to make statements made to such investors not misleading. 17 C.F.R. § 275.206(4)-8 (effective Sept. 10, 2007). Scienter is not required to find a violation of this Rule. *Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles* (SEC Rel. No. IA-2628, Aug. 9, 2007). Section 206(4) and Rule 206(4)-8 are applicable because

---

[2]     The knowledge of individuals who exercise substantial control over a corporation's operation is properly imputed to the corporation. *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999).

the Funds are "pooled investment vehicles."[3]  As a result of the materially misleading statements

to Fund investors made after September 10, 2007, the Defendants violated Section 206(4) and

Rule 206(4)-8.

### B.    The Defendants Are Likely to Continue Their Illegal Conduct

The Defendants have engaged in a series of improper transactions by investing at least

$53 million in investor funds in private equity ventures, and registering the shares in their own

names.  Moreover, certain of the agreements entered into by the Defendants obligate them to

continue providing funds to these ventures – and absent an order of the Court, there will be no

formal legal barrier to doing so.  A temporary restraining order is therefore warranted to preserve

the *status quo* pending a preliminary injunction hearing.  *See e.g., Bonastia*, 614 F.2d at 912

(citing *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975)).

## II.    THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND PROSECUTION OF THE CASE

### A.    The Court Should Order the Appointment of a Receiver

The Court should appoint a temporary receiver for MK Capital Management and the

Relief Defendants.  Courts will appoint a receiver where necessary (1) to preserve the *status quo*

while various transactions are being unraveled so as to determine an accurate picture of the

fraudulent conduct, *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105; (2) to protect those already

injured from "further despoliation of their property or rights," *Esbitt v. Dutch-American*

*Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964); (3) to prevent the dissipation of assets

pending further action by the court, *SEC v. American Board of Trade, Inc.*, 830 F.2d 431, 436

(2d Cir. 1987); (4) to install a responsible officer of the court who could bring companies into

---

[3]    A pooled investment vehicle is defined under Rule 206(4)-8 to include, among other vehicles, any investment company defined in Section 3(a) of the Investment Company Act, and as discussed below, the Funds are investment companies under Section 3(a).

compliance with the law, *id.* at 437; or (5) to place hopelessly insolvent entities in bankruptcy to effect their liquidation, *id.* at 436.

The Defendants' conduct indicates that they cannot be trusted to safeguard the remaining assets and act in the best interests of investors. A receiver will ensure that the funds will be protected and appropriate decisions can be made about the use of investor assets. A receiver also will be able to ensure that an accounting is performed in order to account for all uses and locations of investor assets.

**B.    The Court Should Enter an Asset Freeze and Repatriation Order**

In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon and civil penalties. The ancillary remedy of an immediate freeze of the assets under the direct or indirect control of the Defendants and Relief Defendants is appropriate here to ensure that sufficient funds will be available to satisfy any final judgments the Court might enter against the Defendants and Relief Defendants, and to protect those assets against dissipation. Exchange Act Section 21(d)(5); *see SEC v. Unifund, SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (asset freeze was warranted in amount sufficient to satisfy potential judgment for penalties in insider trading case); *SEC v. Infinity Group Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (purpose of asset freeze is to preserve status quo by preventing dissipation and diversion of assets). When there are concerns that defendants might dissipate assets, a court need only find some basis for inferring a violation of federal securities laws in order to impose a freeze order. *SEC v. Unifund, SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990); *see* 15 U.S.C. § 78u(d)(5) [Exchange Act, § 21(d)(5)] (court may grant any equitable relief appropriate or necessary for benefit of investors).

Here, the Commission has shown significant cause for concern about the safety of investor assets. An asset freeze is necessary to prevent: (a) further misappropriation or

11

dissipation of assets; and (b) the Defendants' making select repayments of interest and/or principal to some investors to the detriment of other investors.

Similarly, it appears that Illarramendi is using offshore accounts to facilitate some of the transactions described here. This use of offshore accounts necessitates a repatriation order, which falls within a federal court's broad equitable authority. *See generally SEC v. Infinity Group Co.*, 212 F.3d 180, 197 (3d Cir. 2000). Accordingly, the Commission further seeks a repatriation order to ensure that full recovery of the proceeds of the fraud alleged herein.

### C.     The Court Should Order An Accounting

Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of unjust enrichment and defendants' current financial resources. *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972); *SEC v. Lybrand*, No. 00 Civ. 1387(SHS), 2000 WL 913894, at \*12 (S.D.N.Y. July 6, 2000); *SEC v. Margolin*, No. 92 Civ. 6307(PKL), 1992 WL 279735, at \*7 (S.D.N.Y. Sept. 30, 1992). In this case, bank records obtained so far indicate complex chains of questionable transfers of money among the Defendants and the Relief Defendants. An accounting is critical for determining the amount of the Defendants' and Relief Defendants' unjust enrichment, and the assets available for disgorgement.

### D.     The Court Should Order Expedited Discovery
### and Prohibit the Destruction of Documents

The Court should order expedited discovery under Federal Rules 30(a), 33(a) and 34(b) to allow the Commission to supplement its motion for a preliminary injunction. Expedited discovery is needed to enable the Commission to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at a hearing on the preliminary injunction motion. Expedited discovery will also assist the Commission in

locating additional assets and effectuating any order entered by the Court freezing the Defendants' and Relief Defendants' assets.  Likewise, the Court should enter an order prohibiting the Defendants and Relief Defendant, or any of their agents, from destroying and altering documents to preserve as much of the evidence as possible.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying Declarations

and exhibits, the Commission respectfully requests that its application be granted.

Dated:       Boston, MA
            January 14, 2011

Respectfully submitted,

**SECURITIES AND EXCHANGE
COMMISSION**

By its attorneys,

Rua M. Kelly (Mass. Bar No. 643351)
Michael D. Foster (Illinois Bar No. 6257063)
Carlos Costa-Rodrigues (NY Reg. No. 2473593)
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8941 (Kelly direct)
Facsimile:  (617) 573-4590
E-mail:  kellyru@sec.gov

Local Counsel:

/s/

John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5373

Dated:  January 14, 2011

14