```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3   * * * * * * * * * * *  *   *      *
                                       *
 4   SECURITIES AND EXCHANGE           * Case No. 11cv78(JBA)
     COMMISSION,                       *
 5              Plaintiff,             *
                                       *
 6         vs.                         *
                                       *
 7   FRANCISCO ILLARRAMENDI, ET AL     * January 14, 2011
                                       *
 8              Defendant.             *
                                       *
 9   * * * * * * * * * * * * *  *      *

10           TRANSCRIPT OF TELEPHONE CONFERENCE

11   BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12   Appearances:
     FOR THE PLAINTIFF:        RUA KELLY, ESQ
13                             LeeAnn GAUNT, ESQ.
                               United States Security and
14                             Exchange Commission
                               33 Arch Street
15                             Boston, MA 02110

16   FOR THE DEFENDANT         MICHAEL BLANCHARD, ESQ
     FRANCISCO ILLARRAMENDI:   NADER SALEHI, ESQ.
17                             STEVEN BRODY, ESQ.
                               Bingham, McCutchen
18                             One State Street
                               Hartford, CT 06103
19
     FOR THE DEFENDANT MK      RICHARD JACOBSON, ESQ.
20   ENTITIES:                 Arnold & Porter
                               555 Twelfth Avenue NW
21                             Washington, DC  20004

22                             THOMAS GOLDBERG, ESQ
                               Day Pitney
23                             One Canterbury Green
                               Stamford, CT 06901
24
     Court Reporter:          Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer.
```

```
 1                    THE COURT:  Good afternoon, counsel.

 2    This is SEC v. Illarramendi, 11cv78.  It's assigned

 3    to Judge Dorsey, he is not available, I am the duty

 4    judge, and therefore, I'm going to hear your

 5    temporary restraining order motion, and particularly

 6    what we'll do now is the scheduling for that.  May I

 7    have appearances for the SEC.

 8                    MS. KELLY:  Yes, good afternoon, your

 9    Honor.  This is Rua Kelly, and my first name is

10    r-u-a.  I'm the senior trial counsel on the case.

11    And with me LeeAnn Gaunt, assistant director in our

12    office, and that's g-a-u-n-t, as well as Sophia

13    Hussain, h-u-s-s-a-i-n, and she's the forensic

14    accountant on this matter.

15                    THE COURT:  All right, and for the

16    defendants?

17                    MR. BLANCHARD:  Good afternoon, your

18    Honor.  Michael Blanchard from Bingham McCutchen for

19    Francisco Illarramendi.  With me on the call is

20    Nader Salehi and Steven Brody from our New York

21    offices.

22                    THE COURT:  All right, thank you.

23                    MR. GOLDBERG:  And this is Tom Goldberg

24    from Day Pitney.  We've been asked to represent the

25    entity defendants.  This obviously was brought on in
```

```
1   very short notice.  We have not been formally

2   engaged, but I would ask for permission to

3   participate in this call.

4              THE COURT:  That's fine.  By "entity"

5   you mean Michael Kenwood MK Energy and MKEI Solar?

6              MR. GOLDBERG:  And also Michael Kenwood

7   Capital Management LLC.

8              THE COURT:  Oh, yes, I see.  All right,

9   then.

10             MR. GOLDBERG:  I'd also like to

11  introduce to the Court Richard Jacobson of Arnold &

12  Porter.  Attorney Jacobson and his firm have been

13  representing the Michael Kenwood Group and the

14  affiliated entities with the SEC investigation.

15             THE COURT:  All right, so I am assuming

16  that counsel, having been involved in this

17  investigation, have a good deal more familiarity

18  with the allegations and circumstances than I do,

19  but let me ask you at this point whether or not

20  there is any portion of the TRO that the government

21  seeks that can be agreed to as a standstill measure.

22  Mr. Blanchard?

23             MR. JACOBSON:  Your Honor, this is

24  Richard Jacobson.  Let me speak to that.

25             THE COURT:  All right.
```

1          MR. JACOBSON:  As Mr. Goldberg

2   indicated, we have been representing Michael Kenwood

3   entities in the investigation, and, you know, the

4   case just was filed today, and in terms of going

5   forward we're not sure how this is going to work,

6   but with respect to the TRO, we have been having

7   discussions with the staff and we've been

8   cooperating with the staff in connection with work

9   that it has been doing in what they call a voluntary

10  enforcement directed inspection of Michael Kenwood

11  and the funds, and we have also talked this

12  afternoon about the possibility of agreeing to

13  aspects of the order that they are requiring.

14          However, we agree to disagree with

15  respect to at least one critical aspect, and that is

16  the funding necessary to keep two privately-held

17  companies alive that my client believes have

18  exceptional value, and there is no dispute that

19  whether they're denominated loans or investments,

20  investor money has gone into these companies.  I

21  believe that the two companies involved are NuScale,

22  which is working on a new technology for building

23  small modular nuclear reactors, and a company called

24  Proterra, which actually is a company that already

25  markets an electrically-powered bus that can be

```
 1    recharged very rapidly and has a very large backlog
 2    and is actually a company that is on the verge of
 3    being ready for an IPO or some other kind of major
 4    strategic sale.
 5             Those two companies need money
 6    immediately to keep going.  Between the two of them
 7    they have over 200 employees, and of course we're
 8    not -- or Michael Kenwood or investors, whoever you
 9    want to say owns the shares that are in dispute
10    here, they're not the whole shareholders, there are
11    innocent shareholders by any definition who would be
12    harmed.  In our view, in fact, the way to protect
13    investors here is to permit some additional funding
14    to go forward to prevent these companies from having
15    to declare bankruptcy in the near term, and by "near
16    term" I mean in a matter of days.  Hopefully it can
17    last until the end of next week so we can have a
18    hearing on this, but we believe at least the issue
19    of whether or not to allow funding of those
20    companies is really critical, and we would hope that
21    the Court would be able to schedule a hearing as
22    early as next Tuesday so that we could present our
23    case to try and convince the Court to permit that
24    funding to go forward while the merits are resolved
25    in a more normal course.
```

1          And during this period, you know, we

2    would represent to, you know, continue to working

3    with the SEC to see whether we could narrow the

4    issues with respect to the rest of the TRO that they

5    are seeking in order to, you know, kind of narrow

6    down the issues that the Court would have to decide.

7          But I believe that, you know, that with

8    respect to the funding of those two companies, that

9    the position of the staff is going to be that that

10   funding should not go forward, because we've

11   discussed it at some length over the last couple of

12   weeks.  So, I think that that really does have to be

13   decided and it's come to a very critical point and,

14   you know, if there is a hearing we'll be able to

15   supply, you know, support for that, for our

16   position, hopefully, and convince the Court to let

17   it go forward.

18          THE COURT:  All right, with respect to

19   any other use of assets, whether investor assets,

20   whether as loans or investments, do you and the SEC

21   have agreements with respect to standstills or

22   freezing of those transactions?

23          MR. JACOBSON:  I think we do pretty

24   much.  There may be an issue with respect to the

25   payment of management fees or some portion of

1   management fees that could be used to fund the

2   company's defense, both in terms of counsel and

3   forensic accounting.  We've had Alvarez & Marsal

4   on-site for about a month, if not more, time has

5   really been flying, actually maybe more than that,

6   to help to get to the bottom of some of these

7   transactions, and I think the staff will agree with

8   me that their work has been helpful, and we would

9   like obviously to have it continue, but, you know,

10  that won't be possible unless some funds can be made

11  available.

12          So, I don't know whether the staff --

13  whether we can agree on that, but I would hope that

14  we could at least, again, narrow that issue as well.

15  But I think that with respect to most of the assets

16  in question, that we should be able to come to some

17  agreement.

18          THE COURT:  All right, Ms. Kelly, is

19  there -- what is your response?  And my second

20  question is going to be have you thought whether or

21  not there are structures or constructs through which

22  or under whose supervision monies can be made

23  available to NuScale and Proterra in the short term

24  that would avert some significant financial turn in

25  the road, at least in the shorter term, some sort

```
 1    of, I don't know, special master surveillance or

 2    monitoring.

 3              MS. KELLY:  Your Honor, let me address

 4    those in turn.  First, I think that there are areas

 5    in which we may be able to reach agreement.  The

 6    defendants have agreed to some short-term measures

 7    through which they would limit certain actions over

 8    the next -- you know, over the course of the

 9    examination while we uncover what has happened.

10              Unfortunately, I don't think there is a

11    lot of room for agreement in the area of the

12    $7 million that is quickly coming due to these two

13    companies, NuScale and Proterra.  From the SEC's

14    perspective, I mean our role is obviously to protect

15    investors, and from our investigation it is fairly

16    clear that at least $53 million of investors' funds

17    have gone out to these private equity ventures and

18    this would add seven million more to that.

19              There may well be ramifications to not

20    making the payments, but from our perspective these

21    investors haven't consented to have the money

22    essentially loaned out with no documentation and no

23    security to Mr. Illarramendi.  There has been no

24    disclosure to the investors and they haven't

25    consented to the use of their funds.
```

1        So, in terms of who we are protecting,

2   we recognize there could be dramatic repercussions

3   to these companies that are in the sort of

4   development stage technology companies.  We can't

5   measure the prospect -- or their success, but I can

6   certainly say we're ready to proceed with a hearing

7   as soon as the Court wants to set it, but I don't

8   think we would be in a position by Tuesday to say,

9   you know, we sanction the money going out to these

10  companies because, you know, it may simply be that

11  it's going to put more investor money at risk.

12        We do think in terms of the Court's

13  second question, we have already taken steps to

14  identify candidates to be receivers.  We think that

15  that may be a mechanism where a receiver would be

16  able to fairly quickly get into the weeds and

17  evaluate whether there are ways that payments could

18  be made without compromising the investor funds.

19        There are at least -- there are several

20  candidates who we've identified, many of whom have

21  experience in particular in dealing with Latin

22  American enterprises, and we think we could have

23  something for the Court's consideration pretty

24  quickly.  But we don't think if the Court is to

25  schedule a hearing on Tuesday and we -- you know, it

1    may be that that's what the Court does and we will

2    be ready.  I don't think it is realistic to think a

3    receiver would be in place by Tuesday who could

4    have, you know, vetted all of these concerns and

5    bless the money being paid out to these entities.

6                We simply think -- the reason we filed

7    this as an emergency action in the first place was

8    to make sure that those payments in particular did

9    not go out.

10               So, you know, we think at this point

11   what is imperative is actually I think the opposite

12   of what defense counsel are looking for, which is

13   our concern is that regardless of what the Court

14   does with respect to the other relief that we're

15   seeking, that that $7 million not go out to those

16   entities unless and until anyone is able to say with

17   certainty that the investors' funds will not be

18   compromised.

19               THE COURT:  So you, in other words, want

20   to freeze that seven million until further order of

21   the Court and the defendants want to have it

22   released pending further hearings and deliberation

23   of the Court, but it seems to me that if Mr.

24   Jacobson is talking about the end of the week versus

25   the earlier part in the week, what is the real time

1   frame here?

2          MR. JACOBSON:   That's a very good

3   question.  With respect to Proterra, my

4   understanding is that they need $2 million by the

5   end of next week.  With respect to NuScale, which is

6   an Oregon company, I understand that there is an

7   Oregon statute that requires them to notify the

8   state in advance if they can't make the next

9   payroll.  My understanding as well is that the only

10  viable funding source for NuScale has been the money

11  it has been receiving from Michael Kenwood Asset

12  Management, which has been sourced from fund money.

13          And again, the SEC says they're not

14  loans and my client says they are loans, and we can

15  talk about that, but at least some aspect of that,

16  some portion of the five million that was going to

17  go to NuScale for operating expenses, including

18  payroll, would need to be funded near term.  I'm not

19  sure they can last to the end of the week.  But I

20  don't think they need the entire five million right

21  away, it may be some lesser amount.  But I think

22  they would probably need that earlier in order to

23  avoid having to notify the state that they can't

24  make the next payroll.

25          And with respect to Ms. Kelly's, you

1    know, view that we should wait to find out whether

2    or not investor funds, you know, will be harmed, you

3    know, in principle that's a wonderful position that

4    I would -- in the normal case I would agree with

5    that, that one should not act with haste, but I

6    think that, you know, the record is going to be

7    pretty clear that these companies can't last that

8    long, and if in a month, you know, the decision --

9    or two months the decision is they should have been

10   funded, but they're already gone under, then I think

11   that you really, you know, burned down the village

12   to save it, if I may use that cliche.  I apologize

13   for having done so, but I think it's appropriate

14   here.

15            All I'm trying to do is maintain the

16   status quo.  The investors are already, whether by

17   loans or by investments, and again that's for -- you

18   know, that could be debated, have put up $43 million

19   for those two companies, and to go under, that

20   $43 million has become, you know, worthless, as well

21   as the money put up by innocent investors who I

22   think the SEC should be thinking about as well.  And

23   what we're trying to do is just maintain the status

24   quo, keep those companies going with the minimum

25   amount of money necessary until the Court can make a

1    reasoned decision as to what to do next.  And

2    unfortunately the situation has arisen making this a

3    decision that needs to be made immediately.

4             Just for your information, your Honor,

5    when the SEC first asked Michael Kenwood voluntarily

6    to agree to a standstill in I think the middle of

7    December, we agreed to a standstill at that time,

8    and the SEC asked us to continue the standstill when

9    the first one ran out, which, you know, which we

10   agreed to do with certain carveouts, but when the

11   SEC objected to the carveouts, which included

12   NuScale and Proterra, we said we're not going to

13   make any of those investments until it's been

14   resolved.

15            I know they're asking for emergency

16   relief, but the relief that they have been asking

17   for has been in effect de facto since the middle of

18   December pursuant to our arrangement.  I understand

19   that the SEC really doesn't want to be in the

20   position of making investment decisions and, you

21   know, is uncomfortable in saying, well, it's okay to

22   make this investment, because that would be saying

23   we think this is a decent investment, but to stand

24   by and not do anything at this point I think is

25   really hurting investors, and we've tried to do

1  everything we can to try to work out something with

2  the SEC to allow this decision to be made.

3          For example, last Monday we proposed a

4  voluntary receivership of sorts where we would

5  basically turn over the reins to an independent

6  third party who could make this decision.  The SEC

7  did not accept that proposal then, and so, you know,

8  we're now kind of really in a situation where a

9  decision just has to be made, and no decision at

10  this point is a decision because there is no -- as I

11  understand it, there is no other viable funding

12  source for these companies near term, and if they

13  don't get near term funds in at least some amount,

14  two million for Proterra and something that may be

15  as much as five million, but hopefully would be

16  somewhat less, for NuScale, these companies are

17  going to go under rapidly, I mean, you know, before

18  the next payroll.

19          And it's a terrible situation.  And as I

20  think either Rua or LeeAnn Gaunt said in one of our

21  recent conversations, you know, there may be no good

22  decision here, but I guess our view is that the

23  decision that is the least harmful to inventors is

24  to preserve these investments until we have a chance

25  to, you know, litigate the issues the SEC is raising

1    on the merits.

2              THE COURT:  Tell me how many investors

3    we're talking about whose money is included in the

4    $7 million that you seek to fund NuScale and

5    Proterra.

6              MR. JACOBSON:  Well, the funds in

7    question, the STLF and the SOF funds, for short, are

8    very tiny funds in the sense they have very few

9    investors.  The principal investor in both of the

10   funds are entities affiliated with the national oil

11   company of Venezuela called PDVSA.  PDVSA money

12   accounts for 90 percent, approximately, of all the

13   assets in both funds, and in the SEC's own moving

14   papers they filed today they quote a PDVSA

15   representative indicating that he was aware that

16   fund money was being used for private equity

17   investments.

18             So, I just -- so that, I mean, there are

19   clearly issues here.  But in terms of how many

20   investors' money, you know, these are pooled funds,

21   so it's hard to distinguish whose money is being

22   used precisely, except 90 percent of that money

23   belongs to PDVSA, 90 percent of the fund assets, and

24   there are a handful of investors in STLF and even

25   fewer in SOF, which is a fund of fund, but -- so not

 1  very many investors.

 2           MS. KELLY:  Your Honor, I believe our

 3  investigation indicated that there are a total of I

 4  think approximately four investors.  The lion's

 5  share is PDVSA, but there are also three minority

 6  investors who are individuals and families, and they

 7  have approximately $40 million invested with Mr.

 8  Illarramendi.  From the SEC's -- sorry, your Honor,

 9  I didn't --

10           THE COURT:  Go ahead.

11           MS. KELLY:  I don't want to interrupt.

12           THE COURT:  Go ahead.

13           MS. KELLY:  But I did want to just point

14  out that when I suggested that a receiver might be

15  able to get to the bottom of this, certainly it is

16  an onerous task for a receiver to look at all

17  aspects of this case and it would be time consuming.

18  I don't think it would be that time consuming for a

19  receiver very quickly to look at the issue of

20  whether investors had consented with full disclosure

21  to the release of this $7 million, and that seems

22  like a fairly, you know, a fairly quick task,

23  because the main concern the SEC has is, you know,

24  whatever academic debate we could have about the

25  relative merits of $7 million going into these brand

1    new companies, maybe it will pay off, maybe it

2    won't, who will be harmed, I think it would be a

3    fairly limited task for a receiver to tackle

4    immediately and it wouldn't have to be something

5    that could take weeks or months, I think that could

6    be done in days.

7              We've been able to reach the minority

8    investors and PDVSA.  We expect they could do so,

9    particularly under the auspices of this action, very

10   quickly.  And I just want to be clear, defense

11   counsel has been more than cooperative.  We've had

12   people on the ground there for quite some time.

13   Nothing that we do should reflect in any way that

14   counsel has not been, you know, absolutely

15   cooperative with all of the SEC's efforts.  As the

16   Court can see, this somewhat narrow issue, things

17   have come to impasse and come to a head and we

18   simply aren't comfortable at this point doing

19   anything that isn't blessed by the Court.  We think

20   it's appropriate at this point to bring these very

21   serious issues before the Court, and so -- but we

22   don't think that this $7 million issue is one that

23   would require a week's long vetting.

24              We do recognize the urgent nature of

25   this, we do think a receiver could be in a position

1  to look at this very quickly and give the Court at

2  least, and perhaps the SEC, some comfort that

3  investors are doing this with eyes wide open.

4          MR. JACOBSON:  Your Honor, may I make a

5  suggestion?  I think that actually one result of a

6  hearing on this to be held on Tuesday would be to

7  give the Court the information, you know, that it

8  does not have now that could be very helpful to

9  decide whether Ms. Kelly's approach is the right one

10  or whether an immediate order is the way to go,

11  which is what we are suggesting.

12          THE COURT:  Well, the reason I asked how

13  many investors are involved with respect to this

14  limited transfer of funds is because Ms. Kelly had

15  earlier said that there had been no disclosures or

16  consent for these unsecured loans being made to the

17  private equity entities, and I wondered if it is

18  just a totally naive thing to, since you have

19  identified who those investors are, since there is a

20  very predominate one, this PDVSA, whether that

21  notice and consent is something that if it were to

22  go out today can be turned around in short order to

23  give everyone more confidence that you have investor

24  knowledge and some guidance with respect to not

25  being in a position of perpetuating what you claim

1    to have been the Investor Act violations from the

2    past.

3                    MS. KELLY:  From the SEC's perspective,

4    I think the Court's suggestion is not naive, and I

5    think is quite on point.  I mean, there are only

6    four investors.  I think the only tricky piece of

7    this from our perspective is what full disclosure is

8    because, you know, we would just want some

9    parameters around that just to make sure that they

10   truly do understand both what is expected to happen

11   with regard to the $7 million and what has happened

12   with their funds.  But, you know, we think that the

13   Court's suggestion is actually pretty narrowly

14   tailored and readily achievable.

15                   THE COURT:  Mr. Jacobson, what do you

16   think about that?

17                   MR. JACOBSON:  I think it's a terrific

18   idea, and I think we can get a draft together

19   tonight, and I think worst case is to have it go out

20   tomorrow.

21                   THE COURT:  So, if you do that and you

22   alert them as soon as we terminate this call that

23   information they have to respond to, to pay

24   attention to in short order is coming, we could --

25   and there is a receiver-type person in the wings to

1    be able to decipher, if you will, the responses from

2    them, aren't we then in a pretty good position by

3    the beginning of next week to act in a way that is

4    responsible to all the concerns, the government's

5    and the investors and the defendants, given that

6    this is, as you seem to both agree, a very, very

7    time-limited, decision-making window?

8              You have some receiver candidates out

9    there, Ms. Kelly?

10             MS. KELLY:  We do.  We actually have

11   identified four prospective candidates, all of whom

12   we believe will submit applications first thing on

13   Tuesday morning.  They have to submit conflict

14   checks and there is a process to go through, but we

15   have put the wheels in motion to do it very quickly.

16             I mean, I think our concern is that it

17   really depends on the quality of the disclosure

18   because, you know, it is -- you know, we're mindful

19   that often in these situations the person who is the

20   defendant, essentially, and has been in our view not

21   properly representing the nature of these

22   investments to his investors, for him to then be the

23   person to turn around and say let me give you full

24   disclosure, we would need to have some real

25   confidence they were getting disclosure about what

1    was intended to happen with these investments and

2    what has happened, and we would -- it would feel

3    much more comfortable if a receiver looked at those

4    because, you know, for us, we just think that a

5    neutral third party would be in a good position to

6    appropriately advise them because I think with the

7    defendant advising them, we don't feel comfortable

8    with the representations that have been made to them

9    over the last weeks, months, years.  So, for the

10   defendant to be doing this kind of disclosure I

11   think would be problematic.

12              We do understand the urgency here, but

13   we are not talking about weeks to put a receiver in

14   place, and that arrangement would be one that's much

15   more comfortable for the Commission because then we

16   would have some assurance that it's a neutral party

17   that is going to be giving them this advice and

18   getting consent, potentially, and we would hate to

19   see a scenario where the folks come back later and

20   say, you know, this was not accurately represented

21   to us, we were told if we didn't do this, you know,

22   people were going to be losing their jobs and going

23   out of business and we don't feel we got the

24   appropriate information throughout.

25              So, again we're not trying to

```
1    inordinately delay this process, but we do think the

2    steps we're talking about would make sense, and

3    having this done under the auspices of a

4    receivership would give I think everyone ultimately

5    more comfort that the results were fair and clean.

6              THE COURT:  So, how do you see the

7    practicalities shaping up, Mr. Jacobson?

8              MR. JACOBSON:  Well, again, I think that

9    in a more normal situation what Ms. Kelly has said,

10   you know, makes sense, and if we had the luxury of

11   time I'd be in full support of that.  But we've

12   essentially lost all of this week, you know, while

13   we were, you know, attempting to come up with

14   something to do on a consensual basis, and now we're

15   in a situation where we are literally days away from

16   having the potential catastrophic result with

17   respect to these two companies, and I think that we

18   can -- I mean, I think we can put together a

19   narrowly -- I don't know that we could put together

20   a consent that would cover all of the allegations

21   that the SEC has made, you know, in the complaint,

22   but I think that a consent that basically provided

23   information regarding the SEC's allegations, the

24   status of the investors and what is needed near term

25   would, I would hope, provide sufficient information
```

1    for the narrow consent that's required here, which

2    is just a limited funding to keep these companies

3    going until this, you know, entire issue could be

4    handled, you know, with the luxury of having a

5    little time to reflect.  But unfortunately we don't

6    have that time now.

7              THE COURT:  Are there two separate

8    things, one is called consent and one is called

9    notice?

10             MS. KELLY:  No, I don't know that we're

11   using them as a term of art.  I think, and I hope

12   I'm answering the Court's question, I think what --

13   what the SEC has been understanding that to mean was

14   this full disclosure of the way the investment funds

15   -- the investor funds have been used in the past, in

16   addition to the notice and their consent to the $7

17   million of the fund money going.  And so, in other

18   words, the investors would have some context in

19   making this decision, i.e. approximately $53 million

20   has already gone out under -- and, you know, is not

21   held in the funds' names and that that structure is

22   what Mr. Illarramendi proposes to keep in place,

23   essentially, for the limited purpose of making the

24   $7 million investment in these two companies.

25             So, when we talk about disclosure and

1   consent, we just don't mean PDVSA and the three

2   minority investors say it's okay for you to invest

3   our funds in this way, it is, you know, here is how

4   we've been treating these monies with respect to

5   private equity ventures.  In light of that, and in

6   light of the investment we would like to continue

7   making, do you authorize us to do that, because I

8   think otherwise the consent is hollow.

9           THE COURT:  Is that what you had in

10  mind, Mr. Jacobson, something in that?

11          MR. JACOBSON:  I would -- basically if

12  that is what the SEC wants us to put in the consent,

13  I would have no objection.

14          THE COURT:  Because I think she's right,

15  that without context they don't know why you are

16  asking.

17          MR. JACOBSON:  Oh, I agree completely.

18  I absolutely agree.  And just, you know, I must

19  admit I am not a 40 Act lawyer and I didn't stay at

20  a Holiday Inn Express last night either.  And in

21  terms of what should be in the consent or what needs

22  to be in the consent from a 40 Act perspective, if

23  that's what the SEC wants, I have no problem in

24  putting in what the SEC wants to be in in order that

25  they have comfort that the consent that's being

1   given is being given in an informed manner.  We all

2   want that.  And again, we're not talking about very

3   many investors, and so I mean, I think that we

4   could, you know, perhaps work something out together

5   that they're comfortable with and we can send that

6   out in the morning.

7              THE COURT:  Well, I think the way

8   forward seems to have become a little bit clearer

9   here.  And although it portends a very busy weekend

10  for everyone, if this drafting of the full

11  disclosure with respect to how the $53 million in

12  investors' funds has already been used and the

13  request for another seven million to be similarly

14  used and why for these two companies, and not only

15  why but immediately, that seems to me to be

16  something that you can turn around and perhaps even

17  get response or further queries from the investors

18  all before Tuesday morning.  I don't know whether

19  anybody is actually in Venezuela, but it's only a

20  one-hour time difference.  So, I think that that

21  makes sense.

22              What I don't know, and I don't know

23  whether you know, is whether this will be the crisis

24  de jour and there will be something more next week

25  or what does the two million for NuScale and maybe

1    up to five for Proterra get you.

2              MR. JACOBSON:  I think it's the other

3    way around, your Honor.

4              THE COURT:  Okay.

5              MR. JACOBSON:  But with respect to

6    NuScale, my understanding was that there was another

7    infusion of capital that was scheduled for February

8    sometime, so I'm not sure, I think that buys several

9    weeks, but I don't know how many.  With respect to

10   Proterra, again, I'm not -- I'm just not sure, but I

11   have not been advised that this is a crisis de jour

12   situation the same way that NuScale might be.

13              But, you know, one of the things that

14   this funding does buy is it buys time to look for

15   other funding sources that, you know, don't

16   implicate the SEC's concerns, which just has not

17   been able given everything that's been going on,

18   given the timeframe we're working in.  And the goal

19   is that this not be something that we would come to

20   you, you know, with every week or two, but rather

21   that would buy us the time to resolve it, you know,

22   in some other way.  But I can't -- I can make no

23   promises in that regard, I just don't know the

24   answer.

25              THE COURT:  And the new infusion of

1  capital due in February to NuScale, is that also

2  these investors' money or is that coming from

3  elsewhere?

4          MR. JACOBSON:  Well, the hope would be

5  that it would come from elsewhere.

6          THE COURT:  Okay.

7          MR. JACOBSON:  We without -- I obviously

8  do not want to waive the attorney-client privilege

9  at all, but let's just say our clients understand

10  that they need to be looking for alternative sources

11  to fund these investments going forward while these

12  issues that are before the Court are being resolved.

13          MS. KELLY:  And just a couple of points,

14  your Honor, that I wanted to make very quickly.

15  One, just so the Court is aware, we did call NuScale

16  and spoke to folks there approximately one week ago

17  to let them know that we had -- we're looking at

18  some concerns relative to this funding and it might

19  not come through.  So we just wanted to make clear

20  to the Court we're not trying to leave these

21  companies in the lurch, we did notify them there may

22  be a problem and they would need to look at

23  alternative sources, you know, for getting this

24  funding.

25          I also wanted to be clear that to the

1   extent -- we will, of course, work with counsel, and

2   we've had a good working relationship so far.  We

3   expect to be able to come up with some kind of

4   disclosure.  I just want to be clear that the SEC

5   may continue to object if we don't feel confident

6   that the consent is -- if we're not comfortable with

7   it.  So, I just want to be clear with the Court.  I

8   don't want to be anything less than completely

9   straightforward with the Court, and I'd say, you

10  know, we just would want to reserve our rights to

11  say, do you know, look, we don't hear that as an

12  informed consent.  If they express any kind of

13  reservation we may come back to the Court and say we

14  don't believe that this is sufficient informed

15  consent, but we'll endeavor to work with counsel to

16  put something together we're all comfortable with

17  and at the end of the day, you know, we hope to be

18  able to be in agreement, we just want to be clear we

19  might not be.

20              THE COURT:  I understand.  What if we

21  have a telephonic status conference on Tuesday at

22  12:30.  By then you will have -- the world will have

23  turned around many times and this discussion will be

24  a different discussion.  It may not be one full of

25  resolution, but it will be a different discussion

1   with efforts having been made to give the full

2   disclosure and obtain informed consent, and as well,

3   if I understand it, Ms. Kelly, you will have the

4   vitae of some receivers.

5           MS. KELLY:  We expect to have them

6   Tuesday morning and we will keep that process moving

7   as quickly as we possibly can.

8           MR. JACOBSON:  Your Honor, just one

9   point, when Ms. Kelly and I were talking about -- I

10  guess that was last night, we were talking about the

11  receiver issue and she indicated at that time that

12  we might be able to have some input into this

13  decision, and I'm hoping that that is still the

14  case, because in light of the rather unique

15  investment strategies that are at stake here

16  somebody with some experience in these kinds of

17  things would really be very helpful, and as I

18  indicated before, we have not been opposed to the

19  receiver concept from the beginning.  In fact, we

20  actually suggested it ourselves, you know, almost a

21  week ago, and I'm just wondering whether we could

22  still kind of maybe even have our own candidate, if

23  we can come up with somebody, one or two people, on

24  a timely basis.  In any event, if we could see the

25  vitae and have an ability to have input, I think

1    that would be helpful as well.

2              THE COURT:  So, I have in the past in

3    different contexts where the Court needed to appoint

4    a special master or a receiver, essentially had the

5    candidates come in to court and be interviewed in

6    court by hearing their presentation as to what they

7    bring to the table, having any questions put to

8    them, and having the Court have the ability to ask

9    questions bearing on their suitability to be a

10   receiver, sort of a beauty pageant, if you will, and

11   it has been a successful process for me in the past.

12   I might recommend that to you also.

13             I could set aside for the 19th a hearing

14   time at 2:00 p.m. just to -- I will have to move

15   things off the calendar, but the matters that are on

16   for that afternoon starting at 2:00 p.m. appear to

17   me to be movable and we can hold that time open, if

18   it's necessary.

19             MS. KELLY:  That's fine for the

20   government and we're, you know, open to however the

21   Court wants to proceed with regard to selection of a

22   receiver.  We have processes here in place to make

23   sure the person is appropriate, neutral and not

24   conflicted, but we will do what the Court tells us

25   to do.

1          THE COURT:  Well, you might want to, as

2  you get the resumes or when you have the contact

3  with those whose resumes you've invited, you might

4  also ask that they be available to visit snowy

5  downtown New Haven on January 19th at two o'clock.

6          MS. KELLY:  I hear it's lovely this time

7  of year.

8          THE COURT:  It is.  It is, indeed.  And

9  that might hurry things along as well, but we

10  certainly can consider whether that's feasible or

11  not at a status conference on Tuesday at 12:30.

12  Shall we do that?

13          MS. KELLY:  Very well, your Honor.

14          THE COURT:  All right, it appears as if

15  you have a plan A that may generate some positive

16  results, and I will look forward to speaking with

17  you the then telephonically.

18          Ms. Kelly, will you initiate the call?

19          MS. KELLY:  I was just about to ask the

20  Court.  We're happy to do what we did today.

21          THE COURT:  That would be fine.

22          Is that fine about you, Mr. Jacobson?

23          MR. JACOBSON:  Yes, it is, your Honor.

24          THE COURT:  And Mr. Blanchard?

25          MR. BLANCHARD:  It works.

1          THE COURT:  All right, then, I will next

2    speak with you at 12:30 on Tuesday the 18th.  I'm

3    just going to have to assume that there is no

4    greater emergency that will occur before then.  As

5    you know, court is closed on Monday.  I can give you

6    the e-mail address of my law clerk who is working on

7    this and you could contact him and he could contact

8    me and we can take whatever steps are necessary.  Do

9    you want that?

10          MS. KELLY:  Thank you, your Honor.

11          THE COURT:  All right,

12    joshua_kretman@ctd.uscourts.gov.  So, that will be a

13    point of contact for you to reach me over the

14    weekend if something must be attended to.  All

15    right.

16          MS. KELLY:  Thank you very much.

17          THE COURT:  Is there anything else?

18          MR. JACOBSON:  Thank you, your Honor.

19          THE COURT:  Anything else you think we

20    can take up at this time?

21          MS. KELLY:  Nothing further for the

22    government.  Thank you.

23          THE COURT:  Very good.  Thank you very

24    much.  Good-bye.

25

1              I certify that the foregoing is a

2      correct transcript from the record of proceedings in

3      the above-entitled matter.

4

5                                    1/31/11

6                                     Date

7

8                          /S/   Sharon Montini

9                          Official Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25