<pre>
 1                   UNITED STATES DISTRICT COURT

 2                     DISTRICT OF CONNECTICUT

 3    * * * * * * * * * * *          *
                                     *
 4    SECURITIES AND EXCHANGE        * Case No. 11cv78(JBA)
      COMMISSION,                    *
 5                        Plaintiff, *
                                     *
 6         vs.                       *
                                     *
 7    FRANCISCO ILLARRAMENDI, ET AL  * January 18, 2011
                                     *
 8                        Defendant. *
                                     *
 9    * * * * * * * * * * * *        *

10            TRANSCRIPT OF TELEPHONE CONFERENCE

11    BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12    Appearances:
      FOR THE PLAINTIFF:          RUA KELLY, ESQ
13                                LeeAnn GAUNT, ESQ.
                                  United States Security and
14                                Exchange Commission
                                  33 Arch Street
15                                Boston, MA 02110

16    FOR THE DEFENDANT           MICHAEL BLANCHARD, ESQ
      FRANCISCO ILLARRAMENDI:     STEVEN BRODY, ESQ.
17                                Bingham, McCutchen
                                  One State Street
18                                Hartford, CT 06103
      FOR THE DEFENDANT MK
19    ENTITIES:                   RICHARD JACOBSON, ESQ.
                                  Arnold & Porter
20                                555 Twelfth Avenue NW
                                  Washington, DC 20004
21
                                  THOMAS GOLDBERG, ESQ
22                                Day Pitney
                                  One Canterbury Green
23                                Stamford, CT 06901

24    Court Reporter:            Sharon Montini, RMR

25    Proceedings recorded by mechanical stenography,
      transcript produced by computer.
</pre>

1          THE COURT:  Good afternoon, counsel.

2     This is SEC v. Illarramendi and the Michael Kenwood

3     entities, docket No. 11cv78.  And do I have Ms.

4     Kelly and Ms. Gaunt for the SEC?

5          MS. KELLY:  You do, your Honor.  Good

6     afternoon.  And we also had been advised that

7     counsel Joel Mullin of Stole Rives has advised us

8     that he intends to participate in the call, or at

9     least insofar as he is present, and he represents

10    NuScale, one of the entities here.  And we have just

11    advised him that we would let the Court know that he

12    wanted to participate in the call.  I also did want

13    to note our forensic accountant Ms. Sophia Hussain

14    is also on the line.  Thank you, your Honor.

15         THE COURT:  Very good.  And for the

16    defendants, do I have Mr. Blanchard?

17         MR. BLANCHARD:  Yes.

18         THE COURT:  And then for the entity

19    defendants, do I have Mr. Goldberg and Mr. Jacobson?

20         MR. JACOBSON:  Correct, your Honor.

21    Yes.

22         MR. BLANCHARD:  And, your Honor, this is

23    Michael Blanchard.  We also have Steven Brody from

24    Bingham McCutchen for the individual defendants as

25    well.

1          THE COURT:  Good afternoon.  All right,

2     tell me the status of the ideas we had proposed last

3     week.

4          MS. KELLY:  Your Honor, this is Rua

5     Kelly for the SEC.  We have been working diligently

6     with the defendants over the weekend.  The defense

7     counsel put together a consent form, and I did just

8     want to note that defense counsel has suggested

9     structuring the investment into NuScale and Proterra

10    in such a way that the money would come from what is

11    called the Special Opportunities Fund for Michael

12    Kenwood, and as I understand it, it is a fund that

13    is essentially invested in only by the pension fund.

14    So, it only has one investor.  I believe it has some

15    related entities that invest, but, in other words,

16    the defendant would only need to get consent from

17    that single investor in order to make the proposed

18    investment.  There is also what I think is a change

19    in the total number that defense counsel is seeking

20    permission to make.  The total number is

21    $13 million, which I believe represents ten million

22    for NuScale and three million for Proterra.

23          So, I did just want to describe overall

24    that the proposal has I think shifted somewhat, and

25    while we have comment on the consent, which we

1    believe is a good faith effort by defense counsel to

2    give disclosure to the single investor, we continue

3    to have overall real discomfort with the investment

4    recommendations of Illarramendi and are concerned

5    about his independent business judgment in light of

6    the very serious allegations that the Commission has

7    made.

8              So, while we do recognize that this has

9    been a good faith effort by defense counsel, and we

10   have made some very minor suggestions about how it

11   might be structured, we would at the appropriate

12   time ask to be heard by the Court and can articulate

13   several reasons why we think it's highly

14   problematic.  One of the main reasons, that I can go

15   into in greater detail, is the fact that there is

16   nowhere for the minority investors to have a voice

17   in the decision, and this $13 million, while not

18   being invested by the minority investors per se,

19   this sort of further investment into the private

20   equity ventures would nevertheless have a serious

21   impact on them, and we think to do this without any

22   kind of notice or disclosure to them, and before

23   frankly the appointment of a receiver, seems

24   premature.

25              I did want to let the Court know also in

```
 1    terms of receivership, and I'll let defense counsel

 2    speak to the sort of core issues we're here to

 3    discuss, but I did just want to let the Court know

 4    we did identify three possible candidates for

 5    receivership, and after this call -- for a receiver

 6    appointment I should say.  After this call we will

 7    forward the CVs and proposals from the three

 8    candidates.  They're all based in New York.  The

 9    first is John Carney of the firm Baker Hofstetler;

10    the second is Robert Cleary of the firm Proskauer,

11    also based in New York; and the third is Aaron

12    Marcu, and his last name is spelled m-a-r-c-u.  He

13    was with Covington & Burling and is now with the

14    firm Freshfields.  And, again, we'll forward all of

15    the relevant materials shortly.  We emphasized again

16    this morning to defense counsel we welcome their

17    input, but that's where we are, and they are all

18    aware of the Court's desire to have a hearing

19    tomorrow at 2 o'clock and have been made aware that

20    they should plan to be present for that.

21              THE COURT:  All right, let me take a

22    little minor issue that probably can't be answered

23    right now.  Mr. Jacobson, you had voiced an interest

24    in your own candidates for receivership.  Do you

25    want to just hold off on that until you see the CVs
```

1    of these people, or do you know these people and is

2    one of these three at least someone who would be

3    appropriate in your view?  How do you want to do the

4    receivership?

5                MR. JACOBSON:  I do not know these

6    individuals personally, I obviously know the firms

7    that they're with.  With respect to our own

8    candidate, your Honor, we have spent pretty much the

9    whole time since our last call working on the

10   consent, and while I have asked whether we --

11   whether there is somebody we would like to put

12   forward, that's something we just haven't had a

13   chance to talk about and it was something I was

14   hoping to be able to do after this call.

15               So, if we do come up with a candidate we

16   would, of course, advise the Court, but as I think,

17   you know, we may have -- and I think we can get into

18   this after we finish with the consent, but we would

19   like to discuss the issue of whether tomorrow should

20   be devoted to receiver candidates or maybe there are

21   some things that ought to be considered before that

22   issue ripens.

23               But I can defer that until we've

24   finished talking about the consent because that's

25   obviously I think the key issue, and I'd like to

1   address a couple of the things that Rua said.  The

2   first thing, I want to underscore is the fact that

3   we have been working closely, and we really

4   appreciate the prompt response and actually some

5   really good suggestions made in a call this morning,

6   all of which we have adopted, and we are sending the

7   consent with the editorial changes that the staff

8   suggested that we make to the document to the PDVSA

9   entities right now, and we are, of course, hopeful

10  that we will get that consent back in time for the

11  Court to consider tomorrow granting the relief that

12  we seek, which is to permit these funds to be paid.

13          And with respect to the total, which has

14  changed somewhat from the total that I mentioned on

15  Friday, we've been talking directly with the

16  entities in question since Friday, and also we were

17  cognizant of the fact that the Court does not want

18  this to be an issue de jour and to basically have to

19  come back in two weeks for more money, and in that

20  regard we have been advised that in order to get

21  through to the end of February, at least, NuScale

22  will require two infusions, an infusion of five

23  million this week and an infusion of another five

24  million I believe in early February, perhaps as

25  early as February 1st, and Proterra requires a

```
 1    $2 million infusion this week and a $1 million

 2    infusion in early February to get it through -- at

 3    least through the end of February, and the hope is

 4    of course between now and the end of February,

 5    either through the efforts of these companies

 6    seeking additional investment or the efforts of the

 7    Michael Kenwood entities that hold equity stakes in

 8    these companies, to raise new money, not fund money,

 9    but completely new money that would be -- you know,

10    that would not be contemplated by any potential

11    freeze that might be put in place to fund -- that

12    any money that would be necessary to keep these

13    companies going beyond the end of February.

14              So, that's why we did ten and three

15    rather than the five and two that I suggested,

16    because the five and two would really actually, you

17    know, make this an issue de jour and we've tried to

18    avoid that.

19              THE COURT:  Now, Ms. Kelly mentioned

20    that a proposed structuring of the investments --

21              MR. JACOBSON:  Yes, I could discuss

22    that.

23              THE COURT:  -- so you ended up with only

24    a pension fund, but --

25              MR. JACOBSON:  Right, I need to explain
```

1    a little bit about the two funds that are involved

2    in order so this is understandable.  The private

3    equity investments have been funded to this point by

4    monies provided by a fund called STLF, Short Term

5    Liquidity Fund.  The Michael Kenwood Capital

6    Management entity, which is advisor to STLF, also

7    advises a company -- or a fund called Michael

8    Kenwood Special Opportunities Fund.  There is a

9    great overlap in investors between the two funds.

10   The investors in the Special Opportunities Fund are

11   all PDVSA entities, all entities related to the

12   national petroleum company of Venezuela, all of

13   them.  These entities also -- there are four of

14   those.  Three of those entities are also investors

15   in STLF, and in fact -- as between SOF and the three

16   PDVSA entities, they account for approximately 90

17   percent of the investment in STLF, and of course the

18   PDVSA entities account for 100 percent of the

19   investment in SOF.  And SOF currently has liquidity,

20   it has $11.5 million in cash at the moment.

21            Accordingly, given the urgency of this

22   situation, you know, we wanted to make use of the

23   fact that basically we only need consent from one

24   set of related entities in order for SOF to be able

25   to make these investments that are urgently needed

1    to keep these companies afloat, and that's why we

2    selected SOF, which it has much more liquidity at

3    the moment than the STLF fund.  In any event, so, we

4    selected SOF because we only needed the consent of

5    one investor and in that way that maximizes the

6    chances we'll get this consent on a timely basis to

7    satisfy the emergency needs of the entities and keep

8    them going, and we drafted a consent that way, and

9    we believe that this satisfies all of the 40 Act

10   requirements and provides -- we believe that this,

11   as drafted, that this consent provides full and

12   complete disclosure with respect to, you know, what

13   was necessary to allow the SOF investors to make an

14   informed consent as to whether or not to authorize

15   SOF to advance these funds as secured loans.

16             THE COURT:  May I interrupt you just a

17   moment?

18             MR. JACOBSON:  Yes.

19             THE COURT:  I take it when you are

20   referring to the pension fund entity, that this is

21   one of the PDVSA entities?

22             MR. JACOBSON:  Yes, I believe there are

23   three pensions -- separate pension fund entities.

24   Their names are -- these are all PDVSA entities and

25   their names are -- they're in Spanish (Spanish

1    pronunciation), and then the fourth entity is PDV

2    Insurance Company Limited, which is wholly owned by

3    PDVSA.

4                  So, these are all PDVSA entities.  I

5    believe three of them are pension funds, and one of

6    them is an insurance company, and the three pension

7    funds are also investors in this STLF to the tune of

8    90 percent of the money in that fund.

9           THE COURT:  All right, so that when you

10   say that you can -- it's a cleaner route, if you

11   will, to get the consent of the pension funds, is it

12   just one of these three pension entities?

13          MR. JACOBSON:  No, it's all of them.

14   It's going to all four of the investors.

15          THE COURT:  Okay.

16          MR. JACOBSON:  All the investors, it's

17   just they're basically all related.  So that's what

18   makes it cleaner, they're not independent of each

19   other.

20          THE COURT:  And the seven -- when the

21   $7 million infusion was contemplated there were

22   three individual or family investors.  They are not

23   involved with the Special Opportunities Fund; is

24   that correct?

25          MR. JACOBSON:  That is correct.  They

 1  are only investors in the Short Term Liquidity Fund.

 2              THE COURT:  So you have drafted a

 3  consent form and the background information that the

 4  SEC wanted to make sure that you shared with the

 5  investor entities and --

 6              MR. JACOBSON:  Yes, and actually we also

 7  are attaching the complaint to the form and sending

 8  it to the investors.  So they will have a copy of

 9  the complaint as well as the other disclosures that

10  we felt, our 40 Act people felt, are needed.  The

11  SEC has reviewed the draft and has made, as I said,

12  some very good suggestions this morning which we've

13  adopted, and then we finalized it and it's being

14  sent out now.

15              THE COURT:  Ms. Kelly, I realize given

16  the time constraints that everyone is working under

17  perfection is not the goal here, but appropriate

18  notice of how the money has been used and where it

19  will be used if this most recent, call it the

20  January, February infusion, is approved, what you

21  now have, in your view, reasonably satisfies the

22  requirements of the Investment Advisors Act?

23              MS. KELLY:  Your Honor, we just -- as I

24  said before, we believe it reflects a good faith

25  effort, and we are not -- we recognize the time

1   constraints here, but we, as we said before, have an

2   overall discomfort with the investment

3   recommendations.

4           But more importantly, in terms of the

5   consent, it is impossible for us to independently

6   verify any of the information regarding the

7   companies and the risk with regard to this

8   investment.  We simply can't do it.  And I just

9   wanted to give the Court one example of what is in

10  the form.  You know, there is $18 million of the

11  STLF purportedly invested in an oil exploration

12  company.  During the exam we repeatedly asked for

13  documentation so we could figure out if that was

14  held in the name of the funds for Mr. Illarramendi

15  or a company associated with him.  If you read the

16  defense consent, it suggests that -- because we had

17  asked them to explain what the fund is being used

18  for, and it says in it that $18 million is in an oil

19  exploration company in the name of the funds.  We

20  don't have a single scrap of paper that says that,

21  it is simply, as we understand, based on Mr.

22  Illarramendi.

23          It is a substantial amount of money and

24  there may be representations going out in this

25  consent that are just not -- not only that we don't

 1   have time to verify, but that cannot be verified,

 2   and it causes us great concern.  And, you know, we

 3   understand and are sensitive to the plight of

 4   companies like NuScale that are standing on the

 5   precipice here, but there may be facts that are

 6   asserted in this consent that later turn out not to

 7   be true, and we have pressed for documentation on

 8   and that we can't get.  It also is of great concern

 9   to the Commission that the minority investors are

10   not now going to have a voice in this because of the

11   change in the way this is structured.

12            When we were all together on Friday the

13   Commission had contemplated that all of the

14   investors would get notice, including these families

15   and individuals.  And, look, it is up to these

16   investors if they want to make investments, the SEC

17   is not here to stand in their way, we simply want to

18   make sure that there is ample disclosure and that

19   even the most sophisticated investors go into this

20   with eyes wide open.  But because the minority

21   investors aren't hearing about this, there is going

22   to be $13 million of MK Group assets that are now --

23   which now means that they're investing in a much

24   more leveraged vehicle, and what it means is that

25   these folks are -- that the more risk their advisor

1    takes on, the less likely it is that at the end of

2    the day they're going to get their money back, and,

3    you know, we would much prefer that a receiver look

4    at it and confirm it's a good recommendation, and we

5    do not -- we have been working very hard to get

6    these folks vetted in a timely fashion, and we're

7    talking about hopefully having someone in place by

8    tomorrow that can look at this, what is a narrow

9    issue, as quickly as possible, and, you know, we

10   have some additional concerns here, your Honor.

11            The last point I would make is that --

12            THE COURT:  Ms. Kelly, before you go to

13   the last point, can I understand this minority

14   investors' protections.

15            MS. KELLY:  Yes.

16            THE COURT:  If the -- if PDVSA entities

17   are 100 percent of the SOF --

18            MS. KELLY:  Yes.

19            THE COURT:  -- why are there minority

20   investors?

21            MS. KELLY:  There are minority investors

22   in the Short Term Liquidity Fund.

23            THE COURT:  But perhaps I misunderstood,

24   I thought the money that was going to be used to

25   fund these two entities through the end of February

1   was not going to be Short Term Liquidity Fund, but

2   only Special Opportunities Fund money.

3            MS. KELLY:  That's correct, your Honor,

4   and I should have mentioned the fact earlier that

5   the Michael Kenwood Group is proposing to guarantee

6   this as a loan to the Special Opportunities Fund.

7   So, the Michael Kenwood Group is taking on

8   additional risk that would in turn be passed along

9   to the Short Term Liquidity Fund since these are all

10  related entities.

11           THE COURT:  So, Michael Kenwood Group

12  guarantee is guaranteeing that this money that comes

13  from the Special Opportunities Fund is somehow -- I

14  don't understand the relationship between the SOF

15  and any guarantee and the Short Term Liquidity Fund

16  if the money is not coming out of the latter.

17           MS. KELLY:  If you would just give us

18  one moment, your Honor.

19           THE COURT:  Yes.

20           MS. KELLY:  I believe Ms. Gaunt is going

21  to address that.

22           THE COURT:  Okay.

23           MS. GAUNT:  Your Honor, as we understand

24  it, the defendants are proposing that -- the loan

25  that they are proposing to take from the SOF fund,

1    they will, among other things, offer a guarantee of

2    the Michael Kenwood Group, which is Mr.

3    Illarramendi's corporate entity.  Illarramendi is

4    taking on the obligation of those loans himself in

5    some respects personally.  And so, in addition -- he

6    is proposing that he will also guarantee all

7    subsequent loans that he has caused to be taken from

8    the STLF fund.

9            And so he has -- you know, from our

10   perspective, it would be that he is now proposing to

11   guarantee the 53 million that we would say he's

12   misappropriated, that he would taken, he has lent,

13   taken a loan out, so he's going to guarantee that,

14   and now he's proposing to guarantee the repayment of

15   an additional $13 million that he will guarantee

16   back to the SOF investors.

17           And so I think our concern is that to

18   the extent the STLF investors are going to have to

19   rely some day on that guarantee of the Michael

20   Kenwood Group to repay the money that has been taken

21   from that fund, the fact Michael Kenwood Group is

22   getting itself in even deeper guaranteeing an

23   additional $13 million, we think that makes the

24   guarantee --

25           MR. JACOBSON:  Can I address that?

```
 1              THE COURT:  Yes.  Also tell me about

 2    when Mr. Illarramendi is making these personal

 3    guarantees, are these secured by things that are in

 4    his name?  I mean, tell me about that.  It's all

 5    very nice to personally guarantee it, but if there

 6    isn't anything backing it up --

 7              MS. KELLY:  Your Honor, the answer is I

 8    think they're not.  We don't know that there is

 9    anything there at all.

10              MR. JACOBSON:  Your Honor, let me -- can

11    I address this point?

12              THE COURT:  Please.

13              MR. JACOBSON:  The guarantee that I

14    believe Ms. Gaunt is referring to is a guarantee by

15    Michael Kenwood Group, an entity which is

16    50.1 percent owned by Mr. Illarramendi, if not

17    wholly owned by him, and that guarantee covers all

18    of the obligations from any of the MK Group entities

19    to any of the funds both existing and the ones that

20    are proposed, that is correct, but the -- I think

21    the fundamental point here is that the entire reason

22    for this emergency funding is that if this funding

23    does not go forward, the sums already invested in

24    Proterra and in NuScale will be -- to say they're

25    being jeopardized is to understate the critical
```

1    nature of the need for those funds.

2              THE COURT:  I understand that, and

3    that's what --

4              MR. JACOBSON:  They may well be lost in

5    their entirety.  And so the use of the guarantee

6    here as somehow a reason to delay things we think is

7    actually not correct.  What is going to protect

8    those minority investors is keeping these

9    investments alive so they can be monetized and to be

10   used to pay back those investors as part of the

11   guarantee.  If these assets are destroyed or become

12   valueless because the money is not available this

13   week to keep them going, the guarantee is probably

14   not very valuable, but the investors, the minority

15   investors and the 90 percent majority investor could

16   be clearly damaged.

17             And so in balancing the equities here,

18   and I really haven't thought through the leverage

19   analysis, we just heard about it for the first time

20   this morning, and so I'm really not sure how it

21   works, but hypothetically, assuming that there would

22   be some, you know, minor value, I think it's

23   completely outweighed by the fact that without this

24   money these companies are likely to go under right

25   now as opposed to sometime in the future.

1          THE COURT:  No, I understand that, and

2     you've presented that argument with great force on

3     Friday.  The question is whether this is good money

4     after bad or whether, in fact, this infusion of

5     investors' money now is going to serve the role of

6     the protection that you argue.

7          MR. JACOBSON:  Actually in that regard,

8     your Honor, could I propose something, which is that

9     we have the consent that is going out to the

10    investor, and hopefully we'll get that back before

11    tomorrow.  In addition, we have been putting

12    together a package of materials to address precisely

13    the point you raise, is this good money after bad,

14    or are these companies that deserve, you know, to be

15    sustained because of their potential, and in that

16    regard, we've been collecting declarations, maybe

17    there are some affidavits in there, but

18    declarations, affidavits, from the companies that we

19    are putting together, you know, that we would

20    propose to submit to the Court to consider along

21    with the hopefully signed consent at a hearing

22    tomorrow, or perhaps if the consent is somewhat

23    delayed, maybe we can push the hearing to Thursday

24    at the latest, but which will I think give the Court

25    much more background and information than currently

1   is available to assess whether what we're suggesting

2   makes sense from an economic point of view, which is

3   what the SEC is raising.  And also we do have on the

4   phone Mr. Mullin, who is counsel for NuScale, one of

5   the companies who may be able to speak to both the

6   need for the money and the upside potential of the

7   company.

8                THE COURT:  Well, I'm going to assume

9   that to be the case in the interest of time.

10               But the concern that the SEC has is that

11  all of the voices being heard in the declarations

12  are on the same side, that is, Proterra and NuScale

13  need and want the money and the defendants want to

14  give them the money, and that the SEC's concern is

15  that there's no neutral there sort of deciding or

16  giving assistance to the Court or the SEC on what is

17  wishful thinking versus what is pragmatic thinking.

18  So, how do you address that?  Where is there a

19  neutral somewhere in this picture, someone who

20  doesn't have a dog in the fight?

21               MR. JACOBSON:  I understand the argument

22  and I think that certainly it would be ideal if

23  there is somebody who could be put in the middle who

24  was completely independent who could make an

25  independent judgment, but given the timing, and

1  maybe Mr. Mullin can speak to it, given the timing,

2  at least the first tranche of what we're requesting,

3  that is the two and the five, at least that I think

4  has to go out this week.

5        Now, with respect to the second tranche,

6  you know, we do have at least some breathing room

7  with respect to the second tranche, so it may make

8  sense to have somebody look at that.

9        But just to keep these companies alive

10  long enough for that judgment to be made

11  independently I think requires that that money be

12  invested, you know, imminently.  I know it's an

13  unfortunate situation, but I think that that is the

14  least bad of the choices here because that preserves

15  the status quo until a neutral or someone else can

16  make a further investment judgment.  But we do have

17  somebody from NuScale who can address that directly.

18        THE COURT:  Okay, but let me just go

19  back to this issue of what is it that the investors

20  are basing their consent, if they're going to give

21  it, on.  And I wondered, Ms. Kelly, whether this

22  proposed notice and consent form contains the SEC's

23  view that there is much that they cannot or have not

24  verified at this time, and therefore, the investor

25  should not assume that this has SEC blessing.

1          MS. KELLY:  It doesn't say anything like

2     that, your Honor.  It doesn't say we have had time

3     to independently verify, it simply says --

4          THE COURT:  I'm sorry, you are breaking

5     up, Ms. Kelly.

6          MS. KELLY:  But I did just want to say

7     one of our overriding concerns with the consent is

8     just who it doesn't go to, that the voices that are

9     being heard here don't include those minority

10    investors, and, look, they are faced with a series

11    of bad choices taken on both sides.  All we're

12    suggesting is that the better course is wait a day

13    or two days and allow their voices to be heard and

14    let them balance the relative risks and make the

15    choice with full disclosure.  And I should note for

16    the Court these three have -- all of them have U.S.

17    representatives in New York or in Florida, we have

18    been able to reach them with no trouble at all.  So,

19    it is not an inordinate heavily lifting to be able

20    to reach out to these folks in very short order to

21    triage this issue.

22          MR. JACOBSON:  I'd like to address that

23    because as the staff knows, it has taken literally

24    around the clock drafting from Friday to this

25    morning to draft a consent that we're both -- I

1    mean, forgetting for the moment the overarching

2    issues that they're concerned with, but just in

3    terms of looking at the document on its face and

4    what it purports to be, to get that to a point where

5    both we and the staff are comfortable that the

6    disclosure is basically a good faith effort to

7    advise the single related set of investors in a fund

8    that has been independently audited and administered

9    from the beginning has taken the better part of

10   almost all of four days of draftsmanship.

11           THE COURT:  So when you have completed

12   this tour de force on getting this drafted, what I

13   understand the SEC to be proposing is just drop four

14   more copies in --

15           MR. JACOBSON:  I don't think so, your

16   Honor, because I'm not -- if that's the case, that's

17   one thing, but my understanding was that they wanted

18   -- they would want the STLF consent to go into all

19   of the STLF issues, which, as the staff is aware,

20   nobody has really turned any attention to until

21   after Christmas when these issues first began to

22   surface.

23           And so I just -- you know, if the staff

24   is just saying drop this in the mail to three

25   investors, minority investors, that's one thing, but

1    if they're saying we have to redo an STLF consent

2    that goes into as much detail about STLF as is

3    available about SOF, doing that in four days or

4    14 days may be not possible because, as I think

5    we'll get into, we're going to need our forensic

6    accountant to spend quite a bit of time on STLF

7    given where that fund is at to get the information

8    that we all need, you know, to make judgments

9    regarding where to go there.

10              But I'll defer to Ms. Kelly.  If all she

11   wants us to do is to give this document to the three

12   minority investors in STLF, we'd be happy to do

13   that.

14              THE COURT:  Ms. Kelly?

15              MS. KELLY:  Your Honor, in terms of

16   dropping a copy, I think -- we think certainly it

17   would be a start to at least put them on notice that

18   this money could go out and to give them the

19   opportunity to say yes or no.

20              One thing that strikes the Commission,

21   your Honor, is that the Court doesn't have a copy of

22   this proposed document, and so I don't know if it

23   would make sense for defense counsel to at least

24   provide a copy, but there isn't -- it doesn't tee up

25   a choice for the investor other than to vote sort of

1    yes or no to this investment.  I think it would have

2    to be put to the minority investors with some kind

3    of choice.  If it's simply a notice this is what's

4    going to happen, then I'm not sure that would

5    make -- they have to be -- they have to be told what

6    their choices are in this.  But I don't think it

7    requires a great deal of redrafting.

8                I think we would have a greater level of

9    comfort if this were to go out through the receiver.

10   I think we would feel like there was a third party

11   there who was neutral and able to -- instead of

12   putting us or defense counsel or the Court in a

13   position of weighing the investment quality and

14   weighing the risks in question, there would be

15   someone there who be able to look at this for them.

16   We're not suggesting that there be a whole new

17   attempt to draft, you know, what has already --

18   redraft what has already been done, but they need to

19   be just given some kind of context, not we just want

20   to let you know this money is going out to these

21   private equities, you know, period.

22               THE COURT:  So, what's wrong with that?

23   That doesn't take much drafting to say this is what

24   is going out through the -- from the SOF and we'll

25   be in communication with you about details on the

1    STLF momentarily and there is a hearing scheduled

2    for whenever it will be scheduled, and that won't

3    take a lot of effort to be added into the packet

4    that's already been prepared to go out.   Isn't

5    that --

6                MS. KELLY:  Do you know, it wouldn't,

7    your Honor, and our only overriding concern is that

8    it not just be the defendant's representing this in

9    a vacuum to the minority investors because it at

10   this point -- you know, I understand what defense

11   counsel said about wanting to move expeditiously and

12   wanting to do that and, you know, the time it would

13   take to get the consent from the three families and

14   individuals, but to us if it goes out from the

15   defendants, you know, we've made serious allegations

16   that have real questions about the independent

17   business judgment of Mr. Illarramendi, and if it

18   were to go out, you know, under the auspices of a

19   receiver, we would have a much higher level of

20   comfort because, look, Mr. Illarramendi very badly

21   wants to do this, and he has a lot at stake here,

22   and these investors should not be pressured by --

23   you know, by anyone to make this decision.

24                You know, they can make whatever choice

25   they want, but we just feel that there would be an

1  inordinate amount of pressure placed, not by --

2  counsel has been incredibly skilled and thoughtful

3  and we have every confidence that they're proceeding

4  in the utmost good faith, but there will be

5  undoubtedly some bad choices posed to these

6  investors and they need to understand there's an

7  environment where someone is looking out for their

8  interests other than the defendant.

9          MR. JACOBSON:  Well, Ms. Kelly, that's

10  why we showed you the form and had you comment on it

11  and actually adopted all of your comments, and we

12  would certainly do the same thing with the

13  additional disclosure we're talking about here.  I

14  don't see any reason why we couldn't get that

15  disclosure done and turn it around and get a consent

16  out to those investors this afternoon even.

17          THE COURT:  Here is the problem, is that

18  I can move things around for a hearing tomorrow, but

19  the rest of the week has some fairly immovable

20  things.  Thursday is really quite spoken for.  There

21  is a suppression hearing that is critical for a

22  trial that begins jury selection February 1st.

23  We'll have to see what that looks like.  And Friday

24  I could do something -- I could move things off the

25  afternoon.  That's not perhaps enough time for you

1    all.

2              So, what about we go back to the tranche

3    idea as a way to sort of hedge the risk of urgency

4    here, have the consent go out as it has been

5    proposed and reviewed by the SEC, with the cover

6    letter for the STLF investors, what the Commission

7    calls the minority investors, saying that this

8    pertains to the SOF investment, not yours, but yours

9    are affected potentially.  And if you're asking

10   for -- but that this is being sent out having been

11   drafted by the defendants and by -- well, I don't

12   know what the involvement in that drafting by Mr.

13   Mullin has been or not been.  Anyhow, just makes

14   clear what it is they're reading and what exactly

15   this means for the minority investors.

16              That at least gets at some of the

17   Commission's concerns.  Then we can see what we can

18   get accomplished tomorrow, and if, in fact, this

19   does get turned around right away and there is at

20   least some assurance that the majority investor who

21   has the most at risk understands or has signed on --

22   I mean, if they don't, I suppose we're back at

23   square one, and that's fine, and we can possibly get

24   a receiver in place to have a look at a second

25   infusion if that seems to be the way things are

1  going.  So, there is from what you are telling me at

2  least the prospect of some graduated approach to

3  this if necessary.

4  MS. KELLY:  Your Honor, I think what

5  you're proposing, I think while we are not

6  comfortable with the consent coming from the

7  defendants because this is -- I guess just for

8  clarification.

9  THE COURT:  It's the fox guarding the

10  henhouse, I understand.

11  MS. KELLY:  Well, it's a concern.  Are

12  you suggesting that the letter go out now prior to

13  the 2:00 p.m. hearing tomorrow, your Honor?

14  THE COURT:  Yes.

15  MS. KELLY:  Am I correct, though, that

16  the money wouldn't go out until the Court has -- the

17  Court itself has ordered that those payments are

18  permissible?

19  THE COURT:  I think that's what you all

20  are seeking at this point, yes?

21  MR. JACOBSON:  Correct.

22  MS. KELLY:  Then --

23  THE COURT:  The SEC doesn't have the --

24  doesn't think it is appropriate for it to bless the

25  outgo of funds, and the best we can do under the

31

```
1   circumstances is to let the Court hear this and do
2   what seems to be appropriate, knowing that the
3   downside of inaction may be far more catastrophic
4   than the downside of further misrepresentations for
5   this smaller amount of money.
6            MS. KELLY:  Your Honor, I'm confident
7   that we can so long as the notice goes out with
8   something very -- sort of something up front that
9   indicates that the SEC has not sort of -- has not
10  had the opportunity to -- the SEC essentially is not
11  endorsing that any of these things are true and the
12  investors are welcome to reach out to us if they
13  have any questions, something along those lines.
14  I'm sure we could work with counsel, but I just want
15  to make sure it says up front -- we don't want there
16  to be any misunderstanding somehow that we vetted
17  the contents of the consent and that we're a party
18  to it.
19            THE COURT:  I would ask that it also
20  include that the Court has not heard any of this,
21  has heard no evidence on the matter thus far either.
22  So, if you make it clear that it's neither a
23  representation or imprimatur from the Court or the
24  SEC, I think that pretty well squares the corners
25  for what we can do under the timeframe.
```

1          MR. JACOBSON:  Understood.

2          MS. KELLY:  It sounds sensible to the

3     Commission, your Honor.

4          THE COURT:  Let's do that, and then if

5     you would, as things become clearer to you, you can

6     e-mail me through Mr. Kretman to tell me how you

7     want to use the hearing opportunity tomorrow.  It

8     may be that there is a receiver candidate that the

9     defendants find particularly unobjectionable, if

10    that's not too many negatives, and we may not need

11    to have any sort of a hearing that relates to the

12    appointment of a receiver and we can use the time

13    for the presentations as to what should be done and

14    what is exactly the nature of the situation with

15    NuScale and Proterra.

16         MR. JACOBSON:  Your Honor, with respect

17    to the receiver issue, we would like to put on the

18    table just, you know, if there is going to be

19    somebody appointed for something, we would like to

20    put on the table exactly what the role of that

21    person is going to be.  The name "receiver" to me

22    connotes a set of responsibilities that may -- that

23    may in this situation be subject to some refinement,

24    let's put it that way, and I think that, you know,

25    given the fact that the -- as I understand it, at

1    least, the reason the SEC filed this complaint when

2    it did and sought the relief when it did was a

3    concern about the potential violations of the

4    voluntary standstill that was in place with respect

5    to the investments in NuScale and Proterra.

6              Now that we have a mechanism to address

7    that, and maybe we have maybe some independent third

8    party to vet those investments, if we get past this

9    crisis, we're kind of wondering, you know, exactly

10   what the need would be for somebody to kind of

11   completely take over as opposed to perhaps have a

12   lesser role, or perhaps there are other ways to

13   address the main concerns that the SEC has voiced

14   today about, you know, bad investment decisions

15   being made by current management.

16             So, I mean, we think there are a lot of

17   potentially open issues that may need to be

18   addressed before we actually get to the issue of who

19   is the individual best suited to fill this

20   particular set of goals.

21             THE COURT:  Now, my contemplation with

22   respect to the receiver at this stage, this very

23   preliminary stage, is a very narrow one, and it was

24   to do what can be done in short order to give the

25   Court and the Commission the comfort level that

 1   authorizing the loan or investment of these monies

 2   is not a perpetuation of what is alleged to have

 3   been some earlier unlawful process or fraudulent

 4   acts, and that the receiver, therefore, would have

 5   the very limited role of checking out the basis for

 6   the representations related to this 13 million.

 7          MS. KELLY:  And, your Honor, on that

 8   note, I should say that while defense counsel has

 9   tried to limit the scope of -- or has tried to make

10   this request sort of all encompassing for January

11   and February, I should note that as it currently

12   reads the order says "NuScale is dependent on a

13   continuation of funding from Michael Kenwood Asset

14   Management to conduct its operations in the short

15   term and for an indefinite future period."  So I

16   don't think -- excuse me, the consent that was

17   proposed.

18          So, I just want to make clear that this,

19   you know, while we are dealing with this sort of

20   short term issue, it will undoubtedly crop up again

21   fairly quickly if they are dependent on this group

22   for an indefinite future period, and I would imagine

23   that that would also be under the auspices of the

24   receiver or that would be part of what they're

25   tasked with doing is determining whether those

1    future investments should be made.

2           THE COURT:  Well, there is a logic to

3    that, but I don't think we need to decide that right

4    now.

5           MS. KELLY:  Fair enough.

6           THE COURT:  Because it may be mooted if,

7    in fact, NuScale and Proterra find other funding, et

8    cetera.

9           MS. KELLY:  Of course.

10          THE COURT:  To answer the concern that

11   Mr. Jacobson had, which is what is this receiver

12   doing, the receiver that we are contemplating right

13   now would have the finite role of being the neutral

14   that is lacking in the equation right now to give

15   what examination can be given in a short period of

16   time to the representations being made to the

17   investors such that their consent could be said to

18   be informed by accurate statements.  So that really

19   is a very limited role, and obviously there is logic

20   that if someone is onboard beginning to understand

21   the operations of the Michael Kenwood entities and

22   these two private equity entities and all these

23   funds, there is a logic to not having to repeat the

24   learning curve, but that doesn't -- these are not

25   chiseled in stone.

```
1              MS. KELLY:  Sure, of course.

2              THE COURT:  All right, Mr. Jacobson,

3    does that satisfy you?

4              MR. JACOBSON:  Yes, your Honor.

5              THE COURT:  All right, then, so why

6    don't you carry on with examining the CVs that will

7    be sent to you momentarily, drafting a cover

8    notification or explanation to the minority

9    investors as to what it is that is attached, and

10   then at some point in the course of the day, you

11   know, up til eight or nine tonight, you can let me

12   know, if you think you need to, how we can best use

13   our time tomorrow.  What I will do, now that I see

14   you need that time definitively for some purpose or

15   another, I will now reschedule the other hapless

16   cases that have fallen in your path.  All right?

17              All right then, anything else that we

18   should go over right now?

19              MS. KELLY:  Your Honor, not for the

20   Commission, but just to be clear, until we -- I take

21   it until the short term issue of this $13 million is

22   resolved, that the Court is going to hold off on

23   ruling on the Commission's motion until this issue

24   is squared away because any sort of ruling at this

25   point would be premature?  I wanted to just ask
```

1    because I don't want to make any assumptions.

2              THE COURT:  Here is what I thought you

3    were telling me last time, that with respect to the

4    other relief sought by the Commission's temporary

5    restraining order you all had a workable standstill

6    agreement with the exception of the NuScale-Proterra

7    investments that we've been talking about and

8    focussing on.  Is that incorrect?

9              MS. KELLY:  It's not incorrect.  I mean,

10   of course, part of the reason we moved -- I mean, we

11   of course want the entity agreement going forward to

12   be under the auspices of a court order, but it is of

13   course counsel -- I mean, counsel has been good at

14   their word and we have, you know, continued to be

15   able to rely on their representations, and so, you

16   know, there has been nothing in our experience so

17   far that suggests that we would have a problem with

18   conformity to the standstill agreement.

19             THE COURT:  Well, if you all discuss

20   this and you have something that can be so ordered

21   so that it is under a court order and that gives

22   satisfaction in certain quarters, we can certainly

23   take that up tomorrow as well.  But it was not my

24   intention to delve into any other aspect that is in

25   dispute between the two sides other than this

```
 1   short-term investment.  Okay?

 2              MS. KELLY:  Okay.

 3              MR. JACOBSON:  Thank you, your Honor.

 4              THE COURT:  All right, and if that

 5   doesn't work, then you tell me why.  Okay?

 6              MS. KELLY:  Thank you very much, your

 7   Honor.

 8              THE COURT:  All right, thank you, and I

 9   will see you tomorrow at two o'clock.

10              MS. KELLY:  Very well.

11              THE COURT:  Thank you.  Good-bye.

12

13

14          I certify that the foregoing is a correct

15   transcript from the record of proceedings in the

16   above-entitled matter.

17

18                          1/31/11

19                           Date

20

21              /S/  Sharon Montini

22                  Official Reporter

23

24

25
```