```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF CONNECTICUT

 3    * * * * * * * * * * *          *
                                     *
 4    SECURITIES AND EXCHANGE        * Case No. 11cv78(JBA)
      COMMISSION,                    *
 5                       Plaintiff,  *
                                     *
 6          vs.                      *
                                     *
 7    FRANCISCO ILLARRAMENDI, ET AL  * January 19, 2011
                                     *
 8                       Defendant.  *
                                     *
 9    * * * * * * * * * * * *         *

10        TRANSCRIPT OF HEARING: RE: NuSCALE & PROTERRA

11    BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12    Appearances:
      FOR THE PLAINTIFF:         RUA KELLY, ESQ
13                               LeeAnn GAUNT, ESQ.
                                 CARLOS COSTA-RODRIGUES, ESQ
14                               United States Security and
                                 Exchange Commission
15                               33 Arch Street
                                 Boston, MA 02110
16
      FOR THE DEFENDANT          MICHAEL BLANCHARD, ESQ
17    FRANCISCO ILLARRAMENDI:    Bingham, McCutchen
                                 One State Street
18                               Hartford, CT 06103

19    FOR THE DEFENDANT MK       RICHARD JACOBSON, ESQ.
      ENTITIES:                  Arnold & Porter
20                               555 Twelfth Avenue NW
                                 Washington, DC  20004
21
                                 THOMAS GOLDBERG, ESQ
22                               Day Pitney
                                 One Canterbury Green
23                               Stamford, CT 06901

24    Court Reporter:           Sharon Montini, RMR

25    Proceedings recorded by mechanical stenography,
      transcript produced by computer.
```

```
 1              THE COURT:  Good afternoon, counsel.

 2   Please be seated.  We're here in SEC v.

 3   Illarramendi, 11cv78.  May I have appearances,

 4   starting with the Commission.

 5              MS. KELLY:  Good afternoon, your Honor

 6   Rua Kelly for the commission.  With me at counsel

 7   table, with the permission of the Court, LeeAnn

 8   Gaunt, who is also with the Commission, but has not

 9   entered an appearance in this case, and Carlos

10   Costa-Rodrigues, who is a member of this court and

11   has entered an appearance.

12              THE COURT:  Good afternoon.  And for the

13   defendants?

14              MR. GOLDBERG:  Good afternoon, your

15   Honor.  Thomas Goldberg from Day Pitney, and we

16   represent the defendant Michael Kenwood Capital

17   Management LLC and the relief defendants, Michael

18   Kenwood Asset Management LLC, MK Energy &

19   Infrastructure LLC, and MKEI Solar LP.  And with me

20   is Richard Jacobson from the firm of Arnold Porter.

21              THE COURT:  Are there any of the

22   entities you don't represent?

23              MR. GOLDBERG:  No.

24              THE COURT:  All right.

25              MR. BLANCHARD:  Good afternoon, your
```

1    Honor, Michael --

2                    THE COURT:  By process of elimination,

3    you must be Mr. Blanchard.

4                    MR. BLANCHARD:  I am, with Bingham

5    McCutchen for Francisco Illarramendi.

6                    THE COURT:  All right, our purpose today

7    is to hear you further on the ever and rapidly

8    evolving status of this case as well as to

9    preliminarily begin a process of selecting receivers

10   for a short-term process, and ultimately perhaps

11   leading to something longer term.

12                   The defendants have asked to have the

13   vetting process not conclude today, but to give them

14   the opportunity also to submit nominations for

15   further -- to be heard at a further hearing.

16                   By way of the posture -- if I may, just

17   one moment.  The posture of this case is the SEC's

18   application, emergency motion for temporary

19   restraining order freezing assets.  The assets that

20   are at issue here are the assets, as we discussed

21   yesterday, that are assets of the Special

22   Opportunities Fund and the Short Term Liquidity

23   Fund.  Is that correct, Ms. Kelly?

24                   MS. KELLY:  The scope of our motion is a

25   bit broader than that.  I think we were looking to

1   freeze any assets that are under the control of the

2   individual and entity defendants.

3           THE COURT:  When we initially started

4   speaking back on the 14th, Mr. Jacobson seemed to

5   indicate that you had an agreement with respect to

6   everything but the assets that would be used to fund

7   the NuScale and the Proterra venture capital

8   entities.

9           MS. KELLY:  That's right, your Honor, in

10  terms of an informal standstill agreement between

11  the parties.

12          THE COURT:  Okay.  So, for the purpose

13  of our TRO hearing, we are looking at your request

14  for an asset freeze with respect to assets of the

15  defendants that are specifically sought to be used

16  for these venture capital entities.

17          MS. KELLY:  That's right.  We seek, as

18  the Court knows, additional emergency relief,

19  including the appointment of a receiver, but insofar

20  as the motion to freeze assets, that is the issue

21  before the Court today.

22          THE COURT:  And you had asked in our

23  call yesterday whether I would be considering your

24  TRO application, and the answer is yes, but in this

25  narrow form by agreement.  Is that a correct

1    statement?

2              MS. KELLY:  If the -- I think the relief

3    that we're looking for is a bit broader than the

4    standstill agreement that was entered into.  The

5    defendants had agreed to -- let me back up for just

6    a moment.  I think that while we had entered into a

7    standstill agreement, there have been some requests

8    that have come from defense counsel for the ability

9    to free up additional assets, for example for

10   payment of attorney fees, for payment of sort of

11   ongoing expenses, to keep the lights on and all of

12   that.  So, even though we do have this standstill

13   agreement, it was I think the parties' sense that we

14   -- that the agreement would only hold until the

15   Court made further rulings.  They can better speak

16   to --

17             THE COURT:  All right, I just want to

18   understand what the scope of the relief that you are

19   seeking today and perhaps Friday is, and whether or

20   not given what seems to be an evolution of a -- or a

21   devolution of a standstill agreement, whether there

22   will still be open issues.

23             So why isn't -- I will just ask Mr.

24   Jacobson.  I'm just trying to put this hearing into

25   context.

1            MR. JACOBSON:  Yes, your Honor.  We have

2       an informal agreement that's been in place for some

3       time, and as Ms. Kelly indicated, we have raised

4       with her and Ms. Gaunt the issue of certain

5       carveouts that we would like to have, and what I

6       would propose that we do is that we attempt, the

7       parties, attempt to work those out amicably, and if

8       we only -- if we have issues, that we bring those to

9       the Court's attention.  Because it's my hope that

10      we'll be able to reach some agreement at least on

11      some, if not all, of them, and at a minimum would

12      narrow the issues that would require the Court's

13      attention.

14            THE COURT:  All right, is that

15      satisfactory, Ms. Kelly?

16            MS. KELLY:  I think just to -- these

17      issues have been raised by defense counsel.  It's I

18      think very unlikely given the allegations we've made

19      that the Commission is going to be amenable to

20      agreeing to the carveouts that are proposed, and

21      particularly until there is -- if the Court sees fit

22      to appoint a receiver, we would see agreeing to any

23      carveouts before the appointment of a receiver or

24      further direction of the Court as being premature.

25            So, while I don't want to unnecessarily

1   expand the scope of the hearing, I do think it's

2   not -- it is unlikely that the parties would be able

3   to on their own work out agreement as to carveouts,

4   particularly given the dollar amounts.  There is a

5   suggestion in the papers that the attorney's fees

6   could be in excess of a million dollars.  They've

7   also asked for the payment of investment advisor

8   fees as a carveout.  That's something that I think

9   we simply couldn't agree to.  So, I do think the

10  scope of the hearing will need to be a bit broader.

11          THE COURT:  All right, but not today.

12          MS. KELLY:  Not necessarily today.  I

13  think the particular emergency that drove us to file

14  was the fact that this money was going to go out to

15  the private equity ventures.

16          THE COURT:  All right, then.

17          MR. JACOBSON:  Your Honor, I do have

18  some information for the Court that might help

19  inform the proceedings, at least initially, if I

20  may.  With respect to the NuScale situation, I had a

21  call this morning with Joel Mullin, counsel for

22  NuScale.  You may recall he was on the call that we

23  had before, and he advised me that NuScale, pursuant

24  to a resolution adopted by a board meeting on

25  Monday, had intended to shut down at 3:00 p.m.

8

1   yesterday, furlough its employees, and use whatever

2   remaining funds it had in the bank to pay existing

3   obligations, and only delayed doing that because of

4   a hope as a result of the rulings and the discussion

5   that we had at the hearing yesterday, thought that

6   there was a chance that perhaps the money that they

7   need would be released today, but that if that money

8   should not be forthcoming today, he believes that

9   they will implement that plan later today that would

10  essentially shut NuScale down.

11          He also indicated that the SEC had

12  called him, I don't know whether it was this morning

13  or last night, to ask whether NuScale could get by

14  on less than the full five million that had been

15  requested, and that he consulted with his client and

16  then advised the SEC that they could not.  So,

17  that's with respect to the NuScale situation.

18          With respect to the PDVSA, we got the

19  consent out to them yesterday, and I am advised that

20  they reported back to the company this morning just

21  before I left to come here that they had received

22  the consent and are considering it, but believe that

23  they will need to confer with U.S. counsel before

24  they respond, and that they will do that and get

25  back to the company as soon as possible, but they

1   were not specific as to when that would happen, and

2   as a result, there certainly could be no guarantee

3   that that will be done today.

4            Finally, with respect to the STLF letter

5   that we talked about yesterday, we provided a draft

6   of that letter to the SEC staff last night and they

7   advised us today that they had no comments, and

8   while of course they could not approve it, you know,

9   it was our decision whether or not to send it, and

10  so that letter either just has been sent out or is

11  in the process of being set out even as we speak.

12           THE COURT:  And this is to the

13  individual or family investors.

14           MR. JACOBSON:  Well, they're all

15  corporations.  I know Ms. Kelly indicated they're

16  families, individuals, but their subscription

17  agreements indicate they are corporations of some

18  sort.  So, they're going to the subscribers at the

19  contact person indicated on the subscriptions except

20  for one investor that never bothered to do a

21  subscription agreement, but we know who that person

22  is and we know the entity involved, and it's going

23  to that person.  And actually, I believe the SEC has

24  been in contact with that person so they understand

25  who I'm referring to.

1            THE COURT:  And Provera -- what's the

2  other one called?

3            MR. JACOBSON:  Oh, Proterra, I believe

4  that the situation with Proterra is unchanged.  They

5  do need the money imminently, but I've not been

6  informed that there are any plans for them to shut

7  down if the money doesn't go out today.

8            THE COURT:  Now, Proterra had a

9  manufacturing operation going on.

10            MR. JACOBSON:  It does, actually, yes.

11            THE COURT:  NuScale does not yet.

12            MR. JACOBSON:  No, NuScale is in the

13  process of preparing -- as I understand it, NuScale

14  is in the process of preparing an application to go

15  to the U.S. government, the Nuclear Regulatory

16  Commission and others, to be certified to

17  manufacture these small modular nuclear reactors

18  that it is designing.  So, it's in an earlier stage.

19  Proterra is an actual company that has an actual

20  product that is actually on the market and is being

21  sold and they have backorders for.

22            THE COURT:  The reason I ask is to

23  understand the significance of furloughing and

24  shutting down and whether or not that is more akin

25  to a switch or a faucet.

1          MR. JACOBSON:  I understand the

2   difference and I cannot personally answer that

3   question.

4          THE COURT:  All right, then, anything

5   that you want to update me on from the Commission's

6   standpoint, Ms. Kelly?

7          MS. KELLY:  Just a couple of minor

8   factual matters that were touched on by defense

9   counsel, and then the issue of the receiver

10  candidates who are here today.  I just wanted to

11  note that when Mr. Jacobson makes reference to

12  $5 million, NuScale has in its possession additional

13  millions of dollars, approximately two and a half

14  million dollars, of MK funds.  So, I just wanted to

15  note that because the five million is in addition to

16  that money that they already have that would I think

17  likely be covered by any freeze order insofar as

18  it's proceeds of the Michael Kenwood Group.

19          I also did want to mention that when we

20  spoke with counsel at NuScale he did advise us that

21  there were no other investors in the pipeline.  We

22  inquired about any other, you know, venture capital

23  outfits or any other entities that were in a

24  position to give them funds any time soon, and they

25  did indicate that there were not.

1          So, the other point that Mr. Jacobson

2    made was that these are corporations.  It's our

3    understanding that the underlying owners are

4    individuals and families.

5          And I'm happy to explain to the Court

6    the posture of our proposal that a receiver be

7    appointed and describe who is here today, but if Mr.

8    Jacobson wants to address a point.

9          MR. JACOBSON:  Yes, I would like to

10   address the issue --

11          THE COURT:  Can I just understand one

12   thing.  The two million that NuScale has in MK funds

13   you said would be subject to the asset freeze order,

14   or no, just the five million?

15          MS. KELLY:  NuScale called us and asked

16   us that very question and we didn't -- we didn't

17   think it appropriate to give them legal advise.  We

18   think in our view a freeze on the assets would

19   include any -- if the funds were indeed

20   misappropriated, the proceeds of the fraud would be

21   in the hands of NuScale, and they do have about two

22   and a half million dollars that is not spent yet.

23   Evidently their financial needs encompass both that

24   two and a half million dollars and the new infusion

25   of capital, the $5 million.  So, in order to survive

```
 1   for the next couple of -- next couple of weeks, I
 2   think they need both the assets that they already
 3   have in their possession that could be subject to an
 4   asset freeze and they also have the -- they also
 5   need the $5 million infusion, is what we are told by
 6   counsel.  But I think reading the language typical
 7   to an asset freeze, I think it would include any
 8   monies that are traceable.
 9             MR. JACOBSON:  NuScale counsel raised
10   that point with me.  I'm sorry, I didn't mention it
11   before.  They would respectfully request that
12   whatever the judge does with respect to the money
13   that is in the hands of Michael Kenwood, under the
14   direct control of Michael Kenwood, that the Court
15   permit them to use those funds to defray the
16   expenses that they have already incurred and are
17   owing.  And I have not looked at the law on this,
18   but I think that it is -- I mean, this Michael
19   Kenwood -- it's certainly a very indirect link, and
20   I would at least propose that whatever the Court
21   does, it permits NuScale to use the funds that it
22   already has in its possession, which it has had for
23   some time, to help it shut down in an orderly
24   fashion.
25             THE COURT:  All right.  Now, without
```

```
 1    consent of PDVSA or obviously any of the STLF

 2    investors, I take it we can't proceed further today

 3    on the issue of authorizing limited funds to be

 4    expended.

 5              MR. JACOBSON:  I have a thought on that,

 6    your Honor, if I may express it.  It's certainly the

 7    case that we would not be asking the Court to

 8    release the funds prior to receipt of the consent.

 9    We don't think that's appropriate.  However, what we

10    would like to put on the table for consideration is

11    the possibility that the Court might indicate that

12    if that consent is returned and if the SEC

13    acknowledges that, in fact, it is a consent to the

14    investment, that if that should happen tomorrow,

15    which I understand is a day that the Court does not

16    have any time, that the funds be allowed to be

17    disbursed to NuScale, and what we are hoping is that

18    we might be able to persuade NuScale to once again

19    defer its shutdown plan for 24 hours to see if that

20    happens.  And we would not -- we do not think that

21    the same urgency applies to Proterra, at this point

22    we could wait until the Court has some time on

23    Friday.  But with respect to NuScale, it is

24    exceptionally in imminent peril.

25              THE COURT:  All right, anything else
```

1    about the funds and NuScale and Proterra?

2              MS. KELLY:  Not for the government, your

3    Honor.

4              THE COURT:  All right, may I hear your

5    proposal and introductions on the receivers.

6              MR. JACOBSON:  Your Honor, before you do

7    that, I'd like just to make kind of a preliminary

8    comment about the receiver issue.  As we understand

9    it, based on what the Court indicated yesterday,

10   that the immediate issue with respect to the

11   receiver is evaluating the pros and cons of

12   continuing the investments in the private equity

13   companies, NuScale and Proterra.  This is obviously

14   a business decision, in our view, that we submit is

15   one that needs to be made by a business person and

16   not by a lawyer, and we have a number of potential

17   candidates that fit the profile that we think is the

18   most appropriate.  We were only able to get one here

19   today, another one is in Mississippi, could be here

20   for Friday, and we're trying to reach out to other

21   potential candidates.

22              But in that regard, we think it is

23   premature to go forward with the distinguished

24   candidates that the SEC is proposing in light of

25   what we understand is the actual mission that this

 1    particular receiver would be asked to undertake.  I

 2    mean, these are very distinguished individuals, they

 3    have long resumes and they are used to

 4    receiverships, and I think that at the time the SEC

 5    talked to them they contemplated a much broader,

 6    in-depth receivership that would involve many more

 7    people and virtual SWAT teams.  But we think in

 8    light of what the Court said yesterday regarding

 9    what is at stake here, that frankly these

10    individuals do not fit the profile we should be

11    looking for and we just think it would be in

12    everybody's interest, in light of what the Court

13    said yesterday, to all, you know, go back and kind

14    of rethink what it is that the receiver is going to

15    be doing and then what is the right kind of person

16    to employ to undertake this task.

17              Do you know, if our candidates, which

18    we'll submit, you know, need a lawyer, it should

19    kind of morph into an engagement in which a lawyer

20    is required, and they obviously could hire one,

21    whereas if it's a lawyer who is appointed in the

22    first instance, we think that by the very nature of

23    the initial assignment they would need to retain a

24    financial advisor, a business person, a consultant,

25    and frankly, we just don't see there is an immediate

1    need for a middleman, particularly the ones as

2    distinguished, and frankly as expensive, as the

3    candidates that the SEC has proposed.

4              So, I guess in our view, just again

5    based on the way the Court has analyzed it, we just

6    don't see that this is a situation that calls for,

7    let me say, the nuclear option, which is what I

8    think was contemplated when the SEC spoke to these

9    gentlemen, and if you look at their proposals that

10   is I think what they contemplate this is involving.

11             And so I just think that, you know, that

12   this is something that we should reconsider before

13   we decide who to hire.

14             And there is also another point, which

15   is we don't think this is a decision that needs to

16   be made either now or, for that matter, this week.

17   The first tranche of funds has to go out.  If it's

18   going to do any good, it has to go out relatively

19   immediately, and it's hard for us to see how anyone,

20   whether a lawyer or a businessman, or whoever, could

21   get up to speed in time to make an informed decision

22   regarding this first tranche.  We recognize, I think

23   as the Court did yesterday, that while we are faced

24   with perhaps, you know, bad decisions one way or the

25   other, we submit that the best bad decision to make

1    is to attempt to keep these entities alive until an

2    independent fiscal agent or businessperson can be

3    put in place who can evaluate whether or not it

4    makes sense to continue with the investments that

5    have been contemplated in our request.

6              THE COURT:  Now, we discussed yesterday

7    that the receiver would have a limited role of

8    checking out the basis for the representations that

9    are related to this 13 million, which is the

10   representations that apparently have now gone out to

11   PDVSA in the form of the notice and consent and will

12   go out -- or are in the process of going out to the

13   other investors, the STLF investors.

14             Why is that -- and the purpose of that

15   was the fox in the henhouse analogy that we were

16   using yesterday, which is it's all entities with

17   interest on one side of the ledger, if you will,

18   that are drafting the consent, sending the consent

19   out and having the communications, and that the

20   existence of a neutral in that process was one that

21   enhanced, to some extent, a comfort level on which

22   of the bad decisions to make.

23             So, I see this as something that, while

24   it's a pretty immediate decision, it would seem to

25   me that one who is familiar with the kinds of

1   representations necessary to get an informed consent

2   could be other than a businessperson, but, in fact,

3   one familiar with the Act and other of the

4   requirements.  Do you disagree with that?

5           MR. JACOBSON:  I guess I was focussing

6   more on the issue whether the neutral was going to

7   be interposing its business judgment for that of the

8   investment manager.  Ms. Kelly I believe mentioned

9   their concern with the investment judgment of the

10  current management, and what I was thinking was what

11  would be appropriate to be put in place in light of

12  that concern was somebody who had the skill set to

13  make that investment decision who was not the

14  current management, and I was focussing on that

15  aspect.

16          But even with respect to evaluating the

17  completeness and the appropriateness of the

18  representations, again, the applications that have

19  been submitted suggest that there is something

20  completely different that has been contemplated by

21  the staff, something that is, you know, more akin to

22  the invasion of Grenada rather than extending

23  diplomatic relations in order to come to a

24  resolution independently of what, you know, one side

25  is arguing should be the case, and even in that

1    sense I think it would be appropriate to step back

2    and decide whether, for example, what they really

3    want would be -- it may be that they want a 40 Act

4    lawyer, this is really a 40 Act issue, as opposed to

5    whether or not that consent stands.  And while I'm

6    sure all of these firms have distinguished 40 Act

7    counsel, again, what they're contemplating are huge

8    teams, a very expensive and global endeavor that we

9    think is really overkill at this point.

10             THE COURT:  Well, that may be, and we

11   may be tranching more than just money and issues for

12   the purpose of finding a very short-term solution,

13   but, for instance, one of the exhibits in the

14   Commission's papers is I guess one of the offerings

15   in the Venezuelan bonds, or whatever it is, and it

16   talks about redeemable on 30 days' notice.  Well, if

17   the information that went in the notice and consent

18   doesn't mention either the continued right of

19   redemption or that there is no right of redemption,

20   and NuScale, as you mentioned, is not going to be on

21   line for several years in terms of return, these are

22   things that my guess is a neutral can tell the Court

23   whether this is a big deal or a little deal in a way

24   that can be done with relative dispatch, and whether

25   that's a one 40 Act lawyer or what, it seems to me

1    that it perhaps at this initial stage just

2    immediately prior to the issue of the investment

3    judgment has some -- it has some appeal to have a 40

4    Act lawyer for that limited purpose.  That said,

5    it's someone who has to not get a lot of sleep in

6    the next few days, right?

7              Why don't we proceed to hear from the

8    candidates and get their views about what is doable

9    or necessary.  Hopefully they are up to speed on

10   where we are, which changes every day.

11             Ms. Kelly, do you want to tell me what

12   the staff had in mind when you selected these

13   people.

14             MS. KELLY:  Certainly, your Honor.  I

15   mean, just to put this in context, what the

16   Commission is looking for is to have someone who --

17   a receiver who is an officer of the court, and we

18   want to make sure that a neutral person who is not

19   conflicted in the way that Mr. Illarramendi and all

20   of his entities are because they have personal

21   investments that they're trying to save.

22             I think what we were looking for, and

23   what I think the Court will find -- and Mr. Jacobson

24   makes a fair point, which is we need someone who has

25   experience dealing with business.  All three of

1  these candidates I think can probably speak far

2  better than we can to their experience giving advice

3  to corporate clients, and they can speak to the

4  Court and talk about their qualifications to be able

5  to make a determination here as to what the best

6  steps are going forward to minimize risk and loss to

7  any investors at all, and we think they're fully

8  capable of making the assessment needed.

9        And, your Honor, just to be clear, the

10  candidates who are here, and it's Aaron Marcu from

11  the firm of Freshfields, John Carney from the firm

12  Baker Hostetler, and Robert Cleary from the firm

13  Proskauer.  They all have extensive experience and

14  also have teams that have pretty deep resources in

15  dealing with corporate clients.  So, I think they

16  can probably speak to it better, but we have been

17  clear that this is a narrower scope.  The proposals

18  that they submitted are -- you know, they wanted to

19  make clear that they can do all of the things that a

20  receiver could ultimately be asked to do, but they

21  are aware that what we are talking about right now

22  is a much more narrowed focus.

23        So, I hope that helps the Court to

24  understand that these folks understand the urgency,

25  but the more narrow nature of the task at hand.

1              THE COURT:  All right.  Now, I have not

2      received any proposals or CVs or anything.  Do you

3      know that?

4              MS. KELLY:  We have copies of all of the

5      relevant materials for the Court, for your

6      consideration, including CVs, proposals, and defense

7      counsel were sent the materials immediately after

8      our call.  With the Court's permission, may I hand

9      them up to the Court?

10             THE COURT:  Thank you.  Now, as you know

11     the Second Circuit in attorney's fees petitions has

12     endorsed the community rate rule.  I can see from

13     these rates that that would not be the case if

14     people were, in fact, selected to get their ordinary

15     hourly rate.  Have you had any discussions with any

16     of these candidates with respect to accommodations

17     in their rates sought?

18             MS. KELLY:  I believe all three in their

19     proposals indicate that they're all proposing to

20     take a discount off of their usual rates, and if --

21     I know under certain circumstances, for example if

22     there was some kind of voluminous document review,

23     they can make further accommodations to make sure

24     that folks who have significantly lower rates will

25     do it.  I think two of the three proposals get more

24

```
1   specific about how heavily the rates will be

2   discounted, but I think all three contemplate some

3   type of discount for this proposal.

4             THE COURT:  All right, Ms. Kelly, should

5   we proceed by asking each of these people to come

6   and describe what they think particularly -- what

7   particular credentials they have that will serve us

8   in the very short run as well as the larger picture.

9   I'm more interested in the short run right now.

10            MS. KELLY:  If that makes sense.

11  Whatever is most helpful to the Court, your Honor.

12            THE COURT:  All right, why don't we

13  start.  Should we start with Mr. Carney?

14            MR. CARNEY:  Thank you, your Honor.

15  It's a pleasure to be here today.

16            THE COURT:  I'm glad that you could

17  come.  Thank you.

18            MR. CARNEY:  I'm probably not on the

19  same level of knowledge as counsel or the government

20  because we haven't been apprised of everything, but

21  we have been apprised of a lot from the Commission

22  and do understand I think what the Court wants to

23  get done in the short term is to understand these

24  two investments and the funding for these two

25  investments.
```

1          I feel honored today to be included in a

2    class with my two colleagues, who I think the Court

3    couldn't go wrong picking any of the three of us.

4    What distinguishes myself and some of my colleagues

5    who are here -- and I did bring more colleagues, and

6    I don't want the Court to think that was because we

7    were thinking yes, we had to staff this up, we

8    understand we'd work for the Court.  We understand

9    that the Court is -- this is the type of situation

10   where if you wanted to take physical possession of a

11   place today, we stood ready to do that today.  So,

12   we come ready to serve and to be out there to do

13   what's necessary to protect the investors and to

14   serve the wishes of the Court.

15          I probably -- I was a CPA with KPMG for

16   five years before law school, and then joined the

17   Securities and Exchange Commission for four to five

18   years in Washington D.C., and then had the pleasure

19   of working as an assistant United States attorney in

20   the District of New Jersey where I had the special

21   privilege of working for one of the U.S. attorneys,

22   Mr. Cleary, as one of his assistants.  Mr. Cleary

23   did me a further honor by assigning me to assist

24   him, and later take over, the Cendant securities

25   fraud case, which I tried before Judge Thompson in

1    Hartford.

2              So, I have had some experience in

3    Connecticut, and actually lived up in Hartford for a

4    year and a half trying one of the largest

5    accounting, securities fraud cases I think--

6    certainly in the District of Connecticut and

7    possibly around the country, eight and a half

8    months.

9              THE COURT:  Did you try it all three

10   times?

11             MR. CARNEY:  Oh, gosh no.  I believe in

12   doing something once, and so I -- after the first

13   time, your Honor, if I may seek your indulgence, I

14   was 15 years in the government, two small daughters,

15   driving home over the Bear Mountain Bridge in my

16   semi-broken down Volkswagen in the middle of winter

17   with -- the heater was off, and I was actually icing

18   the front of the windshield and I would have to stop

19   at a Dunkin Donuts every 20 minutes and actually put

20   coffee cups up to actually defrost the window.  I

21   took that as a sign from God it was time to go into

22   private practice to both ensure my daughters'

23   college education and to buy a car, and that's what

24   happened, and since the last five years I've been

25   with the law firm Baker Hostetler in New York City,

1    where I practice in the securities and

2    investigations, you know, practice.

3              Of special note is that the firm and my

4    partner, Irving Picard, was picked as the Madoff

5    trustee, and I was one of the lead counsel, along

6    with some of my colleagues here, in securing the

7    premises and getting ahold of the evidence and

8    pulling back assets.  So, we are very -- if the case

9    every took that turn, we are very experienced in the

10   ability to, you know, take hold of an entity,

11   preserve the assets and work really in the

12   investors' interest.

13             So, I understand there are really two

14   kind of overriding goals here.  It comes down to

15   being effective and doing what the Court needs, and

16   being effective and not too expensive at the same

17   time because we understand that.

18             I think the Court, and maybe all the

19   other parties, get a little extra with me because I

20   not only have a CPA exam --passed the CPA exam, I

21   practiced for five years.  I consider myself to be

22   one of the most financially fluent lawyers I know,

23   certainly one of the most financially fluent

24   investigators.  I know how to read income

25   statements, balance sheets, cash flows, and I'm good

28

1    at it.  I believe that I can go through a company's

2    financials and be able to provide the Court with a

3    realistic assessment, without even employing a

4    forensic accountant, almost immediately as to what

5    is going on.

6              When I look at the issue that's before

7    the Court today with almost no facts, I, in my mind,

8    think about the fact that there were offering

9    documents that made specific representations as to

10   where the money was going to be used, if the money

11   was going to be used in these investments, and I

12   understand that once the money is there, again, the

13   interest is protecting these investors, and so the

14   Court would -- and all the parties are concerned

15   whether to continue to fund them or not.

16             And so, I believe that, you know, I

17   could be on a plane, if need be, you know, this

18   evening, or if I could -- I'm absolutely chomping at

19   the bit to get ahold of the financials for these

20   entities, and I can really -- I really believe that

21   I can be quick with the Court -- to the Court as to,

22   hey, are there really going concerns here.  Because

23   I heard the term "going concern" and that means a

24   lot of things to an accountant.  Are they really so

25   liquid?  And what goes through my mind now is this

1    infusion of capital, is this prolonging the

2    inevitable or is it going to actually turn these

3    entities in a way that's going to be useful for the

4    victims in this case.

5          And so, I take that look from the very

6    beginning, your Honor, as to what is going on in

7    these companies.  The propriety of whether to

8    continue the funding is something more complicated,

9    but to be able to advise you, your Honor, as to

10   whether, hey, this is where these companies stand,

11   this is what this money is going to be used for,

12   this is how long these companies will be able to run

13   with it, and some type of assessment as to a longer

14   term.

15         If selected I could do that in the short

16   term, your Honor.  If selected for a longer term

17   engagement, certainly I would engage probably

18   forensic accountants, ones who I work with all of

19   the time.  And being a CPA, your Honor, I tend to be

20   a little bit cheap and I know where the money is,

21   and I'm all very mindful of whose money this is who

22   will be paying our bills.

23         I'm not exactly sure what the community

24   rate says for this part of Connecticut.  I'm

25   confident that New York rates are not it, and so

while we've personally agreed to take a significant

reduction, I would be open, if selected, to being

even more flexible.  I view it as a public service

and honor to appear in the court and honored to

serve the Court if selected.

        We have another -- one last thing that I

think my firm has that the two fantastic firms that

would be the alternatives may not have, is we're a

national firm with offices with incredibly talented

people in places like Cincinnati, Columbus, and

Cleveland, and I have got a feeling that the

community rate out there is lower than the community

rate even here, your Honor.  And when it comes to --

and very, very talented people.  So, when it comes

to staffing part of this engagement, I believe that

I can probably do it with fantastically educated and

trained lawyers at a rate that is going to be really

hard for other firms to touch.

        So, if there is any questions, your

Honor.

        THE COURT:  What experience have you,

yourself, had with the Advisors Act?

        MR. CARNEY:  Your Honor, actually

probably just investigating fraud, you know, my

years with the Commission investigating fraud, and I

1    don't -- and while I appreciate the comments of

2    counsel as to whether they need a 40 Act lawyer, I

3    think what you really need is kind of a savvy

4    accountant lawyer.  I mean to pump myself a little

5    bit because I think that's really what is going --

6    that's really the first thing.  I don't think a 40

7    Act lawyer is going to be able to look at these

8    financial statements and look at these companies and

9    be able to tell you any better than the two great

10   litigators and myself, other than the fact that I

11   have this financial training.  And I'm involved in

12   public companies and private companies who are in

13   distress every single day.  This is what I do.  I

14   really don't practice in other areas.

15           And so, again, I can get to that.  If

16   there are fine points of law for the 40 Act, which

17   I'm not exactly seeing, your Honor, I think it's

18   more of -- I take counsel's point about the fact

19   that you need some business acumen here to

20   understand this better.  I think I have that.  I

21   think I have that more than a lot of 40 Act lawyers.

22   And to the extent I need to consult with corporate

23   lawyers, my firm, we're a law firm of 700 people, I

24   can certainly do that.  And to the extent almost --

25   I'm surrounded by friends and colleagues from all my

1    years who are top accountants around the country and

2    40 Act lawyers.  So, I'm confident that I can answer

3    any question the Court has.

4              THE COURT:  As you perhaps heard today,

5    the greatest immediacy is to be able to have a

6    sufficient record to make a decision about whether

7    further investor funds should be permitted to be

8    expended where they would otherwise be characterized

9    as assets to be frozen, being the subject of, in

10   some way, the alleged fraud and unlawful

11   misrepresentations.  The undertaking that counsel

12   have been doing in the last few days is to inform

13   what is a predominate investor of what all of the

14   claims are against the defendants, what the desire

15   is to do with more of their money, which is not what

16   was originally to be represented what they would do

17   with their money, and to obtain their consent.  Is

18   that -- how would you approach that task?

19             MR. CARNEY:  Well, your Honor, I was

20   pleased when I learned from the Commission the list

21   of investors is not in the thousands or the

22   hundreds, but is actually much smaller, and so there

23   is a much greater chance to get one's arms around

24   the investor class and what the investors actually

25   want.

1          THE COURT:  Yes, I think we've actually

2    got one.

3          MR. CARNEY:  Well, one does not --

4          THE COURT:  Getting arms around one is a

5    different thing.

6          MR. CARNEY:  One is good, but I think

7    about all of the other ones who are not the one, and

8    so to the extent that -- again, I am not -- I

9    wouldn't be an advocate in this case, but I would

10   want to gather the maximum amount of consents from

11   the individuals because I do understand that money

12   was invested contrary to what was represented to

13   them.  Now, mindful of their interest, their

14   interest in recovering the maximum amount of their

15   investment, if they believe -- and they're given

16   full, truthful information as to the nature, scope

17   and circumstances surrounding the funding of these

18   entities, and a true picture of where these entities

19   are, that's something that I could gather and report

20   back to the Court.

21          I have to imagine that these companies,

22   whether they are actually in production stage or --

23   I guess the nuclear energy company in pre-production

24   stage -- has financials.  Hopefully, they've been

25   audited and hopefully one can get their arms around

34

```
1    it.  If it's a situation where it's a much longer

2    term project, that's going to be a harder issue for

3    lawyers to address as to whether they want to

4    continue something like this for years or whether it

5    makes sense for possibly, you know, to get their

6    arms around this investment, liquidate this, and let

7    them invest their equity, if they wish.

8              Again, that's not a decision in the

9    foreseeable period, but certainly I would want to

10   talk with defense counsel and understand their

11   position fully and their expert as to what is going

12   on, and I have a feeling the more cooperation,

13   whoever the receiver is that is picked, the quicker

14   they'll be able to get to that answer.

15             But it comes down to math and simple

16   economics as to whether this was a really wise

17   investment or having good money chase bad, and

18   that's certainly something I know the Court doesn't

19   want to have and that I would be diligent in making

20   sure the Court was making an informed decision.

21             THE COURT:  All right, any questions,

22   Mr. Jacobson or Ms. Kelly?

23             MS. KELLY:  Not for the Commission, your

24   Honor.

25             THE COURT:  Mr. Jacobson?
```

```
 1                    MR. JACOBSON:  Not at this time, your
 2    Honor.
 3                    THE COURT:  Thank you.
 4                    MR. CARNEY:  Thank you, your Honor.
 5                    THE COURT:  All right, thank you very
 6    much.
 7                    MR. CARNEY:  One last thing.  I know
 8    there was no request for references, but if the
 9    Court would like to inquire, certainly Judge
10    Thompson, I have not called him, but I was before
11    him for a year and I'm sure he'll give you an honest
12    assessment.  Also, an honest assessment from Richard
13    Schechter, an AUSA in Bridgeport, and the Honorable
14    Herbert J. Stern is an acquaintance of mine, who I
15    have worked with extensively, who I spoke with
16    yesterday and would be happy to speak with you about
17    my abilities.
18                    THE COURT:  Mr. Goldberg and I have both
19    had the honor and pleasure of clerking for Judge
20    Stern.  So, thank you very much.
21                    Mr. Marcu.
22                    MR. MARCU:  Good afternoon, your Honor.
23    Aaron Marcu.  Pleasure to be here.  If I can just
24    hand a card, if I could, to the reporter.  My name
25    is about as hard to spell as the individual
```

36

1  defendant is.  So having a card in front --

2              THE COURT:  But shorter.

3              MR. MARCU:  It's shorter.  Your Honor,

4  as you can see from my application and the profile

5  that I submitted in support, I have been practicing

6  for 30 years.  My first 10 were basically on the

7  public service side, clerking for a judge in the

8  Southern District and then seven years in the U.S.

9  attorney's office in the Southern District where --

10  and I guess I'm the old man here since I had the

11  pleasure of being the tutor of Mr. Cleary when he

12  worked in my unit in the Southern District decades

13  ago, I'm sorry to say.  And I have to agree with Mr.

14  Carney, that you do have -- at least two out of the

15  three candidates here should make you feel very

16  comfortable.

17              My experience since I left the U.S.

18  attorney's office where I had been the chief of the

19  major crimes unit, among other things, and the

20  associate U.S. attorney, has been on the private

21  practice side representing clients in a whole

22  variety of matters, principally in white collar

23  investigations and related civil matters.  I have

24  counselled businesses, including investment advisory

25  businesses.  I have represented them in

1    investigations.  I have examined problems that

2    they've had and assisted them solving them with or

3    without the government's help.

4              I have served -- I've had the honor of

5    serving as a receiver twice before and had to take

6    over investment firms.  In one case the business was

7    not a registered investment advisory business,

8    although it was an investment advisory business, and

9    ultimately after analysis had to close the business

10   down and gather assets, ultimately distribute them

11   to the investors who turned out to be victims of a

12   scheme.

13             In the second case there was an

14   operating and registered broker-dealer and

15   investment advisory business, and in that case

16   ultimately it was determined that the owner/operator

17   of the business was also engaged in fraudulent

18   conduct of a wide-scale nature and SEC came in to

19   take over the businesses.  In fact, Mr. Picard was

20   ultimately the trustee appointed to take over those

21   businesses, and I then became the receiver, instead

22   of the businesses promoting assets of the owner, and

23   we undertook to manage them and ultimately sell them

24   and return the proceeds to the victims.

25             So, in terms of the matter here, we

1    don't have -- we're not presented with a series of

2    allegations that suggest there is a similar type

3    situation where there is clear evidence of

4    fraudulent conduct that at least equates with what I

5    previously encountered in terms of essentially

6    stealing the money of investors and using it

7    wholesale for the purposes of the advisors.

8    Instead, there is a suggestion here of a

9    misappropriation, perhaps an -- and that may or may

10   not be too strong of a word to describe what has

11   happened.

12              So, I would see the principal objective

13   here in the short term to determine what the

14   investors want to do with their funds, because

15   whether or not investing in either of the start-up

16   businesses that have been described, or others that

17   have described in the declaration that was submitted

18   before the Court, is a good idea, it seems to me to

19   be one that is really for the investors.  If they

20   are confident that they had entrusted their funds to

21   an advisor and advisory services and hedge funds

22   that are, to their mind, competent and trustworthy,

23   and they're prepared to follow the advice of the

24   advisors, even if it ultimately is obtained in part

25   retrospectively, that's really their business, I

1  think.  The important thing is to determine whether

2  the funds are being managed in the way the investors

3  intended or are prepared to modify their

4  understanding.

5          So, my approach would be to start by

6  communicating with them and confirming that they

7  know what has happened to their funds and that they

8  are prepared to continue, or not prepared to

9  continue, with the investments as they currently

10  exist.

11          The secondary question to me is the

12  investments that are currently before the Court as

13  the matters for decision.  It may be that the

14  nuclear business will have trouble continuing in

15  operation without an immediate infusion of funds.

16  It's not clear based on what little I know that that

17  result would be either detrimental to the investors'

18  long-term interest in terms of the investment that

19  has already been made, or that some further period

20  of delay so that a sensible decision could be made

21  and the investors' intentions can be determined

22  would have a negative impact on the funds that have

23  already been invested.

24          THE COURT:  Time is not on our side, as

25  you heard today.

1            MR. MARCU:  So I hear, that is the

2      assertion that's made.  I just haven't -- I don't

3      have any real sense of the facts at this point to

4      understand what the impact would be.  And, again, I

5      think that before a decision is made as to whether

6      additional funds should be invested in those

7      businesses, the investors' intentions should be

8      clearly determined, particularly given at least the

9      indication that there has been some disconnect

10     between what the investors were originally told and

11     what has happened with at least some of the funds.

12            I should just add, to address the

13     Court's obvious concern about the professional

14     background and competence of a lawyer to make

15     decisions about a business, that I also would want

16     to consult, if a decision were to be made as to

17     whether additional funds would be committed to these

18     particular businesses, with my colleagues.  I have

19     partners who are extremely experienced in private

20     equity investment, in energy, in start-up ventures,

21     in venture capital, and have, including energy

22     infrastructure, a very experienced collection of

23     partners who engage in that business as -- on the

24     law side of course, for their clients who are

25     investing in that sort of -- those sorts of

1  businesses.  I would want to consult with them to

2  get their guidance as to the nature of this

3  business, what the structure of the businesses are

4  and what professional -- if necessary, what

5  professionals might be appropriate to consult who

6  could provide some further guidance to whether the

7  investments are wise to either continue with or to

8  supplement.

9           THE COURT:  Do I recall that Freshfields

10 has had involvement in litigation involving

11 Venezuela and Venezuelan undertakings?  The reason I

12 ask that is, as you may have heard earlier, the

13 original representations were that the money would

14 be invested in short-term Venezuelan bonds, and that

15 the major investor in this narrow picture we're

16 taking right now is PDVSA, the Venezuela petroleum

17 entity.  Is any of that any sort of conflict?

18          MR. MARCU:  I confess that I'm not yet

19 familiar with who the investor PDVSA is.  Is that

20 the Venezuelan national oil company?

21          THE COURT:  Someone else is going to

22 have to tell you.

23          MR. JACOBSON:  Yes, it is.

24          MR. MARCU:  I would have to look

25 further, your Honor.  We do, in fact, represent

1    Conoco, which owned billions of dollars of oil

2    producing properties in Venezuela, in litigation

3    against the Venezuelan government.  That case, in

4    fact, has recently gone to trial before a panel of

5    international arbitrators.  What role PDVSA had in

6    any of that I don't know and I would have to

7    determine.

8              THE COURT:  All right, any questions for

9    Mr. Marcu?

10             MR. JACOBSON:  No, your Honor.

11             MS. KELLY:  Your Honor, it's not really

12   a question from the government, but the Court had

13   raised an issue of fees and I just wanted to give

14   Mr. Marcu an opportunity to address that.

15             MR. MARCU:  Thank you very much.  Your

16   Honor, as I mentioned in my application in the

17   previous two receiverships that I've been honored to

18   be asked to handle, we made arrangement with the

19   courts to reduce our fees in consideration of the

20   fact that it's a public service and an honor to be

21   selected for such an assignment.  In both those

22   cases, we agreed to reduce our fees to 80 percent of

23   our standard rates, and in this case I've suggested

24   a 75 percent -- a discount to 75 percent of my

25   ordinary rate since I will be the -- I would be the

1    person who's most honored by the appointment, and

2    that we could discuss, of course, but that's the

3    proposal that we have made and thought that it made

4    sense in light of the nature of the assignment.

5              THE COURT:  All right, thank you very

6    much.

7              MR. MARCU:  Thank you, your Honor.

8              THE COURT:  All right, then, Mr. Cleary.

9              MR. CLEARY:  Yes, your Honor.  Good

10   afternoon, your Honor.  Robert Cleary from Proskauer

11   Rose.

12             THE COURT:  Good afternoon.

13             MR. CLEARY:  Your Honor, before I tell

14   the Court a little bit about myself and what I see

15   the issues to be resolved here, I want to inform the

16   Court of a conflict issue that I just found out

17   about last night and apprised the SEC of early this

18   morning.  First of all, we don't represent any of

19   the relevant entities or people involved in this,

20   but I found out that Proskauer represents an

21   investor in the nuclear company.  We didn't

22   represent them in connection with making the

23   investment, but rather when they were concerned

24   about their investment and protecting their

25   investment, some of my corporate and tax partners

1   spent a brief period of time consulting with them

2   about that.  That may be an issue for the Court, and

3   I would certainly understand that.

4            But I just want to just spent a moment

5   telling the Court how I think that could be helpful

6   to the matter at hand here.

7            I agree with Mr. Marcu that one of the

8   key questions here is what do the investors want to

9   do.  What is their interest?  How do they see their

10  way out of this problem?  And I think given

11  Proskauer's relationship to another investor, which

12  I would recommend the receiver talk to as many

13  investors as they can in any event, but given

14  Proskauer's relationship to at least one investor in

15  the nuclear company, it would be very helpful to try

16  to meet with them.  Undoubtedly we could do that on

17  very short notice, start to develop some facts very

18  quickly and, most importantly, try to understand

19  what they as an investor and the other investors

20  want to do.

21           I do anticipate that with the private

22  equity companies there is going to be a number of

23  upset investors, and I think from the receiver's

24  point of view, the receiver should be coming in not

25  with a view towards litigation, but rather with a

1    view towards cooperation and negotiation among all

2    the investors to try to find a way that very quickly

3    gets to the point of what they all want to do, or

4    should want to do, which is protect their investment

5    and maximize their investments.  And as I said, I

6    think Proskauer could be very helpful on that front

7    because of its relationship with one of the

8    investors.

9              I do think what would have to be

10   explored is whether there is a way in terms of the

11   $5 million for the nuclear company, whether there is

12   a way to build in a little more time.  So, for

13   example, I don't know if anyone had considered yet

14   seeking a bridge loan to provide a little breathing

15   room so the facts could be developed and the

16   investors as a group could be consulted and have

17   time to figure out a way beyond this problem.  So

18   that's --

19             THE COURT:  We had hoped there might be

20   other investors in the wings.  That turns out not to

21   have been something that materialized.

22             MR. CLEARY:  That is correct, your

23   Honor.  So, I think creating time, your Honor

24   mentioned time is not on our side, that is so true,

25   but looking for a way to create time I think should

1  be the first order of business.  So that's the

2  conflict problem, your Honor.

3          I can answer whatever I can.  I'll try

4  to answer whatever questions you have about that,

5  and if you don't, I'll move on to a little

6  description about myself and what I see as the other

7  issues in the matter.

8          THE COURT:  Could I ask you just a

9  little bit more about the issue of representing one

10  of the NuScale investors.  Do you think that creates

11  a problem where you are looking for -- that the best

12  path is to find the cooperation and negotiation

13  among all the investors so that together they

14  maximize the benefit in their position and whether

15  or not that can be accomplished if it is known that

16  your firm represented one of them?

17          MR. CLEARY:  I think actually there are

18  problems, candidly.  There are problems with the

19  potential conflict, and I want to spell those out.

20  I don't view that as one of them.

21          I think one of the ideas here would be,

22  whether it is a conflict or not, is to try to

23  embrace one-by-one the investors to try to build a

24  critical mass.  Might they be skeptical because

25  Proskauer had a relationship?  Sure, that's a

1  possibility, and that would be something that would

2  have to be worked around.  But I think being able

3  from the get-go, probably as soon as tonight or

4  tomorrow, to have that initial meeting would be

5  very, very helpful.

6          The problems I see with the conflict,

7  your Honor, is that -- let me back up a little bit.

8  So, of course if we were to be selected we would

9  resign the engagement of the other investor so we

10  would not be representing two different parties.

11          The problem, as I see it, is the

12  unwaiveable conflict of a lawsuit by the receiver

13  against the investor or vice-versa.  I don't see

14  that as a realistic possibility, quite frankly, they

15  seem to be similarly situated, but there is that

16  issue as well, and I see that as a bigger potential

17  concern than the one the Court raised.

18          THE COURT:  So, that sort of litigation

19  would be -- what sorts of causes of action are you

20  talking about?

21          MR. CLEARY:  It's difficult to imagine

22  the cause of action from the receiver against an

23  investor in the company.  I could imagine, however,

24  hypothetically, a situation arising where this other

25  investor thinks that the predecessor to the

1    receivership at stake, the company before it was

2    taken into receivership, did something inappropriate

3    and wanted to, therefore, bring that claim against

4    the receivership.  As I say, I could see that, it's

5    difficult to imagine what that would be, but that's

6    kind of the issue I'm focused on.

7                THE COURT:  Thank you.

8                MR. CLEARY:  Should I tell the Court a

9    little bit about myself and some of my background?

10   I'll spend two minutes doing this unless, your Honor

11   -- because it's in the proposal, which I know you've

12   not had a chance to read.

13               I spent the majority of my career as a

14   federal prosecutor, prosecuting mostly throughout my

15   entire career complex white collar cases, and

16   developed a facility as a result of doing that with

17   financial issues and reading balance sheets and

18   understanding financial projections, which I do

19   think, I agree with Mr. Carney, is an important

20   skill set for the receiver in this case, if for no

21   other reason than to be able to communicate

22   effectively and efficiently with auditors or

23   accountants that are brought in to assist the

24   receiver.

25               So, I served for 18 years as a federal

```
1   prosecutor.  And I've actually had the privilege of

2   running businesses.  I ran two large -- one large

3   and one small U.S. attorney's offices, New Jersey

4   the large one, southern Illinois as the smaller one,

5   and have familiarity as a result of that experience

6   with running a business and concerns about budgets

7   and finances and all of those sorts of issues that

8   you confront every day in running a business.

9            I have been in private practice since I

10  left government service for the last eight years and

11  remain very active in running the business of a law

12  firm; admittedly a different business than the

13  businesses we're talking being here, but it has

14  focussed me even more on financial issues and the

15  data you rely upon to make decisions in a business

16  context.  I'm the co-chair of our litigation

17  department, which is a 225-lawyer operation spread

18  out among many different offices.

19            So, that's the kind of business judgment

20  and business acumen training that I have that I

21  bring to the table here.  And then beyond that, the

22  bulk my experience has been as a practicing

23  litigator, as a trial lawyer, both in government and

24  for the last eight years as a private practitioner.

25            THE COURT:  How does your expertise in
```

1   fraud work translate into experience assessing

2   business judgments and viability of start-up

3   companies?

4               MR. CLEARY:  I don't think it directly

5   relates to the assessing the viability of a start-up

6   company.  I've had candidly very little experience

7   with that at all.  I think where it's helpful is to

8   do things like assessing the viability of any

9   company.  A lawyer should be able to understand the

10  rudiments of what the data set is that you are going

11  to be looking at.  So, I think the key data sets

12  here -- these are the things I would be asking for

13  to make the most important judgment about whether to

14  put more money into these companies or refuse to do

15  so.  It would be things like the business plan, the

16  budgets, the financial projections, the historical

17  financials, the current financials.  In terms of the

18  financial projections, what is management's view

19  about their ability to meet those projections and

20  how credible is their assessment?  Those are the

21  sorts of things that, having spent time

22  investigating and prosecuting complicated white

23  collar cases in a commercial setting, that enables a

24  receiver to help make those decisions.  So, I think

25  that's how it's very, very helpful.

1          On the particular expertise of dealing

2     with small start-ups, developmental stage start-ups,

3     particularly in high-tech businesses, I would rely

4     upon my partners that do that.  One of them -- two

5     of them in particular are identified in the proposal

6     I made who deal with those sorts of issues day in

7     and day out.

8          The other expertise I would rely upon,

9     it may prove to be more in this case, is we do have

10    an office in Brazil, which office has substantial

11    experience in private equity investments as well as

12    Latin American lending experience, and that sort of

13    expertise may become important down the road.  So,

14    it's that sort of thing.  I would have an ability to

15    assess a lot of the material myself and -- based on

16    my training, and then beyond that would be looking

17    to other expertise within the firm.

18          THE COURT:  Is Latin American lending

19    experience do you think markedly different to count

20    to be important here?

21          MR. CLEARY:  It might be, your Honor.  I

22    the only raise that issue because I know there have

23    been some claims made in the course of the case

24    about some of the monies being expended being loans.

25    And so that's why I raised that particular issue.

1    Being able to assess whether they are, in fact,

2    loans or not may become important down the road.

3              THE COURT:  I think I understood that

4    the majority of the investors in the MK entities

5    were Latin American.  Is that -- did I just make

6    that up?

7              MR. CLEARY:  That's what I understood.

8              MS. KELLY:  No, that's right, your

9    Honor, and we're actually -- it may be something

10   that Mr. Clearly is pointing to that is an issue

11   because some of the assets in the funds are Latin

12   American loans, and so there may be, depending on

13   what the scope of the receivers' duties are, there

14   may be some question as to whether -- you know,

15   making a determination as to whether they're liquid

16   and enforceable.

17             THE COURT:  Thank you.

18             MR. CLEARY:  Thank you, your Honor.

19             THE COURT:  Any questions for Mr.

20   Cleary?

21             MR. JACOBSON:  No, your Honor.

22             THE COURT:  Thank you very much for

23   coming.

24             And then, Mr. Jacobson, you had someone

25   to be heard from.

1          MR. JACOBSON:  Your Honor, could we have

2   a brief recess?

3          THE COURT:  Yes, I forget about those

4   things.  Yes, we will take a recess.

5          (Recess)

6          MR. JACOBSON:  Your Honor, may we ask

7   about one minute's indulgence?

8          THE COURT:  Sure.

9          All right, Mr. Jacobson, are you ready

10  to proceed with --

11         MR. JACOBSON:  Actually, your Honor,

12  with respect to the individual that we have here, as

13  a result of the discussions, a potential conflict

14  question has arisen that we would need to address

15  before we put that person forward.  And in addition,

16  we'd like to, again, renew our request to continue

17  this on Friday with our candidates that we can

18  present that can't be here today.

19         And, in addition, with respect to the

20  presentations that were made today, we'd appreciate

21  learning more with respect to the Conoco

22  representation that Mr. Marcu mentioned, and with

23  respect to the representation of the other NuScale

24  investor that Mr. Cleary represented -- discussed,

25  so we can kind of make an informed notion as to

1    exactly what that all means.

2                THE COURT:  When you say learning more,

3    what specifically do you want to know?

4                MR. JACOBSON:  Well, we'd like to know

5    what Conoco's relationship is, you know, with PDVSA

6    or against PDVSA or the potential disputes there

7    might be between those entities.  What PDVSA is

8    likely -- if they know, whether there are facts that

9    suggest there might be some animus there that might

10   make PDVSA unwilling to cooperate with Mr. Marcu

11   because of his firm's representation of Conoco.

12   That's just one question that came to mind.  This is

13   the first we've heard of that, obviously, and it

14   just raises that and perhaps other issues as well.

15   We'd like to know as much about it as we can.

16                And with respect to the NuScale issue, I

17   understand Mr. Cleary said he resigned that

18   engagement, but I'm not sure that would cure

19   whatever conflict there might have been in that

20   regard, and I would like some time to explore that

21   as well.  Again, we're just hearing about that for

22   the first time this afternoon.  And if it's at all

23   possible, we would like, of course, to bring our

24   people who could not be here today.

25                THE COURT:  Mr. Marcu may have an answer

 1   already.

 2              MR. MARCU:  I do, your Honor.  I

 3   apologize for taking the Court's time.  We do have a

 4   very adverse relationship with PDVSA in significant

 5   and multiple incidents of litigation, and I think

 6   probably it would be best if we withdrew our

 7   application -- I withdrew my application to be

 8   receiver, and I'm sorry that I won't be able to be

 9   of service to the Court.

10              THE COURT:  Well, I'm sorry, too.  Thank

11   you very much.

12              MR. MARCU:  Thank you.

13              THE COURT:  All right, scheduling.  I'm

14   advised that the suppression hearing that I had

15   tomorrow morning will, in fact, not go forward and

16   will become a plea, and therefore, I would be happy

17   to reconvene at nine o'clock tomorrow morning.  That

18   can be in person or telephonically, as you wish.

19              By that time Mr. Jacobson will know what

20   we have by way of PDVSA consent or not and the --

21   and we can proceed.  I think that with the record as

22   it is now, not knowing what investors want to do

23   with their money, that the Court can't take any

24   further steps vis-a-vis NuScale, and I don't know

25   what that means, but it is certainly not an

1    authorization or direction that I'm prepared to make

2    absent knowledge of what, at a minimum, that

3    investor whose money is headed to NuScale views the

4    landscape as.  But I would like to have a copy of

5    the consent that was sent out as well as the letter,

6    or whatever it was, to the Short Term Liquidity

7    Fund.

8             MR. JACOBSON:  We could provide that

9    almost immediately.  I represented to NuScale's

10   counsel that we would report back with respect to

11   the status of the 2.8 or 2.9 million that they have

12   in the bank.  Does the Court have any view as to

13   what I might be able to tell them?  This is the

14   money that Ms. Kelly believes will be covered by

15   their request for an asset freeze, although it is

16   not in MK's hands anymore, it is in the hands of an

17   innocent third party.

18             THE COURT:  And is that subject by any

19   chance covered in the notice and consent materials

20   that were sent out?

21             MR. JACOBSON:  No.

22             THE COURT:  And, Ms. Kelly, you say that

23   that is, in the SEC's view, the proceeds of the

24   fraud.

25             MS. KELLY:  Yes, we believe so, your

1    Honor.

2              THE COURT:  And the indication was that

3    NuScale has had no other investors or just don't

4    have any investors in the pipeline?

5              MS. KELLY:  No.  Just to be clear, that

6    they don't have any investors in the pipeline,

7    because we inquired as to whether there might be any

8    alternate funding sources and we were told that

9    there were not going forward.  We don't know if

10   there have been other investors in the past other

11   than Michael Kenwood Group.

12             THE COURT:  So, in your view that can't

13   be used to secure any sort of bridge loan or interim

14   funding?

15             MS. KELLY:  Your Honor, the Court hasn't

16   yet entered any kind of order, so I'm reluctant to

17   opine as to what the company can or can't do at this

18   very moment.  We think under the plain language of

19   the order, were the Court to enter it, it covers

20   "all persons who hold or possess the direct or

21   indirect proceeds of the misconduct."  So,

22   theoretically every dollar of the investors' money

23   that went out to any entity, including NuScale,

24   could be covered by the Court's order.

25             Certainly if the company -- it may be at

58

1    this point it is premature to say because, in fact,

2    Mr. Mullin on behalf of NuScale indicated today --

3    we thought the amount remaining was 2.8, he

4    indicated it was less than that because of

5    expenditures they've already accrued.  So, we don't

6    actually know what amount is in there, and it sounds

7    like at least some portion has been spent already.

8    But we do think that that money could be subject to

9    an order of the Court unless the Court -- and that

10   is our position.

11            If the Court decides to make an order

12   that carves that out, I think otherwise if it was

13   entered as currently drafted, it would certainly

14   cover that money.  Because it's investor money, your

15   Honor, and it was -- and just to be clear, and I

16   know the Court has read our complaint, but every

17   penny of the 53 million is in the name of

18   Illarramendi or related entities.  So, that money

19   went out, in our view, in a fashion that

20   misappropriated investor assets.  So, that's why it

21   could be subject to the order and that's why we're

22   proceeding.  That's why we raised the issue in the

23   first place.  That's why NuScale raised it with us,

24   because they believe it could be subject to our --

25   to be recouped if there was a successful litigation.

1            THE COURT:  And how would you view

2      the -- if PDVSA were to consent to the additional

3      funding, using its money to fund NuScale, to

4      having -- to inferring from that consent that the

5      funds existing in the NuScale coffers should be

6      permitted to be used to pay accrued expenses?

7            MS. KELLY:  Your Honor, at this point in

8      time we would object until a receiver is in place to

9      any of that money being used even if PDVSA does sign

10     the form.  Your Honor, I think it would be -- it

11     would certainly be helpful I think to the Court in

12     looking at this form that was sent to PDVSA to note

13     that there is a block of text that addresses the

14     $53 million and basically says, we'll get back to

15     you about that, and says in, you know, in very -- in

16     more precise language we will be communicating with

17     you in the future to explain what has happened to

18     these funds.  But in the SEC's view, what PDVSA has

19     gotten does not in any way begin to explain to them

20     what has already happened with their funds.

21            Now, to be fair, the SEC's complaint is

22     attached to that document, so they can certainly see

23     our allegations, but the document itself doesn't

24     explain what's happened to the money, nor does it

25     fully explicate what is going on with the assets of

1    the Short Term Liquidity Fund.

2             So, we remain gravely concerned that all

3    of the assets we're talking about in this complaint

4    have been misappropriated and any informed consent

5    that isn't supervised by a neutral third party will

6    be potentially compromising investor assets.  We

7    also think, and we did indicate to counsel, should

8    the Court wish to continue the hearing and look at

9    additional candidates, particularly given some of

10   the conflict issues that came out, and we do want to

11   apologize to the Court, we provided the names of all

12   of the investors and for the some reason that one

13   didn't come up.

14            THE COURT:  So much better to have it

15   come out now.

16            MS. KELLY:  Of course.  We just wanted

17   the Court to understand we have been trying to be

18   conscientious in that regard and we were able to

19   identify the issue that Mr. Cleary represented to

20   the Court.  But having said that, you know, Mr.

21   Carney is an eminently qualified candidate.  He

22   doesn't have a conflict.  The thing we keep hearing

23   from defense counsel is that it is absolutely

24   imperative and urgent for this money to go right

25   away.  We're also hearing, let's slow down the

1    receiver appointment process, we want to have

2    someone from Mississippi come in on Friday.  We

3    think -- we very much acknowledge that this is an

4    issue of great urgency and we think that it calls

5    for the appointment of a receiver immediately.  Of

6    course should the Court wish to consider additional

7    candidates that the defense can put forward, the SEC

8    would not object to that, but we do have a qualified

9    candidate here who doesn't have any conflict and

10   could start working on this question tonight, and if

11   this is of the utmost urgency, we would suggest that

12   the Court at least has that as one option to

13   consider, if defense counsel sincerely wants to move

14   this process forward as quickly as possible.  So, we

15   just suggest that as an option to the Court.

16            THE COURT:  I wanted to ask you, Mr.

17   Jacobson, whether you have immediately at your

18   disposal NuScale's financials and audits.

19            MR. JACOBSON:  Personally I do not have

20   them here, but I'm sure that we can provide those

21   documents, to the extent they exist, rather quickly.

22            I just wanted to reflect our

23   understanding of where we were.  I mean, before the

24   hearing, based on what we understood the Court to

25   say yesterday, which was that we were going to treat

1   the money that we requested in our emergency

2   application, that is the 13 million, in two

3   tranches, one that is needed this week, which is

4   seven million, two for PDVSA and five for NuScale,

5   which NuScale has confirmed is imminently needed to

6   avoid them shutting down, and then a second tranche

7   of six million, which is not needed until

8   February 1st, and it was as to the second tranche

9   that I understood the Court to say yesterday we

10   would perhaps be able to have somebody in place to

11   take a look at, but that given the imminence of the

12   harm that would be caused if these companies were

13   allowed to go out of business simply because of the

14   SEC's fear that we might be throwing good money

15   after bad and it would be a self-fulfilling

16   prophecy, or as I think I said in one call, it would

17   be burning down the village to save the villagers,

18   which is not appropriate, I do not think appointing

19   a receiver tonight solves that problem because I

20   really don't see with respect to the imminence of

21   the seven million that needs to go out within a day

22   or two at the most, that anybody could -- anyone, no

23   matter how qualified, could come up to speed.  The

24   learning curve is substantial.

25             And so, I would hope that we could

1    continue to deal with this on a two tranche basis,

2    assuming, of course, that we get PDVSA's consent.

3    If PDVSA for some reason does not consent, I mean,

4    we're in a different situation because we're not

5    asking the judge -- we're not asking you, your

6    Honor, to approve the disbursement of these funds

7    without PDVSA's consent.

8              THE COURT:  Here is the problem.  The

9    two tranche approach was just simply an observation

10   that there is this differential in timing that may

11   bide sometime.  The problem is that it doesn't do

12   anything to furthering the Court's basis for acting

13   on what is, in essence, your request for a carveout

14   from the SEC's TRO for a total asset freeze as to

15   the first tranche.  And so as I am sitting here I

16   have no information on which to make the decision

17   other than the knowledge that not carving that out

18   will cause NuScale to close its doors.  And,

19   therefore, there is at least some appeal to a

20   mini-receiver, if you will, who can immediately look

21   at your financials and audit to at least be able to

22   tell the Court whether there is something obvious or

23   that things look pretty good or that they look

24   terrible, and that at least gives some -- moves the

25   ball of knowledge down the field, at least a bit.

1    So that is why that holds some attraction.  And I

2    agree with you without the consent nothing is going

3    to happen.  But, as I say, I have not seen that

4    consent, notice and consent form, and so that may

5    bear on it as well.

6              MR. JACOBSON:  I believe that it would,

7    and we will submit the documents that you requested,

8    that consent form, and the consent form that was

9    sent to the minority investors in the Short Term

10   Liquidity Fund as well, this afternoon so you can

11   review those documents.

12             Just an observation with respect to

13   NuScale.  I'm not sure looking at the financial

14   statements of an early stage company that is not

15   expected to be -- you know, manufacturing its

16   product for years is going to provide that

17   information.  I would just respectfully suggest that

18   an evaluation of NuScale requires somebody who

19   understands that industry, that understands the

20   position of small modular nuclear reactors in the

21   global nuclear industry, and in that regard, we have

22   been collecting, you know, declarations.

23             I know that we -- the Court doesn't want

24   to substitute its business judgment for that of

25   either an investor or anyone else for that matter,

1    but should it become relevant we thought some

2    information regarding exactly what it is that

3    NuScale is doing and why it's doing it and why it

4    makes sense and what the prospects are in some form

5    that could be submitted would be helpful.  And if

6    the Court, you know, would like those affidavits or

7    declarations with respect to NuScale, we could

8    provide those very quickly.

9           But with respect to consent, the consent

10   has been reviewed by -- and the Court mentioned that

11   the adequacy of representations would need to be

12   reviewed, and there is really two ways to look at

13   that.  With respect to the 40 Act, two 40 Act

14   lawyers looked at the representations.  The SEC

15   staff looked at them and made helpful comments, all

16   of which were adopted.  And so from a 40 Act

17   perspective, I think the issue is, as the Court

18   indicated, what are the underlying facts.

19          And again, we submit that that --

20   whether those are the facts that an investor should

21   have is really a business decision.  And we think

22   that -- and we respect the representations that have

23   been made by Mr. Carney, that as a CPA and someone

24   who can understand financial statements, that that

25   helps him, and it may help him understand the

1    current state of play of a company, but if it's an

2    early stage company that's value is what it's going

3    to be doing two, three, four or five years from now,

4    which is a judgment that the investment community,

5    that the people who are familiar with that business

6    are making, I'm not sure the ability to read a

7    financial statement is that relevant.  But I think

8    we could leave that for another day.  I just don't

9    think that appointing a mini-receiver just to look

10   at historical documents is going to answer the

11   question as to whether it makes sense to put five

12   million more dollars into NuScale.

13                  THE COURT:  I'm only trying to move this

14   process.

15                  MR. JACOBSON:  I appreciate that.

16                  THE COURT:  That keeps the --

17                  MR. JACOBSON:  I understand.

18                  THE COURT:  -- inevitable from

19   happening.

20                  MR. JACOBSON:  I understand.  I

21   understand, your Honor, and I think that making

22   yourself available tomorrow morning would be of

23   great assistance in that regard, and hopefully by

24   then we could have the NuScale -- the PDVSA consent

25   in hand, which would I think go a long way to at

1    least help the Court make a decision regarding the

2    initial funding.  And then if we could have a

3    hearing on Friday with respect to -- so we could put

4    our receiver candidates in play, we would

5    respectfully submit that would help as well.

6                THE COURT:  So, if I'm understanding

7    you, you want me to make the decision about what

8    we're calling the first tranche solely on the basis

9    of PDVSA's consent?

10               MR. JACOBSON:  Well, your Honor --

11               THE COURT:  What else would I have?

12               MR. JACOBSON:  Not quite.  You would

13   have the consent document, so you could read it for

14   yourself.  You would see what PDVSA was told, you

15   would see what the Short Term Liquidity investors

16   were told, whose consent we continue to believe we

17   do not need because they're not in the Special

18   Opportunities Fund which would make the investment,

19   and you would have the benefit of the argument that

20   the SEC has signaled it would make that that's not

21   enough, and we would of course try to convince you

22   that it was, and then you could make a reasoned

23   decision based on some documentary evidence as to

24   what PDVSA was told and what they say in return.

25   Again, hopefully --

```
 1              THE COURT:  Is there any case law that
 2    you think would be of assistance to the Court in
 3    guiding this, some aspect of this analysis and
 4    decision?
 5              MR. JACOBSON:  With respect to case law,
 6    I defer to my distinguished colleague, Mr.
 7    Blanchard.
 8              MR. BLANCHARD:  Distinguished?  Nice.
 9    Thank you, Mr. Jacobson.
10              I just wanted to backtrack a little bit
11    and return to Friday night for how we got to where
12    we are today.  The question that was before the
13    Court was that a single investor has $53 million
14    still in the game, and the question we had put
15    before the Court, a difficult question, is, well,
16    should additional follow-on financing go to these
17    companies in which that investor is taking the risk.
18    And I seem to recall that the way the question was
19    viewed at the time was, gees, this is a difficult
20    situation because maybe we're throwing good money
21    after bad, or maybe we're going to cause investors
22    by the filing of this action and the relief that the
23    SEC is seeking a loss of 53 million instead of, you
24    know, something different, and we don't know at this
25    point.
```

1          And so I thought where we were going

2    over the weekend was a determination that really the

3    party that should be in the best position to make a

4    decision about whether or not they want to risk an

5    additional financing for this company or whether

6    they say, that's it, hold off and let the 53 million

7    go and we'll let everything get sorted out in the

8    receivership, was PDVSA, and that's why we were

9    trying to seek the consent.  And so we drafted the

10   consent over the weekend with the SEC's review, not

11   approval, and that's what I thought we were going

12   through yesterday and today.

13          And so as far as case law that bears on

14   the issue, I'm going to have to look at the cite,

15   and I'm not going to argue extensively the case, but

16   I'll provide copies to the Court.  In receivership

17   situations courts certainly look at the interest of

18   the investors and whether the investor has stated

19   its opinion on, you know, what should be happening

20   with its money that's ultimately at issue.  There is

21   a case called -- it's SEC v. Hollnagel case, and it

22   is a Northern District of Illinois case, and if I

23   may, your Honor, I'll give the Court a copy.

24          THE COURT:  Thank you.

25          MR. BLANCHARD:  And SEC as well.  It's

1    not a terribly complicated case, your Honor.  But,

2    in general, what the case says is it looks at what

3    the court is going to do in terms of appointment of

4    receiver or whether it's going to do something more

5    limited, and the court indicates that one of the

6    principal investors had made an indication that they

7    thought management should continue running the

8    assets of the company despite a number of problems

9    that the SEC had identified, some that are similar

10   to here, and I'm not going to go through them, but,

11   you know, the court ultimately chose to go with a

12   more limited form of relief and let that investor

13   have his say in terms of what's going to happen with

14   his money.  So, there is case law that supports the

15   proposition.  And there is other cases that

16   generally say that a court when acting in receiver

17   jurisdiction is acting in equity land and should do

18   what is, you know, most narrowly focused to

19   accomplish the objectives of equity, and in the

20   context of enforcing securities laws to protect the

21   investors for which these securities laws were

22   enacted to protect.

23          So, I think we have a construct here

24   where what we're trying to do is allow the investor

25   to make the decision, and it may be that the

 1   investor doesn't make the decision in time and maybe

 2   this all blows up, but it seems to me, your Honor,

 3   that that original inclination of where I thought we

 4   were going over the weekend best protects the

 5   interest of the investor and best, you know,

 6   advances this ball forward, and that was why we were

 7   not in a position to be rushing with a receiver

 8   appointment at the time because, frankly, a receiver

 9   I don't think is going to be able to make informed

10   decisions himself, no matter who he is or what

11   resources they have, about -- for instance, about

12   whether the consent that was sent out was adequate

13   from a 40 Act perspective.  I mean, these are issues

14   that the SEC themselves would take a long time to

15   review and analyze, and a lot of 40 Act lawyers did.

16   So, that's a hard thing to assume would actually

17   happen in time to make a decision on this first

18   tranche of investment.

19             I've probably spoken a little bit more

20   than I was invited regarding case law, but I've been

21   quiet because everyone has been addressing things

22   pretty clearly, and I thought I would add that to

23   this conversation, your Honor.

24             THE COURT:  There is a suggestion in

25   your comments that you think we are not heading in

1    that same direction as we started out.

2              MR. BLANCHARD:  I'm confused, your

3    Honor, because if what we're discussing is the idea

4    that PDVSA can provide its consent, but we need a

5    receiver to review the accuracy from a 40 Act

6    perspective of the consent, I view that as a very

7    unlikely possibility that anything is going to

8    happen that would further the objectives of what --

9    you know, where we were going.

10             Thank you, your Honor.

11             THE COURT:  All right, do you want to

12   come here tomorrow or do you want to have our

13   further conference telephonically with documents

14   being submitted in pdf overnight?

15             MS. KELLY:  Could we talk briefly, your

16   Honor.

17             THE COURT:  Yes.

18             MR. JACOBSON:  Your Honor, Ms. Kelly and

19   I have conferred, and assuming we will be back here

20   on Friday to discuss receiver candidates, we think

21   it makes more sense to do tomorrow over the phone.

22             THE COURT:  All right, we'll do that at

23   nine o'clock.

24             MR. JACOBSON:  Your Honor, does the

25   Court feel it would be helpful to submit the

1   declarations from NuScale representatives?

2           THE COURT:  Let me just say that I have

3   so little that I can't possibly imagine it would

4   not -- it would be at a minimum neutral.  So, the

5   answer is yes.

6           MR. JACOBSON:  Thank you, your Honor.

7           THE COURT:  On Friday why don't we

8   reconvene at ten o'clock.  We don't have the whole

9   day, we have maybe til 12:30.  We'll work that out.

10          All right, is there anything else we can

11  take up today?  I wanted to ask the SEC whether

12  there is additional evidentiary showing that you

13  want to make on the likelihood of success, on

14  meeting the standards for a temporary restraining

15  order for the purpose of putting in place an asset

16  freeze, if, as you say, or as you anticipate, there

17  is not going to be agreement on what the defendants

18  want as carveouts?

19          MS. KELLY:  Your Honor, the person who

20  we -- I think we could fairly easily address these

21  questions by just putting one witness on the stand,

22  and that would be Sophia Hussain, who is the

23  forensic accountant.  She has already submitted a

24  sworn declaration along with the attachments, but

25  because -- which was one of the documents that was

 1    filed electronically, and we're happy to provide

 2    additional copies if it would be of assistance.

 3                THE COURT:  Which exhibit was that?

 4                MS. KELLY:  The declaration should have

 5    been an attachment itself to the complaint, and then

 6    the exhibits were actually attachments to Ms.

 7    Hussain's declaration.

 8                THE COURT:  The reason I'm rummaging

 9    right now was that I had been looking for affidavits

10    or declarations for my greater enlightenment and

11    didn't see any, and I think my courtesy copy does

12    not have that.

13                MS. KELLY:  Your Honor, we'll hand you

14    up a complete copy, if I may approach.

15                THE COURT:  Thank you.  All right, I

16    will review this then this evening.

17                MS. KELLY:  But we are happy to put Ms.

18    -- there may be specific issues that the Court is

19    concerned about that aren't necessarily addressed in

20    the affidavit, and we'd be happy to present Ms.

21    Hussain's testimony, even if it's just on a couple

22    of narrow areas.  But perhaps we'll speak with

23    defense counsel and see if there are any further

24    allegations in there that are contested, because

25    much of our complaint is derived from admissions of

1   the defendant through counsel and from documents

2   that have been provided to us from defense counsel.

3          So, I'm not sure that there is a lot

4   that's contested, and we don't want to take up the

5   Court's very busy calendar with allegations that are

6   not necessarily contested.

7          MR. JACOBSON:  Actually, Ms. Kelly

8   raised a good point, because in the complaint there

9   is a statement that certain representations were

10  made by counsel, and just so the record is clear, no

11  representations were made by counsel, all the

12  representations that were made during the inspection

13  were made by the client, direct representations by

14  the client.  All the documents were prepared by and

15  submitted by the client.  We made that very clear to

16  the staff in our submission on January 7th, which

17  indicates specifically all of the documents being

18  submitted are being submitted by the client.  And in

19  addition, we advised the staff, in Ms. Hussain's

20  presence, orally, that these documents are being

21  submitted by the client.

22          I know it's a small point, but I think

23  it's an important one because these are not

24  representations by counsel, these are actually

25  representations by the client, and I just wanted to

76

1    make that clear for the record.

2              MS. KELLY:  And not to parse this too

3    finely, but my understanding had been that the

4    representations of the defendant were communicated

5    through counsel at certain times.  I wasn't present

6    for the examination, but that was my understanding.

7              THE COURT:  What are we talking about

8    here?  The complaint and the emergency motion are

9    notably broad.

10             MR. JACOBSON:  There is a representation

11   in the complaint that, quote, according to counsel

12   there was an X number of assets that were in the

13   Short Term Liquidity Fund, and it's not according to

14   counsel.  Counsel has no idea how many assets.

15             THE COURT:  But counsel conveyed that to

16   the Commission.

17             MR. JACOBSON:  Counsel conveyed the

18   representation of his client to the staff, that is

19   correct, and that document that was conveyed by

20   counsel, handed by counsel to the -- actually it was

21   actually handed by a forensic accountant to the

22   staff to be precise, but when produced it was

23   produced with a cover attachment that said

24   specifically this is being submitted by Michael

25   Kenwood Group, not by counsel.  None of the

 1   representations are according to counsel.  Counsel

 2   has no idea what's going on.  The client knows what

 3   is going on.  Counsel is conveying information from

 4   the client, as is I think normal and customary in

 5   any of these cases.

 6              MS. KELLY:  And we're not suggesting by

 7   our drafting that counsel has personal knowledge, it

 8   was these were statements of the client that were

 9   communicated through counsel.

10              THE COURT:  And where in the complaint

11   is this coming up?

12              MS. KELLY:  I think the reference is at

13   paragraph 17.

14              THE COURT:  I don't see anything in

15   paragraph 17 of the complaint that attributes

16   anything to counsel.  What am I missing?

17              MS. KELLY:  It's in the middle of the

18   second to last sentence of paragraph 17, it starts

19   out --

20              THE COURT:  "According to counsel,"

21   okay, got it.  It's been weighing heavily on Mr.

22   Jacobson.

23              MR. JACOBSON:  I apologize for taking

24   the Court's time with minutia, but it did weigh

25   heavily, frankly, your Honor.

1          THE COURT:  All right, then, if there

2     is -- now, I gather, from Mr. Kretman, we never got

3     a courtesy copy of all of this.  Let me review what

4     I have.  I have the complaint, I have the

5     plaintiff's emergency motion, I have now the

6     declaration of Sophia Hussain.  I have Exhibits B,

7     C, D, E and F.  Am I missing anything else?

8          MS. KELLY:  We had submitted a

9     memorandum of law as well as a proposed order.  To

10    the extent the Court does not have courtesy copies,

11    we'll make sure all of those are timely provided to

12    the Court, and I apologize for any oversight in

13    doing that.  I should note that we -- if I may

14    approach, I'll hand up the memorandum of law to be

15    sure that the Court has it.

16         THE COURT:  That will be good.  Let me

17    see, do I have that?  I have that.  And I know I

18    have your draft order because it seemed quite broad.

19         MS. KELLY:  Yes.

20         THE COURT:  All right, if there is

21    nothing else that we can accomplish today.

22         MR. JACOBSON:  I have the letters, if I

23    may I approach.  I will submit the letters that were

24    submitted to PDVSA, one letter, and the other letter

25    that was sent today to the STLF investors.

1              THE COURT:  All right, thank you.

2              All right, is there anything else we can

3    take up before tomorrow morning?  If not, then we

4    will stand in recess.

5              And thank you to the potential receivers

6    for taking the time to come here and address the

7    Court.

8              We stand in recess.

9              (Proceedings concluded 4:35)

10

11             I certify that the foregoing is a

12   correct transcript from the record of proceedings in

13   the above-entitled matter.

14

15                             1/29/11

16                              Date

17

18                   /S/   Sharon Montini

19                      Official Reporter

20

21

22

23

24

25