```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF CONNECTICUT

 3   * * * * * * * * * *  *         *
                                    *
 4   SECURITIES AND EXCHANGE        * Case No. 11cv78(JBA)
     COMMISSION,                    *
 5                 Plaintiff,       *
                                    *
 6         vs.                      *
                                    *
 7   FRANCISCO ILLARRAMENDI, ET AL  * January 20, 2011
                                    *
 8                 Defendant.       *
                                    *
 9   * * * * * * * * * * * *        *

10            TRANSCRIPT OF TELEPHONE CONFERENCE

11   BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12
     Appearances:
13   FOR THE PLAINTIFF:        RUA KELLY, ESQ
                               LeeAnn GAUNT, ESQ.
14                             United States Security and
                               Exchange Commission
15                             33 Arch Street
                               Boston, MA 02110
16
     FOR THE DEFENDANT         MICHAEL BLANCHARD, ESQ
17   FRANCISCO ILLARRAMENDI:   Bingham, McCutchen
                               One State Street
18                             Hartford, CT 06103

19   FOR THE DEFENDANT MK      RICHARD JACOBSON, ESQ.
     ENTITIES:                 Arnold & Porter
20                             555 Twelfth Avenue NW
                               Washington, DC  20004
21
                               THOMAS GOLDBERG, ESQ
22                             Day Pitney
                               One Canterbury Green
23                             Stamford, CT 06901

24   Court Reporter:           Sharon Montini, RMR

25   Proceedings recorded by mechanical stenography,
     transcript produced by computer.
```

1        THE COURT:  Good morning, counsel.  This
2   is SEC v. Illarramendi et al, 11cv78.  This is our
3   status conference in follow-up from many of the
4   issues that were raised yesterday with respect, most
5   importantly, to the response to the notice and
6   consent forms sent to the PDVSA groups and the
7   minority investors, namely the ones who got the
8   notice to the STLF investors.
9        Mr. Jacobson, do you want to tell me
10  what the status of things is --
11       MR. JACOBSON:  Yes, your Honor.
12       THE COURT:  -- today.
13       MR. JACOBSON:  We were advised PDVSA has
14  retained Shearman & Sterling to advise them with
15  respect to the consent letter, and that that is in
16  process, and we have still -- all we know is that
17  they are going to get back to us as soon as they
18  can, but they have not given us any indication when
19  that will be.
20       With respect to the STLF letter, that
21  went out yesterday and I have no information as to
22  whether there have been any responses.
23       THE COURT:  All right, and I have this
24  morning received the affidavits from several of the
25  NuScale people involved with the NuScale

```
 1   undertaking, and the Proterra undertaking.  Do you
 2   have -- a fair amount of the detail contained in
 3   those affidavits is not a part of the consent.  What
 4   are your thoughts with respect to making available,
 5   if requested, to Shearman & Sterling these
 6   declarations?
 7              MR. JACOBSON:  Your Honor, I have no
 8   problem with doing that, you know, with - I mean, I
 9   would hope that there would be some confidentiality
10   restrictions, but with some appropriate
11   confidentiality restriction, we have no problem at
12   all.
13              And I do have a little additional
14   information as to those companies.  I reported the
15   results of our conference yesterday to counsel for
16   NuScale and Proterra, and I was advised that it was
17   counsel's belief that NuScale would proceed with its
18   plan to shut down.  I also advised counsel that the
19   SEC's view is that the 2.8 million that is in the
20   bank is covered by the scope of the freeze that
21   they're requesting, which is what the SEC said in
22   open court yesterday, and I don't know what they're
23   going to do, but my understanding from prior
24   conversations was that if the money was not
25   forthcoming by yesterday they were going to
```

```
 1   implement the program that had been approved by the
 2   board, which was to furlough their employees and
 3   suspend operations.  As the Court indicated,
 4   hopefully this would be something that is temporary
 5   and could be reversed if they're going to get the
 6   money soon enough to do that, but that I guess is
 7   just something that we'll have to see how that plays
 8   out.
 9               THE COURT:  All right, but they're not
10   doing anything that triggers the consequences to
11   their IP rights, the bankruptcy filing or anything
12   like that?
13               MR. JACOBSON:  Yes, I do not believe
14   they're doing that.  That is my understanding.  I
15   could confirm that, but my understanding is that
16   they are not doing that.
17               THE COURT:  All right.
18               MR. JACOBSON:  With respect to Proterra,
19   I was informed that Proterra is trying to be
20   creative to see whether there is some way to get
21   past their drop dead date, which really was tomorrow
22   because they can't make payroll, and unless they get
23   the money in today, then they can't cut the checks
24   for tomorrow, and so they have come up with a --
25   "plan" may be too strong a word, but they have
```

```
 1   advised me that they are speaking to an individual
 2   or an entity, I don't know which, somebody,
 3   something that's close to the company, who may be
 4   willing to loan them enough money to make the
 5   payroll if that loan could be put in first position.
 6   Right now the loan that MK has secures all of
 7   Proterra's assets and it's in first position.  So,
 8   in order for that to happen, MK would have to agree
 9   to the extent of this payroll amount to subordinate
10   its loan to the new money that would come in to make
11   the payroll tomorrow.
12              And so I wanted to raise that with the
13   Court because I don't know whether this is, in fact,
14   what the SEC might argue, but -- you know, putting
15   the loan to meet the payroll in second position, you
16   know, arguably affects MK's property rights, and
17   based on what the SEC said in court yesterday
18   regarding NuScale, I just don't know whether the SEC
19   would object to that.  I believe that to the extent
20   this might require Court authorization, that that be
21   given, because I think it's clearly better to be in
22   second position in a going concern rather than first
23   position in one that has wound up.
24              So, I throw that on the table.  I have
25   not been advised that, in fact, they have
```

```
 1   implemented this strategy, but I believe that there
 2   is a good chance that if they are advised that they
 3   could put that money in first position, that they
 4   have at least a decent chance of having that come in
 5   today so they could cut the check tomorrow.  They
 6   would still need the MK money in order to pay back
 7   that loan, and so -- but they wouldn't need it
 8   immediately, we would have breathing room, which is
 9   something that I think we would all like to have in
10   this matter.
11              THE COURT:  And according to the
12   affidavit that you've given me with respect to
13   Proterra, Mr. Granato's declaration, this is about
14   three quarters of a million dollars for payroll.
15              MR. JACOBSON:  I think that's right.
16              THE COURT:  Any other news?
17              MR. JACOBSON:  That's all my news for
18   now.
19              THE COURT:  All right, Ms. Kelly, any
20   response to the news?
21              MS. KELLY:  Your Honor, with respect to
22   the affidavits, you know, we were aware that these
23   existed and they were signed on the 17th of January,
24   but in all fairness, we've only had about a half an
25   hour to look at them.  So, I can't say that we have
```

1  a total handle on the materials that we have here,
2  but the -- you know, I just think, briefly in
3  response to what Mr. Jacobson is telling the Court,
4  you know, I think that we're repeating what we said
5  yesterday, but we just think a receiver is uniquely
6  positioned to determine if this is in the interest
7  of the investors.  The defendants are asking the
8  Court, and to some degree the SEC, to make a series
9  of business decisions, and we're not in the position
10 to do that, and frankly, I think we would need a lot
11 more data, I think as one of the candidates said
12 yesterday, in order to make this decision.
13             I do think NuScale and Proterra stand in
14 fairly different positions.  It's clear to us from
15 what we see on NuScale that, you know, frankly, it's
16 hard to see this cash infusion as anything more than
17 just a Band-aid.  We understand from our review of
18 the materials during our on-site enforcement
19 directed examination of the Michael Kenwood entities
20 that we think at least 28.5 million of the 37
21 million that NuScale has gotten over the past three
22 years, in other words more than two-thirds of
23 NuScale funding over the past three years has come
24 solely from entities that are associated with
25 Illarramendi.  There is no other sources of funding

1  lined up.  Mr. Illarramendi obviously has a vested,
2  interest, perhaps, as the majority owner at this
3  point of the entity, and it seems like at this point
4  it may be, you know, a real stretch to think that
5  this is a company that's really going to make it.
6  It's also not clear why there are so many bills
7  right now when they're in the R and D phase.
8              Proterra, from our brief look at the
9  affidavit, it looks like they've done a pretty good
10 job of drilling down on what the real expenses are
11 and what the real numbers are, but we're still --
12 you know, we're not there and I think the receiver
13 would need to get financials for these companies to
14 make sure that these representations are fully
15 accurate.
16             And, you know, just to go back to the
17 key issue that's before the Court, with no consent
18 it's inconceivable to us that any money could move,
19 and that has not yet been forthcoming, never mind
20 from minority investors, but certainly from PDVSA.
21 That's where we are, your Honor.
22             MR. JACOBSON:  May I respond briefly,
23 your Honor?
24             THE COURT:  Yes.
25             MR. JACOBSON:  We're actually not

1  talking about NuScale at the moment, we're only
2  talking about Proterra, and we're not talking about
3  any money moving, we're only talking about a very
4  minor change in the loan structure to allow the
5  payroll to be made tomorrow.
6           This is -- you know, even if a receiver
7  was appointed at this second, the receiver would not
8  be able to pass judgment as to whether it made sense
9  to do that, and we really don't believe that this is
10 a significant change in the status quo, it simply
11 allows this company to live for another couple of
12 weeks, which will, in fact, provide the time, at
13 least some time, to make, you know, a decision based
14 on more information, however that decision is
15 reached.
16          And so we think that this is basically
17 balancing the equities that would be the best way to
18 go right now, to tell Proterra that if they can in
19 fact find someone who will loan them money to make
20 payroll tomorrow, that MK should be permitted to
21 subordinate its loan to the extent of that amount of
22 money.  It would still have a significant first
23 position on all of its assets.  It would be about --
24 I think that's slightly more than ten percent of the
25 position would be moved down a notch.

```
 1               THE COURT:  Well, let me understand.  If
 2   the consent is forthcoming for either or both
 3   Proterra and NuScale, the entity, the angel lending
 4   the three quarters of a million to make payroll
 5   tomorrow, would be reimbursed immediately, no?
 6               MR. JACOBSON:  I believe that's the
 7   understanding, yes.
 8               THE COURT:  So this -- because if the
 9   money had been forthcoming earlier this week it
10   would have gone to the same purpose.
11               MR. JACOBSON:  Exactly.  This will be a
12   bridge loan, yes.
13               THE COURT:  And so that bridge loan
14   being of such short duration only impacts the MK
15   entity position for a short period of time, like
16   days.
17               MR. JACOBSON:  That is correct, your
18   Honor.
19               THE COURT:  Ms. Kelly, do you have a
20   view of that?  I mean, when you read the affidavits,
21   I agree with you that you see Proterra in a very
22   different position.  It has -- it's in production,
23   it has customers, it has revenue coming in, or will
24   imminently have revenue coming in, it has -- it's
25   just in a very different position from NuScale,
```

1  which is very early, projects it will need 220
2  something million to get to I guess production, and
3  no other lenders immediately -- investors
4  immediately out there.
5           So, I think we are -- I think everybody
6  would agree that in terms of an investment risk,
7  whether it be changing first position for a few days
8  versus whether it is a risk an investor would like
9  to undertake, that Proterra is the less risky of the
10 two.
11          But from the SEC's standpoint, what's
12 wrong with this idea of a loan from the angel?  The
13 only problem would be if there is not consent
14 forthcoming.
15          MS. KELLY:  And I think that's the
16 threshold matter.  It assumes the consent is
17 forthcoming.
18          THE COURT:  Right.
19          MS. KELLY:  And that's not clear.  I
20 mean, your Honor, it certainly doesn't sound like an
21 irrational business judgment, we're just not in a
22 position to bless it.  I think -- you know, I think
23 we've been, of course, candid with the Court in
24 saying that there is -- we think the Court is right,
25 there is a difference between what is set forth by

1  NuScale and what is set forth by Proterra, but there
2  is a big difference between one declaration from
3  someone who has a real interest in seeing this
4  company survive and having a neutral sit down and
5  look at this.
6            Again, I think the Court has heard our
7  position about the urgency of a receiver and I'm not
8  going to repeat myself, but I think, you know, we're
9  just not in a position to bless a business judgment
10 like that when, you know, someone else who is
11 looking out for the investors might be able to get
12 on the ground and get a lot more information and
13 perhaps come up with something that he can have
14 confidence is truly in the best interest of all of
15 the investors.
16           THE COURT:  Anything further, Mr.
17 Jacobson?
18           MR. JACOBSON:  Yes, just one thing.  I
19 understand what Ms. Kelly is saying is that it would
20 be wonderful if someone could sit back and spend a
21 week or two analyzing Proterra's financials and
22 looking at prospects and doing all the work that one
23 would need to do with respect to due diligence to
24 decide whether or not an investment was appropriate
25 in that company, but unless they get this money

```
 1   today they can't make payroll tomorrow, and in light
 2   of that, I think that -- and given the fact that we
 3   are not right now asking that that money come from
 4   any MK entity, we're only asking for a very minor
 5   change in property rights that will, you know --
 6   that will be fully disclosed, everybody will know
 7   what's going on, I don't think that -- balancing the
 8   equities, frankly, I think it's a no-brainer, your
 9   Honor, to allow this to happen.  It's a very short
10   duration, it's not a lot of money in the scheme of
11   things, and this is a going concern that clearly is
12   in a much better position to have a dramatic impact
13   on society because of the clean emissions buses it
14   produces, and I would think keeping it alive for two
15   weeks until an independent evaluation could be made,
16   if that's the way we're going to go, is the best
17   course.  And basically what the SEC is saying is
18   they can't bless anything, I understand that's their
19   position, but I believe that equity would suggest
20   that we allow Proterra to do this one thing today to
21   see whether it can make payroll tomorrow.
22               That's all I really have to say on the
23   subject.
24               THE COURT:  Does that change -- if that
25   is approved, that change of subordinating whichever
```

```
 1   the MK entity has that loan for the three-quarters
 2   of a million dollars, does that then need to go back
 3   to the PDVSA entities to update them, or is that not
 4   required?  I mean, you actually at this point have a
 5   better focus for communications.  Who do you have --
 6   who do they have at Shearman & Sterling?  Do you
 7   know?
 8               MR. JACOBSON:  I only know her first
 9   name her first name is Antonia.
10               THE COURT:  Oh, well, Antonia.
11               MR. JACOBSON:  Do you know her?
12               THE COURT:  No.
13               MR. JACOBSON:  She is apparently a
14   senior partner.
15               THE COURT:  I just don't know why we
16   have this first name as opposed to a last name.
17               MR. JACOBSON:  The reason is I learned
18   this close to midnight last night, and one of the
19   first things I was going to do this morning was to
20   Google her or ask someone who knew what her last
21   name was, but I barely got into the office in time
22   for the call.  So, I apologize for not having that
23   information.  I suspected it would come up.
24               MS. O'LOUGHLIN:  Your Honor, this is
25   Colleen O'Loughlin from Bingham.  Her name is
```

```
 1   Antonia Stolper.
 2              THE COURT:  All right, so you know who
 3   to contact.  It seems to me that there are several
 4   things that are in play here:  A, a person who is
 5   going to give advice to the investors, and giving
 6   that advice as soon as possible is in everybody's
 7   best interest; secondly, my protective order is on
 8   the website, if that is of immediate use to you for
 9   confidentiality purposes with some editing; third,
10   we're going to proceed tomorrow with the defendants'
11   proposals for receivers.
12              And we're ready to do that, Mr.
13   Jacobson?
14              MR. JACOBSON: We have one person who is
15   ready to be there.  We have the possibility of a
16   second, and we are hoping for a third.  But we have
17   one that's definite.
18              THE COURT:  Would you e-mail me the
19   proposals or whatever materials you have about them.
20   I felt a little bit handicapped yesterday not having
21   had the opportunity to read the proposals and ask
22   perhaps more probing questions.  So, if you can get
23   those to me as soon as possible, which is probably a
24   little more than seven minutes before we begin.
25              MS. KELLY:  Your Honor, on that note, we
```

1   wanted to ask the Court, do you want us to have Mr.
2   Carney back to the extent the Court might want to
3   ask him additional questions given the developments
4   that have taken place?
5               THE COURT:  Do you know, I don't think
6   so.  But why don't we do this:  Why don't we ask Mr.
7   Carney if he could be available telephonically, and
8   if between now and then, since 24 hours in the life
9   of this case is often major, then we can hook him up
10  in the courtroom for further questions or responses
11  if we need to.  Can we do that?
12              MS. KELLY:  Certainly, your Honor.  If
13  he indicates that he wants to or he would prefer to
14  be there in person, does the Court have any problem
15  with that?
16              THE COURT:  Oh, I only look at his
17  billing rate and think about our mandate to reduce
18  cost and delay in civil litigation.
19              MR. JACOBSON:  Certainly, your Honor, he
20  wouldn't be billing us for time spent prior to being
21  retained.
22              MS. KELLY:  We will leave it to Mr.
23  Carney to determine that, but we will assume it will
24  all be gratis, and we will let him know.  I suspect
25  with potential inclement weather he may well want to

```
 1   be telephonic anyway.
 2           THE COURT:  Right, he doesn't want to
 3   put the Dunkin Donuts coffee cups on his windshield
 4   anymore.
 5           All right, then, I understand why the
 6   SEC is not in a position to bless this bridge loan
 7   idea because we are looking into the dark.  The
 8   bridge loan best works, obviously, if there is a
 9   consent from PDVSA, the PDVSA entities, but we
10   should not presume it.
11           But it does seem to me that the SEC's
12   goal is to preserve -- in preserving the status quo
13   is to ensure the availability of sufficient funds to
14   satisfy final judgments and protect the assets
15   against dispassion from whatever process, and that
16   the extremely short term way to do that as to
17   Proterra is to authorize the MK entities to
18   subordinate their loan position to the amount of the
19   payroll necessary to be made tomorrow.
20           The Court is not in any way attempting
21   to stand in the shoes of an investor considering all
22   the material information about the companies that is
23   underway, in at least a piecemeal form, but that the
24   reality of a complete loss of investors' assets,
25   which may occur if Proterra stumbles and falls at
```

1  this point, is a consideration that leads the Court
2  to conclude that under these circumstances the
3  defendant should be authorized to put the angel
4  lender in first position, but limited to the amount
5  of the payroll necessary to be made tomorrow.
6              To the extent that this represents a
7  change that Attorney Stolper should be made aware
8  of, I would urge Attorney Jacobson to add that
9  development.
10             MR. JACOBSON:  Yes, your Honor.
11             THE COURT:  It may not be necessary, of
12 course, to make that disclosure unless and until the
13 angel comes forward and, in fact, loans the money
14 for payroll.
15             MR. JACOBSON:  Understood.
16             THE COURT:  But the declarations that I
17 have on Proterra, the information from the notice
18 and consent form, do indicate a going concern that
19 is -- that can be kept on life support by this
20 method for the next few days -- or the next I guess
21 it's week or two, and I think that that is in the
22 Court's view the way to best protect the investors'
23 assets with minimal compromise to their ability to
24 recover their assets should consent not be
25 forthcoming, and thus, should that loan not be able

```
 1  to be paid back immediately.  All right?
 2              MR. JACOBSON:  Thank you, your Honor.
 3              THE COURT:  Now, that said, do you need
 4  that in a written order or is it sufficient to have
 5  the transcript of this proceeding -- will that
 6  suffice, Ms. Kelly?
 7              MS. KELLY:  I don't think -- I mean,
 8  your Honor's order on the record I think is
 9  perfectly clear and I don't think, personally, that
10  there is any need for clarification in written form.
11              THE COURT:  All right, then, let's move
12  with dispatch to keep the consent obtaining process
13  moving, the investing or loaning process moving, and
14  as to NuScale, I don't know what the future holds.
15              Anything further we can accomplish
16  today?
17              MR. JACOBSON:  Not from us, your Honor.
18              MS. KELLY:  No, your Honor.
19              THE COURT:  All right, then, we'll see
20  you at ten o'clock tomorrow morning.
21              MS. KELLY:  Very well, your Honor.
22              THE COURT:  Snow and all.  Okay, thank
23  you very much.  Good-bye.
24
25
```

```
 1          I certify that the foregoing is a correct
 2   transcript from the record of proceedings in the
 3   above-entitled matter.
 4
 5                            1/29/11
                              -------
 6                             Date
 7
 8                   /S/   Sharon Montini
                     ------------------
 9                    Official Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```