```
1                    UNITED STATES DISTRICT COURT.

2                      DISTRICT OF CONNECTICUT

3    * * * * * * * * * * *  *   *      *
                                       *
4    SECURITIES AND EXCHANGE           * Case No. 11cv78(JBA)
     COMMISSION,                       *
5                  Plaintiff,          *
                                       *
6         vs.                          *
                                       *
7    FRANCISCO ILLARRAMENDI, ET AL  * January 21, 2011
                                       *
8                  Defendant.          *
                                       *
9    * * * * * * * * * * * * *  *      *

10                 TRANSCRIPT OF MOTION HEARING

11   BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12   Appearances:
     FOR THE PLAINTIFF:        RUA KELLY, ESQ
13                             LeeAnn GAUNT, ESQ.
                               United States Security and
14                             Exchange Commission
                               33 Arch Street
15                             Boston, MA 02110

16   FOR THE DEFENDANT         MICHAEL BLANCHARD, ESQ
     FRANCISCO ILLARRAMENDI:   Bingham, McCutchen
17                             One State Street
                               Hartford, CT 06103
18

19   FOR THE DEFENDANT MK      RICHARD JACOBSON, ESQ.
     ENTITIES:                 Arnold & Porter
20                             555 Twelfth Avenue NW
                               Washington, DC  20004
21
                               THOMAS GOLDBERG, ESQ
22                             Day Pitney
                               One Canterbury Green
23                             Stamford, CT 06901

24   Court Reporter:           Sharon Montini, RMR

25   Proceedings recorded by mechanical stenography,
     transcript produced by computer.
```

1              THE COURT:  Good morning, counsel,

2    ladies and gentlemen.  Another snow, another

3    hearing.  Here we are.

4              All right, I'm sorry for the late start.

5    I wanted to at least take a quick look at the

6    briefing that the defendants have now filed as well

7    as the resumes and proposals that have been

8    submitted.  So, let's see, we have a communication

9    from one of the STLF investors requesting that Mr.

10   Illarramendi remain the investor here.

11             Tell me, Mr. Jacobson, where are we

12   would respect to PDVSA?

13             MR. JACOBSON:  Yes, your Honor.  My

14   daily report, apparently.

15             THE COURT:  Your midnight report.

16             MR. JACOBSON:  My midnight report.

17   Before I get to PDVSA, I would like to report some

18   sad news, which is that I spoke with counsel for

19   NuScale yesterday and they advised me they are going

20   to suspend operations and furlough their employees

21   as we indicated yesterday morning might have to be

22   the case, and apparently that has been done and they

23   issued a press release yesterday afternoon about one

24   o'clock or so to that effect.  So, NuScale -- in

25   terms of the question you asked I think a couple

1    days ago as to whether this could be reversed if the

2    money is forthcoming any time soon, I just don't

3    know the answer, and I would think that would depend

4    on whether the highly-talented, well-educated and

5    well-trained employees that they're relying on find

6    other work between now and the time that they're

7    offered their jobs back.  I think that's probably

8    the key issue there.

9              THE COURT:  All right, Mr. Jacobson,

10   however, does that change the numbers of what is

11   sought to be advanced or invested at this time?  In

12   other words, are the numbers for NuScale off the

13   table?

14             MR. JACOBSON:  No, your Honor, they're

15   not, because my understanding is that if they were

16   to get the $5 million infusion relatively -- you

17   know, in a day or two or three, I would think the

18   chances are pretty good that they could start up

19   again.  If it's going to be two weeks or a month, I

20   don't know the answer.  But -- so that to the extent

21   that we have an emergency request for five million

22   now and five million on February 1st, I think, you

23   know, we don't have to decide about February 1st

24   yet, but the five million that they have requested

25   on an urgent basis I think is still on the table.

1          With respect to Proterra, Marc

2     Gottschalk, the general counsel of Proterra, is in

3     the court today.  I'd like to introduce him.

4          THE COURT:  Good morning.

5          MR. GOTTSCHALK:  Good morning.

6          MR. JACOBSON:  And he has a creative

7     proposal building on your Court's decision yesterday

8     that I think would take Proterra off the table as

9     far as we're concerned, without the need for any new

10    money to be going out from MK to Proterra, which I

11    -- which we believe is actually a very creative and

12    sensible approach which he can provide to you.

13          And now with respect to PDVSA, we have

14    counsel from Shearman & Sterling representing those

15    entities in court.  Jerry Fortinsky from Shearman &

16    Sterling is here.

17          MR. FORTINSKY:  Good morning, your

18    Honor.

19          THE COURT:  Good morning.

20          MR. JACOBSON:  And he can speak to their

21    position.  And that concludes my daily report.

22          THE COURT:  All right.  Anything from

23    the SEC?  Ms. Kelly?

24          MS. KELLY:  Good morning, your Honor.

25    We have just two matters.  While we have received I

1   think the bulk of the materials that the Court has

2   reviewed from defense counsel, we don't have and

3   have not seen the letter from -- an STLF letter that

4   was referenced by your Honor.  So I'm not sure --

5           THE COURT:  All right, do you have a

6   copy for her or shall we make one?  This is the

7   letter from Attorney Curran.

8           MR. JACOBSON:  Your Honor, could we have

9   that also?

10          THE COURT:  Did it just come directly

11  here?

12          MR. JACOBSON:  Apparently.

13          MS. KELLY:  Thank you, your Honor.

14          THE COURT:  This is the information

15  exchange.

16          MS. KELLY:  Well, I feel better now that

17  we didn't miss it.

18          The other thing we wanted to mention,

19  your Honor, is that we had advised defense counsel

20  last night -- your Honor had asked the Commission if

21  we intended to present any evidence, and in

22  responding we had said that many of the allegations

23  in the complaint are derived from documents and

24  statements given to us by the defendant.  We do

25  think that it would be of assistance, we hope, to

1    this proceeding to present brief, perhaps 20 to

2    30 minutes' worth, of testimony from Ms. Hussain.

3            We think that's particularly appropriate

4    because it would pertain to the scope of the

5    proposed receivership.  Ms. Hussain was on-site for

6    a lengthy on-site examination at Mr. Illarramendi's

7    place of business and can talk a little bit about

8    the state of the books and records there and some

9    concerns that came up in the course of the

10   investigation.  We do think it would be helpful

11   because to this point we have been fairly

12   exclusively focused on these potential private

13   equity ventures, but there are some kind of very

14   basic concerns about the way business is being done

15   there and the lack of the Commission's ability to

16   verify and value certain assets.  So, that's the

17   Commission's proposal.

18            And as to the receiver candidates, we

19   have had some time with the materials and are

20   prepared to proceed at the Court's direction.

21            THE COURT:  All right, and then this can

22   bear -- or be an opportunity, if you want, Mr.

23   Jacobson, to follow up with your -- maybe it's Mr.

24   Blanchard, I'm not sure, Mr. Illarramendi's response

25   in seeking the particular carveouts for fees and

```
1    living expenses.

2              MR. BLANCHARD:  I'm sorry, your Honor,

3    did you say you wanted me to be heard?

4              THE COURT:  Well, Ms. Hussain is going

5    to be apparently offering testimony that may bear --

6              MR. BLANCHARD:  Yes.

7              THE COURT:  -- on certain of the

8    carveouts that you have briefed, and to the extent

9    that you want to use your opportunity of

10   cross-examination to supplement your brief there, I

11   invite you to do so.

12             MR. BLANCHARD:  Thank you, your Honor.

13             MS. KELLY:  And just to be clear, your

14   Honor, Ms. Hussain, I don't think she will be able

15   to talk about the books and records for the various

16   funds.  I'm not sure to what extent she's going to

17   be able to talk about the personal assets.  But

18   we'll do our best to give the Court as much

19   information as we possibly can.

20             THE COURT:  I didn't know, I just wanted

21   to make sure that the defense counsel weren't shy.

22             MS. KELLY:  Thank you.

23             THE COURT:  Do I think there is any

24   possibility?  No.

25             Let's start with Mr. Gottschalk and
```

1   Proterra's proposal.

2                    Sir, do you want to come to the lectern.

3                    MR. GOTTSCHALK:  Thank you, your Honor.

4   I appreciate the opportunity.

5                    THE COURT:  Your full name is?

6                    MR. GOTTSCHALK:  My full name is Marc

7   Edward Gottschalk.

8                    THE COURT:  And you are a New York

9   licensed attorney?

10                   MR. GOTTSCHALK:  I am a California and

11  Washington D.C. and New Hampshire licensed attorney.

12                   THE COURT:  Yes.

13                   MR. GOTTSCHALK:  If you could just let

14  me give a brief background.  I am chief business

15  development officer and general counsel of Proterra.

16  Prior to joining Proterra in May of 2010, I was a

17  partner and chair of the Clean Technology and

18  Renewal Energy practice at a law firm called Wilson.

19  Sonsini, Goodrich & Rosati in Palo Alto, California,

20  where the firm represented a large number of clean

21  technology companies.

22                   I voluntarily left in May of last year

23  because of my having worked with Proterra for four

24  years as their outside counsel, having a very strong

25  belief and knowledge of the company's operations and

1    management and strong feelings about their path to

2    success in the transportation industry.

3                THE COURT:  So, Proterra had been a

4    client of your firm.

5                MR. GOTTSCHALK:  They had been my

6    client.  Yeah, a client of the firm that I was the

7    chief counsel for for four years.

8                The reason I'm here, of course, is to

9    save Proterra.  It is to save the jobs of the people

10   working at Proterra, to save the customers, to save

11   the investors who have collectively put quite a bit

12   of money into Proterra, and to support the suppliers

13   in 33 states who help us build the U.S.-made bus

14   with the most American content of any bus on the

15   street in the country.

16               As you know, I believe, from Jeff

17   Granato's declaration that was submitted, the

18   company is in crisis right now.  We were expecting

19   to receive an investment from our lead investor, MK

20   Energy & Infrastructure, back in the last quarter of

21   last year.  They are a lead investor.  They have

22   essentially the right of first refusal on any

23   investment into the company.  And so with their

24   enthusiasm and support and confidence that they

25   could invest in us, we saw no reason to go out and

1    look for any other investment, and were prepared to

2    close on an investment in the last quarter of last

3    year.  We were unaware of the standstill agreement

4    that was entered into with the SEC and unaware that

5    there would be any concern about getting a deal

6    closed.

7           We were -- the negotiations on that

8    transaction stretched into the beginning of 2011.

9    We had to accommodate that, you know, as best we

10    could given that we were getting close to the end of

11    our cash reserves.  When it came to the first

12    payroll of this year, management, the four

13    executives of the company, collectively put in a

14    half million dollars of our own personal money in

15    order to make payroll and keep the company going.

16    We were literally, we thought, on the verge of

17    closing on a loan to be able to fund the company

18    from MK last -- what was it -- 14th, when we found

19    out that this complaint had been filed in this

20    action and we were facing circumstances that we had

21    never expected and didn't know even existed.

22           So, needless to say, this comes at the

23    worst possible time.  We, in order to preserve the

24    company as a going concern and not to essentially

25    throw fear into our customers, to essentially damage

1   severely our reputation in the community and to

2   essentially allow our competitors in the

3   conventional bus industry to bad mouth the ability

4   of Proterra to succeed in the marketplace, it's

5   important that we continue the company as a going

6   concern, not just for them, but for the other

7   investors in Proterra.

8           And let me speak to that for a minute.

9   So, the way Proterra is structured, there is a

10  Series A stock.  The Series A stock has roughly

11  $17,400,000 invested in it, of which $12 million, or

12  roughly 70 percent, comes from high-net worth

13  individuals, mostly based in the United States, who

14  have long been supporters of the company.  You know,

15  one thing about high-net worth people investing in

16  your company that's both a benefit and a challenge

17  is they're very excited, enthusiastic and

18  supportive, and they're also in a constant state of

19  wanting to know information about the company, being

20  kept informed, and are very engaged and work with

21  the company to know what the company's inner

22  workings are and how it's doing.

23          Ahead of that Series A is a $15 million

24  convertible note with MK that is secured by all of

25  the assets of Proterra.  So in the event the company

1    were to meet its demise, the loan would get paid off

2    first and be in a secured position and the Series A

3    would get whatever is left over.  So, to put a finer

4    point on it, the non-MK Series A investors are the

5    ones who are most at risk in the current

6    circumstances.

7              What my request of the Court is, is to

8    allow the Series A investors to save the company for

9    their own benefit, and essentially for the benefit

10   of the MK investors who will lose a substantial

11   amount of value of their investment if the company

12   is not able to continue as a going concern.  When

13   Jeff Granato submitted his declaration, you know, we

14   -- to take it a step back, you know, we heard that

15   there was just one consent that was needed, not to

16   worry, we'll get the consent and we'll get this loan

17   in.  Well, as it's become aware, that's a lot more

18   complicated an issue than we were ever aware of.

19   And so it's only in the last 24 to 48 hours that

20   we've actually started to go back to our Series A

21   investors and talk to them about whether they would

22   be able to continue supporting the company.  When

23   Jeff Granato signed his declaration we weren't sure

24   that would be the case because we hadn't really

25   reached out to them.  And to put it in the most

1    positive sense, we've had what I would call "it's a

2    wonderful life" moment because we started to make

3    calls to these investors and the responses have

4    been, what can we do for you, how can we help.  So

5    just with the first two people that Jeff Granato

6    talked to we think we may be able to raise about a

7    million and a half, and that's without talking to

8    the rest of them.

9              So, what I would like to be able to ask

10   is to allow those Series A investors to help save

11   the company.  And by that I mean to let them come in

12   on a loan, like the loan that MK was going to do,

13   and because of the risk of the circumstances that

14   we're all in, to allow it to be placed ahead in a

15   security interest of the existing MK debt.  It would

16   only account for about 1/7th, or about 14 percent,

17   of the total amount of that debt.  And the money

18   that would come in would be able to allow the

19   company to survive to be able to bring in its next

20   round of investment.  We're already in discussions

21   with a couple capital venture firms that have

22   expressed interest in investing in the company and

23   have been tracking us, but as you know, and as the

24   SEC would expect, they would want to do due

25   diligence on the company, and it doesn't happen

1  overnight, it's going to take some time for those

2  entities to be able to get a good sense of the

3  company and put in their money, presuming of course

4  MK would be unable to follow through on its eight to

5  ten million dollar equity investment.

6         So, your Honor, that is what my request

7  is, is to let the Series A investors, who are the

8  collateral damage, along with the company in this

9  process, help save the company.

10         THE COURT:  Now, yesterday Mr. Jacobson

11  put forth the request for court approval of an

12  investor loan that would cover payroll til

13  mid-February.

14         MR. GOTTSCHALK:  It covers a two-week

15  period starting today.  We would owe another payroll

16  period in two weeks.

17         THE COURT:  It was, as I read the

18  affidavits, it was 700 -- no, wait a minute, that

19  payroll was $750,000 that would cover two pay

20  periods.

21         MR. GOTTSCHALK:  That was not the way it

22  was expressed to me.  So we only --

23         THE COURT:  So 750,000 per pay period?

24         MR. GOTTSCHALK:  No, no, you are right

25  about the numbers, your Honor.  I think there may

```
 1   have been a misunderstanding what we were being

 2   permitted to do.  So, we only paid for the initial

 3   pay period tomorrow.  We did not request the full

 4   loan to allow for both pay periods.

 5              THE COURT:  And how much is the pay

 6   period for tomorrow?

 7              MR. GOTTSCHALK:  347,000, roughly.

 8              THE COURT:  Okay.

 9              MR. GOTTSCHALK:  If the Court is

10   permitting both, certainly we'd appreciate that.

11              THE COURT:  I thought we were.

12              MR. GOTTSCHALK:  I was not present, so

13   I --

14              THE COURT:  I thought that I had

15   referenced back to the figure of $747,000 and knew

16   that that covered the payroll for today and for the

17   first one in February, which takes you to

18   mid-February.

19              MR. GOTTSCHALK:  That sounds correct,

20   your Honor.

21              THE COURT:  And the approval was that

22   that loan would be in first position above MK, the

23   MK entity, whose money was prior, whose loan was

24   prior, it would move that down, and it would be in

25   first position.  What's different about what I
```

```
 1   approved yesterday from what you are requesting

 2   approval from today?

 3              MR. GOTTSCHALK:  So, the concern that I

 4   have is, while we very much appreciate the ability

 5   to be able to cover the employees for two pay

 6   periods, we can't run a business on just that money,

 7   it's not possible.  We have payments like -- for

 8   example, one that is due to our most critical

 9   vendor, which was referenced in Jeff Granato's

10   declaration, it's the company that provides the

11   battery technology and battery chemistry to us,

12   without which we would not be able to have a product

13   that does what it does.  We have various

14   intellectual property rights in that agreement, and

15   we have various other beneficial provisions for a

16   supply from that company that would essentially go

17   away if they were able to pull back the contract on

18   us because we don't make payment by next Tuesday.

19              We have a lot of, you know, other

20   general expenses.  That employee payroll number we

21   gave you does not include, for example,

22   reimbursement of employee travel expenses and other

23   expenses that are incurred by employees for sales,

24   like the employees who were up in British Colombia

25   yesterday in a sales meeting in British Columbia,
```

1   and the other salesperson in Tallahassee, and our

2   support person for Foothill Transit, following the

3   buses in service in Foothill.

4                   We need to be able to plan for the

5   company to make its payments and keep its vendors

6   going.  Obviously we'd stretch them as far as we can

7   to last as long as we can until we get the new

8   equity in.

9                   So, what I am asking for is to see if we

10  can get our Series A investors to put up to

11  $3 million to keep the business going as a going

12  concern in all of these aspects.  While we have to

13  essentially stretch out as much as we can in each

14  direction with our vendors and others to be able to

15  last long enough to get the next round of equity in,

16  but if we are literally just coming in to, pardon

17  the expression, to ask for a permission slip for

18  each payment, that's not a practical way to run the

19  business as a going concern.

20                  And, your Honor, you know, we had asked

21  Attorney Jacobson to make the full request yesterday

22  for the three million.  I don't know if that request

23  was made.  I think he expressed to me that he was

24  concerned that he would only be able to make the

25  request for payroll and would otherwise be severely

1    objected to by the SEC, so was not willing to risk

2    asking for the whole thing.

3            THE COURT:  So the parameters of what

4    you are looking for is to displace in priority the

5    investors in the MK fund by the amount of $3 million

6    without -- excuse me, $3 million on their

7    $15 million convertible note.

8            MR. GOTTSCHALK:  Correct, from money

9    raised by other shareholders of the company who are

10   engaged in trying to protect their investment, and

11   ultimately MK, because as we keep the company going

12   as a going concern, everybody is getting protected.

13           THE COURT:  And then what are the terms

14   of -- so this is an investment, this is not a loan.

15           MR. GOTTSCHALK:  No, this is a loan.

16           THE COURT:  This is a loan.

17           MR. GOTTSCHALK:  It is a loan, your

18   Honor, correct.

19           THE COURT:  And so if you get new

20   investment money from other equity investors -- you

21   are out looking right now, I presume?

22           MR. GOTTSCHALK:  Correct.

23           THE COURT:  And you have some that are

24   in the pipeline whose maturation of that wooing

25   process is coming to a conclusion?

```
1              MR. GOTTSCHALK:  Correct, your Honor.

2              THE COURT:  When you get that, does that

3    then pay back the Series A investors?

4              MR. GOTTSCHALK:  On their loan only.

5              THE COURT:  On their loan only.

6              MR. GOTTSCHALK:  Correct, yes.  The idea

7    is we don't want to impair the MK debt any longer

8    than we have to.  And so the intention would be that

9    upon the next equity investment we would immediately

10   take those notes out and MK would go back to having

11   its first priority interest in the assets.

12              Now, you know, in all candor, part of

13   the transaction we were doing with MK was that when

14   the equity closes, that it was actually enabling a

15   working capital loan for the company of 15

16   million -- and sorry to get far afield here, but the

17   bank making that loan would require MK to

18   subordinate to its working capital line, and MK

19   agreed to allow that to happen.  So, if need be I

20   would come back to this Court when we're ready to go

21   through that process to get our working capital loan

22   in to ask that the MK debt be subordinated to that

23   as well.  But that may be an issue for down the road

24   if we need to deal with this in steps.

25              THE COURT:  So, the working capital loan
```

1   from a bank is different from the working capital

2   loan from MK?

3          MR. GOTTSCHALK:  So, MK's loan was the

4   kind of transaction you see in early stage companies

5   where an investor may sort of hedge its bets by

6   putting it in the form of a loan that you can then

7   convert into stock.  So that's why I was referring

8   to it as a convertible.  And so their intention was

9   to loan money and then, as they saw the company's

10   business prospects move forward and the value of the

11   company increased, to convert that loan into Series

12   B preferred stock.

13          THE COURT:  And that is at the

14   investor's option?

15          MR. GOTTSCHALK:  Correct.

16          THE COURT:  And none of that has

17   happened so far with MK's loans.

18          MR. GOTTSCHALK:  You mean in terms of

19   their converting it into stock?  No, they had

20   intended to hold the loan for somewhere between

21   18 months and two years before converting.

22          THE COURT:  Starting when?

23          MR. GOTTSCHALK:  That would have been

24   May of last year.

25          THE COURT:  So, getting close.

21

1          MR. GOTTSCHALK:  No, we're not even at

2     the one year mark.

3          THE COURT:  Oh, last.

4          MR. GOTTSCHALK:  May 2010, correct.

5          THE COURT:  And does that -- is that

6     affected in any way by who is prior to whom?  So you

7     said the bank capital loan wanted to be first, or

8     wanted to be prior to --

9          MR. GOTTSCHALK:  Correct.

10          THE COURT:  -- MK, and MK was okay with

11     that.

12          MR. GOTTSCHALK:  Correct.

13          THE COURT:  Does Series A investors

14     having first position affect MK's convertibility?

15          MR. GOTTSCHALK:  So, perhaps the

16     lettering is confusing because Series A is actually

17     in the weakest position.  The Series B that MK would

18     convert to would be a priority equity to the Series

19     A.  The Series A is always last.  The Series B would

20     take priority.  Presumably when a new investor comes

21     in they're going to ask for a Series C equity that

22     would take a preference over Series B and Series A.

23          THE COURT:  So, the bank working capital

24     loan that you described was somewhere in the process

25     of being obtained and you had already obtained MK's

1    consent to it having the prior position that it

2    wanted.

3              MR. GOTTSCHALK:  Yeah, to --

4              THE COURT:  Where is that?

5              MR. GOTTSCHALK:  So, to give it a full

6    explanation, we were negotiating two separate

7    agreements with MK, A loan to essentially carry us

8    forward through to the closing on the equity, and an

9    equity round of eight to ten million that was going

10   to enable several things.  It was going to

11   essentially take out that loan that MK was putting

12   in.  It was intended to provide the equity support

13   for the working capital line that Silicon Valley

14   Bank was in the process of agreeing to that would

15   allow the company $15 million to support its, you

16   know, purchase of inventory and building the buses,

17   and it was also going to support the requirements of

18   a loan from Palmetto Bank to be able to allow us,

19   along with $3 million in South Carolina state

20   grants, to start building our full-scale

21   manufacturing plant.

22              So, there are a lot of sort of ornaments

23   hanging off of the tree of that eight to ten million

24   dollar equity investment that we were anticipating

25   to come in from MK.

1        We had reached agreement on the terms of

2    the term sheet for that equity investment, as we had

3    reached agreement on the terms of the loan, but

4    neither document had gotten executed before all of

5    this happened.

6        THE COURT:  The suit was filed.  Is the

7    path that Proterra is taking in terms of its

8    obtaining and maintaining its funding aberrational

9    or typical?  The reason I ask that question is would

10   investors in MK, sophisticated investors presumably,

11   expect that this kind of rearranging of priorities

12   takes place as a practical matter?  Is this

13   something that is understood to be taking place?

14       MR. GOTTSCHALK:  Yes.  So, in the

15   typical course of an early stage company, there are

16   steps that you go through going forward, and it's

17   very typical to have, you know, a Series A round of

18   investments, a Series B, a Series C, sometimes a

19   series D, before the company will get to

20   profitability.  As you get to each of those stages,

21   and as the company grows, the investor's position in

22   the company is going to have to essentially move

23   back a little bit to allow either for new investment

24   to come in or for loans to come in or for other

25   things to take place to allow the company to move

1    forward.

2              You know, in the case of, you know,

3    allowing the Silicon Valley Bank loan to come in and

4    the Palmetto loan and the state grants to build the

5    building, this is building value in the company,

6    it's allowing the company to expand more rapidly to

7    build buses, in the case of the working capital

8    line, with a fairly, you know, low interest loan,

9    and in particular with respect to the construction

10   of the building, it's essentially allowing

11   $3 million of, quote-unquote, free money to come in

12   as equity into the company, in a sense, because it's

13   value going into that building that the company will

14   own, along with the other loans, which are actually

15   fairly low interest because they are purportedly

16   being supported by a United States Department of

17   Agricultural loan guarantee.

18             So, the ability to bring in this cheap

19   capital, for lack of a better term, and to bring in

20   these grants to enable that, investors will move

21   back their position to allow that to happen because

22   it's growing the overall value of the company.

23             THE COURT:  So, it's another form of

24   investment.

25             MR. GOTTSCHALK:  Correct.

1          THE COURT:  All right, questions for Mr.

2     Gottschalk?  Ms. Kelly?

3          MS. KELLY:  Not exactly, your Honor, but

4     I just did want to mention that counsel for the

5     primary fund investor is here in court, and in terms

6     of sort of what the investor might expect, it would

7     probably be instructive to hear from him on this

8     issue, because obviously one of the main things

9     we've been talking about is getting PDVSA's consent,

10    and since he's here, although certainly he doesn't

11    represent all investors, it would be instructive to

12    get their view on it.  The expectations, you know,

13    of both venture capital firms may not be the same as

14    investors in a short term liquidity fund, and I

15    think it would be helpful to hear him on that.  But

16    I think this has certainly been informative and the

17    SEC doesn't I think have any questions.

18         THE COURT:  All right, Ms. Kelly makes

19    the distinction between investors in a short term

20    liquidity fund versus equity investors.  Is there

21    any comment that you have with respect to their

22    expectations of your own experience?  And I will

23    certainly ask Mr. Fortinsky the same question.

24         MR. GOTTSCHALK:  Yeah, I don't know that

25    I can answer that.  I don't know what the terms and

```
1   conditions were of the fund that she's talking
2   about.  I only know what my company is and what we
3   do and what's typical for a company like ours.
4                THE COURT:  Okay.
5                MS. KELLY:  Your Honor, we did have one
6   question, which is simply did Mr. Illarramendi ever
7   make you aware during negotiations that there was an
8   SEC investigation on-site while he was in these
9   discussions with you?
10               MR. GOTTSCHALK:  So, let me clarify.  I
11  have never been in discussions with Mr.
12  Illarramendi.  So I don't know --our company has
13  not.  We have been in discussions with
14  representatives of MK Energy & Infrastructure, and
15  to the best of my knowledge I recall at one point
16  that they mentioned that there was an inspection in
17  their offices, but it was not described to us to be
18  anything other than sort of routine and not anything
19  that was something we should be concerned about.
20               MS. KELLY:  Nothing further.
21               THE COURT:  So the filing of the lawsuit
22  was the first time that you had any awareness of,
23  shall we call it, adversity between the SEC and Mr.
24  Illarramendi and the MK entities.
25               MR. GOTTSCHALK:  That is correct.  And I
```

1    think, quite frankly, the best evidence of that is

2    that the four executive officers of the company

3    would not collectively put $500,000 of their own

4    money on the line to meet payroll if we were under

5    the impression that MK in any manner would have been

6    stopped from providing a loan or an equity

7    investment in the company.

8                    THE COURT:  And you were one of those

9    four?

10                   MR. GOTTSCHALK:  Correct.  And to put a

11   finer point on it --

12                   THE COURT:  Yes, is the finer point that

13   if you had known we'd have been at this crisis

14   earlier -- or Proterra would be at this crisis

15   earlier?

16                   MR. GOTTSCHALK:  Perhaps if we had known

17   back in mid-December or earlier that there was some

18   significant adversity between the SEC and MK we

19   would have been scrambling way back then to get

20   additional funds, and my guess would be we would not

21   have had to put in our funds because the same Series

22   A investors who are willing to step up now would

23   have stepped up then.

24                   THE COURT:  All right, Mr. Jacobson, any

25   questions?

1          MR. JACOBSON:  No questions, your Honor.

2     I would just say that MK is in full support of the

3     request that Mr. Gottschalk has made to the Court,

4     and he correctly analyzed the reason I didn't ask

5     for the full three million yesterday.  I thought the

6     way I did it was to maximize the chances of getting

7     something to keep this company from going under

8     today.  We appreciate the Court's willingness to do

9     that.

10          THE COURT:  All right, thank you, sir.

11          Let me hear counsel for the PDVSA

12     entities, Mr. Fortinsky.  We probably need the

13     spelling of your name.

14          MR. FORTINSKY:  Sure, the last name is

15     spelled f-o-r-t-i-n-s-k-y.  We pronounce it

16     Fortinsky.  It's Jerry Fortinsky from Shearman &

17     sterling on behalf of the PDVSA entities.

18          THE COURT:  So you are not Antonia

19     Stolper.

20          MR. FORTINSKY:  I'm sorry?  I missed

21     something.

22          THE COURT:  Yesterday we had believed

23     that the point person at Shearman & sterling would

24     be Attorney Antonia Stolper.

25          MR. FORTINSKY:  Okay, Antonia Stolper

1    s-t-o-l-p-e-r.  Antonia Stolper is my partner and I

2    am working with her on this.

3              THE COURT:  Thank you.

4              MR. FORTINSKY:  She is a corporate

5    partner, I am a litigator, and I'm here because she

6    generally doesn't come to court, but by the same

7    token, you know, for the intricacies of corporate

8    transaction, I would certainly look to her, and of

9    course the client, for input.

10             THE COURT:  All right.  So, let's see,

11   let me find the consent.  You have received the

12   Michael Kenwood Capital Management LLC e-mail.  Your

13   clients have come to you for advice on whether or

14   not they should consent to the proposed additional

15   funding from MKAM and MKE&I.

16             MR. FORTINSKY:  Correct, your Honor, but

17   just to clarify, when you say the "e-mail," what I

18   have is a letter of ten pages on the letterhead of

19   Michael Kenwood Capital Management.  Is that what

20   you are thinking of, too?

21             THE COURT:  Yes, signed by Odo Habeck.

22             MR. FORTINSKY:  Yes.

23             THE COURT:  Yes.

24             MR. FORTINSKY:  Yes, that's right, your

25   Honor.

1          THE COURT:  Yes, sir.

2          MR. FORTINSKY:  We have received that.

3   We are not in the position to consent to the

4   proposals that's made in this letter.  Let me say,

5   first of all, that my client has really just learned

6   of all of this in the last 24 hours or so.  I've

7   learned of it in the last 24 hours.  It might have

8   been Wednesday night when my client heard, or when

9   Ms. Stolper heard.  So, our ability to evaluate

10  what's going on is very limited.  There are a lot of

11  documents we have not seen.  We have not had much

12  time to get our arms around this, and so it's very

13  difficult when I hear we're being asked to make --

14  to accept proposals and give our consent on the fly.

15  It's very difficult to do that without adequate

16  documentation and time to evaluate it.

17          Beyond that, though, we are concerned

18  about what we've heard in the last 24 hours about

19  the way this -- about the way MK has managed the

20  money in question and about the way the various

21  transactions here have been documented and we have

22  some open questions.

23          We do begin with a lot of goodwill

24  towards MK, and to Mr. Illarramendi in particular,

25  and, you know, naturally you assume honesty until

1    you the see evidence to the contrary.  But we have,

2    in fact, seen some things, seen some allegations and

3    indications that things are amiss here, and under

4    those circumstances it's very difficult for us to

5    authorize any further use of our money in a way

6    that's not consistent with the underlying purpose of

7    the fund and in a way that's -- you know, that

8    hasn't been adequately documented and adequately

9    explained.

10                One of the things that concerns me here

11   is the way -- on occasion people seem to talk about

12   my clients as -- and this is speaking loosely, as

13   investors in the two entities here, NuScale and

14   Proterra.  Actually, as I understand it, and, you

15   know, I'm happy to be corrected if appropriate, but

16   as I understand it, what has happened is simply that

17   there were loans made by the Short Term Liquidity

18   Fund to MK entities, I believe Michael Kenwood Asset

19   Management and maybe another MK entity.

20                And so, what we have here is not a

21   direct investment by my clients in these portfolio

22   companies.  As would typically be the case in a

23   private equity investment, but rather what we have

24   is essentially a loan to MK.  And what troubles me

25   is that it appears as though this was structured in

1    a way to give MK, and perhaps Mr. Illarramendi, the

2    upside home run potential of investments in these

3    two exciting companies while leaving my clients with

4    essentially only the downside, and it's hard to see

5    how that kind of transaction is fair, especially

6    when it's done without my client's consent or

7    without any -- without any adequate documentation or

8    disclosure to my clients.

9            So, you know, those facts make us very

10   concerned about what's gone on here.

11           THE COURT:  And how -- you've been

12   sitting here and hearing, for instance, that NuScale

13   has abandoned -- what's the word I'm looking for?

14   Shut down operations.  I think there is another word

15   than "shut down" that I'm not using.

16           MR. FORTINSKY:  I think they said they

17   furloughed employees.

18           THE COURT:  Furloughed employees.  It is

19   not operating currently.  And then you've heard Mr.

20   Gottschalk explaining all of what Proterra is doing

21   and needing, and I'm not sure whether you got any of

22   the declarations from principals in the two entities

23   and principal scientists in the two entities.  Did

24   you have those provided to you?

25           MR. FORTINSKY:  Yes, your Honor, last

1    night.

2              THE COURT:  So you have that as part of

3    your knowledge.  What is your thinking about -- and

4    I realize you are counsel and so you're, by the role

5    you are undertaking, not the investor, not the one

6    who is willing to take the risk, but the one who's

7    trying to advise the client on all the aspects,

8    including what obviously in these circumstances is

9    the huge downside risk.  But where do you balance

10   protecting an investment that has already been made

11   versus putting in more good money after bad?  I

12   mean, short of a full scale forensic investigation

13   of the financials and the audits of these companies,

14   how do you balance those things?  So you hear Mr.

15   Gottschalk talking about it's a good going concern,

16   it has tremendous potential, it has got itself

17   positioned in a fairly -- on a fairly good

18   trajectory, but it's going to be lost.

19              MR. FORTINSKY:  Your Honor, I see this

20   through a different framework a little bit.

21              THE COURT:  Okay.

22              MR. FORTINSKY:  What I hear, and a big

23   caveat over all of this is I don't know a whole lot

24   and I haven't seen the documentation, but what I

25   hear is that the fund that my client's money is in

1   has made a loan to MK.  That loan was not

2   documented.  My clients did not know about that

3   loan.  What I want to know is how my client, how is

4   the fund going to get that money back from MK.  MK

5   is not Proterra.  I have sympathy for Proterra.  I'm

6   sure the Court has sympathy for Proterra.  There are

7   20 people in this room that hear the same story, and

8   all of us hear about a company that's got great

9   prospects that needs the money, and naturally we're

10  all sympathetic, but I don't think anybody in this

11  room is reaching into his or her pocket to give

12  money to Proterra.

13           THE COURT:  Mr. Gottschalk did.

14           MR. FORTINSKY:  Well, I encourage him to

15  do as much of that as he can.

16           THE COURT:  I'll bet he has.

17           MR. FORTINSKY:  But in a way my client

18  is in the same position as the other 20 people in

19  this room.  We're all sympathetic, but there is a

20  difference between being sympathetic and to digging

21  into your pocket to support the project, and here

22  the financial transaction that my client apparently

23  unwittingly -- or at least this fund that my

24  clients' money is in, entered into, is a loan, and

25  from what I understand the terms of that loan have

1    not been documented.  The terms of that loan have

2    not been fully explained to my client, if at all.

3    And before we get into any discussion about what my

4    client is going to authorize and how it relates to

5    this other company, I would like to see

6    documentation that shows what the terms of the loan

7    are, and I would like to see -- I would like to

8    understand how the fund is going to get back the

9    money that it lent to MK.

10         THE COURT:  Now, there is -- it seems to

11   me that there are two funds that I understood we

12   were speaking about.  One is the Short Term

13   Liquidity Fund and then the other is the Special

14   Opportunities Fund, and I thought that's what your

15   clients have invested in, was the Special

16   Opportunities Fund.

17         MR. FORTINSKY:  My clients have invested

18   in both.  My client, as I understand it, 100 percent

19   of the money in the Special Opportunities Fund is my

20   clients' money, and something close to 100 percent,

21   but not exactly, in the Short Term Liquidity Fund is

22   my clients' money.  From what I understand, the

23   loans that were made so far were from the Short Term

24   Liquidity Fund, and the loans that are proposed in

25   this letter that we talked about at the outset were

1    to be made from the Special Opportunities Fund

2    because there was nobody else in it.

3           So, you know, our concern is -- and, you

4    know, we're talking about these as loans, but from

5    what I understand, based on the allegations in the

6    complaint, you know, they're all characterized as

7    loans after the fact.  I don't know firsthand what

8    the evidence on that is.

9           MS. KELLY:  I don't want to interrupt,

10   but I just wanted to clarify one point.  We don't

11   have any documentation for the loans with one

12   exception, which is Proterra.  It you look at Ms.

13   Hussain's declaration, at paragraph 21, it says "I

14   reviewed loan documentation for the investment in

15   Proterra which indicates that the loan was due to be

16   repaid to the Short Term Liquidity Fund in

17   November 2010 at LIBOR plus nine percent.  Counsel

18   to the MK group has advised Commission staff that

19   these terms were subsequently extended."

20          So, I just wanted to clarify that is the

21   only loan documentation that we've seen that was not

22   created after the fact.  And I don't know that we

23   can say investors in the Short Term Liquidity Fund

24   knew about it, nor do we think that it was

25   consistent with the terms of the private offering

```
 1   memoranda.  And the rest of the 53 million is
 2   entirely undocumented.  So, I just wanted to clarify
 3   that so the Court understands and counsel
 4   understands that there is one loan of the total that
 5   is documented.
 6              THE COURT:  And how much is that loan?
 7   Paragraph 21 doesn't say.
 8              MS. KELLY:  Twenty million dollars,
 9   approximately.
10              MR. FORTINSKY:  We are very concerned
11   here that this was set up in a way that -- or that
12   what was going on here was an arrangement which was
13   fundamentally unfair and got involved in
14   self-dealing, where the money manager set things up
15   so that instead of our client getting the profit
16   that ensues when you hit a home run in a private
17   equity investment, he would get the profit instead
18   of my client, even putting aside the fact that there
19   was no authorization and no documentation.
20              So, you know, again, we begin -- and we
21   still have a willingness to believe the best about
22   Mr. Illarramendi and we'd like to come away with the
23   conclusion that there was really nothing here that
24   was untoward and everything was done in good faith,
25   and we hope still that that's the case, but there
```

1   are substantial concerns here, and, you know, it

2   does not make sense for our clients to consent to

3   arrangements that perpetuate an arrangement that was

4   unfair to begin with.  Or to put it another way, how

5   can they come to us now and again ask us to put

6   further money into a company even now that we know

7   that the upside is going to go to somebody else?

8           THE COURT:  Tell me what, minimally

9   speaking, is the documentation that you need and

10   what is the timeframe that in a most expedited

11   fashion you can consider that information?  When you

12   said at the outset that your client cannot consent

13   to this proposal, you then qualified it, I thought I

14   heard, because of the absence of information or the

15   inadequacy of information.  That suggests to me that

16   a consent could be forthcoming with more

17   information, or not, but that it wasn't as if the

18   door was slammed shut on that.  I assume also that

19   somewhere in the wings there is an ability to

20   understand what Mr. Illarramendi or the MK entities

21   can give up that you believe is a structure that

22   would give them, as you say, all the upside

23   potential and slough off the downside to your

24   investors.  What do you need and how long do you

25   need to consider it?

1          MR. FORTINSKY:  Well, I think what we

2     would need is certainly all documentation relating

3     to the loans that were made by the Short Term

4     Liquidity Fund to MK.  We need -- there has been

5     some discussion about what could be done to provide

6     a guarantee that would, to the extent that any -- as

7     I've said, I don't understand how this can be a loan

8     if our clients have the exposure.  That ordinarily

9     gives them the right to an equity participation.

10          So we would need either something that

11     would ensure that we -- that our money gave us, you

12     know, the rights of an equity investor, or some sort

13     of guarantee that would protect our investment and

14     provide us some security before we were to proceed.

15     I think we would need to get an explanation of what

16     was not adequately documented and get documentation

17     in place that would, to the extent appropriate,

18     document transactions that should have been

19     documented.  It may or may not be the case that

20     those can be adequately documented at this stage, I

21     don't know.

22          As to how long it would take to

23     evaluate, I can't say that for sure because it sort

24     of depends on what the documentation looks like.

25     And, you know, I share the concerns that the SEC

1  apparently has expressed about whether we can -- you

2  know, whether we can sort of proceed on the current

3  trajectory without getting some accounting.  I think

4  most fundamentally what my client needs is an

5  accounting that shows what the -- what has happened

6  to the funds it has invested.

7          THE COURT:  All right.  And I had asked

8  Mr. Gottschalk about whether investors in

9  early venture --

10         MR. GOTTSCHALK:  Early stage.

11         THE COURT:  Early stage anticipate the

12  switching around of priorities.  They described it

13  in terms of earlier investors back off their

14  position to get new money into the venture,

15  ultimately anticipating that that will build value

16  and they will ultimately reap the benefits of that.

17  What's your view?

18         MR. FORTINSKY:  Well, let me take this

19  back to your prior question.  I think in order to

20  evaluate that one thing we do need, one kind of

21  documentation we need is documentation of what

22  rights the Short Term Liquidity Fund has in NuScale

23  and Proterra.  We don't have anything of that nature

24  now, and I don't know whether that's a matter of

25  documenting what's already been agreed to or making

1    sure that the documentation is amended to reflect

2    what our clients underlying, you know, interests are

3    here.  But I think that would be a starting point.

4              As to -- I'm sorry, I'm not sure if I've

5    answered your question or not.

6              THE COURT:  I guess I was asking it

7    assuming straight-up documentation and full

8    disclosure.  Is this, in your experience, something

9    that investors anticipate doing, that they don't

10   just have their position prior to the series

11   something or other and it doesn't ever change, that

12   that's too stultifying in the fluid investment

13   methodology that's used?

14             MR. FORTINSKY:  Well, remember, my

15   clients didn't think they were investing in these

16   companies.

17             THE COURT:  That's the basic dispute

18   here, is it loans or is it investments.  The SEC

19   says it's investments, the defendants says it's

20   loans, and we'll get to that at some point.

21             MR. FORTINSKY:  Well, even if we resolve

22   whether it's a loan or investment, there is still

23   the concern about my client being prejudiced either

24   way because if it's a loan, then why isn't there

25   adequate documentation and why aren't our interests

 1   protected and when are we going to get the money

 2   back, under what terms?  What's our exposure?  If

 3   it's an investment, then why don't we have, you

 4   know, essentially the upside interest?  And when we

 5   talk about a loan, also remember, that the loan is

 6   not a loan -- the discussion you had with Mr.

 7   Gottschalk was about, among other things, the

 8   distinction between the loans being made by the

 9   high-net worth individuals to the fund versus the

10   investments being made in the fund.  The loans that

11   my clients supposedly made here were not loans to

12   his company, but loans to MK.  So, it's a horse of a

13   different color.

14           So, we're concerned about our interest

15   being protected no matter how those transactions are

16   characterized.

17           THE COURT:  So, how do you anticipate

18   analyzing the impact on your clients' interests if

19   the money coming into Proterra is new money, it's

20   not your clients' money through MK through either

21   the SOF or the STLF, but it is instead new money

22   that will displace the priority that you don't

23   really understand about anyhow that MK has

24   negotiated for itself with NuScale and Proterra?  I

25   mean, is this new money, on balance, more protective

43

```
1    of your clients' interest in not losing their whole

2    investment than it is prejudicial from the change of

3    position of the MK entity where you say they hold

4    all the cards anyhow and your investors aren't in a

5    good position?

6              MR. FORTINSKY:  Your Honor, all I can do

7    is try to give you my own gut reaction.  But, in

8    fairness, I would need to really get an informed

9    response from my client in order to sort of take a

10   firm position on that issue.

11             THE COURT:  Of course.

12             MR. FORTINSKY:  But I think the answer

13   to your question with that caveat is that we need to

14   understand what the documentation is and whether

15   this was done -- how this was done in order --

16             THE COURT:  I'm sorry, "this" being this

17   Series A new money or "this" being whatever MK has

18   been up to in the past?

19             MR. FORTINSKY:  We need to understand

20   the past transactions and to see the documentation

21   in order to know whether -- whether the past MK

22   investments should fairly be treated as investments

23   by my client under all the circumstances.  If under

24   all the circumstances those investments should be

25   treated as investments by my client, then we ought
```

```
 1    to be able to evaluate the transaction that's

 2    proposed by Mr. Gottschalk, and perhaps under those

 3    circumstances it would make sense, and I'm not even

 4    a deal lawyer, let alone the finance guy, so I'm not

 5    in a position to evaluate it, but if that's -- if

 6    the substance of the past transactions gives us a

 7    right to participate as if we, in effect, controlled

 8    and benefited from the series -- the MK convertible

 9    notes as if those were ours, then we would be in a

10    position to say yes, that's a good transaction and

11    under all of the circumstances we agree to the

12    proposal, because that would better protect our

13    investment.  That would be sort of one sort of

14    decision tree, if you will.  If the investment is

15    fundamentally ours, then we should be in the

16    position to make the decision.  Maybe it's a good

17    decision, maybe it's not a good decision, that's for

18    my client to say.

19            The other path is maybe based on the

20    documentation there is adequate security for the

21    loan that was made by the Short Term Liquidity Fund

22    to MK and maybe that should be simply treated as a

23    loan.  And under those circumstances if we have

24    adequate assurance that the money is properly being

25    used and that we got a substantively fair -- and
```

1    there was a substantively fair transaction, then it

2    might be under those circumstances that we would not

3    have a voice in how that money was invested because

4    we had adequate security by other means.  But I

5    don't know the answer to that.

6              I do know that on the face of it a

7    transaction in which the investment manager puts his

8    own client's money into an investment that he has a

9    separate interest in is, on the face of it, a cross

10   trade that raises questions of fiduciary duty.  And

11   where the manager has engaged in that kind of

12   transaction, you know, sort of the benefit of the

13   doubt, if you will, goes to his clients to whom he

14   owes the highest fiduciary duty.

15             THE COURT:  All right, I approved

16   yesterday the use of $750,000 of this new money from

17   -- we called them angels, I now understand that they

18   are probably more accurately called Series A

19   investors, to be used, $750,000, which would be

20   prior to the MK loan.  In the scheme of things

21   $750,000, given the level of investments here, given

22   the drop dead nature of the need for that capital,

23   was a call that the SEC did not make, I did, because

24   it seemed small enough in amounts of money, big

25   enough in amounts of payoff, to warrant it.  From

1    the numbers that Mr. Gottschalk is giving me, that's

2    going to cover payroll that goes out today for two

3    weeks and the big vendor loan he's got to meet on --

4    pay on Tuesday, and then that's it.  So there is

5    very short turnaround here for you to learn a whole

6    lot of stuff.

7              I'm happy to let counsel for the

8    Commission and for the defendants pose any further

9    questions.  I'm also happy to recess this hearing,

10   since all of you are here in the room, and hopefully

11   somebody's briefcase has a whole lot of documents in

12   it, to begin a very speedy process by which a clear

13   view to whether there is a solution can be found.

14   There may not be.  There may be, as your antennae

15   are up, such issues of fiduciary duty breach that it

16   just isn't going to be a go, but everybody has real

17   interest in getting that explored to the end.

18             I also have put the question out, but I

19   don't have an answer, and that is what you raised

20   earlier, which is that Illarramendi personally

21   doesn't seem to have, what do we say, skin in the

22   game, and that may be something that is an operative

23   piece of a puzzle.

24             But let me first ask whether or not Ms.

25   Kelly or Mr. Jacobson have any further questions or

```
 1    points.  The bottom line for your purposes today is

 2    there is no consent forthcoming for the Court to

 3    utilize.  I understand that.

 4              MR. FORTINSKY:  That's correct.  And the

 5    touchstone that my client comes back to, and I

 6    perhaps should have said this earlier, is that if

 7    there is any investment from this point to be made

 8    by these funds, by SOF or STLF, my client should be

 9    the one making those decisions because basically

10    it's my clients' money.

11              MR. JACOBSON:  Your Honor, I think your

12    idea of a recess is quite good.  And I also agree

13    with Mr. Fortinsky, basically it is his clients'

14    money, it's his clients' decision, and I think that

15    goes not only with respect to this issues, but also

16    with respect to the issue of whether or not there

17    should be a receiver.  I think basically his client

18    will be paying for the receiver and that's a

19    judgment that the Court should hear.  I don't know

20    right now, I'm not sure Mr. Fortinsky is prepared to

21    say anything on that subject, but I do think with

22    respect to the immediate issue, which is whether or

23    not to agree to Mr. Gottschalk's request, a recess

24    now so all can talk it through is in everybody's

25    interest.
```

```
 1                THE COURT:  All right, we have some

 2     people who have come up here, however, to be heard.

 3                MR. JACOBSON:  May I speak to that?

 4                THE COURT:  Yes.

 5                MR. JACOBSON:  Both of our candidates,

 6     they are not lawyers, they are actually people who

 7     operate in the world that we're talking about.

 8                THE COURT:  Lawyers are not actual

 9     people?

10                MR. JACOBSON:  No, no, I didn't -- no,

11     no.

12                THE COURT:  You contrast it, they are

13     not lawyers, they are actually people.

14                MR. JACOBSON:  As a lawyer I will defend

15     our -- will defend our profession to the death.  But

16     there are some things we're good at and there are

17     some things we're not good at and there are some

18     things we really want business people with

19     restructuring experience to opine on, and both of

20     the candidates we have brought I think might be able

21     to provide the Court some illumination into the very

22     issues you've been discussing with Mr. Fortinsky,

23     which is how you should deal with the proposal Mr.

24     Gottschalk has put forward it, and it might be

25     illuminating to all of us litigators as well.  Since
```

1    they are here, perhaps you can just hear from them.

2              THE COURT:  Free advice.

3              MR. JACOBSON:  Then we could talk.

4              MR. FORTINSKY:  Your Honor, if I may.  I

5    would be happy to recess and discuss this privately.

6    I did not address the issue of a receiver, which I

7    understand has been under discussion here this week.

8              THE COURT:  Would you like to?

9              MR. FORTINSKY:  I would say, only

10   because it was raised by Mr. Jacobson, you know,

11   there is an anomaly here in that, as Mr. Jacobson

12   has -- Mr. Jacobson said, that the funds, meaning my

13   clients, would be paying for any receiver that's

14   appointed.  Our view is if a receiver is to be

15   appointed it should be paid by the defendants, not

16   by my clients.  There is no need for a receiver here

17   other than because of the admitted failings by the

18   defendants.  There would be no need for an

19   accounting.  There would be no need for a receiver

20   except because of actions that not even the

21   defendants contend were proper.  And under those

22   circumstances, especially given this is a court of

23   equity and the Court can exercise its equitable

24   powers, we would urge that if a receiver is

25   appointed, and we do think an accounting is

1    appropriate, that the charges for that not be

2    charged to the funds in question, but instead to the

3    defendants.

4              THE COURT:  All right.

5              MR. GOTTSCHALK:  May I speak for just a

6    moment, your Honor?

7              THE COURT:  Yes.

8              MR. GOTTSCHALK:  Thank you.  I guess I

9    just wanted to make a couple quick comments on the

10   receiver discussion.

11             THE COURT:  Do you want to come up to

12   the lectern.

13             MR. GOTTSCHALK:  Sure, if you don't

14   mind.

15             THE COURT:  It will make it easier on

16   the court reporter.

17             MR. GOTTSCHALK:  Yeah, I just wanted to

18   make a couple of the comments on the receiver

19   question.  The first one being that with respect to

20   this $3 million, hopefully, we haven't gone out to

21   the Series A and had them all commit up to

22   $3 million, but a $3 million loan in the company

23   from the Series A investors, our view is that with

24   respect to that transaction, that the Series A

25   investors in a sense are acting as the analyzer of

1   the situation from a business perspective and they

2   have spoken.  They're the ones that know the

3   business better than anybody other than the company,

4   and they have spoken with their pocketbooks to say

5   we're willing to put up more money to keep the

6   company going.  And so in that respect, at least for

7   this decision, I don't think a receiver is

8   necessary.

9           And I guess the second thing I would say

10  is -- it's maybe a semantic thing, but, you know,

11  you often talk about receivers in a bankruptcy

12  context, and this isn't really a, quote-unquote,

13  receivership in that sense.  And to the extent that

14  we have to appoint anybody for anything here, I

15  would rather be talking about having it be a

16  business advisor as opposed to a, quote-unquote,

17  receiver, because, you know, like I said, it makes

18  me a little nervous about what the intent is.

19          And then finally, you know, I don't know

20  where things are going to come out, what the SEC is

21  going to want or what MK is going to want or what

22  they're going to want, but, you know, perhaps with

23  respect to Proterra, if there is somebody that needs

24  to be advising as to the business prospects or

25  anything else to do with the operations of Proterra,

1    it could be somebody that's actually selected by the

2    other Series A investors who clearly want to be

3    protecting their investment and don't have positions

4    to take from a litigation perspective that MK and

5    the SEC do.

6              THE COURT:  Thank you.

7              All right, anything further before we

8    take a brief recess and -- yes?

9              MS. KELLY:  Just a couple of things,

10   your Honor.  Just to be clear, the receivership the

11   Commission had contemplated, and I think if anything

12   this morning's hearing highlights the need and the

13   urgency for a neutral in this process to give proper

14   voice to all of the people, because despite all of

15   the voices that are in the room, there are also

16   minority investors who are not here.  You know, we

17   just want to be clear, though, the receivership

18   would be as to the MK entities and certainly not to

19   Proterra or NuScale who stand in a very different

20   posture.

21             We also just wanted to note that to the

22   extent the Court thinks it would be helpful during

23   the time we have, we understand the Court's time is

24   limited today, Ms. Hussain may be of assistance to

25   the Court and also to the folks who are here,

```
1    particularly the main investor, because she can talk
2    about the state of the books and records and what
3    documents are and are not in existence and are or
4    are not available, which may be of -- may be
5    edifying and may help to clarify everyone's
6    positions more quickly.  So, we just make that
7    suggestion to the Court.  We know your time is
8    limited.
9              MR. JACOBSON:  And, your Honor, also
10   because your time is limited, and because our two
11   receiver candidates are here, one of whom is here
12   from Mississippi, and I think the Court indicated
13   that we would only have another hour or so, I think
14   before we take a recess it might be helpful to just
15   illuminate the entire process to hear from them,
16   because they've heard what has gone on this morning
17   and it's possible they might have helpful things to
18   say on that subject, as well as to answer any
19   questions that the Court might have regarding their
20   qualifications.  Because we really have a
21   philosophical difference here as to the -- if there
22   is going to be a receiver, and of course we're not
23   saying there should be, but as to the nature of the
24   skill set that is appropriate for that person to
25   have.
```

1      THE COURT:  Now, Mr. Gottschalk

2  expressed reservation about a receiver for Proterra.

3  I had not understood that to have been the

4  contemplation or the request.  They're doing fine,

5  it's the MK entities that would be subject to the

6  receiver if one were appointed.  Was that your

7  understanding of the -- that which you opposed?

8      MR. JACOBSON:  No, I had the same

9  understanding, although -- the Commission, one of

10  the few things that they're not requesting is a

11  receiver for Proterra and NuScale.  However, the way

12  Ms. Kelly characterized the asset freeze that they

13  are asking for, it would freeze assets that Proterra

14  and NuScale have that can be traced to MK.  So, I

15  think there is a -- there is an issue there that the

16  Court is going to have to address that may affect

17  them.  I don't think that -- unless the Commission

18  withdraws their request for a freeze of such

19  extraordinary scope, I think that's an issue that is

20  going to have to be dealt with at some point.

21      What I was suggesting was that the

22  receiver candidates we have, which would be

23  receivers for the MK entities, we have selected

24  because we think they have the appropriate skill set

25  for the job that the Court has articulated, and also

1   for anything that may come up in addition down the

2   road, and that skill set is initially I think

3   ideally suited to give the Court the information

4   regarding the kinds of things that have been said

5   this morning about the Series A and the

6   subordination that Mr. Gottschalk is requesting, and

7   things along those lines, because, as you know, Mr.

8   Gottschalk's proposal is not that MK commit more of

9   PDVSA money to Proterra, and also I think, as the

10  Commission will stipulate, it has stipulated, the

11  Proterra loan from MK STLF to MKE&I is, in fact,

12  fully documented, and was so from the beginning.

13          So, I don't know whether the Commission

14  would -- and I think that with respect to the issue,

15  the records, I mean, I really don't think there is

16  much dispute regarding the state of the records.  We

17  have been very transparent with the Commission.  We

18  have been dealing with them for some time in their

19  inspection and thereafter, and we have tried to be

20  very transparent with the state of the records.

21  They're not in very good shape at all, there is no

22  question about that.  The documentation is

23  deficient, there is no question about that.

24          I think what we're dealing with here

25  today and, you know, what we have been, is a much

1    more urgent question, which is, given the mess that

2    we're in, what do we do to preserve the value of at

3    least right now the one private equity company that

4    is not only a going concern, but seems to have

5    tremendous upside potential, and whether that

6    potential is going to ultimately be for the benefit

7    of PDVSA, as Mr. Fortinsky indicated might be the

8    outcome of negotiations, or whether it's going to be

9    used to help repay the Proterra loan, which is a

10   documented loan.  I think that it would be just --

11   and also because the receivers are here and because

12   the Court has such short time, I think that before

13   we recess it would be helpful to hear from them, but

14   obviously the Court can decided what to do.

15              THE COURT:  I think for the court

16   reporter's benefit we'll take a ten-minute recess

17   and then we'll be back.  All right, and then I will

18   hear -- I'm thinking that it may -- if this

19   synergistic process that we seem to have set up is

20   to be maximized, we should hear from Ms. Hussain

21   first.  Okay, ten minutes, please.

22              (Recess)

23              THE COURT:  All right, counsel, as my

24   clerk has advised you, Article III powers are vast,

25   I have made two more hours.  But let's -- this is

```
1    very pressing and I can in good conscience do that,

2    and so we have done that.

3              MS. KELLY:  Thank you, your Honor.

4              THE COURT:  All right, let's proceed

5    with Ms. Hussain then.

6              MS. KELLY:  Thank you.  Very well, your

7    Honor, the Commission calls Sophia Hussain.

8              S O P H I A   H U S S A I N,

9    Having first affirmed, was examined and testified as

10   follows:

11             THE WITNESS:  My name is Sophia Hussain.

12             THE COURT:  You need to pull the

13   microphone down, please, closer to you.

14             THE WITNESS:  My name is Sophia Hussain,

15   h-u-s-s-a-i-n, and I live in Sudbury, Massachusetts.

16             THE COURT:  Thank you.

17             You may proceed.

18   DIRECT EXAMINATION

19   BY MS. KELLY:

20       Q.   Good afternoon, Ms. Hussain.

21       A.   Good afternoon.

22       Q.   Ms. Hussain, where are you employed?

23       A.   I work for the Securities and Exchange

24   Commission.

25       Q.   And which office?
```

1      A.     In the Boston regional office.

2      Q.     When did you first join the SEC?

3      A.     I joined the SEC in December 2010.

4      Q.     Ms. Hussain, what's your title at the SEC?

5      A.     I am a forensic accountant with the SEC.

6      Q.     And can you just briefly describe your

7   duties and responsibilities as a forensic

8   accountant.

9      A.     Yes, my responsibilities include

10  investigating financial crimes, financial frauds in

11  relation to securities violations.

12     Q.     Ms. Hussain, let's just go back and talk

13  about your educational background.  Where did you go

14  to college?

15     A.     I did my undergraduate at Boston

16  University.

17     Q.     And what degrees did you receive?

18     A.     I have a Bachelor of Arts in English and a

19  Bachelor of Science in business administration with

20  a concentration in accounting.

21     Q.     Ms. Hussain, what kind of work did you do

22  when you graduated from college?

23     A.     I worked for Deloitte & Touche USA LLP in

24  their financial advisory services group, and under

25  that I was in their forensic and dispute services

1   practice, and I was a forensic accountant there as

2   well, and I worked mainly on white collar crimes and

3   securities litigations, also investigating financial

4   fraud.

5       Q.   Did you obtain any further degrees beyond

6   undergraduate education?

7       A.   I do.  I am a certified public accountant.

8   I am also a certified fraud examiner, and I have a

9   Master of Science in development studies from the

10  London School of Economics.

11      Q.   When did you receive your degree from the

12  London School of Economics?

13      A.   2008.

14      Q.   And did you go to the London School

15  immediately after you finished working at Deloitte &

16  Touche?

17      A.   Yes, I was at Deloitte and Touche for four

18  years, and then I went on to obtain my Master's.

19      Q.   After you got your Master's degree, what

20  was your next job?

21      A.   I worked for the Federal Bureau of

22  Investigation for one year before joining the SEC.

23      Q.   Can you talk a little bit about what you

24  did for the FBI.

25      A.   Yes, I was a forensic accountant there as

1  well, and my role there also included investigating

2  white color crime, which included securities

3  litigation, two of which went to indictment and one

4  of which involved, similarly, an investment advisor

5  situation that involved asset misappropriation.

6       Q.    And you joined the SEC, you said, in

7  December.

8       A.    In December.

9       Q.    And prior to working with -- actually, let

10 me withdraw that question.  Ms. Hussain, when did

11 you first become involved in the investigation that

12 led to this action?

13      A.    I became actively involved on December 29,

14 2010.

15      Q.    What did you do on December 29, 2010?

16      A.    That was the first day that I, along with a

17 team from the SEC, arrived at Michael Kenwood Group

18 offices to meet with representatives there.

19      Q.    Can you just tell us about the team that

20 the SEC sent down.

21      A.    Sure.  The team consisted of myself as well

22 as three other examiners and an attorney from the

23 SEC.

24      Q.    When you say "examiners," what kind of

25 background did the other folks have who went down

1  there with you?

2      A.   We had two other CPAs and one person who is

3  an -- I believe a Master's in finance, but all three

4  between them have 15 years of examination experience

5  conducting usually routine, but also cause exams at

6  the SEC.

7      Q.   Meaning -- "examinations" meaning, sort of

8  just very basically, that you go onto the premises

9  of an entity to examine their books and records?

10     A.   Right.

11     Q.   So, how long did you and the SEC team spend

12 down at the MK Group?

13     A.   We were down there for about five and a

14 half days.

15     Q.   And in addition to your team, were there

16 any other people there other than staff from the MK

17 Group?

18     A.   There were representatives of Arnold &

19 Porter, including Mr. Jacobson.  And also a team

20 from the accounting firm, I believe forensic

21 accounting firm, Alvarez & Marsal, that was employed

22 there as well at the time.

23     Q.   About how many lawyers were there?

24     A.   There were usually two, sometimes three

25 from Mr. Jacobson's firm, and from the accounting

62

1    firm there were between three and six to eight

2    people there at any given time.

3        Q.   What was your understanding of what the

4    forensics accounting firm was doing on-site?

5        A.   We were instructed initially the forensics

6    accounting firm had been hired to produce or

7    construct the accounting records of one MK fund, the

8    MK Venezuela Fund, and that was because that fund

9    had been wound up in 2010, and due to that winding,

10   because of Cayman lay, the Cayman law requires

11   audited financial statements from a fund that had

12   been closed.  So Alvarez & Marsal had been obtained

13   in order to create those financial statements.

14   While we were on-site their role expanded a bit to

15   include constructing the accounting records of other

16   MK entities as well.

17       Q.   And just a minor point, when you say

18   "Cayman law," are you referring to the Cayman

19   Islands where the corporate entities are

20   established?

21       A.   Yes, I am.

22       Q.   Ms. Hussain, what was the team's goal when

23   they went down to the MK Group?  What was your

24   assignment there?

25       A.   Ultimately what we wanted to do was we

1    wanted to verify the assets of initially just the

2    Michael Kenwood Venezuela Fund.  And when I say

3    "verify assets" I mean we wanted to understand which

4    assets were held by the fund and the value of these

5    assets.

6         Q.   So, the existence and the valuation of the

7    funds?

8         A.   Yes.

9         Q.   And was there any role that you had in

10   looking at whether those assets were being managed

11   in way that was consistent with the clients' goals?

12        A.   Yes, that was part of our investigation as

13   well, to understand what clients -- what the

14   investors expected would occur with their

15   subscriptions and whether or not that expectation

16   was being met.

17        Q.   In doing that, were you provided with

18   copies of the offering memoranda that the people who

19   invested in the fund received?

20        A.   Yes, we received copies of the private

21   offering memorandums that were given to investors.

22        Q.   What type of financial records were you

23   looking for from the MK Group?

24        A.   We weren't looking for anything specific in

25   terms of -- we understand that this is not a

1    registered entity and there are no books and records

2    requirement, but we were looking for any

3    documentation that would show the transactions that

4    the funds took in, the lists of the assets that the

5    funds held, the value of those assets, any

6    obligations or the liabilities of those funds, and

7    then also an understanding of who the investors were

8    and the amounts of money that the investors had put

9    into these funds.  So, any sort of documentation

10   that listed all of these items.

11       Q.    Was one of the things -- one of the things

12   you mentioned I believe were internal accounting

13   documents for the funds.  Would that have included a

14   general ledger?

15       A.    It should have included a general ledger,

16   which would basically be a summary of the

17   transactions that had occurred and categorized by

18   accounts for the funds.

19       Q.    Did the funds -- and I'm referring

20   specifically when I say "the funds" to STLF, the

21   Short Term Liquidity Fund, and the MK Venezuela

22   Fund, did those funds have general ledgers at all?

23       A.    Not that we were provided with.

24       Q.    And were you told anything about whether

25   there were to be general ledgers prepared at some

1   point?

2       A.   We were told that the MK Group had hired a

3   controller in December of 2010 and he had been

4   brought on to construct these accounting records,

5   and he, along with the team of Alvarez & Marsal,

6   were in the process of putting together these

7   records.

8       Q.   So, if you couldn't look at the general

9   ledger, did counsel or any of the MK staffers give

10  you any other financial records to look at?

11      A.   We were able to look at bank records for

12  the main bank account held by -- main bank account

13  held by both STLF and MKV, which was a Deutsche Bank

14  account in Amsterdam, and these bank records were

15  able to show us the cash and securities transactions

16  conducted by the funds.

17      Q.   Were you also looking for documents to

18  verify the existence of client assets?

19      A.   Yes.

20      Q.   Stock certificates, that kind of thing?

21      A.   That was our main goal, was to understand

22  what the assets were, and then to be able to verify

23  those with an independent source.

24      Q.   Were you able to do that for all of the

25  assets held by the funds?

1     A.    We weren't able to do that for a majority

2  of the assets that were held by the funds as of the

3  date of 11/30 2010, which is the date that we

4  requested such a listing for.

5     Q.    Just starting with -- you'd mentioned

6  before wanting to get an asset list.  Did you get an

7  asset list for the funds?

8     A.    We did get an asset list, but this wasn't

9  readily available.  We arrived on the 29th, as I

10  mentioned, which was a Thursday, and we had been in

11  communication with counsel of MK beforehand and had

12  made them aware of the kind of information that we

13  were looking for, and so we expected to be provided

14  with an asset list once we were on-site, and we

15  didn't obtain this until the end of our second day

16  there.  And from our understanding that list was

17  created while we were on-site for our benefit.

18     Q.    And in looking at the asset list -- excuse

19  me, with regard to all of the items on that asset

20  list, did you attempt to verify the existence and

21  value of all of the assets on the list for the

22  funds?

23     A.    We did try to do that, yes.

24     Q.    And did you find documents for all of those

25  assets?

1      A.    We did not.

2      Q.    With regard to the allegations in the

3  complaint, are you familiar with the complaint in

4  this case?

5      A.    Yes, ma'am.

6      Q.    And have you the read it?

7      A.    I have.

8      Q.    And is it fair to say that the team

9  found -- the team determined that $53 million in

10  funds were actually held in Mr. Illarramendi's

11  entities' names?

12      A.    We weren't -- the information that we

13  received was -- involved a combination of

14  discussions, and it was through those discussions

15  that we understood that those -- the 53 million, to

16  which you refer, was held in the name of entities of

17  MK Group and not of the funds.  So we didn't see --

18  we saw some documentation, mainly in the form of

19  stock certificates, which showed that that 53

20  million was held in an ownership by MK entities.  It

21  was first a discussion, and then after prompting we

22  were able to the receive stock certificates for the

23  majority of those transactions and the underlying

24  assets resulting from those transactions.

25              THE COURT:  I'm sorry, the 53 million

1   were held in the Illarramendi entities' names as

2   opposed to what?

3            THE WITNESS:  As opposed to the fund.

4   So the funds were the ones who gave consideration

5   for these investments.

6            THE COURT:  "Funds" being the STLF?

7            THE WITNESS:  Meaning money from MKV

8   bank accounts or STLF bank accounts went to entities

9   to purchase shares in various private equity

10  companies, but all of these shares were held in the

11  name of either Michael Kenwood Asset Management,

12  Michael Kenwood Energy & Infrastructure, or Michael

13  Kenwood Solar.

14           THE COURT:  Thank you.

15  Q.    So, with regard to the $53 million, you

16  were able to determine after first hearing from --

17  let me back up for just a moment just so it's clear.

18  When the team went down there from the SEC, how did

19  you go about collecting information?  Did you just

20  rummage around or did you ask somebody for it?

21  A.    No, the way we started was we first

22  familiarized ourselves with the entities themselves,

23  the structure of the Michael Kenwood Group and the

24  way the funds fit into the structure, and then we

25  requested an asset list.  From that list we

1    requested documentation and support showing how

2    these assets came to be in existence and then how

3    these assets were valued.  And so, any information

4    that we received, whether -- that involved actual

5    documentation, actual physical papers, was provided

6    to us by the entity.

7         Q.   And so if you couldn't locate a particular

8    document or verify a particular asset, would you

9    then return to either counsel or staff and ask them

10   again for the documentation?

11        A.   Yes.

12        Q.   So, to the extent you've testified thus far

13   about not having particular documents, in all cases

14   you asked for those documents if you were not

15   provided with them?

16        A.   Yes.

17        Q.   Is that fair to say?

18        A.   It is.

19        Q.   And so ultimately as to the 53 million that

20   went into private equity ventures, you were provided

21   with stock certificates showing the names in which

22   those investments were held; is that right?

23        A.   Yes, that is correct.

24        Q.   Ms. Hussain, could you just talk about what

25   observations you made while you were on-site at the

1  MK Group and what were your concerns when you were

2  there.

3      A.   Our biggest concerns centered around the

4  lack of documentation, which we have discussed here.

5  And while we were out on site, counsel was quite

6  forthright in explaining that the documentation we

7  were requesting did not -- does not currently exist,

8  and we found it to be of concern that the advisor is

9  not able to explain to us what assets are held by

10  the fund, how those assets came to be in existence.

11  We were quite concerned that we couldn't fully

12  verify all of the subscriptions made by investors.

13          We received a list of the investors and

14  we received the amounts of money that was put into

15  the fund by the investors, but with our own

16  independent review of bank statements, we were able

17  to see additional funds put in by investors that

18  were not on that list.  So our biggest concern was

19  really just the lack of accounting of all of the

20  transactions that the funds participated in.

21      Q.   Through your time on-site at the MK Group,

22  were you able to -- were you able to determine what

23  the total value of the funds currently held was?

24      A.   We were given a number.  We weren't able to

25  independently verify that number, but we were told.

1      Q.    In terms of -- you talked about your

2  concerns generally.  Are there any specific examples

3  that come to mind about certain assets that you had

4  difficulty verifying?

5      A.    Well, there are a couple of examples.  One

6  easy to understand example is the asset list we were

7  given, we were told there was some cash held in a

8  Venezuelan bank, and we were given the name of that

9  bank, and through discussions later we learned

10  actually there are two Venezuelan banks, and maybe

11  there are three.  And it was concerning to us that

12  the fund did not know how many bank accounts it held

13  and how much money was in those bank accounts.  So,

14  that was one example.

15           Another example, there was some shares

16  purchased in an oil exploration company called

17  Vectra (ph), and we were able to see in the bank

18  statements money going out from that fund to

19  purchase these shares, but no one was able to

20  provide us with any sort of documentation as to what

21  was received in exchange for these shares.  We

22  didn't know -- we didn't have any share

23  certificates, stock certificates.  We weren't able

24  to determine whether those shares existed, whose

25  names they were held in.  So it was concerning to us

1   to see that money go out and not see anything

2   supporting what was received in return.

3        Q.   And how much money went to the oil

4   exploration investment; if you know?

5        A.   I don't remember at the moment.  I'm sorry.

6        Q.   Was it in the -- you know, more than

7   $10 million?

8        A.   It was several million dollars.

9        Q.   And were there any assets that you were

10  unable to verify on the MK Group side of the

11  transaction?  In other words, you learned an

12  investment was made, but you weren't able to

13  determine what consideration was given for it?

14       A.   Yes, we also encountered that as well.

15  There were approximately two -- we were told of

16  approximately $246 million of loans made to private

17  companies in Venezuela, and we asked several times

18  for any sort of documentation on these loans, and we

19  were able to receive a letter from an international

20  accounting firm, BDO Seidman, confirming that these

21  loans existed and that this firm had approached the

22  companies with which the loans were made and BDO had

23  valued these loans, but we weren't able to

24  understand what consideration the funds paid for

25  these loans.  So, we asked to see which transactions

1    showed that a loan is made from, for example, STLF

2    to an X Venezuelan company, and we didn't get to

3    that point, they -- that information was not readily

4    available in the time that we were there.  We

5    weren't -- no one was able to figure out that

6    information.

7              MS. KELLY:  May I just have one moment,

8    your Honor?

9              THE COURT:  Yes.

10              MS. KELLY:  Nothing further.  Thank you.

11              THE COURT:  Okay, cross-examination.

12    CROSS-EXAMINATION

13    BY MR. JACOBSON:

14        Q.    Good morning, Ms. Hussain.

15        A.    Good afternoon.

16        Q.    Good to see you again.

17        A.    Good to see you, too, sir.

18        Q.    With respect to the examination or

19    inspection that you conducted that you began on

20    December 29th, do you know how that inspection came

21    about?

22        A.    It came about, there was an inspection

23    earlier in 2010 of another entity called Highview

24    Point Partners, which is actually a registered SEC

25    entity and subject to periodic SEC examinations, and

1  through that examination the exam team, which

2  included the individuals that were out with me at

3  MK, they saw transactions between Highview and MK

4  Venezuela Fund that were a cause of concern, and so

5  we requested a voluntary examination of MKV based on

6  that information.

7      Q.    Did Michael Kenwood Group or MKV, whoever

8  the entity was you discussed that with, did they

9  have the -- were they required to submit to that

10  examination?

11      A.    No, they were not.

12      Q.    Because they were unregistered?

13      A.    Right.

14      Q.    So, it was entirely voluntary on their

15  part?

16      A.    Yes, it was.

17      Q.    And I believe you said earlier that the

18  initial focus of the examination was entirely on

19  MKV, correct?

20      A.    Correct.

21      Q.    And is it fair to say that you learned very

22  early, maybe on the first day, that the Alvarez firm

23  had been retained to assist in the preparations of

24  financial statements for MKV?

25      A.    Yes, we learned that immediately.

1    Q.   And you mentioned that the Alvarez firm is

2  a forensic accounting firm, correct?

3    A.   Yes.

4    Q.   Are they also well known for their asset

5  recovery work?

6    A.   Yes, they are.

7    Q.   Would you consider them to be a preeminent

8  firm in the industry?

9    A.   Yes, I would.

10    Q.   And you mentioned that they had three to

11  eight people.  Would you agree that during the

12  course of the examination that when your attention

13  turned to STLF, Alvarez increased the team in order

14  to address questions you were asking about this new

15  fund?

16    A.   Yes, they did.  It was clear that the team

17  was increased based on our inquiries into that STLF

18  fund.

19    Q.   And would it be fair to say that, at least

20  from your perspective, the Alvarez team was

21  attempting to answer all of the questions that you

22  were asking of it?

23    A.   Yes.  Yes, they were making all efforts to

24  attempt to answer the questions that we were asking.

25    Q.   Would you agree with me that they were

1   cooperative and actually even at some point sharing

2   with you documents that might arguably be attorney

3   work product?

4        A.   They were extremely cooperative.  Yes, they

5   were extremely helpful.  Whether it was attorney

6   work product -- yes, we were told that some of it

7   might be so.

8        Q.   Do you specifically recall an occasion

9   where an attorney work product label was, in fact,

10  deleted before the document was handed to you?

11       A.   Yes, I do.

12       Q.   So, did you have any concerns at all

13  regarding the level of cooperation you were

14  receiving from the Alvarez fund?

15       A.   No, none at all.

16       Q.   Or with any of the other representatives

17  with whom you dealt?

18       A.   No, none at all.

19       Q.   Is it also fair to say that given the state

20  of the records of the Michael Kenwood Venezuela Fund

21  that you actually were quite complimentary regarding

22  the ability of the Alvarez firm to put together as

23  much as they had in the time that they had to work?

24       A.   Yes, they did quite a good job of putting

25  together the information that we needed in a short

1   period of time.  We were more concerned with the

2   fact that this information did not exist before our

3   arrival.

4       Q.   And would it also be fair to say that you

5   have no reason to believe that any failure to

6   provide a document that you requested was due to

7   anything other than the fact that that document did

8   not exist?

9       A.   That's correct.  We understood that if we

10  did not receive something we requested it was

11  because it did not exist.

12      Q.   And specifically, do you recall actually

13  being provided during inspection with documentation

14  of the loan made by STLF to the Michael Kenwood E&I

15  entity for the purpose of funding Proterra?

16      A.   I do remember reading that document.  We

17  did request it in the production, and unfortunately

18  didn't receive it, but I do remember reading that

19  document, and I believe that I declared that we did

20  see this document.  So, we do know that there is

21  documentation showing the loan between STLF and

22  MKE&I.

23      Q.   If there was any inadvertent failure to

24  give you a document, I apologize, and I guarantee

25  you you will get a copy.

1           Also, would it be fair to say that we

2   indicated that we would produce on behalf of our

3   client the documents that were shown to you during

4   the exam?

5       A.   Yes, and the majority of those documents

6   were produced.

7       Q.   As a matter of fact, would you agree with

8   me that significant effort was made in order to be

9   able to provide you those documents in electronic

10  form on the last day of your examination and, in

11  fact, that was done?

12      A.   Yes.

13      Q.   Now, with respect to the STLF fund, would

14  you agree with me that basically the first time that

15  the Alvarez team turned to the records of that fund

16  was when you asked -- you started asking questions

17  about it during the examination?

18      A.   Yes, that was our understanding, that they

19  had not looked at it beforehand.

20      Q.   So, would you agree with me that the fact

21  that the -- that there was an inability to provide

22  you STLF documents during the exam may well have

23  been due to the fact that the Alvarez team, which

24  had been working on MKV for several months, had

25  simply not been able to do the work necessary to

1  reconstruct the transactions necessary to verify the

2  documents in question, correct?

3      A.   Yes, correct.  We completely understood

4  that, and that wasn't our concern, it was more that

5  the records did not exist to begin with.

6      Q.   So, not to belabor a point, but it would be

7  fair to say you had no concern documents were

8  deliberately being withheld from you with respect to

9  either fund; would that be correct?

10     A.   Correct, we had no concern of that.

11     Q.   Would it also be fair to say that, at least

12 given what you observed the Alvarez team was able to

13 do with respect to reconstructing the MKV records in

14 a relatively short time, that if they had had more

15 time you would have expected them to be able to

16 answer more, if not all, of the questions you were

17 asking regarding the STLF fund as well?

18     A.   Yes.  We did expect that given more time

19 all of that information could be gleaned.

20     Q.   And you mentioned a concern that the fund

21 didn't know how many bank accounts it had.

22     A.   Yes.

23     Q.   I'd like to talk about that for a second.

24     A.   Sure.

25     Q.   Isn't it a fact that what actually happened

80

```
 1   was that the Alvarez team advised you initially that

 2   they thought there was only one account and

 3   described that, and that during the course of the

 4   week the Alvarez team learned of the additional

 5   accounts and then supplied those to you?

 6       A.   It is true that the Alvarez team made us

 7   aware of the other two accounts, but our concern was

 8   that the client itself did not know of the number of

 9   accounts, and we did not receive statements for the

10   other two accounts that we learned of and we only

11   received very partial statements for the one account

12   that the client did make us aware of.

13       Q.   Isn't it fair to say you really don't have

14   a factual basis to say that the client didn't

15   know -- I mean the fund itself did not know how many

16   accounts it had, but rather the forensic team

17   on-site had not gotten to that point yet?  Isn't

18   that really all that you know?

19       A.   I know that we requested the client -- we

20   requested an asset list of the client, and I know

21   that on that asset list two accounts were not

22   included.  And I know that these two accounts were

23   made aware to us by the Alvarez team.

24            MR. JACOBSON:  May I just take a short

25   break.
```

```
1                    THE COURT:  Yes.

2       Q.   Well, Ms. Hussain, I would just like to

3  thank you for your time this morning.

4                    MR. JACOBSON:  And I have no further

5  questions at this time.

6                    THE COURT:  All right, Mr. Blanchard, do

7  you have separate questions?

8                    MR. BLANCHARD:  No questions, your

9  Honor.

10                   THE COURT:  All right, Mr. Goldberg?

11                   MR. GOLDBERG:  No.

12                   MS. KELLY:  Just two questions, your

13  Honor, if I may.

14                   THE COURT:  Yes.

15  REDIRECT EXAMINATION

16  BY MS. KELLY:

17      Q.   Ms. Hussain, did you have any contact

18  personally with Mr. Illarramendi during your time

19  there or was it entirely through counsel that you

20  had any dealings with him?

21      A.   We exchanged pleasantries, but that was the

22  extent.

23      Q.   Do you have any personal knowledge as to

24  whether Mr. Illarramendi was or was not cooperating

25  fully with the Alvarez firm?
```

1      A.    Could you --

2      Q.    Let me rephrase the question.  Did you have

3  any understanding of whether the client was fully

4  cooperating with the Alvarez firm?

5      A.    I had no understanding either way.

6      Q.    Okay.

7            MS. KELLY:  Nothing further.

8            MR. JACOBSON:  Just very brief, your

9  Honor.

10  RECROSS-EXAMINATION

11  BY MR. JACOBSON:

12      Q.    Ms. Hussain, isn't it a fact that at one

13  point in the examination you asked the Alvarez team

14  whether they were obtaining full cooperation from

15  the client and the Alvarez team said that they were?

16      A.    I do recall what you mean, and yes, the

17  answer was we were -- they were obtaining -- they

18  were receiving cooperation.  Yes, you are right.  I

19  apologize.  Thank you for reminding me.

20            MR. JACOBSON:  Thank you, your Honor.

21            THE COURT:  So, what was the bottom line

22  with respect to the asset list?  Did you get a

23  complete asset list that you were able to verify who

24  the investors were and the amounts invested?

25            THE WITNESS:  No.  We received a list of

1    the investors and we received amounts that each

2    investor invested and was redeemed.  We weren't able

3    to trace all of those back to any sort of bank

4    statements, and the Alvarez team itself let us know

5    they weren't able to trace all of the amounts.  So,

6    there were amounts on that list that the Alvarez

7    team did not see coming into bank statements and

8    there amounts that we, the examination team, saw

9    coming into the bank statements that were not on the

10   investor subscription list.

11            And then in terms of the assets that

12   were held by the funds, for the majority of those

13   assets we did not see any sort of independent

14   documentation showing that these assets existed or

15   what their value was.  So, the documentation that we

16   saw was really limited to bank and brokerage

17   statements that show the cash and securities

18   transactions occurring and the stock certificates

19   from several of the private equity companies showing

20   that those stocks were held in the name of MK

21   entities.  And that's the extent of the independent

22   documentation that we viewed while we were there.

23            THE COURT:  So, what was the

24   relationship between the asset list that you were

25   finally able to reconstruct, or have the Alvarez

1   firm give you information for, and the 53 million

2   held in Mr. Illarramendi's entities' names?

3            THE WITNESS:  Sure.  And I may be

4   forgetting an asset here or there, but the asset

5   list we received was for the STLF fund, because the

6   MKV fund had been wound down in December of 2010,

7   and that list included what the client believed to

8   be all the assets in STLF.  That included the 53

9   million of what we understand to be loans from the

10  STLF fund to MK entities to make these private

11  equity investments.  There were other assets on the

12  list which included cash and bank accounts,

13  particularly Deutsche bank account, another smaller

14  bank account, and the Venezuelan bank account that I

15  mentioned.

16            It also included an investment in

17  Venezuelan real estate for about $7 million.  It

18  included a small balance of PDVSA bonds.  It

19  included a significant balance of 205 million in

20  something called the Cheyne Fund, which we weren't

21  actually able to dig in to while we were down there.

22  And it also included 246 million in bolivar loans,

23  which were loans made in bolivar denominations, the

24  currency of Venezuela, to companies in Venezuela for

25  private loans between the STLF fund and various -- I

1  believe it was 15 or 16 companies in Venezuela that

2  received funding from the STLF.

3        So, that was the extent of the list.

4  And at the top of that list was the 53 million of

5  loans from the funds to MK entities for the private

6  equity investments.

7        So, from that asset list we were able to

8  verify the cash in the bank and we were able to see

9  stock certificates for the 53 million, but we

10  received very little documentation on the rest of

11  the assets.  We received some documentation on the

12  Cheyne Fund, but we were told that that valuation

13  was still being worked out and it wasn't finalized.

14  And we received a letter from BDO regarding the 246

15  million of the bolivar loans, and the letter

16  indicated that BDO had confirmed the existence of

17  the loans and it placed a value on it, but that was

18  the extent of the documentation on those loans.  The

19  MK entities had no paperwork showing that the fund

20  held these loans that was to these companies in

21  Venezuela.

22        THE COURT:  Yes?

23        MR. JACOBSON:  May I be permitted to ask

24  just a couple more questions.

25        THE COURT:  Yes.  Can you hold the

1    question and let me finish my questions?

2                    MR. JACOBSON:  Sure.

3                    THE COURT:  Because I will lose my train

4    of thought.

5                    You said when you went there you reviewed

6    the private offering memos.

7                    THE WITNESS:  Yes.

8                    THE COURT:  And those were the memos

9    that went to the investors who appeared on your

10   asset list that you received for the STLF?

11                   THE WITNESS:  So, I think there is a

12   little bit of confusion.  So, we requested two main

13   lists that we wanted to start with.  The first list

14   was the list of assets held by the STLF.  So, what

15   does the STLF own.  And then we requested a separate

16   listing of who the investors were and how much money

17   had they put in.  So, I guess the first list -- the

18   second list would come first, what money came into

19   the fund by whom, and what was that money used for

20   would be the second list, would be the asset list.

21                   So, the private offering memorandums

22   that we requested, we requested those which were

23   given to the list of investors that put money into

24   the fund.  Does that make sense?  Is that clear?

25                   THE COURT:  And what did the private

1   offering memos given to those investors say about

2   any of the terms of the loans or the purpose for

3   which that money would be used?

4           THE WITNESS:  Well, there were two main

5   points from the POM.  For short, the POM.  One was,

6   especially in the STLF, which is the Short Term

7   Liquidity Fund, that investors would be able to

8   redeem their money with 30 days' notice.  That

9   implies that the investment that would be made would

10  be in such a form that they could be converted into

11  cash within 30 days to be given back to the

12  investors.  So that was the first representation in

13  the POM that might not have been in line with the

14  kinds of investments that were being made.  For

15  example, loans to private companies with terms --

16  you know, what we understood to be short-term loans,

17  but "short term" means within a year, so it was our

18  understanding that if $246 million is with loans of

19  private companies that probably couldn't be

20  converted to cash within 30 days.

21          And the second representation made in

22  the POM was that any loans to the advisor, so for

23  example for those private equity investments, they

24  were loans to MK entities, those loans would have to

25  be disclosed to the investors before they were made.

1    So, it was our understanding the fund couldn't loan

2    money to any of the MK Group subsidiaries without

3    obtaining consent from the investors before doing

4    so.  The POM didn't preclude such transactions, but

5    it did indicate that disclosure would have to be

6    made to investors before such transactions were

7    entered into.

8              THE COURT:  Two further questions.  Did

9    you see from the asset lists or any of the records

10   that redemptions were requested and provided?

11             THE WITNESS:  We saw that redemptions

12   were provided, yes.

13             THE COURT:  And --

14             THE WITNESS:  Those were listed both on

15   the asset list and we were able to -- we were able

16   to verify all of the redemptions back to the bank

17   statements.  We did see additional money going out

18   to certain investors that were not included on that

19   redemption list.  But we didn't have concern that

20   investors had not received back any money to this

21   point that they had asked for.

22             THE COURT:  And did you find -- so you

23   said that the 53 million of assets that went into

24   the STLF fund came out as shares held in

25   Illarramendi's entities' names, not STLF or MKV.

1          THE WITNESS:  Correct.

2          THE COURT:  And were there documents

3    that you found or that were related to loans that

4    STLF or MKV would be making to other entities,

5    including the MK entities?

6          THE WITNESS:  The only documentation

7    that we saw was a letter between STLF, and I believe

8    MKE&I for the Proterra loan, and that letter

9    described a loan had been made, it described an

10   interest rate, and it gave a date of a repayment,

11   which had initially been November 2010, and then we

12   saw that it had been extended to January 14, 2010.

13   So, we did see that one letter for that one loan.

14         THE COURT:  And that was for how much?

15         THE WITNESS:  I don't remember what the

16   documentation said.  We know that the transfer was

17   for 20,350,000 from STLF to -- it actually went to I

18   believe -- I don't remember the name of the fund.

19   Yes, it went directly from STLF to Wilson Sonsini

20   for 20,350,000, but I don't remember what amount was

21   included on the loan letter between STLF and MKE&I.

22         THE COURT:  Now, I had been under the

23   impression that the PDVSA entities were 90 percent

24   of the STLF fund.

25         THE WITNESS:  Yes.

1          THE COURT:  Is that borne out your by

2    inspection?

3          THE WITNESS:  Yes, it is, in the sense

4    that the list of investors provided by the client

5    explains that.  We haven't been able to

6    independently verify through bank records or

7    brokerage records the exact amount that all

8    investors put in and redeemed.  We were only able to

9    do that partially.  So, that 90 percent reliance is

10   based on the amount that was disclosed to us by the

11   client without full independent verification as of

12   yet.

13         THE COURT:  Thank you.  Questions on my

14   questions?

15         MR. JACOBSON:  I'm sorry, your Honor.

16   BY MR. JACOBSON:

17   Q.   Ms. Hussain, do you recall the legend that

18   was contained on the bottom of the asset list for

19   STLF that was provided to you during the course of

20   your examination?

21   A.   I remember there was a legend, I can't

22   remember what was on it.

23   Q.   Do you recall whether that legend said

24   "preliminary, unaudited and incomplete draft for

25   discussion purposes only produced pursuant to staff

1    request and not to be relied upon"?

2              MS. KELLY:  Objection, your Honor.

3        Q.    Does that sound right?

4              MS. KELLY:  Objection.

5              THE COURT:  Does this refresh your

6    recollection in any way?

7        A.    Yes, that is correct.

8        Q.    Do you also recall on that asset list there

9    were certain narrative entries, comments, if you

10   will, that were attached to certain of the dollar

11   entries that were on that list?  Do you recall that?

12       A.    Could you explain another way?  I'm sorry.

13             MR. JACOBSON:  Maybe I could show a

14   document that would refresh the witness's

15   recollection, your Honor.

16             THE COURT:  All right.

17       A.    And then your question again?  I'm sorry.

18       Q.    I'm sorry, does that document I showed you

19   refresh your recollection as to whether on the asset

20   list that you were shown there were comments in a

21   narrative form relating to certain of the dollar

22   amounts that were on the asset list?

23       A.    Yes, I do remember seeing this before.

24       Q.    Does that refresh your recollection as to

25   what you saw the first time?

1        A.    Yes, it does.

2        Q.    Okay.  And so now based on your refreshed

3    recollection, can you testify that with respect to

4    the dollar amounts that was on the asset list that

5    you were shown, there were certain narrative

6    entries?

7        A.    Yes.

8        Q.    And isn't it a fact that with respect to

9    certain of the amounts that were shown as private

10   equity loans, that there were entries that said

11   "collateral packages being prepared"?

12       A.    Yes, I do remember those entries were

13   there.

14       Q.    And do you remember being told through

15   explanation that, in fact, loan documentation was

16   being prepared for those loans that included, to the

17   extent possible, security interests, so that the

18   assets in which the entity had invested would be

19   used as security for the loan between the fund and

20   the entity?

21       A.    I remember discussing that the packages

22   were being prepared and there were discussions as to

23   what the securities and guarantees would be, but

24   that those weren't in place at the time.

25            MR. JACOBSON:  No further questions.

 1              THE COURT:  Anything further?

 2              MS. KELLY:  No, thank you.

 3              THE COURT:  I have one last question.

 4    Is the -- is a part of your inspection the

 5    communications between either of those two funds or

 6    the MK entities and the investors?

 7              THE WITNESS:  I can't comment on

 8    examinations in general because this is my first,

 9    but given that our goal was to ensure that

10    investments were occurring in the way that investors

11    expected, we were hoping to see some sort of

12    communication between the fund and investors

13    regarding the loans to the MK entities.

14              THE COURT:  So, you were looking for

15    that?

16              THE WITNESS:  And we did ask for that.

17    We asked whether consent had been received, and we

18    were told that there were verbal communications with

19    some of the investors, but that no formal consent

20    had been provided.

21              THE COURT:  Did you -- were you able to

22    pin down with any more specificity from whom

23    these -- which investors these verbal consents had

24    been obtained?

25              THE WITNESS:  We were told that the

```
 1    clients spoke often with PDVSA representatives and
 2    that they had verbally discussed the possibility of
 3    making private equity investments with the PDVSA
 4    representatives.  Our independent confirmation with
 5    PDVSA showed that, yes, PDVSA was aware that private
 6    equity investments were being made, but their
 7    impression was that the equity investments were in
 8    the funds' name, they were not aware of loans by the
 9    funds to the MK entities.
10              THE COURT:  So, they thought that those
11    investments were being made from STLF or MKV
12    directly.
13              THE WITNESS:  Yes, that's what PDVSA
14    assumed.  The other investors we spoke with did not
15    know at all that private investments were occurring
16    in any fashion.  But PDVSA thought that the
17    investments were in the name of the fund.
18              THE COURT:  And you described earlier
19    that one of the POM terms was this 30-day redemption
20    period which suggested loans not to going concerns.
21              THE WITNESS:  Right, especially if you
22    think of a loan, and a loan has a term of, let's
23    say, 365 days, and investors want their money in 30,
24    if the loan isn't due yet, the company to which the
25    loan is made has no obligation to pay it back before
```

```
 1    it's due, and so there would really be no legal way

 2    of obtaining the money back with the agreement that

 3    had been in place.  So, if a loan is made to a

 4    company and it's for 365 days, that's when the

 5    company is obligated to pay it back and not before

 6    that.

 7                THE COURT:  To focus on the issues that

 8    have been before us for the last several days, is it

 9    correct then that you verified with PDVSA that they

10    knew of loans to NuScale and Proterra, but thought

11    that those loans were coming straight from STLF and

12    MKV?

13                THE WITNESS:  It's correct we spoke with

14    PDVSA.  Our understanding was that PDVSA believed

15    that they weren't loans in any fashion, they were

16    investments.

17                THE COURT:  Investments.

18                THE WITNESS:  They were -- they owned a

19    piece of NuScale and they owned a piece of Proterra.

20    They did not know that they were Proterra and

21    NuScale, they didn't know the names of the

22    companies, they just knew that there were private

23    equity investments being made, and they thought that

24    that resulted in ownership to the fund.

25                THE COURT:  All right, any questions on
```

1  mine?

2          MS. KELLY:  Just to clarify.

3  BY MS. KELLY:

4     Q.   Ms. Hussain, was your understanding of what

5  PDVSA thought concerning the funds' investments is

6  based on a telephone conversation that you and the

7  team had with a representative of PDVSA?

8     A.   Yes.

9     Q.   Prior to the filing of the complaint?

10    A.   That is correct.  We spoke over the phone

11 with an individual who -- I don't remember his

12 title, but he was responsible for investment

13 decisions at the PDVSA pension fund.  So, it wasn't

14 all of the PDVSA entities, it was just the pension

15 fund.

16    Q.   And just to be clear, did the

17 representative have any knowledge of the specific

18 names of the investments, like NuScale and Proterra,

19 or just generally that private equity investments

20 were being made?

21    A.   No, he knew just generally that private

22 equity investments were being made, and he was aware

23 that they some were made in U.S. companies, but that

24 was the extent of his understanding.  He didn't know

25 of the amounts or of which companies.

1          THE COURT:  And you referenced earlier

2     the MKV trading in bolivars.  Is that what the PDVSA

3     pension fund thought the MKV money was used for, or

4     did they think that as to MKV, like STLF, they were

5     being invested, those funds were also being invested

6     in private equity investments of which they then

7     would have a piece?

8          THE WITNESS:  From my recall, their

9     understanding was MKV -- we didn't discuss MKV and

10    STLF separately with them, because MKV had been

11    wound down.  So, I'm not sure what they thought

12    occurred in MKV.  But in STLF, they assumed that the

13    main kinds of transactions that were occurring in

14    STLF were Venezuelan currency arbitrage through the

15    purchase of bond denominated funds from Venezuela.

16         THE COURT:  All right, thank you very

17    much.

18         MR. JACOBSON:  Just one question.

19    BY MR. JACOBSON:

20    Q.  Ms. Hussain, do you recall whether there

21    was any PDVSA money in the MKV fund at all?

22    A.  I can't recall at the moment.  I'm sorry.

23         THE COURT:  All right, thank you.  If

24    there are no further questions, you may step down.

25    You are excused.

```
1              THE WITNESS:  Thank you.

2              THE COURT:  All right, shall we proceed

3    to hear from the persons proposed as receivers or

4    advisor, whatever we are going to call them, if we

5    have them at all.  Should we start with Ms. Midanek?

6              MR. JACOBSON:  I think that's a good

7    idea, your Honor, since she travelled the farthest .

8              THE COURT:  Are you the Mississippi

9    delegate?

10             MS. MIDANEK:  I'm a New Yorker to my

11   toes, I just happen to live in Mississippi.  Good

12   afternoon, your Honor.

13             THE COURT:  Good afternoon.

14             MS. MIDANEK:  My name is Deborah

15   Midanek, and yes, I do live in Mississippi.  I also

16   have an office and apartment in Manhattan, however.

17   Would you like me to give a general presentation

18   about background and so on at this point?

19             THE COURT:  Yes, and you've been

20   listening all morning to the quandaries that we

21   face, and any of your insight that is of derived

22   from your experience obviously will be very

23   pertinent to our understanding of what skill set

24   best fits and what you would anticipate doing.

25             MS. MIDANEK:  Thank you, your Honor, I
```

1   will be happy to do that.

2           Just a quick background statement first.

3   As I said, my name is Deborah Midanek, and I have a

4   degree in history from Bryn Mawr College and an MBA

5   from the Wharton School, received in 1980.  I spent

6   the 1980s on Wall Street in strategic planning at

7   Bankers Trust Company, then as an early member of

8   the interest rate and currency derivatives

9   activities, of which Bankers Trust was a leader in

10  the early 1980s.

11          I then moved to Drexel Burnham where I

12  built the interest rate products desk in New York,

13  and then moved into being responsible for structured

14  products at Drexel Burnham.  I spent a large part of

15  the '90s building my own registered investment

16  advisor, focussing on managing money for

17  institutional clients, principally pension funds and

18  some endowments in the Fortune 100 sort of area.  We

19  invested in mortgage-related instruments and

20  structured products where we got our main attention

21  and scrutiny, particularly from the press and

22  sometimes from regulators, when we took on a series

23  of troubled portfolios affected in the 1994

24  derivatives meltdown, and we became sort of a

25  manager of last resort, where we'd often take on

1    responsibility for portfolios in trouble at three

2    o'clock in the morning.

3              We also offered registered funds, as in

4    under the Investment Company Act of 1940, in short

5    duration government funds.  In fact, we think we had

6    the first short duration government fund offered, or

7    at least one of the very first.  It was a registered

8    fund, however, not private fund unregistered.

9              In the late 1980s, I sold Solon Asset

10   Management, which had about a billion dollars in

11   assets under management at that time, and went into

12   the world of corporate restructuring and turnaround

13   advisory work by joining the firm of Alex Partners

14   as a principal.  Alex, you know, and Alvarez, and a

15   handful of others, are very well-known in the world

16   of taking interim management assignments, serving as

17   responsible parties in gray areas, in situations

18   that are uncertain, ambiguous or sometimes, frankly,

19   bankrupt.  I served at Alex as a chief restructuring

20   officer, which became a term of art in the world of

21   the bankruptcy courts for responsible parties, or as

22   the chief executive officer for several large

23   sub-prime originators and servicers that were in the

24   first round of the sub-prime collapse in 1998 into

25   2000.  CityScape Financial in Elmsford, which had

1  operations in the US and UK, a lot of regulatory

2  scrutiny given there, particularly in the UK, I

3  managed that through a bankruptcy and a sale on the

4  other side.

5           Then I went to United Companies

6  Financial in Baton Rouge, which was the oldest

7  retail originator, as their guide through a

8  liquidity crisis, and ultimately when they realized

9  they had no cash left, I became the CEO and went

10  through taking that company through a bankruptcy and

11  split it into two pieces to receive the most value

12  in, again, ambiguous circumstances.

13           I then was hired, was recruited by

14  another turnaround management firm called Glass &

15  Associates where we did a number of out-of-court

16  interim management assignments in different kinds of

17  companies.  There I advised the equity company in

18  Finova, a financial services company, and I served

19  -- let's see, I served on the board of Rodman &

20  Renshaw, which was a broker-dealer that was owned by

21  the Mexicans at that point, but they were needing

22  some help to figure out how to wind it down.  It was

23  a public company that had suffered a string of

24  operating losses.

25           I am often operating in ambiguous

1   circumstances and trying to tease out the path to

2   preserving value.  For the last five years I've had

3   Solon Group, Inc, which is my own firm which does a

4   combination of things.  We work in both advising on

5   business development issues in venture stage

6   companies and early stage companies and on advising

7   in troubled company scenarios.  We will serve as

8   interim management as needed, as corporate director,

9   independent director as needed.  And we also do

10  occasional angel investing ourselves and are --

11  what's the other?  There was another piece to this

12  that I'm forgetting at the moment.

13          Most recently I've served as financial

14  advisor to the lenders and the creditors in several

15  of the large sub-prime meltdowns of the last couple

16  of years.  One was Alliance Mortgage Investments in

17  Brisbane, California.  The other was Freemont

18  General Corporation in Santa Ana, California.

19          I also, as Solon, had a client that was

20  a money management firm who manages my own funds,

21  where they realized I had a background in

22  fund-related activities and asked me to help them

23  build a series of private unregistered funds.  So, I

24  did that.  I created the legal structure and built

25  the team of advisors surrounding it, including

1   building Cayman-related funds, working with the OGA

2   firm, who I understand may have been involved here,

3   and created the independent administrator and the

4   audit relationships and so on.  So I'm familiar with

5   that area.

6           A couple of things to highlight before I

7   give some comments on what I've heard this morning.

8   How did I go from Wall Street into the world of

9   restructuring?  Well, as I mentioned, I was an

10  employee of Drexel Burnham Lambert Group Inc and --

11  in February of 1990, and when the company filed for

12  bankruptcy protection I organized the shareholders

13  of the firm to get recognition from the bankruptcy

14  court as an official equity committee.  It was not

15  broadly understood that the shareholders were the

16  employees of the firm, and, in fact, the 50th

17  largest shareholder of the firm was the head of the

18  mailroom.  So these were people who -- whatever was

19  going on about Drexel Burnham in the press, these

20  were people who had no knowledge or no ability to

21  represent themselves in this situation.

22          I chaired that court-appointed

23  committee, and as chairman of that committee

24  negotiated a restructured board of directors for the

25  debtor, Drexel Burnham, and was, in the middle of

1   the case, deemed to be not the chairman of equity,

2   but a disinterested director, and served as the lead

3   independent director in that situation.

4           This pertains because the SEC deemed

5   Drexel very shortly after I had seated my

6   independent directors to be an inadvertent

7   investment company, and thus, needed to be managed

8   under the 40 Act rules.  The independent directors

9   who had just been recruited became, in effect, a

10   substitute for a trustee or a receiver being

11   appointed because of the difficulties of litigation

12   swirling around the firm and the emotions and

13   intensity of that particular case.

14           So, the independent directors, because

15   the whole street was, at that point, affiliated one

16   way or another through the extensive holdings of

17   Drexel Burnham, had to make every single portfolio

18   decision about a $38 billion balance sheet that was

19   at that point adversel selected.  Everything that

20   was liquid could be sold -- had to be sold, so we

21   needed to make those decisions.

22           In another situation I became an

23   independent director of Standard Brands Paint

24   Company in California after a bankruptcy.  It turned

25   out that the restructuring had not been completed;

1    the CEO died, there were a bunch of things that

2    happened, and the company needed to be sold.  A

3    Venezuelan company bought the company, Corimon

4    Paint, and invested substantial dollars in the

5    situation.  They invited me to serve as chairman of

6    the board of the company that they now substantially

7    owned.  Some months later the Venezuelan currency

8    was devalued and they could not continue to perform

9    on their obligations.  We, the independent

10   directors, of which I was the lead and chairman of

11   the board, then had to essentially take control of

12   the company and follow the Venezuelans into

13   Venezuelan jurisdiction to try to figure out if we

14   could compel them to perform.  It was a difficult

15   task, but nevertheless, I've had some exposure to

16   Venezuela through that process and do maintain some

17   friendships today.  We ended up getting them to

18   provide a DIP facility which enabled us to then do

19   an orderly liquidation of the company.

20            I think those are the main things about

21   background that pertain.  I'm sorry for giving you

22   so much detail, but this is a complicated set of

23   facts and some of these pieces of background just

24   really need to be explained.  I'm happy to explain

25   more, of course.

1          Listening this morning, I find it quite

2     fascinating to listen to the various parties, and

3     honestly I do have tremendous sympathy with all of

4     the parties, but particularly with Mr. Fortinsky's

5     position regarding needing information to make a

6     decision about further committing assets of his

7     client.  I also believe there are other participants

8     here who are not represented at all.

9          There are three critical pieces of

10    information that seem to me need to be examined

11    before final decision could be made, and those would

12    be:  Does MK Energy have any other assets which

13    could be used in any way to support Proterra or to

14    repay the loan that the fund, the Short Term

15    Liquidity Fund, made to MK Energy, allegedly?  What

16    is the liquidation value of Proterra?  My assumption

17    is that for an early stage company its liquidation

18    value would not reach the amount that MK Energy has

19    put into the company, and therefore, if Mr.

20    Fortinsky's clients want to preserve their option

21    for taking an ownership position in this company and

22    having it be valuable, they need to defend that

23    position.  I think the third question, and this is a

24    lawyer's question --

25               THE COURT:  When you say they have to

1  defend that position, in the context here, what does

2  that mean?

3          MS. MIDANEK:  Well, as I've heard this

4  morning, the parties here cannot fully determine

5  based on information available as to whether there

6  was a -- actually, there was a loan from Short Term

7  Liquidity Fund to Proterra.  It, however, has

8  expired.  So, does it get it extended?  Were the

9  proceeds of that then used to finance Proterra?  And

10 does that give Mr. Fortinsky's client a constructive

11 ownership interest in Proterra or not?  We don't

12 know that because we don't know MK Energy's balance

13 sheet, we don't know the documentary flow, so on.

14 We don't know the understandings amongst the

15 parties.  But constructively it looks like Mr.

16 Fortinsky's clients and the other investors not

17 represented here today have a substantial interest

18 in the future of Proterra.  If the liquidated value

19 of Proterra is not sufficient to enable them to

20 repay the loan today, or if they can't refinance it

21 from other sources of money, then it seems to me

22 that Mr. Fortinsky's clients need to defend the 15

23 to 20 million dollars they already have at risk.

24          THE COURT:  And that's what you meant by

25 need to defend.

1          MS. MIDANEK:   Right.   And I think that's

2     a point that your Honor has been making throughout

3     the morning, how do you handle the fact that there

4     is serious value at risk.   Even if it wasn't a fully

5     properly documented investment, even if it didn't go

6     along with the investment objectives set forth in

7     the offering memorandum, it seems to exist.

8     Therefore, what is the best way to recover value.

9          The only information that I have seen

10    thus far is the complaint filed by the Securities

11    and Exchange Commission plus the information I've

12    listened to this morning.   So, all of the comments I

13    would offer are conditioned on the fact that, like

14    Sergeant Schultz, I know nothing.   But to me, I

15    really commend Mr. Gottschalk who got, you know, hit

16    over the head with an enormous surprise in the last

17    few days, it sounds like, and has managed to put

18    together a plan where the Series A investors may

19    very well be able to provide a short-term loan that

20    would be senior to the loan that MK Energy has

21    provided for the period of time until venture equity

22    arrives and that loan is repaid.

23          To me, the remaining question to answer

24    beyond what is on the balance sheet of MK Energy,

25    what's the liquidating value of Proterra, would then

```
 1    be, if Mr. Fortinsky's clients are willing and the

 2    other investors are willing to allow the $3 million

 3    to come in ahead of them as a loan for the short

 4    term until equity -- further equity capital arrives,

 5    does that in any way reduce their rights that are

 6    afforded them under the loan agreement.  And that's

 7    a lawyer's question.  I don't know the answer to

 8    that, but, in other words, if they go along with the

 9    $3 million, have they unintentionally abrogated any

10    other rights that they might have.

11              I do believe, though, that the bottom

12    line here is that given there are $20 million in

13    Short Term Liquidity Fund, slash, MK Energy assets

14    already invested in Proterra, the best way to

15    preserve value would be to allow Mr. Gottschalk to

16    work as hard as he can to get that $3 million firm

17    and committed in hours, if not days -- or days, if

18    not hours.

19              THE COURT:  You made a note that the

20    legal effect of the PDVSA entities consenting to

21    anything would require an attorney's view as to what

22    rights were being abrogated or not.  Is that the --

23    in the way these things work out in what you call

24    the ambiguous environment, is that something that

25    counsel for each of the investors does or is that
```

1  something that a person serving in the role of the

2  independent party, the responsible party, the

3  receiver does?

4          MS. MIDANEK:  That's an interesting

5  question.  The point that I was trying to make was

6  that the questions about liquidation value of

7  Proterra and the balance sheet of MK Energy,

8  presumably there are some facts around here

9  somewhere and there is some ability to estimate the

10  liquidating value of Proterra.  What is beyond my

11  knowledge and expertise, since I'm not a lawyer by

12  training, is to know whether there are any rights

13  that would be abrogated if they offer the consent

14  very narrowly.  So, I believe it's a question that

15  needs to be asked and answered.  I would expect that

16  Mr. Fortinsky may very well know the answer to that

17  question.

18          THE COURT:  But that's something that

19  the lawyers do for their clients.

20          MS. MIDANEK:  Yes.

21          THE COURT:  And then to the extent they

22  need to have an agreed-upon consensus.  They can do

23  that.

24          MS. MIDANEK:  Right.

25          THE COURT:  But that doesn't have to be

```
 1  done by someone who is in the position of preserving
 2  value and creating or recreating structure.
 3            MS. MIDANEK:  Correct.
 4            THE COURT:  Okay.  Any questions for Ms.
 5  Midanek?
 6            MS. KELLY:  Your Honor, we just had a
 7  couple of questions.
 8            THE COURT:  Yes.
 9            MS. KELLY:  I guess the first question
10  is who would you work with as legal counsel, because
11  I think you indicated in your proposal that you
12  would need to work with legal counsel.  Do you know
13  who that would be?
14            MS. MIDANEK:  I have talked with a
15  couple of firms in the 24 hours since I was aware I
16  was coming here, and the two firms that I was
17  thinking about were either Blank Rome or Kramer
18  Levin.  You know, I know that there will be
19  significant and sensitive legal issues depending on
20  how this role is characterized.  It would be my hope
21  that given the number of lawyers in this room and
22  the number of parties represented that we could keep
23  additional legal involvement at a minimum.  My
24  choice of those two at this point would be Blank
25  Rome.  0h, who has completed a conflict view.  I
```

  1   have not heard back from Kramer Levin as to whether

  2   they have completed their review.

  3          MS. KELLY:  And with regard to Blank

  4   Rome, do they have any experience, to the best of

  5   your knowledge, in dealing with Latin American

  6   business transactions, specifically Venezuela?

  7          MS. MIDANEK:  I believe that they do,

  8   but I'm sorry, I did not bring the bios with me.  I

  9   have them in my computer that is out in front of the

 10   gate to the courthouse.

 11          MS. KELLY:  And just, finally, do you

 12   have any concerns today about whether you've heard

 13   today beyond the sort of question of what to do with

 14   Proterra?

 15          MS. MIDANEK:  Do you know, I suppose

 16   from my personal point of view the main question is

 17   the question that's already been raised by the

 18   attorneys in the room, which is, okay, exactly what

 19   is this role?  Does it need to be a receiver?  Does

 20   it need to be what amounts to sort of a responsible

 21   party?  And how many of the entities does it cover?

 22   Do the funds come within it or are they outside of

 23   it, et cetera?  So, I think a definition of the

 24   universe of the parties that would be underneath

 25   this role would be important to me.

1          MS. KELLY:  I actually -- that just

2     brought up one other question, if I could just ask

3     the Court's indulgence.  Who would your team be?

4          MS. MIDANEK:  Difficult to answer given

5     that I don't really know the scope of the work

6     required.  So, the number one team person is me.

7     And given that a lot of this appears to be based on

8     sort of issues of judgment and communication, I

9     think that I could probably do a great deal of it.

10    I may, however, need to bring in, depending on what

11    the Alvarez & Marsal team has done, some of the team

12    I work with in forensic accounting or fraud

13    examination.  I may need to bring in people who

14    understand energy and alternative energy assets,

15    perhaps very narrowly, in terms of establishing a

16    value and potential path.

17          And one of the other things that seems

18    to me imperative for everybody to think about is how

19    quickly could we help potentially Proterra and some

20    of the other unexpected investments in this

21    portfolio to find alternative sources of financing,

22    and I do have contacts and connections that could do

23    that.  So, that would be me.

24          Sorry that is not a complete answer, but

25    I do have the resources required, I believe, to

1    cover most of the types of skills that would be

2    required potentially in this situation, including --

3    I do not speak Spanish, but I do have colleagues who

4    are fluent, in fact native-born Spanish speakers.

5    It is my experience in Venezuela that English is the

6    language of business.

7              THE COURT:  In your proposal you

8    indicate that your hourly rate is $575 per hour.

9    The issue of cost is one that concerns everyone for

10   different reasons.  Others who have made their

11   presentations, but whose fees were attorney's fees

12   much higher than that, have indicated a willingness

13   to discount, under the concept that this is a public

14   service assignment.  Is that something that you are

15   prepared to do?

16             MS. MIDANEK:  I am, your Honor.  And I

17   put in an hourly rate, which actually is already

18   discounted from the rates that I've been earning

19   recently.  But I am not wedded to needing to have an

20   hourly rate.  It's the convention of bankruptcy

21   court and many other professional service

22   organizations to work on the basis of an hourly

23   rate.  I'm perfectly willing to negotiate, you know,

24   a monthly fee or something like that depending on

25   how large you believe the scope of this needs to be.

1          THE COURT:  And how would I decide how

2     big the scope should be?

3          MS. MIDANEK:  Were I in your position I

4     think I would listen to the people in this room and

5     then -- you have already exercised substantial

6     judgment here.  This is a complicated situation that

7     crosses many borders.  So, to me, the critical issue

8     here is to have someone who is in a position to talk

9     to all of the parties and try to create a consensual

10    plan that keeps as much value available to the funds

11    as possible, with occasional perhaps need to have

12    the authority to bang them on the head, and whether

13    you want to keep that authority for yourself or

14    whether you want to give that authority to a

15    receiver, essentially, I think would be a major

16    question for you.

17         THE COURT:  Thank you.  Anything

18    further?  Thank you very much.  Do you want to go

19    get your computer out front and see if you can give

20    any supplement on the experience of the Blank Rome

21    folks on Latin America.  Ms. Midanek, if it's an

22    extensive bit of work to do, there is an attorney

23    lounge across the hall.  If you need to come -- if

24    you think it's beneficial to come back in here and

25    work with one half of your brain and listen with the

1   other half, would you tell the court security

2   officers I've authorized you to bring that computer

3   in.  Thank you very much.  And if there is any

4   question, they can just come down to chambers and

5   I'd be glad to verify that.

6              Victor Mandel is here?

7              MR. MANDEL:  Yes.

8              MR. JACOBSON:  I apologize, I'm not sure

9   that you have the supplement to his vitae that was

10  just prepared this morning.

11             THE COURT:  I have --

12             MR. JACOBSON:  I will hand it up.

13             THE COURT:  I have two pages, front and

14  back.

15             MR. JACOBSON:  Well, there is a third

16  page.

17             THE COURT:  All right, if I may have

18  that, please.

19             MR. JACOBSON:  I have the complete

20  submission.

21             THE COURT:  If I may keep you waiting

22  just a moment.

23             Yes, sir.

24             MR. MANDEL:  Good afternoon, your Honor.

25             THE COURT:  Good afternoon.

1          MR. MANDEL:  Just by way of background,

2    and I have a proposal here submitted to the Court as

3    well as the attorneys, but by way of background,

4    I've spent my entire investment career evaluating

5    investment opportunities and assisting with funds

6    and directly making investments in portfolio

7    companies.

8          My educational background is I have an

9    undergraduate degree from Harvard College and I have

10   an MBA degree from the Wharton Business School in

11   1991.  I am a CFA, or certified financial analyst.

12   I spent a decade, just under a decade, at Goldman

13   Sachs in the investment department, and since then

14   I've been CFO of public companies and a member of

15   the board of directors of public companies as well.

16          I have, again, extensive experience in

17   the valuation and management of both hedge funds,

18   private equity funds, and their underlying portfolio

19   investments.  And, in particular, I have worked as a

20   combination both of an investment manager as well as

21   a direct operator in investment funds that take

22   control stakes through portfolio companies.  So, I

23   have both operating experience and investing

24   experience.

25          THE COURT:  Can I interrupt you just for

1   a moment?  Several have used this term "portfolio

2   companies."  What does that mean?

3            MR. MANDEL:  Well, generally you work

4   with a fund, whether it be a hedge fund or private

5   equity fund, and their underlying investments are

6   termed -- or the companies that they own, whether

7   they be stocks or the equity that they own, are

8   termed their portfolio companies.  So you don't

9   directly work with them, but in my case generally

10  I'm either on the board or heavily involved in

11  working with management to convey our advice and

12  opinions as main or majority shareholder, and most

13  recently having done that with an international fund

14  called the Governance For Owners, which is a

15  corporate governance-based investment fund out of

16  London.

17            I additionally have worked with the Rock

18  Creek Group, which is one of the leading

19  multibillion dollar hedge fund of funds which

20  allocates money to hedge funds, and in such -- and

21  through some counsel and advice that I provided to

22  them, I've been working with them in the past in

23  recovering assets from a number of different funds.

24  Two in particular were Amaranth Advisors in 2006,

25  which was a collapsed hedge fund, as well as the

1   Murakami fund, which was also from the same era or

2   time period, again another collapsed hedge fund

3   where as a direct LP investor in those funds, I was

4   tasked with assisting in the recovery and maximizing

5   the return of our investment in those hedge funds.

6          Additionally, through that work,

7   including a number of other funds, I've been

8   involved in consent solicitations by the funds to

9   its LP investors for various issues, both

10  reallocation fund name, change of, you know,

11  investment philosophy, or in some cases a decision

12  that we needed to make with respect to a receipt of

13  cash at some discounted amount or payment in-kind of

14  securities that the fund actually held, which again

15  entails going in and evaluating all of these

16  securities that you receive from the fund that they

17  own, each one being equity in a different company,

18  and evaluating what the value is of that portfolio

19  of stocks that you receive.

20          I also have significant experience

21  working with a private equity fund, MatlinPatterson

22  out of New York, which is a distressed fund,

23  predominantly focused on acquiring companies that

24  are either severely distressed, on the verge of

25  bankruptcy or actually in bankruptcy.

1          I also have experience as a CFO of

2     Circle.com, which has a ticker symbol CIRC, a public

3     company, which I was involved with through its

4     transition to a public company, including all of the

5     regulatory filing requirements necessary with that,

6     and as well was on the board of directors of Consys

7     IT Partners, another distressed firm which I helped

8     to advise on, purchase, and recently sold to

9     Manpower, and Gleacher & Company, which is a

10    broker-dealer out of New York City.

11         Also in my career I've worked in -- with

12    a number of investors in investment opportunities in

13    Latin America, particularly in northern countries in

14    South America, Columbia and Venezuela.

15         That's by way of my background, and, you

16    know, I thought what may be helpful is to also talk

17    a little bit about, you know, the process we have

18    here in front of us.

19         To me, my approach generally is not one

20    of throwing good money after bad, and I really look

21    at each investment as a separate investment

22    opportunity.  So that if in the case in Proterra the

23    ultimate value is likely to be zero, it's irrelevant

24    whether or not there is a previous investment of

25    $20 million or not.  We are looking at incremental

1    investment opportunities, or in this particular case

2    subordination of our current investment due to a

3    potential to raise money through other investors.

4    And that's just generally the way I approach the

5    investment, in looking at each opportunity, does it

6    merit further investment from a fresh look today,

7    irrespective of what historical committed capital

8    has been.

9           Obviously what we have here is a

10   challenge in the recovery of assets.  It's certainly

11   unclear to me the full breadth of where the assets

12   are, and I assume that some of that was in the asset

13   list that was referenced earlier, but I certainly am

14   not aware of it.  I would assume, though, that

15   recovery of assets is paramount.

16          One of the assets in question, Proterra,

17   comes with it the right of first refusal on

18   investments within that company by the fund, and I

19   would just like to point out that is a right, that

20   is a value that in my opinion exists for the

21   investors in Proterra, and unfortunately given the

22   court proceedings any serious ability to evaluate

23   that right of first refusal has been lost and,

24   hence, there has been a loss of value in fund

25   assets; albeit it may be a small amount, if the

1    amount of $3 million is the case, which was

2    represented to be about 14 percent of the

3    investment.  But nonetheless, I just want to impress

4    again that there is urgency in making investment

5    decisions here with respect to Proterra given some

6    minor, but certainly a deterioration already, in

7    asset value.

8              I certainly have many questions.  If I

9    focus, you know, initially on my opinions on

10   Proterra, you know, there was over $20 million

11   indicated that went to Wilson Sonsini and I only

12   heard 15 million invested in the convertible.  I

13   assume the balance is owned in equity.  And if so,

14   out of the total amount that was raised from -- at

15   Proterra, it looks like there was 15 million in a

16   convertible and another, I don't know, 17 million I

17   believe in equity, that would make $32 million, of

18   which 20 million came from the MK assets.

19             In my experience that ratio, which of

20   course is just over 60 percent, is a significant

21   investment on behalf of a venture capital investment

22   opportunity by one fund, and as such, I would have

23   serious concerns in looking at what was the

24   consideration that was received for such a

25   significant investment.  You know, a LIBOR plus nine

1    percent is plausible, but certainly for the extent

2    of the capital there it's something that I think

3    also makes -- has merit in evaluating whether or

4    not, again, these terms are -- you know, are fair to

5    the investors in Proterra.

6                In my experience, you know, I don't have

7    any of the documents, but that could be on the lower

8    side of what I've seen in like transactions, but it

9    certainly would be very interesting as we find a

10   term sheet, or I should say Proterra finds a term

11   sheet from the Series A investors, what is the fair

12   market bid that Mr. Gottschalk is receiving for an

13   increased loan investment by the Series A investors.

14               So, I would also say that, you know, in

15   looking at the -- one would also need to look in the

16   process at the liquidation value of Proterra.  I

17   would also likely assume that given the early stage

18   nature of the company the liquidation value is not

19   high, but again, if the liquidation value is

20   anywhere near $3 million, subordinating to that

21   amount of money is a serious investment

22   consideration.

23               So, when I look at that and the decision

24   in front of us, or the Court I should say, about

25   whether or not to -- how to proceed on this, and I

1    again defer to PDVSA here in the room, what I would

2    hope -- as well to other minority investors, it's

3    very difficult to make a decision without having

4    seen any of the financials, but I will also express

5    my opinion that in my experience having the four

6    senior executives of a VC firm dipping into their

7    own pocket to invest in the company is very rare,

8    and certainly a very strong showing and sign of

9    support for the ultimate value in Proterra, and as

10   such, it would lead me to believe upon further due

11   diligence that the value here would certainly be

12   worth more than $3 million, and potentially, if such

13   is the case, then a subordination is most likely the

14   best course of action right now.

15            And, you know, that's just my opinion

16   kind of reading between the lines of like

17   transactions that I've seen and what I am hearing

18   today.

19            THE COURT:  You discussed a lot of

20   background that you have and current work with

21   distressed companies, companies in bankruptcy.  How

22   does that experience translate into work with early

23   companies?

24            MR. MANDEL:  Well, in particular in this

25   case, I mean a lot of these are kind of development,

1    early stage companies or companies in need of

2    capital, and they always require negotiations

3    between different stakeholders, the debt holders and

4    the equity holders, on the investment in additional

5    capital.  So, in bankruptcy companies, debt holders

6    generally have more control.  Here, in this

7    particular case, you have a hybrid investor in the

8    convertible where you are asking them to subordinate

9    their claims on the company.  And generally what you

10   have is, you know, intercapital structure

11   negotiations, which I see in Proterra right now, and

12   that's very similar to what you would have in

13   bankruptcy cases.

14            Additionally, in a lot of bankruptcy

15   cases and distressed companies, there is an urgency

16   on funding, and so most of my experience has been

17   going into these types of situations and making a

18   decision as to whether or not and -- whether or not

19   to continue funding and how to structure that

20   funding.  And here in Proterra, again, I think we

21   have the same urgency, and I think we have the same

22   solvency concerns at the company as expressed by its

23   general counsel.

24            THE COURT:  You said that the terms that

25   you had learned of with respect to the MK entities'

1   investment in Proterra and its significant

2   percentage of the investment in Proterra of LIBOR

3   plus nine percent is plausible, on the lower side.

4   Tell me what you mean by that.

5              MR. MANDEL:  Well, it's very

6   difficult --

7              THE COURT:  Does it mean there is

8   something else going on?

9              MR. MANDEL:  Absolutely.  It's a

10  convert.  So, what you get in the convert is you get

11  a debt instrument which is convertible into equity,

12  but what is -- what I still don't know with respect

13  to those terms is, you know, at what price can they

14  convert, how many shares do they get if they convert

15  their convertible note into equity.  There is always

16  a trade off, the debt interest rate you would get on

17  the front end of the convert, with effectively a

18  fixed income instrument or bond, versus the

19  conversion price you get on the back end when you

20  convert it into a stock.  So, there is a bit of a

21  trade off.  So, only knowing one side of the puzzle

22  it's tough to make an investment decision -- I'm

23  sorry, investment opinion with respect to whether or

24  not those terms were market terms and fair.  But to

25  me, 67 percent is significant, and I would, you

1   know, do due diligence also to determine what is the

2   origin of the investment, how does 67 percent

3   investment come about from Proterra to the MK fund.

4                    THE COURT:  Any questions for Mr.

5   Mandel?

6                    MS. KELLY:  Just a couple, your Honor.

7                    Mr. Mandel, do you have yourself or

8   anyone you could immediately rely upon with

9   Venezuelan transactional experience?

10                   MR. MANDEL:  I've worked on a number of

11  different opportunities in -- I've worked with one

12  private equity fund, Acorn International.  That was

13  to evaluate an investment opportunity there, which

14  ultimately was not successful, and also I speak

15  Spanish.

16                   MS. KELLY:  You had referenced a couple

17  of different law firms in your proposals.  Have you

18  begun a dialogue with any of the lawyers about

19  actually engaging on this case?

20                   MR. MANDEL:  No, no, and I apologize.  I

21  was briefed on the case last night at 7:30 and spent

22  most of the time preparing the proposal and trying

23  to logistically get here in front of the storm.  I

24  could certainly follow-up with respect to both

25  availability and conflicts, but I've worked with

1   them before.

2            MS. KELLY:  And the firms you listed,

3   Weil Gotshal --

4            MR. MANDEL:  Dewey, both out of New

5   York, and Washington D.C., Williams and Connolly.

6            MS. KELLY:  Any concerns in light of Ms.

7   Hussain's testimony -- you are someone who knows

8   funds pretty well.  Any concerns about how the fund

9   is being run?

10           MR. MANDEL:  I have no knowledge about

11  how the fund is being run, but I have done extensive

12  due diligence at the fund level, including going in

13  and asking as potential LP investors for all of the

14  financials, and certainly the questions in the

15  approach that she described, you know, it would

16  merit -- yeah, for me, that was exactly the approach

17  that I would take, and if I were to go into a fund

18  like that that did not have all of that information

19  at hand, I personally would not make an investment.

20           MS. KELLY:  Meaning that were you to

21  invest in a fund and you determined that it didn't

22  have the records that Ms. Hussain was there looking

23  for, you wouldn't invest?

24           MR. MANDEL:  It wouldn't really

25  necessarily go to whether or not -- a determination

1   of whether or not it had records, but certainly if

2   it had or did not have records, but could not

3   produce it to me on demand, then it would be a

4   question for me of the accounting and

5   record-keeping.  At the Rock Creek Group, and in my

6   the experience, I would not make an investment in

7   the fund as such if it could not produce records to

8   me on demand.

9             MS. KELLY:  Including general ledger.

10            MR. MANDEL:  The general ledger would be

11   something that I would not generally expect on

12   demand.  You know, sometimes we review funds at

13   different locations, but certainly the annual

14   financial statements, you know, that actually the

15   general ledger produces would be something we would

16   expect.

17            MS. KELLY:  Very well.  Nothing further.

18            THE COURT:  Anything further, Mr.

19   Jacobson.

20            MR. JACOBSON:  Yeah, just one question.

21            Would you expect -- a hypothetical

22   question, if I may.  Would you expect a fund that

23   was launched in May of a year to have done annual

24   financials by Christmas of that same year?

25            MR. MANDEL:  No.  Generally, in my

1    experience, the annual financials would be due -- it

2    would have to be done by March, you know, in my

3    experience, but sometimes it would certainly happen

4    sooner than that.  But in my experience we do

5    require -- an investor requires is a track record,

6    per se.  So, I've not had the experience of

7    investing in a start-up fund directly without

8    historical financial information.

9              THE COURT:  All right, thank you very

10   much.

11             Yes, sir, would you like to come back

12   into the well.

13             MR. FORTINSKY:  Well, just a brief

14   request.  I would be interested , having heard the

15   two presentations we've just heard, to hearing a bit

16   about the process by which these two candidates were

17   identified, and for that matter I would ask the same

18   thing with respect to the SEC with respect to the

19   candidates they identified.

20             THE COURT:  Fair question.

21             Do you want to start, Ms. Kelly?

22             MS. KELLY:  If we could just have a

23   moment, your Honor.

24             THE COURT:  Yes, we could actually have

25   a break.  Why don't we -- let me ask before we take

1   a break, what else can we accomplish today?

2            MS. KELLY:  The only thing from the --

3   well, in terms of any other people who the Court

4   might need to hear from, or information, I know that

5   you'd indicated that Mr. Carney should be available.

6   I know that, you know, the person who is here

7   representing the main the investor has not yet heard

8   from Mr. Carney or seen his presentation, so at some

9   point we think it makes sense for him to have an

10  opportunity to do that.  They're by far the largest

11  investor and I think it's fair to solicit his

12  informed views on which receiver it should be.  So,

13  I think at a minimum he should have an opportunity

14  to talk to the candidate whom we've proposed.

15            In terms of the process by which we

16  selected a receiver, for purposes of full

17  disclosure, our team was not the team in place

18  selecting a receiver.  The SEC has a very specific

19  protocol in place for how we solicit proposals for

20  receivership.  So, we can use the break to make sure

21  that we fully educate the Court on what we did to

22  select candidates for receiver.

23            THE COURT:  Anything you need to say

24  before break, Mr. Jacobson?

25            MR. JACOBSON:  Well, we basically sent

1   out what we call ISOs, basically asking a network of

2   people we know, both lawyers and people at the

3   Alvarez firm and people that we thought highly of

4   who might know people who would be qualified, who

5   would have no conflicts, who had nothing to do with

6   the defendants or the law firms that were involved

7   who we thought would be, you know, people with

8   distinguished records who would have the skill set

9   that we thought appropriate for this job, which

10  included, we thought, the business judgment

11  necessary, and also connections to top-tier law

12  firms so that they could have access to the legal

13  talent needed when necessary, and we collected names

14  and interviewed some of the names and then chose the

15  people that we thought were the most appropriate who

16  were interested and who could be available on such

17  short notice.

18             THE COURT:  All right.  What would you

19  think of the idea that there be a brief break for

20  sustenance.  We would come back in half an hour.

21             And in the interim would it be of

22  interest to Mr. Fortinsky to essentially interview

23  Mr. Carney by phone?  We know he's available.  I can

24  give you his proposal, CV and other materials.

25             MR. FORTINSKY:  I think that would be of

```
 1    interest.  What I would like to do at the break is

 2    to see whether my client, or at least my partner,

 3    the corporate partner that you mentioned earlier,

 4    Ms. Stolper, would be interested and available to

 5    participate so they can make a more informed

 6    judgment.

 7              THE COURT:  All right, why don't you

 8    make your calls, I will give you --

 9              MS. KELLY:  Your Honor, I believe we

10    provided a copy of Mr. Carney's materials to

11    counsel.

12              MR. FORTINSKY:  Yes, I have that.

13              THE COURT:  Very good.  Let's take a

14    half an hour break, and then we will return and see

15    what new developments there have been.

16              Thank you.

17              (Recess)

18              THE COURT:  All right, before we begin,

19    which is to say -- please be seated.  And let me ask

20    you if there are any new developments.  I know we

21    don't have Mr. Mandel or Ms. Midanek in the room,

22    and nor do we have Mr. -- counsel for PDVSA.

23              MS. KELLY:  I can report to the Court

24    that counsel for PDVSA is, as we speak, either

25    polishing off his sandwich or on the phone with Mr.
```

1  Carney.  He indicated that before speaking with Mr.

2  Carney he wanted to try to reach out to his clients

3  to see if he could actually get them on the phone as

4  well.  So, I believe that's what he's still doing.

5          THE COURT:  Okay.  Do you know what I'm

6  thinking might be useful, would you like to join me

7  for a brief chambers conference while they finish

8  all their phone calls, et cetera?

9          MS. KELLY:  Certainly.

10          THE COURT:  All right.

11          (Discussion held off the record)

12          THE COURT:  All right, is Mr. Fortinsky

13  available?  There you are.  Do you have anything

14  that you wish to report back or share?

15          MR. FORTINSKY:  I am available.  I'm

16  happy to talk to the other proposed receiver.  My

17  clients are not available for that this afternoon,

18  but I'd be happy, if the Court has the time and if

19  the parties wish to, I would be happy to hear from

20  the other receiver.

21          THE COURT:  All right, and then are

22  there any other loose ends other than what you were

23  making some calls on?

24          MR. GOTTSCHALK:  Your Honor, I guess

25  from my perspective the loose end is finding a

1    pathway to being able to try to get --

2              THE COURT:  And I understand that full

3    well.  And as I envision it, you are clear until

4    Tuesday.  Here is what -- yes, ma'am?

5              MS. MIDANEK:  I was just going to

6    report, your Honor, I did research.  The question of

7    Blank Rome's Latin American capacity, they do have a

8    small debt trading practice that focusses on Latin

9    America, which strikes me as particularly germane.

10   And I communicated the names to the representatives.

11             THE COURT:  Yes, Ms. Kelly said that you

12   had given those names.  Anything else?  Any further

13   thoughts from either Mr. Midanek or Mr. Mandel?

14             So, obviously there are critically

15   urgent decisions that have to be made, urgent not

16   only because the companies need the infusions, but

17   there is an erosion of value, as Mr. Mandel says,

18   from just the crisis position they find themselves

19   in, and that needs to be averted, to the extent it

20   can be.

21             The most immediate question is the

22   question of whether the MK entity loaning or

23   investing, whatever, providing capital to Proterra,

24   should be required to subordinate up to $3 million

25   of that loan to satisfy the Series A investors'

```
 1   requirement.

 2              MR. GOTTSCHALK:  Your Honor, if I may, I

 3   would ask that -- you know, we're working hard to be

 4   able to try to fill that with the Series A

 5   investors.  In the event that we can't, what we'd

 6   like to be able to do is at least have -- the amount

 7   needs to be at least half filled by the Series A and

 8   the remainder can be on the same terms.

 9              THE COURT:  I see what you are saying.

10   So that you have a million and a half.

11              MR. GOTTSCHALK:  Right.

12              THE COURT:  If you get another million

13   and a half, even if not immediately --

14              MR. GOTTSCHALK:  Or if not from the

15   Series A, but somebody else that comes in on the

16   same terms, but at least we're showing the Series A

17   is very involved.

18              THE COURT:  And the amount of three

19   million is the number that you are working with.

20              MR. GOTTSCHALK:  Well, I'm using that

21   number because that was the number going to be the

22   loan coming from MK.  It will get us, you know,

23   45 days, if we stretch it maybe 60.

24              THE COURT:  But the subordination issue

25   is the most pressing issue.
```

1          MR. GOTTSCHALK:  Correct.

2          THE COURT:  And then the second is the

3   proposed additional loan from the MK entities set

4   out in the notice and consent form that was sent to

5   Mr. Fortinsky's clients, and a copy of which was

6   also sent to the STLF investors on behalf of whom we

7   have heard from Goldenbird Finance SA via Mr.

8   Curran.

9          So, it seems to me that the tasks that

10  have to be undertaken immediately are obtaining the

11  information that Mr. Fortinsky listed as basic

12  information that he and other investors would need

13  to give informed consent or informedly withhold

14  consent.

15          Second, to speak to the investors, and

16  here Mr. Fortinsky plays such a critical role

17  because the proposed 13 million is all SOF money,

18  and that's all PDVSA entities' money.  And so your

19  involvement in a decision-making process going

20  forward is critical, and I hope you will be

21  involved.

22          And then the third is that the Court

23  needs to draw upon the expertise of those who have

24  much experience in the trenches of corporations in

25  crisis, distressed corporations, investors seeking

```
 1    to preserve value, and to that end what I would like
 2    to ask Ms. Midanek and Mr. Mandel to do is jointly
 3    serve as interim business advisors.  And I'm not
 4    calling it receiver for a very specific reason.
 5    There is an open issue that I must decide about
 6    whether or not we will have a receiver.  We have had
 7    briefing on it, we will be making that
 8    determination, it has not been made, and the balance
 9    of skill sets and background that is necessary for
10    a -- if there is to be a receiver, a defined role
11    for that receiver just cannot be made at this time,
12    does not need to be made at this time because we
13    have before us two extremely talented, experienced
14    persons whose work, I have complete confidence, will
15    give not only the investors and not only the SEC,
16    but also the Court what is critical here, and that
17    is the neutral view that is informed and informs.
18              Now, I express the necessity for
19    urgency.  Therefore, the undertaking, should you
20    choose to accept it, is over this weekend.  We need
21    to be back in court at noon on Monday with as much
22    of a -- with a recommendation from you with respect
23    to the subordination issue, how that should be
24    structured, whether it should be permitted, et
25    cetera, and you will work with not only Mr.
```

1    Fortinsky and his need for information and client

2    viewpoint, but also Mr. Gottschalk and the SEC team,

3    who has all the inspection information which they

4    have agreed they will be available to provide to

5    you, to Mr. Fortinsky, and I think that we can

6    safely assume that that is the universe of

7    information available.  The Alvarez team continues

8    to work and will also be available over the next

9    72 hours to be responsive, and has gone, I'm told,

10   further than just the wound-up fund and should be

11   able to be a resource.

12              So that if Mr. Mandel and Ms. Midanek

13   can compile the information that PDVSA needed or

14   ensure that you have everything that you need to

15   give the informed decision, and presumably that will

16   inure to Mr. Fortinsky's ability to advise his

17   clients, speak to investors as you are able in this

18   short time period, research these companies as you

19   are able to in this short time period, and make a

20   recommendation to the Court Monday at noon about the

21   Series A subordination, and to the extent you can,

22   make a recommendation on the 13 million in the

23   notice and consent document, make that -- or advise

24   the Court what more is necessary for you to make

25   that recommendation on the $13 million infusion from

 1    the MK entities.

 2              For this interim business advisorship

 3    the fees will be paid by the MK entities, not either

 4    Proterra or NuScale or the funds, and will represent

 5    a carveout from the SEC and the defendants' current

 6    agreement with respect to the assets.

 7              Questions?

 8              MS. KELLY:  A minor point that I think

 9    goes without saying.  To the extent the business

10    advisors are provided any new documents from the

11    Alvarez firm or any new information, we would just

12    ask that the SEC receive copies of whatever

13    documents those are as part of our -- which I think

14    we have an ongoing request, and we've been getting

15    documents on a rolling basis, but just to be clear.

16              THE COURT:  I think everyone should stay

17    afterwards to put together a new Facebook page and

18    you can all post everything on it.  No, I'm not --

19    don't really mean that, but you need to have a way

20    of communicating with dispatch and efficiency.

21              Anything else?  Yes, sir.

22              MR. FORTINSKY:  I just want to make sure

23    I can report accurately to my client as to what the

24    Court expects to take place at the hearing Monday.

25    My understanding is that we are going to at that

 1    point have perhaps, if the information permits, some

 2    form of evaluation from the business advisors, and

 3    that evaluation, if I understand right, will be part

 4    of what allows the other players here, including the

 5    Court, including my client, to understand what's at

 6    stake and what should be done.

 7              I would -- if we're going to get some

 8    sort of recommendation on Monday at noon, I would

 9    want to have the opportunity to take that back to my

10    client as the decision-maker with respect to its own

11    funds.  I don't want to be in a situation where the

12    Court thinks that we're going to make a decision at

13    noon and my client thinks it's going to get a

14    recommendation at that hearing that it can then

15    evaluate.

16              THE COURT:  That's why I want you to be

17    involved over the weekend, because I want you to be

18    very much involved in the whole process of that

19    evaluation so you have that input and so your client

20    has that input going contemporaneously.  So that it

21    may be, and hopefully is, that by the time we get

22    back here on Monday at noon you actually already

23    know the recommendation, the basis for the

24    recommendation, and you've already shared that and

25    reviewed that with your client.  You have very

```
1    sophisticated clients, I trust they can get the

2    picture very fast, and so that's what I'm asking of

3    you so that we can, at a minimum, have a good basis

4    for understanding whether Mr. Gottschalk's

5    subordination request should or should not be

6    granted.  Okay?

7              MR. FORTINSKY:  Okay.

8              THE COURT:  So, it is my hope that we

9    are not -- you would not be hearing that for the

10   first time, you will have already known exactly what

11   it's going to be and you will be in a position to --

12   well, you would have already given your input as to

13   the evaluation and reservations that you may have,

14   or not, and that you are -- you and your client are

15   as up to speed as all on being able to give a

16   position.  Okay?

17             MR. FORTINSKY:  Okay, understood.

18             THE COURT:  Any other questions?

19             MS. KELLY:  I just wanted to make clear,

20   we'll give contact information for the minority

21   investors as well so that -- because obviously PDVSA

22   is the largest investor, but not the only investor,

23   we'll provide that information.

24             THE COURT:  To be clear, the fund that

25   provides -- is proposing to provide the 13 million
```

1   is only the PDVSA investors, but -- right?

2             MS. KELLY:  The concern that we have is

3   that the subordination will also impact the minority

4   investors.

5             THE COURT:  Right.

6             MS. KELLY:  As evidenced by the letter

7   today, they seem to want to have a voice in the

8   process.

9             THE COURT:  I think it would be very

10  much my recommendation that Lawrence Curran be

11  included in all of this as one of the three minority

12  investors, and to the extent that Ms. Midanek and

13  Mr. Mandel can reach out to the other two, this is

14  all about everyone having information that they can

15  trust, and that's why the neutrals with such skills

16  are going to be critical to this undertaking.

17           Now, I have assumed in my outline here

18  that you would agree to participate in this

19  undertaking, Ms. Midanek?

20           MS. MIDANEK:  Certainly, your Honor.  In

21  fact, I was hoping at lunch that we could do it

22  together.  I hope Victor will say yes.

23           THE COURT:  Mr. Mandel?

24           MR. MANDEL:  Yes, certainly.  I am quite

25  enthusiastic to work with Ms. Midanek.

1          THE COURT:  All right, you have much to

2     bring to the table here, not the least of which is a

3     tremendous amount of credibility because you are

4     officers of the Court for this purpose.  If anything

5     comes up over the weekend that requires the Court's

6     attention, again, I ask you to communicate with Mr.

7     Kretman whose e-mail you obviously all know because

8     you are using it.  Yes, sir?

9          MR. GOTTSCHALK:  Your Honor, just a

10    couple of clarifications.  When you were speaking of

11    both addressing the subordination issue and

12    addressing the 13 million issue, I guess my working

13    assumption would be if there is consent received for

14    the 13 million or any portion of it that that might

15    potentially be a replacement for what we're doing

16    with Series A.  I would be more than happy for it to

17    be in addition to, but I guess I wasn't sure what

18    the interplay was between the two of them.

19          THE COURT:  Well, that's for you to

20    share with the others as they understand -- as Ms.

21    Midanek and Mr. Mandel come to really understand

22    Proterra, and they are the creative ones to find the

23    path to preserve value, and that's exactly the kind

24    of thing they will do, and both of them have

25    expressed admiration for your role and your literal

1  investment in the Proterra company as the strongest

2  manifestation of your belief in its purpose.  So, I

3  think that these -- there is no question that is off

4  the table and there is no limitation to how things

5  can be structured.  There just is a terrible time

6  crunch.

7           MR. GOTTSCHALK:  Thank you, your Honor.

8  I appreciate it.

9           THE COURT:  I thank counsel very much.

10  We'll stand in recess until noon on Monday.

11           (Proceedings concluded 3:35)

12

13

14

15

16           I certify that the foregoing is a correct

17  transcript from the record of proceedings in the

18  above-entitled matter.

19

20                              1/30/11

21                               Date

22

23               /S/  Sharon Montini

24               Official Reporter

25