1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF CONNECTICUT

3     *  *  *  *  *  *  *  *  *  *  *   *    *
                                               *
4     SECURITIES AND EXCHANGE         * Case No. 11cv78(JBA)
      COMMISSION,                     *
5                      Plaintiff,     *
                                      *
6            vs.                      *
                                      *
7     FRANCISCO ILLARRAMENDI, ET AL   * January 24, 2011
                                      *
8                      Defendant.     *
                                      *
9     *  *  *  *  *  *  *  *  *  *  *  *   *    *

10                    TRANSCRIPT OF MOTION HEARING

11    BEFORE:   THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12    Appearances:
      FOR THE PLAINTIFF:          RUA KELLY, ESQ
13                                LeeAnn GAUNT, ESQ.
                                  United States Security and
14                                Exchange Commission
                                  33 Arch Street
15                                Boston, MA 02110

16    FOR THE DEFENDANT           MICHAEL BLANCHARD, ESQ
      FRANCISCO ILLARRAMENDI:     Bingham, McCutchen
17                                One State Street
                                  Hartford, CT 06103
18
      FOR THE DEFENDANT MK        RICHARD JACOBSON, ESQ.
19    ENTITIES:                   ADAM REINHART, ESQ.
                                  Arnold & Porter
20                                555 Twelfth Avenue NW
                                  Washington, DC  20004
21
                                  THOMAS GOLDBERG, ESQ
22                                Day Pitney
                                  One Canterbury Green
23                                Stamford, CT 06901

24    Court Reporter:            Sharon Montini, RMR

25    Proceedings recorded by mechanical stenography,
      transcript produced by computer.

1    THE COURT:  Good afternoon, counsel,

2    ladies and gentlemen.  Please be seated.

3         All right, this is our continued

4    temporary restraining order hearing in SEC v.

5    Illarramendi et al, 11cv78.  I see present in court

6    for the SEC Ms. Kelly and Ms. Gaunt.

7         MS. KELLY:  Good morning, your Honor --

8    good afternoon, your Honor.

9         THE COURT:  Mr. Jacobson, Mr. Blanchard.

10        MR. BLANCHARD:  Good afternoon, your

11   Honor.

12        MR. JACOBSON:  And, your Honor, this is

13   Adam Reinhart from our firm, Arnold & Porter.

14        THE COURT:  Good afternoon.  And I see

15   Deborah Midanek and Victor Mandel.  I see Mr.

16   Gottschalk, I see Mr. Fortinsky, and I know on the

17   phone is Mr. Schneider for NuScale who seeks to be

18   present.  Is he now on the phone?

19        MR. SCHNEIDER:  Yes.  Good afternoon,

20   your Honor.

21        THE COURT:  Good afternoon.  Anyone else

22   whose appearance should be noted?  Ms. Hussain is

23   also in the courtroom.

24        MR. FORTINSKY:  With me, your Honor, is

25   counsel to my firm, Lindi Beaudreault.

1          THE COURT:  Good morning -- good

2     afternoon.

3          All right, I have been provided by Ms.

4     Midanek and Mr. Mandel, the Court's business

5     advisors, a significantly-sized package, measured in

6     inches, that contains a summary of the presentation

7     that they are going to make to the Court with

8     respect to the requests and charge given at the end

9     of last week.

10          Is there anything new to report.

11     Starting with -- well, let me start with Mr.

12     Fortinsky.

13          MR. FORTINSKY:  Yes, your Honor.  Shall

14     I approach the well?

15          THE COURT:  Yes.

16          MR. FORTINSKY:  Good afternoon, your

17     Honor.

18          THE COURT:  Good afternoon.

19          MR. FORTINSKY:  Thank you again for your

20     assistance in trying to work this out Friday --

21     before Friday and going forward as well.

22          As I'm sure you'll hear in more detail

23     from the business advisors, there were a series of

24     conversations Friday afternoon and throughout the

25     weekend, including presentations by the management

1    of Proterra and NuScale to a phone audience of a

2    bunch of people, including my clients in Venezuela.

3    Based on the discussions that we had and the

4    presentations that we had, my clients, with certain

5    caveats that I'll note, are prepared to undertake an

6    investment in Proterra on a short- or long-term

7    basis on an amount to be negotiated, and are

8    prepared to discuss a short-term loan in an amount

9    to be determined to NuScale.

10              In each case our willingness to discuss

11   these things would be conditional on adequate

12   documentation.  In other words, I'm not coming here

13   to make a commitment in court, but instead,

14   expecting that whatever commitment or financing

15   extended by my clients would be done in an

16   appropriate fashion and that the investment would be

17   undertaken pursuant to direct negotiations with the

18   parties, with the respective parties.

19              We understand that there is urgency to

20   this on the part of the companies involved and we

21   are prepared to negotiate in a way that respects

22   that.  We have had discussions with both the

23   business managers and Mr. Gottschalk for Proterra in

24   a way that, as we've just been discussing a moment

25   ago in court before we -- before your Honor was on

1    the bench, we have, I think, a way that buys us a

2    little bit of time and does not put us in a position

3    of facing an imminent problem for Proterra tomorrow,

4    which I can discuss or Mr. Gottschalk can discuss.

5         We also do need to sort out, as we've

6    said before, not only the investment itself, but the

7    issues of title and control.  In other words, we

8    need to get assurance that the money that's been

9    used to finance these investments results in title

10   in the appropriate parties, namely my clients, since

11   it's their money that's been used, are entitled to

12   have title over these investments, and that means

13   both with respect to what's been invested until now

14   and also what it will be investing subject to

15   negotiation from this point forward.

16        With respect to control, the client also

17   is concerned about ongoing control in the hands of

18   the existing management.  We are willing to suspend

19   judgment for now on whether a receiver is necessary

20   pursuant to negotiation that we would hope to have

21   about how the company will be managed, but we do

22   think that at least at this point there ought to be,

23   as we understand the SEC has proposed, some

24   protection in place that would ensure -- I know

25   there is a standstill agreement, but we do want to

1   be sure that there is adequate protection in place

2   to make sure that essentially nothing happens to our

3   money in the meantime, and that would mean making

4   sure that the money is not moved out of the existing

5   accounts, except perhaps with our consent, and that

6   the funds are not in the meantime earning management

7   fees that have the effect of draining the accounts

8   with the passage of time.

9         We also do believe that in order for

10  this to get properly resolved there needs to be an

11  accounting.  As I said Friday, there needs to be an

12  accounting so that we basically understand the

13  movement of money in to and out of that account til

14  now, and that obviously would be used to try to

15  unwind this mess.

16        So, your Honor, in short, those are our

17  views based on the discussions over the last

18  72 hours or so.

19        THE COURT:  Very good.  Thank you very

20  much.  And I will probably come back to you with a

21  few questions in refinement of that, but in essence,

22  what I understand is that the PDVSA proposal is new

23  money.

24        MR. FORTINSKY:  Yes, your Honor.

25        THE COURT:  And did you take a position

```
 1   with respect to the subordination issue that was --

 2   that was pressed on Friday, but that may, from your

 3   telling, be mooted if there is to be essentially new

 4   money that would stand in that place?  Did your

 5   clients take a position with respect to a Series A

 6   investor loan?

 7             MR. FORTINSKY:  Yes, your Honor, and I

 8   guess it's a two-part answer.  We are not willing to

 9   put the cart before the horse and to give other

10   money priority over ours, especially if we are

11   ourselves putting in new money.  On the other hand,

12   and this is the second part, we do think that there

13   is no pressing need for immediate funding tomorrow

14   as it appeared -- as appeared to be the case on

15   Friday, and the reason seems to me to be that the

16   funding that had previously been authorized by the

17   Court to support two payments of payroll appears to

18   be, at least approximately, sufficient to support

19   the payment that was to have been made tomorrow,

20   that is to be made -- that was to have been made

21   tomorrow, and I'll let Mr. Gottschalk address the

22   status of that.  But that money can, in short, be

23   used partly for the payment to -- I think it's

24   Altairnano, and partly for the first of the two

25   payroll requirements.  And that we have a window of
```

 1  two weeks until the second payroll requirement is

 2  needed, and that may give us the breathing room to

 3  negotiate and get something in place.

 4           THE COURT:  All right, we'll hear from

 5  everybody on whether that perception takes into

 6  account all the circumstances.  Thank you.

 7           MR. FORTINSKY:  Thank you.

 8           THE COURT:  Let's see, now should I hear

 9  from Proterra and NuScale, or should I hear from the

10  business advisors next?  In other words, Ms. Midanek

11  and Mr. Mandel, do you hear more information as

12  these people speak that --

13           MS. MIDANEK:  No, we've been listening

14  to them for 48 hours.

15           THE COURT:  All right, anything new from

16  your standpoint, Mr. Jacobson?

17           MR. JACOBSON:  No, your Honor, we're

18  just interested, as you are, to hear what the

19  business advisors have to say.

20           THE COURT:  All right.

21           MR. GOTTSCHALK:  Your Honor?

22           THE COURT:  The reason I had asked Mr.

23  Fortinsky to let me know where he was in this

24  spectrum was because my -- what had to necessarily

25  be a quick glance at the business advisors' report

1    had suggested that you didn't know what PDVSA's

2    position was.  Okay.

3              All right, Mr. Gottschalk, I will hear

4    from you.  Should I hear from you right now?

5              MR. GOTTSCHALK:  It seems like it would

6    be -- it would make sense for me to follow Mr.

7    Fortinsky since he did address some of the issues

8    associated with the funding of Proterra, and while

9    the issue is fresh, it might be worth my setting

10   forth our position.

11             THE COURT:  Why don't I hear the -- let

12   me hear from the business advisors first.  I don't

13   think that the concept of PDVSA's position or

14   evolving position is going to get less fresh.

15             Okay, would you like to come forward.

16             MS. MIDANEK:  Almost all of this is

17   exhibits.  We only made a limited number of copies,

18   for obvious reasons, and want to --

19             THE COURT:  Well, everyone has been very

20   cooperative so far, so sharing will work.

21             MS. MIDANEK:  Good afternoon, your Honor

22   and thank you very much for the opportunity to not

23   only report our findings this morning, but for the

24   adventure of a lifetime in the last 72 hours, or

25   whatever it's been.  It's been a fascinating

1   experience for us, and we are extremely grateful to

2   everyone in this room for turning their lives upside

3   down to participate in this, and to the people at MK

4   Group who also participated wholeheartedly in the

5   effort to get this done.

6           I'd like to make a couple of corrections

7   to the exhibit list while people have their pile in

8   front of them in that as time was of the essence,

9   our list of exhibits is slightly out of sync with

10  the actual way the exhibits are arranged in the

11  document.

12          Under Exhibit No 2, Short Term Liquidity

13  Fund 1, we have included, in addition to the

14  investment management agreement, and behind it, the

15  statement of assets that Ms. Hussain was talking

16  about on Friday dated 11/30 2010 as legended in

17  accordance with the way Mr. Jacobson described it.

18  We have not found a more recent statement of assets

19  than that.

20          In the promissory notes section, we have

21  included additional detail in the note from MKEI to

22  Proterra.  We've included two or three -- actually I

23  think it's three, different prospective instruments;

24  drafts of current subordination agreement,

25  discussion drafts of the short-term promissory note

1   that was under discussion with MKEI, and an

2   execution-ready term sheet with respect to the

3   conversion of the existing note into Series B

4   shares.

5           I think, Victor, we were still missing

6   the actual convertible note itself.  Did we find

7   that?  Okay, it exists, we simply didn't have time

8   to get it Xeroxed.

9           And, finally, the other amendment is

10  that under the -- we don't have valuation estimates

11  and capitalization tables so much as what we have

12  is, as it relates to Proterra, a table showing the

13  MK ownership of the capital interests in Proterra

14  which follows right behind the Proterra, Inc

15  PowerPoint presentation.

16          That having been said, if everyone is

17  with me, to the best of our recollection and ability

18  to take notes on Friday, we believed that what the

19  Court asked us to look at and consider was two

20  things:  One was to recommend a course of action

21  with respect to a possible investment in Proterra by

22  non-MK Series A holders of an additional -- up to

23  $3 million, and the corresponding subordination

24  consent request.  We have interpreted that a little

25  bit more broadly, simply thinking about is Proterra,

1    you know, an attractive investment proposition, and

2    if so, what are the various ways that such an

3    investment could be made, including the Series A

4    possibility.

5            Number two, as I understood your request,

6    it was to recommend an approach to resolving the

7    issues set forth in the consent letters sent to

8    investors in the Short Term Liquidity Fund 1 with

9    respect to a possible $13 million infusion, into

10   NuScale $10 million and Proterra $3 million.  And

11   you further stated that if we could not make such a

12   recommendation you would like us to outline the

13   issues that needed to be addressed in order to make

14   such a recommendation with an approximate timetable.

15           I actually think that we have made a good

16   deal of progress on all of these issues and do have

17   at least some preliminary recommendations, but I

18   will keep you in suspense and ask Mr. Mandel to now

19   take up the next section, which is the overall

20   philosophical position we took in developing these

21   recommendations.

22           MR. MANDEL:  And, your Honor, we really

23   took to heart your additional request for us to try

24   to be creative in approaching the issues in front of

25   us, and as we went through the various documents and

1   financial statements that we received, we were

2   working off -- we have in the exhibit list a

3   schedule of assets for the STLF 1 fund dated

4   November 30th which aggregates up to over half a

5   billion dollars in assets, and although initially we

6   were focused on, as mentioned earlier, the

7   subordination consent request, we believe that what

8   we were really looking forward to here is, is there

9   an opportunity to achieve a recovery of these

10  assets, preserve, in particular with respect to this

11  subordination request, the investment in Proterra,

12  but more broadly speaking, how do we preserve all

13  the assets as best we can in the STLF fund for the

14  benefit of the fund investors, focussing in

15  initially on Proterra and NuScale.

16          When we went through the assets we had --

17  the asset list, we had serious concerns about the

18  ability to achieve an immediate and full cash

19  redemption to all investors, and there are a number

20  of issues which I think bear further investigation

21  and due diligence, but certainly as of November 30,

22  an $8 million cash balance listed at Deutsche Bank

23  we were told no longer exists.  We have the

24  investment in the -- I believe it's the Cheyne

25  accounts listed on the asset statement at 205

1    million, we were told could be roughly approximately

2    half of that value, or a discrepancy of about

3    $100 million.  And, additionally, there are a

4    significant number of assets and amounts of various

5    assets of the fund that are I think even located in

6    Venezuela, putting the eventual recovery of those

7    assets certainly at a challenge.  And of course the

8    fourth point which puts some question on the ability

9    to recover the assets is the illiquidity in the

10   private equity investments.

11             And so for that purpose, we really

12   looked at the Proterra investment as an investment

13   that, at the end of the analysis we did, was very

14   attractive, and frankly may be one such investment

15   that would be relied on to achieve incremental

16   value.  We felt NuScale was earlier in the course of

17   the development of its company and not likely to

18   achieve the same realization in the same timeframe

19   as Proterra for investors in the fund.

20             Our position, therefore, was how do we

21   look at the investors' investment in Proterra to

22   maximize value.  And if you look at the

23   subordination request, although it is a short-term

24   loan, the short-term loan actually comes with

25   warrants to the Series A holders which create

```
 1    dilution or a loss of ownership to our -- to the
 2    investors in the STLF fund.  And so for that reason,
 3    we then went to Mr. Fortinsky and the other minority
 4    investors and encouraged them to explore the private
 5    equity investments and the ability to make an
 6    investment in the private equity investments of both
 7    Proterra as well as NuScale in order to preserve all
 8    their rights and all of their eventual recovery
 9    value of those private equity assets.  That was the
10    approach we had taken with respect to the two
11    investments.
12              I'll turn it back over to Ms. Midanek
13    for just an update on the situation, the detailed
14    work we had done.
15              THE COURT:  May I ask you just one
16    question?  The warrants that went along with the
17    subordination request --
18              MR. MANDEL:  Yes.
19              THE COURT:  -- other than being prior to
20    the STLF investors --
21              MR. MANDEL:  The convertible note,
22    right.
23              THE COURT:  -- how do those warrants
24    work?  Why did it diminish the STLF investors'
25    value?
```

1          MR. MANDEL:  The deal was a $3 million

2     offer to the Series A investors, of which the verbal

3     indication was of about a million and a half.  That

4     was really just for a short-term note of, you know,

5     a somewhat low interest rate to bridge the company

6     up until it can raise the full $8 million round of

7     funding that was indicated would be forthcoming from

8     MK investors.

9          In order for the Series A investors to

10    just give a loan to a private equity and early stage

11    company, there were certain enticements that

12    Proterra had offered those investors, which were

13    basically in the form of equity ownership in the

14    company, which would reduce the equity ownership of

15    everybody else by approximately, depending on the

16    amount that gets raised, of about two or three or

17    almost up to four percent.  And so that would be, in

18    at least our opinion, for such a nominal amount, a

19    very minimal two to four percent erosion or dilution

20    in the equity value of the STLF investors.  And for

21    that reason we looked at it somewhat skeptically, at

22    least wanting to preserve the right and putting it

23    back to all the investors, including the minority

24    investors, to preserve that dilution.

25          THE COURT:  Thank you.

1          MS. MIDANEK:  Some of this recitation

2     will be familiar to everyone in the room, but I

3     wanted to be sure we had a comprehensive statement

4     of what it is we're dealing with in the fund.

5          So, the Short Term Liquidity Fund 1 is

6     actually registered as a mutual fund organized under

7     Cayman law in May of 2010.  It's not registered with

8     the U.S. -- in the U.S. with the SEC, and this is a

9     perfectly normal fact pattern.  I just wanted to lay

10    out what the facts are.

11         For various reasons the Short Term

12    Liquidity Fund is difficult to value, and to put a

13    ballpark on it, the range of possible values if we

14    did it today could be as broad as $200 million out

15    of a 500 plus million dollar original value fund.

16    That's a relatively significant swing, particularly

17    since the fund is only, what, eight months old.

18         THE COURT:  When you the say "original

19    value," does that mean the money that was actually

20    put into it?

21         MS. MIDANEK:  Yes, with the proviso that

22    we're not actually sure how the Cheyne investment

23    worked.  Is that a fair consideration?  Yes, so to

24    list anecdotally what we believe is included in the

25    fund, and this is taken from the description of

1    assets provided by Odo Habeck in the letter that

2    went as part of the consent package to the

3    investors, the STLF holds various types of assets,

4    including, but not limited to, a significant

5    position in the shares, amount currently unknown, of

6    a UK-based fund called the Cheyne Fund.  It's

7    reportedly, and we haven't verified this directly

8    with PDVSA, but we have been told that it is an

9    investment that -- the investment in the Cheyne Fund

10   was made by PDVSA who asked the MK entities to take

11   it on given some difficulties in the portfolio, and

12   its value, which was stated to be 205 million at the

13   time of the STLF investment in the shares of Cheyne,

14   is in dispute, which is one reason why the fund is

15   having trouble establishing a value for itself

16   because it's not getting a value from Cheyne.  We

17   believe anecdotally that the expected value may be

18   $100 million less than the $205 million that was the

19   basis of the investment by STLF.  So, it's difficult

20   to proceed in terms of an overall resolution of this

21   fund until there is further understanding of what

22   the Cheyne investment is all about.

23              The other things that are in the

24   portfolio include loans to various entities,

25   including, but not limited to, MK Energy &

1    Infrastructure LLC, the loans we have been talking

2    about, and MK Energy & Infrastructure LLP, which is

3    a UK entity.  The value of these loans themselves is

4    difficult to establish.  The total dollars invested

5    is estimated to be $53 million in these loans.

6            We also understand there is an

7    $18 million at cost investment in a privately held

8    oil and gas exploration and production company, the

9    name of which Mr. Mandel did recently uncover, but I

10   don't have it in my head.  There is a $25 million

11   in-kind receivable with respect to an investment in

12   Venezuelan sovereign bonds.  And then there is the

13   bolivar portfolio, which is the currency arbitrage

14   portfolio, that was I believe both valued and

15   verified by BDO Seidman in a letter dated December,

16   6, 2010.  The value of that was established at 366

17   million at a bolivar-to-dollar exchange rate of 4.3

18   to 1.  The general maturity of those holdings is

19   estimated at six to eight months.

20           So, you can see this is a varied

21   portfolio with issues in it that go well beyond the

22   question of the status of the private equity

23   investments we have been dealing with here.

24           Now, switching to the positions of the

25   various investors.  First, who are they?  There are

1    three minority investors.  We have not been able to

2    confirm that there are anymore.  The MK people say

3    that, no, these three minority investors are all

4    there are.  Mr. Costa-Rodrigues had heard through an

5    attorney to one of them that there might be some

6    more.  That attorney is looking to see if there are

7    any others that believe they are investors.  MK says

8    no, there are not.  And they have all in writing,

9    which is included in your pack of documents,

10   repeated, in almost identical language, that they

11   believed they were in a short-term fund doing

12   currency arbitrage, and all would like to redeem, of

13   course at par plus interest with appreciation, from

14   their currency-related activities.

15              THE COURT:  When you say they would all

16   like to redeem, meaning this is something new or

17   that they are wishing to hold undeterred their right

18   to that redemption?

19              MS. MIDANEK:  Anecdotally, Mr. Curran,

20   the attorney for Goldenbird, from whom you heard by

21   letter the other day, indicated that the consent

22   documents had startled these investors who believed

23   that they were in a currency arbitrage situation.

24   So, their basic reaction was, wait a minute, I'm not

25   really involved in any of this, I'm just doing

 1   currency arbitrage, so if there is an issue here, I

 2   just want my money back.  We have been at some pains

 3   to explain to them that, I'm sorry, you may have

 4   thought you were in a currency arbitrage situation,

 5   but to tell you the truth, the value of the whole

 6   fund is in question, so the ability of the fund to

 7   pay you out on the terms you are asking for or, in

 8   fact, pay you out at all right now is in question,

 9   so you need to come to the table and have your views

10   represented.

11             MR. MANDEL:  And in the e-mail which we

12   received they had stated that they had requested of

13   MK Capital that they receive all of their capital

14   investment plus appreciation, we have not been able

15   to procure any redemption documents from any of the

16   minority investors.

17             THE COURT:  That e-mail is in my packet?

18             MR. MANDEL:  It was one we received from

19   the Court directly addressed to you from last week.

20             MS. MIDANEK:  The letter from Curran

21   Associates.  But we did also e-mail all of the

22   principals, including Curran & Associates' client

23   Goldenbird, and Ponter Investments and Aspenwood,

24   and invite them to participate in the dialogue that

25   was going on this weekend with respect to the actual

1  investment in private equity and invite them into

2  discussion as to the status of their investment.

3  They all declined to participate in the discussions

4  with the management team, and we're in varying

5  states of discussion with them as to whether they

6  want to talk later today about their situation.  One

7  of them is basically thus far declined to talk at

8  all.  Mr. Curran has certainly been participating

9  with us in discussions.  He understands what is

10 going on.  His client will be in from Caracas in

11 Miami today, so they're meeting face-to-face to

12 talk.  And the third one is in Europe and is making

13 time to talk with us this afternoon.

14          The other investors in the fund include

15 the MK Special Opportunities Fund, which has a

16 significant investment in MK STLF, estimated by them

17 to have been $90 million at the time of investment.

18 Perhaps complicating some of these interpretations

19 of what's in the fund, we do believe that PDVSA and

20 Francisco Illarramendi have a long and multifaceted

21 relationship that includes many different investment

22 activities in many different vehicles, and many

23 different advisory activities as well.  So, there is

24 a complicated relationship I think of some -- many

25 years duration and some significant confidence.  We

23

1    don't fully understand the dimensions of the

2    relationship.

3              Finally, to us, there is significant

4    good news in the fact that, though the valuation

5    issues in the Cheyne investment are complex and may

6    take some time to figure out how to handle

7    equitably, we do believe that with only four known

8    parties involved, a negotiated solution that allows

9    the minority investors to separate from the PDVSA

10   investors should be possible should the group decide

11   that that's the way they want to go.  In other

12   words, PDVSA was surprised, we have been told, that

13   there were minority investors and believes their

14   life would be easier if there were not minority

15   investors.  The minority investors are saying we

16   would like to get out, we're not interested in any

17   private equity vehicles.  So, somewhere there is a

18   deal potentially to be made here in which there is

19   some kind of make-whole agreement perhaps with

20   respect to one party's obligations to another.  But

21   I'm getting ahead of ourselves.  I'm sorry.

22             What did we do to respond to your

23   request, and then I'll turn it back to Mr. Mandel.

24   One, we were able to substantially I think

25   accelerate certain document collection and review.

 1   We do have a long list of documents available.  We

 2   received all of the SEC production documents which

 3   were provided to us by Arnold & Porter who had also

 4   provided them to the SEC.  We also received the

 5   fund-related documents and MK materials from Michael

 6   Colohan, who is the controller at the MK Group, and

 7   Odo Habeck, who is the CEO at the MK Group.  There

 8   is some overlap between these pools of documents,

 9   but not much.

10          Financial reports for both Short Term

11   Liquidity Fund and Special Opportunities Fund are

12   still in process, but we were told over the weekend

13   that Alvarez & Marsal has an electronic copy of a

14   draft balance sheet for STLF, they simply haven't

15   gotten it to us yet, and until we see it will we

16   don't really know that it's there.  And at the time

17   that this presentation was written, the financials

18   for MKEI LLC and for MK Asset Management, who was

19   the investor in NuScale, were not yet available.

20   They were produced this morning, so they are

21   incorporated in the exhibits list here.

22          We also interviewed Odo Habeck, as the

23   CEO, and Michael Colohan, as the controller, at the

24   MK offices in Stamford, and we had phone discussions

25   with Jim Barratt of Alvarez & Marsal.  All parties,

```
 1    as noted, have been extremely cooperative and

 2    helpful.  What we did was establish a standing

 3    status call with all of the attorneys each day to

 4    report progress and identify any gaps that the

 5    collective group might see in the routes and paths

 6    we were taking.  We reached out to all of the known

 7    current investors.  Thanks to Mr. Fortinsky and his

 8    colleagues at Arnold & Porter, principally we were

 9    able to get --

10              THE COURT:  I think you switched him

11    to --

12              MS MIDANEK:  I put him in the wrong

13    firm.  Shearman & Sterling.  I'm sorry, you are

14    absolutely right, excuse me.  We were able, however,

15    to have the principal in charge of the investments

16    at PDVSA join the phone calls last night and hear

17    directly from the management teams of Proterra and

18    NuScale.  And we have not completed research, which

19    I believe needs to be done, to see if there were any

20    investors who were involved in the fund who have

21    redeemed their shares between the inception of the

22    fund in May and today, because it's possible that,

23    in fact probably likely, that the value at which

24    their shares were redeemed might not be accurate, it

25    might be higher, it might be lower, and I know the
```

1    SEC will be very concerned about that.

2              Okay.  Now, we divided our work, and

3    Victor spent a great deal of time doing due

4    diligence on Proterra and NuScale.  Both management

5    teams turned themselves inside out to provide

6    information and make presentations multiple times to

7    multiple parties over the weekend.  They provided a

8    great deal of presentation and data and we wanted to

9    assemble those and to sort of due the basic due

10   diligence, you know, deal room kind of style of

11   presenting the information.  Both teams presented

12   not only to the PDVSA investment team and the

13   attorneys, the attorneys included the attorneys for

14   the SEC, for the MK Group and the funds, for the

15   Illarramendis and for PDVSA.  The minority investors

16   and their legal representatives that we were able to

17   identify were invited, but didn't participate.

18             Current status, and I think Mr.

19   Fortinsky has updated you even beyond this at this

20   point, is that we did get advice from counsel to

21   PDVSA that they were working on a proposal and would

22   try to have it for us this morning.  So, I think

23   that they have confirmed that that is true.

24             All right.  Now, I'm about to lose my

25   voice, so I'm going to ask Mr. Mandel to pick up the

1    thread again.

2              THE COURT:  Now, usually we have water.

3              MS. MIDANEK:  Are there any questions so

4    far?  I'm just reciting what we did, so there is

5    nothing controversial.  The whole team went every

6    step of the way.

7              THE COURT:  You had said earlier the

8    three minority investors declined to participate.

9    That means they did not hear these presentations?

10             MS. MIDANEK:  That is correct.  They

11   were invited.  In fact, we actually pushed Mr.

12   Curran to attend himself.  He attended a status call

13   with all of the attorneys at two o'clock yesterday,

14   but he declined to attend the four o'clock and five

15   o'clock management presentations.

16             THE COURT:  Was some particular reason

17   given?

18             MS. MIDANEK:  No, we sort of guessed

19   that the feeling might be that if they listened they

20   were seeming to take seriously the notion that they

21   might participate, but that's only our

22   interpretation.  We have no idea what their

23   positions actually are.

24             THE COURT:  Beyond their request for

25   full redemption and plus appreciation.

1          MR. MANDEL:  Then if we can move on to

2     the recommendation stage.  Again, as we prepared

3     this document yesterday and finalized it earlier

4     this morning, we were unaware of Mr. Fortinsky's

5     clients' intentions, and certainly it helps to

6     narrow down the options that we were considering.

7          From our perspective, to have the PDVSA

8     entities make an investment, certainly potentially

9     in Proterra and also consider an investment in

10    NuScale, simplifies things significantly.  However,

11    you know, it was our view that these are assets that

12    belong to STLF and unfortunately -- perhaps even

13    unfortunately without the knowledge of Mr.

14    Fortinsky's client, they're not the only investor in

15    STLF.

16          THE COURT:  When you say "these are

17    assets:  I'm sorry, what are you referring to?

18          MR. MANDEL:  Referring to the assets of

19    the promissory notes that were made to MK in the

20    amount of 20 million for an eventual investment in

21    Proterra and 27 million for an eventual investment

22    in NuScale.  So these are promissory notes, one of

23    which is in default for nonpayment as of

24    January 14th, and, you know, the ultimate -- I would

25    say the ultimate investment was the investment in

1    NuScale for 20 million.

2              I want to just focus on NuScale

3    initially because, again, NuScale is closer to break

4    even, and as such, I think a bit easier to value.

5    I'm sorry, Proterra.  Sorry about that.  Proterra is

6    closer to break even and as such easier to value.

7    The MK entities through their investments, and I

8    believe in the case of Proterra it was all through

9    monies received through STLF, which is a distinction

10   to NuScale where there also was family put in money

11   -- I'm sorry, the family put in money separately.

12             With respect to Proterra, the current

13   valuation, assuming the current valuation holds, and

14   we have significant indication that named and

15   confidential VC investors have serious interest in

16   Proterra, although all such investments generally

17   take significant time, but if the current valuations

18   hold, it would put the valuation on the stake held

19   by the MK entities at approximately just over

20   $25 million.  That's on an initial investment of

21   $20 million and obviously shows significant

22   appreciation.

23             And based on very, very preliminary

24   analysis and a discounted cash flow that I had done

25   on the projections received from Proterra, the

1   eventual value could certainly be north of

2   $40 million if they achieve their targets.  So, I

3   think there is significant investment .

4           My concerns are as we go through the

5   valuation, you have one particular investment in

6   Proterra, because of its stage of development, where

7   there can be significant appreciation potential, and

8   hence a reliance or a need to rely on that

9   appreciation potential to achieve, you know, still a

10  partial recovery perhaps, but at least the maximum

11  recovery possible.  And, therefore, I believe that

12  it should be the STLF fund investors who actually

13  have the benefit of that equity upside to recoup

14  their investments in the STLF fund.

15          So, although I am extremely appreciative

16  both for the opportunity to -- appreciative of Mr.

17  Fortinsky's client of the interest in investing in

18  the companies, I believe that right should be made

19  available to all of the investors in the STLF fund.

20          THE COURT:  May I understand.  When you

21  say that the source of your concern is that there is

22  this -- you said one particular investment.  There

23  is really only the one.

24          MR. MANDEL:  Well, at this point in time

25  given the stage of developments, I would look at two

1   investments, but I do believe Proterra has, you

2   know, the most optimistic prospects and at this

3   point the greater likelihood of realization given

4   that its projections and business model is

5   approximately 12 months from break even whereas at

6   NuScale we're talking years.

7          THE COURT:  All right, so what you are

8   saying is that because STLF's money was used to

9   achieve this status --

10         MR. MANDEL:  Correct.

11         THE COURT:  -- whether they knew it or

12  not, that they're entitled to have a commensurate

13  equity position that recoups the investment that

14  they unknowingly made.

15         MR. MANDEL:  Right, and potentially,

16  again, in a portfolio approach, recoups the

17  investments they made, unknowingly made not only in

18  Proterra but as well as NuScale, along with a couple

19  of smaller private equity investments.  And to the

20  extent, for example, if there was an upside in just

21  one of the investments, taking a hypothetical, if

22  there was upside potentional in Proterra and MK

23  investments were allowed to redeem effectively the

24  promissory note for $20 million and then keep the

25  equity in MK, then that would, you know, curtail any

1    ability of the STLF investors to achieve the equity

2    upside in that one investment and they would again

3    be holding the promissory notes on the other

4    investments.

5         So, I think to selectively just take one

6    investment and move it out from -- or move it -- you

7    know, keep it in MK or move it over to PDVSA without

8    consideration by all investors in STLF, I think will

9    certainly prejudice those investors and may put a

10   limit on the recovery of assets of the STLF fund.

11        There are a couple other issues which do

12   make things somewhat complicated in the recovery of

13   assets of STLF.  We've highlighted a couple of times

14   the Cheyne Fund.  I really, again, do believe that

15   as a recommendation this is something that requires

16   further investigation.  Again, they were contributed

17   in a subscription in-kind by PDVSA.  Unfortunately,

18   they were contributed as a subscription in-kind into

19   a commingled multi-investor account, and now there

20   is a discrepancy on the valuation.  So, I think

21   certainly that bears further investigation.

22        By way of other recommendations, again,

23   given the dilutions we talked about earlier, we

24   really would not be supportive outright of just

25   granting the subordination request without, again,

33

1    the consideration of the investors to make that

2    investment directly through the fund themselves or,

3    alternatively, at the option of some select

4    investors who do want to make such investment to

5    make it.

6            So, again, just to reiterate our

7    recommendation, we do believe that an investment by

8    PDVSA in Proterra would be very much welcomed, but

9    certainly we think it is probably a second or maybe

10   a third, but at least a second step solution which

11   should not occur at the disenfranchising of the

12   rights of the other minority investors to likewise

13   make such an investment for which, to date, we have

14   received no indication of interest of their

15   willingness to do so.

16           And certainly, you know, with respect to

17   the $3 million, we would be highly supportive of

18   assisting in whatever ways we can to come to a

19   negotiated solution to the satisfaction of all

20   parties involved to allow Proterra to continue its

21   operations.

22           I think those were -- any other comments

23   on the recommendations on the first request?

24           MS. MIDANEK:  Just a footnote.  It may

25   be quite possible given the stance the minority

1    investors have taken to have them waive their rights

2    to any private equity position, assuming certain

3    other undertakings they might want with respect to

4    redemption of their funds.  So, in outlining the

5    complexity here, we don't want to forget to repeat

6    that with four parties at the table, there should be

7    a negotiated solution possible, and that may even be

8    possible in such a way that could allow Mr.

9    Fortinsky's client to proceed.

10           MR. MANDEL:  So, there were a number of

11   options we considered.  Ms. Midanek and I had

12   certainly discussed this particular option, and with

13   the news this morning from Mr. Fortinsky of his

14   clients' intent, those are our recommendations with

15   respect to his news and development.

16           If we can move on to the second request.

17   Again, we do believe that both investment

18   opportunities are very attractive.  We believe that

19   the amount of funds needed to get to break even from

20   Proterra would probably be in the amount of

21   approximately 20 million.  An amount needed to get

22   to a sustainable business model at NuScale could be

23   upwards of ten times that amount given the timeline

24   to get to break even for NuScale.  There is some

25   serious and some higher risk of a loss or an

1    impairment of a continued investment in NuScale as

2    opposed to Proterra, although we do believe that

3    both companies merit, you know, some further

4    investigation and due diligence, and are extremely

5    appreciative of Mr. Fortinsky's client, the PDVSA

6    entities, to engage in discussions to satisfy those

7    funding needs.

8            We just wanted to make one other

9    observation in a fact that we uncovered for the

10   Court to highlight a potential conflicts of

11   interest.  Given the timeline of the SEC's

12   complaint, the MK entities were in the middle of a

13   commitment to NuScale to the aggregate amount of, I

14   believe, $10 million, for which we've been told that

15   the inability to satisfy that commitment would

16   create a legal exposure for the MK entities, and we

17   have not explored whether or not if the fund assumes

18   the title and ownership of the investment in

19   NuScale, if in any way that would create any legal

20   exposure for the fund itself, but it certainly does,

21   again, create a conflict of interest between both MK

22   and the fund with that potential legal exposure.

23   But it's certainly something, again, to bring up

24   because we do need to do more work on that.  With

25   respect to the recommendation on the second --

1          THE COURT:  Let me just stop you one

2    second, if I may.  When you said -- when you speak

3    of "the fund," are you talking about the Special

4    Opportunities Fund or the STLF?

5          MR. MANDEL:  No, my apologies.  To

6    qualify, I was talking about the STLF, which was

7    actually the fund that made the $27 million loan to

8    the MK entities, specifically MK Asset Management,

9    for the investment in NuScale.

10         Our recommendation with respect to your

11   request to look into the consent letter is, again,

12   that we believe it's a -- you know, we believe that

13   that could certainly be a misappropriation of the

14   rights of the STLF 1 LP investors because it may

15   limit the recovery of any monies from NuScale, and

16   that, for the same reasons that were mentioned

17   earlier, this option should not be given first to

18   SOF.  We do believe it was given first to SOF as

19   outlined in the consent letter because that's where

20   the money was, but the option -- if the ownership of

21   the equity interest rightfully through this

22   promissory note does belong to the investors in

23   STLF, we believe this option of reinvestment

24   outlined in the consent letter should again

25   correspondingly be given to the investors in STLF.

1              So, although we would be supportive

2    eventually if it was the minority investors' desire

3    to not get involved, we would be supportive of the

4    approach that was taken in the consent letter.  We

5    believe it was premature to go down that route of

6    offering that investment to SOF.

7              MS. MIDANEK:  I don't want to forget to

8    make a minor comment.  Actually, it's quite a major

9    comment for NuScale's purposes.  But we had heard

10   that employees had been furloughed at NuScale on

11   Friday.  In fact, I may not state this exactly

12   correctly, but what we have since learned, and

13   perhaps if I'm misstating it, if counsel for NuScale

14   would like to correct it, I understand he's on the

15   phone, that NuScale was operating in an abundance of

16   caution as their bank balance got low because of a

17   desire to observe a state law that requires them

18   always to have the money to pay their employees

19   currently.  So, in fact, they did not -- employees

20   did not stop working on Friday, and the estimate of

21   how long they might actually be able to fund their

22   payroll is -- it's still at the edge of a cliff, but

23   it's measured in days now, it's not measured in

24   hours.

25              MR. MANDEL:  That's a good point.  It

 1   was something else I wanted to bring up, which is

 2   that it is the understanding of the management of

 3   NuScale that their bank balance is, I believe to the

 4   aggregate amount of $2.1 million, subject to the TRO

 5   and freeze in the SEC's complaint, and as such they

 6   have not been spending that money and went into the

 7   position that it did last week, and they've

 8   certainly asked us to clarify whether or not they

 9   have the right to use their bank balances in their

10   normal course of daily business.

11            THE COURT:  And did you have a

12   recommendation on whether they should be able to use

13   that bank balance, recognizing that the bank balance

14   came from STLF?

15            MR. MANDEL:  The recommendation, again

16   focussing on the priority of the maximization and

17   recovery of assets, is that if NuScale is not

18   allowed to pay its bills in the ordinary course of

19   business, it will just file -- most likely dissolve,

20   and the ability to recoup any of the 27 million

21   would be lost.  Given Mr. Fortinsky's client, the

22   PDVSA entities' interest in negotiating and

23   potentially investing in NuScale, we would be highly

24   supportive of freeing up those assets so NuScale

25   could continue its operations and achieve the time

```
1    allowed to negotiate a deal with the PDVSA entities.

2              THE COURT:  Thank you.  What a weekend

3    can do.

4              MS. MIDANEK:  I told you it was an

5    adventure.

6              THE COURT:  Very impressive.  Let me

7    invite counsel for the SEC to ask any follow-up

8    questions and make any follow-up observations, and

9    then let me give that opportunity as well to Mr.

10   Jacobson, if you wish, and then we can hear further

11   from, if Mr. Fortinsky has further comment, or

12   perhaps you can tell me what, if anything, you are

13   hearing anew today that may make some sort of

14   difference, and then we can hear from Mr. Gottschalk

15   and Mr. Schneider, if he wishes to be heard.

16             Ms. Kelly.

17             MS. KELLY:  Just I think it's two

18   additions, or perhaps corrections.  There is -- I

19   think Ms. Midanek mentioned at one point -- one

20   substantial piece of the asset list is a

21   $246 million investment, and I think Ms. Midanek

22   described it at one point as currency arbitrage.  I

23   just want to make clear, as we understand it, this

24   is the piece of the portfolio that was valued by BDO

25   Seidman, it's loans to private Venezuelan companies.
```

1    So, that's our understanding, and that was how we --

2    I believe our team spoke with a BDO partner who

3    worked on this.  But, in other words, it's not cash

4    that's readily available.  So, I just wanted to make

5    sure to point that out.  The other piece --

6              THE COURT:  And this is in the asset

7    list for STLF.

8              MS. KELLY:  That comprises depending on

9    the value of STLF, you know --

10             THE COURT:  A lot of it.

11             MS. MIDANEK:  A lot of it.  And at

12   relatively short maturity, as I understand it, if

13   the loans are good.

14             MS. KELLY:  I think six to eight months,

15   is our understanding, but we haven't seen the loan

16   documents, and I should say that's a transaction for

17   which we have nothing on the MK side.  So, it's -- I

18   mean, we're certainly not comfortable with the level

19   of documentation to verify that very substantial

20   asset.

21             The other piece is I think Mr. -- I know

22   Mr. Costa-Rodrigues, and I think I mentioned at one

23   point on the record on Friday, that we were

24   concerned that there may be other investors.

25             MS. MIDANEK:  Right.

 1          MS. KELLY:  And I did show Mr. Jacobson

 2   a document that we located this weekend which is

 3   dated -- it's a Deutsche Bank statement dated

 4   December 10th of 2010, and it shows an investment by

 5   a company called Edenwood of $500,000.  So, it does

 6   appear that that at least is one other investor, and

 7   this is specifically directed to the Short Term

 8   Liquidity Fund bank account in the Cayman Islands.

 9   So, I just wanted to mention that because it seems

10   to us that the question of whether we have the full

11   universe of investors is sort of an open question.

12          MS. MIDANEK:  Yes.

13          MS. KELLY:  From the SEC's perspective,

14   we're trying to track down information to see if we

15   have contact information, and I say this all with a

16   caveat that because we're doing this so quickly it

17   might be that this isn't an investment, maybe this

18   is a counterparty to a transaction.  I don't want to

19   suggest that this document is dispositive, but I did

20   want to give the Court and the business advisors the

21   information.  I previously showed this document to

22   Mr. Jacobson.  But the level of uncertainty here,

23   both in terms of -- you know, I think, you know, I

24   think the broader point is that the level of

25   uncertainty as to who the investors are and what the

42

1   assets are is very, very high, a point that I think

2   has been made by the advisors in their presentation

3   this morning.

4           Other than that, if I could just have

5   one moment to consult with co-counsel, I don't

6   believe we have any additional questions.  That's it

7   for the SEC.

8           THE COURT:  Now, there was a question

9   that was raised with respect to NuScale's bank

10  account.  Mr. Mandel has given an analysis that

11  suggests that at bottom line that should be freed up

12  from the asset freeze or clarified that it's not

13  subject to the asset freeze.  It's over $2 million,

14  and the recommendation was predicated on PDVSA's

15  investment interest and that without freeing it up

16  it will -- all value will be lost for all the

17  investors.  Does the SEC have a different view or

18  rationale for how it should -- for how the Court

19  should consider the request for clarification on the

20  status of the bank account?

21          MS. KELLY:  Your Honor, I don't doubt

22  for a moment what Mandel says, which is that this is

23  money that NuScale badly needs and that it would

24  help keep its operations going.  I also don't think

25  there is any question that that money is the

1   proceeds of -- whether you want to call it a

2   misappropriation or a fraud, it is the proceeds of

3   the activity that Mr. Illarramendi has been engaged

4   in.

5          So, I think, you know, in our role as

6   looking out for investors, I think we would be

7   remiss in not saying that the investors may want

8   that money with -- you know, their concern may well

9   not be for NuScale, but that its in effect another

10  $2.1 million of their money.

11         And I also want to clarify that we have

12  I think been consistent in saying that it's our view

13  that this would be covered under the scope of at

14  least what we would propose as an asset freeze

15  order.  But it is not an order that has entered yet,

16  as the Court well knows.  So, we just want to make

17  that clear because I think there was a reference to

18  an order previously.  So, I mean, we recognize --

19         THE COURT:  There is no order

20  outstanding at this point.

21         MS. KELLY:  Yes, everything has been

22  sort of not codified by an order, and we recognize

23  the Court has a difficult balance of interests, but

24  from the investor perspective, I think it could be

25  highly troubling to them that they're continuing to

 1    pay their bills with money that really belongs to

 2    somebody else.

 3               THE COURT:  Although, it is also, I

 4    gather from the investor interest, that given the

 5    state they find themselves in today, that they do

 6    have an interest in preserving the value of what

 7    they've already put in by some means.

 8               MS. KELLY:  Right.

 9               THE COURT:  And that this utilization

10    does that if, in fact, there is going -- if, in

11    fact, there is going to be a PDVSA investment that

12    will essentially back up the investment they've

13    already made unwittingly in NuScale.  Is that the

14    way I should be looking at it?

15               MS. KELLY:  I mean, your Honor, I think

16    -- although the SEC I think has consistently been of

17    the view that a receiver is a third party who is

18    most capable of looking at this issue, the Court can

19    make a determination as to what is in the best

20    interest of all the parties both in the court and

21    outside of the court.  Our view is that it's -- you

22    know, we certainly wouldn't be comfortable ourselves

23    saying this is an appropriate investment because we

24    feel like that's certainly not the perspective that

25    the investors seem to be coming from.  Indeed, the

45

1    investors, the minority investors I should say, have

2    been given an opportunity to listen to NuScale's

3    presentation and to listen to Proterra's

4    presentation and have essentially said no thanks,

5    we'd just like to get our money back and move on.  I

6    don't think their concern has been for the future

7    prospects of NuScale.

8              And I also should note that as to

9    NuScale, it does seem that it's going to be, you

10   know, years, at best, before they're able to turn a

11   profit.  So, it may be that they've made a decision,

12   which is, you know, certainly not an entirely

13   unreasonable one, that perhaps this is just, you

14   know, some cost that -- you know, that they're not

15   going to get the money back and they want to be made

16   whole and they're not particularly concerned about

17   the future of this business.  They may just want to

18   cut their losses, simply put.

19             So I don't -- this is -- you know, of

20   course I have a law degree and not a business

21   degree, and I don't by any means to suggest that I,

22   myself, or anyone else, is in the best position to

23   make this decision, all we're looking for is the

24   investors to have as much information as they can

25   and make a good choice with the maximum amount of

1    disclosure possible.

2              THE COURT:  And the role of the business

3    advisors is to be the neutral that does not have any

4    conflict or any piece in this game to assist the

5    Court in making what I think you all have previously

6    called the less bad of bad decisions.

7              MR. MANDEL:  Your Honor, may I make a --

8              THE COURT:  Yes.  Can I -- before I lose

9    this thought.  The minority investors have not

10   participated in the process of understanding what

11   these private equity investments are all about.

12   They have expressed a desire for their money, not

13   surprisingly.  Is there a trade off kind of

14   mechanism that means that if the traceable monies in

15   NuScale's bank account is somehow -- if there is

16   some consideration -- is there some consideration

17   that can be a trade off that is slightly different

18   than just saying your desire for your money back is

19   just not something that is going to happen right

20   now, but nonetheless, either gives them a little

21   added protection they didn't have before, a little

22   consideration that they didn't have before?  Is

23   there something that in your experience would be

24   doable and more palatable to the SEC?  This really

25   may be a question I should be directing to the

1  advisors.

2         MS. KELLY:  I was actually just about to

3  suggest that.

4         MS. MIDANEK:  Just to address the first

5  two comments that Ms. Kelly made.  I believe I may

6  have mistakenly referred to the bolivar portfolio as

7  currency arbitrage.  In fact, it is a bolivar

8  denominated portfolio.  We know the BDO has looked

9  at it as recently as December 6th, and we know

10  nothing more about it than that.  And because it's

11  in another currency, I used the wrong words.

12         With respect to Edenwood and any other

13  prospective investor, we are certainly not stopping

14  to look for them, and Mr. Curran is actually looking

15  for Edenwood today.  He believes the name -- he's

16  not totally familiar with the name, but he thinks

17  the universe of investors that are in here will know

18  Edenwood and would be able to bring them to the

19  table if they're involved.  That's an anecdotal

20  approach to doing it.

21         And then, you know, finally, you know, I

22  don't know exactly the mechanism for a negotiation

23  to work, but I do believe any negotiation with

24  respect to the positions of the minority and the

25  majority investor must be predicated on full

48

 1    information insofar as we can get it being provided

 2    to all of them.  You know, whether they simply want

 3    their money back or not, they need to have the

 4    information, and then they may find that they have a

 5    different position mand at that point we can, we

 6    hope, sponsor a negotiation.

 7              Excuse me, Victor.

 8              MR. MANDEL:  I was going to make two

 9    comments with respect to your points, Ms. Kelly.

10    The first one was with respect to the bank accounts.

11    I'm sorry, my recommendation is that we look at

12    freeing up the funds in the bank accounts.  Whether

13    it is to the tune of $2.1 million or not, I haven't

14    made a determination, nor do I have the information

15    to make such a determination, but I do view it as

16    analogous to the payroll relief request that was

17    granted to Proterra.  I don't believe that just

18    because the company at NuScale was a business day or

19    two later in getting that request in that they

20    should be disadvantaged in any way, but that is

21    certainly what the money is needed for, and there is

22    a precedent already granted with respect to a

23    payroll relief at Proterra.  So, I think that is

24    something that I think should merit some further

25    investigation, the consideration of the relief and

```
1    release of some funds to pay payroll at NuScale.

2              The second question, your Honor, if I

3    can just address the issues with respect to the

4    minority investors.  The minority investors, as I

5    think you've indicated, would certainly love to get

6    all of their initial investment back plus

7    appreciation, for which, again, on asset statements

8    I'm not certain is fully even realizable.  But in

9    reality, and having done a number of hedge fund

10   dissolutions, the offer in the option usually with

11   illiquid investments is to offer a discounted -- an

12   option of either a securities in-kind or a heavily

13   discounted cash payment, and as such, I think their

14   indication of their desire to be fully redeemed in

15   full plus appreciation I think is very much

16   unrealistic at this point in time.

17             THE COURT:  Well, it certainly is what

18   anyone would want; that is, however, not the world

19   we're dealing in.  All right, thank you.

20             Mr. Jacobson, do you have comment,

21   questions, observations?

22             MR. JACOBSON:  I'm not sure how to

23   characterize them, your Honor, but yes, I do.  I

24   think with respect to the potential that there might

25   be additional minority investors in STLF, Alvarez &
```

1   Marsal has been compiling a list.

2              THE COURT:  I'm sorry, where is this

3   potential that you are identifying?

4              MR. JACOBSON:  Ms. Kelly mentioned

5   Edenwood.

6              THE COURT:  Oh, okay.

7              MR. JACOBSON:  And --

8              THE COURT:  I'm sorry, I thought you --

9   I misunderstood.  I thought you were talking about

10  minority investors investing in.  But that does not

11  seem to be the direction they're going.

12             MR. JACOBSON:  No, we're just trying to

13  find out who the investors are in STLF.  As you

14  know, an unregistered fund has no books and records

15  requirement.  STLF might have taken this to a new

16  level, but Alvarez & Marsal are putting together a

17  lot of records that funds like this typically have,

18  and the investor schedule is obviously one of them,

19  and has been compiling a list of open items, and is,

20  you know, looking to determine whether there are

21  anymore minority investors, and the payment that

22  came from Edenwood to the STLF fund of $500,000 was

23  identified by Alvarez & Marsal and they're trying to

24  determine whether that was an investment in the

25  fund, whether it was, as Ms. Kelly speculated, might

1    be a counterparty payment, or exactly what it is.

2    We have not found any subscription agreement from

3    Edenwood that would provide a conclusive

4    determination that they were an investor, but we do

5    know at least one investor, Goldenbird, also did

6    not, even though they invested 20 million, they

7    didn't bother to fill out a subscription agreement

8    either.  So, while it is an open question, it is

9    being addressed as we speak, and hopefully Alvarez

10   will be able to find out something.  And I

11   understand the SEC is reaching out to Edenwood, so

12   we should be able to address this and find out what

13   the status is pretty quickly.

14            With respect to the bolivar loan

15   portfolio, Ms. Kelly indicated that there were no

16   documents on the MK side, and my understanding from

17   the client is that all of the documentation with

18   respect to these loans are in Venezuela, and one of

19   the tasks that BDO Seidman has been carrying out is

20   to collect that documentation and provide it, and I

21   was advised during the inspection that the client

22   expected that documentation, you know, sometime

23   around the end of January from Venezuela.

24            So, it is possible that more

25   documentation is forthcoming with respect to the

1    bolivar loan portfolio that is in Venezuela,

2    which -- and correct me if I'm wrong, but I believe

3    that the BDO valuation at the official exchange rate

4    was 336 million on the U.S.  On the draft asset

5    schedule, which as Ms. Hussain testified was

6    preliminary, unaudited, incomplete, it was valued at

7    246 million.  So that was a con -- so there may be

8    another 100 million or 90 million in the fund.

9         And that raises a question I had about

10   the Cheyne position, because Mr. Fortinsky's

11   partner, Ms. Stolper, mentioned on one of the calls

12   we had that the Cheyne position was not an

13   investment by STLF, it was an investment by the

14   PDVSA entities, or one of the PDVSA entities, in

15   Cheyne, which I understand is a United Kingdom

16   entity, and that this was an -- I think she put it a

17   distressed investment, and it was given to STLF --

18   or subscribed to STLF in a distressed condition, as

19   she put it, to see what could be done with it.  By

20   that I assume she meant to see whether its value

21   could be recovered.

22        And so, if at the time that that was

23   transferred to STLF the distress valuation, which

24   Cheyne put on it of 205 million, was in error, then

25   it seems to me the subscription price would also

1   have been in error, and that if the valuation is

2   corrected ab initio, the subscription price should

3   be corrected ab initio, which means that Mr.

4   Mandel's concern, just looking at the numbers, the

5   unadjusted numbers, that there may not be enough

6   money in this fund to pay everybody off, seems to me

7   to be perhaps premature because when I look at the

8   numbers and I look at the 48 million that the

9   minority investors put in and everything else being

10  PDVSA, it seems to me that whatever the amount is in

11  that fund, assuming the bolivar loan portfolio is in

12  fact monetizable at something like the value, it

13  seems to me there is ample money to pay everybody

14  what they are entitled to.  But, again, there are

15  certain provisos, but I think it's premature to make

16  that assumption, and I wonder whether you agree with

17  me.

18          MS. MIDANEK:  Well, we agree I think

19  that it's hard to characterize the value of the fund

20  at all without a further investigation of what

21  happened with the Cheyne asset.  It's a very

22  significant value swing.  We don't know anything

23  about it.  It wasn't part of our sort of scope for

24  the weekend, thank heaven, but it needs to be done

25  in order to have a position with respect to the

1    entire fund, which is I think a comment you made to

2    us yesterday.

3            The issue about the value of the fund,

4    though, is a complex one in that, you know, the

5    stated position, and I think you repeated this

6    yesterday, too, Dick, that the stated position of

7    the MK Group managers is that the reason they had

8    put STLF assets into these couple of private equity

9    situations was to try to capture the upside in them

10   in order to make the fund whole.  So, they seem to

11   be acknowledging that that rationale -- they know

12   there is a diminution of value in the fund.  I don't

13   know the size of that acknowledgement, and that

14   remains for investigation.

15           MR. JACOBSON:  With all respect, I think

16   that what they were trying to say was that -- I'm

17   sorry, this is not working.

18           Okay, that going back to the Cheyne

19   position, PDVSA was carrying the Cheyne position on

20   its books -- not PDVSA, but I think it's one of the

21   pension funds.  I don't think PDVSA is a client of

22   any of the funds, but -- itself, but in any event,

23   the PDVSA pension fund that owned the Cheyne

24   position was carrying it on its books at something

25   north of $240 million.  It invested $240 million

1   with Cheyne, is what I am advised, and that Cheyne,

2   whatever -- I mean, Cheyne didn't do it so well,

3   let's put it that way, and that Cheyne was conceding

4   to a valuation of 205 million, which meant that the

5   PDVSA entity would have to show a loss of 35 million

6   on its books if it accepted the Cheyne valuation,

7   and it was hoping that through the unique skills and

8   investment ability of MK management, that if they

9   gave those funds in to the care of MK management

10  that the value could be recovered to make it worth

11  240 million again, and that that's what was going on

12  with the private equity.

13          Now, to go back to what I was saying,

14  just a hypothetical, but if the subscription price

15  is 205 and it turns out Cheyne was inaccurately

16  valuing the portfolio, so it should have been let's

17  say 105, that means the subscription price should

18  have been 105 as well, correct?  That's all I'm

19  saying.

20          MS. MIDANEK:  I understand.

21          MR. JACOBSON:  So it means when you look

22  at what the fund needed to have in assets in order

23  to pay everybody back, the investor plus an

24  appropriate appreciation, whatever that might be,

25  it's $100 million less on both sides of the ledger.

1   That's all I'm saying.  Do you agree with that?

2            MS. MIDANEK:  Well, in fact, I

3   understand the point you are making, but I think

4   it's something that none of us in this room can come

5   to a conclusion about because we just don't have the

6   facts.  So, your interpretation is one very possible

7   fact pattern.  It might, in fact, be the actual

8   case.  It could be, in fact, that the Cheyne assets

9   are worth more, we just don't know.

10           THE COURT:  But it should be reflected

11  in both places, though, in the same way.

12           MR. MANDEL:  But certainly -- yeah.  And

13  there are a number of different areas that I pointed

14  to with respect to the valuation.  I'm not making a

15  determination that, you know, the fund cannot be

16  liquidated in full, but certainly there are a number

17  of different areas of significant concern.

18           And with respect to your point about

19  having liquidity to redeem the $48 million, I in no

20  way looked at, you know, a disproportionate

21  redemption of the different LP investors, but in

22  fact a pro-rata redemption.  And certainly a

23  disproportionate redemption may be something that is

24  a negotiated solution here, but in terms of being a

25  liquidation of funds distributed to all LP investors

 1   on a pro-rata basis, there were four areas that I

 2   indicated where I felt there were some questions

 3   that merited further due diligence from the schedule

 4   of assets dated November 30, 2010.

 5          MR. JACOBSON:  No, I'm not disagreeing

 6   with that at all.  I'm just making a pure

 7   arithmetical point, that's all.

 8          MS. KELLY:  Your Honor, I just want to

 9   stop for one moment because I think where we are

10   right now is that Mr. Illarramendi's unique skills,

11   as Mr. Jacobson put it, have put us in a position

12   where there are hundreds of millions of dollars

13   swing possible in this fund, which as one of the

14   business advisors said is not S, is not T, is not L

15   and it may not be F.  So, I just want to back up for

16   a second and talk about a couple of the things that

17   are really troubling about what we're hearing from

18   Mr. Jacobson.

19          The $500,000 investment that we talked

20   about from Edenwood we were told -- the SEC was told

21   in our examination who the investors were.  It turns

22   out that this was an investment made with Mr.

23   Illarramendi on December 10th and we are only

24   learning about this now from our own review of the

25   documents.  That's really troubling because we're

1   not talking about someone who has a client base of

2   100,000 investors, there are four or five.  I mean,

3   it's like knowing what your child's name is.  It

4   makes no sense to us.

5            I also want to point out as far as this

6   $246 million investment, all we have is what BDO

7   says about the investment from the side of the

8   recipient of the funds, and we don't have a stitch

9   of documentation for something that comprises

10  probably half.  Who knows what the value is of the

11  fund.

12           I mention these points, your Honor,

13  because I think it shows the urgency and the

14  necessity of putting an asset freeze in place.  I

15  don't think NuScale should be in the position at

16  this point of not knowing whether it can spend

17  money.  I think Mr. Illarramendi -- it is going to

18  take probably weeks or months to unwind all of these

19  transactions, and in the meantime we don't think it

20  makes sense for anyone there to be moving any of

21  this money because there is commingling of funds, as

22  defense counsel has acknowledged.  There is

23  significant ambiguity in who owns what, and if we

24  can't answer these very basic questions, nobody

25  should be touching anything for the time being, and

```
 1    I think the investors would at least take a great

 2    deal of comfort, as reflected in PDVSA's comments

 3    this morning -- this afternoon, I think it is

 4    imperative that we have some clarity for them so we

 5    can stop and take the time necessary that they need

 6    to get the disclosure and to evaluate all of these

 7    investments.

 8              THE COURT:  I don't think anyone

 9    disagrees with you.  The question is how, with time

10    not on everyone's side, we can most efficiently do

11    that.  I would like to know -- get some time

12    perspective on how the various things would work.

13    So, for instance, let me theorize that NuScale can

14    use its bank account, Proterra gets some new money,

15    or some properly conditioned Series A loan, and BDO

16    Seidman is busily gathering together contracts and

17    notes in Venezuela.  What is our timeframe here?

18    Because unwinding every nuance is going to take a

19    long time.  The big nuts are obviously the Cheyne

20    Fund and finding out what the $260 million

21    investment actually went to.

22              MR. MANDEL:  Your Honor, based on the

23    work that we've done to date, to answer your

24    question, and I would defer to the companies

25    directly with respect to those amounts, the
```

1   2.1 million at NuScale and the potential to raise,

2   let's assume, again in theorization of it,

3   $3 million at Proterra, that that would buy the

4   Court on the order of one to two months in order to

5   deal with this issue, in particular all these

6   employees who are caught up in this situation at the

7   companies of both NuScale and Proterra.  But, again,

8   I defer to more refined estimates to both companies

9   directly.

10             THE COURT:  Thank you.

11             Why don't I hear from Mr. Gottschalk.

12   And then, Mr. Schneider, if you wish to be heard, I

13   would be happy to hear you, too.

14             I'm sorry you are breaking up.  What

15   sort of --

16             MR. SCHNEIDER:  Can you hear me better

17   now?

18             THE COURT:  That's better.  Thank you.

19             MR. SCHNEIDER:  And I don't have to go

20   first, but I would like to be heard.

21             THE COURT:  All right.  I'm going to let

22   Mr. Gottschalk go first, and then we'll come to you.

23             MR. GOTTSCHALK:  Thank you, your Honor.

24   I do want to reiterate what the business advisors

25   said, which was everybody worked intensely hard over

1   the last three days with a lot of dedication to be

2   able to be here today and present to you the

3   information.

4              THE COURT:  I am impressed.

5              MR. GOTTSCHALK:  And it's with no small

6   amount of enthusiasm that I have talked to counsel

7   with PDVSA and they've expressed interest in making

8   an equity investment into the company.  That being

9   said, I have some concerns.  As I had discussed in

10  my last presentation to the Court, we were unaware

11  of the situation behind the scenes and were

12  expecting to have an investment much sooner than we

13  finally got one, and as a result, we were already

14  doing things to push out payments to vendors and

15  other things as early as December to essentially

16  last as long as we could before we would be getting

17  the investment we were expecting.  And so, you know,

18  it's certainly sort of the lethal things that have

19  been addressed by addressing the payroll and

20  addressing the Altairnano payment, but there are

21  other things hanging by a thread with respect to

22  vendors who won't deliver product because they're

23  not getting paid.  And, you know, PR firms were, you

24  know, helping us with a giant event this week who

25  basically said, we can't really do anything right

1    now because we have a balance due and owing.  So,

2    it's not just those critical payments, but it's

3    really the ability to at least stretch out as much

4    as we can without essentially doing some significant

5    harm to the business.

6              And addressing the issue with regard to

7    the Series A shareholders, my concern is there is a

8    balance here, and when I discussed this with

9    Attorney Fortinsky before I came up, he was

10   suggesting that allowing for any kind of dilution

11   or, you know, subordination of position to his

12   client is, in a sense, sort of affecting the rights

13   of the employees who put monies into the pension

14   fund that he represents, pension funds.  You know,

15   at the same time we have the investors here in the

16   U.S., and a few in Hong Kong, who invested in the

17   Series A who are being affected at the same time and

18   are trying to do what they can to protect their

19   rights and their investment.  And so there is a

20   little bit of a balance of interest going on here,

21   although in some respects I would argue that

22   allowing the Series A is actually protecting the

23   Series A investment, is actually protecting his

24   client in terms of the value of the company.

25              To that end, you know, I would like to

 1   suggest a couple of different things as sort of

 2   creative alternatives.  Certainly one of them would

 3   be to just have -- if PDVSA is willing to do it,

 4   essentially to let PDVSA come in on the loan portion

 5   of the transaction, the $3 million loan.  All the

 6   paperwork is essentially done, that can be adjusted

 7   to put them in first position with respect to all of

 8   the rights, and that would allow us some breathing

 9   room.

10        THE COURT:  Instead of the Series A

11   investors?

12        MR. GOTTSCHALK:  Well, it would replace

13   the existing one, or it could stay in place.  It

14   doesn't matter, it's up to PDVSA.  I don't have a

15   strong feeling either way.  But yes, as otherwise as

16   a replacement for the Series A.

17        The other thought I would offer is, to

18   address the concern about dilution, that we could

19   set up a concept that each week for the next four

20   weeks there would be a $750,000 opportunity on the

21   same terms as what we've given to the Series A for

22   both the Series A and PDVSA to essentially put money

23   into that note.  The note is already created.  It

24   could be on a pass-through basis, and it could be

25   set up so PDVSA has the right to take as much of

1    that as it wants up to its fully diluted share of

2    the company, assuming the conversion of the Series

3    B.

4              And I know that may be a little

5    confusing, but if their convertible note for 15

6    million were put into stock, that would give you

7    sort of the fully diluted numbers upon conversion

8    into stock, which would give them roughly 70 percent

9    of the share of the company.  They could then put in

10   up to 70 percent of that 750,000 and the remaining

11   Series A investors would have the right to take the

12   remainder.  And that way there would be no dilution

13   to PDVSA and it would allow the company essentially

14   to continue on to pay its bills and operate its

15   business.

16             THE COURT:  What does that do for the

17   STLF minority investors?

18             MR. GOTTSCHALK:  I was getting to that

19   next.  I understand that's an issue.  So, the issue

20   there would be -- it would be -- there would be an

21   effort by PDVSA to essentially get a waiver from the

22   minority shareholders to allow that to occur.  I

23   can't pretend to tell you upon what basis they could

24   negotiate that deal, but -- and obviously the other

25   STLF minority shareholders would have the right if

65

1    they wanted to, in theory, to opt in to that as well

2    on an individual basis.  But it would allow money to

3    flow into Proterra, would avoid the dilution issue,

4    and needless to say with respect to the minority

5    shareholders in STLF, that dilution is, you know,

6    1/10th of what it would be for PDVSA.  So, it's

7    relatively de minimus.  So, that was a thought I

8    had.

9            And, your Honor, I obviously have no

10   idea what the fund documents say about what the

11   rights are of the 90 percent party to the fund

12   versus the minority shareholder rights, minority

13   investor rights, and whether there are decisions

14   that can be made without unanimity or whether this

15   would require indeed for them to come up with an

16   agreement to allow for a waiver to allow them to do

17   that.

18           THE COURT:  All right, you have received

19   clarification that you can use the $750,000 that was

20   released as best needed, which you've done for

21   payroll, and I presume for the critical vendor

22   payment of tomorrow.

23           MR. GOTTSCHALK:  Correct.  Just for

24   clarification to the Court, we have spoken with that

25   vendor.  They are willing to give us a few more days

1   to Friday.  They are themselves in need of that

2   money.  So we have at least dispensation until

3   Friday to make that payment.

4            THE COURT:  And you referenced some

5   other events and vendors that play a role this week,

6   the PR firm in an event you are having, et cetera.

7   Tell me what kind of obligations and money you are

8   talking about.

9            MR. GOTTSCHALK:  Your Honor, to be

10  honest with you, I don't think I could recite that

11  off the top of my head.  I could get those numbers

12  for you by the end of the day today.

13           THE COURT:  Is it a fair statement that

14  all things are in place with the status quo to hold

15  until Friday?

16           MR. GOTTSCHALK:  If you are asking are

17  there no dire circumstances that would happen

18  between now and Friday if we did not receive any

19  additional funds, I would say the answer is we could

20  survive until Friday.

21           THE COURT:  Recognizing all the while

22  there is additional debt creeping up.

23           MR. GOTTSCHALK:  Correct, and vendor

24  calls and other issues where we're stretching things

25  to the breaking point.  But that is correct, your

1    Honor.

2              THE COURT:  All right, thank you.  Any

3    other comment you want to make about the business

4    advisors' recommendations or concerns?

5              MR. GOTTSCHALK:  No.  The only other

6    comment I would make really has to do with the

7    timing and ability to bring in additional

8    investment.  Needless to say, we would very much

9    like to see PDVSA become an investor in the company,

10   and Mr. Fortinsky has generously suggested that he

11   would offer up his corporate attorneys to be working

12   around the clock to see if they could make a

13   transaction happen even by Friday.  I believe that

14   that's probably an unrealistic deadline because,

15   number one, you actually have to reach agreement on

16   what the terms of the investment would be, and then,

17   number two, you actually have to do the paperwork to

18   paper it, and that's not always a short process.

19             And the second issue is, if for any

20   reason there was a decision not to do that

21   investment or there was the possibility that it

22   could be a co-investment with other investors that

23   we're talking to, obviously by Friday not a lot of

24   that could be worked out.

25             So, the suggestion I was making having

```
1   these weekly payments or having them put in the loan

2   is essentially also a way of buying time to allow

3   these things to happen in a more orderly and regular

4   fashion as opposed to trying to cram it out into

5   four days, which I see as being not exactly an easy

6   or possible thing to do.

7           THE COURT:  I don't know, I think

8   everybody has demonstrated the art of the impossible

9   from this weekend.

10          MR. GOTTSCHALK:  Believe me, I'm willing

11  to work every minute between now and Friday to see

12  that happen.

13          THE COURT:  Your proposal -- or your

14  concept of having each week for four weeks the

15  $750,000 opportunity to loan or invest is in lieu of

16  the $3 million Series A investment that was

17  originally contemplated, or on top of?

18          MR. GOTTSCHALK:  So, for clarification,

19  originally the plan was that there would be a

20  $3 million loan that would be a bridge to the

21  $8 million equity financing, and now we're talking

22  about another method for having a $3 million loan

23  placed into the company that's based on what we did

24  with the original Series A money provided for the

25  payroll to essentially get to that $3 million loan
```

1    portion.  It doesn't address the equity need, it

2    just addresses that initial loan that was meant to

3    bridge to the equity closing.

4                THE COURT:  And the equity closing, what

5    you had originally expected was the $8 million from

6    the MK entities, is now in contemplation being

7    actually investment money from PDVSA directly.

8                MR. GOTTSCHALK:  That is correct.

9                THE COURT:  So that the concern of the

10   SEC with respect to unknown minority investors,

11   substantial questions on what the assets of the STLF

12   are anyhow, are put aside by that method.

13               MR. GOTTSCHALK:  Yeah, if anything, the

14   STLF minority investors are benefited by that

15   additional funding coming in as equity because there

16   is the $15 million convertible note which ostensibly

17   they'll still have an interest, which is fully

18   secured.

19               THE COURT:  I guess there is some

20   question about to whose benefit that redounds,

21   whether that ultimately gets to the STLF investors

22   or whether it's the MK entities.  The managers seem

23   to think that the STLF investors have not gotten

24   those rights and are entitled to them, if I

25   understand Mr. Mandel and Ms. Midanek's comments.

1          MR. GOTTSCHALK:  That's correct.  My

2    understanding has been the rights associated with

3    the Proterra investment would essentially be granted

4    over to the STLF.

5          THE COURT:  All right, thank you.

6          MR. GOTTSCHALK:  One other comment, your

7    Honor, quickly, is the company has placed

8    essentially everything you could ever want to know

9    about it of a confidential nature into a data site,

10   and in some cases in individual e-mails to the

11   parties here to allow them full and complete

12   understanding of the company's prospects.  In

13   addition, there is a presentation that is included

14   in the documents that were prepared by the business

15   advisors and distributed today.  My concern is for

16   the confidentiality, and so I request from the Court

17   whether there is some form of protective order or

18   required non-disclosure that we could address to

19   protect those documents.

20          THE COURT:  We did recognize that all of

21   these documents being exchanged were likely to

22   contain a large number of confidential documents and

23   materials that were not, by a long shot, public

24   information.  I had referred you all to the draft

25   protective order on the website for my standard

```
 1   operations to see whether you could just use the

 2   basics of that and tinker, rejigger it for your use.

 3   I'm happy to sign into effect any rejigged

 4   protective order you need nunc pro tunc, and people

 5   should just start working on that because it is --

 6   if this is to go forward in the fashion it has with

 7   this free flow of information, you all have to be

 8   able to be confident that it is confidential.  It is

 9   confidential and no one -- everyone is ordered to

10   maintain that confidentiality.  I make that order in

11   this very broad, sweeping form, but I think you

12   should reduce it to writing in a way that will

13   reflect specifically what your needs are.

14               MR. GOTTSCHALK:  Thank you very much.  I

15   appreciate that.

16               MR. MANDEL:  Your Honor, may I make a

17   quick comment on the reference to our report?

18               THE COURT:  Yes.

19               MR. MANDEL:  Sorry, the opinion that we

20   had was that the right of first refusal -- just to

21   clarify our opinion, which was the right of first

22   refusal that exists at Proterra, which we think

23   should transfer along with the assets, in effect

24   should be a right of first refusal for the investors

25   in STLF 1, which again includes the minority
```

72

1    investors.  Direct negotiation between the PDVSA

2    entities and Proterra would preclude their ability

3    to invest side-by-side or protect their rights, and

4    we believe that either through a consent

5    solicitation to them to waive those rights or

6    potentially a concurrent subscription offer to them

7    to also invest alongside PDVSA may be the best route

8    to their protect their rights, to preserve their

9    values in the Proterra investment.

10              THE COURT:  If you go the route of the

11   concurrent subscription offer, does that end out

12   having the effect of a waiver if they don't

13   participate?

14              MR. MANDEL:  It would -- I would have to

15   defer to a legal interpretation of the offering

16   documents of the fund.  From a practical purpose,

17   from an economic purpose, they would be given the

18   option then to maintain their non-dilutive ownership

19   in the investment, and therefore, to protect their

20   opportunity to share in the upside.

21              THE COURT:  And that doesn't take care

22   of the past, though.

23              MR. MANDEL:  No, no, not at all, it just

24   maintains a non-dilutive investment in Proterra

25   alongside the other investors in STLF who were given

1    this option.

2            MS. MIDANEK:  I also had a minor

3    response to Mr. Gottschalk, which is to point out

4    that when he was referencing the fund documents and

5    the powers that may exist for a certain percentage

6    of the equity interest or -- excuse me, the OP

7    interest to -- actually in Cayman it is equity

8    interest -- to change the terms and, in fact,

9    possibly the investment objective, the memorandum of

10   association under Cayman law and the offering

11   document are part of the package that you have in

12   front of you for your own reference, but I do

13   believe that to clarify that question we couldn't

14   find real clarity in these documents.  So, I think

15   we'd have to ask Cayman counsel how the directors of

16   the fund could potentially amend certain of the fund

17   guidelines to allow some of these things to happen.

18           THE COURT:  When you say "some of these

19   things," to the extent you are proposing the

20   possibility of a going forward solution, that would

21   be something entirely different from what the

22   directors of the fund under Cayman law can or cannot

23   do; is that right?

24           MS. MIDANEK:  I think what I'm trying to

25   say is that there is usually a provision that allows

1    for a majority or a supermajority of the ownership

2    interests in the entity to override the minority.

3    And so -- but we need to look at the actual

4    circumstances in this situation and talk with Cayman

5    counsel, who hasn't been part of these discussions

6    at all, about how that plays in Cayman law.

7              Would you agree with that?

8              MS. KELLY:  With the caveat that --

9    depending on whether the fund is worth 500 or 300,

10   it may make a difference in terms of how much of a

11   minority it is.  We've been sort of referencing

12   PDVSA as the 90 percent investor.  It may well be

13   the 70 percent investor, we just don't know at this

14   point, and that may be a question that's relevant.

15             MS. MIDANEK:  There is also that

16   subjective question for Cayman law, in this context

17   what would Cayman counsel say.

18             THE COURT:  All right, any other

19   comments on Proterra's presentation and remarks?

20             All right, let me hear then from Mr.

21   Schneider for NuScale.

22             MR. SCHNEIDER:  Thank you, your Honor.

23   I think I'll take a step back and talk about the

24   issue as to NuScale's current funds in its account.

25   NuScale strongly agrees with Mr. Mandel that NuScale

1    needs access to these funds in the short term to

2    preserve the status quo and to preserve the

3    investment made to date in NuScale.  I think your

4    Honor has a good understanding of that based upon

5    the comments you made earlier, but the fact of the

6    matter is that if these assets are frozen, NuScale

7    will literally shut down and shut its business, and

8    obviously that's not good for the company and that's

9    not good for the investors and the amounts that have

10   already been invested in the company.

11            Funds are needed in the current account

12   even to enable the company to negotiate for

13   additional funding, and, you know, this morning is

14   the first we've heard PDVSA may be interested in

15   pursuing those discussions directly, and NuScale

16   certainly is interested in pursuing those

17   discussions, and NuScale is also in discussions with

18   other investors on obtaining funding, but these

19   discussions take time.

20            You know, we think that even if the

21   account is not frozen, there will be substantial

22   layoffs in the next days, weeks.  We think we can

23   stretch the current cash balance to keep a skeletal

24   team in place in order to continue pursuing funding

25   to move forward.

1           A secondary risk here is, it's a

2    significant risk to investors, also the fact that if

3    the company stops pursuing commercialization of the

4    technology that it has been trying to bring to the

5    market, there is significant risk that Oregon State

6    University that holds the patent on this technology

7    may declare that the license agreement with NuScale

8    is terminated, that NuScale is not pursuing

9    commercialization, in which case it would be a

10   significant impairment to any value of the company.

11          So, at least in the short term we'd ask

12   the Court to adopt Mr. Mandel's recommendation and

13   not apply an asset freeze to the account currently

14   in NuScale's possession, to permit it to scale back

15   its operation, obviously, but to look for additional

16   sources of funding to preserve the investment

17   previously made.

18          THE COURT:  Any questions for Mr.

19   Schneider or comments on his remarks?

20          MS. KELLY:  Nothing for the government.

21          MR. JACOBSON:  Nothing from us, your

22   Honor.

23          THE COURT:  All right.  Can we go back

24   now to Mr. Fortinsky and tell me -- I'm of course

25   most interested in the timeframe, and I am also

1    interested in sort of the most optimistic scope of

2    negotiations that you would have with minority

3    investors, MK, whoever, for the purpose of getting

4    PDVSA's direct investment in there.

5              MR. FORTINSKY:  On the question of

6    timing, we did say based on the Court's express

7    concern about getting this resolved immediately that

8    under pressure, you know, to try to achieve the

9    impossible, we would try to do something this week.

10   We also had a discussion, which Mr. Gottschalk

11   referred to, about how by using the $750,000 to

12   cover the next two major obligations that Proterra

13   had, we might thereby achieve -- obtain for

14   ourselves another week, giving us essentially a

15   two-week window, at least with respect to Proterra,

16   to negotiate the terms of an investment.  It does

17   seem to me as though the next --

18             THE COURT:  Two weeks starting when?

19             MR. FORTINSKY:  Starting now.

20             THE COURT:  I didn't hear Mr. Gottschalk

21   giving quite that big a window, but go ahead.

22             MR. FORTINSKY:  The logic of that window

23   is that the funds already discussed that the Court

24   authorized, from I think last Wednesday or Thursday,

25   would cover the first payroll and -- the payment

1    that was due tomorrow, and that the second payroll

2    obligation was two weeks away.  I'm sure Mr.

3    Gottschalk can provide more detail.

4              But I guess my hope would be that we

5    would come away from today's discussion with two

6    things.  One, is an order more or less along the

7    lines that was described by the SEC earlier to

8    ensure there would be no money that moved or

9    surprised us by moving while we were all trying to

10   sort things out.  And, number two, an understanding

11   among the people in this room that what we needed to

12   do was enter into a short term series of

13   negotiations.  And as I see it, that's really the

14   only practical path.

15             And the negotiations that I see are on

16   at least three fronts:  One is to negotiate the

17   terms with Proterra of the investment that we

18   discussed; two, to negotiate the terms with NuScale

19   of the short-term financing that we discussed; and

20   three, to negotiate with the minority investors to

21   see if we can address the issues that have been

22   discussed this morning.

23             Earlier today I think it was Ms. Midanek

24   that -- I think it was both Mr. Mandel and Ms.

25   Midanek spoke about how we could negotiate with the

1   minority investors and by negotiating effectively

2   resolve the complications that the minority

3   investors present.  That may be possible, I don't

4   know.  I think that my client in a sense is in the

5   same position as those minority investors, we'd also

6   like to get our money back, we'd also like to be

7   made whole.  We'd also like to make sure there is no

8   prejudice to us of everything that has gone on so

9   far.

10          So, I think that if the minority

11   investors simply take the same position that we're

12   taking and everybody says we're not going to

13   negotiate, then there will be --

14          THE COURT:  And they'd get their money

15   back.

16          MR. FORTINSKY:  But I think there is an

17   opportunity to negotiate something that will be in

18   the nature of a settlement of these issues that

19   hopefully we can pursue over the next, let's say,

20   two weeks.  I certainly can't guarantee to the Court

21   what the outcome of those negotiations would be

22   even, or make any commitment as to, you know, can we

23   get it done in two weeks, but I think what we should

24   leave here today with is an understanding that those

25   three negotiations need to take place with the

1   support of the -- and I guess the foundation of the

2   kind of order that the SEC proposed.

3           I would say also that on the question of

4   the $2.1 million that NuScale was addressing, it

5   seems to me, it sort of feels to me as though that

6   is -- that they may have a good argument, that it is

7   in the interest of my clients to permit that money

8   to be used for operational purposes starting, you

9   know, as soon as possible.  I did not hear about

10  this $2.1 million issue until today, until here in

11  court, or just before court, and so I don't have any

12  direction from my client or view from my client as

13  to what should be done with that $2.1 million, but

14  it does feel to me as though that is the kind of

15  issue that ought to be the subject of a direct

16  negotiation with my client or with the

17  participation, as appropriate and as they wish, of

18  the minority investors, and it may be that we can

19  get that resolved that way.

20          We are sympathetic to the concerns

21  expressed by both NuScale and Proterra to their need

22  for financing.  We also have, as Mr. Gottschalk

23  alluded to, competing concerns of our own, which is

24  that we, as the pension fund managers, most of the

25  money that has been put in is pension fund money,

1    basically we have fiduciary obligations and don't

2    want to play fast and loose with the retirement

3    savings of basically a lot of people who are poor

4    and working class.  Investment is important, we

5    recognize that.  The people in this room either are

6    in the investment business or represent people who

7    are, but at the same time we also can't loose sight

8    of the fact that we can't simply give priority to

9    financing needs at the expense of people's

10   retirement funds.  It's one thing if people have

11   knowingly invested, but it's another thing if they

12   have not, and we need to be sensitive to that.

13          So, all in all I think we do have a path

14   forward with these sets of negotiations.  Part of

15   that will also be -- and maybe this is a fourth

16   negotiation that I should have said at the outset,

17   we also need to negotiate the terms of our existing

18   investments and of the future control of the funds.

19   But it seems to me that I basically don't see an

20   alternative to try to negotiating that, to

21   negotiating that among the business principals

22   rather than negotiating that, you know, kind of on a

23   standing-on-one-foot basis among a set of

24   litigators.

25          THE COURT:  Does it seem to you that the

1    talents of Ms. Midanek and Mr. Mandel would

2    facilitate this process by being, A, the neutral and

3    independent voice and oversight for the Court, and

4    B, I think a pretty creative experienced duo?  Do

5    they have a role to play, and it may be a slightly

6    different role than they've played over the weekend,

7    in making this happen on a faster basis?  You know,

8    the term yenta occurs to me, and --

9             MR. FORTINSKY:  We've worked

10   productively with both Ms. Midanek and Mr. Mandel,

11   and I like them both.  I don't have any direction

12   from my clients on this.  I will say that my

13   clients' overriding concern on this subject is that

14   we not be in a situation where someone else tells us

15   what we have to do with our money.  Yes, there is a

16   footnote about the minority investors, we understand

17   that, and maybe we can negotiate that footnote to

18   disappearing, but we would not want to be in a

19   position where our ability to achieve a resolution

20   of this was impeded because somebody else had

21   authority over what would be done with those funds.

22             I certainly have, you know, no problem

23   continuing to work with them toward a resolution,

24   and certainly would be guided by what the Court

25   wants to do, because as I understood it, an

1  important part of their role until now has been

2  advising the Court on what's been going on.

3          I suppose as I'm standing here it occurs

4  to me also that if these are going to be something

5  along the lines of traditional business

6  negotiations, one would expect them to be done

7  confidentially, and if we were to think about

8  whether there was a role going forward for Mr.

9  Mandel and Ms. Midanek we would have to be

10 sensitive to the fact that if they had an obligation

11 to report to the Court, there might be a tension

12 between the need for confidential negotiations and

13 their obligation to report back in a public setting.

14         So, I'm not sure I've given you a clear

15 answer, but those are some of the thoughts that are

16 guided by the discussions I have with my clients

17 about the need for, you know, not losing control

18 over its money and at the same time my favorable

19 experience with Mr. Mandel and Ms. Midanek over the

20 last three days.

21         THE COURT:  Now, one of the

22 methodologies we use, in any event, when a

23 transcript is being made, is that notice is sent to

24 the parties with respect to redactions and so forth

25 before it is actually put up, and I would strongly

1   urge everyone to pay attention to that timely and

2   make any requests that confidential material that

3   appears in the course of our proceedings is

4   appropriately sealed, or at least sealed for a

5   period of time, because it is quite apparent to me

6   that the interest of the public in the details that

7   are the confidential business affairs is far

8   outweighed by the need to keep them confidential in

9   order to make these negotiations go on and make

10   these businesses be able to proceed as they would

11   have anticipated absent the litigation.

12          All right, anything further?

13          MR. FORTINSKY:  I would just add one

14   more thing, if I may, your Honor.  There was a

15   comment about how we don't know the value of the

16   funds, and therefore, don't know the percentage of

17   my clients' interest, and maybe it's as low as

18   70 percent.  I can't speak to the precise number or

19   percentage, but it does seem to me that we should

20   not lose sight of the fact that this fund was

21   created for my clients.  It was not just a fund or

22   some mutual fund in which lots of people made

23   investments and now -- or not only a mutual fund,

24   certainly other funds that have been unwound have

25   been of a similar nature, the fund was getting money

1    from lots of different sources and then somebody has

2    to come in and sort out whose money it was, perhaps

3    prototypically, because it's been so public, one

4    thinks of the Madoff example.

5              But this is not like that.  This is an

6    example of a fund that was a vehicle created in

7    order for an unregistered investment advisor to

8    serve a specific client in a specific relationship

9    that was negotiated by my client.  I heard, based on

10   the information, I think that ultimately comes from

11   Mr. Illarramendi, that there were these minority

12   investors in the fund.  I, myself, have not seen any

13   documentation other than a chart that, again, was

14   based on Mr. Illarramendi's say so.  I have not seen

15   any documentation that shows that there were

16   subscription agreements in which these minority

17   investors placed money into the fund created for my

18   client.

19             And so, the notion that there is some

20   sort of legitimate constraint on what my client can

21   do with its own money in its own fund, is, to me at

22   least, in question, notwithstanding the estimates of

23   70 percent or 90 percent that may reflect the total

24   of the money involved.  To put it differently, Mr.

25   Illarramendi may have received money from other

86

1    sources that he was charged with taking care of and

2    investing, I am not certain that it is necessarily

3    the case --

4              THE COURT:  They ended up in STLF.

5              MR. FORTINSKY:  I'm not sure exactly how

6    that happened or what subscription or arrangements

7    or understandings there were, and whether those

8    indeed properly constitute a constraint on my client

9    to manage its own funds as it sees fit.

10             THE COURT:  You spoke about the direct

11   negotiations.  I take it that there are several

12   different types of investments which might

13   simultaneously be contemplated by PDVSA, loans,

14   investments, something else.

15             MR. FORTINSKY:  I think in the context

16   of a business transaction which is intended to

17   provide financing to a company like Proterra, the

18   terms of that financing, whether it would be a loan,

19   a convertible instrument or pure equity, would be

20   one of the things that would be negotiated.

21             THE COURT:  All right, as I remember

22   from the earlier discussions, Mr. Gottschalk and the

23   papers that were filed, there was another payroll

24   due on May 4th -- February 4th.  So we don't have

25   quite as much time as two weeks.

1              Is that right?

2              MR. GOTTSCHALK:  Yes, your Honor, and to

3    sort of be realistic about it, you would probably

4    want to be wiring the funds the day before and would

5    want to have the Court approval to be able to do

6    that the day before that so you are not essentially,

7    you know, scrambling like crazy to get that done at

8    the last second.

9              THE COURT:  Well, you need to have it

10   the day before you cut the checks.

11             MR. GOTTSCHALK:  That is correct.

12             THE COURT:  So as not to trigger your

13   reporting obligations to the state of Oregon.

14             MR. GOTTSCHALK:  We are based in

15   Colorado.  It's more of an issue of essentially not

16   having our bank --

17             THE COURT:  That was NuScale, right.

18             MR. GOTTSCHALK:  Have our bank put a

19   stop on the payments.

20             THE COURT:  That said, would you like to

21   reconvene, telephonically or otherwise in person,

22   February -- the morning of February 1st or the

23   morning of February 3rd?  I am inclined to the

24   February 1st, but I don't want to be premature.

25   That is a Tuesday or a Thursday.

88

1          MR. GOTTSCHALK:  Needless to the say,

2     your Honor, we would prefer the Tuesday.

3          THE COURT:  You want Tuesday, yes.  If

4     we do Tuesday, it really does give structure, as we

5     say.

6          MR. FORTINSKY:  Your Honor, we'll be

7     here whenever the Court would like us to be.

8          THE COURT:  Ms. Kelly, does it appear to

9     you that by Tuesday morning the world will have

10     turned around enough times that we will be able to

11     productively assess the situation?

12          MS. KELLY:  I'm not sure.  We'll be here

13     whenever the Court wants us to be here, that goes

14     without saying, but there is a concern that we have

15     about the framework that I think Mr. Fortinsky very

16     precisely outlined as a way to go forward.  And to

17     be specific, he said while there needs to be an

18     asset freeze, and two, there needs to be a series of

19     short-term negotiations, there is no question we

20     agree there should be an asset freeze in place at

21     this point.

22          Our concern about the short-term

23     negotiations is that they essentially don't put --

24     if they're done without being under the auspices of

25     a receiver, there is no one there looking out for

1    the investor in those negotiations, understanding

2    the Court has throughout this process been looking

3    at the interests of all parties, as the Court always

4    does, but in a series of private negotiations that

5    are done, it seems to the SEC that that presents a

6    real problem for the minority investors.  And while

7    we certainly don't disagree with Mr. Fortinsky's

8    assertion that PDVSA is the by and large biggest

9    investor, I would just point out that Mr.

10   Illarramendi told PDVSA that this was an investment

11   vehicle that was being created for them, or, you

12   know, that he was going to be working for them

13   exclusively.  That was not the case, and, you know,

14   clearly what he said to investors and what he has

15   done with their money has been very different.

16             We're just concerned that these

17   negotiations are going to happen outside of the

18   Court's view, and while we appreciate the suggestion

19   the Court made about having the business advisors be

20   part of those discussions and part of that dialogue,

21   if they're simply there without being vested with

22   the power to make decisions on behalf of the Court,

23   then they're really just kind of, you know, watching

24   over without the ability to, you know, wield any

25   authority over the negotiations other than to sort

1  of watch to make sure that fairness is -- that the

2  process is fair.

3        So, I'm not sure that the private

4  negotiations can really take place just among the

5  parties.  And I don't imagine that Mr. Fortinsky

6  contemplates the SEC and defense counsel would be

7  part of those either necessarily, understandably,

8  because it is unwieldy, but it just seems to me it

9  would be much simpler in many ways for the Court to

10 simply appoint someone as a receiver and have this

11 be one of their duties to engage in, and perhaps

12 they could simply be a part of the negotiations on

13 behalf of the minority investors just to make sure

14 they have a voice and with authority to speak for

15 them.

16        THE COURT:  Well, that's a little bit of

17 a different proposition than a receiver would be,

18 which is to essentially be an arm of the Court.

19        MS. KELLY:  Certainly.

20        THE COURT:  Not to be the privately

21 retained and free representative of the minority

22 investors.  They've got their attorneys, they've

23 been invited to participate, they don't want to

24 participate, that's their problem.  So, I think the

25 minority investors, having been given the

1    information and the opportunity, and continuing to

2    do that going forward, are in a much different

3    position than if they were sitting in a dark closet,

4    which they had been before.

5            I want to explore the idea of a sort of

6    financial agent, if you will, in the form of an

7    attorney who can appreciate the nuances of the legal

8    statuses that are being negotiated, but I'm not sure

9    that that takes place while they're being negotiated

10   and proposed without chilling, and I am not sure why

11   that can't be done once the negotiations have

12   produced something to be assessed.  Tell me what I

13   am missing.

14           MS. KELLY:  We recognize the Court is

15   trying to think, be thoughtful and creative in

16   trying to move this process forward as quickly as

17   possible.  Our only concern is that there is some

18   neutral third party who can speak on behalf of

19   investors during all stages of the process, because

20   even though Mr. Curran and the other attorneys who

21   are representing the investors may well be invited

22   to be part of their negotiations, that puts the

23   investors in the position of, you know, I guess

24   paying their attorneys to work, you know, to engage

25   in these negotiations regarding investments that

1   they never signed up for in the first place.

2             That seems like a real burden.  And if

3   there is no one else there who is an advocate for

4   them -- you know, we would welcome whatever the

5   Court's creative suggestions are as to how to give

6   them a voice in the process, because essentially

7   what they've said so far is, we didn't sign up for

8   this, just let us go home, and it may not be

9   realistic to redeem any investors out, never mind

10  even all of the minority investors.  But we do have

11  concerns about -- it may not be in a dark closet,

12  but the victims -- the investors have not been here

13  during the court proceedings, they haven't been

14  privy to a lot of the information that's been going

15  back and forth here, and so they may not be in a

16  dark closet, but they're not in possession of as

17  much information as many of the parties have.

18            May I have just a moment, your Honor?

19  That's all.

20            THE COURT:  The neutral who can speak on

21  behalf of all investors, does that give appropriate

22  recognition to the fact that there is one big

23  investor and then a few minority investors?  In

24  other words, there is going to be tension among the

25  investors themselves, and so my question is what

```
 1    role a neutral can play that needs to anticipate the
 2    coming potential conflict.
 3              MS. KELLY:  I think in the Commission's
 4    view a neutral can calibrate his role and, as always
 5    in any case where they're balancing competing
 6    interests, a neutral can calibrate their role and
 7    their voice to serve all of the investors.  Again,
 8    particularly when it's such a small, small group,
 9    and I would expect that Mr. Fortinsky will, as he
10    has already, continue to be, you know, a thoughtful
11    and zealous advocate on behalf of his client, and
12    I'm sure he would not be shy about making his views
13    known to a receiver should a receiver be in place.
14              So, the other thing that I think from
15    the Commission's perspective, it seems perhaps --
16    while we've all been very focused on the short-term
17    question of financing the private equity ventures, I
18    know Mr. Fortinsky is very interested in seeing an
19    asset freeze in place.  From looking at the case law
20    on the imposition of an asset freeze, it is fairly
21    rare for there not to also be a receiver in place in
22    these type of civil proceedings, simply because I
23    expect that the next order of business is going to
24    be Mr. Illarramendi's request for various carveouts
25    to the asset freeze not limited to his living
```

94

```
1    expenses and his attorney's fees.  So we're soon

2    enough going to be in the thick of those

3    discussions, which I think certainly -- you know, I

4    think certainly a receiver could balance the

5    interests of all of the investors in looking at how

6    it got into court.

7              May I just have a moment, your Honor?  I

8    mean, ultimately, your Honor, there is just the

9    broader question of who are the investors, what are

10   the assets and how much are they worth, and we think

11   that that sort of fundamental question, while placed

12   on the back burner for the time being, of necessity

13   will come to the forefront very quickly, and we

14   think, you know, a receiver would be in a position

15   to deal with that, because there is a lot right now

16   necessarily putting the court before the horse.

17             THE COURT:  The court before the horse?

18   It doesn't sound like a good position to be in.

19             MS. KELLY:  Your Honor, I shouldn't use

20   any kind of colloquial expression, I always get them

21   wrong.  But I think that's all.

22             MR. FORTINSKY:  Your Honor, I'd be

23   willing to comment, if the Court is willing.

24             THE COURT:  Please.

25             MR. FORTINSKY:  We don't oppose a
```

1   receiver ever, we just think we should hold off

2   before we put one in place.  And if we're going to

3   meet again on February 1st, we can evaluate what

4   happens in the negotiations between then and now and

5   address at least the latter set of concerns that the

6   SEC just raised at that point.  I would add that --

7   well, first let me say that I've said throughout, my

8   concern, our clients' concern about a receiver is it

9   ties our hands in dealing with an asset that is,

10  again with a footnote about the minority investors,

11  essentially ours, and we don't want to be in a

12  position where someone else can veto what we want to

13  do with our money.  That would not be right, that

14  would not be fulfilling the essential mission of

15  ensuring that the investors who are prejudiced can,

16  again, exercise control over their own assets.

17          As to the concern about, well, who is

18  going to speak for the minority investors, I think

19  the answer is that they have counsel.  The outline

20  that I described a moment ago to the Court

21  contemplated that we would be in negotiations with

22  those minority investors.  And the bottom line is

23  that nobody, no sophisticated investor is going to

24  enter into an agreement that is out of sync with

25  what the governing documents provide.  We're not

1    going to enter into an agreement that's illegal.

2    We're not going to enter into an agreement that we

3    don't have authority to do.

4              And if the -- the SEC here has been

5    quite vocal in expressing its concerns about the

6    role and interests of the minority investors.  We

7    understand that, we're on notice of that, and we're

8    not going to do something that ignores that.  We

9    will be negotiating with those parties, we will

10   address those concerns, and it's just like in any

11   other business negotiation, you know, people make --

12   in any business negotiation people make

13   representations, they make warranties.  Just about

14   any sophisticated business agreement has those kinds

15   of reps and warranties in it, and those reps and

16   warranties talk about what -- essentially what the

17   parties have the authority to do.

18             So, I don't think that the assurance

19   that any agreements that we enter into will respect

20   the minority investors comes from having a receiver

21   be appointed, it comes from the fact that we're not

22   going to purport to do something that we don't have

23   authority to do, because we know, as is true in

24   every business negotiation that if you purport to

25   buy or sell something or hold yourself out as

1    something other than what you are, there are legal

2    consequences.

3              So, I don't think that's a concern here.

4    And, in any event, I would suggest that we can

5    revisit that when we reconvene on the 1st if it

6    appears as though we have had obstacles in dealing

7    with the minority investors or have been

8    unsuccessful in trying to achieve some progress in

9    these negotiations.

10             THE COURT:  All right, may I ask the

11   SEC, there has been a broad use of the term "asset

12   freeze."  I don't know what assets you are talking

13   about.

14             MS. KELLY:  We can talk about what

15   assets we know of.  Of course we are asking for an

16   asset freeze, first of all, on any bank accounts

17   that are controlled by Mr. Illarramendi or entities

18   associated with Mr. Illarramendi, which I think

19   would essentially cover all of the blocks on the

20   organizational chart.  So, we're looking to freeze

21   any and all bank accounts as well as any other

22   assets of Mr. Illarramendi.  We're looking for a

23   broad asset freeze, in part because we're not at the

24   point yet where we can trace all of the monies, and

25   we are aware that some money from -- you know, from

1    the MK Group has gone to Mr. Illarramendi

2    personally.  We don't yet -- we've gotten this one

3    page affidavit from Mr. Illarramendi that talks

4    about his expenses.

5              THE COURT:  But I have no asset list.

6              MS. KELLY:  Right.  We can put together

7    very quickly a list of all --

8              THE COURT:  I'm sorry, no, Mr.

9    Illarramendi puts together the list of his assets.

10             MS. KELLY:  Right.  And actually we just

11   wanted to point out, in looking at the asset freeze,

12   I know that, you know, typically the Court, and as

13   well as the government, look at very detailed lists

14   of assets.  I have examples from the SEC in the

15   civil context and the U.S. attorney's office in the

16   criminal context of the kind of disclosures that

17   would be necessary in order to release his -- any

18   monies to him should the Court entertain a carveout.

19   And so we have documents like that available that he

20   could start to prepare, but what he's provided is --

21   you know, we think it would be premature to release

22   funds based on what we have seen.

23             We are aware Mr. Illarramendi has from

24   our investigation, which has been brief and limited,

25   has substantial assets in terms of, you know, real

1    estate, et cetera, but we don't yet have a full

2    picture of his assets.

3              THE COURT:  Well, in considering the

4    response of the defendants to your TRO with respect

5    to the asset freeze and seeking the carveouts, I

6    realized how little I know about Mr. Illarramendi

7    other than he has a $5,700 a month mortgage.  I need

8    to know a good deal more about what his assets are

9    to understand whether or not this -- and the scope

10   of a carveout for "living expenses."

11             So, I'm going to leave that with you,

12   Mr. Blanchard, to provide.

13             The other that is a complete cipher is

14   the attorney's fees issue.  And you'll need to flesh

15   that out as well because just saying carveout for

16   attorney's fees without any kind of quantification

17   or delineation for what that means is a bit too

18   broad.  The parties have in place an asset -- what

19   are you calling it?  You are not calling it a

20   standstill, you are not calling it an asset freeze,

21   you have some quaint euphemism for it.

22             MR. JACOBSON:  Well, I'm not quite sure.

23   Our position is in light of the uncertainties here,

24   what we think is the appropriate thing to do, which

25   is I think pretty consistent with what Mr. Fortinsky

 1   has proposed, is that there needs to be a lot of

 2   business solutions addressed before we start

 3   treating this like a normal case.  We have -- we are

 4   voluntarily not moving money around, dissipating

 5   assets or doing any of the kinds of things that

 6   would concern the SEC, and our view is that we

 7   should, as Mr. Fortinsky indicated, just defer this

 8   issue until we see where we are on the 1st, and we

 9   don't think that there is going to be any material

10   difference then to now in terms of fear that any

11   money is going to be moved.

12            THE COURT:  I don't know whether that is

13   the kind of consolation that Mr. Fortinsky was

14   looking for.  I have a feeling it was a court order.

15            MR. FORTINSKY:  Yeah, just to clarify,

16   what I was proposing is we hold off on the question

17   of a receiver until we next reconvene, but not that

18   we hold off on turning the standstill agreement into

19   a court order.

20            MR. JACOBSON:  Well, in that case there

21   are issues that the SEC has kind of glided over.

22   She mentioned all the boxes in the organization

23   chart.  Well, not all of those boxes are under Mr.

24   Illarramendi's control.  And we don't really know,

25   other than they want to freeze everything, which is

1   what the SEC typically wants, including social

2   security payments, if there are any.  Typically the

3   SEC says, let's just freeze everything and deal with

4   carveouts.

5           THE COURT:  Okay, but you have something

6   in place that has more specificity than that, right?

7           MR. JACOBSON:  Well, the SEC asked us

8   way back in December to voluntarily suspend

9   subscriptions, dividends or redemptions.  We went

10  well beyond that in our first -- we committed in

11  December through the end of that month to suspend

12  all of those things, and then any interfund

13  transfers, any payments by a company the fund should

14  make, any payments by the fund the company should

15  make, basically pretty much what our brain thrust

16  thought the SEC might be interested in if they had

17  been more specific, which they weren't, and we did

18  that.

19          When it came time to renewing the

20  freeze, by then we'd been frozen for two weeks,

21  nobody had been paid anything, they let the first

22  freeze lapse, they wanted a new freeze on

23  January 4th, we responded on January 5th with a

24  proposal to freeze basically a lot of things.

25  Actually our proposal has been submitted to the

1    Court, I believe it's Exhibit A to Ms. Hussain's

2    declaration, and we -- but we needed, we thought we

3    needed, my client told me that they needed certain

4    carveouts.  Two of the carveouts were the Proterra

5    loan and the NuScale loan.  And then there were also

6    a couple other carveouts as well.

7              But, you know, this is a going concern,

8    they have payroll, they have heat, they have lights,

9    utility bills.  None of those have been paid while

10   we have been here.  And in terms of the scope of the

11   freeze, what we would like to see is the SEC telling

12   us, you know, what they want as opposed to simply

13   saying freeze everything and then have litigation,

14   you know, over things like lights and heat and

15   payroll, which we think ought not to be covered in

16   the first place, nor should certain -- let's call it

17   blocks in the organization chart be covered

18   initially because they're not controlled by Mr.

19   Illarramendi, which I believe is the Commission's

20   concern here.

21             Perhaps what we could do is we could put

22   this on the Court's calendar for the 1st and we

23   could have, you know, both sides prepare documents

24   for the Court to look at.  At that time the Court

25   could make a decision with a lot more documents than

1    the Court has now as to what's appropriate.

2            Now, I understand Mr. Fortinsky's

3    concern, but we've lived this long without that

4    order, and I don't see how, you know, another week

5    is going to affect anything, frankly.  And I think

6    it will enable us, both sides, to put more before

7    the Court in terms of specificity that would help

8    the Court reach a decision.

9            THE COURT:  Now, I am assuming that if

10   subscriptions, dividends, redemptions, interfund

11   transfers and payments were suspended, that the

12   operating expenses of the funds, the lights, the

13   heat keep getting paid.

14           MR. JACOBSON:  Only to the extent --

15           THE COURT:  These funds operate with

16   some kind of --

17           MR. JACOBSON:  Well --

18           THE COURT:  --assets.

19           MR. JACOBSON:  They had some money in

20   their accounts, but they're running out.  They have

21   not paid -- typically the income stems from

22   management fees that are paid from the fund pursuant

23   to the fund documents, and those have not been paid.

24           MS. KELLY:  To be clear, your Honor, the

25   standstill agreement, Mr. Jacobson had asked us for

 1  carveouts on living expenses, attorney's fees, and

 2  at one point asked for the release of certain

 3  management fees, all of which we were not at that

 4  point willing to negotiate.

 5          I should just note that not a dime of

 6  Mr. Illarramendi's money personally is frozen at

 7  this point.  So, that's something that the

 8  standstill agreement has not covered, and I expect

 9  one of the reasons that counsel for PDVSA is eager

10  to see something in place is that we don't know at

11  this point, we have no information about his

12  personal assets, but that could be a substantial

13  source -- there may be substantial investor assets

14  that have made their way back to Mr. Illarramendi,

15  and we do think if the Court is inclined to defer

16  the question of whether to put in place a receiver

17  until February 1st, we nonetheless think an asset

18  freeze is appropriate now because there could be a

19  lot of, you know, leakage over the next week to week

20  and a half absent a formal court order.

21          THE COURT:  Well, it seems to me that,

22  first of all, today is the perfect day to be talking

23  about freezes, right?

24          MS. KELLY:  We couldn't agree more, your

25  Honor.

1          THE COURT:  But you are from Boston.

2          MS. KELLY:  It's extra freezing up

3   there.

4          THE COURT:  It seems to me that the time

5   is appropriate, given the Court's involvement in

6   this matter and in this fashion, that some order

7   such as the broad confidentiality order needs to be

8   in place.  The issue that we have been -- that has

9   brought us here on such urgency has been, sub

10  silentio, the carveout from an asset freeze for the

11  Proterra and NuScale loans.  The fact that private

12  negotiations have begun and will continue, it seems

13  to me, is done appropriately in the context of a

14  court-ordered asset freeze of some sort.  By that,

15  the parties can be assured, to the extent they have

16  any misgivings, not unreasonably predicated by the

17  mysteries caused by the lack of documentation, that

18  their money is sitting in a place going forward.  To

19  the extent there will be carveouts for the things

20  that are necessary to keep the lights on, the Court

21  has attempted to be very time responsive to the

22  parties and we can -- and we will continue in that

23  fashion.  The absence of any information that I have

24  about Mr. Illarramendi's personal assets is also

25  underscored in the sense that from the itemization

1  of living expenses I have no context in which to

2  know whether revenues from other sources could

3  easily pay those living expenses versus the children

4  go without shoes.

5         It seems to me that in the interest of

6  ensuring that the Court's interest in protecting

7  investors, which is a broad and multi-pronged path,

8  that there should be the asset freeze in place that

9  suspends subscriptions, dividends, redemptions,

10 interfund transfers and payments to and from the

11 funds and entities that Mr. Illarramendi controls

12 directly or indirectly.

13         Without further specificity from the

14 SEC, I'm not sure I have that.  Do I?

15         MS. KELLY:  Well, in our temporary

16 restraining order that was proposed, your Honor --

17         THE COURT:  Yes.

18         MS. KELLY:  -- which I think is the

19 sixth document that was filed on the 14th, it

20 outlines specifically the assets that we believe

21 should be frozen.  Specifically in section -- I

22 believe it's paragraph 3A, we seek to freeze all

23 assets held by the defendant under -- for their

24 direct or indirect benefit under their direct or

25 indirect control.

1          THE COURT:  I remember that language.

2    It wasn't specifying particular funds or entities.

3    That's what I wanted to identify because it's too

4    broad otherwise.

5          MS. KELLY:  We can put together a list

6    of accounts and the assets of which we are aware

7    very quickly.  In fact, we can probably do that this

8    afternoon if we had a few minutes to speak with our

9    colleagues in the regional office.  I'm certain we

10   can do it as to the bank accounts.  As to Mr.

11   Illarramendi's personal assets, we're less able to

12   do that, but we have a little bit of information.

13         THE COURT:  All right, I will receive

14   that from you when you are ready to submit it, and I

15   will give Mr. Jacobson a 24-hour turnaround time for

16   response.

17         MR. JACOBSON:  Thank you, your Honor.

18         THE COURT:  So we have confidentiality

19   in place, we have asset freeze in place, at least in

20   form, and the third thing is the clarification of

21   NuScale's bank account.  While I haven't heard any

22   particulars as to the need and timing for that bank

23   account, other than the critical need to have access

24   to it, given the total close down consequence of

25   having no asset -- no access to it, the Court

1   believes that the protection of the investors,

2   minority and majority, requires that some relief be

3   given to NuScale, although as of today not the

4   entirety of that.

5            For the time being then, Mr. Schneider,

6   I'm going to carve out, if you will, a million

7   dollars of your account to be used as you need to

8   best keep the value of -- the path to value moving

9   along, or at least not falling to the wayside, and I

10  will hear further from you as late as February 1st,

11  or if something critical has come up I will try to

12  be available.  All right?

13           MR. SCHNEIDER:  Thank you, your Honor.

14           THE COURT:  This, I'm hoping, is an

15  interim fix that gives NuScale a tiny bit of

16  planning ability, and I'm sure I will hear from

17  NuScale if there is a problem, a critical close down

18  problem.

19           MR. SCHNEIDER:  You will, your Honor.

20  Thank you.

21           THE COURT:  As to the appointment of a

22  receiver, I am persuaded by the comments and by the

23  business advisors that we don't need that at this

24  stage.  The parties have demonstrated from their

25  weekend endeavor that this does not appear to be a

1    case in which hiding the ball has been the flavor,

2    it's just nobody can find the ball, and so I have

3    listened carefully to what Mr. Mandel and Ms.

4    Midanek have said, and it does not appear as if they

5    have sniffed an odor of fraud here, just I suppose

6    chaos.

7            And so I'm not -- I don't think with the

8    freeze in place that there is a need for a receiver

9    where the investors are all represented by their

10   attorneys.  True, they didn't invest for this

11   opportunity to pay attorney's fees, but here we are,

12   and their best interest is reflected by the advice

13   they receive from their counsel.  That is not to

14   reflect that there has been any decision about

15   whether ultimately we will need a receiver and when

16   and who that receiver should be.

17           Having an insufficient record on which

18   to consider the defendants' request for carveouts

19   for living expenses and attorney's fees, I will

20   defer that.  The asset freeze is intended to

21   guarantee the negotiating parties that there can be

22   no voluntary change of heart and no self-help or

23   difference in interpretation, and they can negotiate

24   with that assurance.  It does not mean that this is

25   going to continue for very long or continue, most

 1    particularly, in this form for a significant period

 2    of time.  So that we will be reconsidering it as we

 3    go along and as additional record is made available

 4    that enables the Court to, in an informed way, make

 5    those modifications.

 6              The Alvarez accountants are imminently

 7    to be producing additional information that the

 8    business advisors needed.  The search for

 9    certificates or contracts or documents related to

10    the investments in the Venezuelan businesses, the

11    overall operations of the Cheyne Fund are also

12    missing pieces for the business advisors.  Inasmuch

13    as they are going to be coming available hopefully

14    with immediacy, I would ask the business advisors to

15    stay on and to be in a position to receive and

16    evaluate those documents in the bigger picture, and

17    as well take on the responsibility for ensuring that

18    this process of private negotiation is continuing

19    apace and continuing with the -- no one declining to

20    participate for lack of information or

21    communication.  That is not to say that if not

22    invited that the business advisors need to be a part

23    of those private negotiations, but they need to be

24    advised immediately of the results of those

25    negotiations so that they can put -- refocus the

1    lens that they have provided, the very helpful

2    recommendations here for further recommendations.

3              There is a last area that has not

4    particularly been addressed, but may come up as

5    further consideration of whether and who a receiver

6    should be in this case, and that is what is the

7    unique knowledge or expertise that Mr. Illarramendi

8    brings to the picture.  This was suggested in Mr.

9    Curran's letter, I believe, that suggested he be

10   continued as investment advisor because of expertise

11   in Venezuelan bolivars.  Now, I don't know whether

12   the fact that this turns out not to be an arbitrage

13   fund means that's irrelevant, but to the extent Mr.

14   Illarramendi is claiming unique talents and

15   expertise such that he should remain in his

16   position, his current position, I need to know more

17   about that.  All right?

18             MS. KELLY:  Your Honor, with respect to

19   the asset freeze, we will provide a list to the

20   Court immediately.  We would typically send out

21   letters to the banks putting them on notice

22   immediately.  I know that the Court is making its

23   order from the bench.  Is it the Court's intention

24   to issue a written order or --

25             THE COURT:  Yes, but I need to give Mr.

1    Jacobson a chance to respond to your submission.

2              MS. KELLY:  I understand that.  I just

3    wanted to ask what the Court's intention was because

4    it will dictate how quickly we move.

5              THE COURT:  All right, is there anything

6    further that needs to be taken up?  Yes, sir?

7              MR. GOTTSCHALK:  Your Honor?

8              THE COURT:  Yes, Mr. Gottschalk.

9              MR. GOTTSCHALK:  I just wanted to

10   address the issue of essentially making it until

11   next Tuesday without any adverse effect, or serious

12   adverse effect on the company.  And I want to

13   apologize for actually having taken a moment to

14   e-mail my colleague, the CFO, to ask him what the

15   situation is, and he sent me back, essentially our

16   accounts payable is roughly about 2.9 million.  Out

17   of that there is sort of an urgency payment amount

18   for critical suppliers and other matters that is

19   460,000 and he has sent to me -- I sent him an

20   e-mail back and said, look, what we do need to

21   actually make it to next Tuesday without real

22   trouble, who can we stretch and what do we need, and

23   he responded back and said 200,000 will essentially

24   get us there without losing contract rights and

25   other important matters so we can get to next

```
1   Tuesday without too much difficulty.  Given the
2   small amount of that amount, I'm hopeful that we can
3   reach agreement so we can at least have 200,000.
4             MR. FORTINSKY:  Isn't that covered by
5   the 750?
6             MR. GOTTSCHALK:  What he's doing, we
7   have -- the previous 750 is almost entirely taken up
8   with the last payment plus the Altairnano payments,
9   and this would be an additional 200,000 over that.
10  That would cover suppliers --
11            THE COURT:  Why don't we get your
12  declaration on that with the specifics, circulate
13  that, and that can be taken up in the interim in a
14  telephonic conference.
15            MR. GOTTSCHALK:  Thank you very much,
16  your Honor.
17            THE COURT:  Does that satisfy you,
18  PDVSA?
19            MR. FORTINSKY:  Yeah, that would be
20  fine, your Honor.  It would allow me the chance to
21  consult with our clients.
22            THE COURT:  Of course.  And it may also
23  tie in to your immediately -- or your continuing
24  negotiations anyhow.
25            MR. FORTINSKY:  That is correct, your
```

1    Honor.

2              THE COURT:  So when we have a

3    declaration that sets out exactly why the crisis,

4    then we can convene.  All right?

5              MR. GOTTSCHALK:  That's fair, your

6    Honor.  Thank you very much.

7              THE COURT:  Anything else?

8              MR. SCHNEIDER:  Your Honor, this is Tim

9    Schneider again.  Would it be convenient for us to

10   file a notice of appearance just to get us in the

11   case at this point?

12             THE COURT:  I do think it's a good --

13   yes.  Mr. Gottschalk hasn't actually filed an

14   appearance.  You are not actually parties.  I do

15   think for the purposes of getting you electronically

16   served with orders, et cetera, you probably should

17   file appearances as interested party, and Mr.

18   Gottschalk and -- let's see, Mr. Fortinsky, we don't

19   have your appearance either.

20             MR. FORTINSKY:  That is correct, your

21   Honor.

22             THE COURT:  So let's put interested

23   parties' appearances in the mix here.

24             MS. KELLY:  Your Honor, on that note,

25   would it make sense for the business advisors to be

1   on electronic notification, particularly for ease of

2   communication with the minority investors?

3            THE COURT:  Well, they're not attorneys.

4            MS. KELLY:  I understand.  When you said

5   interested party, I didn't know if a victim, for

6   example in a criminal case -- no?  They can't, okay.

7            THE COURT:  I'm going to leave that up

8   to you, Ms. Kelly.  You can forward on anything that

9   comes out from the Court to them.

10           MS. KELLY:  We'll make sure to do that.

11           THE COURT:  Okay, I think that's the

12   appropriate way to do it.

13           MS. MIDANEK:  I was just murmuring

14   briefly here, your Honor, with the SEC, because in

15   the enumeration of the categories that are frozen,

16   and I know we're going to get more specifics about

17   this shortly, there is no reference to the

18   management fees, which would typically be the source

19   of operating capital to keep the lights on and make

20   the payroll.  And so I would hope that the SEC could

21   address that and how that should be treated.

22           The problem with calculating the

23   management fee right now, it's usually expressed as

24   a percentage of the value of the fund.  Since we

25   don't know what the value of the fund is, we don't

1   know what the fee is.  So it may be that there needs

2   to be a stipulation of an amount that could be

3   allowed to be paid as fees that would keep the

4   lights on.

5              And the reason I'm raising this is that

6   there is a controller there, Mr. Michael Colohan,

7   who started working on December 1st, he's from a

8   local CPA firm.  There is no suggestion he's had

9   anything to do with any history here, but if he

10  goes, our ability to go through the assets in an

11  orderly or relatively less chaotic manner will be

12  seriously damaged.

13             THE COURT:  And the controller salary is

14  paid out of the management fees, is what you are

15  saying.

16             MS. MIDANEK:  Typically.  I don't know

17  the exact flow of funds, but MK Group would be

18  getting money from the fund in order to pay

19  operating expenses, including his salary.

20             Mr. Jacobson, do you have a comment

21  about that?

22             MR. JACOBSON:  Yes, I do, actually.  I

23  agree with Ms. Midanek.  Also the Alvarez firm,

24  which is working right now without having been paid

25  anything for any of its work, I would think that the

1    business advisor might agree having them continue to

2    work is definitely in the interest of the investors,

3    and I would suggest we should, you know, include

4    them in any such, quote, carveout, end quote.

5                THE COURT:  To the extent the controller

6    is helping to solve the dilemma of whose funds went

7    where and what they are, doesn't that sound like an

8    essential person?

9                MS. KELLY:  May I just have one moment,

10   your Honor?

11               THE COURT:  Yes.

12               MR. FORTINSKY:  Your Honor, if I may, I

13   would just -- I'll defer to the SEC.

14               MS. KELLY:  We just think that it's --

15   we don't think it's appropriately a carveout.  We

16   think -- but we think ultimately it should be paid

17   for by the defendant, and, you know, I think the

18   problem with doing this, sort of taking up the

19   carveouts in this way is that, you know, we have

20   information for the Court about other folks who are

21   at the company who may actually also owe the company

22   money.  It gets quite murky.  So, we'd be reluctant.

23   It's -- you know, the Court's basically going to

24   fast track the issue of the carveouts and we're back

25   here on February 1st.  I don't give short shrift to

1    concerns being articulated by defense counsel and by

2    Ms. Midanek, but I do think these issues should be

3    addressed thoroughly and we're just not in a

4    position to do that on the fly.

5              We don't -- and on the advisor fee

6    issue, that's a very, very tricky issue because

7    there is really no way to do anything except kind of

8    guess in the dark.  So, we think these issues can be

9    taken up by the Court as we go on this week, and if

10   we're going to have a telephone conference it may be

11   we can address a few of these topics at one time so

12   we can do our best thinking about how to manage this

13   process.  We don't discount that there have been --

14   there has been value added, certainly by the Alvarez

15   firm, but the right way to handle this is we don't

16   think to pay them with fund assets at this point.

17   And it may be that Mr. Illarramendi has substantial

18   personal assets that could go towards these

19   expenses.

20             MR. FORTINSKY:  Your Honor, we --

21             THE COURT:  Well, Mr. Gottschalk

22   certainly is an example of putting one's private

23   money into the ongoing operation.  Yes, sir.

24             MR. FORTINSKY:  Your Honor, we agree

25   with the SEC.  I would just add that MK is a

1  business, it has this fund, but just because the

2  fund doesn't pay doesn't mean that the controller

3  will be fired.  Every business has a staff that

4  carries out the business of the company and I don't

5  see why the same shouldn't be true here.  It doesn't

6  mean they'll lose the service of Mr. Colohan.

7           THE COURT:  I think the basis for making

8  any carveouts right now is not something that should

9  be done on a piece-by-piece basis, particularly

10  because I don't even have the overall framework with

11  specifics in place.  So, I will defer that and we

12  will take that up as necessary.

13           Anything else that must be taken up

14  today?  All right then, I need to warn you that as

15  of now I'm picking a jury for a criminal case on

16  Wednesday.  That criminal case starts Friday --

17  excuse me, Monday the 7th, and my availability is

18  going to be far more limited than I was able to do

19  now with just rescheduling cases that were not on

20  trial.

21           All right then, we will not schedule a

22  telephonic conference because I don't know when

23  we'll have the materials in response, but we will

24  see you at nine o'clock on -- you know we're going

25  to get some more snow.  9:30 on February 1st.  All

```
1   right.  If anyone thinks that it can appropriately

2   be done -- I think there are too many people for a

3   telephone conference, so I do need to bring you in.

4              Thank you very much for your assistance.

5   We stand in recess.

6              (Proceedings concluded 3:20).

7

8

9              I certify that the foregoing is a

10  correct transcript from the record of proceedings in

11  the above-entitled matter.

12

13                            1/29/11

14                             Date

15

16                    /S/  Sharon Montini

17                       Official Reporter

18

19

20

21

22

23

24

25
```