UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FRANCISCO ILLARRAMENDI, and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP,<br><br>Relief Defendants. | Civil Action No.<br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against Defendants Francisco Illarramendi ("Illarramendi") and Michael Kenwood Capital Management, LLC ("MK Capital Management") and Relief Defendants Michael Kenwood Asset Management, LLC ("MK Asset Management"), MK Energy and Infrastructure, LLC ("MK Energy") and MKEI Solar, LP ("MKEI Solar"):

### SUMMARY

1. This case involves the misappropriation and misuse of investor assets by an unregistered investment adviser located in Stamford, Connecticut. Illarramendi is the majority

1

owner and control person of a group of affiliated entities (the "MK Entities") organized under the name The Michael Kenwood Group, LLC (the "MK Group"), a Stamford, Connecticut-based holding company. Through one of the MK Entities, namely MK Capital Management, Illarramendi advises several hedge funds, which include the Short Term Liquidity Fund, I, Ltd. (the "Short Term Liquidity Fund") and the MK Venezuela, Ltd. (the "MK Venezuela Fund") (collectively, the "Funds"). The investors in the Funds are off-shore individuals and entities, including a pension fund for a foreign corporation (the "Pension Fund").

2.  Beginning as early as 2006, Illarramendi and MK Capital Management have misappropriated investor assets and have used both Funds as vehicles for Ponzi activity; that is, they have used new investors' money to pay off earlier investors. For example, according to Illarramendi, as of the end of 2010, the purported value of the Short Term Liquidity Fund was $540 million. In fact, however, the assets of the Short Term Liquidity Fund at that time were substantially less than that because many of its assets were used during 2010 to pay redemptions to investors in the MK Venezuela Fund. This use of investor assets was not disclosed to investors and was fraudulent.

3.  In December 2010 and January 2011, during the course of the Commission's investigation in this matter, Illarramendi attempted to hide the missing assets of the Short Term Liquidity Fund by providing the Commission staff with a false letter from an accountant in Venezuela, purporting to verify the existence of at least $275 million in assets held there by the Short Term Liquidity Fund. In fact, those assets do not exist.

4.  In addition, Illarramendi and MK Capital Management have directly misappropriated at least $53 million from the Funds by first transferring monies from the Funds' accounts into bank accounts that Illarramendi personally controlled, and then making

unauthorized investments of the monies in long-term private equity investments. Illarramendi misappropriated the Funds' assets by causing MK Capital Management to use the Funds' assets to purchase interests in private companies for the benefit of Illarramendi and other entities that he controls. This self-dealing created an undisclosed conflict of interest and was in breach of Illarramendi's fiduciary duty to the Funds.

5. Moreover, Illarramendi and MK Capital Management have taken substantial compensation directly from the Funds, in the form of management fees which were purportedly based on a percentage of assets under management and on fund performance. These fees were fraudulent because Illarramendi and MK Capital Management fraudulently manufactured both the assets under management and the performance figures for the Funds.

6. By engaging in the conduct alleged herein, Defendants violated Sections 206(1), (2) and (4) of the Investment Advisers Act of 1940 ("Advisers Act") and Rule 206(4)-8 thereunder.

7. Based on these violations, the Commission seeks: (1) entry of a permanent injunction prohibiting Defendants from further violations of the relevant provisions of the federal securities laws; (2) disgorgement of Defendants' ill-gotten gains, plus pre-judgment interest; (3) disgorgement by the Relief Defendants of all unjust enrichment and/or ill-gotten gain received from Defendants, plus prejudgment interest; and (4) the imposition of a civil monetary penalty due to the egregious nature of Defendants' violations. In addition, because of the risk that Defendants will continue violating the federal securities laws and the danger that any remaining investor funds will be dissipated or concealed before entry of a final judgment, the Commission seeks preliminary equitable relief, to wit, a temporary restraining order and upon notice a

preliminary injunction, to prohibit Defendants from continuing to violate the relevant provisions of the federal securities laws.

## JURISDICTION AND VENUE

8. The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)]. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 and Section 214 of the Advisers Act [15 U.S.C. §80b-14].

9. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) and Section 214 of the Advisers Act [15 U.S.C. §§ 77v(a), 78aa, and 80b-14], because a substantial part of the acts constituting the alleged violations occurred in the District of Connecticut and because Illarramendi's primary residence is in the District of Connecticut and the principal place of business of all of the entities named as defendants is Connecticut.

10. In connection with the conduct alleged in this Complaint, Defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

11. Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

12. Unless enjoined, Defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

13.    Illarramendi, age 42, is a resident of New Canaan, Connecticut. Illarramendi is not registered with the Commission in any capacity. Illarramendi is the majority owner of the MK Group, and was previously associated with a U.S.-based registered investment adviser.

14.    MK Capital Management was incorporated in Delaware in 2006 and its principal place of business is in Stamford, Connecticut. It is wholly owned by the MK Group and is therefore controlled by Illarramendi. It is not registered with the Commission in any capacity.

## RELIEF DEFENDANTS

15.    MK Asset Management was incorporated in Delaware in 2006 and its principal place of business is in Stamford, Connecticut. It is wholly-owned by the MK Group and controlled by Illarramendi. It is not registered with the Commission in any capacity. MK Asset Management is the record owner of shares of the Nuclear Energy Company, which were purchased using the Funds' assets.

16.    MK Energy was incorporated in 2010 in Delaware and its principal place of business is Stamford, Connecticut. The precise ownership of MK Energy is currently unknown, but it is controlled by Illarramendi either as a direct owner or as the owner of MK Group. On information and belief, MK Energy may be partially owned by a relative of Illarramendi. MK Energy is the record owner of shares of at least two private companies -- which shares were purchased with investor assets, and thus rightfully constitute the property of the Funds.

17.    MKEI Solar is the record owner of certain shares in a private company, which were purchased using the investor money from the Funds.

## FACTUAL ALLEGATIONS

### A. Illarramendi and MK Capital Management Used Investor Funds from the Short Term Liquidity Fund to Pay Investors in the MK Venezuela Fund

18. Beginning at least as early as 2008, Illarramendi and MK Capital Management have used money raised from new investors in the Funds to pay off, or redeem, earlier investors in the Funds. For example, according to Illarramendi, as of the end of 2010, the purported value of the Short Term Liquidity Fund was $540 million. In fact, however, the assets of the Short Term Liquidity Fund were worth substantially less than that, in part because some of its assets were used during 2010 to pay redemptions to investors in the MK Venezuela Fund.

19. This use of "Ponzi-like" payments was designed to hide the fact that over the previous several years, Illarramendi and MK Capital Management had misappropriated substantial assets from the Funds. The payments were also designed to hide the fact that, over the previous several years, the Funds had experienced substantial investment losses. As a result of the hidden misappropriation and investment losses, the liabilities of the Funds (the purported value of investor subscriptions and money owed other creditors) now vastly exceed the actual assets held by the Funds. As of the date of this action, the "gap" between the liabilities of the Funds and their actual assets is as much as hundreds of millions of dollars.

20. As an example of the Ponzi payments, beginning in July 2010, Illarramendi and MK Capital Management attempted to hide the gap in the MK Venezuela Fund by redeeming its investors and winding up the fund. They did this by using assets from the Pension Fund to pay off (or redeem) the investors in the MK Venezuela Fund, and then by using assets from the Short Term Liquidity Fund to repay the Pension Fund.

21. Through an extremely complex series of transactions, apparently designed to hide the true nature of the scheme, Illarramendi and MK Capital Management used at least $57

6

million from the Short Term Liquidity Fund to partially fund the redemption of the MK Venezuela Fund investors.

22. Illarramendi initiated the transaction by offering the Pension Fund the opportunity to engage in an even exchange of certain bonds maturing in 2027 and 2037 for bonds maturing in 2014. The Pension Fund then transferred the 2027 and 2037 bonds to an entity with which Illarramendi was associated, without receiving the 2014 bonds in exchange. On July 1, 2010, Illarramendi caused the bonds to be transferred to the MK Venezuela Fund. In early July 2010, the MK Venezuela Fund sold the 2027 and 2037 bonds to a third party for approximately $149 million. Of that $149 million, Illarramendi used $89 million to redeem MK Venezuela Fund investors, and caused approximately $52 million to be transferred to the Short Term Liquidity Fund between July 7 and July 14, 2010.

23. The Short Term Liquidity Fund then used $109 million of its own investor funds to purchase the bonds with a maturity date of 2014. In August 2010, Illarramendi caused the Short Term Liquidity Fund to transfer those bonds, without payment being made in exchange, to the Pension Fund, to complete the even exchange of the 2027/2037 bonds for the 2014 bonds. The result was the Short Term Liquidity Fund paid out $57 million more than it received from the MK Venezuela Fund. Illarramendi and MK Capital Management used that money to redeem the investors in the MK Venezuela Fund, in a classic Ponzi payment which used one set of investors' money to pay off another set of investors.

### B. Illarramendi and MK Capital Management Attempt to Hide Missing Assets By Obtaining a False Letter Verifying Non-Existent Assets

24. During the investigation which led to the filing of this action, the Defendants attempted to hide the fact that the Funds were missing assets by obtaining a fraudulent letter from a Venezuelan accountant, which purported to verify the existence of loans due to the Funds

7

from entities in Venezuela. The letter, dated December 6, 2010, purported to verify that the value of the assets was at least $275 million.

25. During December 2010 and January 2011, in response to requests from the Commission staff for documentation to verify the existence of Fund assets, the Defendants provided the false letter to Commission staff. During the same time period, the Defendants also misled the Commission staff by falsely asserting that the assets purportedly verified in the letter were part of the consideration transferred from the MK Venezuela Fund to the Short Term Liquidity Fund in the above-described transaction between the two Funds.

26. In fact, the assets described in the letter do not exist at all.

### C. Illarramendi Misappropriates $53 Million in Investor Funds to Make Private Equity Investments in the Names of Entities That He Personally Controlled

27. Beginning in or around late 2009, Illarramendi made numerous multi-million dollar investments in private equity deals using the investor monies from two of the Funds: namely, the MK Venezuela Fund and the Short Term Liquidity Fund. The investors in the Funds are off-shore individuals and entities, including the Pension Fund.

28. The largest of Illarramendi's private equity investments was in a West Coast-based Nuclear Energy Company. From approximately April 22, 2010 to approximately November 23, 2010, Illarramendi invested almost $23 million from the Funds into the Nuclear Energy Company. Specifically, in or about April 2010, approximately $10.5 million in investor funds were transferred from an MK Venezuela Fund account to Relief Defendant MK Asset Management, and $7 million of which was wired from MK Asset Management to the Nuclear Energy Company the next day. From August 2010 through November 2010, approximately $13 million was wired from a Short Term Liquidity Fund account to MK Asset Management, which then made five transfers totaling approximately $16 million from its account to the Nuclear

8

Energy Company shortly after the receipt of monies from the Short Term Liquidity Fund. Although Illarramendi used Fund assets to make the investment, he caused the shares in the Nuclear Energy Company to be registered in the name of Relief Defendant MK Asset Management, an entity he owns and controls.

29. Based on information and belief, the Nuclear Energy Company is in the early development stage of product design, and does not expect to have federal approval for the sale of its product until at least 2014. Accordingly, the Nuclear Energy Company is not anticipated to generate investor returns, if any, until at least 2014 or upon the purchase of the shares by another investor, either privately or through an initial public offering.

30. In addition to the $23 million investment in the Nuclear Energy Company, in or about May 2010, Illarramendi authorized the transfer of approximately $20 million from the Short Term Liquidity Fund's account to pay for shares in a manufacturing company that is in the early development stage of creating zero-emissions mass transportation alternatives (the "Clean Transportation Manufacturer"). The shares in the Clean Transportation Manufacturer were registered not in the name of the Fund, but in the name of Relief Defendant MK Energy, an entity owned and controlled by Illarramendi.

31. In or about September 2010, Illarramendi authorized the transfer of $4 million in investor funds from the Short Term Liquidity Fund account to pay for shares in a development stage energy technology company (the "Technology Company"), which were then registered in the name of Relief Defendant MKEI Solar, an entity owned and controlled by Illarramendi.

32. In or about December 2009, Illarramendi authorized the transfer of more than $3.5 million from an account in the name of Highview Point Offshore Ltd. to a Spanish company that produces rolled steel (the "Spanish Steel Company"). These shares were registered to MK

9

Energy. On information and belief, this Highview Point Offshore, Ltd. Account held money belonging to the MK Venezuela Fund. Illarramendi authorized the transfer of this MK Venezuela Fund money to the Spanish Steel Company directly. In or about March 2010, Illarramendi authorized another transfer of approximately $2 million from the Short Term Liquidity Fund to the Spanish Steel Company, and an additional $1.2 million in or about August 2010. In total, Illarramendi authorized a total of approximately $6.7 million in investor funds to the Spanish Steel Company. Notwithstanding that the shares were purchased using money from the Funds, the shares were registered in the name of Relief Defendant MK Energy, an entity owned and controlled by Illarramendi.

33. In total, between December 2009 and November 2010, Illarramendi misappropriated $53 million in investor funds to make investments in private entities in the names of companies that he owned and controlled.

34. During the investigation leading to the filing of this action, Illarramendi and MK Capital Management, asserted to Commission staff that, in fact, the $53 million transferred from the Funds to private equity investments were loans from the Funds to entities controlled by Illarramendi.

35. However, investors were not informed that the Funds were used to make "loans" to entities controlled by Illarramendi to invest in private equity ventures. Moreover, the purported "loans" from the Funds to entities controlled by Illarramendi were unsecured and, with a single exception, never documented. Indeed, Commission staff have learned that loan documents only exist for the investment in the Clean Transportation Manufacturer, which was due to be repaid to the Short Term Liquidity Fund in November 2010 at LIBOR plus 9%, and that these terms were subsequently extended through January 2011.

D.  **Illarramendi Made False and Misleading Statements to Investors Regarding Use of Investor Funds**

36.  All of the above transactions and uses of investor funds were wholly inconsistent with the representations made by Illarramendi, MK Capital Management, the MK Venezuela Fund and the Short Term Liquidity Fund to investors in the Funds at the time the investments in the Funds were made.

37.  With regard to the Short Term Liquidity Fund (and as the fund's name necessarily implies), the Private Offering Memorandum contemplated that the investments in said fund would be short term in nature:

> While the Fund may, from time to time, invest in longer-term securities, its primary investment strategy seeks to take advantage of products offered in the global fixed income and derivatives markets to generate gains through short-term (under one year) investments[.] . . . [T]he Investment Manager may pursue any strategies, employ any investment techniques and purchase any type of security it considers appropriate to achieve the investment objective of the Fund, as long as they are constrained to fixed income securities and derivatives referencing fixed income securities.

38.  Consistent with the goals of a self-described short term liquidity fund, the Private Offering Memorandum provided that investors may generally redeem their investments upon 30 days' notice. The Private Offering Memorandum did not disclose that investor funds would be used to redeem investors in other Funds, and it did not provide for loans to be made to the adviser or entities under common ownership or control of the adviser without notice to the investors.

39.  The Commission staff has interviewed an executive at the Pension Fund (the "Pension Fund Executive"). The Pension Fund Executive indicated to the Commission staff that although he was aware that Illarramendi was investing certain of the pension funds in private equity transactions, he was unaware that any of the pension funds were used to make loans.

40. In addition, Commission staff has interviewed two other investors in the Short Term Liquidity Fund ("Investor A" and "Investor B"). Investors A and B advised Commission staff that their understanding was that their funds would be used solely for short term currency transactions involving Venezuelan bonds.

### First Claim for Relief
### (Violation of Sections 206(1) of the Advisers Act)

41. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 40 above as if set forth fully herein.

42. At all times relevant to this Complaint, the Defendants acted as investment advisers to the Funds.

43. Defendants, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, employed devices, schemes or artifices to defraud their clients or prospective clients.

44. At all times relevant to this Complaint, the Defendants acted with scienter.

45. By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 206(1) of the Advisers Act [15 U.S.C. §80b-6(1)].

### Second Claim for Relief
### (Violation of Section 206(2) of the Advisers Act)

46. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 40 above as if set forth fully herein.

47. At all times relevant to this Complaint, the Defendants acted as investment advisers to the Funds.

48. Defendants, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, engaged in

transactions, practices and courses of business which have operated as a fraud or deceit upon their clients or prospective clients.

49. By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

### Third Claim for Relief
### (Violation of Sections 206(4) of the Advisers Act and Rule 206(4)-8)

50. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 40 above as if set forth fully herein.

51. At all times relevant to this Complaint, the Defendants acted as investment advisers to the Funds.

52. Defendants, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, engaged in acts, practices or courses of business which were fraudulent, deceptive, or manipulative. The Defendants made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, and otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

53. By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4) and Rule 206(4)-8 [17 C.F.R. 275.206(4)-8] thereunder.

## Fourth Claim for Relief
### (Other Equitable Relief, Including Unjust Enrichment and Constructive Trust, Against Relief Defendants)

54. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 40 above as if set forth fully herein.

55. Section 21(d)(5) of the Exchange Act [15 U.S.C. §78u(d)(5)] states: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

56. The Relief Defendants have received investor funds under circumstances dictating that, in equity and good conscience, they should not be allowed to retain such funds.

57. Further, specific property acquired by the Relief Defendants is traceable to Defendants' wrongful acts and there is no reason in equity why the Relief Defendants should be entitled to retain that property.

58. As a result, the Relief Defendants are liable for unjust enrichment and should be required to return their ill-gotten gains, in an amount to be determined by the Court. The Court should also impose a constructive trust on property in the possession of Relief Defendant that is traceable to Defendants' wrongful acts.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter a temporary restraining order, and order for other equitable relief in the form submitted with the Commission's motion for such relief, and, upon further motion, enter a comparable preliminary injunction, and order for other equitable relief;

B.  Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 206(1), (2) and (4) of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

C.  Require Defendants to disgorge their ill-gotten gains and losses avoided, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

D.  Require the Relief Defendants to disgorge all unjust enrichment and/or ill-gotten gain received from Defendants, plus prejudgment interest, with said moneys to be distributed in accordance with a plan of distribution to be ordered by the Court;

E.  Require Defendants to pay appropriate civil monetary penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. §§77t(d), 78u(d)(3), 80b-9(e)];

F.  Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

G.  Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its attorneys,

_____
Rua M. Kelly (Mass. Bar No. 643351)
Carlos Costa-Rodrigues (NY Reg. No. 2473593)
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8941 (Kelly direct)
Facsimile:  (617) 573-4590
E-mail:  kellyru@sec.gov

Local Counsel:

_____
John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5373

Dated:  March 7, 2011