```
 1               UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3   * * * * * * * * * * *          *
                                    *
 4   SECURITIES AND EXCHANGE        * Case No 11cv78(JBA)
     COMMISSION,                    *
 5                   Plaintiff,     *
                                    *
 6              vs.                 *
                                    *
 7   FRANCISCO ILLARRAMENDI, ET AL  * February 18, 2011
                                    *
 8                 Defendant.       *
                                    *
 9   * * * * * * * * * * *          *

10          TRANSCRIPT OF TELEPHONE CONFERENCE

11   BEFORE:   THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

12   Appearances:
     FOR THE PLAINTIFF:       RUA KELLY, ESQ
13                            LeeAnn GAUNT, ESQ.
                              CARLOS COSTA-RODRIGUES, ESQ
14                            United States Security and
                              Exchange Commission
15                            33 Arch Street
                              Boston, MA 02110
16
     FOR THE DEFENDANT        JOHN GLEASON, ESQ.
17   FRANCISCO ILLARAMENDI:   Gleason & Koatz
                              122 East 42nd Street
18                            New York, NY 10168

19

     FOR THE DEFENDANT        THOMAS GOLDBERG, ESQ
20   MK ENTITIES:             Day Pitney
                              One Canterbury Green
21                            Stamford, CT 06901

22                            RICHARD JACOBSON, ESQ
                              Arnold & Porter
23                            555 12th Street
                              Washington DC 2004
24
     Court Reporter:          Sharon Montini, RMR
25   Proceedings recorded by mechanical stenography,
     transcript produced by computer.
```

```
1              THE COURT:  Good afternoon, counsel.

2    This is SEC v. Illarramendi, et al, 11cv78.  May I

3    have appearances.  Let's start with -- is the SEC

4    on?

5              MS. KELLY:  Yes.  Good afternoon, your

6    Honor.  Rua Kelly, LeeAnn Gaunt and Carlos

7    Costa-Rodrigues for the Commission.  Good afternoon.

8              THE COURT:  Good afternoon.  And for Mr.

9    Illarramendi?

10             MR. GLEASON:  Good afternoon, your Honor

11   John Gleason representing Francisco Illarramendi.

12             THE COURT:  All right, and for the --

13   what are they called?  The something entities.

14             MR. JACOBSON:  MK.

15             THE COURT:  MK entities, yes.

16             MR. GOLDBERG:  You have Tom Goldberg

17   from Day Pitney and Dick Jacobson from Arnold &

18   Porter.

19             THE COURT:  And do I have Mr. Fortinsky?

20             MR. FORTINSKY:  Yes, your Honor.

21             THE COURT:  And for the minority

22   shareholders.

23             MR. ZAKARIN:  Don Zakarin, your Honor.

24             MR. CURRAN:  Laurence Curran for

25   Goldenbird.
```

```
 1                THE COURT:  All right, anyone else on
 2   the line?
 3                MR. CARNEY:  Yes, your Honor.  John
 4   Carney, the receiver, along with Pat Hannon and Jon
 5   Barr as counsel.
 6                THE COURT:  Excellent.  Thank you very
 7   much.  Is Mr. Mandel on the line?
 8                MR. MANDEL:  Yes, your Honor.
 9                THE COURT:  Anyone else?  Mr.
10   Gottschalk, is he on the line?
11                MR. GOTTSCHALK:  Yes, Mr. Gottschalk
12   Marc Gottschalk from Proterra, your Honor, and Jack
13   McFarland, our CFO, as well as representing the
14   interest of the Series A emergency loan lenders, Ann
15   Corrigan.
16                THE COURT:  All right, anyone else?
17   Yes, sir?
18                MR. SNIDER:  Yes, your Honor.  Good
19   afternoon.  This is Tim Snider on behalf of NuScale.
20                THE COURT:  All right.
21                MS. MIDANEK:  Deborah Midanek, your
22   Honor, business advisor with the receiver.
23                THE COURT:  Very good.  Thank you.
24                All right, the purpose of our call today
25   was requested by Mr. Fortinsky with respect to the
```

```
1    terms of the approved $5 million loans to Proterra

2    and NuScale from the Special Opportunities Fund.

3              Why don't I let you bring me up to date,

4    Mr. Fortinsky, on what the issue is, or should I

5    turn to Mr. Zakarin and Mr. Curran for the issue?

6              MR. FORTINSKY:  I'm happy to introduce

7    the issues.  Mr. Zakarin's firm will have their

8    other comments, I'm sure, as well.

9              THE COURT:  Thank you.

10             MR. FORTINSKY:  First of all, let me

11   thank the Court for hearing us all on short notice.

12             THE COURT:  You are welcome.

13             MR. FORTINSKY:  We appreciate that.  We

14   also recognize that in a sense this is the third

15   time we're coming to the Court for essentially the

16   same relief, and let me explain why.  Essentially

17   what we're asking for is to go ahead with the

18   transactions that we've previously discussed many

19   times with the Court, the loan of $5 million from

20   the Special Opportunities Fund, which is to say from

21   PDVSA's own pocket, to NuScale, and separately a

22   $5 million loan also from the Special Opportunities

23   Fund to Proterra.

24             We had the Court's approval once, I

25   think that was February 2nd, and then we came to the
```

1   Court a second time again, got the Court's approval

2   for this transaction, and specifically including all

3   documents necessary to effectuate the transaction on

4   February 3rd, and that order said -- the reason we

5   came to the Court that time was because we saw a

6   looming issue as to what would happen in the event

7   that the receiver was appointed before the

8   transaction was consummated, and we had heard

9   just that day, at the time, that there might be some

10  delay of a day or two, or whatever, in order to get

11  the various consents and signatures that were

12  necessary.  Your Honor granted our request for

13  clarity on that and again confirmed that we were

14  approved to go ahead, effectuate all of the papers

15  necessary, and that the transaction would be done,

16  in effect, on the Court's watch, not on the

17  receiver's watch.

18          What prompts us to come back to the Court

19  today, I guess it was on Wednesday we got two

20  e-mails that concerned us and created a question

21  that we felt we had to raise with the Court.  One

22  e-mail was from the minority investors who

23  questioned the fairness of the transaction, and I'm

24  sure they will describe their concerns in more

25  detail.  The second e-mail, which in a way concerned

1    us even more, was from somebody at the receiver's

2    counsel which said, in effect, the receiver

3    understands that there is a question here and if you

4    go ahead with this transaction you are proceeding at

5    your own risk.

6              Our clients were very concerned when

7    they -- from our clients' point of view, from a

8    businessperson point of view, we felt we had already

9    obtained the approval of the Court twice blessing

10   this transaction and confirming that there was no --

11   basically this was not a proceed-at-your-own-risk

12   sort of transaction, that it was being done with the

13   Court's blessing, and certainly I perceived that the

14   Court welcomed our infusion of funds in order to

15   address the concerns that the Court had heard even

16   before our involvement about the fate of NuScale and

17   Proterra and what would happen as a result of the

18   SEC's filing this action.

19             So, our clients were very concerned that

20   basically all of a sudden there was a cloud over

21   this, and they said (inaudible) we can't without

22   getting (inaudible) basically trying to.  So that's

23   really why we are here.  I know Mr. Zakarin had also

24   initially said --

25             THE COURT:  Mr. Fortinsky, you are

1    cutting out.  I'm sorry, we're not getting all your

2    words.

3              MR. FORTINSKY:  I'm sorry.  Is this

4    better?

5              THE COURT:  Yes.

6              MR. FORTINSKY:  What I was saying was

7    that my clients were concerned because they thought

8    they were proceeding with the Court's blessing, and

9    the receiver acting, in effect, as an arm of the

10   Court, or in some sense as an arm of the Court, had

11   said that we were proceeding at our own risk, and

12   they were very concerned about that and they wanted

13   to get clarity.  Simultaneously I know Mr. Zakarin's

14   clients had also said that they wanted to -- or they

15   had talked about raising these issues with the

16   Court.  And so that's what brings us here.

17             With respect to -- I'm sure we'll talk

18   further about this, but with respect to the

19   transaction on the merits, there are a lot of papers

20   that need to be signed in order to implement the

21   transaction.  Essentially the issue that, as I

22   understand it, has raised a concern is the question

23   whether there is any prejudice to the interests of

24   the minority, and we believe that there -- that this

25   transaction is beneficial to the interests of the

1    minority, far from being prejudicial, because these

2    are two companies that unwittingly the investors in

3    the STLF have put millions and millions of dollars

4    into, and if they're going to get their money back,

5    these companies need to survive and hopefully do

6    well, and they are at a point where they desperately

7    need funding.

8            So, what we've done, at the Court's

9    encouragement I think, is provide that funding.  We

10   are on the brink of doing that with respect to

11   Proterra, who tells us that they need the money

12   within the next day or two, the next one or two

13   business days.  I'm sure Mr. Gottschalk can address

14   that point in more detail.  And from our point of

15   view, there is no unfairness here at all because

16   there is old money and there is new money going into

17   this deal.  The old money, the money that's been

18   previously invested, the minority investors are

19   completely on the same footing as the PDVSA

20   entities.  We are in the same boat, we're pari

21   passu, there is no difference.

22           With respect to the infusion of new

23   money, the same thing is true in the sense we're on

24   the same footing, we're putting in money, they have

25   the right to put in money.  If they think this deal

1    is a good deal, they are free to put in money pari

2    passu in the same percentage as we are.  We've

3    offered them that chance, they've said no.  If they

4    want to, they still can do that.  It's a $5 million

5    infusion of money for Proterra, ten percent of that

6    which is the notional amount of -- the minority

7    investors' stake is only $500,000.  There are three

8    or four minority investors.  So, we're really just

9    talking about, you know, a couple hundred thousand

10   dollars each.  It's not as though this is an amount

11   of money that PDVSA can afford and they can not.  If

12   they think this is a good deal, they're free to

13   invest in it.

14           But the critical thing is that this is

15   an emergency loan, a bridge loan, and bridge loans

16   typically in this sort of situation will be exactly

17   that, it will be a bridge to the next financing, and

18   as a result, when the new funding, the bridge

19   emergency funding comes in, companies like Proterra

20   and NuScale need to assure investors like my clients

21   that they can get their money out, and as a result,

22   the new money can come out sooner than the old

23   money.  That's the issue that the minority is

24   concerned about.  But that's really just par for the

25   course in this world and is not anything that

1    involves any advantage of PDVSA over the minority

2    investors.

3              THE COURT:  All right, let me just say

4    two things.  One is because everything remains in

5    the state of exploration by the receiver and the

6    continuing work of the business advisors, your

7    number of ten percent for the minority share, which

8    is what everybody believes, I just want to note that

9    that's not being accepted as a given because it may

10   well be something that turns out not to be the case,

11   but I have no idea.  That was the only point I

12   wanted to make.

13             MR. FORTINSKY:  We fully agree with

14   that, by the way.

15             THE COURT:  And the same would go from

16   -- because we've had so much discussion about

17   commingled funds, I recognize that PDVSA believes

18   that the Special Opportunities Fund is all of its

19   money, as you say from PDVSA's own pocket, but who

20   knows in the future whether that will turn out to

21   be, in fact, accurate or as PDVSA believes.

22             So, that said, let me understand what

23   the minority investors' concern is and whether there

24   are new terms that you read from the term sheet that

25   cause any of you to also want to invest.  You have

1    been invited to co-invest and what -- tell me what

2    the problem is from your standpoint.  Shall we start

3    with Mr. Zakarin.

4             MR. ZAKARIN:  Thank you, your Honor.

5    And thank you for hearing us as well.  First of all,

6    and I'm sure your Honor will recall, we expressed

7    our concerns at the hearing on February 2nd because

8    we had not seen the documents, we didn't know what

9    the sources of money had been for the original

10   investment to begin with, remembering that our

11   clients had put in cash into MK and PDVSA had put

12   in, as far as we knew or understood, somewhat

13   illiquid bonds and private equity investments.  I

14   think that's also reported in the business advisors'

15   report, that there were questions about those

16   issues.

17            Even accepting Mr. Fortinsky's

18   representations, and I have no reason to doubt it,

19   that all of the money was going to come from the

20   Special Opportunities Fund and that was solely their

21   money, the issues from our perspective were still,

22   you know, we didn't know the allocation of the

23   investment, we didn't know the terms of the

24   investment, we didn't know whether there were any

25   preemptive rights, we didn't know whether there were

1    any anti-dilution rights.  We knew nothing, and we

2    were concerned with $10 million more coming in.

3    Recognizing that it may be protective of PDVSA's

4    existing investment, whatever it was, and

5    potentially ours as well, it -- we didn't want that

6    to prejudice our rights in any way, and I believe I

7    addressed that point.

8             My recollection is that we were assured

9    on the record, both I think on the 2nd and again on

10   the 3rd, and I'll address the change over from the

11   2nd to the 3rd in a second, we were assured that

12   there was nothing negative that would occur, that

13   there was nothing that was prejudicial or negative

14   to our clients' rights in any way; on the contrary,

15   it was all beneficial.

16            The change over, by the way, your Honor,

17   between the 2nd and the 3rd, and this is where I do

18   diverge from Mr. Fortinsky, what was represented to

19   the Court, as I understood it, on the 2nd was -- and

20   we understood it then, was that the receiver would

21   be in charge of all of this and would handle this,

22   because the receiver was going to be appointed, but

23   the contemplation was the money was only going to

24   come from the Special Opportunities Fund and, hence,

25   only be the money of PDVSA.  Late in the evening,

1  after a long day anyway it was late in the evening,

2  about 11 o'clock, Mr. Fortinsky sent an e-mail

3  around and indicated that from the negotiations --

4  or the status of the negotiations and the urgency of

5  them then, the change is going to be they did not

6  want the receiver to be involved, they wanted MK to

7  make the investment itself through -- funded through

8  PDVSA.

9          So when we had the hearing on the 3rd,

10  the issue was instead of the receiver, who's the

11  real protection for the minority investors, being

12  involved, vetting this, in dealing with the terms

13  and conditions, it was going to be directly a deal

14  negotiated by PDVSA with Proterra and NuScale with

15  the involvement of MK.  And that was presented

16  because of the urgency, and your Honor accepted that

17  and made that -- you know, that was going to be the

18  case on February 3rd, this was going to be signed

19  immediately, it was urgent.  We now know that we're

20  two weeks past that point in time and no agreement

21  has been signed and the receiver has not in fact

22  been involved, so far as we know, at all.

23          Last night we got the term sheets.  We

24  had heard -- what prompted the letter, the e-mail at

25  least from us on Wednesday, is we heard, and it was

14

```
 1    only word-of-mouth at that time, that, in fact, the
 2    terms of the deal that were being negotiated between
 3    PDVSA and Proterra and NuScale was actually going to
 4    subordinate the position of our clients.  Instead of
 5    occupying the investment position it had, it was
 6    going to be subordinated to the rights of the fresh
 7    money coming in from PDVSA.  And remember, PDVSA was
 8    putting in money voluntarily, choosing to do so
 9    based upon its desire to protect what it says was
10    its 90 percent share of the investment already in.
11    We were, in effect, going to get theoretically the
12    benefit of that protection, but we were also now
13    being subordinated to them.
14              So when I saw the term sheets last night
15    and I went through them, in fact that's what they
16    do.  It appears that the consent of prior investors
17    are necessary for this to happen, but our consent is
18    not being sought because presumably MK, under the
19    control of PDVSA, can grant that consent because
20    they are viewed as the investor as opposed to the
21    minority investors.
22              And, as I say, our rights are being
23    subordinated.  That is obviously a negative impact
24    on our investment; we're standing behind other
25    investors.  Now, I can understand --
```

1        THE COURT:  Other investors being just

2   PDVSA in this $5 million; is that what you mean?

3        MR. ZAKARIN:  Correct.  Now, it's not

4   merely just the loan, by the way, that PDVSA is

5   getting.  The term sheet reflects that PDVSA for its

6   five million, and this is both in NuScale and

7   Proterra, is getting a convertible subordinated

8   note.  It is getting 100 percent of security

9   interest in all of the assets, it appears, of

10  Proterra and NuScale, and it is also getting, I

11  think in both, warrants.  So, it's getting

12  considerable value as well as jumping up in

13  priority.  And of course the security interest that

14  it gets means that, you know, our interests as a

15  minority investor, an unwilling minority investor,

16  could be completely foreclosed and we could end up

17  having nothing.

18         Our issue is not with the investment

19  being made, our issue is not to preclude Proterra or

20  NuScale to get investments, our issue is really are

21  these terms self-serving and to the detriment of the

22  minority investors.  We think that they are.  It's

23  contrary to what was represented to the Court on

24  February 2nd and 3rd, which is why -- I mean,

25  normally we would have the protections of an

1    independent receiver examining and negotiating the

2    terms and the receiver would be charged with

3    protecting the interests of all of the investors,

4    and if the receiver had determined that the only way

5    the investment properly should be made would be

6    predicated upon a subordination, so be it.  But

7    here, that's not the case.  The protections that we

8    sought were those we requested from the Court, and

9    the assurances that we raised, that we sought to

10   obtain, which was, you know, are we being negatively

11   impacted, we don't want our rights prejudiced, and

12   we were assured they were not, and in fact, they

13   are.

14          So, the issue is really not the

15   investment per se, it's the terms of the investment

16   and the relationship between PDVSA and the minority

17   investors with respect to the investment being made

18   by PDVSA through the Special Opportunities Fund.

19          MR. FORTINSKY:  I'd be happy to respond

20   to that if the Court wants to hear from me.

21          THE COURT:  Let me ask you this:  What

22   I'm hearing you say is that you want the assurance

23   of a neutral with respect to whether this is an

24   appropriate arm's length, fair market deal, and you

25   just are highly uncertain about that because of the

17

1  progress of events, but that you don't -- as a

2  matter of course you are not saying that PDVSA as

3  the new money under -- for the bridge loan doesn't

4  get certain subordinations and other rights, that

5  that would be something that you'd expect people to

6  get under ordinary circumstances similar to this,

7  but given the enormous amount of what is not known

8  about the MK entities, including SOF and STLF, you

9  are very wary on behalf of the minority investors.

10  Is that what is concerning you?

11              MR. ZAKARIN:  That is a part of it, your

12  Honor.  It certainly is.  This is an unusual

13  situation where people, in this case our clients,

14  invested unwittingly, involuntarily, and in a manner

15  that was inappropriate to their -- the money they

16  put into a short-term liquidity fund, and they are

17  -- having been prejudiced in that regard already,

18  they're now being potentially, and indeed pretty

19  directly, further prejudiced by that investment

20  being subordinated.  It may well be -- we don't even

21  know, as I said, your Honor, we don't know how much

22  of that investment in Proterra and in NuScale

23  actually was made with our clients' money.

24              THE COURT:  I recognize that, and that's

25  all part of the uncertainty that remains for

1    everyone.  That is why you -- why we have a receiver

2    who will be sorting this out.  That's why I was

3    wondering whether, given what cannot be knowable

4    right now given the state of affairs that we've come

5    to understand exists with the MK entities, whether

6    you want to know if this is a fair deal, given what

7    PDVSA's doing, or whether in some way they are

8    taking undue advantage of the situation and doing

9    something, getting themselves in a better position

10   and being potentially in a better position than they

11   ordinarily should be.  Because I gather you don't

12   dispute that somebody coming in to make the bridge

13   loan under these circumstances and taking that risk

14   isn't going to make certain requirements about

15   getting their money out, the timing of doing that,

16   securing it, et cetera.

17            MR. ZAKARIN:  Yes, I agree with that,

18   your Honor.  And I think that as investors, if we

19   were willing investors and we had certain rights

20   under our investment agreements, which by the way I

21   still haven't seen, we would have the ability in

22   that context to say yea or nay assessing the risk.

23   Here, it's not an independent third party putting

24   money in.  We don't know, as I said, and as your

25   Honor acknowledged, it could be that almost all of

1  the cash that was put into these two investments

2  came from us and not from PDVSA.  So, I mean -- and,

3  in effect, PDVSA now may be advantaging itself by

4  getting first position ahead of us when it was

5  almost all of our cash used and we may end up being

6  relegated to the -- you know, to recovery out of

7  assets, less liquid assets that it contributed

8  ultimately to these MK funds, and all of that is not

9  going to get sorted out for some time.

10          My suggestion, and it's only a

11  suggestion, is we're not opposed to the investment,

12  we understand that the money is needed by these

13  entities and it's protective of something, but it's

14  the terms of that investment, you know, vis-a-vis as

15  between PDVSA and the minority investors.  So, if it

16  were made subject to an alteration.  If the

17  investment were made subject to the receiver's

18  further investigation and it could be changed and

19  the priorities and subordination could be changed

20  based upon the outcome of the receiver's

21  investigation, that might be protection enough for

22  us for it to go forward.

23          THE COURT:  So, why --

24          MR. ZAKARIN:  We're just trying to

25  protect our ultimate position here if the facts turn

1    out that our clients have, in effect, you know, put

2    in money, gotten ultimately foreclosed out or

3    reduced, and in fact this was done on their backs.

4              THE COURT:  Okay, I take it that the

5    idea of being a co-investor doesn't interest you or

6    Mr. Curran.

7              MR. ZAKARIN:  No, no, our clients didn't

8    want to be there in the first place.

9              MR. CURRAN:  No, your Honor, my client

10   doesn't want to --- I completely agree with

11   everything Don has said on behalf of the minority

12   investors, and I think the key issue really is our

13   clients are involuntarily invested with these

14   entities, and that's the difference.  We were not

15   participating voluntarily on a first round financing

16   and now we're at a second round stage and then there

17   are some of these issues.  We also were surprised

18   because, quite frankly, I had believed that Mr.

19   Fortinsky represented to the Court and to all

20   parties present during the Wednesday February 2nd

21   hearing at around 5:00 p.m. that our client would

22   not be harmed or our interests subordinated in any

23   way by any future PDVSA investment in either

24   Proterra or NuScale.

25              THE COURT:  And so why doesn't it work

1    this way:  For the purposes of the loan, it goes

2    through on the terms that PDVSA has negotiated, but

3    if it should turn out after all the dust settles

4    that in fact, let's say for instance, PDVSA is only

5    a 70 percent investor or that the minority investors

6    actually do have money in the SOF, doesn't the

7    allocation of the rights flowing under PDVSA's loan

8    as things become clear, don't the minority

9    investors, if in fact that turns out to be their

10   money, don't they in effect step into those shoes?

11   Because there is so much that cannot be known now.

12            We've had Mr. Mandel and Ms. Midanek

13   looking at these two venture capital entities to

14   give us a business opinion on whether they are good

15   investments.  We've had Mr. Carney on the scene for

16   a couple of weeks with his counsel looking at some

17   of the business undertakings here, and we have at

18   least some neutrals who can give opinions that may

19   be useful in allowing the minority investors to

20   consent, having had that review done by those who I

21   suppose are among the best, of all of us with little

22   knowledge have the best knowledge at this point.

23            So the short of it is if -- would you

24   like to hear from the receiver once the receiver has

25   had a chance to digest the term sheet and whatever

1    else there is out there, and Mr. -- I know Mr.

2    Mandel continues to follow Proterra and NuScale,

3    would you like to hear from them and at a time when

4    they are prepared to speak to you?

5              MR. ZAKARIN:  Your Honor, I have a

6    suggestion.  Apropos of what you were just saying,

7    maybe it will, maybe it won't be acceptable to

8    PDVSA, but what if the transactions went forward

9    with PDVSA in effect standing as constructive

10   trustee for the benefit of the investors subject to

11   that constructive trust being eliminated based upon

12   the results of the receiver's investigation?

13             THE COURT:  Well, that idea is sort of

14   what I was suggesting obliquely occurs anyhow when

15   you have a situation like this in which there may be

16   fraud, there may be mismanagement, there may be a

17   whole host of things, and when you deconstruct it

18   all you then know where the constructive trusts need

19   to exist.  So, I'm a little bit -- I mean, I will

20   certainly welcome Mr. Fortinsky saying, sure, I'd

21   like to do a constructive trust, but I have a strong

22   feeling that's probably not going to be what it is.

23   But I just would think that as a matter of law once

24   the facts are known that constructive trusts are

25   established based on that knowledge as opposed to

```
 1   sort of having the inchoate purpose going in.  Don't
 2   you think that's right?
 3              MR. ZAKARIN:  Well, maybe this is even
 4   better clarified, because I think the investor is
 5   technically an MK entity, if I'm not mistaken, in
 6   each case, because it's flowing through that, so ---
 7   I mean, if the MK entity, which is theoretically
 8   under the receivership, holds it subject -- holds
 9   the investment subject to further determinations by
10   the receiver, you know, I'm comfortable with that.
11   Maybe it functionally works that way.  I'm only
12   concerned a little bit because we are dealing with a
13   foreign entity, but I don't know that that's really
14   a significant factor.
15              THE COURT:  Well, if we made sure that
16   we had all the right -- all the MK entities under
17   the receiver, so that we have MK Group and we have
18   -- I don't know, others that may not be in that
19   list, but if we have all of the MK entities under
20   the receiver and subject to the receiver, am I
21   hearing you say that that then becomes the
22   protection that would satisfy you, the minority
23   investors?
24              MR. ZAKARIN:  The problem with that is I
25   think it's been carved out from the receivership
```

1  already.

2            THE COURT:  We can always amend, you

3  know, the receive --

4            MR. ZAKARIN:  Put it back under the

5  auspices.

6            THE COURT:  Right.

7            MR. ZAKARIN:  I thought, actually, on

8  some levels for Mr. Fortinsky and PDVSA my

9  suggestion of -- you know, that they do the deals,

10  you know, as constructive trustee for the benefit of

11  all investors subject to the receiver defeating

12  that, in fact releasing that so it's only for the

13  benefit of them if he determines that there is

14  nothing untoward and the investments were done here,

15  that may or may not be more acceptable to him, but I

16  leave that to him.  I'm just looking to get the

17  investments done and maintain, in effect, the status

18  quo, you know, so that they are not gaining all of

19  the benefit of this transaction right up front, it's

20  a done deal and there is nothing that can alter that

21  thereafter if it turns out that the facts are

22  otherwise.

23            THE COURT:  All right, let me ask Mr.

24  Fortinsky whether this idea has legs, and that is

25  that -- I'm not sure, who becomes the constructive

```
 1   trustee, MK -- the MK entity, yes?
 2             MR. ZAKARIN:  I think that's the
 3   investor, but, I mean, Mr. Fortinsky knows the
 4   parties better than I do.  I think it's -- the
 5   purchaser is SOF, if I'm not mistaken.
 6             MR. FORTINSKY:  The investor is SOF,
 7   that's true.  The original idea, which we discussed
 8   at length in court before Mr. Zakarin was retained,
 9   was that the PDVSA entities would make an investment
10   in order to protect the unwitting investment of the
11   STLF investors, Mr. Zakarin's clients and mine,
12   both, in these private equity companies that they
13   didn't know about in advance.  The idea was that
14   PDVSA would be making the investment, and the SOF
15   was a vehicle because it was PDVSA's money, and
16   nobody has suggested otherwise, for PDVSA to make
17   that investment, not as constructive trustee, not
18   for somebody else's benefit, but for PDVSA.
19             And after all, the point that Mr.
20   Zakarin has made again and again is he doesn't want
21   his client to be taking anymore risk.  As he said
22   February 2nd, if this money is going in, it's for
23   PDVSA's account, it's PDVSA for the upside, it's
24   PDVSA for the downside, it's not for his clients.
25   That's contrary to the idea that there would be a
```

1    constructive trust.

2            We can't -- I don't understand exactly

3    how this idea would work.  It sounds, with all

4    respect to everybody involved, awfully squishy to

5    me.  And, more concretely, our clients are not going

6    to put in money in an investment if they don't know

7    on what terms they might get that money back.  If

8    there is anybody on this call who is willing to put

9    money in a bank or in an investment without knowing

10   in advance under what circumstances and to what

11   amount they are going to be able to get that money

12   back, then please say so because I would love for

13   you to give me some of your money.  That's not the

14   way people make investments and that's not what my

15   clients are going to be willing to do here either.

16           THE COURT:  Let me work with this

17   concept.  We have a receiver who is in a position,

18   or going to be in a position, to really sort things

19   out.  If the investor is SOF, is SOF under the

20   receiver's jurisdiction?

21           MR. FORTINSKY:  In a sense that's true,

22   although this investment pursuant to the

23   February 3rd order is outside the scope of the

24   receiver's purview for the reasons we previously

25   discussed.  But let me perhaps offer a distinction.

27

1    If it were to turn out, contrary to what everybody

2    expects, that $2 million of the minority investors'

3    money had been invested -- had ended up in the SOF,

4    then that would certainly be something that they

5    would be entitled to get credit for when the

6    ultimate accounting is done.  We don't think that's

7    the case, but if it were the case they would be

8    entitled to get credit for.  We're not taking the

9    position that if the $2 million somehow unwittingly

10   got invested in the SOF that now they're going to --

11   you know, that it's their $2 million that's being

12   invested now, or about to be invested, in Proterra

13   and NuScale.  No, it's clear that it's the PDVSA

14   money for good or for bad.  So, if it were to turn

15   out that somehow the minority investors' money

16   landed in the SOF fund, then they would get an

17   appropriate credit for that when the dust all

18   settles.

19           That's a -- that I think is really the

20   protection that the minority invests have and are

21   entitled to.  That's different from some sort of

22   arrangement, which is hard to sort of work out the

23   details of in advance in which there is some sort of

24   imprecise -- I don't even understand exactly how it

25   would work, but some sort of investment or

1   constructive trust with respect to the current

2   investment.

3           MR. ZAKARIN:  Maybe I can explain this,

4   and there is two pieces.  First of all, as I said,

5   it's not merely whether there is some money of ours

6   in SOF, and I accept your representation to the best

7   of your knowledge that's not the case, but the Short

8   Term Liquidity Fund, our clients had $50 million

9   plus in the Short Term Liquidity Fund.  I gather

10  that there was $20 million invested in Proterra and

11  23 in NuScale, or vice versa.  We know we had that

12  amount of cash and more in the Short Term Liquidity

13  Fund.  I don't know what PDVSA had in the way of

14  cash in the Short Term Liquidity Fund, so I don't

15  know that all of the money, all of the cash money

16  was not, in fact, our clients' money, or at least

17  the lion's share of it, not merely, you know, 10

18  percent or 15 percent.  So, our money may be

19  hostage, you know, in this investment whether we

20  like it or not.

21          However it gets allocated, and all of

22  that has to be pieced together by the receiver,

23  which the receiver will do that, the constructive

24  trust theory is simply you're getting 100 percent

25  protection for the money that you are putting in,

1   the terms are precisely the terms that you've

2   negotiated, the only difference is that MK, whether

3   under the receivership -- the Special Opportunities

4   Fund, whether under the receivership or otherwise,

5   in effect holds the benefit of that investment for

6   the investors and subject to his investigation.

7           It may turn out that it's 100 percent

8   for the benefit of PDVSA, or it may turn out, based

9   upon the investigation, as the facts come out, that

10  the allocation is different, that it is partially,

11  and should be partially, for the benefit of our

12  clients.  I don't know because we don't know the

13  facts, but the 100 percent protections of the deal,

14  deal terms you've negotiated, are there, and the

15  terms of the deal are inviolate, it's only the

16  question under a constructive trust theory who

17  ultimately, based on evolution of the facts, gets

18  the benefit of those terms and to what extent.

19          And, I mean, I don't think -- I don't

20  think I'm hearing from you that you disagree if the

21  facts turn out that we should have a benefit or the

22  facts turn out other than what we know, why

23  shouldn't we have that benefit.  Why should our

24  clients, because of the urgency of this and the

25  absence of information, why should their rights be

```
 1   prejudiced?

 2              MR. FORTINSKY:  Your clients' rights are

 3   not being prejudiced.  In fact, there was a lot in

 4   what was said, what you said on -- what Mr. Zakarin

 5   said that was actually, you know, not correct in

 6   your comments.  And there is no prejudice to your

 7   clients here.  Yes, it's true that in the end there

 8   needs to be some accounting by the receiver, but you

 9   made some comments that I wanted to go back to

10   because I don't think that's correct.  You know, the

11   notion that the deal was changed between

12   February 2nd and February 3rd to your clients'

13   disadvantage is not true.  The deal was the same

14   deal that was being negotiated, the only --

15              MR. ZAKARIN:  I'm not suggesting, by the

16   way, it was changed from then.  I'm suggesting I

17   didn't know what the terms were and I never heard

18   anything about our rights being subordinated.  The

19   first I saw the terms were last night when you sent

20   them.

21              MR. FORTINSKY:  It's also not true, as

22   Mr. Curran said, that I made any representation that

23   there would be no subordination of any kind.  It was

24   not addressed one way or the other.

25              MR. ZAKARIN:  I think that's correct.
```

1          MR. FORTINSKY:  And, in fact, you know,

2     the notion that the new money is entitled to get

3     priority, because that's the way life works, is

4     actually reflected in the prior order of the Court.

5     The Court issued an order February 2nd, the modified

6     temporary order freezing assets, in which it said

7     specifically in paragraph 5, that:  It is hereby

8     further ordered that, notwithstanding Sections I, II

9     and III of this order, Proterra is permitted to use

10    any and all funding contained in its existing

11    accounts and, in accordance with the terms of the

12    Court's previous orders, is permitted to raise up to

13    $1,017,000 in funding from its Series A investors in

14    a first security position on all assets of Proterra

15    for its operations.

16          In other words, in dealing with the

17    issue for the Series A investors, the Court has

18    already recognized that of course new money,

19    emergency money, bridge loan money is entitled to a

20    first security position.  That's the only thing

21    that's going on here, and that is being done also to

22    be fair to everybody on terms that we are willing to

23    extend to share pari passu with the minority

24    investors.  If there is any disadvantage -- if there

25    is any advantage, rather, in getting these terms for

1    a relatively small amount, the investors can have

2    them.  To the extent there is any issue about

3    whether the cash ended up in the wrong pocket, SOF,

4    which we don't think is true, that's something, as I

5    said, that can be dealt with, but I don't think that

6    affects the transaction.

7              THE COURT:  Let me ask -- may I ask our

8    business advisors or our receiver if they have any

9    views that would be helpful at this time.

10             MR. MANDEL:  Your Honor, this is Victor

11   Mandel.  I think the transaction here, again --

12             THE COURT:  You are not coming through

13   very clearly.  Can you do something different.

14             MR. MANDEL:  Sure.  Is this better?

15             THE COURT:  Yes.

16             MR. MANDEL:  Yes, okay.  Your Honor,

17   sorry.  We -- unfortunately I believe this

18   transaction really got caught in the transition to

19   the receivership, and with the request by Mr.

20   Fortinsky to have this done outside the receivership

21   and with the consent, with conditions, by Mr.

22   Zakarin, you know, I believe it created confusion

23   about the receiver's role, and I think this lack of

24   transparency certainly is creating some doubt as to

25   the fairness of the terms.

1           In our view the process itself certainly

2    I think has fault in that, you know, it was

3    negotiated without representation by MKE&I, the

4    business advisors or the minority investors or the

5    receiver, but certainly if I have to look at the

6    final outcome with respect to new money coming in

7    and the terms that are provided to SOF, this is in

8    our opinion a market-based transaction, one that

9    certainly could be worse, could be better, but

10   something that is definitely within I think the

11   middle of what an expectation would be for a

12   third-party investor to come in and provide

13   $5 million, you know, in a loan to Proterra at this

14   current state.

15           THE COURT:  Okay, Mr. Carney?

16           MR. CARNEY:  Well, you know, your Honor,

17   I look at this as where would we be in a month from

18   now if an additional call for funding came up and if

19   the -- then it would be clearly within the

20   receiver's purview to act on this.  In that

21   situation, you know, I would look to the business

22   advisors for their opinion.  And we just heard Mr.

23   Mandel express I think a positive opinion about the

24   merits of this.  Then I would be in a situation then

25   to consult with the wishes, basically the wishes of

1  the investors, and the wishes of the investors could

2  express, as we have here now, a positive view by Mr.

3  Fortinsky's client and maybe a negative from the

4  minority investors.  But even if that were true, and

5  they could appeal whatever decision I made to the

6  Court, but we would be making it from one common

7  pool, because we don't have -- we can't delineate

8  assets at this point in time, it just can't be done.

9  So, the tide would -- the boat would rise and fall,

10  the boats would rise and fall equally on this, and

11  that's kind of how I see this going forward.

12          So, what we're having here is a

13  discussion, in my mind, of like it's before the

14  receivership gets involved, and so Mr. Fortinsky

15  wants to take on the risk of the investment, his

16  client does, wants to take on the risk, and he wants

17  the benefit, and I understand that, especially if

18  he's willing to give a full offset to the minority

19  investors should it ultimately be determined that,

20  you know, their monies were in here.

21          And, frankly, let me say at the outset,

22  from what we have seen so far, the records of the

23  company are not in a condition that are -- or we'll

24  say the best of shape, and it does appear that the

25  company was run a little bit globally without --

1  failing to respect some of the lines between

2  corporations.  So, we're coming, even from just

3  being on the ground for a week and a half, coming to

4  the view there is a fair amount of commonality,

5  maybe commingling, with just the way the whole

6  operation was run.  In fact, some of our interviews

7  have suggested that of even the CEO.

8          So, I think there is, you know, there is

9  -- again, there is some argument the whole ship, the

10  receivership should be expanded to collapse in all

11  of the MK entities and the funds there very, very

12  clearly, and I think that would allow for a more

13  efficient operation.

14          But explicitly what we have here, your

15  Honor, I think it's just that choice, is it going to

16  be inside the receivership, in which case the boats

17  rise and fall together, and the decision to fund, I

18  rely upon the expertise of the business advisors,

19  after consulting with my counsel, and it's my

20  understanding that they would be in favor of moving

21  to fund Proterra.  In that situation, since -- in my

22  mind there wouldn't really be any subordination

23  because, again, everybody would be the same, the

24  boats are the same, and it is kind of taking the

25  minorities' interests along.  Whether they want to

1   go or not, I don't know if there is really an

2   opportunity.

3                    So, I think really the choices are I

4   think it goes in all together like this, or that, as

5   Mr. Fortinsky says it, if this one transaction were

6   to be outside the receivership because it was prior

7   to its existence, that PDVSA bears the ultimate risk

8   in the final accounting, good or bad.

9                    THE COURT:  Well, I don't understand

10  this transaction, once its completed, to be outside

11  the receivership.  The process of getting the

12  transaction consummated may be, but once it's

13  completed it, like all the other transactions and

14  investments and so forth, fall within the -- fall

15  under the receivership, as I conceive this.  And

16  that's why it was my thought that if it turns out to

17  be somebody else's money, that the receiver on that

18  finding then is able to make the recommendations as

19  to how the entities, whose money it is, should be

20  equitably treated as to the good and the bad.

21                   And so that's why I'm a little puzzled

22  at the minority investors' protest at this point

23  other than they didn't have the specifics when they

24  agreed to let this go along.  They have the

25  specifics now, but I don't really understand how

1    those specifics alter their rights in any way, their

2    rights being -- or certainly in any unexpected way,

3    and given what Mr. Mandel says, that this, the

4    paper, the term sheets and papers he's looked at

5    looks like what you'd see in an arm's length

6    transaction, that the problem that the minority

7    investors have that causes them agita that it's not

8    an independent third party putting money in, is

9    fairly well dissipated, don't you think?

10              MR. ZAKARIN:  If I can, your Honor.

11              THE COURT:  Mr. Zakarin, if this

12   transaction, once it's finished, is now under the

13   receiver, as all the transactions of the MK entities

14   are, and will be, aren't you in -- why aren't you in

15   as good a position or as bad a position as you would

16   be in any event?  I'm not quite sure that I see any

17   harm to you beyond that which you are already in by

18   being this involuntary investor through the Short

19   Term Liquidity Fund.

20              MR. ZAKARIN:  I think, your Honor, with

21   the clarity you've provided, which is that SOF and

22   its investment here in Proterra and NuScale is under

23   the auspices of the receiver once this investment is

24   made, and subject to his, you know, allocation,

25   determination and distribution at the end of -- you

38

1   know, his process of analysis, then I think we are

2   protected and I'm comfortable.  I can't speak for

3   Mr. Curran's investors, but I think for mine, I

4   think that provides me with the comfort and the

5   clarity that I think was lacking.

6          THE COURT:  So, Mr. Fortinsky, do you

7   see it any differently than that, that when we had

8   you go ahead without having the receiver approval

9   because we were in this transitional period, that we

10  finished that, but at the end of the day it, "it"

11  being the transaction, like all the other

12  transactions that will be sorted out, will be under

13  the receiver?

14         MR. FORTINSKY:  I don't think I disagree

15  with what you said.  I might say it a little

16  differently.  I think the assets, because the asset

17  is the MK Special Opportunities Fund, remains

18  subject to the freeze order overall and to the scope

19  of the receivership overall.  So, I think I agree

20  with that.  I would add that to my knowledge, and

21  maybe Mr. Jacobson can confirm or expand on this, to

22  my knowledge the SOF was under -- there was a

23  separate independent administrator for the SOF which

24  provided a greater level of paperwork and comfort as

25  to what funds were in there and whose they were and

```
 1    statements and so forth.  And so I think that at the

 2    end of the day there is going to be, you know, with

 3    respect to the SOF, no need to, you know, sort of

 4    put together account statements from scratch and

 5    no -- well, therefore I wouldn't anticipate any

 6    ambiguity as to whose money it is.

 7              THE COURT:  That may be and you may be

 8    the best documented transaction the receiver will

 9    have to deal with, but at the end of the day isn't

10    it correct that whatever this transaction is, it,

11    too, the results of it, will be under the receiver?

12              MR. FORTINSKY:  Yes.

13              THE COURT:  And that clarity is then

14    what the minority investors need to assure

15    themselves that however this sorts out they are in

16    no worse position than before this investment was

17    made and maybe -- well, they are no differently

18    positioned than they were when they discovered their

19    involuntary investment status.

20              MR. FORTINSKY:  That's correct, your

21    Honor.  I would agree with that with the one

22    qualification that when we say it is subject to the

23    jurisdiction, if that's the right word, of the

24    receiver, it's not in the receiver's absolute

25    discretion.  The terms of the transaction provide
```

40

1    for -- the transaction has certain terms that govern

2    what's supposed to happen with that money.  The

3    receiver does not have the discretion to simply

4    ignore those terms, those terms we're relying on in

5    making the investment.

6             THE COURT:  I understand that, but if

7    the investment turns out to give Proterra and

8    NuScale exactly what they need to get to great and

9    wondrous success with all sorts of benefits, but it

10   turns out it wasn't PDVSA money, that the people,

11   whoever's money it was, get that benefit, and then

12   the downside as well.  That's what the STLF

13   investment in these two entities is all about.

14            I don't want to say more because I'm

15   afraid I'm going to ruin whatever clarity we've

16   reached.  So, let me stop.  But let me ask, there

17   may -- I expect that there will be need from time to

18   time to modify the receiver -- the order appointing

19   receiver as we understand what entities exist, what

20   entities need to be under the receiver's authority

21   to run the operations, notwithstanding the freeze

22   order, et cetera.  And what I would like to invite

23   the receiver to do is to try to contemplate now if

24   there are any -- "now" being sometime in the next

25   two weeks, whether there are changes that he would

1  propose that would make his running of the MK

2  operations less complicated or smoother, that would

3  reduce outlays of monies that should be conserved as

4  best as possible to protect a corpus for the

5  investors, and that we do that, but that we have the

6  understanding that notwithstanding the fact that

7  there may be flaws in the process of PDVSA's -- from

8  some viewpoints, PDVSA's and SOF's negotiations

9  being less than transparent, that, as Mr. Mandel

10  says, it looks fair on its face, and the ultimate

11  fallout from this transaction will be under the

12  receiver's purview, and thus, whatever the

13  consequences are in terms of how successful this

14  investment is or isn't, and how successful the STLF

15  investment is or isn't, that will be all under the

16  receiver in the long run with the allocations being

17  made once investor money is traced, if it can be.

18              So, if we do it that way, Mr. Zakarin,

19  doesn't that satisfy your minority investors'

20  concern?  It gives you the assurance that the

21  receiver -- this is not a deal that is in some way

22  standing outside of the purview of the receiver who

23  is looking at all of the assets, and therefore, you

24  enjoy the protections once everything begins to be

25  sorted out.

42

```
1              MR. ZAKARIN:  Yes, your Honor.  In

2    effect it converts this investment into the

3    receiver's investment, which may be wholly for the

4    benefit of PDVSA, which is fine if that's what it

5    turns out to be, or partially for the benefit of our

6    clients if that's what it turns out to be.  So, once

7    it has that protection, it is functionally -- you

8    know, perhaps your Honor picked up on it faster than

9    I did because I was going down a more complicated

10   path I guess with the constructive trust, but

11   functionally, it doesn't.  Once it's under the

12   receiver purview to be allocated, distributed and

13   addressed based upon the receiver's determinations,

14   then that's fine.

15              THE COURT:  Well --

16              MR. ZAKARIN:  I'm comfortable with that.

17              THE COURT:  And that's not -- you are

18   not suggesting that the receiver can change the

19   terms of it, it's just --

20              MR. ZAKARIN:  No, no, the deal terms are

21   the deal terms.

22              THE COURT:  Okay.

23              MR. ZAKARIN:  But what happens to the

24   results of that investment, whether it's cash,

25   whether it is stock, whether it is foreclosed upon,
```

1    the assets, whatever happens with that investment

2    will be determined, allocated, distributed based

3    upon the receiver's assessment of where did the

4    money come from, whose money was it, et cetera.

5              MR. FORTINSKY:  I might say that

6    differently, but -- the money is being invested,

7    functionally, by PDVSA.  It remains invested through

8    the vehicle of the SOF, which is of course still

9    subject to the orders the Court entered concerning

10   the receivership and the asset freeze, and, you

11   know, accordingly we can't ignore the terms of those

12   orders and disregard them to the detriment of any of

13   the other parties, such as the minority investors.

14   It is, again, not something that the receiver will

15   be able to simply reallocate at will.

16              And as I said, in this case there is an

17   independent third party that tallies and basically

18   takes care of the books and records for this

19   separate fund and there is no reason to disregard

20   what that independent third party has, you know,

21   what those books and records reflect.  If there

22   were, then of course it would be a different story.

23              THE COURT:  Right.  So, I think

24   everybody is saying the same thing, and that is that

25   although this loan has been negotiated in the

1    transitional period and will continue to be

2    negotiated and consummated on its terms between SOF

3    and PDVSA for the -- SOF, I'm not quite sure whether

4    it's SOF and Proterra and NuScale, but all of that

5    will just simply take place, everything being

6    carefully recorded and available for everyone to

7    see, but that ultimately whatever comes out of the

8    receiver's work will take this transaction as one of

9    the other assets that falls within the receiver's

10   estate, and I think that's fine.

11           I think that without saying more,

12   because nobody intends that the loan gets in some

13   way renegotiated or terms get changed or terms don't

14   get honored, it is simply the assumptions may

15   change, that is the assumption that SOF is all PDVSA

16   money, the assumption that -- well, I can't -- I

17   think I had another one in the back of my mind that

18   has slipped away, but as long as everything is

19   represented, it will be the best documented asset

20   the receiver has to work with, but it is an asset of

21   the estate that the receiver is in control of.

22           So, I think that with that

23   clarification, that and a suggestion in time from

24   the receiver as to how the order might be reworded

25   to get that contemplation in place for any other

1   transactions so that we don't need to go through

2   this discussion again, I think we're all set.

3           Is there anybody who thinks we aren't

4   all set.

5           MR. FORTINSKY:  I have two more points,

6   and after that I think we'll be all set.  One is

7   just a clarification of the record because somebody

8   said earlier there was no transparency to MK in the

9   negotiations, and I just wanted to just put on the

10  record that, in fact, the negotiation of the

11  transaction was done with copy -- with the

12  involvement of certainly e-mail copies of drafts to

13  MK's counsel which, with respect to the Proterra

14  transaction, was not Arnold & Porter but was a firm

15  called Finn Dixon.  So, it's not true that there was

16  no transparency to MK.

17          THE COURT:  I think the minority

18  investors meant as to them, that they were not privy

19  to the process, only the end result.  That's what I

20  was hearing was the transparency, and whether that

21  is a fault or not, it simply seems to be a cause of

22  why we're here today.

23          MR. FORTINSKY:  Okay, the other thing,

24  your Honor, that I wanted to ask was that the

25  Court -- I transmitted earlier to Mr. Kretman, I

46

1   don't know if the Court has seen, a proposed order

2   which we would ask the Court to enter in light of

3   the continuing debate and uncertainty that we had

4   based on the state of the record prior to today.  We

5   would propose that the Court enter that as an order,

6   obviously subject to whatever changes the Court

7   might wish to make, that would allow us to have

8   clear record confirmation that on these particular

9   terms, the terms reflected in the two term sheets,

10  that we have the authority to proceed and to enter

11  into all of the transactions, all of the documents

12  and sign all of the documents that are necessary.

13          MR. ZAKARIN:  Your Honor, if I might

14  again, and I think the receiver should have -- the

15  receiver's counsel should perhaps have the

16  opportunity to offer their suggestions.  If this is

17  going to become a receivership asset, they should

18  probably reflect on it, have that opportunity,

19  because I could see given that reality perhaps an

20  additional paragraph being put in, but it would be

21  worth taking a look at.

22          MR. CARNEY:  And, your Honor, it's Mr.

23  Carney.  Not the last word, but hopefully close to

24  the last word, while I appreciate the Court's

25  invitation to consider modifications to the order,

1    and we'll certainly think about that, but there is

2    one simple modification which I would ask the Court

3    to consider now.

4              We've had again some issues receiving,

5    you know, notices from companies which are really

6    all part of the same common MK Group, and, in fact,

7    I have reviewed the financial statements, such as

8    they are, of the group, and there is massive

9    receivables and payables to each other.  They're

10   really, in my opinion, just one entity, and I

11   believe some of the personnel have agreed that it,

12   respectively, is.  But, for example, there are

13   notices to the state from employees.  BCI has been

14   contacting us, but they actually contracted with MK

15   Technology which we do not currently have, and there

16   is actually offices and bank accounts and stuff.

17             So, it is making -- it is complicating

18   the efforts of the receivership, and it is certainly

19   adding expense because we're having to deal with

20   these things, and it's unclear to the banks what

21   exactly is going on because the asset freeze is much

22   larger than the receivership.  So at the top of the

23   pyramid, your Honor, is Michael Kenwood Group LLC,

24   which basically has controlling interest in all of

25   these entities.  So just now for an interim basis --

1   well permanently, but until we come back to the

2   Court with something more comprehensive, if the

3   Michael Kenwood Group LLC could be added under the

4   control of the receiver, that would allow me to work

5   on a lot of these day-to-day issues as well as to

6   better protect and collect the assets from all of

7   the MK entities, STLF as well as SOF, as

8   appropriate.

9           THE COURT:  Does anyone -- we will

10  reduce this to writing, but does anyone have any

11  objection to including the Michael Kenwood Group LLC

12  under the receiver's jurisdiction?

13          MS. KELLY:  Your Honor, this is Rua

14  Kelly.  We certainly, from the Commission, don't

15  have any objection.  Given all the arguments we've

16  made over the course of the hearings before this

17  Court, I'm sure I don't have to amplify the reasons

18  why, but we think that for the reasons Mr. Carney

19  stated, that it would be an appropriate broadening

20  of the order.

21          THE COURT:  Anyone else?  All right,

22  let's then include the MK Group LLC under that.

23          Mr. Carney, why don't you just draft a

24  quick order amending the order appointing receiver

25  to do that in the way that will cover the needs that

1    you've seen come up.

2              With respect to Mr. Fortinsky's proposed

3    order, is it sufficient based on the colloquy that

4    we have had today for me to simply -- and I

5    understand that you want to be clear that you still

6    have the authority to go ahead and to proceed with

7    your bridge loans and to do so under the terms that

8    you have given us and to get all of your documents

9    necessary to consummate that loan without further

10   approval by the receiver or the Court.  I'm -- in

11   other words, what I'm not putting in is all the

12   predecessor stuff because the more that gets said

13   the more complicated it gets.  But that's all you

14   want, right?

15             MR. FORTINSKY:  That's right.  You could

16   delete the recitals and still have the same relief.

17             THE COURT:  All right, and is there

18   anyone who thinks that is, in light of our colloquy

19   today, not what's going to happen?  Okay, then I

20   will sign the order that will clarify that based on

21   our discussion this bridge loan to NuScale and

22   Proterra will go ahead on the terms that have been

23   appended to the motions -- the motion, and that

24   PDVSA and the SOF, the MK SOF, can proceed and

25   prepare all the documentation, sign and deliver it,

1    that's necessary to consummate those loans so they

2    can be done with dispatch.

3              Is that all right?

4              MR. BARR:  Your Honor, this is Jon Barr,

5    the receiver's counsel.  I think it would be prudent

6    to also perhaps have a sentence in the order which

7    indicates that the asset remains a part of the

8    receivership estate.

9              THE COURT:  That, therefore, the asset

10   remains as part of the receivership.  Okay, any

11   problem with that?

12             MR. FORTINSKY:  I guess I'm hesitant to

13   single out this asset as if it were being treated

14   separately or specially from any other asset under

15   the scope of the MK Group.

16             MR. ZAKARIN:  The reason why I would

17   concur with the receiver's counsel is because it is

18   the only asset that's being treated, you know,

19   outside the receivership estate in terms of the

20   consummation of the transaction.  So, that would be

21   -- that would justify its being identified

22   nonetheless as still being a part of the

23   receivership estate.

24             MR. FORTINSKY:  What if we were to

25   delete the last few words so it simply said "without

1    further approval" without the reference to "by the

2    receiver," which I think is what prompts a concern

3    that's been raised by Mr. Barr and Mr. Zakarin.

4            THE COURT:  But if your concern -- Mr.

5    Fortinsky, if your concern is that somehow this is

6    being singled out, can we solve that by saying

7    "thereafter this asset, too, will become a part of

8    the receivership estate"?

9            MR. ZAKARIN:  That works for me.

10           MR. FORTINSKY:  What if we were to say

11   that "nothing in this order shall, except expressly

12   indicate, limit the scope of the Court's

13   receivership order of" such and such a date.

14           THE COURT:  I don't think that --

15           MR. ZAKARIN:  Your Honor, we're looking

16   for further debates down the road.  A simple

17   sentence is clear.

18           THE COURT:  All this says is the upshot

19   of what we've been talking about for the last little

20   while, with which I do not believe there was any

21   disagreement, thereafter this asset, too, will

22   become a part of the receivership estate.

23           MR. BARR:  Thank you, your Honor.

24           THE COURT:  All right then, thank you.

25           MS. KELLY:  Your Honor, this is Rua

```
 1   Kelly for the Commission, and I'm sorry to bring up
 2   one very minor housekeeping matter, but as long as
 3   we are all on the line, I did want to just mention
 4   that we are conscious that the deadline for the
 5   report to the Court on discovery is approaching and
 6   we are theoretically supposed to confer today.  I
 7   spoke earlier with Mr. Goldberg, but we haven't had
 8   a chance to speak yet with counsel for Mr.
 9   Illarramendi in light of the change of counsel, and
10   wanted to ask the Court to consider whether we might
11   get the Court's permission to extend the deadline
12   briefly.  We're thinking it would take us another
13   bit of time just to make sure Mr. Illarramendi's
14   counsel has time to get up to speed and we have time
15   to have a meaningful conference, and we'd suggest,
16   if we could, a brief extension would serve the
17   parties well in that regard so we could make a
18   report to the Court having conferred with counsel
19   thoroughly.
20             THE COURT:  And your contemplation of a
21   brief extension is how much?
22             MS. KELLY:  I had actually suggested to
23   Mr. Goldberg that one week would suffice.  I think
24   for scheduling reasons it would make sense to have
25   it be ten days to two weeks.
```

1          THE COURT:  All right, why don't we do

2     two weeks -- let's do two weeks, and particularly

3     because I'm not going to be available next week

4     except with difficulty, and --

5          MS. KELLY:  And Mr. Goldberg, as I

6     understand.

7          THE COURT:  And Mr. Goldberg will be

8     equally unavailable.  So, let's do this in two

9     weeks, and I say only marginally available because

10    we are getting information that our Internet

11    services there are quite problematic.  So, take two

12    weeks and let's do it right.  Okay, very good.

13         MS. KELLY:  Thank you very much.

14         THE COURT:  Thank you all very much.

15    Good-bye.

16

17         I certify that the foregoing is a correct

18    transcript from the record of proceedings in the

19    above-entitled matter.

20

21                                    3/4/11

22                                    Date

23                              /S/Sharon Montini

24                              Official Reporter

25