UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | 11-CV-00078 (JBA) |
| Plaintiff, | |
| v. | |
| FRANCISCO ILLARRAMENDI and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC, | **FIRST STATUS REPORT** |
| Defendants, | |
| and | |
| MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP, | |
| Relief Defendants. | |

John J. Carney, Esq.
Receiver for the Assets of The Michael Kenwood
Group, LLC; Michael Kenwood Capital
Management, LLC; Michael Kenwood Asset
Management, LLC; MK Energy and
Infrastructure, LLC; MKEI Solar, LP; MK
Automotive, LLC; MK Technology, LLC;
Michael Kenwood Consulting, LLC; MK
International Advisory Services, LLC; MKG-
Atlantic Investment, LLC; Michael Kenwood
Nuclear Energy, LLC; MyTcart, LLC; TUOL,
LLC; MKCM Merger Sub, LLC; MK Special
Opportunity Fund, Ltd.; MK Venezuela Fund,
Ltd.; and Short Term Liquidity Fund I, Ltd.

and
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201
Attorneys for Receiver, JOHN J. CARNEY,
ESQ.

John J. Carney, Esq., Court-appointed Receiver for the assets of The Michael Kenwood Group, LLC; Michael Kenwood Capital Management, LLC ("MKCM"); Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC; (collectively, the "MK Entities"); MK Special Opportunity Fund, Ltd. ("SOF"); MK Venezuela Fund, Ltd. ("MKV"); and Short Term Liquidity Fund, I, Ltd. ("STLF") (collectively, together with the MK Entities, the "Receivership Entities"), submits this Status Report (the "Report") in accordance with the Order of this Court entered on March 17, 2011, and for the purpose of providing a status report on the Receiver's work and findings to date (the "Investigation"). The facts presented in this report may be amended and changed as the Investigation continues, and includes the preliminary assessment of the Receiver's counsel as well as the consultants and advisers retained by the Receiver's counsel (the "Receiver Team").

## I.      INTRODUCTION

The Receivership Entities are a group of interrelated corporations, partnerships, funds and other entities, all of which were either controlled or owned directly or indirectly by Defendant Francisco Illarramendi ("Illarramendi") and others. Illarramendi, MKCM and others advised and operated purported investment funds, including MKV, SOF and STLF (collectively, the "Funds"). The MK Entities purported to receive and invest investors' money and securities through the Funds, with a predominant amount of investor subscriptions being attributable to foreign institutional and individual investors.

On January 14, 2011, the Securities and Exchange Commission ("SEC") commenced a civil enforcement action (the "Enforcement Action") against the Defendants and Relief Defendants. *See* Complaint filed January 14, 2011 attached as Appendix 1 (the "SEC Complaint"). The SEC Complaint alleges that the Defendants misappropriated investor assets in violation of Section 206(1), (2) and (4) of the Investment Advisers Act of 1940 and Rule 206(4)-(8) thereunder. The SEC also sought equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest, and civil monetary penalties.

Simultaneous with the filing of its complaint, the SEC sought emergency relief, including a preliminary injunction, in the form of an order freezing the assets of the Receivership Defendants. *See* Plaintiff's Emergency Motion For A Temporary Restraining Order, Order Freezing Assets and Order for Other Equitable Relief filed January 14, 2011 attached as Appendix 2. The SEC also sought the appointment of a receiver over those assets. *See* SEC Complaint.

On February 3, 2011, the Court appointed John J. Carney, Esq. as Receiver over all assets "under the direct or indirect control" of Defendant Michael Kenwood Capital Management, LLC and Relief Defendants Michael Kenwood Asset Management, LLC, MK Energy and Infrastructure, LLC, and MKEI Solar, LP. *See* Order Appointing Receiver dated February 3, 2011, attached as Appendix 3 (the "Initial Receiver Order"). As the Investigation commenced, the Receiver Team learned that the Receivership Defendants were only a subset of interrelated entities that had commingled investor funds and assets, and had engaged in multiple transactions that were either poorly documented or not documented at all. A motion to expand the scope and duties of the Receivership was filed on March 1, 2011. An Amended Order Appointing Receiver

was entered on March 1, 2011, expanding both the duties of the Receiver and the definition of

the Receivership Estate to include The Michael Kenwood Group, LLC; Michael Kenwood

Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and

Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael

Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic

Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC;

MKCM Merger Sub, LLC; MK Special Opportunity Fund, Ltd.; MK Venezuela Fund, Ltd.; and

Short Term Liquidity Fund I, Ltd. *See* Amended Order Appointing Receiver dated March 1,

2011, attached as Appendix 4 (the "Amended Receiver Order").

As discussed in greater detail below, during the first 60 days of the Receivership, the

Investigation has uncovered evidence of numerous improprieties, including but not limited to the

following: (1) disregard of corporate formalities among the Funds and the MK Entities, resulting

in a significant commingling of assets across the Receivership Entities; (2) misappropriation of

millions of dollars in Receivership Entities' assets for personal use; (3) improper or nonexistent

documentation of the majority of the thousands of transactions executed through or on behalf of

the Receivership Entities; (4) falsification of documentation regarding material transactions; (5)

Ponzi-like activity, from in or about 2005 to in or about February 2011, involving assets of the

Receivership Entities, including but not limited to transfers of assets of the Funds into entities

previously affiliated with Illarramendi; and (6) the transfer of tens of millions of dollars of assets

across the Receivership Entities to make investments in private equity companies in an apparent

attempt to produce gains to offset and conceal earlier fraudulent activity.

## II.    PROCEDURAL BACKGROUND

The Amended Receiver Order directs the Receiver to: (a) use reasonable efforts to

determine the nature, location and value of all property interests of the Receivership Entities

which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property"); (b) take custody, control and possession of all Receivership Property and records relevant thereto, including selling or exchanging assets as necessary to achieve that objective; (c) manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Property; (d) use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver; (e) take any action which, prior to the entry of the Amended Receiver Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Entities; (f) engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities; (g) take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property; (h) issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure; (i) bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver; (j) pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and (k) take such other action as may be approved by the Court. *See* Amended Receiver Order, ¶ II.7.

On or about March 7, 2011, the United States Attorney's Office for the District of Connecticut ("USAO") filed a criminal information against Illarramendi alleging that Illarramendi, with others, had engaged in a massive Ponzi scheme (the "Scheme") involving hundreds of millions of dollars of money supplied primarily by foreign institutional and individual investors. *See* Information, *United States v. Illarramendi*, Case No. 11-cr-41, attached

as Appendix 5. The primary purpose of the Scheme was to conceal the existence of the gap between the commingled assets and liabilities of the Funds.

According to the Information, Illarramendi engaged in or caused multiple acts in furtherance of the Scheme including but not limited to: (1) making false statements to investors, creditors and employees of the Receivership Entities, the SEC, and others to conceal and continue the Scheme; (2) creating or causing fraudulent documents to be created; (3) engaging in multiple transactions without documentation in an effort to conceal and continue the Scheme; (4) transferring millions of dollars of assets across the Receivership Entities and other entities he controlled to make investments in private equity companies; and (5) commingling assets across the Receivership Entities and other affiliated entities. These acts, *inter alia*, were part of a concerted effort to conceal the existence of, and continue, the Scheme. As a result of the Scheme, the Funds currently have outstanding liabilities that greatly exceed their assets and expose investors to losses totaling hundreds of millions of dollars. On March 7, 2011, Illarramendi pleaded guilty to two counts of wire fraud, one count of securities fraud, one count of investment adviser fraud, and one count of conspiracy to obstruct justice, to obstruct an official proceeding and to defraud the SEC.

Two other individuals[1] were also arrested in connection with these charges. Both of these individuals are alleged to have participated in a conspiracy to falsify an asset verification letter on behalf of STLF which purportedly showed that STLF was owed money by various Venezuelan companies, when, in reality, no such loans existed.

---

[1] Juan Carlos Guillen Zerpa (District of Connecticut Case No. 3:11-mj-00039-WIG), and Juan Carlos Horna Napolitano (District of Connecticut Case No. Case 3:11-mj-00040-WIG).

On or about March 7, 2011, the SEC filed an amended complaint (the "SEC Amended Complaint") alleging that Defendants had misappropriated investor funds and Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial loss, or significant risk of substantial loss, to other persons. *See* SEC Amended Complaint, attached as Appendix 6.

In light of Illarramendi's arrest and the SEC Amended Complaint, the Receiver Team has been cooperating with the USAO and SEC to locate, gather and preserve assets, both domestically and internationally.

## III.   DESCRIPTION OF RECEIVERSHIP ENTITIES

### A.   Michael Kenwood Group, LLC

Michael Kenwood Group, LLC ("MKG") is a Connecticut Limited Liability Company that was established in or around January of 2007 and is registered to do business in Connecticut. MKG was purportedly established for two primary purposes: (1) to hold and manage the equity securities of MKG and its subsidiaries; and (2) to manage and direct the business operations of MKG and its subsidiaries.

### B.   Michael Kenwood Asset Management, LLC

Michael Kenwood Asset Management, LLC ("MKAM") is a Delaware Limited Liability Company that was established in or around January of 2007 and is registered to do business in Connecticut. The purported purpose of MKAM was to invest in and manage private equity investments.

### C.   Michael Kenwood Capital Management, LLC

Michael Kenwood Capital Management, LLC is a Delaware Limited Liability Company that was established in or around December of 2006 and is registered to do business in Connecticut. This company purports to be an unregistered investment manager to the Funds.

D.     **MKEI Solar, LP**

MKEI Solar, LP, is registered as a Delaware Limited Partnership. It was established in or around late 2010 and its principal place of business is identified as Stamford, Connecticut.

E.     **Michael Kenwood Automotive, LLC**

MK Automotive, LLC is a Delaware Limited Liability Company that was established in or around July of 2009 and is registered to do business in Connecticut. The purported purpose of this company was to purchase and refurbish antique cars and to export used car parts to Latin America.

F.     **Michael Kenwood Consulting, LLC**

Michael Kenwood Consulting, LLC ("Consulting") is a New York Limited Liability Company that was established in or around May of 2006 and is registered to do business in Connecticut, Tennessee, and Florida. The purported purpose of Consulting was to provide business consulting services. Consulting was the first entity established under the Michael Kenwood name and was used to process payroll and other expenses for the Receivership Entities.

G.     **Michael Kenwood Energy and Infrastructure, LLC**

MK Energy and Infrastructure, LLC is a Delaware Limited Liability Company that was established in or around July of 2009 and is registered to do business in Connecticut. This company was purportedly established to invest in clean energy start-up companies.

H.     **MK International Advisory Services, LLC**

MK International Advisory Services, LLC is a Delaware Limited Liability Company that was established in or around August of 2009 and is registered to do business in Connecticut and Florida. This company was purportedly created to provide international tax planning and consulting services.

I.      **MK Technology, LLC**

MK Technology, LLC is a Delaware Limited Liability Company that was established in or around April of 2010 and is registered to do business in Connecticut. This company was purportedly created to invest in technology start-up companies.

J.      **MKG-Atlantic Investment, LLC**

MKG-Atlantic Investment, LLC is a Delaware Limited Liability Company that was established in or around November of 2010 and is registered to do business in Connecticut. This company was purportedly established to hold approximately a 70% interest in Atlantic Asset Management, an SEC Registered Investment Adviser with approximately $6 billion under management.[2]

K.      **Michael Kenwood Nuclear Energy, LLC**

Michael Kenwood Nuclear Energy, LLC is a Delaware Limited Liability Company that was established in or around April of 2010 and is registered to do business in Connecticut. This company was purportedly established to provide consulting services to governments and companies interested in building nuclear power plants and to advise on the use of nuclear energy.

L.      **MyTcart, LLC**

MyTcart, LLC is a Delaware Limited Liability Company that was established in or around June of 2010 and is registered to do business in Florida. This company was purportedly created to develop a universal online bill payment system.

---

[2] The Michael Kenwood Group was in advanced negotiations to acquire Atlantic Asset Management. These negotiations were put on hold when the SEC Complaint was filed and ultimately abandoned by both sides.

M.   **TUOL, LLC**

TUOL, LLC is a Florida Limited Liability Company that was established in or around March of 2007 and is registered to do business in Connecticut. TUOL, LLC was purportedly involved in operating talent competitions through the Internet.

N.   **MKCM Merger Sub, LLC**

MKCM Merger Sub, LLC is a Delaware Limited Liability Company that was established in or around November of 2010, is registered to do business in Connecticut and was created as part of the contemplated acquisition of Atlantic Asset Management.

O.   **MK Special Opportunity Fund, Ltd.**

MK Special Opportunity Fund, Ltd. is a Cayman Islands Limited Company that was established in or around September of 2007 with the name ISI Special Opportunities Fund, Ltd. The name of the fund was changed to MK Special Opportunities Fund, Ltd. in October 2008. SOF's purported investment objective is to achieve significant risk-adjusted capital appreciation through the application of the multi-manager asset-allocation strategy of MKCM, SOF's investment manager, and, possibly, by making direct investments on an opportunistic basis.

P.   **MK Venezuela Fund, Ltd.**

MK Venezuela Fund, Ltd. is a Cayman Islands Limited Company that was established in or around August of 2008 and purportedly began winding down on or about May 2010. MKV's purported investment strategy seeks to take advantage of current opportunities in the Bolivarian Republic of Venezuela credit spectrum including arbitrage between the Venezuelan Bolivar (VEF) and the US dollar (USD), as well as high returns currently being offered by Venezuelan USD-denominated international bonds.

Q.    **Short Term Liquidity Fund I, Ltd.**

Short Term Liquidity Fund I, Ltd. is a Cayman Islands Limited Company that was

established in or around June of 2008. STLF's purported primary investment strategy seeks to

take advantage of products offered in the global fixed income and derivatives markets to

generate gains through short-term (under one year) investments in sovereign securities,

particularly those subject to currency arbitrage opportunities in their country of issuance, due to a

particular country's exchange rate policy. MKCM is STLF's Investment Manager as well as

STLF's Administrator.

## IV.    SUMMARY OF RECEIVERSHIP OPERATIONS AND FINDINGS TO DATE

As described above, the Amended Receiver Order directs the Receiver to identify, locate,

recover and preserve all assets of the Receivership Estate for liquidation and distribution to the

appropriate parties. Accordingly, the Receiver Team has been primarily focused on the following

activities: (1) establishing and operating the Receivership Estate; (2) analyzing the operations of

the Receivership Entities; (3) investigating the Receivership Entities' financial condition; (4)

evaluating and preserving Receivership Estate assets; (5) understanding, evaluating and advising

upon the private equity investments; and (6) investigating and analyzing claims against third

parties. This section of the Report summarizes the actions taken to date by the Receiver Team

within each of these broad categories.

A.    **Establishing and Operating the Receivership Estate**

Before the Receiver's appointment, the Court appointed two Business Advisors, Victor

Mandel and Deborah Midanek, to advise the Court with regard to certain private equity

investments that had been made by the Receivership Defendants. *See* Order dated January 25,

2011, Docket No. 27. Upon the Receiver's appointment on February 3, 2011, he retained Baker

& Hostetler LLP ("BH") to act as his counsel, who then formally retained the Business Advisors.

After the Court entered the Amended Receiver Order, the Receiver directed BH to retain the forensic accounting firm of FTI Consulting, Inc. ("FTI") as consultants to assist with the analysis of the financial condition and activities of the Receivership Entities. The Court approved the retention of FTI on February 14, 2011. *See* Order Authorizing Receiver to Retain FTI Consulting, Inc. *nunc pro tunc* as of February 7, 2011, Docket No. 91. Because certain of the Receivership Entities, including STLF, SOF, and MKV, are organized, domiciled and operate pursuant to Cayman Islands law, the Receiver is in the process of retaining the Cayman Islands law firm of Higgs & Johnson ("H&J") to provide legal advice with respect to Cayman Islands law. The Court approved the retention of H&J on March 23, 2011. *See* Order Authorizing Receiver to Retain Higgs & Johnson as Special Counsel, Docket Nos. 130-131.

1.      Cash on Hand and Receiver's Receipts and Disbursements

The Receiver has opened accounts on behalf of the Receivership Estate. The primary account (the "Receivership Account") was opened on February 17, 2011. The Receivership Account holds any receipts received and is used to pay operating expenses such as payroll and rent. Creating segregated accounts controlled by the Receiver will ensure accuracy in the forensic accounting and complete control by the Receiver.

The Receiver personally approves all payments made by the Receivership Estate and has implemented procedures and internal controls to ensure that all payments and transactions are authorized by this Court's Orders and are necessary to preserve the Receivership Estate. With the assistance of FTI, the Receiver ensures that all transactions are accurately recorded and monitored.

Since the Receiver was appointed on February 3, 2011, the Receiver Team has marshaled approximately $5.4 million in cash through consolidation of Receivership Entity bank accounts and collection of outstanding receivables. For the period from February 3, 2011 through March

31, 2011, the Receiver has made approximately $362,000 in disbursements, for employee payroll and associated benefits and taxes, office rent, and for Receivership operating expenses, which include IT support and communications costs. The Receiver has also identified more than $3 million in accounts payable, including invoices for professional services for accountants, consultants and lawyers. As discussed more fully below, the Receiver is still in the process of determining the validity and amounts of the accounts payable, and ascertaining the priority in which they should be paid.

## 2.   Communications with Investors

Before the Receiver was appointed, the Court had been contacted by certain investors who then filed notices of appearance as "Interested Parties" in the Enforcement Action. The Receiver Team has been in regular communication with the Interested Parties. The Receiver Team has also received calls and correspondence from other purported investors and creditors and is in the process of communicating with those parties to ascertain the nature and validity of their claims. To facilitate communications with investors, the Receiver Team is in the process of setting up a website through which investors and claimants may access information relating to the status of the Enforcement Action and the Receivership.

## 3.   Notice to Third Parties

As required by the Amended Receiver Order and the Initial Receiver Order, the Receiver Team promptly served the Receiver Orders and the Temporary Asset Freeze Orders, together with a notice letter (the "Notice Letter"), on third parties known to have an interest in the Receivership Estate and/or its assets. An example of the Notice Letter is attached as Appendix 7.

### a.   Financial Institutions

On February 7, 2011, the Receiver Team began serving the Initial Receiver Order on banks, brokerage houses, and financial institutions that appeared to have conducted business with

the Relief Defendants. On March 8, 2011, the Receiver Team began serving the Amended

Receiver Order on all banks, brokerage houses, and financial institutions that appeared to have

conducted business with the Receivership Entities.

The Receiver directed each of the financial institutions served with the Notice Letters and

Receiver Orders to freeze any of the Receivership Entities' assets in its possession and to serve

on the Receiver a certification or statement setting forth a description of any assets traceable to a

Receivership Entity in its possession as of the date of the receipt of the Receiver Order.

b.    Known Creditors

The Receiver Team also served the Notice Letter, Asset Freeze Order and Receiver

Orders on known potential creditors. Based on interviews with former employees, interviews

with certain vendors, documents collected at the Receivership Entities' office and documents

provided by the vendors, the Receiver Team has identified a number of vendors that had ongoing

contracts and/or were apparently owed money by the Receivership Entities.

In conjunction with the wind-down of the Receivership Entities' operations, the Receiver

Team has advised vendors providing business services that he is or will be terminating their

contracts effective no later than April 30, 2011. Non-essential services have been terminated on a

rolling basis.

The Receiver has also been contacted by a number of vendors who purportedly provided

consulting services to the Receivership Entities before the SEC brought the Enforcement Action.

The Receiver is in the process of interviewing these vendors to better understand the nature of

their arrangements with the Receivership Entities and the representations that were made by the

former officers, directors and/or principals of the Receivership Entities before the appointment of

the Receiver.

The Receiver has also received inquiries from other individuals and entities who assert that they are creditors of the Receivership Estate, and the Receiver Team is currently investigating the nature of these claims as well.

c.   Employees

Upon commencement of the Receivership, the Receiver Team began interviewing the employees, officers and directors of the Receivership Entities to gain information relevant to the location and recovery of assets. Before March 1, 2011, many of these interviews were conducted with the presence of the Receivership Entities' former counsel. Upon gaining greater control and authority over the Receivership Entities in the Amended Receiver Order, the use of separate counsel for the Receivership Entities was discontinued. Beginning in March 2011, the Receiver began terminating employees, and the last employee was terminated effective March 31, 2011. All officers, directors and employees who were employed by the Receivership Entities at the time of the Receiver's appointment were provided notice of such appointment.

d.   District Courts In Locations Where Receivership Estate Property Is Or May Be Located

To obtain jurisdiction and control over Receivership Estate assets pursuant to 28 U.S.C. §§ 754, 959 and 1962, the Receiver filed the Original Receiver Order and the SEC Complaint, and then filed the Amended Receiver Order and SEC Amended Complaint, in the following judicial districts where the Receiver understands Receivership Estate assets may be located:

Northern District of California

Southern District of California

Eastern District of California

Central District of California, Western Division

District of Colorado

District of Delaware

Northern District of Florida

Middle District of Florida

Southern District of Florida

District of New Jersey

Southern District of New York

Eastern District of New York

District of Oregon

Northern District of Texas, Dallas Division

Western District of Texas, Austin Division

Eastern District of Texas, Tyler Division

Southern District of Texas, Houston Division

Eastern District of Wisconsin, Milwaukee Division

Western District of Wisconsin

   e. County Clerks in Locations Where Receivership Estate Real Property is Located

The Receiver is in the process of determining whether any real property, vehicles or other tangible property may be traceable or traced to assets of any Receivership Entity and, if appropriate, will seek an Order and Notice of Pendency to file with the County Clerk's office in each county where real property, vehicles or other tangible property that is traced or traceable to assets of any Receivership Entity is located.

   f. Representatives for Portfolio Company Investments by the Receivership Entities

As the SEC has detailed in its original and Amended Complaints, investor assets were commingled and misappropriated within the Receivership Entities. Specifically, certain assets

which properly belonged to the Funds were used to make private equity investments in various portfolio companies (the "Portfolio Companies"). Accordingly, the Receiver Team has been in contact with representatives of the Portfolio Companies to understand the nature of the Receivership Entities' investments in the Portfolio Companies, and maximize the value of these investments to the Receivership Estate. To date, the Receiver has undertaken considerable effort into understanding, examining and analyzing the past investments and relationships between the Receivership Entities and the Portfolio Companies and has identified 16 Portfolio Companies. The Receiver continues to investigate, examine, assess and negotiate appropriate resolutions to marshal these assets and monetize them in a manner most beneficial to the Receivership Estate.

B.      **Analyzing the Operations of the Receivership Entities**

The Receivership Entities conducted business primarily out of an office located at 350 Bedford Street in Stamford, Connecticut (the "Stamford Office"). MK International Advisory Services also maintained an office in Miami, Florida (the "Florida Office"), from which a few employees worked.[3] On February 4, 2011, the Receiver Team secured the premises of the Stamford Office by changing all locks. On or around March 16, 2011, the Receiver Team retrieved computers that had been used in the Florida Office.[4] To date, one employee has been retained on a part-time consulting basis to further assist in administration and asset recovery efforts. The Receiver anticipates entering into one additional consulting agreement with a former employee for the purpose of assisting in various asset recovery efforts.

---

[3] The Florida Office lease was terminated by MKG before the Receiver was appointed.

[4] The Stamford Office will remain open through April 2011.

1.      Employee Interviews

Beginning on February 4, 2011, the Receiver Team immediately began to collect and review the records of the Receivership Defendants and to interview witnesses and employees. At the time the Receiver was initially appointed, the Receivership Entities collectively employed approximately 11 individuals, almost all of whom worked in the Stamford Office. The Receiver Team interviewed the former employees, officers, and directors of the various Receivership Entities about the Receivership Entities' business operations, including electronic and hard copy recordkeeping systems and accounting procedures, and also about the existence and location of potential assets for the Receivership Estate. The employees did not appear to distinguish among the Receivership Entities and believed that they were employed by the MK Entities as a group. The recordkeeping by and among the Receivership Entities also confirmed that the Receivership Entities did not observe corporate formalities in their operations. Certain employees confirmed that funds were often received and transferred among the various Receivership Entities – without regard to corporate form, ownership, or source – in order to meet obligations as they were incurred.

2.      Analysis and Preservation of Electronic and Hard Copy Documents and Records

The Receiver Team has secured and preserved data from all of the computers located at the Stamford Office, and laptops that were purchased by Receivership Entities, loaned to outside consultants, and that have been returned by them. The Receiver has also preserved and collected the Blackberry PDA devices that were issued by the Receivership Entities. To date, the Receiver Team has secured, imaged or preserved: 8 servers; 19 desktop computers; 21 laptop computers; 56 removable media; 20 Blackberry PDAs; and 2 other electronic media.

The Receiver Team secured and collected all hard copy files and records – approximately 89 boxes of documents – from the Stamford Office. These documents are in the process of being electronically scanned and reviewed, with the originals transferred to a secure location.

The Receiver Team has also received approximately 100,000 pages of documents from third parties pursuant to voluntary document requests and subpoenas, with significant productions still to come. To date, FTI has processed over 730 GB of data (approximately 26 million pages) and the Receiver Team has begun a targeted and prioritized review of the data. Thus far, the Receiver Team has reviewed and analyzed several hundred thousand pages of both electronic and hard copy materials.

### C.      Investigating the Receivership Entities' Financial Condition

The Receiver has identified numerous accounts in which the Receivership Entities may have held an interest, and is in the process of securing and marshaling those assets where appropriate. The Receiver Team has also begun analyzing financial records of the Receivership Entities. As more fully discussed in the SEC Amended Complaint, certain financial information in the Receivership Entities' financial records has been found to be inaccurate, and documentation for certain transactions appears to be false, inadequate or incomplete. The Receiver Team is currently in the process of reconstructing several years of financial information. Because of the significant lack of documentation and evidence of extensive commingling among the Receivership Entities and other third parties, this process will be time-consuming but necessary for the Receiver to identify additional assets, trace the proceeds of the fraudulent conduct, evaluate claims of creditors and investors, and identify potential claims against former employees, third parties and others that may have received assets of the Receivership Estate.

D.     **Evaluating and Preserving Receivership Estate Assets**

As part of the effort to marshal, identify and secure potential assets of the Receivership

Estate, the Receiver Team has communicated – through counsel when appropriate – with

numerous individuals and entities who are believed to have information about Receivership

Estate assets. Initial interviews of the Receivership Entities' employees, officers and directors, as

well as communications with various Interested Parties and Portfolio Companies, have revealed

the identities of numerous other individuals and entities who might have relevant information,

including potential business associates and investors. A substantial portion of the Receiver's

work has consisted of the domestic and international investigation, collection and preservation of

the assets described below.

1.     Bank and Brokerage Accounts

As discussed above, the Receiver Team sought to locate and identify all domestic and

foreign bank accounts controlled by the Receivership Entities, as well as any banks, brokerage

houses and other financial institutions that had conducted or were conducting business with the

Receivership Entities. The Receiver relied in part on a list of financial institutions provided by

the SEC, but also identified additional entities through the investigation. In addition to serving a

Notice Letter, the Receiver Orders and Freeze Orders on each bank, brokerage house and

financial institution that may have held Receivership Estate assets, the Receiver requested from

each institution a statement of all accounts held in the name of or for the benefit of the

Receivership Entities and the balance in each account. The Receiver also sought to ensure that all

identified accounts were frozen and is in the process of following up with each financial

institution to obtain historical account information and account opening documents.

To date, more than 75 financial institutions have been identified at which the

Receivership Entities held or opened cash, trading and/or custody accounts. Some of these

accounts were closed, inactive or had a zero balance before the Receiver was appointed. Still other of these accounts are held outside of the United States, and the Receiver Team is taking steps to obtain control over the accounts that held Receivership Estate assets and to transfer, where appropriate, the remaining funds from such accounts to the custodial account(s) set up in the name of the Receiver. These efforts have included negotiations with foreign financial institutions to secure these assets, significant amounts of which are in the process of being transferred to domestic and international Receivership accounts.

The balance in the Receivership Account as of March 31, 2011 was approximately $5.1 million.

### 2.      Real Property

The Receivership Entities did not appear to directly hold any real property in their names, but the Receiver is currently investigating whether any real property, including property that may be located in Venezuela, was purchased with Receivership Estate assets and titled to others. The Receiver intends to vigorously pursue, with leave of the Court, the recovery of any and all real property traceable to investor assets, but held by others.

### 3.      Personal Property

The Receivership Entities did not appear to hold any personal property in their names, but the Receiver is currently investigating whether any personal property was purchased with Receivership Estate assets and titled to others. The Receiver intends to vigorously pursue, with leave of the Court, the recovery of any and all real property traceable to investor assets, but held by others.

### 4.      Business Property

The Stamford Office will remain open through April 2011. The contents of the Stamford Office, consisting of office furnishings, telephones, computers and electronics, will be liquidated.

A bidding process is in place and will be executed at the end of April. There were no tangible assets in the Florida office, as the space was rented furnished, aside from the computer equipment, which has been collected.

       5.     Portfolio Companies

As discussed above and in the SEC Amended Complaint, the Receivership Entities made investments into various Portfolio Companies, several of which filed appearances as Interested Parties in the Enforcement Action. These investments, taken together, represent a substantial portion of the Receivership Estate's assets.

       E.     **Analyzing Claims Against Third Parties**

As evidenced by the discussion above, the Receiver Team has focused its initial efforts primarily on locating and securing assets of the Receivership Estate. The Receiver Team has identified certain transfers for the benefit of others involving proceeds misappropriated from Receivership Entities. The Receiver's investigation of these and other claims against third parties are in the preliminary stages. The Receiver is not in a position at this time to report on such claims or predict the likelihood or extent of any recovery. The Receiver will not only have to assess the legal merits of any such claims, but will also have to make a practical evaluation of the potential benefit to the Receivership Estate weighed against the cost of pursuing each claim.

## V.     ASSET LIQUIDATION AND DISTRIBUTION OF PROCEEDS

As discussed above, the Receivership Entities' interests in the Portfolio Companies represent a significant portion of the Receivership Estate's assets. None of these assets are liquid or easily valued. As discussed above, the Receiver Team has been actively engaged in discussions with each of the Portfolio Companies.

## VI.    CLAIMS PROCESS

The Receiver Team is in the process of investigating the claims of potential creditors and setting up a website for creditors and other interested parties. The Receiver has also received notice of potential claims where the documentation supporting those claims is scant. Accordingly, the Receiver's investigation of such claims is in its preliminary stages, and thus the Receiver is not in a position at this time to report on such claims. Due to the lack of documentation from certain putative creditors, the Receiver's assessment of the validity and extent of these claims will need to be completed before an estimate of the total value of claims is made.

## VII.   CONCLUSION

While the Receivership was originally focused upon what appeared to be more technical violations of the securities laws, subsequent events – including the guilty pleas of Illarramendi, the arrests of Juan Carlos Guillen Zerpa and Juan Carlos Horna and the preliminary results of the Investigation – indicate that the vast majority of investor assets has been misappropriated or wrongfully transferred to others as part of a long-running fraudulent scheme. The duration of the scheme, the high number of transactions and the near-complete lack of supporting documentation will require additional and significant investigatory efforts. Because of the nature of the fraud, litigation may be necessary to recover the significant amount of assets of the

Receivership Entities that have been wrongfully transferred or otherwise held by third parties who either assisted or benefited from the fraud.

Dated:          April 4, 2011

By: _____/s/_____
            John J. Carney, Receiver, Esq.

and

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201

*Attorneys for Receiver, JOHN J. CARNEY, ESQ.*