UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. 11-0078 (JBA) |
| v. | ) ) ) | |
| FRANCISCO ILLARRAMENDI, HIGHVIEW POINT PARTNERS, LLC and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC, | ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| HIGHVIEW POINT MASTER FUND, LTD., HIGHVIEW POINT OFFSHORE, LTD., HIGHVIEW POINT LP, MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP, | ) ) ) ) ) ) ) ) ) | |
| Relief Defendants. | ) ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
APPLICATION FOR EMERGENCY RELIEF**

Plaintiff Securities and Exchange Commission respectfully submits this memorandum of law in support of its emergency application to prevent misappropriation of assets by Defendant Highview Point Partners, LLc ("Highview Point Partners") and to recover proceeds of the fraud received by Relief Defendants Highview Point Master Fund Ltd. ("HP Master Fund"), Highview Point Offshore Fund, Ltd. ("HP Offshore Fund"), and Highview Point LP ("HPLP") (collectively, the "Highview Funds").

## PRELIMINARY STATEMENT

On January 14, 2011, the Commission filed the original Complaint in this matter, alleging that Defendants Francisco Illarramendi ("Illarramendi") and Michael Kenwood Capital Management, LLC ("MK Capital Management") used $53 million of investor funds to make undisclosed, unauthorized investments in private equity deals in the names of the Relief Defendants Michael Kenwood Asset Management, LLC ("MK Asset Management"), MK Energy and Infrastructure LLC ("MK Energy") and MKEI Solar, LP ("MKEI Solar") (collectively, the "MK Relief Defendants"). The Commission sought such emergency relief after learning that Illarramendi was imminently making additional unauthorized use of investor funds. This Court held a series of hearings over the following weeks, and appointed two Business Advisers to evaluate the proposed private equity investments. On January 28, 2011, the Court entered an order freezing the assets of Illarramendi, MK Capital Management, and the MK Relief Defendants, and then held two additional hearings regarding the appointment of a receiver. On February 3, 2011, the Court appointed John J. Carney of Baker & Hostetler LLP as receiver ("Receiver"), an order which was subsequently expanded, upon motion of the Receiver, to cover a larger group of related companies owned and controlled by Illarramendi.

Since that time, the Commission's investigation and a parallel criminal investigation by the United States Attorney's Office for the District of Connecticut (the "USAO") have revealed

1

that the conduct described in the original Complaint was just a small subset of a broader

investment fraud scheme by Illarramendi.  In fact, Illarramendi has now admitted perpetrating an

enormous Ponzi scheme from at least 2006 through 2010 that has resulted in losses of hundreds

of millions of dollars.  On March 7, 2011, Illarramendi entered a guilty plea to counts of

securities fraud, investment adviser fraud, and wire fraud before the Honorable Stefan R.

Underhill in connection with the same conduct, as well for obstructing justice by providing a

false asset verification document to the Commission during this investigation.  *United States v.*

*Illarramendi*, 3:11CR-41 (SRU).  That same day, the Commission filed the First Amended

Complaint in this matter to add additional factual allegations relating to the admitted Ponzi

scheme and Illarramendi's attempt to obstruct the Commission's investigation with a phony

document.

      As described in the Second Amended Complaint, the Commission has determined that

from 2005 through mid-2010, Illarramendi caused Highview Point Partners and the Highview

Funds to engage in scores of extraordinarily complex and multi-layered transactions that are part

of the Ponzi scheme to which he has pled guilty.  Illarramendi conducted the fraud using both the

Highview Funds and the MK Funds, essentially operating them in tandem, engaging in many

related transactions between them, including purported loans and undocumented transfers of

cash.  The Second Amended Complaint alleges that, in a classic Ponzi-type scheme, Illarramendi

and Highview Point Partners misappropriated investor money from the Highview Funds, and

then Illarrmandi and MK Capital Management misappropriated investor money from the MK

Funds by transferring it to the Highview Funds so that Illarramendi could hide the

misappropriation in the Highview Funds.   The result of the scheme is that the Highview Funds

are both victims and beneficiaries of the fraud and are now holding tainted assets.

2

In mid-March 2011, the Commission learned that Highview Point Partners intended to wind up the Highview Funds and distribute the assets held by the Highview Funds to investors. Based on information provided by Highview Point Partners, it appears that Highview Funds currently have assets under management of approximately $230 million, of which approximately $200 million is currently held in cash in a Deutsche Bank account in Amsterdam. Although Highview Point Partners voluntarily agreed to suspend redemptions and distributions for a period of 60 days, that agreement expires on May 11, 2011.

As a result, the Commission seeks emergency relief to protect investors and preserve the status quo, including an immediate freeze of all assets owned and controlled by Highview Point Partners and the Highview Funds, the appointment of a Receiver, and a verified accounting of Highview Point Partners and the Highview Funds. Because of the extensive commingling of investor funds by Highview Point Partners and the MK Capital Management, an immediate redemption could work a substantial injustice on the MK Funds investors, and effectively continue the Ponzi scheme by inequitably distributing the remaining funds. In addition, the Court should appoint a Receiver to take immediate possession of the assets of Highview Point Partners and the Highview Funds, locate additional assets, and take other actions to preserve the status quo. The Commission also seeks verified accountings, the repatriation of assets, and an injunction against further violations.

3

## STATEMENT OF FACTS

The evidence supporting this emergency application[2] is set forth in the Declaration of

Sofia Hussain executed on May 6, 2011 ("Hussain Decl.") and the attached Exhibits C through

R, which are true copies of documents obtained by the Commission staff during the course of the

Commission staff's investigation that led to this action.

### Illarramendi Used a Shell Company to Funnel Highview Funds Money to Himself and Third Parties

Highview Point Partners is the investment adviser to the Highview Point Funds,

including the Highview Point Master Fund. Illarramendi was associated with Highview Point

Partners and was a part owner of Highview Point Partners from 2005 through 2010. On March

7, 2011, Illarramendi entered a guilty plea before the Honorable Stefan R. Underhill in the

related criminal case, admitting that he operated a massive fraudulent scheme beginning in 2006

that resulted in hundreds of millions of dollars in investor losses. *See* Criminal Information,

*United States* v. *Illarramendi*, 3:11 Cr. 41 (SRU) (Exhibit A). Specifically, Illarramendi

acknowledged under oath that he began the scheme to defraud in an effort to "conceal from the

investors and creditors the hole that existed between the fund assets and liabilities, which has

been estimated at exposing investors to potential losses in the hundreds of millions of dollars."

Transcript of Defendant's Waiver and Plea, *United States* v. *Illarramendi*, 3:11 Cr. 41 (SRU)

(March 7, 2011), at 40 (Exhibit B). While Illarramendi did not identify the fund or the investors

by name during the plea allocution, the Commission has learned through this investigation that

the fund where Illarramendi's fraudulent scheme began was the Highview Point Master Fund.

---

[2] Because all of the allegations set forth in the Second Amended Complaint with respect to Illarramendi's fraud in connection with the Michael Kenwood Group are virtually identical to the allegations in the Commission's previously filed complaints, this Statement of Facts references only the new allegations relating to Highview Point Partners and/or the Highview Funds.

4

As an example of the methods used to perpetuate the fraudulent scheme, from 2006 through at least 2008, Illarramendi and Highview Point Partners repeatedly transferred money from the Highview Funds to an offshore entity called Naproad Finance, S.A. ("Naproad"). Highview Point Partners falsely listed the Naproad transfers on the Highview Funds' books as "investments" in Venezuelan bonds; in truth and in fact, Naproad was an entity controlled by Illarramendi that was used to funnel money to himself, other entities he controlled or to third parties. Indeed, the Naproad bank statements list its address as the same as Highview Point Partners' and the statements were delivered "in care of" Highview Point Partners. *See* Exhibit C to Hussain Decl. Moreover, Highview Point Partners had formal power of attorney over Naproad. *See* Exhibit D to Hussain Decl.

The bank and brokerage statements for Naproad reveal the sham nature of the transactions and the misappropriation of investor monies from the Highview Funds. For example, on January 5, 2006, Illarramendi and Highview Point Partners caused $5.5 million to be transferred from the Highview Funds to Naproad. *See* Exhibit E to Hussain Decl. Between January 6 and January 13, 2006 they caused $5.2 million of that amount to be wired to a Highview Funds' investor, $50,000 to be wired to Illarramendi's personal bank account, and $100,000 to be wired to the personal bank account of an individual who co-owned Highview Point Partners with Illarramendi. *See* Exhibit F to Hussain Decl. In another transaction on February 1, 2006, Illarramendi and Highview Point Partners caused $9.5 million to be transferred from the Highview Funds to Naproad. *See* Exhibit G to Hussain Decl. The next day, the total amount was wired to another company controlled by Illarramendi. *See* Exhibit H to Hussain Decl. Similarly, on February 7, 2006, $10 million was transferred from the Highview Funds to

Naproad. *See* Exhibit I to Hussain Decl. The next day, the total amount was wired to the same Illarramendi-controlled company. *See* Exhibit J to Hussain Decl.

From January 2006 to October 2008, the Highview Funds made transfers totaling $283 million to Naproad, and during that period, the Highview Funds received $143 million back from Naproad. *See* Exhibit K to Hussain Decl. Highview Point Partners falsely recorded those transfers as purchases and sales of "corporate bonds" or "corporate debt" on its trade blotter and monthly portfolio valuation reports. *Id.*

### Illarramendi Misappropriates Money from Highview Funds and Uses Money from MK Funds to Hide the Losses

As described below, during at least 2009 and 2010, Illarramendi and Highview Point Partners used money from the Highview Funds to make payments to various offshore entities. As described below, Illarramendi then "repaid" the Highview Funds by transferring money from the MK Funds to them, as purported returns on investments.

Between May 2009 and September 2009, Illarramendi caused the Highview Funds to transfer $79 million (almost 45% of the Highview Funds' assets) to various offshore third parties. Approximately $10 million of the $79 million was used by Highview Point Partners to repay its own debt to a third party. *See* Exhibit L to Hussain Decl. These cash transfers were all falsely recorded on the Highview Funds trade blotter variously as "investments" in certain entities or in the MK Venezuela Fund. By the end of 2009, Illarramendi and Highview Point Partners began falsely recording the entire $79 million on the Highview Funds books as an investment with the MK Venezuela Fund.

On December 30, 2009, to avoid having the MK Venezuela Fund investment on the Highview Funds books at year's end, and to attempt to evade scrutiny from the Highview Funds' auditors, Illarramendi caused a different MK Fund (the MK Special Opportunities Fund) to

6

transfer $99 million in cash to the Highview Funds, $91 million of which was as a purported redemption of the $79 million MK Venezuela Fund investment, with interest. *See* Exhibits M and N to Hussain Decl. The result was that Illarramendi and Highview Point Partners had misappropriated $79 million from the Highview Funds during 2009 (including the $10 million used to repay Highview Point Partners' own debt) and then replaced those misappropriated assets with $91 million from a different set of investors in the MK Funds.

Illarramendi essentially repeated this shell game in 2010. Between January 2010 and March 2010, Illarramendi and Highview Point Partners caused the Highview Funds to transfer approximately $90 million to various offshore third parties. Again, the transfers were falsely recorded in the Highview Funds' trade blotter as purported investments in the MK Venezuela Fund. *See* Exhibits M and N to Hussain Decl. Of that $90 million, at least $24 million was misappropriated by Illarramendi to pay operating expenses for a private company he controlled and another $5 million was used to purchase a private plane. *See id.*

As with the prior year, Illarramendi "repaid" the misappropriated assets to the Highview Funds using money from other investors. In May 2010, Illarramendi and Highview Point Partners caused the MK Venezuela Fund to transfer $94 million to the Highview Funds. Again, this payment was falsely characterized on the Highview Funds' books as representing repayment plus interest of their interest in the MK Venezuela Fund. Similar to 2009, the result was that Illarramendi and Highview Point Partners had misappropriated $90 million from the Highview Funds and then replaced those misappropriated assets with $94 million from a different set of investors in the MK Funds. *See* Exhibit Q to Hussain Decl.

In 2010, after the Commission staff requested documentation of transactions, Illarramendi and Highview Point Partners created phony loan documents purporting to document

7

loans between the Highview Funds and the MK Venezuela Fund, in an attempt to conceal their misappropriation of approximately $169 million in investor assets from the Highview Funds. In fact, no such loans existed.

### Illarramendi Made False and Misleading Statements to the Highview Funds Investors Regarding Use of Investor Funds

All of the above transactions and uses of investor funds were wholly inconsistent with the representations made by Illarramendi and Highview Point Partners to investors regarding the Highview Funds. Between 2006 and 2010, Highview Point Partners falsely reported to investors that the Highview Funds were profitable during the relevant time period. For example, Highview Point Partners falsely claimed that, from the Highview Funds' inception in June 2005 through at least October 2008, it had profits for 40 consecutive months. In periodic statements to investors, Highview Point Partners did not disclose that the Highview Funds' investment "returns" were actually Ponzi payments received from related entities. *See* Exhibit R to Hussain Decl. Highview Point Partners and Illarramendi also failed to disclose that they used millions in investor funds for non-investment activity and to pay debts and expenses of Highview Point Partners.

The Commission staff has interviewed a Florida resident who was an investor in HPLP (the "Florida Investor"). The Florida Investor advised Commission staff that he understood that his funds would be used to make investments in developing economies and he was unaware of any transactions with related parties.

8

**ARGUMENT**

I.   **DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED
      AND PRELIMINARILY ENJOINED FROM FURTHER
      VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

15 U.S.C. § 77t(b) and Section 21(d) of the Securities and Exchange Act of 1934, 15

U.S.C. § 78u(d), entitle the Commission to temporary and injunctive relief against future

securities law violations upon a "substantial showing of likelihood of success as to both a current

violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998).

Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged

with safeguarding the public interest in enforcing the securities laws," its burden to secure

temporary or preliminary relief is less than that of a private party. *SEC v. Mgmt. Dynamics, Inc.*,

515 F.2d 801, 807 (2d Cir. 1975). It need not show irreparable injury, a balance of equities in its

favor, or the unavailability of remedies at law. *Id.* at 808; *SEC v. Bonastia*, 614 F.2d 908, 912

(3d Cir. 1980); *SEC v. Graystone Nash, Inc.*, 820 F. Supp. 863, 875 n.13 (D.N.J. 1993), *rev'd on

other grounds*, 25 F.3d 187 (3d Cir. 1994). Instead, the Commission need only make a "proper

showing" of violative activity to obtain a temporary restraining order or preliminary injunction

against statutory violations. *See Cavanagh*, 155 F.3d at 132; *Mgmt. Dynamics*, 515 F.2d at 807;

*Bonastia*, 614 F.2d at 912 ("reasonable likelihood" of repetition must be shown).

The Commission meets this standard without difficulty under these circumstances.

Highview Point Partners violated the antifraud provisions of the Advisers Act of 1940 (the

"Advisers Act") and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. If a

temporary restraining order is not entered, Highview Point Partners' conduct will continue to

harm investors, including investors in the MK Funds.

### A. The Commission Has Made a Substantial Showing that Highview Point Partners Violated The Antifraud Provisions of the Advisers Act.

Section 206 of the Advisers Act prohibits fraud by investment advisors. Highview Point Partners is an "investment adviser," as defined by Advisers Act Section 202(a)(11), and indeed, has been registered as an investment adviser with the Commission since 2005. Highview Point Partners is also the named investment adviser to the Highview Funds. Thus, it can be charged with violations of the Advisers Act.

Sections 206(1) and 206(2) of the Advisers Act prohibit fraudulent conduct by investment advisers. The Supreme Court has interpreted Sections 206(1) and 206(2) to impose a fiduciary duty on investment advisers, requiring an affirmative obligation of utmost good faith, and full and fair disclosure of all material facts to an investment adviser's clients, as well as an affirmative obligation to employ reasonable care to avoid misleading its clients. *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 194 (1963). This fiduciary duty requires investment advisers to act for the benefit of their clients, and precludes investment advisers from using their clients' assets to benefit themselves. Scienter is necessary to violate Section 206(1) of the Advisers Act, but scienter is not required to prove violations of Section 206(2) of the Advisers Act. *See Steadman v SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981). For purposes of Sections 206(1) and 206(2), the advisor's client is the fund and not the investors in the fund. *See Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006).

Here, Highview Point Partners, acting through at least Illarramendi, engaged in a practice and course of business that operated as a fraud and deceit upon the Highview Funds and the MK Funds. Specifically, from 2005 through fall 2010, Illarramendi caused Highview Point Partners and the Highview Funds to engage in scores of extraordinarily complex and multi-layered transactions as part of a fraudulent scheme. Illarramendi conducted the fraud using the

Highview Funds and the MK Funds in tandem, engaging in many related transactions between the two groups which included purported loans and extensive undocumented transfers of cash. In addition, Highview Point Partners has taken substantial unearned compensation directly from the Highview Funds in the form of advisory fees based on fund performance and a percentage of assets under management. Because Highview Point Partners inflated both the performance and asset under management for the Highview Funds, those fees were unearned and fraudulently obtained.

Thus, in violation of Sections 206(1) and 206(2), Highview Point Partners failed to act for the benefit of the Highview Funds by, among other things, misappropriating Highview Fund assets for its own use and the use of its principal. *See, e.g., SEC v. Trabulse*, 526 F. Supp. 2d 1008, (N.D. Cal. 2007) (finding manager of fund violated Sections 206(1) and 206(2) of the Advisers Act when he used fund monies for his personal expenses). Moreover, with respect to Section 206(1), Highview Point Partners acted with the requisite scienter because, among other things, Illarramendi personally directed the misuse of the Highview Funds assets and knew that the assets were not being used for the purposes disclosed to investors.[3]

Highview Point Partners also violated Section 206(4) of the Advisers Act, which prohibits investment advisors from engaging in any "act, practice or course of business which is fraudulent, deceptive, or manipulative" in interstate commerce. 15 U.S.C. §80b-6(4). Rule 206(4)-8 promulgated thereunder defines as a fraudulent practice an investment adviser's making false statements of material fact to any investor or prospective investor in a pooled investment vehicle, or failing to state material facts necessary to make statements made to such investors not

---

[3]    The knowledge of individuals who exercise substantial control over a corporation's operation is properly imputed to the corporation. *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999).

misleading. 17 C.F.R. § 275.206(4)-8 (effective Sept. 10, 2007). Scienter is not required to find

a violation of this Rule. *Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*

(SEC Rel. No. IA-2628, Aug. 9, 2007). Section 206(4) and Rule 206(4)-8 are applicable because

the Highview Funds are "pooled investment vehicles."[4] As a result of the materially misleading

statements and omissions made after September 10, 2007 to Highview Fund investors, Highview

Point Partners violated Section 206(4) and Rule 206(4)-8.

B.   **The Commission Has Made a Substantial Showing that**
**Highview Point Partners Violated Section 10(b) of the**
**Exchange Act and Rule 10b-5 Thereunder.**

Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. 240.10b-5] prohibit the use of fraudulent devices in the offer or sale of securities.

Misrepresentations are deemed to violate those provisions if they are: (1) material; (2) made in

the offer and sale or in connection with the purchase or sale of securities; and (3) made with

scienter. All the required elements are present here.

1.   **Highview Point Partners Made Material Misrepresentations**

Statements are material if a reasonable investor would consider them important in the

total mix of information available. *Basic, Inc.* v. *Levinson*, 485 U.S. 224, 231-32 (1988). Here,

statements made by Highview Point Partners were material, because a reasonable investor would

want to know, for example, that the Highview Funds' investment "returns" were actually Ponzi

payments received from related entities, and that its adviser was using millions in investor funds

for non-investment activity and to pay debts and expenses of Highview Point Partners. *See SEC*

*v. Prater*, 289 F.Supp.2d 39, 52-53 (D.Conn. 2003) (reasonable investor would want accurate

---

[4]   A pooled investment vehicle is defined under Rule 206(4)-8 to include, among other vehicles, any
investment company defined in Section 3(a) of the Investment Company Act. The Funds are
investment companies under Section 3(a).

information about companies involved in investment scheme); *SEC v. Gallard*, 1997 WL 767570, *3 (S.D.N.Y. Dec. 10, 1997) (promises to invest in fictitious "prime bank guarantees").

### 2.    The Misrepresentations Concerned the Sale of Securities

Fraudulent statements are "in connection with" the purchase or sale of securities as long as they "touch" upon the purchase or sale of securities. *Supt. of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12-13 (1971). Here, Highview Point Partners used the false statements described above to obtain and to retain (*i.e.*, prevent redemption of) money from investors. The use of false statements in that fashion satisfies the "in connection with" requirement. *See, e.g., U.S. v. Kendrick*, 692 F.2d 1262, 1266 (9th Cir. 1982) (misrepresentations that money borrowed from margin account would be used to purchase securities); *Gaudette v. Panos*, 644 F.Supp. 826, 833 (D.Mass. 1986) (misrepresentations about how broker would manage client's investments).

### 3.    Highview Point Partners Acted with Scienter

Scienter is a mental state embracing intent to deceive or defraud and includes recklessness. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976); *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978). Here, Illarramendi's scheme to mislead investors about the use of their funds -- which included misrepresentations that investors' money would be used to make investments in developing economies, that the Highview Funds were profitable as a result of investment activity, and that the Highview Funds had profits for 40 consecutive months, when in reality, at least some of the investment "returns" were actually Ponzi payments received from related entities -- demonstrates a high degree of intent to defraud. Illarramendi's scienter, as an owner and associated person of Highview Point Partners, is attributable to Highview Point Partners. *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999).

13

C.      **The Defendants Are Likely to Continue Their Illegal Conduct**

Highview Point Partners, acting through at least Illarramendi, has engaged in a series of improper transactions in furtherance of a massive scheme to defraud investors. Highview Point Partners has expressed its intention to distribute the assets currently held by the Highview Funds to the investors in those Funds, most of whom are offshore entities. If Highview Point Partners is allowed to do so, that action will be in furtherance of Illarramendi's massive fraud and will deprive defrauded investors in the MK Funds which are also victims of Illarramendi's scheme, of the possibility for potential recovery. A temporary restraining order is therefore warranted to preserve the *status quo* pending a preliminary injunction hearing. *See e.g., Bonastia*, 614 F.2d at 912 (citing *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975)).

II.     **THE COURT SHOULD GRANT ADDITIONAL RELIEF TO FACILITATE THE PRESERVATION OF INVESTOR ASSETS AND PROSECUTION OF THE CASE**

A.      **The Court Should Order the Appointment of a Receiver**

The Court should appoint a receiver for Highview Point Partners and the Highview Funds. Courts will appoint a receiver where necessary (1) to preserve the *status quo* while various transactions are being unraveled so as to determine an accurate picture of the fraudulent conduct, *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105; (2) to protect those already injured from "further despoliation of their property or rights," *Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964); (3) to prevent the dissipation of assets pending further action by the court, *SEC v. American Board of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987); (4) to install a responsible officer of the court who could bring companies into compliance with the law, *id.* at 437; or (5) to place hopelessly insolvent entities in bankruptcy to effect their liquidation, *id.* at 436. A receiver will ensure that the funds will be protected and appropriate decisions can be made about the use of investor assets. A receiver also will be able to ensure that

14

an accounting is performed in order to account for all uses and locations of investor assets.

**B.**     **The Court Should Enter an Asset Freeze and Repatriation Order**

In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment

interest thereon and civil penalties. The ancillary remedy of an immediate freeze of the assets

under the direct or indirect control of Highview Point Partners and the Highview Funds is

appropriate here to ensure that sufficient funds will be available to satisfy any final judgments

the Court might enter against the those parties, and to protect those assets against dissipation.

Exchange Act Section 21(d)(5); *see SEC v. Unifund, SAL*, 910 F.2d 1028, 1041-42 (2d Cir.

1990) (asset freeze was warranted in amount sufficient to satisfy potential judgment for penalties

in insider trading case); *SEC v. Infinity Group Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (purpose of

asset freeze is to preserve status quo by preventing dissipation and diversion of assets).

The Court's equitable power to freeze a defendant's assets in order to prevent their

dissipation or transfer is well-established. *See Manor Nursing Centers, Inc.*, 458 F.2d at 1105-06

(freezing defendant's assets where "uncertainty existed with respect to the total . . . proceeds and

their location . . to preserve the status quo [while ascertaining] the whereabouts of the

proceeds[.]"); *SEC v. Cherif*, 933 F.2d 403, 416-17 (7th Cir. 1991), cert. denied, 112 S.Ct. 966

(1997); *see also* 15 U.S.C. § 78u(d)(5) [Exchange Act, § 21(d)(5)] (court may grant any

equitable relief appropriate or necessary for benefit of investors). The purpose of the asset freeze

is "to facilitate enforcement of any disgorgement remedy that might be ordered in the event a

violation is established at trial." *SEC v. Coates*, 1994 WL 455558 (S.D.N.Y.) at *1 , No. 94 Civ.

5361 (KMW). When there are concerns that defendants might dissipate assets, a court need only

find some basis for inferring a violation of federal securities laws in order to impose a freeze

order. *See Unifund, SAL*, 910 F.2d at 1041. The Second Circuit has instructed courts to consider

15

any potential harm that could result from an asset freeze, such as disruption of an ongoing concern that might otherwise provide funds to investors, and weigh the need for an asset freeze against the "disadvantages and possible deleterious effect" on the parties whose assets are to be frozen. *See, e.g., Manor Nursing Centers, Inc.*, 458 F.2d at 1106 (upholding temporary freeze of defendant's assets to preserve the *status quo*, notwithstanding potential harm to "defendants' business affairs.").

Moreover, the Court can order freezes against relief defendants who are "not accused of wrongdoing in a securities enforcement action where that [entity]: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *Cavanagh*, 155 F.3d at 136 (freezing proceeds of stock in possession of relief defendant). Indeed, where the Commission seeks to freeze the assets of a relief defendant, it must only demonstrate "that it is likely to succeed on the merits [and] need not make any showing that a future violation is likely, because it is not accusing the nominal defendant of any wrongdoing." *Id.*

It is black letter law that the Court may order an asset freeze where the funds are subject to eventual disgorgement, <u>even where certain of the funds may not be traceable to the fraud</u>. *See, e.g., Manor Nursing Centers, Inc.*, 458 F.2d at 1105-06 (permitting broad, temporary asset freeze to preserve status quo while trustee "unraveled what was necessary to obtain an accurate picture of what transpired."); *SEC v. Spongetech Delivery Systems, Inc.*, 2011 WL 887940 at *9 (E.D.N.Y.), Fed. Sec. L. Rep. P. 96,246 (ordering freeze of defendant's assets not traceable to the fraud, where the amount frozen was "an approximation of defendant's maximum [disgorgement] liability."); *SEC v. Sekhri*, 2000 WL 1036295 (S.D.N.Y.) at *1 (denying application to release frozen funds that were not traceable to the defendant's fraud) (unreported case); *SEC v. Current Fin. Servs.*, 62 F. Supp. 2d 66, 68 (D.D.C. 1999) (refusing to release

personal funds not traceable to the fraud because defendant's liability exceeded the total funds frozen); *SEC v. Grossman*, 887 F.Supp. 649, 661 (S.D.N.Y. 1995) (freezing personal assets of defendant's wife and daughter, finding it "irrelevant whether the funds affected by the [asset freeze] are traceable to the illegal activity, as [the defendants] are jointly and severally liable[.]"); *SEC v. Glauberman*, 1992 WL 175270, at *2 (S.D.N.Y.) (rejecting defendant's argument that the SEC must trace proceeds "dollar for dollar" in order to freeze assets, and noting that a defendant "cannot take refuge in having commingled his profits.") (unreported case).

The Commission has demonstrated significant cause for concern about the safety of investor assets, and given the complexity of the fraud, it is impossible at this stage to trace every penny held by Highview Point Partners and the Highview Funds as proceeds of the fraud. Illarramendi's scheme to defraud investors was complex and multi-layered, and occurred over several years with the use of multiple funds and accounts, both onshore and offshore. And, as he has admitted in open court, Illarramendi's fraud resulted in hundreds of millions of dollars in investor losses, which will be subject to disgorgement in the event he is found liable. Nonetheless, the complexity of the fraud, and in particular, the commingling of Highview and MK Funds, has prevented the Receiver and the Commission from providing a full and complete accounting of all of the fraudulent transactions.

Accordingly, a complete asset freeze of all funds held by Highview Point Partners and/or the Highview Funds is crucial to prevent: (a) further misappropriation or dissipation of assets and (b) inequitable distributions to some investors to the detriment of other investors, when all investors were injured by what is clearly a single fraudulent scheme. The Commission and the Receiver will continue to work in the interim to ascertain investor losses and create a distribution plan for the assets held in the Receivership Estate, an asset freeze to preserve the *status quo* –

17

even over assets not directly traceable to the fraud – is both necessary and appropriate at this early stage in the litigation.

Finally, it appears that Highview Point Partners has used offshore accounts to facilitate some of the transactions, and indeed, the largest amount of assets currently held by the Highview Funds is in an offshore bank account in Amsterdam. This use of offshore accounts necessitates a repatriation order, which falls within a federal court's broad equitable authority. *See generally SEC v. Infinity Group Co.*, 212 F.3d 180, 197 (3d Cir. 2000). Accordingly, the Commission further seeks a repatriation order to ensure that full recovery of the proceeds of the fraud alleged herein.

### C.     The Court Should Order An Accounting

Courts may impose the equitable remedy of a sworn accounting to provide an accurate measure of unjust enrichment and defendants' current financial resources. *See, e.g., Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105; *SEC v. Lybrand*, No. 00 Civ. 1387(SHS), 2000 WL 913894, at \*12 (S.D.N.Y. July 6, 2000); *SEC v. Margolin*, No. 92 Civ. 6307(PKL), 1992 WL 279735, at \*7 (S.D.N.Y. Sept. 30, 1992). In this case, bank records obtained so far indicate complex chains of questionable transfers of money among the Defendants, the Relief Defendants and the MK and Highview Funds. An accounting is critical for determining the amount of unjust enrichment, and the assets available for disgorgement.

### D.     The Court Should Order Expedited Discovery and Prohibit the Destruction of Documents

The Court should order expedited discovery under Federal Rules 30(a), 33(a) and 34(b) to allow the Commission to supplement its motion for a preliminary injunction. Expedited discovery is needed to enable the Commission to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at a hearing on

18

the preliminary injunction motion.  Expedited discovery will also assist the Commission in locating additional assets and effectuating any order entered by the Court freezing Highview Point Partners and Highview Funds' assets.  Likewise, the Court should enter an order prohibiting Highview Point Partners and Highview Funds, or any of their agents, from destroying and altering documents to preserve as much of the evidence as possible.

## CONCLUSION

For the foregoing reasons, and those set forth in the accompanying Declarations

and exhibits, the Commission respectfully requests that its application be granted.

Dated:      Boston, MA
            May 6, 2011

Respectfully submitted,

**SECURITIES AND EXCHANGE
COMMISSION**

By its attorneys,

Rua M. Kelly (Mass. Bar No. 643351)
LeeAnn G. Gaunt (Mass. Bar No. 630557)
Carlos Costa-Rodrigues (NY Reg. No. 2473593)
33 Arch Street, 23rd Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8941 (Kelly direct)
Facsimile:  (617) 573-4590
E-mail:  kellyru@sec.gov

Local Counsel:

/s/
John B. Hughes (Fed. Bar No. CT 05289)
Assistant United States Attorney
Chief, Civil Division
United States Attorney's Office
Connecticut Financial Center
157 Church Street, 23rd Floor
New Haven, CT 06510
(203) 821-3700
(203) 773-5373

20