UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE
COMMISSION,
                                    Plaintiff,
v.

FRANCISCO ILLARRAMENDI
HIGHVIEW POINT PARTNERS, LLC and
MICHAEL KENWOOD CAPITAL
MANAGEMENT, LLC,
                                    Defendants,

and

HIGHVIEW POINT MASTER FUND, LTD.,
HIGHVIEW POINT OFFSHORE, LTD.,
HIGHVIEW POINT LP,
MICHAEL KENWOOD ASSET
MANAGEMENT, LLC, MK ENERGY AND
INFRASTRUCTURE, LLC, and MKEI
SOLAR, LP,
                                    Relief Defendants.

11-CV-00078 (JBA)

**FIRST INTERIM APPLICATION FOR
FEES AND EXPENSES BY THE
RECEIVER AND HIS ADVISERS**

John J. Carney, Esq.
Receiver for the Assets of Highview Point Partners, LLC,
The Michael Kenwood Group, LLC; Michael Kenwood
Capital Management, LLC; Highview Point Master Fund,
LTD, Highview Point Offshore, LTD; Highview Point LP;
Michael Kenwood Asset Management, LLC; MK Energy
and Infrastructure, LLC; MKEI Solar, LP; MK Automotive,
LLC; MK Technology, LLC; Michael Kenwood
Consulting, LLC; MK International Advisory Services,
LLC; MKG-Atlantic Investment, LLC; Michael Kenwood
Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC;
MKCM Merger Sub, LLC; MK Special Opportunity Fund,
Ltd.; MK Venezuela Fund, Ltd.; and Short Term Liquidity
Fund I, Ltd.

and

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201
Attorneys for Receiver, JOHN J. CARNEY, ESQ.

TO:     THE HONORABLE JANET B. ARTERTON
        UNITED STATES DISTRICT JUDGE

John J. Carney, Esq., Court-appointed Receiver for the assets of The Michael

Kenwood Group, LLC; Michael Kenwood Capital Management, LLC ("MKCM"); Michael

Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP;

MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK

International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood

Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC; (collectively,

the "MK Entities"); MK Special Opportunity Fund, Ltd. ("SOF"); MK Venezuela Fund, Ltd.

("MKV"); and Short Term Liquidity Fund, I, Ltd. ("STLF") (collectively, together with the

MK Entities, the "Receivership Entities"), and Baker & Hostetler LLP (B&H), as counsel for

the Receiver, hereby submit this application (the "Application") for allowance of

compensation and reimbursement of expenses incurred by the Receiver, B&H and FTI

Consulting, Inc. ("FTI"), accountants for the Receiver, during the period from February 3,

2011 through March 31, 2011 (the "Compensation Period").

## I.  SUMMARY OF PROFESSIONAL FEES AND REIMBURSEMENT OF`
     EXPENSES REQUESTED

1.      This Application has been prepared in accordance with the Billing Instructions

for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission

(the "SEC Guidelines").

2.      Pursuant to an Order dated February 3, 2011 (the "Initial Receiver Order),

upon motion of the Securities and Exchange Commission ("SEC"), the Court appointed John

J. Carney, Esq. the Receiver over all assets "under the direct or indirect control" of Defendant

Michael Kenwood Capital Management, LLC and Relief Defendants Michael Kenwood Asset Management, LLC, MK Energy and Infrastructure, LLC, and MKEI Solar, LP.

3. An Amended Order Appointing Receiver was entered on March 1, 2011 ("Amended Receiver Order"), expanding both the duties of the Receiver and the definition of the Receivership Estate to include the Receivership Entities.

4. The Receiver and B&H attorneys and paraprofessionals have expended a total of 4087 hours working on this matter during the Compensation Period. The Receiver and B&H seek allowance of compensation of services rendered during the Compensation Period with respect to the Receivership Estate in the amount of $1,570,332 (which reflects the Receiver's discounted hourly rate of $495 and an 18% discount all New York-based B&H personnel's regular billing rates), and reimbursement of actual and necessary expenses in the amount of $44,996.[1]

5. The Receiver retained FTI as the forensic accountants for the Receivership Estate. FTI professionals expended a total of 3773 hours working on this matter from February 14, 2011 to March 31, 2011, and seek allowance of compensation for services

---

[1] At the time of the Receiver's appointment, the Receiver and B&H agreed to an hourly billing rate of $495 for the Receiver and for Patrick Hannon, and an 18% reduction in the hourly rates of all New York-based B&H attorneys and paraprofessionals. The Receiver also discounted the billing rate of Jonathan Barr, a Washington-based partner with experience, by 18%.

In accordance with the SEC Guidelines, long-distance travel time was billed at a rate that was reduced 50% from the already-discounted rates, resulting in an effective discount of 59% or greater for travel time, and a total discount of $63,544 in fees related to travel time alone. The Receiver further determined not to charge the estate for the costs of car service, whether local or long-distance. The Receiver retained two attorneys based in Washington, DC and Cleveland, Ohio, and has not charged the Estate for either the travel time of these attorneys between their home cities and the New York/Stamford area, or for their New York City hotel costs.

The Receiver and B&H have also taken an additional reduction of more than 250 attorney hours which includes not only travel time of non-NY attorneys to the New York/Stamford area, but also attorney time spent in training or training others new to the case.

rendered in the amount of $1,229,989 (which similarly reflects an 18% discount from FTI's regular billing rates[2]) and reimbursement of actual and necessary expenses in the amount of $121,233.[3]

6.      Pursuant to the SEC Guidelines, the following exhibits are attached:

a.      a Certification regarding compliance by the Receiver and B&H with the SEC Guidelines (attached as Exhibit A);

b.      a Certification regarding compliance by FTI with the SEC Guidelines (attached as Exhibit B);

c.      a Fee Schedule setting forth all B&H professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed by B&H, each individual's customary hourly billing rate; the hourly billing rate charged by B&H for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit C);

d.      a Fee Schedule setting forth all FTI professionals and paraprofessionals who have performed services in this case during the Compensation Period,

---

[2] In keeping with the rate discounts applied by B&H, FTI reduced the hourly rates for its Senior Managing Directors to $495 or less, and reduced the hourly rates for all other professionals and paraprofessionals by 18%.

[3] The fee amount requested herein reflects an 18% discount from the customary billing rates of FTI and a 50% travel time reduction from the already-reduced hourly rates. The total fee discount is $344,977. The amount of expenses requested for FTI also reflects a discount of more than 50%, or $110,901, related to the Ringtail expense. Also as discussed in Paragraph 55, FTI charged the Ringtail expense by providing a credit based on an estimated database size of 150 GB despite the actual database size of more than 730 GB. The breakdown of FTI expenses, with the discounts, is $97,457 for Ringtail expenses and $23,776 for other expenses.

the capacity in which each individual is employed by FTI, each individual's customary hourly billing rate; the hourly billing rate charged by FTI for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit D);

e.      a schedule specifying the categories of expenses[4] for which the Receiver and B&H seek reimbursement, and the total amount for each such expense category (attached as Exhibit E);

f.      a schedule specifying the categories of expenses[5] for which FTI seeks reimbursement, and the total amount for each such expense category (attached as Exhibit F);

g.      all B&H time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order with respect to each category, and *filed under seal* to protect privileged, confidential and/or sensitive information (attached as Exhibit G); and

h.      all FTI time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order with respect to each category, and *filed under seal* to protect privileged, confidential and/or sensitive information (attached as Exhibit H).

---

[4] Because of the lack of proper financial records, non-adherence to corporate form and extensive commingling of assets, the time and efforts of the Receiver and his counsel and advisors simultaneously cross over multiple time sub categories and therefore any given sub category total may not fully reflect the work performed in that area.

[5] Because of the lack of proper financial records, non adherence to corporate form and extensive co-mingling of assets, the time and efforts of the Receiver and his counsel and advisors simultaneously cross over multiple time sub categories and therefore any given sub category total may not fully reflect the work performed in that area.

7.    This is the Receiver's first application for fees and expenses. The Receiver and B&H have not received any previous payments with respect to the fees and expenses sought in this Application. The Receiver and B&H do not object to a permissive holdback of up to 20%, and FTI does not object to a permissive holdback of up to 20% of fees, but both request that any holdback be done on a rolling basis, and reconsidered at each application. The fees and expenses for which payment is sought were incurred in connection with the discharge of the Receiver's duties as specified in the Court's Initial Receiver Order and Amended Receiver Order. We believe that the charges are necessary and appropriate, and that the Receiver's efforts have resulted in a significant benefit to the Receivership Estate.

## II.    BACKGROUND

8.    The Receivership Entities are a group of interrelated corporations, partnerships, funds and other entities, all of which were either controlled or owned directly or indirectly by Defendant Francisco Illarramendi ("Illarramendi") and others.

9.    On January 14, 2011, the Securities and Exchange Commission ("SEC") commenced a civil enforcement action against the Defendants and Relief Defendants. The SEC's complaint alleges that the Defendants misappropriated investor assets in violation of Section 206(1), (2) and (4) of the Investment Advisers Act of 1940 and Rule 206(4)-(8) thereunder. The SEC also sought equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest, and civil monetary penalties.

10.    Simultaneously with the filing of its complaint, the SEC sought emergency relief, including a preliminary injunction, in the form of an order freezing the assets of the

Receivership Defendants. The SEC also sought the appointment of a receiver over those assets.

11.    On February 3, 2011, the Court appointed John J. Carney, Esq. as Receiver over all assets "under the direct or indirect control" of Defendant Michael Kenwood Capital Management, LLC and Relief Defendants Michael Kenwood Asset Management, LLC, MK Energy and Infrastructure, LLC, and MKEI Solar, LP. As the Investigation commenced, the Receiver and his counsel learned that the Receivership Defendants were only a subset of the interrelated entities that had commingled investor funds and assets, and had engaged in multiple transactions that were either poorly documented or not documented at all.

12.    As a result, a motion to expand the scope and duties of the Receivership was filed on March 1, 2011, and the Amended Receiver Order was entered on March 1, 2011, expanding both the duties of the Receiver and the definition of the Receivership Estate to include the Receivership Entities as defined above.

13.    On or about March 7, 2011, the United States Attorney's Office for the District of Connecticut ("USAO") filed a criminal information against Illarramendi alleging that Illarramendi, with others, had engaged in a massive Ponzi scheme involving hundreds of millions of dollars of money supplied primarily by foreign institutional and individual investors. The primary purpose of the Ponzi scheme was to conceal the existence of the gap between the commingled assets and liabilities of the Funds.

14.    According to the Information, Illarramendi engaged in or caused multiple acts in furtherance of the Ponzi scheme, including but not limited to: (1) making false statements to investors, creditors and employees of the Receivership Entities, the SEC, and others to conceal and continue the scheme; (2) creating or causing fraudulent documents to be created; (3) engaging in multiple transactions without documentation in an effort to conceal and

continue the scheme; (4) transferring millions of dollars of assets across the Receivership

Entities and other entities he controlled to make investments in private equity companies; and

(5) commingling assets across the Receivership Entities and other affiliated entities. On

March 7, 2011, Illarramendi pleaded guilty to two counts of wire fraud, one count of

securities fraud, one count of investment adviser fraud, and one count of conspiracy to

obstruct justice, to obstruct an official proceeding and to defraud the SEC.

15.     Two other individuals[6] were also arrested in connection with these charges.

Both of these individuals are alleged to have participated in a conspiracy to falsify an asset

verification letter on behalf of STLF which purportedly showed that STLF was owed money

by various Venezuelan companies when, in reality, no such loans existed.

16.     On or about March 7, 2011, the SEC filed an amended complaint[7] alleging that

Defendants had misappropriated investor funds and that Defendants' conduct involved fraud,

deceit, or deliberate or reckless disregard of regulatory requirements and resulted in

substantial loss, or significant risk of substantial loss, to other persons.

17.     In light of Illarramendi's arrest and the SEC Amended Complaint, the Receiver

Team has been cooperating with the USAO and SEC to locate, gather and preserve assets,

both domestically and internationally.

18.     The Amended Receiver Order directs the Receiver to: (a) use reasonable

efforts to determine the nature, location and value of all property interests of the Receivership

---

[6] Juan Carlos Guillen Zerpa (District of Connecticut Case No. 3:11-mj-00039-WIG), and Juan Carlos Horna Napolitano (District of Connecticut Case No. Case 3:11-mj-00040-WIG).
[7] On May 9, 2011, the SEC filed a Second Amended Complaint adding Highview Point Partners, LLC as a Defendant and Highview Point Master Fund, Ltd., Highview Point Offshore, Ltd., and Highview Point LP as additional Relief Defendants (collectively, the "Highview Point Defendants"). The Court has scheduled a hearing on May 23, 2011 to address, *inter alia*, the SEC's Motion for Appointment of a Receiver over the Highview Point Defendants.

Entities which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property"); (b) take custody, control and possession of all Receivership Property and records relevant thereto, including selling or exchanging assets as necessary to achieve that objective; (c) manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Property; (d) use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver; (e) take any action which, prior to the entry of the Amended Receiver Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Entities; (f) engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities; (g) take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property; (h) issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure; (i) bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver; (j) pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and (k) take such other action as may be approved by the Court.

19.     In addition, the Amended Receiver Order directs the Receiver to file Quarterly Fee Applications within 45 days after the end of each calendar quarter.

## III. SUMMARY OF STEPS TAKEN BY THE RECEIVER

20.     As more fully discussed in the Status Report filed on April 4, 2011 (Docket Entry 143), the Receiver, his counsel and other Retained Personnel have secured the premises of the Receivership Entities, wound down the business operations of the Receivership Entities, and begun: operating the Receivership Estate; analyzing the operations of the Receivership Entities; investigating the Receivership Entities' financial condition; evaluating and preserving Receivership Estate assets; understanding, evaluating and advising upon the Receivership Entities' private equity investments; and investigating and analyzing claims against third parties. The Receiver and his team have expended considerable time and effort under significant time pressure to investigate the affairs of the Receivership Entities and, in particular, to familiarize themselves with the Receivership Entities' private equity investments.

21.     As more fully discussed in the Status Report and the SEC First and Second Amended Complaints, certain information in the Receivership Entities' financial records has been found to be inaccurate, and documentation for certain transactions appears to be false, inadequate or incomplete. Because of the significant lack of documentation, and evidence of extensive commingling among the Receivership Entities, the Highview Point Defendants and other third parties, it has been time-consuming but necessary for the Receiver to identify additional assets, trace the proceeds of the fraudulent conduct, evaluate claims of creditors and investors, and identify potential claims against former employees, third parties and others that may have received assets of the Receivership Estate.

22.     Notwithstanding the foregoing, the Receiver and his team recognize that the resources of the Receivership Estate are limited, and have thus sought to minimize the time spent on the assignment without compromising their ability to properly discharge the

Receiver's duties under the Amended Receiver Order. Moreover, the Receiver and his team have also significantly discounted their time charges and requested expense reimbursements beyond the parameters required by the SEC Guidelines. *See* Paras. 53, 56, *infra*.

## IV.    CASE STATUS

23.    The Receiver has identified and secured certain liquid assets outside of the United States valued at approximately $30 million. As of March 31, 2011, the Receiver also held approximately $5.1 million in cash for the Receivership Estate, for a total of over $35 million in liquid assets. The domestic cash on hand was recovered from domestic accounts held by the Receivership Entities and collection of outstanding receivables.

24.    As more fully described in the Status Report, these liquid assets represent only a small portion of the Estate's assets, as the Receiver has also taken steps to secure private equity assets and securities which are not valued herein. The Receiver's highly preliminary estimate of the total private equity and securities recovery for the Estate, based on the facts available to date, is in the range of $93,000,000 to $147,000,000.

25.    As of March 31, 2011, the Receiver has made approximately $362,000 in disbursements, for employee payroll and associated benefits and taxes, office rent, and for Receivership operating expenses, which include IT support and communications costs, all of which were necessary expenses associated with the wind-down of the Receivership Entities' business and with the Receiver's duties to identify additional assets, trace proceeds of fraudulent conduct, evaluate claims against the Estate, and identify the Receiver's potential claims against others.

26.    The Receiver respectfully refers the Court to the Status Report for more information regarding the assets located to date, the Receiver's continuing efforts to locate

and monetize additional assets, the claims of creditors and investors, and the identification of the Receiver's potential claims against others.

27.    The Receiver estimates that as of March 31, 2011, the accrued, unpaid administrative expenses incurred by B&H during the Receivership amount to $1,615,328. The Receiver estimates that as of March 31, 2011, the accrued, unpaid administrative expenses incurred by FTI during the Receivership amount to $1,351,222.

28.    These administrative expenses consist of accrued and unpaid professional fees and expenses owed to B&H and FTI as of March 31, 2011. Through the date of this Application, the Receiver has not paid any disbursements to B&H, FTI or any other professionals, with the exception of $80,054.74 paid to Ms. Midanek on April 22, 2011 for her services as a business advisor to the Court for the period from January 21, 2011 to February 3, 2011.

## V.    FEES AND EXPENSES REQUESTED

29.    In connection with the Compensation Period, the Receiver and B&H request compensation for services in the amount of $1,570,332 and reimbursement of expenses in the amount of $44,996.

30.    In connection with the Compensation Period, the FTI requests compensation for services in the amount of $1,229,989 and reimbursement of expenses in the amount of $121,233.

31.    These amounts reflect the hours worked by the Receiver and B&H attorneys and legal assistants, and the hourly rates in effect at the time that the services were rendered, as modified by the significant discount provided by the Receiver and B&H and additional write-offs of attorney time. These amounts also take into account all relevant circumstances

and factors as set forth in the New York Lawyer's Code of Professional Responsibility and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and B&H under the Receiver Order and the Amended Receiver Order.

32.     Pursuant to the Receiver Order and Amended Receiver Order and the public service discount and additional fees and write-offs as described in Paragraphs 53 and 56 and footnotes 1 and 3, the fees of the Receiver and B&H have been reduced from more than $2,139,841 to $1,570,332, a reduction of $569,509. As required by the SEC Guidelines, the Receiver and B&H provided a 50% reduction in fees associated with non-working, non-local travel time, for a discount of $63,545, which is included in the previous total discount.

33.     The work described in this Application was performed primarily by a group of approximately 13 attorneys, who were assisted primarily by 5 legal assistants, with a total[8] of 36 timekeepers.

34.     As more fully set forth below, a significant portion of the professional fees in the first quarter of 2011 relate to the wind down of the Receivership Entities' operations, closure of physical offices, oversight and termination of employees. Fees and expenses related to these efforts are non-recurring as the objectives have been largely achieved.

---

[8] The remainder of the timekeepers consist of B&H professionals and paraprofessionals working in specialized capacities, such as bankruptcy, tax, employee benefits and information technology, who were consulted for a limited purpose and who charged limited time to the Estate.

35.     Moreover, the Receiver, B&H and FTI have made significant progress related to investigating and managing the 16 private equity investments. Costs related to these efforts will be less in future periods.

36.     Finally, as of the date of this filing, efforts pertaining to the forensic accounting analysis of the raw financial data are more than 75 percent complete.

37.     The Receiver and B&H submitted this Application to the SEC on April 21, 2011. We have been informed by the SEC that it has no objection to this Application.

38.     The Receiver and B&H have not filed any prior fee and expense application in this case. B&H has not received a retainer in this case.

39.     As required by the SEC Guidelines, the Receiver and B&H professionals recorded all services performed in time increments of one-tenth of an hour. All services by B&H legal assistants and other paraprofessionals were professional in nature.

40.     In accordance with the SEC Guidelines, this Application does not seek payment for time spent preparing the Application or any documentation in support.

## VI.     SUMMARY OF SERVICES RENDERED BY THE RECEIVER AND B&H DURING THE COMPENSATION PERIOD

41.     Pursuant to the SEC Guidelines, B&H has segregated its time during the Compensation Period into ten activity categories. Narrative summaries of these activity categories[9] are provided below.

---

[9] Because of the lack of proper financial records, non-adherence to corporate form and extensive commingling of assets, the time and efforts of the Receiver and his counsel and advisors simultaneously cross over multiple time subcategories and therefore any given subcategory total may not fully reflect the work performed in that area. Accordingly, the task codes were grouped according to the nature of the work.

A. *Asset Analysis and Recovery, Asset Disposition, Business Analysis and Data Analysis (01, 02, 08, 10)* AMOUNT: $1,251,595.

42. The activities in this category consist of efforts to identify and locate assets of the Receivership Estate, to secure and prevent dissipation of those assets, and efforts to evaluate, transfer and/or liquidate the private equity investments of the Receivership Estate. Due to the extensive commingling of assets, the Receiver and his counsel and his advisors were also required to analyze internal transactions among the Receivership Entities, which in turn required considerable efforts with FTI to secure, preserve, analyze and review the Receivership Entities' business records. Specifically, the activities in this category include on-site and remote witness interviews, review and analysis of the Receivership Entities' business records and documents concerning the private equity investments, regular meetings and telephone conferences between the Receiver, B&H and FTI professionals concerning the nature and location of assets, communications with investors and purported creditors, and activities undertaken to provide notice to relevant individuals and entities of the Orders of this Court. The Receiver has also conducted due diligence and negotiations with potential buyers of the private equity investments. Because the Receivership Entities' operations have been largely concluded and the Receiver has identified and made significant progress in managing the Receivership Entities' private equity investments, fees and expenses related to these activities will decrease in future fee applications. As of the date of this filing, data analysis of the Receivership Entities is approximately 75% complete, and future activities will focus on further asset recovery and asset disposition.

B. *Business Operations, Benefits/Pension (03, 06)* AMOUNT: $142,187.

43. The activities in this category consist of managing the wind-up of the operations of the Receivership Entities, including review of receivables and payables,

establishing procedures for – and payment and administration of – final payroll and benefits and operational expenses of the Receivership Estate, internal consultations and review with employee benefits professionals to review the same. Because the Receivership Entities' operations have been largely concluded, fees and expenses in this category are likely to be non-recurring in future fee applications.

C.    *Case Administration and Status Reports (04, 11)  AMOUNT: $132,591.*

44.    The activities in this category consist of regular meetings between the Receiver, B&H and FTI from the inception of the Receivership to: provide status updates among the team; determine next steps; coordinate activities; attend to Court filings and comply with the directives of the Court. Other activities in this category included participation in status reports, calls, communications and/or conferences with the Court and with representatives of the SEC, USAO and FBI, as appropriate, in order to coordinate the efforts of the Receiver with those of the governmental agencies and to provide the Court with timely updates of the Receiver's activities.

D.    *Corporate Finance (09)                           AMOUNT: $36,157.*

45.    The activities in this category consist of analyses and reviews of potential funding transactions contemplated by and among the Receivership Entities.

E.    *Tax Issues (14)                                      AMOUNT: $7,803.*

46.    The activities in this category consist of internal consultations and review with tax professionals to review and comply with domestic and international tax requirements for contemplated activities and transactions of the Receivership Estate.

*F.      Travel Time[10]*                                      *AMOUNT: $46,283.*

47.     The activity in this category covers all non-working travel time of the Receiver

and B&H professionals during the Compensation Period. The starred entries on Exhibit C

reflect the actual travel time of the professionals. The SEC Guidelines permit non-working

travel time to be billed at 50% of the professional's billing rate. Accordingly, the Receiver

and B&H reduced the fees that fell within this category by charging at 50% of the discounted

rates, resulting in a discount from $109,828 to $46,283, or a total travel time reduction of

$63,545, resulting in an effective discount of approximately 58%. The Receiver and B&H

professionals further reduced travel time – and increased savings to the Estate – by housing

several B&H professionals in Stamford, Connecticut during the weeks when the offices of the

Receivership Entities were open and the Receiver and B&H were winding down the

operations of the Receivership Entities. Because the Receivership Entities' operations have

been largely concluded, fees and expenses in this category are likely to be non-recurring in

future fee applications.


## VII.   SUMMARY OF SERVICES RENDERED BY FTI DURING THE COMPENSATION PERIOD

*A.      Data Acquisition, Document Review and Analysis (FTI Codes 6, 7, 11, 12)*
*AMOUNT: $500,378.*

48.     The activities in this category include the preservation of records and

documents of the Receivership Entities, initial document review, and the creation and

maintenance of the Ringtail environment,[11] an electronic litigation support environment that

---

[10] Non-working, non-local travel time was billed to the activity category associated with the purpose of the travel.
[11] As more fully discussed in Paragraph 5, footnote 3, B&H and FTI negotiated a reduced rate and further voluntary reductions for the setup and hosting of the Ringtail environment.

facilitates document management, document review and electronic discovery. As more fully

discussed in the Status Report, the Receiver and his team have obtained and secured a

significant volume of hard copy and electronic documents representing approximately 26

million pages. The activities in this category were necessary to manage the volume of

documents recovered. Efforts pertaining to data acquisition from the Receivership Entities is

largely complete, and future fees and expenses in this category will pertain to data acquisition

from third parties, and continuing document review and analysis.

B. *Background Investigation, Forensic Analysis, and Financial Analysis*
   *(FTI Codes 3, 4, 5)*                 *AMOUNT: $543,458.*

49.       The activities in the category consist of steps taken by FTI to understand the

background and relationships among the Receivership Entities, their officers and directors and

other related entities and persons and the transactions in which they engaged. Specifically,

FTI reviewed bank, brokerage, and other records of the Receivership Entities, as well as

public records and documents produced by third parties pursuant to voluntary document

requests and subpoenas, in order to facilitate the identification and preservation of assets and

records of the Receivership Entities and the tracing of funds among the Receivership Entities

and others. Efforts pertaining to forensic accounting analysis of the Receivership Entities is

approximately 75% complete as of the date of this filing, and future fees and expenses in this

category will pertain to forensic accounting and analysis of information obtained from third

parties, as appropriate.

C.     *Business Operations (FTI Code 2)*              *AMOUNT: $97,213.*

50.       The activities in this category consist of managing the wind-up of the

operations of the Receivership Entities, including review of receivables and payables,

establishing procedures for, and payment and administration of, final payroll and benefits and

operational expenses of the Receivership Estate. Because the Receivership Entities'
operations have been largely concluded, fees and expenses in this category are likely to be
non-recurring in future fee applications.

> D. *Case Administration (FTI Codes 1, 8, 9)* *AMOUNT: $88,940.*

51.     The activities in this category consist of regular meetings between the
Receiver, B&H and FTI from the inception of FTI's engagement to create internal work
plans, provide status updates among the team, determine next steps, coordinate activities, and
respond to requests from B&H.

## VIII.   EXPLANATION OF EXPENSES AND RELATED POLICIES

52.     The Receiver and B&H seek reimbursement for their out-of-pocket costs in the
amount of $44,996. Exhibit E sets forth the various categories of expenses for which
reimbursement is sought. B&H will retain the documentation supporting these expenses for a
period of seven years in accordance with the SEC Guidelines and will provide the SEC with
copies upon request.

53.     B&H observed the following policies in connection with its expenses during
the Compensation Period:

A.     With respect to all expenses, B&H seeks reimbursement only for the actual
costs of its expenses. B&H has not included the amortization of any investment, equipment or
capital outlay in any request for expense reimbursement.

B.      In accordance with the SEC Guidelines, B&H has not sought reimbursement for local travel expenses[12] (within a 20-mile radius of B&H's office), including mileage, taxis and meals.

C.      B&H used private car service to accommodate safety considerations for some of its attorneys and paraprofessionals for local and long-distance travel after hours; however, B&H has not sought reimbursement for any charges for car service.

D.      For two attorneys based in Cleveland and Washington, DC (Ms. Schill and Mr. Barr, respectively), B&H has not charged for their travel time between their home cities and the New York/Stamford area.

E.      B&H has not sought reimbursement for Ms. Schill's and Mr. Barr's hotel costs in New York City.

F.      B&H has not sought reimbursement for secretarial, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

G.      In accordance with the SEC Guidelines, B&H seeks its internal photocopying expenses at a rate of $0.15 per page for black and white and $1.00 per page for color copies. B&H made 15,987 black and white and 311 color internal photocopies during the Compensation Period at the above-listed rates.

---

[12] The "Local Travel" category on Exhibit E reflects only travel expenses beyond a 20-mile radius of B&H's office, or local travel expenses while in Stamford, Connecticut. Due to the settings on B&H's accounting software, certain of these charges are automatically tracked in the "Local Travel" category even though they are reimbursable under the SEC Guidelines.

## IX.    COST SAVINGS TO THE ESTATE

54.    In total, the Receiver and B&H seek $1,615,328 for fees and expenses, and have agreed to a 20% holdback of $323,066. B&H recognized the public service nature of the engagement, and accordingly discounted all New York-based professionals' and paraprofessionals' rates as well as the rates of Mr. Barr.

55.    In total, FTI seeks $1,351,222 for fees and expenses, and has agreed to a 20% holdback for fees of $245,998. FTI recognized the public service nature of the engagement, and accordingly discounted all if its professionals' and paraprofessionals' rates. FTI also provided a credit of $110,901 in relation to the Ringtail expense.

56.    The Receiver and FTI have also undertaken additional cost savings beyond those required by the SEC Guidelines, including the following:

    a.    Saving travel time during the week by housing certain professionals in Stamford, Connecticut while the Receivership Entities' premises were secured, employees interviewed and documents collected;

    b.    Not charging for non-working travel time incurred by Mr. Barr and Ms. Schill for travel between their home cities and the New York/Stamford area, and accommodations in New York City;

    c.    Not charging for private car service, no matter the distance or purpose;

    d.    Not charging for time spent training on use of the Ringtail database and for training new attorneys to the matter;

    e.    Not charging for certain communications with counsel; and

    f.    Negotiating a substantially reduced rate for the pre-culling, maintenance and hosting of the Ringtail environment.

57.     Before the inception of the Receivership, the Receiver estimates that the Receivership Entities were charged, on average, $1,998,153 per quarter in legal, accounting and advisory fees. This amount includes fees charged by consultants, legal advisors, accountants, and charges by the fund advisors. The appointment of a Receiver has obviated the need for the Receivership Entities to incur such advisory costs, thus saving the Estate an estimated average of $7,992,613 per year, if the Receivership Entities were operated as an ongoing concern.

58.     Accordingly, these discounts and write-offs have collectively saved the Estate $1,032,750 compared to B&H and FTI's standard billing rates and standard practices for charging expenses.

## X.     THE REQUESTED COMPENSATION SHOULD BE ALLOWED

59.     The Court has discretion to determine the Receiver's compensation and the fees and expenses of the Receiver's professionals. In determining the reasonableness of fees and expenses requested, the Court should consider the complexity of the problem faced, the benefit of the services to the Receivership Estate, the quality of the work performed and the time records presented. SEC v. Fifth Ave. Coach Lines, Inc., 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); see also SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir. 1992) (per curiam) (if a receiver reasonably discharges his duties, the receiver is entitled to compensation and the circumstances surrounding the receivership, including the results, are relevant/irrelevant).

60.     Although case law provides guidelines and standards for determining compensation requests, the unique facts and situations of the case make direct reliance on such guidelines impossible. SEC v. W.L. Moody & Co., 374 F. Supp. 465, 485 (S.D. Tex 1974), aff'd, 519 F.2d 1087 (5th Cir. 1975).

61.     In the instant case, the Receiver, B&H and FTI respectfully submit that the services for which they seek compensation in this Application were necessary for, and beneficial to, the orderly administration of the Receivership Estate.

62.     The issues addressed by the Receiver and B&H have been and continue to be highly complex, requiring investigation of an alleged fraud that spanned many years, consisted of thousands of poorly-documented transactions, and involved numerous offshore entities and foreign financial institutions. Potential assets of the Receivership Estate are located in as many as 19 federal districts in the United States and several foreign countries. The breadth of tasks faced by the Receiver required several attorneys to work long hours, often involving nights and weekends. We respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved. The professional services were performed expediently and efficiently. Accordingly, the Receiver and B&H submit that the  compensation requested herein is reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

## XI.     SOURCE AND MANNER OF PAYMENT

63.     This Application seeks approval of professional fees and expenses incurred by the Receiver, B&H and FTI during the first quarter of 2011. During the Compensation Period, the Receiver has determined that the current cash represents a relatively small portion of the assets that ultimately may be recovered through liquidation of the private equity investments and the resolution and liquidation of the Receiver's claims against others who may have received assets of the Receivership Estate or who otherwise enabled the fraud on the Funds' investors.

## XII.    RELIEF REQUESTED

WHEREFORE, the Receiver and B&H respectfully request that this Application be granted and that they be awarded an allowance of $1,570,332 for legal services rendered during the Compensation Period, and $44,996 for the reimbursement of expenses; that FTI be awarded an allowance of $1,229,989 for services rendered during the Compensation Period, and $121,233 for the reimbursement of expenses; and that the Receivership Estate be allowed to pay such amounts and reimburse B&H and FTI for approved expenses, together with such other and further relief as necessary and proper.

Dated:        New York, New York
              May 23, 2011

By: _____/s/_____
       John J. Carney, Receiver, Esq.

and

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201

*Attorneys for Receiver, JOHN J. CARNEY, ESQ.*