UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Securities and Exchange Commission,<br>        *Plaintiff*, | Civil No. 3:11cv78 (JBA) |
|       *v.* | |
| Francisco Illarramendi, *et al.*,<br>        *Defendants*. | |
|      and | |
| Michael Kenwood Asset Management, LLC, *et al.*,<br>        *Relief Defendants*. | June 16, 2011 |

RULING ON MOTION FOR TEMPORARY RESTRAINING ORDER, ORDER
FREEZING ASSETS, AND ORDER FOR OTHER EQUITABLE RELIEF

On May 10, 2011, Plaintiff Securities and Exchange Commission (the "Commission")

moved [Doc. # 182] pursuant to Federal Rule of Civil Procedure 65(b) for entry of a

temporary restraining order, order freezing assets, and order for other equitable relief to

prevent misappropriation of assets by Defendant Highview Point Partners, LLC ("HPP") and

to recover proceeds of fraud received by Relief Defendants Highview Point Master Fund Ltd.

("HPMF"), Highview Point Offshore Fund, Ltd. ("HPOL"), and Highview Point LP

("HPLP") (collectively "Highview Funds") through the machinations of Defendant

Illarramendi and others.  As part of its requested relief, the Commission asks the Court for

a repatriation order requiring the Highview Funds to transfer assets currently held by them

in offshore bank accounts to a financial institution within the United States and an order

freezing those assets.

After having earlier agreed to an asset freeze, at a hearing held May 27, 2011 HPP

consented to the appointment of the Receiver without waiver of its attorney–client privilege

and work product protections and represents that an accounting has now been done. At this time the Commission does not seek appointment of a receiver for the Highview Funds. However, the Highview Funds claim they are improper Relief Defendants and challenge the authority of this Court to order the repatriation of any of their offshore assets. For the reasons stated below, the Court orders the Highview Funds to transfer all assets under their control held in offshore accounts, primarily in their Deutsche Bank account in Amsterdam, the Netherlands, to a financial institution within this Court's jurisdiction and further orders an immediate freeze of such repatriated assets.

I.      Fact Summary

HPP is an LLC organized under Delaware law to serve as an investment manager and registered investment adviser to "feeder funds," HPOL and HPLP, which invest all their assets through HPMF, a Cayman Islands company. The founding and current managing members of HPP are Christopher Luth and Frank Lopez. Until July 31, 2010 when he withdrew from HPP, Defendant Francisco Illarramendi was a managing member of HPP. The Commission claims that from 2005 through mid–2010, Illarramendi used HPP and the Highview Funds to engage in a pattern of complex transactions that formed a part of the Ponzi scheme to which he pled guilty in *United States v. Illarramendi*, 3:11cr41 (SRU), managing in tandem the Highview Funds and the funds of the now receiver–controlled Michael Kenwood entities ("MK Funds") through purported loans and falsely documented or undocumented transfers of cash among the funds, surreptitiously misappropriating investor money to cover undisclosed trading losses ("the hole").

Through the testimony of Sofia Hussain, forensic accountant with the Commission, Matthew Greenblatt, senior managing director for FTI Consulting retained by the Receiver,

and Mr. Illarramendi, the Commission has demonstrated that in 2009 and 2010 Illarramendi and HPP used HPMF to transfer more than $166 million to various offshore entities, while mischaracterizing the trade blotter transfer notations as investments in MK entities, and later transferred more than $191 million from the MK Special Opportunities Fund ("MK SOF") and MK Venezuela ("MKV") to HPMF in supposed "repayment" for the falsified transfers. Ms. Hussain testified that during its examination of Highview Point Partners, the Commission observed  these investments in MK entities on the trade blotter, but were unable to find any evidence of actual transfers of money from HPMF to Michael Kenwood Venezuela because the transfers reflected on the trade blotter as MK investments actually represented transfers of money to third parties. (Hr'g Tr. at 51:13–52:7.)

According to Mr. Greenblatt's review of bank records, trade blotters, and other financial information relevant to transactions between HPMF and MK entities retrieved from the offices of the Michael Kenwood Group (*id.* at 91:17–93:23), the purported investments in MK entities totaling $166 million are actually reflected in HPMF's bank records as payments to third parties. On January 6, 2010, wire payment orders from HPMF's Deutsche Bank account reveal a payment of $10 million to 4 A Star Corporation and a payment of $24 million to Rowberrow Trading from HPMF. (*Id.* at 98:5–99:14.) This transfer of $34 million is characterized on the trade blotter as an investment in MKV, however, according to MKV's bank accounts, it did not receive that amount of money during the relevant time period. (*Id.* at 99:15–100:22.) HPMF's Deutsche Bank account similarly reflects January 11, 2010 wire payments of $1,575,000 to Vetra Energy Group LLC, $2,130,000 to Web Financial Services, and $1,800,000 to Highview Point Offshore; however the trade blotter records this $5,505,000 in total transfers as an investment in MKV despite

MKV never having received that sum.  (*Id.* at 100:23–103:24.)  Wire payments of $8.2 million to Highview Point Offshore and $1.8 million to Multiplicas Casa De Bolsa on January 14, 2010, of $30 million to Inverplus, and $10 million to funds and entities associated with PDVSA are all characterized on the trade blotter as investments in MKV, however MKV's bank records reflect that MKV received none of that money.  (*Id.* at 103:25–109:10.)  Wire payment orders demonstrate that on April 29, 2010 and May 10, 2010, HPMF received payments totaling $94 million from MKV, which are described on the trade blotter as sale proceeds from supposed previous investments inaccurately represented on the trade blotter as discussed above.  (*Id.* at 109:11–111:12.)  In summary, the 2010 records retrieved from the MK Group show that $89.5 million was transferred from HPMF to various parties, those transfers were falsely recorded on the trade blotter as investments in MKV, and MKV later paid $94 million to HPMF for the supposed sale of those investments despite their nonexistence.

Mr. Greenblatt's review of the MK Group's 2009 records reveals a similar mischaracterization of wire payments to third parties as investments in MKV and subsequent transfers of funds from MKV to HPMF.  HPMF's bank accounts reflect wire transfers on February 26, 2009 of $10 million to Fractal Fund Management Limited, on March 13, 2009 of $5 million to Ontime Overseas, Inc., on March 30, 2009 of $2,100,000 to Heptagon Sociedad de Corretaje de Valores, and on March 23, 2009 and April 3, 2009 of $1,555,000 and $3,550,000 to Bradleyville Limited and of $10,450,000 and $11,360,000 to LaSignoria Corporation.  (*Id.* at 124:12–132:11.)  The trade blotter noted these transfers as investments in IVP Overseas or VEF Local Market and later characterized this combined $45,974,400 as transferred to MKV, despite none of those funds ending up with MKV.  (*Id.*)

HPMF's bank records also show wire transfers on August 31, 2009 of $7.8 million to BCT Bank International and on July 13 and September 24, 2009 of $15 million and $10.4 million to HVP Offshore, and although the trade blotter reflects these transfers as investments in MKV, none of this money was deposited in MKV's bank accounts.  (*Id.* at 132:12–144:21.) Further appearing as part of a similar pattern of fraudulent transactions, on December 31, 2009, MK SOF paid $99 million to HPMF, and the trade blotter reflected this transaction as sales of investments in MKV, even though no funds from HPMF had ever been received by MK entities as any form of investment.  (*Id.* at 145:3–150:8.)

Mr. Illarramendi testified that he used HPP, HPMF, and their bank accounts in part to commit the fraud to which he pled guilty in his criminal case.  (*Id.* at 356:7–20.)  In executing this fraudulent scheme, he drew on money from multiple sources that he was helping manage or advising, including HPMF, its underlying feeder funds, HPP, the MK entities, and third–party investors including Goldenbird and BCT Bank.  (*Id.* at 357:17–358:14.)  During this time Mr. Illarramendi used a "pot" or BCT bank account containing commingled money from HPMF, MK entities, and third–party investors to aggregate funds supposedly invested in MKV but in actuality combined in one place in part to facilitate his Ponzi scheme to pay all investors whose obligations were maturing (and to purchase Mr. Lopez's plane from him at an inflated price).  These fraudulent activities also resulted in inflated management fees for HPP.  (*Id.* at 371:19–388:5.)  To Mr. Illarramendi, the pot containing the total amount of money from these sources was not a collection of separable and distinct investments, but was "one" account whose use and purpose was unknown to investors  (*Id.* at 367:23–368:24.)

The evidence of fraudulent accounting practices and Mr. Illarramendi's admitted actions and fraudulent transfers support the Commission's claims that Illarramendi used HPMF and its underlying feeder funds to commingle and misappropriate investor funds in order to cover the substantial hole resulting from Mr. Illarramendi's prior trading mishaps. The Commission's examination of HPMF's and the MK entities' financial records, as presented through Ms. Hussain's and Mr. Greenblatt's testimony demonstrates that as part of Mr. Illarramendi's misappropriation and financial manipulation, HPMF likely received more than $191 million from MKV without having any demonstrable legitimate ownership interest in those assets.

II.      *Morrison* and Section 21

As part of their Opposition [Doc. # 226] to the Commission's motion for injunctive relief, the Relief Defendants argue that Section 21 of the Securities Exchange Act of 1934, 15 U.S.C. § 78u, under which the Commission seeks equitable relief, cannot be applied extraterritorially in light of the Supreme Court's recent decision in *Morrison v. National Australia Bank, Ltd.*, ---U.S.----, 130 S. Ct. 2869 (2010), and thus does not provide a basis for injunctive relief over the Highview Funds' assets.

In *Morrison*, the Supreme Court applied the longstanding presumption against extraterritorial application of U.S. legislation in the absence of indication of contrary Congressional intent and held that Section 10(b) of the Exchange Act does not apply extraterritorially.  130 S. Ct. at 2883 ("[T]here is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we therefore conclude that it does not.").  In so holding, the Supreme Court directed its attention to the Act's regulatory center of gravity:

"we think that the focus of the Exchange Act is not upon the place where the deception occurred, but upon purchases and sales of securities in the United States." *Id.* at 2844.

> Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." . . . Those purchase–and–sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to "regulate," . . . it is parties or prospective parties to those transactions that the statute seeks to "protec[t]."

*Id.* (citations omitted).   Thus, *Morrison* addressed the securities trading conduct of the defendants and where that conduct occurred.  *See In re Royal Bank of Scot. Grp. PLC Sec. Litig.*, —F. Supp. 2d----, No. 09cv300 (DAB), 2011 WL 167749, *7 (S.D.N.Y. Jan. 11, 2011) ("[T]he Court makes clear its concern is on the true territorial location where the purchase or sale was executed and the particular securities exchange laws that governed the transaction."); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 472–73 (S.D.N.Y. 2010) ("[T]he Court was concerned with the territorial location where the purchase or sale was executed and the securities exchange laws that governed the transaction.").

While *Morrison* focuses on whether the Exchange Act can proscribe securities trading conduct abroad, Section 21 of the Act, under which the SEC brings its claim for injunctive relief against the Highview Funds, focuses on what relief the Commission may obtain to protect investors.  Specifically, Section 21(d)(5) provides: "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).  In pursuing injunctive relief against the Highview Funds, the Commission does not seek to prosecute any extraterritorial conduct—it is undisputed that HPP's investment activity was

all U.S.–based—but rather seeks relief from offshore entities whose assets likely include the products of HPP's fraudulent conduct.  Neither the Highview Funds nor HPP have argued that *Morrison* bars application of the Exchange Act to the fraudulent conduct alleged by the Commission, and there is no claim that the conduct itself occurred extraterritorially.  Since *Morrison* does not limit the Commission's authority to seek equitable extraterritorial relief to protect investors who are the victims of U.S.–based securities laws violations, Section 21 of the Exchange Act provides proper authority for the relief sought by the Commission to protect and preserve misappropriated investor assets located in offshore accounts of the Highview Funds.

III.    Proper Relief Defendants

The Highview Funds argue that even if Section 21 of the Exchange Act applies to their extraterritorial assets, they are not proper relief defendants in this action because they have a pre–existing ownership interest in the assets the Commission seeks to repatriate to the U.S. and thus the Commission cannot meet its burden of showing a substantial likelihood of success on the merits or serious harm without repatriation.

Although a relief defendant is not accused of wrongdoing, "[f]ederal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill–gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998) (*Cavanagh II*).  A relief defendant has a legitimate claim to funds if it has an ownership interest in the funds obtained for value rather than through a gratuitous or fraudulent transfer.  *Id.* at 137 (district court did not err in freezing relief defendant's stock proceeds where she did not have a legitimate claim to the proceeds because the SEC was likely to be

able to show that she "gave no consideration" for the shares but received them as a gift); *see also Janvey v. Adams*, 588 F.3d 831, 834–35 (5th Cir. 2009) (investors had a legitimate interest in CD proceeds and thus were not proper relief defendants because even though the CDs sold by Stanford Bank were backed by fraudulent assets in a Ponzi scheme, the investors "received the CD proceeds pursuant to written certificate of deposit agreements with the Stanford Bank" and had a debtor–creditor relationship with the bank); *CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 207 (S.D.N.Y. 1999) (investor Aronwitz had a legitimate interest in "funds paid as compensation for services actually performed" even if those funds were "paid out of proceeds of the principal defendant's fraud" and therefore was not a proper relief defendant).

The Commission has preliminarily shown that the Highview Funds likely do not have a legitimate claim to $180 million transferred to them from MK entities as part of Illarramendi's financial manipulation.  The Commission's evidence demonstrates that the Highview Funds received assets and purported sales proceeds from MK entities for which they lacked any legitimate ownership interest, as part of Illarramendi's fraudulent management of his "pot."  In distinction to the investors in *Janvey*, 588 F.3d at 834–35, and *Hanover Trading*, 34 F. Supp. 2d at 207, who had given consideration for their interests in funds that drew on ill–gotten and fraudulent assets, the Commission has shown that the Highview Funds exchanged no consideration for the MKV assets transferred to them, but instead their receipt of those assets was related to fraudulent transfers effectuated by Illarramendi.  Although the Highview Funds may have a legitimate interest in some assets, not obtained through the fraudulently recorded series of transactions outlined by the Commission's evidence, they have shown no legitimate interest in the majority of the $230

million they hold in offshore accounts, i.e. the more than $180 million transferred to HPMF from MKV and MK SOF on December 31, 2009, April 29, 2010, and May 10, 2010.

The Highview Funds' argument that the Commission "ignores the fact that the Funds' investors gave substantial consideration for their investment in the Funds" (Opp'n at 16) focuses on the wrong transaction. The Commission does not seek to add the investors in the Highview Funds as relief defendants, only the Highview Funds themselves. Even if the investors in the Funds may have purchased a legitimate ownership interest in the Funds, as did the investors in *Janvey*, 588 F.3d at 834–45, the Highview Funds did not provide any consideration for the assets that Illarramendi and HPP transferred to them from MKV and MK SOF. The Commission therefore has shown that the Funds likely lack a legitimate interest in these ill–gotten assets and are proper relief defendants in this action.

IV.    Relief Sought: Freeze and Repatriation

The Commission seeks an immediate freeze of the assets under the direct or indirect control of the Highview Funds and a repatriation order requiring the transfer of the Funds' assets to a financial institution within this Court's jurisdiction to effectuate the freeze order. A party seeking injunctive relief to maintain the status quo must demonstrate "(a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success of the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995). However, "[u]nlike a private litigant, the SEC need not show risk of irreparable injury"; the Commission, in order to obtain an asset freeze to maintain the status quo "must establish only that it is likely to succeed on the merits." *Cavanagh II*, 155 F.3d at 132. Where the

Commission can make that showing, an asset freeze may be necessary in order to enable the Commission "to preserve its opportunity to collect funds that may yet be ordered disgorged." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990).

"[O]nce the equity jurisdiction of the district court properly has been invoked, the court has the power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984). Therefore, where the Court has the authority to order equitable relief such as an asset freeze in order to preserve particular funds in anticipation of potential future disgorgement, it also has the authority to order repatriation of assets to effectuate that freeze order. *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1021 (N.D. Ind. 2000) ("In order to satisfy an award of equitable monetary relief, a court may order the repatriation of assets."); *SEC v. The Infinity Group Co.*, 27 F. Supp. 2d 559, 561 (E.D. Pa. 1998) ("[W]e have 'authority to grant the full panoply of equitable remedies so that the [victims] can obtain complete relief.' These remedies include disgorgement, asset freezes, appointments of receivers, repatriation of assets, constructive trusts, and restitution.") (citations omitted). Although the requested repatriation order actually requires the Relief Defendants to take some action rather than just refrain from action, since transfer of assets to the Court's jurisdiction is solely for the purpose of preserving the status quo as to investor assets pending merits determination, the Court concludes that the Commission has met the standard for this injunctive relief under *Doherty*. In any event, even if the higher standard for mandatory injunctive relief applies, the Commission has also shown substantial likelihood of success on the merits. *See S.E.C. v. Cavanagh*, 1 F. Supp. 2d 337, 372 (S.D.N.Y. 1998) (*Cavanagh I*) ("Because the Court finds a strong likelihood that the SEC will succeed on the merits in establishing a Section 5

11

violation, the Court finds that a continued asset freeze is appropriate, in addition to a continuing order providing for an accounting and repatriation of assets. These orders are appropriate to preserve the status quo pending a determination on the merits.").

Ordering repatriation of foreign assets is necessary and appropriate to preserve and keep intact such funds to satisfy future disgorgement remedies. *See FTC v. The Crescent Publ. Gr., Inc.*, 129 F. Supp. 2d 311, 325–26 (S.D.N.Y. 2001) (ordering "the corporate defendants to transfer all funds now or hereafter held in foreign accounts to accounts in New York branches of a bank or banks organized under U.S. law" where the collateral already provided by the defendants would be inadequate to cover potential disgorgement in the event of a judgment against defendants); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1275–77 (S.D. Fla. 1999) (ordering the repatriation of funds from a Bahamian bank account). Here the Court has ample cause to believe that assets outside the United States could be subject to an eventual disgorgement order such that those assets may be necessary to enable effective relief at a later stage. *See SEC v. Universal Consulting Res. LLC*, No. 10–cv–02794–JLK–KLM, 2010 WL 4873733, *2–4 (D. Colo. Nov. 23, 2010) (finding "good cause to believe that the defendants and relief defendant have interests in or ownership of assets outside of the United States that could be subject to an order directing disgorgement or the payment of civil money penalties in this action and that an order requiring repatriation of such assets is necessary" and ordering repatriation of all assets and funds which directly or indirectly derive from funds obtained in connection with the scheme alleged in the Commission's complaint); *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 564–65 (D. Md. 2005) (ordering "the appointment of a receiver, an asset freeze, an accounting, and a repatriation of Defendants' assets" based on "the public interest in preserving the

possibility of effective relief at the end of litigation . . . before [the transferred assets] are completely dissipated"); *Crescent Publ. Gr.*, 129 F. Supp. 2d at 325–26; *Cf. SEC v. Quan*, No. 11–723 ADM/JSM, 2011 WL 1667985, *8 (D. Minn. May 3, 2011) ("The SEC's request for repatriation is denied without prejudice because there is no evidence on the present record that the Defendants hold ill–gotten gains overseas.").

The Commission has shown that it is likely to succeed on the merits in showing that the Highview Funds contain fraudulent proceeds of Illarramendi's Ponzi scheme. The Commission has demonstrated that in December, 2009, MK SOF transferred $99 million in assets to HPMF, and in April and May, 2010, MKV transferred $94 million in assets to HPMF. Mr. Illarramendi testified that he and the MK entities used HPP, HPMF, and their bank accounts to help commit fraud, using money from HPMF and its underlying feeder funds. The Commission and the Relief Defendants agree that the Highview Funds' assets are currently held in a Deutsche Bank account in Amsterdam, the Netherlands. The Relief Defendants represent that they have already taken steps to protect and preserve these assets by appointing an independent fiduciary and advising Deutsche Bank of the voluntary temporary asset freeze and have complied with all Commission requests to date. In addition, they represent that HPP no longer has control over any of the assets in the Highview Funds' offshore account. However, because these offshore assets appear to include funds involved in the fraudulent scheme perpetrated by Mr. Illarramendi, because easy and rapid multi–million dollar wire transfers characterize financial transactions in this industry, because of the potential that the Funds' investors could seek distribution or encumbrance of these assets in Cayman courts, and because of the absence of this Court's authority over foreign banks notwithstanding the present good–faith acquiescence with voluntary freeze

order terms, the freeze and repatriation of the offshore assets are warranted to preserve investor assets for potential eventual disgorgement and disbursement.

V.      Conclusion

For the reasons set forth above, the Commission's Motion [Doc. # 182] for Injunctive Relief is granted with respect to Relief Defendants Highview Funds. It is hereby ordered that:

A.  The Relief Defendants shall immediately transfer all assets held and controlled by them in offshore accounts as described above to an appropriate financial institution within the jurisdiction of the Court.

B.  Such transferred assets are hereby ordered frozen and the Relief Defendants and their agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, shall prevent any withdrawal, removal, transfer, dissipation, assignment, pledge, alienation, encumbrance, disposal, or diminution in value of any such funds until further order of the Court;

C.  All banks or other financial institutions to which such assets are transferred pursuant to this order, and each of their agents, servants, employees, and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, shall retain within their control and prohibit the withdrawal, removal, transfer, dissipation, assignment, pledge, alienation, encumbrance, diminution in value, or other disposal of any such funds or assets subject to the above

14

transfer and freeze order, until further order of the Court, except to pay the Highview Funds' attorney fees incurred to the date of this order as documented by contemporaneously–maintained time–and–task records.

IT IS SO ORDERED.

                                    /s/
                    _____
                    Janet Bond Arterton, U.S.D.J.

        Dated at New Haven, Connecticut this 16th day of June, 2011.

15