UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>      Plaintiff,<br><br>v.<br><br>FRANCISCO ILLARRAMENDI and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC,<br>      Defendants,<br><br>MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP,<br>      Relief Defendants. | Civil Action No. 3:11-cv-00078-JBA<br><br><br><br>September 7, 2011 |

**MOTION FOR ORDER REQUIRING
A DEFINED PERIOD OF DUE DILIGENCE
PRIOR TO SALE OF RECEIVER ESTATE ASSETS:
IN PARTICULAR, OWNERSHIP INTEREST IN NUSCALE POWER, INC.**

Interested Party Ramon A. Illarramendi (RAI) hereby respectfully moves for an order requiring opening of a defined due diligence period that would allow Mr. Illarramendi to present an offer, be it in a public auction or otherwise, for the ownership interest in NuScale Power, Inc. (NuScale). In support of this Motion, the undersigned attorney for RAI represents the following:

1.  The Receiver's counsel asserts that the Receivership Estate holds the following ownership interests in NuScale:

    a.  an aggregate of 12.8 million shares of common stock
    b.  warrants to acquire 5.34 million of common stock
    c.  an aggregate of 2,965,705 shares of Series A preferred
    d.  a convertible note having an outstanding principal amount of $10 million.

2.  The combined effect of these ownership rights would give the purchaser of such rights a controlling interest in NuScale.

**ORAL ARGUMENT REQUESTED**

3.  These ownership rights were obtained by Michael Kenwood Nuclear Energy (MKN) as a result of an investment of over $25 million in NuScale.

4.  The Receiver has determined that the ownership interest in NuScale is an asset of the Receivership Estate and the Receiver has advised RAI that it intends to sell this valuable asset any day without prior confirmation by the Court and for a price that could be substantially below competing offers and well below the amount MKN invested in NuScale.

5.  NuScale is widely recognized as perhaps the leading nuclear technology company in the development of Small Modular Reactors (SMR). The SMR technology allows for lower manufacturing and installation costs, higher safety level, reduced financial requirements, and simplicity of design and maintenance. NuScale's SMR is positioned to supply a substantial portion of the future energy market, thereby reducing reliance on coal and oil energy sources and reducing environmental concerns relating to global warming, smog, and acid rain. In addition, SMR technology has the potential to avoid the safety problems that have threatened large nuclear reactors and brought the construction of new nuclear facilities to a halt in the United States for decades. The list of advantages of this advanced technology is too long to enumerate here, but includes, as well, the creation of a considerable number of jobs in the depressed US employment market, including for production of the reactors, transportation, and the subsequent onsite installation of the power plants.

6.  The quality of NuScale's technology was recognized by RAI and its prospects led Michael Kenwood Nuclear Energy (MKN) to invest an amount in excess of $25 million in a move that gave rise to the possibility of extraordinary returns for all its investors.

7. This Court has already heard testimony on the importance of the NuScale business and this Court ordered the Receiver to provide additional funds to NuScale during the Receivership.

8. RAI is the father of Defendant Francisco Illarramendi, but had no involvement in the finances or administration of the Michael Kenwood Group. Instead RAI brought valuable expertise in the world energy market to Michael Kenwood Group.

9. During his 50-year career, RAI has acquired a privileged perspective of the energy industry and the development of global energy strategies. From his first professional endeavor as Counsel for the oil workers' unions in Venezuela, through his various missions as Venezuelan Representative to OPEC and the OPEC Fund, as DCM at the Embassy in Washington DC and Ambassador to several Caribbean countries, as Director of the Venezuelan (Sovereign) Investment Fund and as Executive Director at the Inter-American Development Bank, RAI has built up distinguished credentials through his wide-ranging international experience.

10. RAI's experience in the world energy market led him to research and decide to promote investments in the fledgling field of SMRs several years ago. Based on the outstanding prospects RAI discerned in the field of clean (non-emitting) energy, Michael Kenwood Group (MKG) agreed to join in RAI's new company, which ultimately became Michael Kenwood Energy and Infrastructure (MKEI), in exchange for a 50% participation.

11. MKG undertook to incorporate the company, pay all legal fees and administrative costs including hiring of employees and consultants, payroll, travel and other expenses, and financing investments in worthy companies and projects. Michael Kenwood Nuclear Energy (MKN) was then incorporated as the MKEI vehicle to hold those investments that

pertained specifically to the field of nuclear power, namely NuScale. MKN thus gained a 56 percent ownership interest in NuScale (even if the investor of record was provisionally a different MKG entity pending incorporation of MKN).

12. There have been no allegations in any court proceeding that NuScale squandered the more than $25 million that was invested in it by MKN. Instead, there seems to be a consensus that NuScale has used the money to full advantage to improve its technology and bring the SMR closer to market. Based on such progress, as far as RAI understands, this Court approved the continued funding of NuScale by the Receiver. Moreover, RAI has always admired (a) the technological advance that NuScale represents as a result of the work of professors and researchers of the Nuclear Engineering Department of Oregon State University (OSU), under the leadership of Professor José N. Reyes, PhD, whose scientific achievements are recognized in the United States and all over the world; and (b) the management team, from the Board of Directors on down, with experience and dedication second to none: 1) the CEO, Dr. Paul Lorenzini, co-founder of NuScale, a Hall-of-Famer, the first Doctor of Nuclear Engineering to graduate from OSU, a lawyer and head of energy companies from Australia to Turkey to California; 2) GiWon Lee, PhD, University of Illinois graduate, legendary chief engineer of multiple international projects; 3) Joseph Turnage, PhD, veteran manager and recipient of awards from several nuclear industry organizations; 4) James Carter, lawyer and engineer, with vast experience as industry consultant; 5) Maurice Gunderson, former member of the Board and key shareholder representative; 6) Michael Sellman, head of NuScale's Vendors' and Providers' Council; and finally, the top administrative, financial and operations team: Ed Wallace, Scott Bailey, Jay Surina, Tom Marcille, Bruce Landrey, an all-star lineup.

13. Despite the value of NuScale and the funds well-invested in its technology, RAI has now learned through industry sources that the Receiver may be about to sell its ownership interest in NuScale for an amount that could be substantially below fair market value, substantially below the amount of funds invested in NuScale, and without giving RAI, or other interested parties a reasonable opportunity to make a competing bid.

14. The imminent sale of NuScale ownership through a private sale has been confirmed by counsel for the Receiver in the email message attached as Exhibit 1. The Receiver's counsel indicated that a private sale was so imminent, that RAI would be given no chance for due diligence investigation and only 24 hours to put together a competing bid:

> If Mr. Illarramendi actually has investors who are prepared to make a bonafide offer, he must make the offer now or lose the opportunity to have such an offer considered by the Receiver. If Mr. Illarramendi wishes to have such an offer considered by the Receiver and his business advisor, he must present the written offer by the end of the close of business tomorrow with supporting documentation which establishes the availability of funds to consummate the purchase at the price contained in his offer, and which demonstrates the substantial likelihood that the proposed transaction could be closed within a very short time period. In addition, documentation should be submitted which would establish that any proposed purchasers are legally able to purchase nuclear technology under existing export control and other applicable U.S. laws. As I am sure you understand, the Receiver must make decisions for the benefit of the Receivership Estate based upon well supported and documented bonafide offers. [Ex. 1 - August 24, 2011 Email from Jonathan Barr to Counsel for RAI]

15. There have been no orders issued by this Court relating to the sale of NuScale and the entire private sale process to date has been handled in secrecy by the Receiver.

16. Receivership sales are akin to bankruptcy estate sales and also rely on court orders allowing for free and clear sales of estate property. Sale orders in both bankruptcy and receivership proceedings relate to the court's *in rem* jurisdiction over estate property. The

U.S. Supreme Court's decision in *Tennessee Student Assistance Corporation v. Hood*, 541 U.S. 440 (2004) confirmed the Court's role in supervising and approving "*in rem*" jurisdiction.

17. It is well settled that a court-supervised auction sale may bring higher value to the Estate than a private sale. The Bankruptcy Rules specifically provide guidance for selling Estate assets and those rules confirm the value of transparency in a process, such as auction sales, to increase competition and provide the best value to the Estate. The United States Bankruptcy Court for the District of Massachusetts has set forth its local rule to be used to obtain the highest possible value through auction sales:

> RULE 6004-1. SALE OF ESTATE PROPERTY
> \*\*\*
> •Public Auctions
> 1. Court Authorization
> The estate representative, with prior Court approval, may sell estate property by public auction. Subsequent confirmation by the Court of the auction is not required unless such confirmation is a condition of the Court's approval. The notice of public sale shall be substantially similar to MLBR Official Local Form 2B. The estate representative shall file a motion to sell the estate assets, and state why a public, rather than a private, sale is requested. Any auction advertisement placed by an auctioneer or estate representative shall conspicuously state the bankruptcy case name and number. The proposed notice shall be attached to the motion to sell but need not be served on any party. Upon receipt of the proposed notice, the Clerk shall assign a deadline for filing objections, fix a hearing date, and transmit such dates to the moving party by telephone or such other means as the Clerk deems appropriate. The estate representative shall then serve the motion to sell and the completed notice in the manner provided in subsection (a)(3) of this rule or other order of the Court and shall file a certificate of service within seven (7) days of service.

18. The United States Bankruptcy Court for the District of Connecticut also provides guidance on the sale of Estate assets in its local rules:

> **LBR 6004-1**
> **SALE OF ESTATE PROPERTY**
> (a) Appraisals shall ordinarily be required prior to any sale not in the ordinary course of business unless the trustee or debtor-in-possession determines that such appraisal is not warranted under the facts of the case. Where appropriate, the trustee or debtor-in-possession may determine the value of any property by reference to current price guides used to determine the value of such property, unless otherwise directed by the court.
> (b) Appraisals shall be submitted to the court not later than noon on the day prior to the sale of the property in question. Each appraisal shall be kept under seal upon filing and treated as confidential. Access to the appraisal may be had only by the court, the United States Trustee, andsuch other parties as the court may direct. Unless otherwise authorized by the court, the appraisals shall be unsealed at the conclusion of the case.

19. In sum, the standard process for selling a significant Estate asset is a more transparent process than is being followed by the Receiver in the instant case. Consequently, there is no assurance that the sale will bring appropriate value in exchange for the Estate asset.

20. In his rush to unload the NuScale ownership interest, the Receiver has failed to provide information to interested persons and would not appear to be optimizing the value of the investments he is mandated to protect. In RAI's opinion, a minimal acceptable offer should at least include all the funding and expenses incurred in the NuScale venture by Michael Kenwood in pursuit of wealth creation for its investors. On three occasions, RAI made a written formal request for information, including as pertains to NuScale–

    a. Certified Statement dated February 24, 2011, attached as Exhibit 2.

    b. A letter dated March 25, 2011, attached as Exhibit 3.

    c. A letter dated June 26, 2011, attached as Exhibit 4.

21. For reasons that have not yet been explained, the Receiver failed to respond to any of these requests for information by RAI. Instead, the Receiver pursued his own path of seeking out a private purchaser. On information and belief the private purchaser is offering a low-ball figure because it probably knows that the asset sale process is favorable to it and it has no need to fear competition from competing offers.

22. This motion for the opening of a due diligence process prior to the sale of the Receivership assets, including NuScale ownership interest, providing safeguards similar to those accorded to participants in a public auction, will bring transparency to a process that has been cloaked in secrecy and will bring competition to a situation currently involving private negotiations with what appears to be a single purchaser at fire sale prices.

23. In a telephone conference on August 28, 2011 among counsel for the Receiver, counsel for RAI, the Receiver, the Receiver's business advisor, and RAI, RAI expressed his interest in structuring an offer for the NuScale ownership interest, whereof the adjusted amount, pending due diligence, would certainly be several times that of the rumored offer currently being entertained. However, RAI has been denied information about the ownership interest that he has been requesting for over six months, making the adjusted amount of his offer impossible to determine.

24. Based on limited information garnered through various sources, it appears that the Receiver is about to sell the controlling ownership interest in NuScale for a very low figure, despite the value of such ownership interest. Moreover, it appears that every action taken by the Receiver with respect to the sale of NuScale has served only to diminish the value of NuScale in the open market. Reportedly, the Receiver imposed an

exclusivity period to block the receipt of competing offers and allowed one party to gain access to NuScale information while other interested parties, willing to provide funding, such as RAI's group, were denied access.

25. Such disparity of treatment among potential offerors and the secret offer purportedly about to be accepted by the Receiver constitute persuasive reasons for opening up the asset sale process and allowing RAI and any interested party that may have been similarly deprived of the necessary information to present a viable offer, to participate in a transparent process with reasonable deadlines (certainly not 24 hours) and leeway for proper due diligence, that gives a fair opportunity to participate with a level playing field.

26. Such a process should be preceded by an appropriate period of due diligence, where RAI and any other heretofore similarly excluded interested party would be able to obtain asset information necessary to present an offer. No doubt, the Receiver has already provided such information to the private sale purchaser, so this is not likely to impose any additional burden on the Receiver nor on his Business Advisor.

27. The Amended Order Appointing Receiver dated June 22, 2011 (hereinafter referred to as the "Amended Order"), in paragraphs 33 and 36, generally empowers the Receiver to marshal the assets of the Receivership Estate and to liquidate the assets as the Receiver deems necessary and appropriate. The Order requires the Receiver to liquidate the assets in a manner "most beneficial to the Receivership Estate." Specifically, paragraph 42 of the Amended Order contains the following provision:

> The Receiver may, without further Order of this Court, transfer, monetize, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate. With respect to any asset having a value in excess of $1 million, the Receiver shall consult with one of the Business Advisors and consider his or her opinion with respect to said transaction.

28. The Receiver has not followed a transparent process with respect to the disposition of the ownership interest in NuScale. The imminent sale of the Estate's most valuable asset, the NuScale ownership rights, is not being pursued in a manner most beneficial to the Receivership Estate. The Receiver failed to respond to requests for information about NuScale, failed to give notice to the nuclear industry about the nature and extent of the Estate's ownership interest in NuScale, and failed to communicate with RAI, the person within Michael Kenwood with the most significant ownership interest in NuScale. In addition, as discussed below, the Receiver failed to comply with that portion of the Amended Order requiring meaningful consultation with the Business Advisor about inquiries raised about NuScale.

29. During the August 28, 2011 telephone conference with RAI, The Receiver's Business Advisor himself expressed surprise about the repeated expressions of interest by RAI in NuScale, about how RAI would be able to put together an offer of this nature and import and present it in less than 24 hours. It seemed that the Business Advisor was not aware of RAI's repeated requests for information from the Receiver that would have allowed RAI to prepare a proper and timely offer. However, following proper due diligence that would reassure his potential buyer, RAI would be in a position to present such an offer, and if the Court so ordered, RAI would consider providing a meaningful guaranteed cash deposit in escrow as a good faith gesture, while the due diligence was carried out.

30. The granting of this Motion will not require modification of any scheduling order entered by this Court pursuant to Fed. R. Civ. P. 16(b), or the deadlines established by the standing order on scheduling in civil cases.

**WHEREFORE**, the undersigned attorney respectfully requests that this Court issue an Order mandating the opening of a due diligence period that would allow Mr. Illarramendi to present an offer for the ownership interest in NuScale Power, Inc.

Dated at Hartford, Connecticut this 7th day of September, 2011.

                                      **Interested Party**
                                      **Ramon Illarramendi**

                                By:   /s/ Frank F. Coulom, Jr.
                                    Frank F. Coulom, Jr. (CT 05230)
                                    ROBINSON & COLE LLP
                                    280 Trumbull Street
                                    Hartford, CT 06103-3597
                                    Tel. No.: (860) 275-8200
                                    Fax No.: (860) 275-8299
                                    E-mail: fcoulom@rc.com

## **ORDER**

The Motion for Order Requiring Defined Period of Due Diligence, filed by Ramon Illarramendi, having been presented and considered, it is hereby ORDERED, that the Motion is GRANTED.

_____ J.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion For Order Requiring A Defined Period Of Due Diligence Prior To Sale Of Receiver Estate Assets: In Particular, Ownership Interest In Nuscale Power, Inc. was served on all counsel of record, this 7th day of September, 2011, via the Court's ECF system.

By: /s/ Frank F. Coulom, Jr.
Frank F. Coulom, Jr.