**EXHIBIT 3**

## IN THE CIRCUIT COURT OF THE
## THIRTEENTH JUDICIAL CIRCUIT IN AND
## FOR HILLSBOROUGH COUNTY, FLORIDA

**VENTURES TRUST MANAGEMENT**
**LLC, a Delaware Limited Liability**
**Company,**

        **Plaintiff,**

**v.**                             **Case No.:  11-CA-10094**

**PAUL LORENZINI, Ph.D.,**

        **Defendant.**

_____/

## AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF AND MONETARY DAMAGES

Plaintiff Ventures Trust Management LLC ("VTM"), a Delaware limited liability company, by and through its undersigned attorneys, hereby sues Paul Lorenzini, Ph.D. (Dr. Lorenzini") and alleges as follows:

### INTRODUCTION

1.      This is an action for monetary damages, declaratory relief and injunctive relief with respect to defamation, breach of duty of good faith and fair dealing, and tortious interference with prospective business relationships and contracts regarding negotiations and offers to fund advanced by Plaintiff VTM and the resultant acquisition by Plaintiff VTM of a majority and/or controlling equity position in Defendant NuScale Power, Inc. ("NuScale"), an Oregon corporation.

2.      Plaintiff VTM is a Delaware limited liability company with its principal place of business in Odessa, Hillsborough County, Florida.

3.      Defendant Dr. Lorenzini is a resident of Oregon.

## JURISDICTION AND VENUE

4.     Plaintiff VTM conducts business in Hillsborough County, in the State of Florida. Defendant Dr. Lorenzini slandered and defamed the Plaintiff, breached his duty of good faith and fair dealing, and tortiously interfered with prospective business relationships and contracts, the effects of which occurred in Hillsborough County, Florida.

5.     The amount in controversy exceeds $15,000.00, exclusive of interest, costs, and attorney's fees.

6.     Plaintiff VTM is also seeking declaratory and injunctive relief within the equitable powers of this Court.

7.      The Circuit Court has long-arm jurisdiction over Dr. Lorenzini pursuant to Chapter 48.193(b) and (f)(1), *Fla. Stat.*

8.     Original jurisdiction is proper pursuant to Chapter 26.012, *Fla. Stat.*

9.     Venue is proper pursuant to Chapter 47.051, *Fla. Stat.*, because the cause of action against Defendant Dr. Lorenzini arose in Hillsborough County, Florida, in that the acts, practices and courses of conduct at issue herein occurred in Hillsborough County, Florida.

## BACKGROUND

10.     Plaintiff VTM is engaged in the raising of capital for business ventures and the management of portfolio investments through a series of "Ventures Trust" family of investment funds. VTM is managed by directors including Craig L. Berkman ("Mr. Berkman"), a citizen and resident of Hillsborough County, Florida; James Stanley ("Mr. Stanley"), a citizen and resident of Broward County, Florida; and Paul Tabet ("Mr. Tabet"), a citizen and resident of California.

2

11.     NuScale was organized in 2007 as an Oregon corporation.  NuScale's purpose is to advance and develop a small scale nuclear reactor technology within the US power generation market. The Chief Executive Officer ("CEO") of NuScale is Defendant Dr. Lorenzini, a longtime executive in the utility industry.  Dr. Lorenzini and NuScale's management are closely integrated into Oregon State University's Department of Nuclear Engineering which licensed proprietary technology to NuScale on an exclusive basis in November 2007 for development by NuScale (the "OSU License.")

12.     On information and belief, Dr. Lorenzini on behalf of NuScale raised initial funding for its operations from sources in the states of Oregon and California. In 2009, the management of NuScale commenced an interim financing plan with Michael Kenwood Asset Management LLC ("MK"), which entity has its base in Stamford, Connecticut. Through a series of approximately seven (7) related transactions, MK loaned funds to NuScale to fund its operations from 2009 through December 2010 through a series of convertible promissory notes. Each of these loans was sequentially converted to equity in NuScale. By December 2010, MK had acquired a majority interest in the preferred and common shares of NuScale.  The seventh transaction (a loan of approximately $10 million to the Company in or about December 2010) was not converted to equity.  By virtue of the non-conversion, MK is consequently also NuScale's largest creditor.

13.     On or about November 1, 2010, Dr. Lorenzini, as the president and CEO of NuScale, spoke to Mr. Berkman, a managing director of VTM.  At that time, Dr. Lorenzini had known Mr. Berkman personally for approximately twenty (20) years. Dr. Lorenzini was and remains an investor in an investment fund which is managed by Mr. Berkman.  Dr. Lorenzini

described the nature and status of the business activities of NuScale to Mr. Berkman and informed him of NuScale's financing arrangement with MK.

14.      MK was, in fact, an integral part of an alleged, complex, Ponzi scheme managed by Francisco Illarramendi ("Mr. Illarramendi"). The United States Securities and Exchange Commission ("SEC") commenced civil injunctive litigation against MK and related entities and persons in the United States District Court for the District of Connecticut on January 14, 2011[1]. The US Attorney for the District of Connecticut commenced a criminal prosecution of Mr. Illarramendi on March 7, 2011.[2]  All of the assets of MK were frozen on or about January 14, 2011.  On or about June 22, 2011, an Amended Order Appointing Receiver was issued and a stay entered by the Court regarding any interference in the form of other actions with "Receivership Property." The Receiver has clearly taken the position that NuScale constitutes Receivership property.

15.      Under Mr. Illarramendi guidance, MK allegedly defrauded investors of hundreds of millions of dollars. "The primary purpose of the scheme was to conceal the gap between the commingled assets and the liabilities of the fund," according to the Receiver.  In May 2011, Mr. Illarramendi reportedly pled guilty to the criminal charges including securities fraud. Upon information and belief, Mr. Illarramendi is awaiting sentencing at this time.

16.      Upon information and belief, the MK investments in NuScale represented between 5% and 10% of the investments of the MK Ponzi scheme investors. Plaintiff understands that the investments were apparently premised upon the promise of a higher-than-market return. Upon information and belief, investment strategies were developed by Mr. Illarramendi of MK and by other investment advisors. Investments were purportedly placed in 16

---

[1] *SEC v. Illarramendi & Michael Kenwood Capital Management, LLC, et al.,* Dist. Conn., Case No. 2011-CV-78.
[2] *United States v. Illarramendi,* Dist. Conn., Case No. 2011-CR-41.

portfolio entities, including consulting firms, currency arbitrage businesses, sovereign debt trading, internet-based talent competitions, automotive repair companies, consumer bill payment service entities and a variety of other enterprises. Other seemingly legitimate investment targets included BCInet, makers of hardware for neurologically controlled computer devices, Vetra Energy Group, a Colombian oil and gas company, and ProTerra Inc., a promoter of fuel cell technologies. On information and belief, an early investor – and the main victim of the MK Ponzi scheme – is the Venezuelan government-owned oil industry's pension fund ("Petroleos de Venezuela SA") and its administrator.

17.     On February 3, 2011, the District Court in Connecticut appointed a Receiver to supervise the MK assets for the benefit of the investors in MK who had been victims of the Ponzi scheme fraud.[3]   The Receiver's investigation continues at this time.[4]

18.     As of the time that MK's assets were frozen, NuScale was scheduled to receive an additional $10 million advance of funds from MK. Despite NuScale's request for this amount of further financing, the Receiver declined to deliver this final tranche of funds, and NuScale was, as of that time, essentially without a funding plan to proceed with its business and to continue in the payment of requisite salaries to its nearly 140 employees. NuScale later obtained Court permission to utilize a balance of approximately $1,100,000 remaining in the NuScale operating account, which it had on hand from MK, to meet its current indebtedness.

19.     Shortly after the MK assets were frozen on January 14, 2011, Dr. Lorenzini, on behalf of NuScale, solicited Mr. Berkman and Plaintiff VTM for assistance in locating and securing a new source of capital for NuScale. At the time and at all times material hereto, Mr.

---

[3] The Receiver's authority was expanded by a revised Court Order on March 1, 2011.
[4] In May, 2011, the Receiver succeeded in extending jurisdiction to another series of funds in which the MK investments were placed, known as "Highview Point." According to the Receiver's allegations, the Highview Point principals – recipients of MK investments – were both "part of the Ponzi scheme and victims."

Berkman and the VTM principal place of business were located in Odessa, Hillsborough County, Florida.

20.     Between January and May 4, 2011, VTM responded to the request of Dr. Lorenzini by performing as follows:

a.  Conducting research and due diligence into the NuScale's status and business activities, its equity structure, financing posture and business plan;

b.  Having three managing directors of VTM travel to Portland and Corvallis, Oregon, to conduct an on-site inspection of the facilities and to have discussions with Dr. Lorenzini;

c.  Developing with the President and CEO of NuScale, Dr. Lorenzini, a provisional "Term Sheet" of that which would be required to influx sufficient capital into NuScale in order to salvage the entity;

d.  Arranging a meeting in New York with a representative of Tangent Ventures LP ("Tangent"), a substantial energy industry consulting and operating firm, which entity conducts business from London, England;

e.  Meeting with representatives of Tangent in London and entering into a non-compete, non-disclosure agreement between Tangent and VTM;

f.  Arranging for representatives of Tangent to travel to Oregon to conduct an on-site inspection and technology review visit;

g.  Arranging for representatives of Tangent to travel to Iowa to meet with the CEO of Mid-American Power, which was represented by Dr. Lorenzini to VTM to be a prospective customer and potential investor in NuScale;

h.  Arranging for representatives of Tangent to travel to Virginia to meet with executives of Newport News, which was represented by NuScale to VTM to be a prospective contractor for the construction of NuScale's nuclear reactor units;

i.  Meeting with representatives of Tangent in New York to review the terms for a potential investment by Tangent /VTM in NuScale;

j.  Corresponding and conferring extensively with Dr. Lorenzini about a prospective investment in NuScale directly by VTM or, alternatively, as a member of a group investment conglomerate, more specifically VTM and Tangent;

k.  Overcoming an alleged refusal, as communicated to VTM by Dr. Lorenzini, on the part of one of NuScale's strategic partners, under circumstances where VTM subsequently learned that the strategic partner identified by Dr. Lorenzini, in fact, was ready, willing and able to participate with VTM and Tangent regarding investments in NuScale and participation, as appropriate, in the management of NuScale thereby confirming that the earlier representation made by Dr. Lorenzini to VTM of said partner's "refusal" to work with VTM and Tangent was, in fact, untrue; and

l.  Submitting a good faith "Term Sheet" proposal to Dr. Lorenzini for an initial investment of $30 million by Tangent /VTM as a short term funding remedy to meet the current needs of NuScale, and a further investment of $20 million and a long term financing plan were to be proposed and delivered to Dr. Lorenzini by VTM with respect to long term financing.

21.    The "Term Sheet" referred to in paragraph 20(l) above was delivered to Dr. Lorenzini on April 30, 2011, for immediate consideration by NuScale's board of directors. The

Term Sheet resulted from a series of meetings and discussions between Dr. Lorenzini and VTM with respect to NuScale's requirements for capital and Dr. Lorenzini's expressed continued interest in controlling the management of NuScale. The Term Sheet's provisions were reviewed by Dr. Lorenzini, VTM, and Tangent prior to submission for approval by the NuScale board of directors, and responded directly to the articulated requirements of Dr. Lorenzini and the NuScale board. The NuScale board was, in fact, presented the Term Sheet for board approval.

22.     According to the Term Sheet, the funding to be provided included (a) a sum to "buy out" the interests of MK which were now under the jurisdiction and control of the court-appointed Receiver; (b) working capital for a 90-day bridge period; and (c) a mechanism for NuScale to secure long-term financing during the bridge period adequate to bring the technology of NuScale and Oregon State University to market. Dr. Lorenzini would have remained NuScale's CEO pursuant to the Term Sheet.

23.     On information and belief, the NuScale board of directors consists of four individuals, Dr. Lorenzini, Joseph Turnage ("Mr. Turnage"), GiWon Lee ("Mr. Lee") and Mr. Carter, a prior president of MK Nuclear Energy. Plaintiff VTM understands that the Director of the Office of Commercialization and Corporate Development of Oregon State University participated and continues to do so as an observer regarding the NuScale board of directors. On information and belief, the NuScale board of directors met to consider the VTM/Tangent Term Sheet in early May 2011.

24.     Following the board meeting referenced in paragraph 23 above, VTM was told by Dr. Lorenzini that the board of directors of NuScale would have no further dealings with VTM and, by implication, Tangent.

8

25.     On May 5, 2011, Dr. Lorenzini, NuScale's CEO, wrote to Mr. Berkman, in care of "Ventures Trust Funds" at the Odessa, Florida, address of VTM, stating that neither he nor any person affiliated with NuScale would conduct any business with Mr. Berkman, VTM or Tangent. (See Exhibit 1 appended hereto and incorporated by reference herein). After soliciting Mr. Berkman and VTM, Dr. Lorenzini postured that NuScale's strategic business partners would not agree to work with Mr. Berkman or VTM because of a legal action in which Mr. Berkman had been involved prior to 2010.

26.     Plaintiff VTM responded to the assertions of Dr. Lorenzini and rejected the "directive" from Dr. Lorenzini not to contact any person(s) in connection with NuScale.  A copy of Mr. Berkman's May 9, 2011 response letter to Dr. Lorenzini, rejecting the admonishments contained in his May 5th correspondence that VTM not have further contact with NuScale is appended hereto as Exhibit 2.

27.     Plaintiff VTM later learned that the NuScale board of directors had "acquired" from Dr. Lorenzini and acted upon this information in its rejection of the VTM Term Sheet which was and is completely false:  the alleged "information" acted upon and later disseminated and published by Dr. Lorenzini was that Tangent's owners and/or directors are part of the Russian "mob"; that the funds to be utilized in the short-term and long-term financing of NuScale was "mob money" coming from an organized crime syndicate, a racketeering enterprise, or other illicit sources emanating in Russia; and that Plaintiff VTM was knowingly involved.

28.     According to the May 5, 2011 letter appended hereto as Exhibit 1, and knowing that a representative(s) of Oregon State University participated as an observer in the NuScale board of directors meetings, Plaintiff VTM believes and alleges that affiliates of NuScale

enumerated in Exhibit 1 received publication of this false information from Dr. Lorenzini as though it were true and were instructed to rely upon these assertions.

29.    On or about June 1, 2011, VTM was advised by an attorney for Oregon State University that said institution had withdrawn the OSU License for use by NuScale. Said action deprived NuScale of virtually all commercial value. At the time, NuScale was without financial or other resources and had laid off the vast majority of its staff and retained the remainder of its personnel on a voluntary, non-compensated basis. Upon information and belief, these consequences were a direct result of the withdrawal of the OSU license, caused by Dr. Lorenzini's publication to Oregon State University of the false, malicious, and defamatory statements as reflected in paragraph 27 and 28.

30.    VTM then approached the court-appointed Receiver for MK. After meeting with representatives of the Receiver, Plaintiff VTM was orally advised that the Receiver's office would not enter into a Non-Disclosure Agreement or, indeed, engage in any further discussions with VTM in connection with short-term or long-term funding of NuScale by VTM including any "buy-out" of MK's interest in NuScale. Upon information and belief, Dr. Lorenzini published to the Court-appointed Receiver the false, malicious, and defamatory information contained in paragraphs 27 and 28, above.

31.    The court-appointed Receiver for MK took a passive, not an active, role in the management of NuScale, notwithstanding the fact that the receivership held the majority equity interest in NuScale and held a majority of the debt of that entity. Dr. Lorenzini, as the CEO of NuScale, insisted that VTM have no direct contact or interaction with the Receiver. Plaintiff VTM believes it apparent that Dr. Lorenzini, at all material times, controlled and directed the acts, practices, and courses of conduct to tortiously and intentionally deprive Plaintiff VTM of

any reasonable ability to further its avowed effort, objective, and goal of submitting an ultimately successful proposal to the Court-appointed Receiver to acquire NuScale.

32.     Finally, it should be noted that in the order appointing the Receiver, he was not empowered or authorized to engage in management activities on behalf of NuScale; his role was limited to marshall and administrate the assets and debts of MK.

33.     Upon information and belief, Plaintiff VTM understands that the false and defamatory information as alleged in paragraphs 27 and 28, above, has been published to various sources by Defendant Dr. Lorenzini, which defamatory information has deprived and prevented Plaintiff VTM from engaging in any funding activities with regard to NuScale, including but not limited to short-term or long-term funding and "buying out" MK's equity position in NuScale from the court-appointed MK Receiver.

34.     As to the allegations regarding defamation, without this Court's intercession, Plaintiff VTM will be irreparably harmed and monetary damages cannot easily be ascertained.

35.     Further, Plaintiff VTM needs this Court to take jurisdiction and render a declaratory judgment as to the rights and obligations of the parties under the totality of the circumstances.

36.     As to the defamation allegations, there is no adequate remedy at law.

37.     Plaintiff VTM is obligated to pay reasonable attorneys fees in connection with this matter.

## COUNT I

## DECLARATORY JUDGMENT RELIEF

38.     Plaintiff VTM realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

11

39.     This is an action for equitable relief in the nature of a declaratory judgment by this Court to ascertain and determine the rights and obligations of the parties.

40.     By virtue of the acts, practices, and courses of events as alleged above, Plaintiff VTM has been precluded from participating or otherwise submitting proposals for short-term and long-term financing or otherwise submitting a proposal for a "buy out" of MK's equity position regarding NuScale by virtue of the actions of Defendant Dr. Lorenzini as described herein.

41.     Defendant Dr. Lorenzini has maliciously and without factual basis defamed and tortiously interfered with the reasonable business activities of Plaintiff VTM.

42.     Plaintiff VTM requests and is entitled to a declaratory judgment by this Court setting forth the rights and obligations of the parties under the circumstances.

WHEREFORE, Plaintiff VTM respectfully requests that this Court enter a declaratory judgment finding that Plaintiff VTM has been defamed by Defendant Dr. Lorenzini, and that Defendant Dr. Lorenzini has tortiously interfered with prospective and actual business relationships, the awarding the costs and expenses associated with this action to Plaintiff VTM, and for such other and further relief as this Court deems just and appropriate.

## COUNT II

## MANDATORY INJUNCTION ORDERING
## COMPLIANCE WITH DECLARATORY JUDGMENT

43.     Plaintiff VTM realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

44.     This is an action for entry of a mandatory injunction ordering Defendant Dr. Lorenzini and those acting in active concert or participation with him to comply with the provisions of the declaratory judgment also sought in this action.

45.     Without the entry of a mandatory injunction, Plaintiff VTM will suffer irreparable harm.

46.     Without the entry of a mandatory injunction, Plaintiff VTM will have no adequate remedy at law.

47.     It is in the public interest to grant the mandatory injunction to Plaintiff VTM sought herein.

WHEREFORE,  Plaintiff VTM respectfully requests that this Court issue a mandatory injunction compelling compliance by Defendant Dr. Lorenzini with the terms and conditions of the declaratory judgment relief sought herein, plus the costs and expenses associated with this action, and such other and further relief as this Court deems just and appropriate.

## COUNT III

## PROHIBITORY INJUNCTION

48.     Plaintiff VTM realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

49.     This is an action for a prohibitory injunction ordering Defendant Dr. Lorenzini to cease and desist from making or publishing defamatory comments or information concerning Plaintiff VTM where such comments are intended to and do negatively reflect upon the business reputation and acumen of Plaintiff VTM.

50.     Without the entry of a prohibitory injunction there is a reasonable likelihood that Defendant Dr. Lorenzini will continue to publish defamatory information regarding Plaintiff VTM.

51.     Without the entry of a prohibitory injunction Plaintiff VTM will suffer irreparable harm.

13

52.    Without the entry of a prohibitory injunction Plaintiff VTM has no adequate remedy at law.

53.    It is in the public interest to grant the prohibitory injunction to Plaintiff VTM as sought herein.

WHEREFORE, Plaintiff VTM respectfully requests that this Court issue a prohibitory injunction ordering Defendant Dr. Lorenzini to cease and desist from making or publishing defamatory comments or information concerning Plaintiff VTM where such comments are intended to and do negatively reflect upon the business reputation and acumen of Plaintiff VTM.

## COUNT IV

## DEFAMATION - - MONEY DAMAGES

54.    Plaintiff VTM realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

55.    The false allegations fabricated and/or published by Dr. Lorenzini are *per se* defamatory in that they imply and suggest that Plaintiff VTM is a part of, involved with, and/or otherwise engaging in criminal activity including the laundering of money, in violation of US and International Law, and is otherwise intentionally and tortiously fabricating and/or publishing information to defame Plaintiff VTM and injure the business reputation of Plaintiff.

56.    Defendant Dr. Lorenzini has published untrue information about Plaintiff VTM and Tangent, causing the loss of reputation, good will, standing in the community, and the loss of the business opportunity to acquire MK's equity interests in NuScale.

57.    Plaintiff VTM and Tangent were ready, willing and able to invest $30 million and such other sums as would be necessary to salvage NuScale and to advance the business operations and activities of NuScale through the stages of obtaining Nuclear Regulatory

Commission approvals for the small-scale nuclear reactor technology. At such time, Plaintiff VTM's assessment of the market value of NuScale was/is in a range of excess of $1 billion which would have yielded the Plaintiff VTM a substantial return on investment which Plaintiff VTM values in excess of $200 million.

58.    Plaintiff VTM has been damaged thereby as a proximate result of Defendant Dr. Lorenzini defamation of the Plaintiff VTM.

WHEREFORE, Plaintiff VTM respectfully requests that this Court award it monetary damages in excess of $15,000.00, punitive damages, and the costs and expenses associated with this action and such other and further relief as this Court deems just and appropriate.

## COUNT V

## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

59.    Plaintiff VTM realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

60.    Defendant Dr. Lorenzini owed Plaintiff VTM a duty of good faith and fair dealing as the two parties entered into negotiations for the Plaintiff VTM to provide short-term and long-term funding in exchange for an equity participation in NuScale.

61.    Defendant Dr. Lorenzini breached his duty to Plaintiff VTM, depriving it of business opportunities of Plaintiff VTM and causing damage to Plaintiff VTM's business reputation.

62.    Plaintiff VTM has been damaged thereby as a proximate result of the Defendant Dr. Lorenzini's breach of his duty to the Plaintiff VTM.

WHEREFORE, Plaintiff VTM respectfully requests that this Court award it monetary damages in excess of $15,000.00, punitive damages, and the costs and expenses associated with this action and such other and further relief as this Court deems just and appropriate.

## COUNT VI

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS AND CONTRACTS

63.      Plaintiff VTM realleges and incorporates by reference paragraphs 1 through 37 as if fully set forth herein.

64.      Defendant Dr. Lorenzini's conduct as alleged herein constitutes a tortious or intentional interference with the reasonable business opportunity for Plaintiff VTM to acquire a majority and/or controlling interest in NuScale.

65.      Defendant Dr. Lorenzini's acts, practices and courses of conduct, intentional in nature, have deprived Plaintiff VTM of the reasonable opportunity to enter into business relationships and contracts with and involving NuScale as alleged herein.

66.      Plaintiff VTM has been damaged thereby as a proximate result of Defendant Dr. Lorenzini's tortious interference with prospective business relationships and contracts.

WHEREFORE, Plaintiff VTM respectfully requests that this Court award it monetary damages in excess of $15,000.00, punitive damages, and the costs and expenses associated with this action and such other and further relief as this Court deems just and appropriate.

16

## DEMAND FOR JURY TRIAL

Plaintiff VTM demands a trial by jury on issues which are so triable.

John R. Kiefner, Jr., Esq.
FBN: 0137703
KIEFNER LAW OFFICES, P.A.
146 2nd Street North, Suite 300
St. Petersburg, FL 33701
Phone: (727) 894-8000
Fax: (727) 894-8002

17



**NUSCALE POWER**

May 5, 2011

Craig L. Berkman
Ventures Trust Funds
7722 Still Lakes Drive
Odessa, FL 33556

Dear Mr. Berkman,

I write to you after being informed of a meeting you held recently at the court-appointed Receiver's office to discuss an investment in NuScale. I have verbally indicated to you in the past our unwillingness to receive funds from you or Ventures Trust Funds. I am now instructed by the NuScale Board of Directors to write to you and ask that you not make further approaches to NuScale, its officers, directors, employees, legal counsel, strategic partners, suppliers, vendors, investors, outside potential investors or any other parties that have an interest in furthering NuScale's efforts to re-launch the company.

To be clear, NuScale will not entertain any investment proposed by Ventures Trust Fund, yourself personally, or any investment or investor that arises from contact with you or Ventures Trust Fund or any other company with which you are associated.

We appreciate that as well-intentioned as your efforts may be, your past record, including having been found liable for conversion and breach of fiduciary duty, and the deep concerns these matters raise with those with whom we work on a daily basis to develop our future plans simply make it impossible for us to accept any investment arising from you or your efforts.

On behalf of the NuScale Board of Directors, thank you for understanding our position in this matter.

Sincerely,

Paul G. Lorenzini
Chief Executive Officer



EXHIBIT

# Ventures Trust Funds
7722 Still Lakes Drive
Odessa, Florida 33556

9 May 2011

Mr. Paul Lorenzini
President
NuScale Power, Inc.
6650 S. W. Redwood Lane, Suite 210
Portland, Oregon 97224

Re: Your May 5, 2011 Letter to C. L. Berkman

Dear Paul:

The timing and substance of the letter referenced above is both puzzling and troubling.

For many years you have taken the initiative to share the "NuScale Story" with me. A few months ago, you and your NuScale associates encouraged me and my Ventures Trust colleagues to assist you in raising capital for NuScale. I agreed to help a friend in a time of need.

At your invitation, Ventures Trust principals and I spent considerable time and financial resources meeting with you and the NuScale team in Oregon. At the conclusion of our visit, you and I edited a prospective investor term sheet.

In good faith and in reliance on your solicitation, Ventures Trust identified a qualified and value-added institutional investor, Tangent Ventures. With your permission and encouragement, we at Ventures Trust and the principals of Tangent spent considerable time and thousands of dollars on due diligence in support of a substantial investment in the company to relaunch NuScale. With your active support and participation, we and Tangent's principals met with executives from companies that you and your team represented as "strategic partners" who had expressed an investment and/or commercial interest in NuScale's future.

Prior to the last round of meetings, Tangent provided a written offer to provide up to $30 million to meet NuScale's current financing needs, resolve matters with the Court-appointed Receiver and advance the current management team's objectives and a plan to raise $40 to $50 million. We were encouraged that the company could move forward and scheduled two more meetings with "strategic partners" including Kiewit in Omaha, Nebraska.

After the last of these due diligence meetings, however, you informed me that NuScale would reject Tangent because neither Kiewit nor another "strategic partner" which met with Tangent would support NuScale with this investor's participation. Two days after our conversation, I received a copy of an April 27, 2011 email from Tom Shelby, a Kiewit executive, very explicitly contradicting your characterization of Kiewit's willingness to work with Tangent.

I believe that your actions taken during the course of our investor's due diligence process have minimized NuScale's chance of overcoming its current financial challenges.

On Tuesday, May 5th, you advised during our telephone conversation that NuScale would be closing its offices on May 15, 2011 unless it received sufficient capital to support a $600,000 monthly burn. Furthermore, you explained that a prospective investor was demanding an exclusive right to invest. You stated that to their consternation you were not at liberty to grant an

1

EXHIBIT

2

exclusive right to invest in NuScale given the role of the Receiver as both the majority shareholder and the company's largest and secured creditor.

Nevertheless, in your letter of May 5, 2011, Paul, you and your board of directors have apparently asserted your perceived right to unilaterally prevent the involvement of Ventures Trust, Tangent and myself in the resurrection of the company.

As you know, I have served as a founder, officer, director and investor in a number of technology companies and have raised millions of dollars for these enterprises. Seven of them have either become public entities or have been acquired. Investors received positive investment returns. Their revenues are in excess of $9 billion and they have a combined present market valuations in excess of $20 billion. I am proud of my record.

Knowing full well my history, you invited me to assist NuScale. A few short weeks ago, you believed that my overall professional track record and worldwide contacts could provide value to your company. After providing you with a means of salvaging your company, it is rather incredible that their opportunity has been spurned and you have deemed it within your duties to terminate Ventures Trust's efforts on your behalf.

My Ventures Trust colleagues and I do not accept your admonition.

Cordially,

Craig L. Berkman
Managing Director

2