UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------x
SECURITIES AND EXCHANGE                 :
COMMISSION,                             :
               Plaintiff,       :          Civ. Action No. 11-cv-78 (JBA)
                       :
          - v -              :
                       :
FRANCISCO ILLARRAMENDI,                 :
HIGHVIEW POINT PARTNERS, LLC and        :          **Oral Argument Requested**
MICHAEL KENWOOD CAPITAL                 :
     MANAGEMENT, LLC,               :
                       :
               Defendants,      :
     and                            :
                       :
HIGHVIEW POINT MASTER FUND, LTD.,       :
HIGHVIEW POINT OFFSHORE, LTD.,          :
HIGHVIEW POINT LP,                      :
MICHAEL KENWOOD ASSET                   :
     MANAGEMENT, LLC,               :
MK ENERGY AND INFRASTRUCTURE,           :
     LLC, and                       :
MKEI SOLAR, LP,                         :
                       :
           Relief Defendants  :
-------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF
RELIEF DEFENDANTS HIGHVIEW POINT MASTER FUND, LTD.
AND HIGHVIEW POINT OFFSHORE, LTD.**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ............................................................................................3

ARGUMENT .................................................................................................................6

I.      PLAINTIFF'S FIFTH CLAIM FOR RELIEF SHOULD BE DISMISSED
BECAUSE THE COMMISSION CANNOT OVERCOME THE
PRESUMPTION AGAINST EXTRATERRITORIAL APPLICATION OF
SECTION 21(d)(5). .............................................................................................8

      A.    The Presumption Against Extraterritoriality Applies to All
Federal Statutes and Statutory Provisions..................................................9

      B.    The Presumption Against Extraterritoriality Avoids the Risk
That U.S. Law and Cayman Islands Law Would Conflict ....................10

      C.    Congress Has Not Clearly Expressed an Intention to Permit
the Extraterritorial Application of Section 21(d)(5) .............................13

      D.    The Commission's SAC Does Not Pass the "Transactions"
Test, Which Replaced the Conduct and Effects Test.............................16

II.     THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE
HIGHVIEW OFFSHORE FUNDS BECAUSE THE FUNDS ARE NOT
PROPER RELIEF DEFENDANTS..................................................................18

      A.    Any Legitimate Claim Defeats Relief Defendant Status .......................18

      B.    If Assets Consist of <u>Both</u> Legitimate and Illegitimate
Proceeds, A Party Is Not A Proper Relief Defendant...........................21

      C.    The Highview Offshore Funds Have A Legitimate Claim to
the Assets Held by Them Through Their Direct Exclusive
Ownership of the Assets. ........................................................................24

      D.    As Investors, the Highview Offshore Funds Gave Value for
Their Purported Investments in MK Venezuela .....................................25

CONCLUSION............................................................................................................26

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*5-Star Mgmt., Inc. v. Rogers,*
  940 F. Supp. 512 (E.D.N.Y. 1996) ..................................................................................4, 7

*In re Alstom SA Sec. Litig.,*
  741 F. Supp. 2d 469 (S.D.N.Y. 2010) ...............................................................................17

*Amlon Metals, Inc. v. FMC Corp.,*
  775 F. Supp. 668 (S.D.N.Y. 1991) ............................................................................. 13-14

*Antares Aircraft LP v. Fed. Republic of Nigeria.,*
  948 F.2d 90 (2d Cir. 1991),
  *vacated on other grounds,*
  505 U.S. 1215 (1992) ...........................................................................................................7

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ............................................................................................................6

*Bechtel v. Competitive Techs., Inc.,*
  448 F.3d 469 (2d Cir. 2006) .......................................................................................14, 15

*Bell Atl. Corp. v. Twonbly,*
  550 U.S. 544 (2007) ........................................................................................................6, 7

*Carnero v. Bos. Scientific Corp.,*
  433 F.3d 1 (1st Cir. 2006) .......................................................................................8, 9, 10, 14

*CFTC v. Hanover Trading Corp.,*
  34 F. Supp. 2d 203 (S.D.N.Y. 1999) .................................................................................21

*CFTC v. Kimberlynn Creek Ranch, Inc.,*
  276 F.3d 187 (4th Cir. 2002) .......................................................................................20, 21

*CFTC v. Walsh, ("Walsh I")*
  618 F.3d 218 (2d Cir. 2010) ................................................. 19, 20-21, 22, 23, 24

*CFTC v. Walsh, ("Walsh II")*
  __ F.3d __, Nos. 09-3742-cv, 09-3787-cv,
  2011 WL 4090758 (2d Cir. Sept. 15, 2011) .....................................................................23

*CFTC v. Walsh, ("Walsh III")*
  17 N.Y.3d 162 (2011) .......................................................................................................23

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003).................................................................................25

*Eby v. Ashley*,
    1 F.2d 971 (4th Cir. 1924)......................................................................26

*EEOC v. Arabian Am. Oil Co.*, ("*Aramco*")
    499 U.S. 244 (1991).......................................................................8, 14, 15

*Janvey v. Adams*,
    588 F.3d 831 (5th Cir. 2009).................................21, 22, 23, 24, 25, 26

*J.S. ex rel. N.S. v. Attica Cent. Schs.*,
    386 F.3d 107 (2d Cir. 2004)......................................................................7

*Kaiser v. Bowlen*,
    455 F.3d 1197 (10th Cir. 2006)...............................................................25

*Koch v. Christie's Int'l PLC*,
    785 F. Supp. 2d 105 (S.D.N.Y. 2011)....................................................3, 7

*Kollias v. D&G Marine Maint. II*,
    29 F.3d 67 (2d Cir. 1994).....................................................................9, 11

*Labor Union of Pico Korea, Ltd. v. Pico Prods., Inc.*,
    968 F.2d 191 (2d Cir. 1992)..................................................................8, 13

*Lamie v. United States Tr.*,
    540 U.S. 526 (2004)................................................................................15

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)......................................................................7

*Microsoft Corp. v. AT&T Corp.*,
    550 U.S. 437 (2007)............................................................................8, 15

*In re Milazzo.*,
    450 B.R. 363 (Bankr. D. Conn. 2011) ...................................................3, 7

*Morrison v. Nat'l Austl. Bank, Ltd.*,
    __ U.S. __, 130 S. Ct. 2869 (2010)..........................................8, *passim*

*N.Y. Cent. R.R. Co. v. Chisholm*,
    268 U.S. 29 (1925)..................................................................................10

*Norex Petroleum Ltd. v. Access Indus.*,
    631 F.3d 29 (2d Cir. 2010).........................................................................8

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ...........................................................................7

*In re Royal Bank of Scot. Grp. PLC Sec. Litig.*,
  765 F. Supp. 2d 327 (S.D.N.Y. 2011) ..........................................................17

*Sale v. Haitian Ctrs. Council Inc.*,
  509 U.S. 155 (1993) ...............................................................................10, 14

*SEC v. Cavanagh*,
  155 F.3d 129 (2d Cir. 1998) ....................................................................19, 20

*SEC v. Cherif*,
  933 F.2d 403 (7th Cir. 1991) .........................................................................18

*SEC v. Colello*,
  139 F.3d 674 (9th Cir. 1998) ....................................................................19, 20

*SEC v. DiBella*,
  409 F. Supp. 2d 122 (D. Conn. 2006) ...........................................................14

*SEC v. Founding Partners Capital Mgmt.*,
  639 F. Supp. 2d 1291 (M.D. Fla. 2009) .........................................................21

*SEC v. Goldman Sachs & Co.*,
  __ F. Supp. 2d __, No. 10 Civ. 3229 (BSJ)(MHD),
  2011 WL 2305988 (S.D.N.Y. June 10, 2011) ................................................16

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  454 B.R. 285 (Bankr. S.D.N.Y. 2011) ...........................................................25

*Smith v. United States*,
  507 U.S. 197 (1993) .................................................................................8, 13

*United States v. Philip Morris USA, Inc.*,
  783 F. Supp. 2d 23 (D.D.C. 2011) ..................................................................9

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011) ...........................................................16

*Zahourek v. Arthur Young & Co.*,
  750 F.2d 827 (10th Cir. 1984) .........................................................................9

*Zoelsch v. Arthur Anderson & Co.*,
  824 F. 2d 27 (D.C. Cir. 1987) .......................................................................17

**STATUTES**

15 U.S.C. § 78dd(a) (2011) ("Exchange Act") ...................................................................16

    15 U.S.C. § 78u(d)(5) (2011) ............................................................... 13, *passim*

Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"),
Pub. L. No. 107-204, § 305, 116 Stat. 745, 779 (2002)..................................................14

    18 U.S.C. § 1514A (section 306) ...................................................................10

N.Y. Debt. & Cred. Law § 272 (McKinney 2001 & Supp. 2011)................................23

N.Y. Dom. Rel. Law § 236 (McKinney 2010) ...............................................................23

**SENATE REPORTS**

S. Rep. No. 107-205 (2002) ...............................................................................15

**RULES**

Fed. R. Civ. P. 12(b)(1).................................................................1, 6, 7, 18, 26

Fed. R. Civ. P. 12(b)(6).................................................................1, 6, 7, 26

Local Rule 31.2.........................................................................................2

Relief Defendants Highview Point Master Fund, Ltd. (the "Master Fund") and Highview Point Offshore, Ltd. (the "Offshore Fund," together with the Master Fund, the "Highview Offshore Funds" or the "Funds") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint (the "SAC") of the Securities and Exchange Commission (the "Commission"), pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The Highview Offshore Funds are Cayman Islands entities, which were formed offshore, are regulated by a foreign regulator, principally have offshore investors, and are primarily engaged in offshore transactions.  They are <u>not</u> accused of any wrongdoing. Notwithstanding that, the Commission joined the Highview Offshore Funds as relief defendants in this civil enforcement action because allegedly they received proceeds of fraud, which had been transferred to them by their investment manager, defendant Highview Point Partners, LLC ("HPP"), through one of its principals, defendant Francisco Illarramendi ("Illarramendi").

Only the Fifth Claim for Relief, for equitable relief, has been asserted against the Highview Offshore Funds.  That Claim must be dismissed because (1) Section 21(d)(5) of the Securities and Exchange Act of 1934 (the "Exchange Act"), pursuant to which the Commission seeks relief, has no extraterritorial application, and all the fraudulent transactions at issue were foreign, and (2) the Commission has failed to allege that the Highview Offshore Funds lack a legitimate claim to the assets in their possession, as it must to trigger this Court's subject matter jurisdiction over the Funds as relief defendants.  Thus, the Commission's Fifth Claim for Relief must be dismissed.

**Oral Argument Requested.**

## PROCEDURAL HISTORY

The Commission filed its Second Amended Complaint on May 10, 2011,[1] alleging defendants Illarramendi, HPP, and Michael Kenwood Capital Management, LLC ("MK Capital"),[2] misappropriated and misused funds that they had received from the Highview Offshore Funds, and other relief defendants.  Also on May 10, 2011, the Commission filed a motion for permanent and preliminary relief against the Highview Offshore Funds and HPP, seeking an asset freeze, repatriation of the Funds' assets to the U.S., and the appointment of a receiver over the Highview Offshore Funds and HPP (the "TRO Motion").  (Dkt. 182.)  The Court held a three-day hearing on the TRO Motion on May 23, 25, and 27, 2011 (the "TRO Hearing"), during which time the Commission withdrew its request for the appointment of a receiver over the Highview Offshore Funds.  On June 16, 2011, the Court entered an order granting the Commission's TRO Motion (the "TRO Order").  (Dkt. 276.)

The Highview Offshore Funds filed a notice of appeal of the TRO Order on August 12, 2011.  The appeal, which raises some of the same issues that are the subject of this motion, is currently pending before the Second Circuit Court of Appeals.  The Highview Offshore Funds filed their initial brief on November 8, 2011.  The Commission's opposition papers are due no later than February 7, 2012.[3]

---

[1]     The Commission filed its Complaint on January 14, 2011, alleging that Illarramendi used various entities managed by MK Capital to facilitate his fraudulent scheme ("Compl.").  (Dkt. 1.)  On March 7, 2011, the Commission filed its First Amended Complaint, adding new allegations about Illarramendi's fraudulent scheme.  (Dkt. 122.)

[2]     MK Capital is an unregistered investment adviser incorporated in Delaware, with its principal place of business in Stamford, Connecticut.   It is wholly owned and controlled by the Michael Kenwood Group (the "MK Group"), which is "a group of affiliated entities" owned and controlled by Illarramendi.  (SAC [Dkt. 190] ¶¶ 2, 17.)

[3]     Pursuant to Local Rule 31.2 of the Local Rules of the Second Circuit Court of Appeals, the Commission has until November 22, 2011 to notify the Second Circuit of the deadline it requests for filing its opposition brief, which deadline must be no later than February 7, 2012.  The Commission has the option of selecting an earlier date for filing its opposition brief.

## STATEMENT OF FACTS

The Highview Offshore Funds are Cayman Islands exempt companies, incorporated under the laws of the Cayman Islands.  (*See* Affirmation of Michael E. Swartz, Esq., dated November 14, 2011 ("Swartz Affirmation"), Ex. A.)[4]  Thus, they are foreign entities, which are not registered or regulated by the Commission or any other U.S. agency.  Rather, they are subject to regulation by the Cayman Islands Monetary Authority ("CIMA"), the Cayman Islands equivalent to the Commission.  (*Id.*)

The Highview Offshore Funds are organized in what is known as a "master/feeder" structure, which is a commonly used investment structure.  (*See* SAC ¶ 3.)  The purpose of the master/feeder structure is to facilitate investments in the Master Fund by various classes of investors.  The Master Fund has "two feeder funds"—the Offshore Fund and Highview Point, L.P. (the "Domestic Fund").[5]  The Commission alleges that "virtually all of the Highview Funds investors are offshore individuals and entities."[6]  (SAC ¶ 3.)  All investors in the Offshore Fund entered into subscription agreements in which they agreed to be bound by the laws of the Cayman Islands.  (Swartz Aff., Ex. B., ¶ 2.)[7]  Thus, the Highview Offshore Funds did

---

[4]     Attached as Exhibit A to the Swartz Affirmation are true and correct copies of printouts from a record search on the Cayman Online Registry Information Service.  The Court may take judicial notice of this public record because the information contained therein is generally known to the parties and the Court, and its accuracy is not subject to reasonable dispute.  *In re Milazzo*, 450 B.R. 363, 367 (Bankr. D. Conn. 2011); *see also Koch v. Christie's Int'l PLC*, 785 F. Supp. 2d 105, 112 (S.D.N.Y.  2011).

[5]     The Domestic Fund, although also a relief defendant, is a separate entity from the Highview Offshore Funds and is not a party to this motion to dismiss.

[6]     The SAC identifies one domestic investor, "a Florida resident who is an investor in HPLP," the Domestic Fund.  (SAC ¶ 37.)  This investor is not an investor of the Offshore Fund or the Master Fund.  (*Id.*).  Moreover, the Commission alleges that this domestic investor engaged in non-U.S. transactions.  According to the Commission, "[t]he Florida Investor advised the Commission that he understood that his funds would be used to make investments *in developing economies.*"  (*Id.* (emphasis added).)  Thus, the Commission's sole allegation regarding a domestic investor does not allege a domestic transaction and does not involve an investor in either of the offshore fund movants.

[7]     Attached as Exhibit B to the Swartz Affirmation is a true and correct copy of the Declaration of Scott Dakers, dated May 18, 2011.  (Dkt. 226-1.)  Exhibit B is submitted in support of the Highview Offshore Funds' motion under Rule 12(b)(1), challenging the district court's subject matter jurisdiction.

not expect to be hauled into U.S. court in connection with their investments, given that they (i) are Cayman Islands companies; (ii) are bound by Cayman Islands law; (iii) are subject to regulation by CIMA; (iv) generally prohibited U.S. persons from investing in them; and (v) required their investors to enter into subscription agreements that are governed by Cayman Islands law.

### *Transactions Involving the Highview Offshore Funds*

There is no allegation in the SAC—none—that any of the Highview Offshore Funds' transactions involved U.S. securities or a U.S. securities exchange.  Rather, the Commission's allegations describe numerous purported transactions involving non-U.S. securities between the Highview Offshore Funds (Cayman Islands entities) and a Panamanian company, a Cayman Islands company, and "various offshore entities."  (*See, e.g.,* SAC ¶¶ 7, 25-26, 28-34.)  Indeed, the Commission has admitted that the "vast majority of the transactions were in non-U.S. securities and instruments," and that "the vast majority of the instruments were maintained overseas."  (Swartz Aff., Ex. C, 5/23/11 Hr'g Tr. at 81:24-82-5.)[8]  Moreover, the Commission has not identified any domestic transaction involving the Highview Offshore Funds.[9]

In addition to the Commission's admission that the Highview Offshore Funds engaged in transactions involving non-U.S. securities and instruments that were maintained overseas, defendant Illarramendi admitted that he caused the Highview Offshore Funds to

---

[8]     Attached as <u>Exhibit C</u> to the Swartz Affirmation is a true and correct copy of excerpts from the hearing transcript, dated May 23, 2011 ("5/23/11 Hr'g Tr.").  At the motion to dismiss stage, the Court may take judicial notice of a transcript that contains a party admission.  *See 5–Star Mgmt., Inc. v. Rogers*, 940 F. Supp. 512, 518 (E.D.N.Y.1996).

[9]     The only domestic transaction referenced in the SAC did not involve the Highview Offshore Funds.  The Commission alleges that "Illarramendi invested almost $23 million from the MK Funds" into a "West Coast-based Nuclear Energy Company."  (SAC ¶ 49.)  There is no allegation of any transaction between the Highview Offshore Funds and the Nuclear Energy Company.

engage in foreign transactions.  Specifically, Illarramendi admitted that he caused the Funds to engage in Venezuelan foreign exchange arbitrage transactions that involved the purchase and sale of foreign currency from banks or broker-dealers located in Venezuela, or from other offshore third party intermediaries that are located in Venezuela.  (Swartz Aff., Ex. D, 5/25/11 Hr'g Tr. at 322:23-327:22.)[10]  Because those purchases and sales occurred abroad, they are foreign transactions.  Illarramendi did not describe any domestic transaction involving the Highview Offshore Funds.

### The Funds' Investment Adviser

All of the Highview Offshore Funds' investments were made through its investment adviser, HPP.  (SAC ¶¶ 3, 77.)  HPP "is organized under the laws of Delaware and its principal place of business is in Stamford, Connecticut."  (SAC ¶ 16.)  The Highview Offshore Funds are "separate legal entities[] that are registered in the Cayman Islands."  (Swartz Aff., Ex. C, 5/23/11 Hr'g Tr. 46:8-13.)  Whereas the Offshore Fund is registered with CIMA (Swartz Aff., Ex. A), HPP "has been registered with the Commission since 2006."  (SAC ¶ 16.)  The Highview Offshore Funds did not control HPP.  Rather, "Illarramendi and two other individuals . . . together owned and controlled [HPP]."  (SAC ¶ 3.)

### Nature and Scope of Defendants' Fraud

Illarramendi used HPP and MK Capital (another investment adviser firm under Illarramendi's control), to misappropriate and misuse the assets of the Highview Offshore Funds and other funds owned by the MK Group, including MK Venezuela Fund, Ltd. ("MK Venezuela") and MK Special Opportunities Fund.  (SAC ¶¶ 2, 19, 36, 45, 63.)  The MK Funds also are Cayman Islands entities.  (*See* Swartz Aff., Ex. A.)  "The investors in the MK Funds are

---

[10]     A true and correct copy of excerpts from the hearing transcript, dated May 25, 2011, is attached as <u>Exhibit D</u> to the Swartz Affirmation ("5/25/11 Hr'g Tr.").  The Court may take judicial notice of this transcript because it contains a party admission.  *Id.*

primarily offshore individuals and entities, including a pension fund for a foreign corporation"—

the Venezuelan government-owned petroleum company, Petróleos de Venezuela S.A.

("PDVSA").  (SAC ¶¶ 2-3; Compl. ¶ 1.)  According to the Commission, this pension fund "is the

source of approximately 90% of the monies invested in the [MK] Funds."  (Compl. ¶ 1.)

      The Commission alleges that "Illarramendi conducted the fraud using the

Highview Funds and the MK Funds in tandem, engaging in many related transactions between

the two groups."  (SAC ¶ 4.)  Essentially, the Commission alleges, "the Highview Funds are akin

to early investors in a Ponzi scheme in that Illarramendi and [HPP] misappropriated and misused

investor monies from the Highview Funds and then attempted to hide those losses by transferring

investor monies from the MK Funds to the Highview Funds."  (*Id.*)  "By at least 2006, the

Highview Funds had sustained millions of dollars in investment losses, a fact that Illarramendi

and [HPP] attempted to conceal."  (*Id.* ¶ 24.)

      The Highview Offshore Funds are not accused of any wrongdoing.  Rather, the

Commission alleges that the Funds "are both victims and beneficiaries of the fraud."  (*Id.* ¶ 4.)

## ARGUMENT

      The Commission's SAC must be dismissed pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure because it fails to state a claim upon which relief may be

granted.  Further, the SAC must be dismissed pursuant to Rule 12(b)(1) because the Court lacks

subject matter jurisdiction over the Highview Offshore Funds.  To avoid dismissal, a complaint's

well-pled, non-conclusory, factual allegations must create a "reasonable inference" that the

plaintiff is entitled to the relief sought.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949

(2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Thus, allegations in a

complaint "must be enough to raise a right to relief above the speculative level . . . on the

assumption that all allegations are true (even if doubtful in fact)." *Bell Atl.*, 550 U.S. at 555 (internal citations and quotations omitted).

A motion to dismiss for lack of subject matter jurisdiction made pursuant to Rule 12(b)(1) is analyzed under substantively the same standards as a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).  *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003).  In deciding a Rule 12(b)(1) motion to dismiss, however, the Court must not "draw inferences from the complaint favorable to plaintiffs."  *J.S. ex rel. N.S. v. Attica Cent. Schs.,* 386 F.3d 107, 110 (2d Cir. 2004).  In addition, "[o]n a motion under Rule 12(b)(1) challenging the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits."  *Antares Aircraft LP v. Fed. Republic of Nigeria.,* 948 F.2d 90 (2d Cir. 1991), *vacated on other grounds*, 505 U.S. 1215 (1992).

The Court may consider "court documents or matters of public record at the motion to dismiss stage where both parties had notice of their contents and the documents are integral to the complaint."  *Koch*, 785 F. Supp. 2d at 112; *5–Star Mgmt.*, 940 F. Supp. at 518 (courts may consider transcripts containing a party admission on a motion to dismiss).  Thus, the court may take judicial notice, at any stage of the proceedings, of "its own orders and records not subject to reasonable dispute."  *In re Milazzo*, 450 B.R. at 367.  If those documents contain statements that contradict allegations in the complaint, the documents (not the complaint) control.  *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

I.     **PLAINTIFF'S FIFTH CLAIM FOR RELIEF SHOULD BE DISMISSED BECAUSE THE COMMISSION CANNOT OVERCOME THE PRESUMPTION AGAINST EXTRATERRITORIAL APPLICATION OF SECTION 21(D)(5).**

The Commission's Fifth Claim for Relief, seeking extraterritorial equitable relief pursuant to Section 21(d)(5) of the Exchange Act, must be dismissed as a matter of law because (i) Section 21(d)(5) cannot be applied extraterritorially, and (ii) all the transactions at issue are foreign.

"It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Morrison v. Nat'l Austl. Bank, Ltd.*, __ U.S. __, 130 S. Ct. 2869, 2877 (2010) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("*Aramco*")).  Thus, where "a statute is silent as to its territorial reach, and no contrary congressional intent clearly appears, there is generally a presumption against its extraterritorial application." *Carnero v. Bos. Scientific Corp.*, 433 F.3d 1, 7 (1st Cir. 2006); *Norex Petroleum Ltd. v. Access Indus.*, 631 F.3d 29, 32 (2d Cir. 2010).  That presumption is based on the "commonsense notion that Congress generally legislates with domestic concerns in mind," *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993), and "that United States law governs domestically but does not rule the world." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007).

The Commission has failed to show that Congress meant for Section 21(d)(5) to apply extraterritorially.  *See Labor Union of Pico Korea, Ltd. v. Pico Prods. Inc.*, 968 F.2d 191, 194 (2d Cir. 1992).  Therefore, it does not.  Moreover, the Commission does not seek domestic application of Section 21(d)(5), as it has failed to allege that any of the fraudulent transactions at issue with regard to the Highview Offshore Funds were domestic.  Accordingly, the Commission's Fifth Claim of Relief (its only claim of relief against the Highview Offshore Funds) must be dismissed.

A.   **The Presumption Against Extraterritoriality Applies to All Federal Statutes and Statutory Provisions**

In *Morrison*, the Supreme Court held that the presumption against extraterritoriality applies "in all cases." 130 S. Ct. at 2881 ("Rather than guess anew in each case, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects."); *see also Kollias v. D&G Marine Maint. II*, 29 F.3d 67, 72 (2d Cir. 1994) (presumption applies regardless of statute's subject matter). Thus, the presumption applies to remedial statutory provisions, such as Section 21(d)(5), as well as prohibitory statutory provisions, such as Section 10(b), the provision at issue in *Morrison*. *See United States v. Philip Morris USA, Inc.*, 783 F. Supp. 2d 23, 27-28 (D.D.C. 2011) (rejecting government's argument that *Morrison* applies only to Section 10(b) claims).

Indeed, courts have applied the presumption against extraterritoriality to remedial statutory provisions that are analogous to Section 21(d)(5) of the Exchange Act. *See, e.g., Carnero*, 433 F.3d at 18; *Zahourek v. Arthur Young & Co.*, 750 F.2d 827, 829 (10th Cir. 1984). In *Zahourek*, for example, the Tenth Circuit held that the Age Discrimination in Employment Act could not be applied to protect an American citizen who worked for an American company, where the workplace was in Honduras. 750 F.2d at 828-29. There, the plaintiff sought both monetary damages and injunctive relief. *Id.* at 829. In rejecting the relief sought, the Tenth Circuit stated that: "We fail to see how [plaintiff's] request for injunctive relief brings the instant case out from under the general rule that the Age Discrimination in Employment Act is not to be given extraterritorial effect." *Id.* Similarly, the Commission's request for extraterritorial equitable relief pursuant to Section 21(d)(5) of the Exchange Act cannot escape the presumption against extraterritoriality.

- 9 -

Another example is the First Circuit's holding in *Carnero*, which found that the whistleblower protections in Section 806 of the Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley") could not be applied extraterritorially to protect a foreign employee.  433 F.3d at 2.  The plaintiff in *Carnero* was an Argentinean who was hired to work overseas for an Argentinean company that was owned by a U.S. company based in Delaware.  *Id.*  Plaintiff alleged that he was fired in retaliation for informing his superiors that the company's Delaware parent had engaged in accounting misconduct in the U.S., and sought an order requiring the company to reinstate him. *Id.* at 3.  Like Section 21(d)(5) of the Exchange Act, Section 806 of Sarbanes-Oxley was enacted with "investor-protection goals" in mind.  *Id.* at 5.  But, despite the fact that Section 806 was "designed to protect" employees of publicly-traded companies, the First Circuit applied the presumption against extraterritoriality to Section 806 because the plaintiff was a foreign employee working abroad.  *Id.* at 5-7.  Similarly, the presumption against extraterritoriality applies to Section 21(d)(5), even though it is designed to protect investors, and provides equitable relief.

**B.     The Presumption Against Extraterritoriality Avoids the Risk That U.S. Law and Cayman Islands Law Would Conflict**

The presumption against extraterritoriality is rooted in longstanding principles of the comity of nations that seek to prevent the type of conflicts between U.S. law and the laws of other sovereigns, such as the conflicts that may arise in this case.  *See Morrison*, 130 S. Ct. at 2885.  U.S. laws should not be applied in any way that "would be unjust" or "would be an interference with the authority of another sovereign."  *See N.Y. Cent. R.R. Co. v. Chisholm*, 268 U.S. 29, 32 (1925); *Sale v. Haitian Ctrs. Council, Inc*., 509 U.S. 155, 174 (1993) ("the presumption has a foundation" that includes "the desire to avoid conflict with the laws of other nations.").  Here, the Highview Offshore Funds are Cayman Islands entities that are subject to

and must at all time comply with Cayman Islands law.  (*See, e.g.*, Swartz Aff., Ex. A.)

Furthermore, the Funds are subject to regulation by CIMA, a Cayman Islands regulatory agency.

(*Id*.)  Thus, any order of this Court governing the disposition of the Funds' assets may interfere,

substantially, with the authority of a Cayman Islands court or agency to render a decision about

those assets.  Notwithstanding that, as the Second Circuit has recognized, the presumption

against extraterritoriality applies "even if the potential for international discord is weak or

nonexistent."  *Kollias*, 29 F.3d at 71.

       Indeed, the potential for clashes between U.S. and Cayman Islands law is evident

in this case.  During the TRO Hearing, the Commission argued that the Highview Offshore

Funds' assets (which at all times have been held overseas) should be transferred to the U.S.

because there is a chance that investors or other creditors of the Funds could commence an

involuntary liquidation proceeding against the Highview Offshore Funds in the Cayman Islands.

(Swartz Aff., Ex. C, 5/23/11 Hr'g Tr. at 31-32.)  In response, the Highview Offshore Funds

argued that, because they are Cayman Islands entities, a Cayman court is better situated to

resolve issues relating to the disposition of the Funds' assets.  (Swartz Aff., Ex. C, 5/23/11 Hr'g

Tr. at 26.)

       The Court expressly recognized that conflicts may arise in this case "if the

Cayman courts functioning appropriately under Cayman law are headed in a direction that is at

odds with what a U.S. court has done or will do."  (*Id.* at 33-34.)  As the Court explained, "it's

not a matter of not respecting [Cayman courts], it's one of those knotty issues of the . . . context

that's international."  (*Id.*)

       The presumption against extraterritoriality requires courts to avoid the "knotty

issues" arising from clashes between U.S. and foreign laws, unless Congress directs otherwise.

This case squarely raises the issue of comity that the presumption against extraterritoriality seeks to avoid. As the Supreme Court recognized in *Morrison*, "the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters." *Morrison*, 130 S. Ct. at 2885.

In this case, the Cayman Islands is best situated to resolve any disputes over the Highview Offshore Funds' assets because the Funds (i) were formed in the Cayman Islands and are organized under the laws of the Cayman Islands, (ii) are subject to the rules and regulations of CIMA, (iii) are located in the Cayman Islands, (iv) are managed by Directors who are all located in the Cayman Islands, and (v) principally have foreign investors, all of whom agreed in their subscription agreements that their investments would be governed by the laws of the Cayman Islands. (*See* Swartz Aff., Ex. A.)

In addition to the significant interests that the Cayman Islands has in regulating its own companies, the U.S. connections are minimal. Here, the vast majority of the investors allegedly harmed by the alleged fraudulent conduct are foreign investors (including the Highview Offshore Funds). (SAC ¶¶ 2-3.) All of the alleged fraudulent transactions are foreign, and the vast majority of the investment vehicles used to perpetrate the fraud are foreign—most, if not all, of which are Cayman Islands entities. (*Id.* ¶¶ 5-6, 25, 26, 28-34; Compl. ¶ 1; Swartz Aff., Ex. A.) Indeed, the MK Funds are Cayman Islands entities. (Swartz Aff., Ex. A.)

The only U.S. interest in this case is that the fraud was allegedly conducted in the U.S. by U.S. actors. However, as discussed below, the Supreme Court's holding in *Morrison* makes clear that the place of the fraudulent act has no bearing on extraterritoriality. Rather, it is

the nature of the transactions that controls the analysis. Here, the alleged fraudulent transactions were purely foreign.  Thus, it is appropriate (indeed necessary) to apply the presumption against extraterritoriality, and the principles of comity that underlie it, in this case.

**C.      Congress Has Not Clearly Expressed an Intention to Permit the Extraterritorial Application of Section 21(d)(5)**

In *Morrison*, the Supreme Court reinforced the longstanding presumption against the extraterritorial application of federal laws by instituting the following bright line rule: "When a statute gives no clear indication of an extraterritorial application, it has none." *See Morrison*, 130 S. Ct. at 2878.   The Commission has not identified clear statutory intent to apply Section 21(d)(5) of the Exchange Act extraterritorially.  In fact, that provision is silent as to its territorial reach.  In fact, Section 21(d)(5), which provides as follows, is silent as its extraterritorial reach:

> In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.

15 U.S.C. § 78u(d)(5).  Because, Section 21(d)(5) is silent on its extraterritorial application, "it has none."  *Morrison*, 130 S. Ct. at 2878.

Congress's intent to give a statutory provision extraterritorial effect must be clearly expressed; it cannot be surmised.  *See Morrison*, 130 S. Ct. at 2877; *Smith*, 507 U.S. at 204.  Thus, the Court may not speculate that the broad language in Section 21(d)(5) permitting "any equitable relief that may be appropriate or necessary for the benefit of investors," 15 U.S.C. § 78u(d)(5), was meant to have extraterritorial effect.  *See Labor Union of Pico Korea, Ltd. v. Pico Prods, Inc.*, 968 F.2d 191, 194-95 (2d Cir. 1992) (broad definition of "commerce" is insufficient to extend Labor Management Relations Act extraterritorially); *Amlon Metals, Inc. v.*

*FMC Corp.*, 775 F. Supp. 668, 675 (S.D.N.Y. 1991) (use of the term "any person" is not sufficient to give extraterritorial application to Resource Conservation and Recovery Act suit provision); *Aramco*, 499 U.S. at 249-53 ("broad jurisdictional language" does not express clear congressional intent).  Courts look at "all available evidence" to determine whether Congress intended to give a statute or statutory provision extraterritorial effect, including its legislative history.  *Carnero*, 433 F.3d. at 7-8 (quoting *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177 (1993)).

Not only is Section 21(d)(5) of the Exchange Act silent as to its territorial reach, but the legislative history provides no "clear[] evidence of congressional intent" to give the Commission the right to obtain extraterritorial equitable relief pursuant to Section 21(d)(5). *Aramco*, 499 U.S. at 255.  Congress added Section 21(d)(5) pursuant to Section 305(b) of Sarbanes-Oxley, Pub. L. No. 107-204, § 305, 116 Stat. 745, 779 (2002), as part of sweeping corporate reform legislation following the collapse of Enron Corporation.  *Bechtel v. Competitive Techs., Inc.*, 448 F.3d 469, 484 (2d Cir. 2006) (Straub, J. dissenting) (discussing legislative purpose of Sarbanes-Oxley); *Carnero*, 433 F.3d at 11-15 (discussing legislative history and territorial scope of Sarbanes-Oxley).

Prior to the addition of Section 21(d)(5), "injured investors could only be compensated by funds obtained by the SEC from securities law violators through a disgorgement order."  *SEC v. DiBella*, 409 F. Supp. 2d 122, 130 (D. Conn. 2006) (internal quotation marks omitted).  With the addition of Section 21(d)(5), Congress expanded the Commission's enforcement mechanisms by enabling it to obtain other forms of relief for securities law

violations.  *See* S. Rep. No. 107-205, at 27 (2002).[11]  However, there is nothing to suggest that

Congress wanted to give the Commission the right to seek extraterritorial equitable relief.

      Had Congress intended to give Section 21(d)(5) extraterritorial effect, it would

have done so explicitly, as Congress knows how to give extraterritorial effect to a statute or

statutory provision.  In fact, courts assume that Congress legislates with full knowledge of the

presumption against extraterritoriality, and with the interests of other sovereign nations in mind.

As the Supreme Court has explained, "[i]t is beyond our province to rescue Congress from its

drafting errors, and to provide for what we might think . . . is the preferred result."  *Lamie v.*

*United States Tr.*, 540 U.S. 526, 542 (2004) (internal citations and quotations omitted) (alteration

in original); *see Morrison*, 130 S. Ct. at 2883 n.8 (that Congress subsequently provided

extraterritorial application of the statute at issue in *Aramco*, Title VII, demonstrates that

Congress knows how to give a statute explicit extraterritorial effect); *Microsoft Corp.*, 550 U.S.

at 455 (reiterating that courts should assume that when Congress legislates, it takes into account

the "legitimate sovereign interests of other nations").

      For example, as the *Morrison* Court noted, Section 30(a) of the Exchange Act

contains an "explicit provision for a specific extraterritorial application."  *Morrison*, 130 S. Ct. at

2883.  Section (30)(a) provides as follows:

> It shall be unlawful for any broker or dealer, directly or indirectly,
> to make use of the mails or of any means or instrumentality of
> interstate commerce for the purpose of effecting on *an exchange*
> *not within or subject to the jurisdiction of the United States*, any
> transaction in any security the issuer of which is a resident of, or is

---

[11]    Sarbanes-Oxley itself (pursuant to which Section 21(d)(5) was enacted) was enacted to resolve an acutely domestic problem:  "Revelations of mass corporate fraud, most vividly in connection with the Enron Corporation, threatened to destroy investors' faith in the American financial markets and, in so doing, to jeopardize those markets and the American economy."  *Bechtel*, 448 F.3d at 484 (Straub, J. dissenting).  Therefore, the purpose of Sarbanes-Oxley (and thus, the purpose of Section 21(d)(5)) is to protect and restore faith in *American* financial markets and the *American* economy—purely domestic concerns.  There is simply no indication that Congress intended Section 21(d)(5) to apply extraterritorially.

> organized under the laws of, or has its principal place of business
> in, a place within or subject to the jurisdiction of the United States
> . . . .

(15 U.S.C. § 78dd(a) (emphasis added)).  Thus, Section 30(a) contains what Section 21(d)(5) lacks:  "a clear statement of extraterritorial effect."  *Morrison*, 130 S. Ct. at 2883.  As there is no clear indication that Section 21(d)(5) should be given any extraterritorial effect, the Commission's claim for extraterritorial equitable relief must be dismissed.

### D.   The Commission's SAC Does Not Pass the "Transactions" Test, Which Replaced the Conduct and Effects Test

The Commission's SAC must be dismissed because it seeks extraterritorial application of Section 21(d)(5), as all the alleged fraudulent transactions involving the Highview Offshore Funds are foreign..  In *Morrison*, the Supreme Court replaced the "conduct and effects" test traditionally used by various courts to determine if a statutory provision has been applied extraterritorially with a "transactions" test.  *Morrison*, 130 S. Ct. at 2884-86.  The Supreme Court held that the Exchange Act applies only to domestic purchase and sale transactions, and defined a "domestic transaction" as a purchase and sale of securities listed on a domestic exchange, or the domestic purchase and sale of unregistered U.S. securities.  *Morrison*, 130 S. Ct. at 2885; *see also In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 530-37 (S.D.N.Y. 2011).

The Commission has not alleged, as it must, that any of the transactions involving the Highview Offshore Funds were domestic in nature.  *SEC v. Goldman Sachs & Co.*, _ F. Supp. 2d_, No. Civ 3229(BST)(MHD), 2011 WL 2305988, at *10 (S.D.N.Y. June 10, 2011) (dismissing SEC's Section 10(b) and Rule 10b-5 claims in Madoff-related action because the SEC did not adequately allege facts demonstrating domestic transactions).  There is not a single allegation in the SAC that the Highview Offshore Funds engaged in domestic transactions.

- 16 -

Rather, the Commission alleges numerous purported transactions between the Highview Offshore Funds and a Panamanian company, a Cayman Islands company, and "various offshore entities"—foreign transactions.  (*See, e.g.,* SAC ¶¶ 7, 25-26, 28-34.)

That the Highview Offshore Funds' investment manager, which allegedly engaged in the alleged misconduct, is U.S.-based does not provide a basis to seek extraterritorial equitable relief against the Funds.  (*See id.* ¶¶ 2-3.)  Following *Morrison*, it is irrelevant to the extraterritorial application of the Exchange Act that HPP, the Funds' investment manager, is located in the U.S. or engaged in its alleged fraudulent conduct in the U.S.  *See In re Royal Bank of Scot. Grp. PLC Sec. Litig.*, 765 F. Supp. 2d 327, 336-37 (S.D.N.Y. 2011) (the purchase of foreign securities in the U.S., by U.S. residents, at the direction of a U.S.-based asset manager is not a domestic transaction).

To be sure, the alleged misconduct in *Morrison* occurred in the United States, by HomeSide, a Florida-based affiliate of the Bank of Australia.  *Morrison*, 130 S. Ct. at 2883-84. Like the Commission, the plaintiffs in *Morrison* argued that they only sought domestic application of the Exchange Act because all the alleged misconduct occurred in the U.S.  The Supreme Court rejected that argument, and instead focused on the nature of the transactions.  *Id.* at 2884; *see also In re Royal Bank of Scot. Grp. PLC Sec. Litig.*, 765 F. Supp. 2d. at 336-37 (the purchase of foreign securities in the U.S., by U.S. residents, at the direction of a U.S.-based asset manager is not a domestic transaction); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 472 (S.D.N.Y. 2010) (dismissing plaintiff's securities fraud claim after *Morrison*, notwithstanding the fact that purchases of foreign defendants' securities were initiated in the U.S., the common shares were listed on the New York Stock Exchange, and the securities have been purchased by U.S. residents); *accord Zoelsch v. Arthur Anderson & Co.*, 824 F.2d 27, 32 (D.C. Cir. 1987)

("we might be inclined to doubt that an American court should ever assert jurisdiction over domestic conduct that causes loss to foreign investors").

Thus, although HPP was U.S.-based, the exclusively foreign transactions of the Highview Offshore Funds lead to the inevitable conclusion that Section 21(d)(5) of the Exchange Act does not provide a basis for extraterritorial equitable relief against the Highview Offshore Funds. Based on the foreign nature of the transaction involving the Highview Offshore Funds and the lack of a clear indication of congressional intent to apply Section 21(d)(5) extraterritorially, the Commission's Fifth Cause of Action against the Highview Offshore Funds must be dismissed.

## II.   THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE HIGHVIEW OFFSHORE FUNDS BECAUSE THE FUNDS ARE NOT PROPER RELIEF DEFENDANTS

Even assuming, *arguendo*, that the Commission is entitled to extraterritorial equitable relief under Section 21(d)(5), the SAC nevertheless should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction, because the Highview Offshore Funds are not proper relief defendants. *See SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991) (acknowledging that the Commission must first establish that a party is a proper nominal defendant, before the court can order any relief against such party). Indeed, the Highview Offshore Funds are not proper relief defendants because they have a legitimate claim to the assets that the Commission alleges include ill-gotten gains. The Funds own the assets outright, and as investors who lost significant amounts as a result of the alleged fraud, the Highview Offshore Funds have given value for those assets.

### A.   Any Legitimate Claim Defeats Relief Defendant Status

The Second Circuit recently explained that a party may be joined as a relief defendant, only if the party both (1) is "in possession of ill-gotten funds <u>and</u> (2) lacks a

legitimate claim to those funds." *CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010) ("*Walsh I*")

(emphasis added) (citing *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)).  Thus, the

existence of a legitimate claim to the relevant assets defeats an attempt to join a party as a relief

defendant, even if the party is in possession of ill-gotten funds.  *Id.*  Although the Commission

alleges that the Funds are in possession of ill-gotten gains, (SAC ¶ 83-84), they fail to allege that

the Highview Offshore Funds lack a legitimate claim to those assets.  Accordingly, the

Commission has failed to demonstrate that this Court has subject matter jurisdiction over the

Highview Offshore Funds.

      "A relief defendant is a person who 'holds the subject matter of the litigation in a

subordinate or possessory capacity as to which there is no dispute.'"  *Walsh I*, 618 F.3d at 225

(quoting *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)).  A relief defendant "may be joined

in a securities enforcement action to aid the recovery relief, provided [such party] has <u>no</u>

ownership interest in the property which is the subject of litigation."  *Id.*  (internal quotations

omitted) (emphasis added).  The Fourth Circuit explained the theory behind the "obscure

common law concept" known as "relief defendant," which it also referred to as a "nominal

defendant," as follows:

> A nominal defendant is a person who can be joined to aid the
> recovery of relief without an [additional] assertion of subject
> matter jurisdiction only because he has no ownership interest in the
> property which is the subject of litigation . . . the standard nominal
> defendant is a bank or trustee, which has only a custodial claim to
> the property. Because a nominal defendant has no ownership
> interest in the funds at issue, once the district court has acquired
> subject matter jurisdiction over the litigation regarding the conduct
> that produced the funds, it is not necessary for the court to
> separately obtain subject matter jurisdiction over the claim to the
> funds held by the nominal defendant; rather, the nominal defendant
> is joined purely as a means of facilitating collection. In short, a
> nominal defendant is part of a suit only as the holder of assets that

must be recovered in order to afford complete relief; no cause of
action is asserted against a nominal defendant.

*CFTC v. Kimberlynn Creek Ranch Inc.*, 276 F.3d 187, 191-92 (4th Cir. 2002) (internal quotations
and citations omitted) (alteration in original).

Thus, the purpose of the relief defendant mechanism is to facilitate the eventual

disgorgement of ill-gotten funds, when the ownership interests in such funds are beyond dispute.

*Id.* If, however, the purported relief defendants have a legitimate claim in the assets, either by

virtue of a full or partial ownership interest beyond mere possession, they are, by definition, <u>not</u>

proper relief defendants. *See Id.* at 192, *Walsh I*, 618 F.3d at 226. This is because, as the

individuals have not engaged in any wrongdoing, there is no basis to assert subject matter

jurisdiction over them. *See id.*

The "paradigmatic" relief defendant is not accused of any wrongdoing and has

received ill-gotten funds as a gift, is holding ill-gotten funds as a mere custodian or agent, or has

some other mere possessory interest in the assets. *See, e.g., Colello*, 139 F.3d at 678 n.4

(nominal defendant proper relief defendant where he obtained letters of credit for the defrauding

entity, invoked his fifth amendment rights, and refused to provide information necessary to

determine if he had a legitimate interest in the funds); *Kimberlynn Creek Ranch, Inc.*, 276 F.3d at

192 (nominal defendants proper relief defendants where they merely held funds on behalf of

defendants, there was no evidence to support nominal defendants' claim that they received funds

in return for services rendered); *Cavanagh*, 155 F.3d at 137 (nominal defendant proper relief

defendant, as she was not even aware the funds were deposited in her account by her husband).

By contrast to the paradigmatic relief defendant who has no legitimate claim to

the assets, those "who have provided *some form* of valuable consideration in good faith *in return*

*for proceeds of fraud* are beyond the reach of the district court's disgorgement remedy." *Walsh*

*I*, 618 F.3d 226 (emphasis added); *see Janvey v. Adams*, 588 F.3d 831, 834-35 (5th Cir. 2009) (dismissing relief defendants because they had legitimate claims to in certificate of deposit proceeds, although those proceeds were paid with ill-gotten funds); *Kimberlynn Creek Ranch, Inc.*, 276 F.3d at 192 (receipt of tainted funds for services in exchange for services rendered constitutes a legitimate claim in such funds); *CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 207 (S.D.N.Y. 1999) (party not proper relief defendant because he had a legitimate interest in funds paid to him as compensation for services performed, although he was paid with proceeds of fraud); *SEC v. Founding Partners Capital Mgmt.*, 639 F. Supp. 2d 1291, 1294 (M.D. Fla. 2009) (fraudulent loan proceeds obtained from written loan agreements precluded party from being a proper relief defendant).  Any ownership interest suffices as a legitimate claim.  *See Founding*, 639 F. Supp. 2d at 1294 (a legitimate claim "does not require possession of the full bundle of ownership rights that may exist in various types of property").

Although the Commission alleges that the Highview Offshore Funds are in possession of ill-gotten gains, (SAC ¶¶ 10, 84), they have not alleged that the Highview Offshore Funds lack a legitimate claim to those funds.  The Commission does not allege that the Highview Offshore Funds received the assets in their possession as gifts or as mere custodians.  The Commission acknowledges that the Highview Offshore Funds are investors.  (SAC ¶ 4 ("the Highview Funds are akin to early investors in a Ponzi scheme").)  Therefore, the Commission has not alleged that the Highview Offshore Funds are proper relief defendants and the Funds must be dismissed for lack of subject matter jurisdiction.

**B.      If Assets Consist of <u>Both</u> Legitimate and Illegitimate Proceeds, A Party Is Not A Proper Relief Defendant.**

The Highview Offshore Funds have a legitimate claim to their assets, for purposes of defeating relief defendant status, even if those assets may include proceeds of fraud.  *See, e.g.,*

*Walsh I,* 618 F.3d at 226; *Janvey*, 588 F.3d at 834-35.  In *Walsh*, decided recently by the Second

Circuit, the Commission and the Commodity Futures Trading Commission filed an enforcement

action against defendant Stephen Walsh, alleging that Walsh had used various investment

vehicles to perpetrate a large-scale fraud.  *Walsh I,* 618 F.3d at 221.  The agencies alleged that

Walsh misappropriated "as much as" \$554 million from funds that he and his partner had

managed for various investors.  *Id.* at 221.  Allegedly, Walsh transferred millions of dollars in

fraudulent proceeds to accounts jointly held by Walsh and his then wife, Janet Schaberg.  *Id*. at

221-222.  Subsequently, Walsh and Schaberg divorced, and Schaberg acquired approximately

\$13 million, pursuant to a separation agreement between her and Walsh.  *Id*. at 222.  The

agencies joined Schaberg as a relief defendant in the action, alleging that the assets transferred to

her pursuant to the separation agreement were proceeds of fraud.  *Id.*  Schaberg argued that she

had a legitimate ownership interest in the funds, because her separation agreement was the result

of arms-length negotiations.  *Id.* at 227.

Rather than summarily conclude that Schaberg had no legitimate claim to assets

that constitute proceeds of fraud, Judge Lynch engaged in a detailed analysis to determine

Schaberg's property interest.  *Walsh I*, 618 F.3d at 230.  Judge Lynch, for the Second Circuit,

concluded that whether Schaberg had a legitimate claim to the \$13 million that Walsh had

transferred to her depended on whether, under New York law, a marital estate can include

proceeds of fraud.  *Id*. at 228-229.  The Court certified that question to the New York Court of

Appeals, which advised that a marital estate can include proceeds of fraud.  Relying on that

response, the Court then vacated the district court's orders enjoining Schaberg's access to her

assets because she had a legitimate claim in those assets, even though they included fraudulent

proceeds.[12]  *CFTC v. Walsh*, ___ F.3d ___, Nos. 09-3742-cv, 09-3787-cv, 2011 WL 4090758, at

*2-5 (2d Cir. Sept. 15, 2011) ("*Walsh II*"); *CFTC v. Walsh*, 17 N.Y.3d 162, 172, 176 (2011)

("*Walsh III*").

   Similarly, in *Janvey*, the Fifth Circuit, relying on the law of this Circuit, found

that investors in certificates of deposit ("CDs") had a legitimate claim to their CD proceeds,

notwithstanding that the CD proceeds were "ill-gotten."  *Janvey*, 588 F.3d at 835 (adopted by

this Court in *Walsh*, 618 F.3d at 226).  *Janvey* involved clawback claims asserted by a receiver in

connection with "an alleged multi-billion-dollar Ponzi scheme" perpetrated by a network of

companies controlled by R. Allen Stanford.  *Janvey*, 588 F.3d at 833.  For 15 years, the Stanford

companies sold purportedly high-yield CDs, promising investors a yield of 12.7% to 13.4%.  *Id.*

However, those claimed returns were false.  *Id.*  In reality, "the Bank had to use new CD sales

proceeds to make interest and redemption payments on pre-existing CDs, because it did not have

sufficient assets, reserves and investments to cover its liabilities."  *Id.* at 833.

   The structure of the fraudulent scheme in *Janvey* is strikingly similar to the

fraudulent scheme perpetrated by Illarramendi in this case.  In both cases, the alleged relief

defendants were investors who entrusted their investments with individuals or entities that

misappropriated assets in connection with fraudulent schemes.  In both cases investors gave

money to pay for what they believed to be legitimate transactions and received fraudulent assets

in return.

---

[12]  Plaintiffs SEC and CFTC had argued that a marital estate cannot include proceeds of fraud, but only property lawfully obtained.  The Second Circuit certified two questions to the New York Court of Appeals:  (1) "Does 'marital property' within the meaning of New York Domestic Relations Law § 236 include the proceeds of fraud?"; and (2) "Does a spouse pay 'fair consideration' according to the terms of New York Debtor and Creditor Law § 272 when she relinquishes in good faith a claim to the proceeds of fraud?" *Walsh I*, 618 F.3d at 229-30; *see also Walsh II*, 2011 WL 40907581, at *2; *Walsh III*, 17 N.Y.3d at 172, 176.  In response, the New York Court of Appeals held that marital property <u>can</u> include proceeds of fraud.  *Walsh III*, 17 N.Y.3d at 172, 176.

Just as the investors in *Janvey* received fraudulent assets as purported returns on investments and redemptions in their CD investments, the Highview Offshore Funds allegedly received fraudulent assets as purported redemptions and returns on their investments in the MK Funds.  (*See* SAC ¶¶ 28-34.)  In *Janvey*, the Fifth Circuit found that the "Investor Defendants are a far cry from the 'paradigmatic' nominal defendant—a trustee, agent or depository.  The Investor Defendants have a legitimate ownership interests in their CD proceeds, and therefore cannot be considered proper relief defendants."  *Janvey*, 588 F.3d at 834-35 (internal citations omitted).  The same conclusion follows here, given that the Highview Offshore Funds' have legitimate interests in their bank accounts, and the assets held therein.

As in *Walsh* and *Janvey*, the intermingling of the Highview Offshore Funds' assets with proceeds of fraud does not undermine the legitimacy of their claim or render them proper relief defendants.  *Walsh I*, 618 F.3d at 225-226, *Janvey*, 588 F.3d at 834-835.  Rather, because the Highview Offshore Funds have legitimate claims to the assets, notwithstanding that the assets include proceeds of fraud, they are <u>not</u> proper relief defendants.  *Id.*  There is no allegation in the Commission's SAC that leads to a different conclusion.

### C.  The Highview Offshore Funds Have A Legitimate Claim to the Assets Held by Them Through Their Direct Exclusive Ownership of the Assets.

The Highview Offshore Funds have a legitimate claim to the assets because they own them.  Here, the Highview Offshore Funds stand in the shoes of the *Janvey* investors, who purchased CDs.  The Highview Offshore Funds, rather than the investors in the Funds, own the relevant claim to the property at issue for purposes of analyzing relief defendant status.

That being said, the fact that the Highview Offshore Funds received assets through investments, rather than gratuitously, forms the basis for their legitimate claim to the assets in question.  The assets invested by shareholders in the Funds are the exclusive property of

the Highview Offshore Funds.[13]  The Highview Offshore Funds own the assets because, like

corporations, they own the assets invested in them by their shareholders.[14]

Accordingly, the Highview Offshore Funds' property interest in their bank

accounts, and the assets contained therein, disqualifies them from being proper relief defendants.

### D.   As Investors, the Highview Offshore Funds Gave Value for Their Purported Investments in MK Venezuela

It is undisputed that the Highview Offshore Funds paid approximately $170

million as purported investments in MK Venezuela, which unbeknownst to the Funds, were

misappropriated by Illarramendi and diverted to offshore entities under his control.  (*See* SAC

¶¶ 28-34.)  Those investments were booked on the Master Fund's trade blotter as investments in

MK Venezuela and other MK Funds.  (*Id.*)  As investors in MK Venezuela and other MK Funds,

the Highview Offshore Funds paid value, without knowledge of Defendants' alleged fraudulent

scheme, in exchange for their interests in the MK Funds.  That the assets subsequently

transferred back to the Highview Offshore Funds as "repayment plus interest" may have been the

proceeds of fraud does not defeat their ownership interest in the assets in question.  (*Id.* at ¶¶ 32-

33.)  Thus, the Funds are not proper relief defendants — they are entirely analogous to the

investors in *Janvey* who purchased bogus CDs without knowledge that their redemptions and

proceeds were paid with ill-gotten funds.  (SAC ¶ 4 (characterizing the Funds as both victims

and beneficiaries of the fraud).)

---

[13]      Individual investors gave money to the Highview Offshore Funds pursuant to their subscription agreements with the Offshore Fund. (Swartz Aff., Ex. B., ¶ 2.)  As one court explained, "when [investors] gave money to the Feeder Funds to purchase ownership interests, such money became the sole property of the Feeder Funds."  *See Sec. Investor Prot. Corp v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 285, 299 (Bankr. S.D.N.Y. 2011).  "Accordingly, it was the Feeder Funds, and not the [individual investors], who entrusted *fund-owned* assets with [the Master Fund]."  *Id.*

[14]      Thus, as the Supreme Court has explained, while shareholders have a stake in the corporation (they pay for the right to share in the corporation's profits), "[a]n individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets."  *Dole Food Co. v. Patrickson,* 538 U.S. 468, 475 (2003); *Kaiser v. Bowlen*, 455 F.3d 1197, 1208 (10th Cir. 2006).  Indeed, a corporation is an entity separate and apart from its shareholders—it has its own assets, its own liabilities, its own creditors, and its own interests.  *Dole Food Co.*, 538 U.S. at 474.

Investors in a fraudulent scheme have a right to recover their principal investment "from the moment that [they were] deceived into paying it." *Eby v. Ashley*, 1 F.2d 971, 973 (4th Cir. 1924). Moreover, investors have a legitimate ownership interest in the returns of their investments despite the possibility that the proceeds include ill-gotten gains. *Janvey*, 1 F.2d at 834-835. Like the investors in *Janvey*, the Highview Offshore Funds have a legitimate claim to their investment assets, including the returns on their investments. Therefore, they are <u>not</u> proper relief defendants.

## **CONCLUSION**

Because Section 21(d)(5) has no extraterritorial application, and the Highview Offshore Funds are not proper relief defendants, the Commission's Fifth Claim for Relief, its only claim for relief against the Highview Offshore Funds, must be dismissed, with prejudice, pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.

Respectfully Submitted:

Dated: New York, New York
November 14, 2011

SCHULTE ROTH & ZABEL LLP

By: /s/ Michael E. Swartz
    Harry S. Davis (*admitted pro hac vice*)
    Michael E. Swartz (*admitted pro hac vice*)

919 Third Avenue
New York, New York  10022
(212) 756-2000
harry.davis@srz.com
michael.swartz@srz.com

*Attorneys for Relief Defendants*
*Highview Point Master Fund, Ltd. and*
*Highview Point Offshore, Ltd.*