UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Securities and Exchange Commission,<br>    *Plaintiff,*<br><br>    *v.*<br><br>Francisco Illarramendi *et al.,*<br>    *Defendant,*<br><br>and<br><br>Highview Point Master Fund, Ltd. *et al.,*<br>    *Relief Defendants.* | Civil No. 3:11CV78 (JBA)<br><br><br><br><br><br><br>January 25, 2012 |

RULING ON REOSTAR'S MOTIONS

Non–party ReoStar Energy Corporation, ReoStar Gathering, Inc., ReoStar Leasing, Inc., and

ReoStar Operating, Inc. (collectively, "ReoStar") and Russco Energy LLC move for leave to

continue a pending adversary proceeding in ReoStar's Chapter 11 Bankruptcy Case in the

Northern District of Texas. ReoStar wishes to include several entities that  are part of the

Receivership Estate in this adversary action, which would have the effect of modifying the

stay of litigation in this Court's Amended Order Appointing Receiver  [Doc. # 279]. ReoStar

also moves [Doc. # 402] to strike a supplemental memorandum [Doc. # 395] filed by the

Receiver. The Receiver opposes the motion for leave  and asks that attorneys' fees be assessed

against ReoStar. For the reasons discussed below, ReoStar's motion for leave will be denied,

as will the Receiver's request for costs and fees, and ReoStar's motion to strike the Receiver's

Supplemental Memorandum will also be denied.

I.       Factual Background[1]

ReoStar is an oil and gas company that was incorporated in Nevada in 2004. (ReoStar

Proposed Third Am. Compl., Ex. 1 to ReoStar Mot. for Leave [Doc. # 303] ¶ 26.) It is

engaged in the exploration, development and acquisition of oil and gas properties, primarily

located in Texas, and its principal place of business has always been Fort Worth, Texas. (*Id.*

¶ 29.)  In October 2008, ReoStar executed a Credit Agreement for a line of credit with Union

Bank, which enabled ReoStar to borrow up to $25 million to finance drilling operations. (*Id.*

¶ 31.) The line of credit was secured by all of the Company's assets, was senior to all other

long–term debt, and the outstanding principal was due October 30, 2011. (*Id.*) ReoStar

eventually borrowed up to $10.8 million on this line of credit. (*Id.* ¶ 32.) In late 2008 and

2009, the market price of oil and natural gas sharply declined, and Union Bank froze

ReoStar's line of credit. (*Id.*) As of October 2009, ReoStar was still current on its payments

to Union Bank and had not received a notice of default or acceleration of the line of credit,

though it remained out of compliance with certain financial covenants associated with this

line of credit. (*Id.* ¶ 33.) On January 3, 2010, ReoStar shareholders told Mark Zouvas,

ReoStar's now former CEO, that they wanted to focus on new capitalization opportunities

from third parties. (*Id.* ¶ 36.)

BT and MK Energy and Commodities, LLC ("BTMK"), is a Delaware Limited

Liability Corporation comprised of two members, BancTrust International, Inc. ("BT"), and

---

[1] Many of the facts alleged by ReoStar in its proposed Third Amended Complaint concern issues pertinent to the adversary proceeding in Texas and the alleged mismanagement of ReoStar. Because those issues do not require determination for the purposes of this motion, the facts in this section focus primarily on ReoStar's interactions with the Receiver and Receivership Entities.

MK Oil Ventures, LLC ("MK Oil"). On February 4, 2010, BT, through its Executive Vice President, contacted ReoStar and made a proposal for a majority interest in ReoStar, and in March MK Capital also began conducting due diligence in evaluating a potential financial transaction with ReoStar. (*Id.* ¶¶ 39, 46.) BT and MK Capital represented to ReoStar that they were interested in investing in ReoStar and in acquiring the line of credit for that purpose. (*Id.* ¶ 53.) On August 17, 2010 Union Bank transferred its rights under the $25 million line of credit to BTMK for approximately $5.4 million. (*Id.* ¶ 76.) On October 1, 2010, BTMK accelerated the Union Bank note. (Wang Dec. [Doc. # 323–1] ¶ 3.) On October 12, 2010, BTMK sent a foreclosure notice to ReoStar, indicating that if payment was not made, BTMK would foreclose on the note by November 2, 2010. (*Id.* ¶ 4.)

On November 1, 2010, ReoStar filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. Case No. 10-47176-DML-11 (Bankr. N.D. Tex.). On December 20, 2010, BTMK filed a Motion for Relief From the Automatic Stay (the "Lift Stay Motion"), alleging that ReoStar was not capable of adequately protecting BTMK's security interests in its collateral because the mineral leases that provided the primary security for BTMK's collateral were decreasing in value as a result of ReoStar's operations. On July 26, 2011, Bankruptcy Judge D. Michael Lynn issued a letter opinion denying the Lift Stay Motion without prejudice. (Bankruptcy Proceeding [Doc. # 237].)

In February, ReoStar notified the Receiver that the proceedings in Texas involved Receivership property. On February 14, 2011, ReoStar filed an emergency motion to use cash collateral, seeking an order permitting the proceeds of ReoStar's operations to be used to pay ReoStar's expenses.  (Wang Dec. ¶ 6; Bankruptcy Proceeding [Doc. # 94].) In response, the

Receiver filed a notice of his appointment in the Northern District of Texas pursuant to 28

U.S.C. § 754, attaching the complaint in *SEC v. Illarramendi*, No. 3:11cv78(JBA), the asset

freeze orders, and the February 3, 2011 Order Appointing the Receiver [Doc. # 66]. (Wang

Dec. ¶ 5.) On February 22, the Receiver sent a letter providing notice of his appointment as

Receiver and copies of the February 3, 2011 Receiver Order to counsel for BTMK, with

copies to counsel for ReoStar and Rife Energy (an operator of oil and gas wells that owns the

pipeline for ReoStar's well). (*See* 2/22/11 Email from Blaber to Akerly, Ex. 2 to Wang Dec.)

On February 23, Bankruptcy Judge Lynn granted ReoStar's motion to permit the use of cash

collateral, but directed ReoStar to make monthly interest payments on the ReoStar Note to

BTMK. (Wang Dec. ¶ 7.)

On February 17, 2011, ReoStar commenced an adversary proceeding against BTMK

and Mark Zouvas alleging that BTMK had conspired with Zouvas and knowingly

participated in his breach of fiduciary duty to ReoStar by acquiring the line of credit for a

deep discount and then immediately attempting to foreclose its security interest in ReoStar's

assets. (Emergency Mot. for Leave [Doc. # 303] ¶ 3.) On March 1, 2011, this Court entered

an Amended Receiver Order [Doc. # 118] expanding the scope of the Receivership Estate,[2]

after which the Receiver sent a revised notice letter and copies of the Amended Receiver

Order to counsel for BTMK and to counsel for ReoStar and Rife Energy. (Wang Dec. ¶ 10.)

BTMK's counsel acknowledged receipt of the Orders on March 3, indicated to the Receiver's

---

[2] The Amended Receiver Order expanded the Receivership Estate in order to, among
other things, give the Receiver power of attorney–client privilege for entities within the
Receivership, give the Receiver the authority to direct and control counsel retained for the
MK entities, expand the scope of the Receivership Estate to match the Asset Freeze Orders,
and allow the Receiver to transfer and expend funds notwithstanding the Freeze Orders. (*See*
Receiver's Mot. to Amend [Doc. # 116]; Amended Receiver Order.)

counsel that he would comply with the Receiver Order, that he would notify MK Oil of the Receiver Order, and provided copies of the organizational documents of BTMK and MK Oil. (*Id.* ¶ 12.) At this time, the Receiver had not yet traced assets from MK Group and MK Asset Management to MK Oil, and MK Oil was not yet part of the Receivership.[3] (*Id.* ¶ 13.)

On March 7, 2011, ReoStar filed its First Amended Complaint (No. 11–4022–DML, Adversary Proceeding [Doc. # 8]) and filed a Second Amended Complaint on June 22, 2011 naming MK Group, MKCM, MK Oil, BTMK, and MK Oil Directors Mr. Lionelli and Percival, as defendants, as well as several other defendants who were not covered by the Receiver Order. (Adversary Proceeding [Doc. # 32].) On June 21, 2011, ReoStar's counsel wrote to Receiver's counsel, acknowledged the receipt of the Receiver Orders and awareness of the injunction against prosecution claims of against Receivership entities (6/24/11 Email from Akerly to Wang, Ex. 3 to Wang Dec), and sought the Receiver's consent to the filing, which was refused immediately. (*Id.*) The Receiver notified ReoStar's counsel that the act of filing the complaint against MK Group, MKCM, and any other entity or individual covered by the Receiver Order, violated the Receiver Order. (6/24/11 Email from Wang to Akerly, Ex. 4 to Wang Dec.), and requested that ReoStar dismiss "any and all parties that are covered by the Receiver Order from the Adversary Proceeding." (*Id.*)[4]

---

[3] The Receiver has represented that he has found evidence that money from Receivership Entities had been misappropriated to fund MK Oil's capital contributions to BTMK, as well as to pay BTMK's operating costs, which is why the Receiver sought to bring MK Oil into the Receivership in June 2011. (*See* Emergency Mot. Expanding the Receivership [Doc. # 285].) This Court granted the Receiver's Motion on July 5, 2011. (*See* Order Granting Motion Expanding the Receivership [Doc. # 287].)

[4] The anti–litigation injunction in the Receiver Order covers not only the Receivership Entities, but also the officers and directors of these entities. (*See* Amended Receiver Order ¶ 29.)

ReoStar's Counsel agreed to dismiss the claims against the Receivership entities: "No problem. We will dismiss the claims against MK Group and MK Capital, without prejudice." (*See* Second 6/24/11 Email from Akerly to Wang, Ex. 5 to Wang Dec.) However, at the July 7, 2011 hearing on the Lift Stay Motion, ReoStar's counsel represented that the Receivership Entities and Former MK officers continued as parties before the court as defendants in the action, without mentioning the agreed–upon dismissal. (*See* 7/7/11 Email from Akerly to New, Ex. 6 to Wang Dec.) ReoStar filed its notice of dismissal on July 8, 2011, after a series of contentious exchanges (*see* 7/7/11 Email from Akerly to New; 7/7/11 from New to Akerly, Exs. 6 and 7 to Wang Dec.), dismissing only the named Receivership Entities, MK Group, MK Capital Management, and MK Oil, but leaving Lionelli and Percival as named parties to the adversary proceeding.[5] (Adversary Proceeding [Doc. # 36].) The Receiver's counsel declined ReoStar's request for a modification of this Court's "injunction [order] to include Messrs. Lionelli and Percival, as well as the other previously added MK related entities" (*see* 7/29/11 Email from Akerly to Wang, Ex. 8 to Wang Dec.), reiterating that ReoStar was in continuing violation of the Receiver Order by its failure to dismiss all entities and individuals covered by the Receiver Order (7/29/11 Email from New to Akerly, Ex. 9 to Wang Dec.).

On August 1 and 2, ReoStar sought leave to file a Third Amended Complaint which would name several entities and individuals  covered by the Receiver Order as defendants in its adversary proceeding: MK Group, MK Capital Management, MK Oil, and MK Asset Management, as well as Francisco Illarramendi (Adversary Proceeding [Docs. ## 44, 45]),

---

[5] ReoStar did not dismiss its adversary proceeding claims against BTMK, which all parties agree is not a receivership entity. (*See* Oct. 18, 2011 Tr. at 41:6–7, 44:18–20, 64:17–19.)

which the Receiver opposed on August 23, 2011. (Adversary Proceeding [Doc. # 54]; Ex. 10 to Wang Dec.) ReoStar filed the instant motion on August 3, 2011, amended on August 10, 2011 to add Russco Energy LLC as a movant.  (ReoStar and Russco's Amended Motion [Doc. # 303].) Counsel for ReoStar describes Russco's role as "putting in over $12 million to recapitalize this company [ReoStar] and provide exit financing." (Oct. 19, 2011 Tr. [Doc. # 393] at 38:16–18.)

II.      Discussion

ReoStar argues that leave to continue its adversary proceeding against entities covered by the Receivership Order is appropriate under the circumstances at issue here because (1) "ReoStar's bankruptcy case preceded the Receivership" (Emergency Mot. at 8), (2) "judicial estoppel precludes the Receiver from seeking to prevent the adjudication of ReoStar's bankruptcy estate's claims against Receivership parties" (*id.* at 9), and (3) the Bankruptcy court in Texas has "exclusive jurisdiction" over ReoStar's property rights (*id.* at 10). The Receiver counters that under the relevant standard in *SEC v. Wencke*, 742 F.2d 1230 (9th Cir. 1984), ReoStar has not shown that the Receiver Order's litigation stay should be modified. (Mem. Opp'n at 10.)

A.      The Legal Standard

The Second Circuit has recognized that an anti–litigation injunction or litigation stay in a receiver order is a valid exercise of a district court's equitable powers, *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("*Byers II*"). An anti–litigation injunction or stay is "simply one of the tools available to courts to help further the goals of the receivership." *Id.*, 609 F.3d at 92. Other circuits have found this power to enjoin or stay litigation to be effective against non–parties. *See, e.g.*, *United States v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 442 (3d Cir.

7

2005) (affirming receivership litigation stay and adopting the *Wencke* standard in the Third

Circuit). The modification of a litigation stay is subject to a three–pronged test first

articulated by the Ninth Circuit in *Wencke*, and this standard has since been adopted by the

Second Circuit and the Fifth Circuit. *See, e.g., SEC v. Byers*, 592 F. Supp. 2d 532, 536–37

(S.D.N.Y. 2008) ("*Byers I*") , *aff'd* 609 F. 3d 87, 91–92; *SEC v. Stanford Int'l Bank, Ltd.*, No.

10–10336, 2011 WL 1758763 at *2 (5th Cir. May 5, 2011).

 *Wencke* identified three factors for determining whether, in a receivership context,

an injunction against litigation should be lifted:

> (1) whether refusing to lift the stay genuinely preserves the status quo or
> whether the moving party will suffer substantial injury if not permitted to
> proceed; (2) the time in the course of the receivership at which the motion
> for relief from the stay is made; and (3) the merit of the moving party's
> underlying claim.

742 F.2d at 1231. The burden "is on the movant to prove that the balance of the factors

weighs in favor of lifting the stay." *United States v. Petters*, No. 08–5348 ADA/SJM, 2008 WL

5234527, *3 (D. Minn. Dec. 12, 2008). Several recent decisions in the Northern District of

Texas and the Fifth Circuit have applied the *Wencke* test in receivership cases. *See, e.g.*,

*Provident Royalties*, No. 3:09cv1238, 2011 WL 2678840 at *2–4 (N.D. Tex. July 7, 2011);

*Stanford Int'l Bank*, 2011 WL 17587863 at *2.

 B.  Application of *Wencke* Factors

  1.  *Balancing the Interests of the Parties*

 The first *Wencke* factor balances the interests of the Receiver in preserving the status

quo against the interests of the moving party. The Receiver argues that because he is

"charged with protecting the interests of all investors," he "has a broad interest in preserving

the status quo." (Mem. Opp'n at 14.) At oral argument, counsel for ReoStar clarified that it

is asking for a "simple stay lift as to BTMK, Lionelli, Percival, MK Oil and the previous entities to MK Oil." (Tr. 54:6–8.) All of these, save for BTMK, are Receivership entities.

The purpose of a litigation stay is to enable the receiver to "do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant." *Acorn Tech. Fund*, 429 F.3d at 443. "The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets," and requiring the receiver to defend lawsuits drains receivership assets. *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006); *see also FTC v. Med Resorts Int'l, Inc.*, 199 F.R.D. 601, 609 (N.D. Ill. 2001) (permitting ancillary litigation would "[n]ot only . . . take [the receiver's] attention away from other tasks, but the assets of the receivership estate would quickly be diminished"). Bearing in mind these realities, "[a] district court should give appropriately substantial weight to the receiver's need to proceed unhindered by litigation, and the very real danger of litigation expenses diminishing the receivership estate." *Acorn Tech. Fund*, 429 F.3d at 443.

The Receiver argues that his interest in preserving the status quo is strong, as the costs of actively defending litigation in Texas will be high and active defensive litigation would constitute a significant drain on receivership assets, regardless of any finding of liability. The balancing of interests must also include costs for the defense of any action against Directors Lionelli and Percival, since these individuals are directors of MK Oil, and would likely "pursue a claim against the Receivership Estate for attorney's fees and costs associated with defending against the Adversary Proceeding," under MK Oil's indemnification provisions. (Receiver's Supp. Mem. at 6; *see* MK Oil Ventures, LLC Agreement, Ex. 11 to New Dec. at 32.)

Further, the Receiver maintains that ReoStar "has not—and cannot—articulate any injury, let alone a substantial one, by allowing the litigation stay to remain in place." (Mem. Opp'n at 16.)  ReoStar argues that the Receiver consented to the proceedings in Bankruptcy Court, by virtue of its filing pro hac vice motions. (Emergency Mot. for Leave at 9.)  Far from consenting, however, the Receiver has been adamant that he would not consent to modify the Receiver order so that Receiver entities could be subject to suit in Texas.[6]

ReoStar does not articulate any potential injury that would result from a denial of this motion in its briefing, though at oral argument its counsel argued that it should be able to "defend the estate against the Receiver's motion to lift stay," which according to counsel would include being able to continue with its adversary proceeding against Receivership Entities, and if it cannot, "clearly the ReoStar estate will be prejudiced; the assets will be gone, the reorganization will be dead, the company will be out of business." (Tr. 30:7–12.) On January 18, 2012, Judge Lynn granted BTMK's amended motion for relief from the automatic bankruptcy stay, ordering that ReoStar "retain $300,000 of their cash–on–hand," but that "the automatic stay imposed by 11 U.S.C. § 362 is modified to allow BTMK to

---

[6] In an email dated June 24, 2011, the Receiver's counsel specified:

The Receiver Order . . . enjoins all litigation against Receivership Entities, their subsidiaries, partnerships, past or present officers, directors, managers, agents, general and limited partners, and also enjoins all interference with the Receiver's activities and all interference that may dissipate or otherwise diminish the value of any Receivership Property. Please confirm, by close of business Monday, that Reostar will dismiss that adversary proceeding against any and all parties that are covered by the Receiver Order next week.

(6/24/11 Email from Wang to Akerly, Ex. 4 to Wang Dec. (emphasis in original).)

foreclose all of its liens on the property of the Debtors." (Bankruptcy Proceeding, Order Granting Am. Mot. for Relief from Automatic Stay (With Joinder of Receiver from Michael Kenwood Group) [Doc. # 441] at 2.) However, even if BTMK were to begin foreclosure proceedings against ReoStar, ReoStar's counsel confirmed at oral argument that ReoStar has been suing BTMK in its adversary proceeding for over eight months (Tr. 41:19–20), and plans to continue this litigation against BTMK, regardless of whether Receivership Entities or individuals are added in as defendants in this adversary proceeding.

In its motion before this Court, ReoStar is seeking to add two individuals as defendants in its adversary proceeding, Messrs. Lionelli and Percival, who were officers and directors of MK Oil, a Receivership Entity, as well as several other receivership entities and directors and officers. The Court finds that as to this factor, the balance of interests weighs in favor of preserving the status quo—keeping the litigation stay intact so that the Receiver may continue its work of marshaling, untangling, and safeguarding the assets of the Receivership estate—while ReoStar may simultaneously continue its adversary proceeding against BTMK in Texas.

> 2.    *The Timing of ReoStar's Motion for Leave in the Course of the Receivership*

Under the second *Wencke* factor, the Receiver argues that at this early stage of the Receivership, the Receiver's need to organize and understand the entities in the Receivership weighs more heavily than the merits of ReoStar's claims. (Mem. Opp'n 16.) "Where the motion for relief from the stay is made soon after the receiver has assumed control over the estate, the receiver's need to organize and understand the entities under his control may weigh more heavily than the merits of the party's claim." *Wencke,* 742 F.2d at 1231.

At the time of ReoStar's motion, the Receivership had been in place for about six months, and the Receiver argues that he "is only just beginning to untangle the numerous financial transactions involving hundreds of millions of dollars and to understand the complex relationships among the various Receivership Entities." (Mem. Opp'n at 17.) Further, the Receiver has only begun to investigate and understand MK Oil, as it became a Receivership entity this past July.

While ReoStar believes that the "Receiver has had adequate time to organize and understand the entities under his control" (Tr. 30:21–22), the Court is of the view that the Receiver is still in the early stages of the Receivership, the bar date for claims against Receivership Entities having just passed (December 30, 2011). The Receiver's need to organize and understand the financial transactions among all the Receivership entities, as well as assess the claims filed, outweighs ReoStar's need to proceed with its claims against the Receivership Entities in the pending adversary proceeding.

### 3.      The Merits of ReoStar's Underlying Claims

Under the third *Wencke* factor, even if ReoStar could show that there is a "colorable" claim against the entities and individuals, courts are generally unwilling to delve deeply into the merits where the first two factors weigh heavily in favor of maintaining the litigation stay. *Byers I*, 592 F. Supp. 2d at 537 ("Even assuming the Movants' claims are strong, however, the other two *Wencke* factors weigh heavily against lifting the injunction.").

The Receiver argues that ReoStar's Proposed Third Amended Complaint "shows no colorable claim against the Receivership Entities and their former officers and directors" (Mem. Opp'n 18 ), and "appears to [claim] that each of the Receivership Entities may . . . have been a member of BTMK . . . . insinuating that because fraud was discovered among

12

the Receivership Entities , . . that the fraud must have infected BTMK's purchase of the

Reostar note (*id.* at 19).  In fact, ReoStar's Proposed Third Amended Complaint does not

allege specific acts by any Receivership Entities, nor specific acts by any of the individual

officers or directors associated with the Receivership Entities. At oral argument, counsel for

ReoStar argued that Lionelli and Percival "were the principals at all times that acted on

behalf of what we call the Michael Kenwood side of BTMK, 50–percent owned by Michael

Kenwood entities. . . and the Receiver himself has pled that all of the entities are alter egos

of one another." (Tr. 27:24–28:6.) However, ReoStar's counsel also acknowledged that at this

point, it is difficult to determine within which particular entities the fraudulent activity took

place:

> So from our standpoint it's difficult to determine when funds were
> fraudulently transferred through one or more of these entities, made their
> way to BTMK, and then that money was used, based on our allegations, to
> fraudulently purchase a loan in a deep discount and then try to foreclose on
> ReoStar's assets. It's difficult for us to determine who is to be excluded from
> that group.

(Tr. 28:9–16.) Not only does the heightened pleading standard for ReoStar's allegations of

fraud require more against the Receivership Entities and against individuals Percival and

Lionelli, and especially in light of the first two *Wencke* factors, which both weigh strongly

in favor of preserving the litigation stay, ReoStar has not met its burden of demonstrating

that the balance of factors weigh in favor of lifting the litigation stay at this stage.

      C.     ReoStar's Arguments

     ReoStar's three arguments in favor of its Emergency Motion for Leave do not

consider the case law or *Wencke* standards discussed *supra* and lack merit.

### 1.      First–to–File Rule

Citing the "longstanding first–filed rule," ReoStar argues that because its bankruptcy case was filed on November 1, 2010, and the Receivership Order was entered three months later, leave is appropriate. (Emergency Mot. for Leave ¶ 8.) The first–to–file rule states that "where an action brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action," unless "there are special circumstances which justify giving priority to the second action." *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1025 (2d Cir. 1991) (internal citations omitted). Far from a rigid rule, the "first–to–file" rule is a discretionary rule that requires considerations of "wise judicial administration" and judicial efficiency. *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952).

As a preliminary matter, an application of the first–to–file rule requires identity of parties and issues. *See, e.g.*, *City of New York v. Exxon Corp.*, 932 F.2d at 1026 (applying the first–to–file rule in a bankruptcy case where parties and issues were "in fact, the same case," because "judicial economy argues that two courts should not expend their energies on this matter"). Here there is dissimilarity of issues and parties, between either the SEC enforcement action and the main bankruptcy case or the adversary proceeding.

In addition, the "first–to–file" argument runs contrary to the clear language of the Receiver Order, which anticipated the need to stay or enjoin litigation that had already been instituted, enjoining both commencement of litigation, as well as enjoining parties to any ancillary litigation from "continuing any such legal proceeding." (Receiver Order [Doc. # 66] ¶ 37.)

14

### 2.    *Judicial Estoppel*

ReoStar also argues that because the Receiver's Motion to Expand the Receivership was granted by this Court "based upon the Receiver's position, representations, and arguments, . . . the Receiver is judicially stopped from seeking to prevent adjudication of Debtors' bankruptcy estates' claims against the Receivership Parties asserting claims or liens in Debtors' Bankruptcy Court." (Emergency Mot. for Leave ¶ 11.) Citing *State of New Hampshire v. State of Maine*, 532 U.S. 742, 749 (2001), ReoStar argues that judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument." ReoStar reasons that because MK Oil was added to the Receivership estate in July 2011, the Receiver is judicially estopped from arguing that the litigation stay should be enforced in the adversary proceeding at issue. (*Id.*)

However, the principle of judicial estoppel is generally relevant only where a party makes conflicting assertions. Here, the Receiver's arguments in support of his motion to include MK Oil in the receivership were consistent with the Receiver entering an appearance in the Bankruptcy proceeding, because in both instances, the Receiver seeks to recover and protect the value of Receivership assets. As the Receiver's counsel maintained at oral argument, because MK Oil, a Receivership Entity, is a 50% owner of BTMK, the Receiver has an interest in the automatic stay being lifted so that BTMK could foreclose on ReoStar's loan, and BTMK had filed its motion to lift the automatic stay in the bankruptcy proceeding "well before the receivership was even put in place." (Tr. 46:5–8.) The Receiver's counsel noted that the Receiver "listened into the hearing [on the motion to lift the automatic stay], [but] we did not present an argument or take any position in the hearing." (Tr. 46:11–14.)  The

Receiver has not made conflicting assertions about its interests in the bankruptcy or adversary proceedings, and accordingly, ReoStar's judicial estoppel argument fails.

### 3.     Property Rights

Though ReoStar argues that the Texas Bankruptcy Court has exclusive jurisdiction over all of its property, it fails to explain how the enforcement of the litigation stay in the Receiver Order will affect ReoStar's property rights. ReoStar cites *Gilchrist v. Gen. Elec. Capital Corp., et al.,* 262 F.3d 295 (4th Cir. 2001) as support for its argument, however *Gilchrist* is readily distinguished from the instant case, as it concerned an involuntary bankruptcy that was filed days after the appointment of a receiver and before formal notice of the receivership had been provided to creditors. In addition, the receivership estate and bankruptcy estate in *Gilchrist* both concerned directly competing claims to the same property.

Here, there are no directly competing claims to the same property, even if MK Oil owns a 50% interest in BTMK.[7] The Chapter 11 proceeding will continue regardless of the litigation stay, and ReoStar has not shown how the litigation stay against Receivership Entities, would affect the size of ReoStar's estate. Further, ReoStar's adversary proceeding will also continue, without regard to the existence of the litigation stay. If ReoStar's

---

[7] As Receiver's counsel noted at oral argument, even if the motion for relief from the automatic stay were granted(as it now has been) and BTMK were to foreclose on the assets, the Receiver wouldn't "really do anything" as part of that process, since BTMK, as a non–Receivership entity, is represented by separate counsel. (Tr. 48:18–20.) Receiver's counsel further stated: "Now, indirectly and ultimately the Receiver, the Receivership Entities would stand to benefit because the Receivership entities do have an interest in BTMK, and as such any owner or member of BTMK would be able to share in any profits, but the actual foreclosure auction would be conducted by BTMK, not by the Receiver, and the funds, if any, would be paid to BTMK." (49: 4–11.)

allegations of fraud are proved, and it prevails in its adversary proceeding against BTMK and other entities, its assets are protected, and ReoStar has failed to articulate any threat of injury from the continued stay of litigation as to Receivership Entities and directors and officers, or how the litigation stay would interfere with the Bankruptcy Court's adjudication of claims impacting ReoStar's bankruptcy estate.

> D.     Attorney's Fees

As part of his opposition to ReoStar's motion to lift the litigation stay, the Receiver seeks attorneys' fees to be assessed against ReoStar for this motion, because ReoStar was on clear notice of the Receiver Order for several months, "yet repeatedly attempted to sue entities and individuals covered by the Receiver Order in the face of the Receiver's continued objection and without first seeking leave from this Court." (Receiver's Mem. Opp'n [Doc. # 323] at 23.)

"Where a party shows bad faith by delaying or disrupting the litigation or by hampering the enforcement of a court order," a district court "has the inherent power to police itself" and to assess attorneys' fees against such a party. *Chambers v. NASCO*, 501 U.S. 32, 45–46 (1991). In *Chambers*, the Supreme Court imposed sanctions and noted that sanctions served the "dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." 501 U.S. at 46. Sanctions under the court's inherent power are appropriate when a party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.*; *see also Walker v. Smith*, 277 F. Supp. 2d 297, 301 (S.D.N.Y. 2003). The Sixth Circuit has affirmed a finding of contempt in the receivership context where parties who had clear notice of the receivership court's litigation stay

17

nonetheless instituted litigation against receivership entities. *See Liberte Capital*, 426 F.3d at 557 ("The district court has inherent authority to fashion the remedy for contumacious conduct.")

Here, the records shows that ReoStar was on notice of the Receiver Order, and in spite of numerous exchanges with the Receiver's counsel, refused to dismiss its claims against all Receivership Entities. Further, although Mr. Akerly, counsel for ReoStar told Receiver's counsel that they would "dismiss the claims against MK Group and MK Capital" (6/24/11 Email from Akerly to Wang), ReoStar did not do so promptly, and when ReoStar finally acquiesced and dismissed the named Receivership Entities on July 8, 2011, it still chose not to dismiss its claims against Lionelli and Percival (Adversary Proceeding [Doc. # 36]), and filed a motion for leave to amend its complaint a third time (Adversary Proceeding [Doc. #44]), which continued its knowing violation of the Receiver Order. (*See* 7/29/11 Email from Akerly to Wang, Ex. 8 to Wang Dec.)

The facts support the Receiver's argument that ReoStar has continued to act in knowing violation of this Court's order and litigation injunction, and the many communications that ReoStar has engaged in with the Receiver's counsel evidence clear notice of the Receiver Order. However, as discussed *supra*, ReoStar has been placed between a rock and a hard place in terms of its bankruptcy proceeding, adversary proceeding, and its concerns about the effects of possible foreclosure on its entire company. Ideally, ReoStar should have filed its motion for leave earlier than it did, but the communications with the Receiver and its request for leave of this Court to add Receivership Entities back in do not suggest the bad faith motive that the Receiver describes. Accordingly, the Court finds that an assessment of attorneys' fees is not appropriate under these circumstances.

E.     Order

After considering the parties' briefs and positions at oral argument, the Court is persuaded that the Receiver Order's litigation stay should not be lifted. The *Wencke* factors weigh in favor of preserving the litigation stay, and even without lifting the stay, ReoStar can continue to fully pursue its claims against non–Receivership entities, including BTMK. As now clarified by counsel for the Receiver, "the only action that seems, in the Receiver's view, to be in direct contravention of [the Receiver] order is to the extent that they are going to be pursuing an adversary proceeding against the receivership entities and Mr. Illarramendi, Mr. Lionelli and Mr. Percival." (*Id.* at 53:6–11.) Further, were ReoStar to win a judgment against BTMK, ReoStar can then file a claim in the proceeding before this Court. At that point, this Court would have the opportunity to review that claim in the context of all the other claims asserted against the Receivership entities, rather than letting ReoStar's claims against Receivership entities or officers "jump to the head of the line . . . whereas everyone else is going to have to file a claim before [the Court]." (Tr. 64:2–6.)

It is evident that ReoStar's claims of fraud, as alleged in its Third Amended Complaint, will likely require the depositions of Percival and Lionelli, two directors of Receivership entities who allegedly took action on behalf of BTMK. The litigation stay provides no impediment to ReoStar obtaining this discovery from these individuals, provided that they are not named as defendants in the adversary proceeding,[8] without

---

[8] In the Receiver's Supplemental Memorandum, the Receiver writes, "it would be appropriate and reasonable to allow discovery into such topics as the relationship between Percival and Lionelli and other defendants in the Adversary Proceeding, actions taken by them on behalf of BTMK, and their respective roles in BTMK's acquisition of the Reostar note from Union Bank." (Supp. Mem. at 7.)

concern for violating the litigation stay. Because ReoStar may continue its adversary proceeding against BTMK with full discovery, ReoStar's motion for leave to file an adversary proceeding against Receivership entities and officers of Receivership Entities will be denied.

III.     Conclusion

For the reasons discussed above, ReoStar's Emergency Motion for Leave [Doc. # 303] and ReoStar's Motion to Strike [Doc. # 402] are DENIED.

IT IS SO ORDERED.

       /s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 25th day of January, 2012.