UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br>v.<br><br>FRANCISCO ILLARRAMENDI, HIGHVIEW POINT PARTNERS, LLC and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC,<br><br>                              Defendants,<br><br>and<br><br>HIGHVIEW POINT MASTER FUND, LTD., HIGHVIEW POINT OFFSHORE, LTD., HIGHVIEW POINT LP, MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP,<br><br>                              Relief Defendants. | 11-CV-00078 (JBA)<br><br>ECF CASE<br><br>**DECLARATION OF MATTHEW GREENBLATT** |

I, Matthew Greenblatt, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a Senior Managing Director at FTI Consulting, Inc. ("FTI") where I have worked for more than 13 years.  I have more than 17 years of experience in accounting, auditing and litigation consulting services, including forensic accounting and fraud investigations.  I am a Certified Public Accountant, Certified in Financial Forensics, and a Certified Fraud Examiner.  I am a member of the American Institute of Certified Public Accountants, the New York State Society of Certified Public Accountants and the Association of Certified Fraud Examiners.  I have spoken on multiple panels in the area of forensic accounting and investigations, and currently serve as an adjunct professor with New York University in its forensic accounting

certificate program.

2.      FTI Consulting is the financial advisor to the Court-appointed receiver John J. Carney, Esq. (the "Receiver"), assisting him in his on-going investigation (the "Investigation") mandated by the Amended Order Appointing Receiver dated June 22, 2011.  I make this declaration summarizing information based on my personal review and analysis of voluminous documents and financial records and upon information communicated to me by other FTI forensic accountants and professionals relating to their review of the voluminous documents and financial records.

3.      I make this Declaration for the limited purpose of providing certain evidentiary support for the Receiver's Motion for an Order Expanding the Receivership to Include the Highview Point Master Fund, Ltd., Highview Point Offshore Fund, Ltd., and Highview Point, L.P.  I have not included all of the information known by me or by other FTI professionals about this matter, FTI's forensic investigation, or that is relevant to the proceedings.

**General Background**

4.      The prior testimony before this Court of Francisco "Pancho" Illarramendi ("Illarramendi"), and his admissions in his plea proceedings, reflect that Illarramendi engaged in a massive Ponzi scheme (the "Fraudulent Scheme") originally devised to conceal losses sustained investing money for HVP Offshore and other entities, and eventually done to hide increasing losses of the funds he managed.  Attached hereto as Exhibit A is a true and correct copies of relevant excerpts of Illarramendi's prior testimony in this case.  Attached as Exhibit B are true and correct copies of Illarramendi's criminal plea agreement, excerpts of the transcript of his plea allocution and the Stipulation of Offense Conduct executed in connection with his guilty plea.

5.      Highview Point Partners, LLC ("HVP Partners"), a Delaware entity, was created in August 2004 and began operating under an LLC Agreement in May 2005, executed by Illarramendi, Francisco "Frank" Lopez ("Lopez") and Christopher Luth ("Luth"), each as members with a one-third interest in HVP Partners.  The LLC Agreement, which enumerates one specific purpose for HVP Partners, namely "acting as the investment manager of Highview Point Offshore Fund, Ltd." is attached hereto as Exhibit C.

6.      Highview Point Offshore Fund, Ltd. ("HVP Offshore") was incorporated in the Cayman Islands in September 2004, approximately one month after the creation of HVP Partners.  Operations commenced in May 2005, within one week of the execution of the HVP Partners LLC Agreement.  Lopez was one of five directors of HVP Offshore in May 2005, nominally appointed by Ogier Nominees (Cayman) Limited.  Three of the other four directors were employees of Ogier Fiduciary Services (Cayman) Limited, including Vijayabalan Murugesu, David Sargison, and Andrew Eastabrook.

7.      The HVP Partners' principals – Illarramendi, Lopez and Luth – directed the process of setting up the funds and appointing directors.  Emails show that Ogier & Boxalls, and the U.S. law firm Seward & Kissel LLP, took direction from Luth when executing registration and other formation decisions.

8.      The investment management agreement between HVP Offshore and HVP Partners (the "Offshore IMA") was signed by Lopez on behalf of HVP Offshore, and Illarramendi on behalf of HVP Partners.  The Offshore IMA gives HVP Partners the right and duty to make "all investment decisions for [HVP Offshore]."  This includes "the authority to purchase, hold, sell, sell short, cover and otherwise deal in securities and financial instruments of any sort and rights therein, including restricted and privately issued securities, on margin or

otherwise."  It also includes the right of HVP Partners to "enter into, make, and perform any other contracts, agreements or other undertakings" on behalf of HVP Offshore, effectively granting HVP Partners unfettered power to bind HVP Offshore in agreements with third parties (*i.e.*, to make business decisions).  The Offshore IMA explicitly included the right of HVP Partners to enter into "contracts, agreements, or other undertakings with persons, firms or corporations affiliated with [HVP Partners]."  There is also a section of the Offshore IMA that permits the entire agreement granting powers to HVP Partners relating to the operations of HVP Offshore to be assigned at HVP Partners' will, "without the prior written consent of [HVP Offshore]," to any other entity controlled by Illarramendi, Lopez and Luth.  Notably, the Offshore IMA specifically states that HVP Offshore does not have any right of assignment without prior written consent of HVP Partners.  A true and correct copy of the Offshore IMA is attached hereto as Exhibit D.

9.      In addition to Lopez and the employees of Ogier Fiduciary Services (Cayman) Limited, another director of HVP Offshore at the time of its commencement was Luis Bethart, an investment advisor of Quadrant, a company associated with Oswaldo Cisneros ("Cisneros").  Although Quadrant was originally named co-investment manager along with HVP Partners, HVP Partners had exclusive authority to execute trades and open accounts on behalf of HVP Offshore.  An email shows that Quadrant was listed as a co-manager primarily for tax reasons.  By the end of 2005, Quadrant had resigned the title of investment manager, leaving HVP Partners as the sole investment manager for HVP Offshore.

10.     By April 2006, the business changed its structure to a "master-feeder" structure, by creating the Highview Point Master Fund, Ltd. (the "Master Fund"), turning HVP Offshore into an offshore feeder, and creating Highview Point, L.P. as a domestic feeder (collectively with

the Master Fund and HVP Offshore, the "HVP Funds").

11.     The Master Fund was incorporated in the Cayman Islands in January 2006.  Its directors were Lopez and three employees of Ogier Fiduciary Services (Cayman) Limited, including at various times Vijayabalan Murugesu, David Sargison, Scott Dakers, Evan Burtton and Thomas Parsons.  On April 1, 2006, the effective date of the new master-feeder structure, the Master Fund entered into an investment management agreement with HVP Partners ("Master Fund IMA").  The Master Fund IMA grants HVP Partners the same investment and contracting powers over the Master Fund as the Offshore IMA granted over HVP Offshore.  It also includes the same assignments clause, permitting assignment to another entity controlled by Illarramendi, Lopez and Luth.  As in the Offshore IMA, the Master Fund does not have such assignment rights.  Also like the Offshore IMA, the Master Fund IMA is signed by Illarramendi and Lopez, with Lopez signing for the Master Fund.  A true and correct copy of the Master Fund IMA is attached hereto as Exhibit E.

12.     Ogier, a law firm representing HVP Offshore and the Master Fund, addressed correspondence to the HVP Funds at the Stamford, Connecticut office of HVP Partners.

**The Credit Lyonnais Bond Deal**

13.     Based upon my review of documents and the testimony and admissions of Illarramendi, it is apparent that Illarramendi began the Fraudulent Scheme at least as early as October 2005 when he caused losses from the purchase and sale of a Credit Lyonnais bond with a nominal value of $50 million (the "Calyon Bond") to be concealed on the books of HVP Offshore.  (*See* Exhibit A at 359.)

14.     Prior to executing the transaction, Illarramendi obtained funds from a group of

investors, including HVP Offshore, to complete the purchase of the Calyon Bond.  In executing the transaction, HVP Offshore transferred approximately $18.8 million to an investment account in the name of CNI Securities.  Lopez, and his sister Carolina Lopez, transferred approximately $2.5 million to the same account.  Other investors, including Pamac Securities, Goldenbird, Nazri Corp., and BCT Bank International ("BCT Bank"), committed additional monies equaling approximately $28.9 million, for a total of approximately $50.2 million.  BCT Bank committed the funds based upon a loan to HVP Partners.

15.     On or about October 12, 2005, Illarramendi caused approximately $49.3 million to be transferred from the bank account of CNI Securities to Banco Federal de Venezuela.  In exchange, the Calyon Bond was transferred to CNI Securities.  On or about October 14, 2005, the Calyon Bond was delivered from CNI Securities to an HVP Offshore account at the Royal Bank of Canada.

16.     Of the remaining approximately $900,000 of funds sent to CNI Securities, approximately $35,000 was taken by CNI as its fee, approximately $19,000 was used for accrued interest, approximately $170,000 was transferred to a bank account in the name of Northwestern International Ltd., an entity believed to be controlled by Moris Beracha ("Beracha"), and approximately $675,000 was sent to a bank account in the name of HVP Partners.

17.     Illarramendi sold the Calyon Bond on or about October 14, 2005 to Royal Bank of Canada for approximately $46.5 million, which was transferred to an HVP Partners account in the form of cash and Venezuelan bonds.

18.     Despite the fact that the Calyon Bond transaction resulted in a loss, HVP Partners transferred cash to each investor, other than HVP Offshore, in amounts greater than each investor's initial investment.  For example, Lopez, and his sister Carolina Lopez, received

approximately $2.55 million for their $2.5 million investment.  Because Illarramendi distributed

positive returns to the other investors, HVP Offshore only received approximately $14.1 million

in cash and bonds for its original investment of approximately $18.8 million.  Although only

$14.1 million in value was received by HVP Offshore, its books and records were falsified to

reflect the receipt of approximately $19.3 million of value from the investment.  The difference

between the $19.3 million falsely recorded and the $14.1 million in value actually received

constituted a cash shortfall of approximately $5.2 million absorbed by HVP Offshore, which

Illarramendi described to the Court as the beginning of the "hole" that his Fraudulent Scheme

concealed.

### The Cover-Up at HVP Offshore With the Creation of a Fictitious Investment In Ontime[1]

19.     The documents that I reviewed reflect that Illarramendi initially covered the

approximately $5.2 million shortfall by causing a fictitious investment in Ontime to be falsely

entered on the books and records of HVP Offshore and described in the HVP Offshore trade

blotter as "ONTIME_OVERS2".[2]   However, no proceeds from the Calyon Bond transaction

were transferred to Ontime.  As described below, later, false entries were utilized to make it

appear that this fictitious investment in Ontime had been "redeemed" with a profit even though

no such legitimate redemption occurred.

20.     On or about December 19, 2005, Ontime transferred approximately $7.4 million

to HVP Offshore.  Notwithstanding that this transfer did not come from the liquidation of any

---

[1] Ontime is an entity linked to Illarramendi's brother-in-law, Rufino Gonzalez-Miranda.

[2] The $5.2 million hole that was concealed by Illarramendi was bundled with other purported investments in Ontime, for a total purported investment of $7.0 million recorded on the trade blotter of HVP Offshore.

investment by Ontime, the transfer was falsely recorded in the books and records of HVP Offshore as a redemption of the corresponding fictitious investment described above.  Ontime also transferred $30,000 to an account in the name of Illarramendi and Maria Josephina Gonzalez-Miranda (Illarramendi's wife) on or about November 21, 2005.

21.     Ontime's payment to HVP Offshore, which was falsely recorded by HVP Offshore as a redemption of a fictitious investment, was funded, in part, by approximately $5.5 million that had been transferred to Ontime from a bank account in the name of HVP Partners during the time period November 3, 2005 through December 1, 2005.

22.     HVP Partners' transfers to Ontime were funded, in part, by a $5 million loan from BCT Bank on or about November 16, 2005.  Lopez was a director of the holding company that owns BCT Bank.

23.     This $5 million loan from BCT Bank was repaid, in part, with roughly $5 million advanced by an entity known as Goldenbird, which characterized its advance in a spreadsheet as one of many payments listed as the "Highview Point Special Situation."  Notably, the Highview Point Special Situation transactions were reflected in the spreadsheet as being paid back with interest.   None of these Highview Point Special Situation transactions were recorded in the HVP Funds' books and records.  I understand from my review of documents, that Goldenbird was an entity associated with Cisneros.

**Use of Off-Book Options Trading**

24.     On at least five occasions between November 2005 and August 2006, Illarramendi caused the diversion of assets of the HVP Funds to entities he effectively controlled for purposes of directing further transactions with the proceeds of these diversions.    Thereafter,

8

Illarramendi utilized the proceeds of these transfers to engage in a speculative, off-the-books trading strategy which focused primarily on options trading ("Off-book Trading Strategy"). The Off-book Trading Strategy sought to capitalize on the volatility in the markets for stocks like Google, Yahoo and others. The execution of these trades, however, resulted in further net losses of approximately $28 million. Notably, by transferring money from the HVP Funds to these entities to execute the Off-book Trading Strategy, the existence of the speculative options trades and the significant losses sustained as a result were not reflected in the books and records of the HVP Funds. Because these losses continued to be concealed from investors, they caused the hole to grow dramatically. By the end of August 2006, the hole stood at over $33 million, more than one third of the $95 million net asset value of the HVP Funds.

25.     Entities used by Illarramendi to effectuate the Off-book Trading Strategy included HVP Partners, Naproad Finance S.A. ("Naproad"), and HPA, Inc. ("HPA").

26.     HVP Partners' Wachovia Securities account statement indicates that by December 31, 2005, it had gained approximately $1 million as a result of the Off-book Trading Strategy.

27.     HPA Inc.'s Wachovia Securities Account statement indicates that, between December 2005 and February 2006, it had lost approximately $6.1 million as a result of the Off-book Trading Strategy.

28.     Naproad's Wachovia Securities Account statement indicates that between January and August 2006, it had lost approximately $14.3 million as a result of the Off-book Trading Strategy.

29.     In August 2006, Illarramendi received an e-mail informing him that another account where he effectuated his Off-book Trading Strategy had lost approximately $8.6 million

as a result of the Off-book Trading Strategy.

### First Naproad Transaction

30.     The following is a summary of facts related to the falsification of the books and records of HVP Offshore relating to a fictitious investment in Naproad, which was described in the HVP Offshore trade blotter as "NAPROAD", and utilized to further the Fraudulent Scheme.

31.     On or about January 5, 2006, HVP Offshore transferred approximately $5.5 million to a bank account in the name of Naproad and falsely recorded that transfer in its books and records as a purchase of a fictitious investment in Naproad.

32.     Naproad did not utilize the money received from HVP Offshore for any investment.   Rather, on or about January 6, 2006, Naproad transferred approximately $5.2 million to Goldenbird, apparently to repay, with interest, an earlier advance from Goldenbird to HVP Partners that was characterized as a "Highview Point Special Situation" transaction and which is described in ¶ 23 above.

33.     Also, on or about January 13, 2006, Naproad also made the following transfers: $50,000 to a bank account in the name of Illarramendi, $5,000 to a bank account in the name of Adela Illarramendi, and $100,000 to a bank account in the name of Luth.

34.     Several months later, on or about April 5, 2006, Naproad transferred approximately $5.7 million to HVP Offshore.   Notwithstanding that these funds did not come from the liquidation of any investment, HVP Offshore falsely recorded in its books and records the receipt of the approximate $5.7 million as the "redemption" of the fictitious investment in Naproad.   Notably, on the same day of the $5.7 million transfer, Naproad also transferred $100,000 to a bank account in the name of Illarramendi.

10

35.     Naproad's transfers to HVP Offshore and Illarramendi were funded, in whole or in part, by transfers to Naproad totaling approximately $15.8 million, from March 31 through April 4, 2006, from various entities, of which at least $11.8 million were secured by promissory notes with HVP Partners.  These funds, which constituted other people's money loaned to HVP Partners and transferred to HVP Offshore, were commingled with other investor funds in HVP Offshore's account.

36.     From my review of financial records and other documents, it is apparent that in many cases the execution of transfers of money obtained from other entities to any of the HVP Funds' bank accounts to assist in concealing the hole, had the effect of enlarging the hole because entities or persons who provided funds ultimately used in these transfers for the most part expected to receive their money back with additional profits.

**Lopez Learns of the Fraudulent Scheme**

37.     In his testimony from the May 25, 2011 hearing before this Court, Illarramendi admitted that he informed Lopez about the Fraudulent Scheme during 2006.  (*See* Exhibit A at 360-365.)  According to that testimony, rather than exposing the Fraudulent Scheme, Lopez instructs Illarramendi to fix the problem. (*id*.).  The Fraudulent Scheme continued and grew for several more years after that.

**Commingled Funds Tainted All Subsequent Investments**

38.     The Investigation conducted by the Receiver and FTI has confirmed multiple instances where money received from others, which the HVP Funds falsely recorded as redemptions of fictitious investments, was used to invest in what otherwise might have appeared to be legitimate investments.  The use of commingled funds to make these investments tainted

11

those investments and the corresponding profits received.  The following are two examples of this occurring.

39.     As described in ¶ 20, HVP Offshore, on December 19, 2005, received $7.4 million from Ontime, which was falsely characterized as the redemption of the fictitious investment in Ontime.  Based on my review of the HVP Offshore account statements, it is evident that prior to, and following this date, the HVP Offshore account entered into certain purchase and sale transactions which left HVP Offshore with balances less than $7.4 million in the account.  As such, cash received from Ontime was used to fund, in part, the trading activity conducted by HVP Offshore to purchase this bond.

40.     On April 29, 2010, Illarramendi caused the Michael Kenwood Venezuela Fund ("MKV") to transfer approximately $34 million to the Master Fund, which the Master Fund falsely recorded as the redemption of a prior fictitiously recorded investment in MKV that never actually occurred.  The $34 million transfer to the Master Fund is part of the $180 million in transfers this Court found that the "Commission has preliminarily shown that the Highview Funds likely do not have a legitimate claim to…" (Doc #276 at 9-10.)  Shortly after the Master Fund received the $34 million transfer from MKV some of those funds were utilized to invest in four securities.  These securities transactions utilizing funds commingled from MKV ultimately yielded profits to the Master Fund.

**Concealment of the Hole Through The Falsification of Additional Fictitious Investments In the Books and Records of the HVP Funds**

41.     During 2006, Illarramendi continued to cover up the hole and execute the Fraudulent Scheme by falsely creating fictitious investments on the HVP Funds' books and records, and thereafter making false entries in its books and records reflecting the purported

redemption of the fictitious investments.   Many times these falsely recorded redemptions occurred contemporaneously with the receipt of money from another entity that was commingled with that of the HVP Funds.   Examples relating to the falsification of investments in Pamac Securities ("Pamac"), Ontime and Naproad and the commingling of funds are briefly summarized below.

### *Pamac*

42.      On or about June 2 and June 14, 2006, false entries were entered in the Master Funds' books and records purporting to record $10 million and $4 million investments in Pamac which were described in the Master Fund's trade blotter as "PAMAC2".   An examination of the financial records of the Master Fund reflects that no such investment was made in Pamac.

43.      In reality, the $10 million entry related directly to a transfer to a proprietary account of BCT Bank, to pay back loans made to HVP Partners to further the Fraudulent Scheme.   The $4 million entry related directly to a transfer to Pamac, used in part to pay back obligations to third parties.

44.      On or about August 28, 2006, a false entry was entered in the Master Fund's books and records inaccurately reflecting the redemption of the fictitious investment in Pamac for approximately $14.7 million.   However, no monies were actually received by the Master Fund at this time.   Instead, as will be described in more detail below, at the same time as this fictitious redemption was recorded, a new fictitious investment in Naproad Finance, S.A. was simultaneously falsely recorded in the books of the Master Fund, which included the amount of this falsely recorded redemption.

### *Ontime*

13

45.      On or about June 6, 2006, a false entry was entered in the Master Fund's books and records purporting to record a $4 million investment in Ontime which was described in the Master Fund's trade blotter as "ONTIME3".

46.      In reality, this entry related directly to a transfer of approximately $4 million to Ponter Investments, S.A., to pay back a loan made to HVP Partners to further the Fraudulent Scheme.

47.      On or about August 28, 2006, a false entry was entered in the Master Fund's books and records inaccurately reflecting the redemption of the fictitious investment in Ontime for approximately $4.2 million.  However, no monies were actually received by the Master Fund from Ontime at this time.  Instead, as will be described in more detail below, at the same time as this fictitious redemption was recorded, a new fictitious investment in Naproad Finance, S.A. was simultaneously falsely recorded in the books of the Master Fund, which included the amount of this falsely recorded redemption.

*Naproad Finance, S.A.*

48.      As referenced above, both of the falsely recorded redemptions of the fictitious Pamac and Ontime investments, were covered with the false creation of a new fictitious investment in the books and records of the Master Fund purportedly in Naproad Finance, S.A. The Master Fund's trade blotter described this fictitious investment as "NAPROADFI".

49.      On or about August 28, 2006, a false entry was entered in the Master Fund's books and records to inaccurately reflect that a purported investment of $20 million had been made in Naproad.  On or about the same date, the Master Fund transferred only approximately $1.1 million in cash to Naproad.  The rest of the fictitious investment consisted of the false book

14

entries, described in ¶¶ 44 and 47 above, that in effect rolled over the fictitious investments in Pamac and Ontime into the purported investment in Naproad Finance S.A.  For example, on or about August 28, 2006, Illarramendi sent an e-mail to the HVP Funds' administrator GlobeOp indicating that the $14.7 redemption from Pamac and the $4.2 redemption from Ontime, neither of which actually occurred, should be transferred via book entry to reflect an investment in Naproad.

### Tens of Millions of Dollars from the HVP Funds Are Utilized to Engage In Venezuelan Currency Arbitrage Trades

50.     During 2007 and 2008, money transferred from the HVP Funds was, at times, utilized to engage in high risk Venezuelan currency arbitrage transactions from which the HVP Funds received little, if any, profits.  My review of documents indicates that certain funds related to PDVSA[3] (the "PDVSA Funds"[4]) and Beracha received millions of dollars of profits from these transactions and that proceeds from the transactions may have been utilized to pay bribes to a former official of PDVSA.  I briefly summarize only some of the details relating to one such transaction in October 2007.

51.     During the period of October 2, 2007 to October 9, 2007, the Master Fund, directly and through transfers to Ontime, sent approximately $26 million to BM Financial.  In connection with these transfers, false entries were made in the books and records of the Master Fund inaccurately recording a purported investment in Ontime of $26 million which was

---

[3] The Venezuelan state-owned oil company, Petroleos de Venezuela S.A., and related entities collectively referred to herein as "PDVSA."

[4] The PDVSA Funds include APJ International Limited; Asociacion Civil Administradora de los Fondos de Pensiones de los Jubilados de Petroleos de Venezuela, S.A. y sus Filiales; Fondo Prevision Trabajadores de Petroleos de Venezuela S.A. y sus Filliales; and PDVSA Institucion Fondo de Ahorros are collectively referred to herein as the "PDVSA Funds."

described in the Master Fund's trade blotter as "ONTIMEUSD."  In addition to the $26 million received from the Master Fund, BM Financial also received approximately $10 million from BCT Bank, which were the proceeds of a loan provided to HVP Partners, and approximately $2 million from Lopez's sister, Carolina Lopez, through transfers to Ontime, for a total of approximately $38 million.

52.     Documents reviewed reflect that BM Financial converted the dollars to Venezuelan Bolivars ("VEF") at a favorable permuta exchange rate, turning approximately $36.5 million of the invested monies into VEF worth approximately $89.5 million (USD) at the official government exchange rate.  According to documents reviewed, BM Financial purchased VEF-denominated bonds with the Venezuelan Bolivars obtained.

53.     BM Financial sent the VEF-denominated bonds to the PDVSA Funds, which in turn sent U.S. dollar-denominated bonds worth approximately $47.6 million to HPA, an entity controlled by Illarramendi, providing a net benefit to the PDVSA Funds of approximately $41.9 million, calculated based upon the official government exchange rate.  HPA then sold the bonds for market value, making a profit of approximately $11.1 million for the investor group.[5]

54.     The Master Fund thereafter received a $26.75 million cash transfer as a result of this Venezuelan currency arbitrage transaction.  A false entry was recorded in the books and records of the Master Fund inaccurately reflecting that this transfer was a redemption of the falsely recorded Ontime investment.

55.     Emails between Illarramendi and Beracha reveal that they kept track of the profits

---

[5] Before the profit was distributed, the proceeds were immediately used to fund another Venezuelan currency arbitrage transaction again executed through BM Financial and the PDVSA Funds.

and distributions thereof for each Venezuelan currency arbitrage transaction separately.

56.     Of the approximately $11.1 million of profit from the permuta transaction described above, more than $10.5 million was transferred to or retained by Beracha or entities which emails suggest Beracha controlled.

57.     One such entity is Hermitage.  An email between Illarramendi and Beracha notes that approximately $7.3 million was to be paid to Hermitage as earmarked for "black."  Additional emails and information evidence that "black" is actually Juan Montes, an official at PDVSA.  In addition, emails between Illarramendi and Beracha indicate that approximately $1.5 million sent to BM Financial, but not used to fund the Venezuelan currency arbitrage transaction, was to be sent to black (Juan Montes) directly by Beracha.  Attached as Exhibit F are true and correct copies of these emails.

**Hotelera Playa Minas' Early Redemption**

58.     Attached as Exhibit G is a true and correct copy of the Confidential Explanatory Memorandum of HVP Offshore.  This document evidences the 90-day redemption policy of HVP Offshore.  (*See* Exhibit G at p 22.)  Documents I reviewed, some of which are described below, reveal that in October 2008, Illarramendi and others apparently circumvented the 90-day redemption policy of HVP Offshore and arranged to favorably redeem an investor, Hotelera Playa Minas, off-the-books, prior to the expiration of 90 days.

59.     In or about September 2008, Alvaro Martin ("Martin"), on behalf of Hotelera Playa Minas, sought an immediate redemption of his investments in HVP Offshore, which would not have been permissible under the 90-day redemption policy.

60.     An email I reviewed indicates that Lopez made an agreement with Martin,

whereby Martin would cancel his September 30, 2008 redemption request and instead reapply for a December 31, 2008 withdrawal.

61.     On or about October 20, 2008, Ontime transferred approximately $2.8 million to a bank account held by Hotelera Playa Minas which appears to be the functional equivalent of an early redemption of Hotelera Playa Minas' investment in HVP Offshore.  Ontime's funding of this transfer followed the receipt of approximately $3.6 million from Elmont Properties, an entity connected to Cisneros, on or about October 17, 2008.

62.     On or about December 22, 2008, Lopez sent an email to Martin instructing Martin to transfer the money that he would receive from the conforming 90-day HVP Offshore redemption in January 2009 to an account at BCT Bank in the name of Flight Services, Inc., apparently to avoid Hotelera Playa Minas from being compensated twice for its investment in HVP Offshore.

63.     On or about January 15, 2009, HVP Offshore transferred approximately $2.3 million to a bank account held by Hotelera Playa Minas.  On or about January 16, 2009, Martin confirmed that he would transfer those funds to Flight Services, Inc., as instructed.

64.     On or about January 22, 2009, Flight Services, Inc. transferred approximately $2.3 million to Ontime.

### More Than a Quarter of a Billion Dollars of Capital From the MK Funds[6] and Certain of the MK Entities[7] Were Transferred To or For the HVP Funds Without

---

[6] The MK Funds refers to the following funds: MK Special Opportunity Fund; MKV; and Short Term Liquidity Fund, I, Ltd. (the "MK Funds").

[7] The MK Entities refers to the following entities: The Michael Kenwood Group, LLC; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory

*continued on next page…*

**The Receipt of Any Benefit in Return**

65.     The Investigation has revealed that well in excess of a quarter of a billion dollars of capital from the MK Funds and certain MK Entities was transferred to or for the HVP Funds without the receipt of any benefit in return from the HVP Funds.  This net amount in excess of $250 million greatly exceeds the $164 million in net principal that investors claim to have invested in the HVP Funds.  Notably, millions of dollars of principal contributed by investors in the HVP Funds was lost in Illarramendi's various attempts to cover up the hole.

**MKV Monies Used by Fidevalores to Pay HVP Partners' Principals and Others**

66.     Illarramendi caused MKV to transfer money to Fidevalores Sociedad de Corretaje de Titulos Valores, S.A. ("Fidevalores") which was used to make significant payments to Luth, Illarramendi, Illarramendi's wife, and an entity controlled by Odo Habeck, who was one of the principals of the Michael Kenwood Group ("MK Group").  Fidevalores is an entity I understand is controlled by Illarramendi's brother-in-law, Rufino Gonzalez-Miranda.   A true and correct copy of an email describing this transaction is attached hereto as Exhibit H.

67.     On or about June 16, 2009, MKV transferred approximately $4 million to a bank account in the name of Fidevalores.

68.     On or about June 16, 2009, Illarramendi sent a letter to Fidevalores requesting that Illarramendi and his wife be paid $500,000.  Attached hereto as Exhibit I is a true and correct copy of that letter.

---

*…continued from previous page*

Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC (the "MK Entities").

69.     On or about June 18, 2009, Fidevalores transferred $1.1 million to a bank account in the name of Luth, purportedly for "MK Group Consulting Fees."

70.     On or about June 18, 2009, Fidevalores transferred $500,000 to a bank account in the name of OGH Advisors, LLC, purportedly for "MK Group Consulting Fees."   OGH Advisors, LLC is an entity controlled by Odo Habeck.

71.     Prior to these transactions, in May 2009, Illarramendi caused MKV to transfer money to Fidevalores which was used to make significant payments: $500,000 to Illarramendi and his wife, $500,000 to entity controlled by Odo Habeck and $935,000 to an entity hired to build Illarramendi's residence in Connecticut.

### MKV Funds Used by Underhill to Pay Individuals Associated with HVP Partners and MK Group

72.     Illarramendi caused MKV to transfer approximately $4 million to Underhill Investments, S.A. ("Underhill"), an entity believed to be related the Lopez family, for the purpose of making payments to Luth, Lopez, Illarramendi and an employee of HVP Partners.

73.     On or about March 24, 2010, Illarramendi sent an email to Lopez.  In the email, Illarramendi instructed Lopez to tell Carolina to send $1,267,000 to, as translated, "us 3," which appears to be a reference to Luth, Lopez and Illarramendi; $105,000 to "BP"; and $50,000 to "LB."  Attached hereto as Exhibit J is a true and correct copy of the email.

74.     On or about March 25, 2010, MKV transferred approximately $4 million to a bank account in the name of Underhill.

75.     On or about March 29, 2010, Illarramendi sent an email to Lopez modifying the instructions in the March 24 email, indicating that "BP" should instead be paid $155,000.  On or about April 6, 2010, $155,000 was wired from Underhill into an account in the name of an

20

employee of HVP Partners with the initials BP.

76.     On or about April 6, 2010, bank records I have reviewed confirm that $1,267,000 was wire transferred from Underhill to an account in the name of Luth.

77.     On or about April 6, 2010, bank records I have reviewed confirm that $1,267,000 was wire transferred from Underhill to an account in the name of Illarramendi.

### HVP Funds' Monies Used by Ontime to Pay HVP Partners' Principals and Others

78.     In January 2009, the Master Fund transferred funds to Ontime which then paid $480,000 each to Luth and Illarramendi, $50,000 to Victor Chong, HVP Partners' Chief Financial Officer and Chief Compliance Officer ("Chong"), and $400,000 to Illarramendi's contractor.

79.     Again, in February 2009, the Master Fund transferred funds to Ontime which then paid $75,000 to Luth, $100,000 to Illarramendi and another $400,000 to Illarramendi's contractor.

### HVP Funds' Monies Used by Naproad to Pay HVP Partners' Principals and Others

80.     In January 2008, the Master Fund transferred funds to Naproad which then paid $60,000 to Chong.

81.     In January 2008, Naproad made transfers of $133,000 to each of Illarramendi, Luth, Argenta Management Inc., and an entity associated with Lopez.  These transfers were primarily funded with loans that were subsequently repaid using funds derived from Venezuelan currency arbitrage transactions that utilized money from the Master Fund.

### Extensive Commingling of Funds To and From HVP Funds and Various Entities

82.     By August 2006, money received from the following entities had been

commingled with that of the HVP Funds, and Illarramendi contemporaneously, falsely recorded the received transfers as belonging to the HVP Funds as "redemptions" of prior purported investments: Stewart Title Latin America, Inc., HVP Partners, Global Jack's, S.A., Alimentos Jack's de Centroamerica, S.A., Ponter Investments, S.A., and Taylor & Cruz, S.A.

83.     It was commonplace for money to be transferred from the HVP Funds for the purpose of facilitating the fraud with the transfers falsely documented in the books and records of the HVP Funds as purported investments.  These transfers caused HVP Funds' money to end up in the hands of numerous entities such as Fractal Fund Management, Ltd., Stewart Title Latin America, Inc., Goldenbird Finance, S.A., Ponter Investments, S.A., Heptagon Asset Management C.V., Web Financial Services, Bradleyville Limited, La Signoria Assets Corp., Rowberrow Trading Corp., Vetra Energy Group, LLC, and others.

### Principals and Employees of HVP Partners Invoked Their Fifth Amendment Rights

84.     Principals and employees of HVP Partners invoked their Fifth Amendment right to not incriminate themselves and answered no substantive questions regarding the Fraudulent Scheme under oath.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 2, 2012.

Matthew Greenblatt