# EXHIBIT A

```
 1                  UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3    * * * * * * * * * * *         *
                                    *
 4    SECURITIES AND EXCHANGE       * Case No. 11cv78(JBA)
      COMMISSION,                   *
 5              Plaintiff,          *
                                    *
 6              vs.                 *
                                    *
 7    FRANCISCO ILLARRAMENDI, ET AL * MAY 25, 2011
                                    *
 8              Defendant.          *
                                    *
 9    * * * * * * * * * * * *       *

10            TRANSCRIPT OF EVIDENTIARY HEARING
                        VOLUME II
11
      BEFORE:  THE HONORABLE JANET BOND ARTERTON, U.S.D.J.
12
      Appearances:
13    FOR THE PLAINTIFF:         RUA KELLY, ESQ
                                 KATHELEEN SHIELDS, ESQ
14                               CARLOS COSTA-RODRIGUES, ESQ
                                 LEEANN GAUNT, ESQ.
15                               United States Security and
                                 Exchange Commission
16                               33 Arch Street
                                 Boston, MA 02110
17
      FOR THE DEFENDANT          JOHN GLEASON, ESQ.
18    FRANCISCO ILLARAMENDI:     Gleason & Koatz
                                 122 East 42nd Street
19                               New York, NY 10168

20    FOR THE DEFENDANT          CARL LOEWENSON, ESQ
      HIGHVIEW POINT             RONALD WHITE, ESQ.
21    PARTNERS:                  Morrison & Foerster
                                 1290 Avenue of the Americas
22                               New York, NY 10104

23    FOR THE DEFENDANT          MICHAEL SWARTZ, ESQ
      HIGHVIEW POINT MASTER      Highview Point
24    FUND, HIGHVIEW POINT       Schulte Roth & Zabel
      OFFSHORE, LTD:             919 Third Avenue
25                               New York, NY 10022
```

```
 1   that -- this was from information in those
 2   transaction reports, and this is what we
 3   accumulated.
 4       Q.   So, we've seen here two instances of
 5   investors essentially getting more out of the Master
 6   Fund than they put in.  Did you do any additional
 7   analysis to determine whether any investors received
 8   more back from the Master Fund than they had
 9   contributed?
10       A.   I did not.  I limited it to the procedures
11   performed to compile this list.
12       Q.   So, what we don't know from Exhibit G is
13   how many investors redeemed and essentially made a
14   profit on their investment?
15       A.   I have not calculated that.
16       Q.   I'm sorry, I meant to go through one other
17   set of -- I'm going to take you back to an exhibit
18   of yours we already looked at.  Let me just figure
19   out which of those exhibits it is.  I think we can
20   do it with Exhibit B.
21       A.   Yes.
22       Q.   And I'd like to direct you to the third
23   line of data on Exhibit B, which is your sort of
24   summary of the MKV X 2010 transactions.
25       A.   Yes.
```

1  Q. And what you've indicated were the total
2  proceeds from that set of transactions of 94 plus
3  million dollars.
4  A. Yes, that's correct.
5  Q. I'd like to have you look at Mr.
6  Greenblatt's presentation concerning that
7  transaction, and that is Plaintiff Exhibit 9, and
8  the piece of it I want to ask you first about is,
9  it's your understanding, sir, isn't it, that the
10  $94 million proceeds were received back into the
11  Master Fund in two chunks, essentially a $34 million
12  chunk on April 29th and a $60 million chunk on
13  May 10th; is that correct?
14  A. That's my recollection.
15  Q. Okay. And it's that $34 million piece that
16  I want to start with. Were some of the documents
17  that you reviewed in connection with your analysis
18  records from the Highview Master Fund Deutsche Bank
19  account?
20  A. I did have those. I did have bank
21  statements from that bank, yes.
22          MS. SHIELDS: May I have permission to
23  approach, your Honor?
24          THE COURT: Yes.
25  Q. I have for you what we've marked for

1   identification as Plaintiff's Exhibit 13.  Have you
2   seen the Deutsche Bank records that are the first --
3   let's see, three pages of Plaintiff's Exhibit 13?
4       A.   I don't recall.  I went through many bank
5   statements.  I don't personally recall this one.
6       Q.   Would you agree with me, sir, that the
7   $34 million payment that was made into the Highview
8   Point Master Fund on April 29th is shown on the
9   first page of Plaintiff's Exhibit 13, about three
10  quarters of the way down?
11      A.   I do see the amount of $34,145,000, yes.
12      Q.   And perhaps it might be easier if you look
13  at Plaintiff's Exhibit 9, which is the presentation.
14  I can direct you to the wire transfer order that
15  matches up there and perhaps give you some
16  additional comfort.  It's page 28 of Plaintiff's
17  Exhibit 9.
18      A.   Yes, I found page 28.
19      Q.   And you see that is the wire transfer
20  payment order reflecting the payment of that
21  $34 million plus amount from the Michael Kenwood
22  Venezuela Fund into the Highview Master Fund
23  Deutsche Bank account?
24      A.   Yes, I agree this is the wire transfer.
25      Q.   And what we have is the Deutsche Bank

1  account statement sort of showing those funds
2  arrived; is that right?
3      A.   That's correct, that's on Plaintiff's
4  Exhibit 13.
5      Q.   And you'll observe on the first page of
6  Plaintiff's Exhibit 13 that prior to the Deutsche
7  Bank's account -- prior to the Deutsche Bank
8  account's receipt of those funds, there was
9  approximately $8.7 million in that account?
10     A.   Yes, 8.7 million appears to be the balance
11 immediately preceding this deposit.
12     Q.   And then if you look at pages 2 and 3 of
13 Plaintiff's Exhibit 13, you'll observe, and we've
14 highlighted them so you can see them more easily,
15 you'll see that there are four transactions, four
16 essential purchases that are reflected in the
17 Deutsche Bank account in the amounts of
18 $9.8 million, $9.8 million, $5.6 million, and
19 $3.9 million.  Do you see those purchases?
20     A.   I do see those disbursements from the bank
21 accounts, yes.
22     Q.   And those four purchase, those are all
23 purchases that you --
24          THE COURT:  Is there an difference --
25 you use the word "purchases," he uses the word

```
 1   "disbursements."  Is this of any significance?
 2              MS. SHIELDS:  I can use the word
 3   "disbursements."
 4        Q.   Essentially funds going out of the Deutsche
 5   Bank account.
 6        A.   Yes.
 7        Q.   For some purpose.  Yes?
 8        A.   Yes.
 9        Q.   And those four disbursements are
10   disbursements that you have analyzed as four, I
11   think what you've called them, securities trades; is
12   that right?
13        A.   I would have to go through -- I'd have to
14   check.  I don't recall of all of the securities
15   trades these four numbers.
16        Q.   Okay.  Well, perhaps we can do it this way.
17   If you look at pages 4 and 5 and 6 and 7 of
18   Plaintiff's Exhibit 13, those are the wire transfer
19   payment orders that correspond to those
20   disbursements.  I'll give you a moment to look at
21   them.
22        A.   Thank you.  I've reviewed the four wire
23   transfers.
24        Q.   And do you agree that those are the wire
25   transfer orders that correspond to those four
```

```
 1   disbursements?
 2        A.   They match in dollar amount to the four
 3   disbursements.
 4        Q.   And those are all from the Highview Point
 5   Master Fund Deutsche Bank account?
 6        A.   Yes, they appear to be, yes.
 7        Q.   Then if you look at the last two pages of
 8   Plaintiff's Exhibit 13, is it fair to say what is
 9   reflected -- that those are pages from the Highview
10   Point Master Fund's trade blotter?
11        A.   They do appear to be the pages from the
12   trade blotter, yes.
13        Q.   And if you look at the highlighted entries
14   on both of those pages, that shows how these, the
15   four disbursements, were characterized on the Master
16   Fund's trade blotter; is that right?
17        A.   If I may just have a moment.
18        Q.   Certainly.
19        A.   I've reviewed the four pages.
20        Q.   And do those pages show how these
21   disbursements were characterized on the trade
22   blotter of the Master Fund?
23        A.   I have matched the dates to the same period
24   and I've matched the dollars for three of them
25   directly to the book net amount and one of them to
```

1   the book net amount plus accrued interest.  So, it
2   would -- they do represent the same dollars.
3       Q.   And --
4       A.   Dollar amounts, if I may.
5       Q.   And these entries on the trade blotter,
6   fair to say that these are entries that you would
7   have put into the securities trades bucket when you
8   sort of grouped investments from the trade blotter
9   together?
10      A.   From my recollection, they would be in the
11  securities bucket.
12      Q.   So, you would agree with me, sir, wouldn't
13  you, that without this $34 million that came into
14  the Master Fund from the Michael Kenwood Venezuela
15  Fund, the Master Fund would not have had enough
16  money to engage in these securities trades?  Is that
17  fair?
18      A.   If I -- they would only have -- just
19  mathematically, the fund would only have had
20  $8.7 million, and I think the aggregate of what was
21  purchased after the receipt of substantially these
22  funds totals about 28 to 30 million dollars of
23  securities.  As to the availability of funds, this
24  was limited to this one bank account.  So, I would
25  just qualify my answer that way.

```
 1        Q.   So, they could have gotten funds from
 2   somewhere else, but if this is the bank account they
 3   had to use, they couldn't have made these securities
 4   trades without the $34 million?
 5        A.   They could not have made all four.  They
 6   may have been able to make individual ones.
 7        Q.   Fair enough.
 8             MS. SHIELDS:  So I think -- if I may,
 9   your Honor, have just a moment to consult with my
10   colleagues.
11        Q.   I have just sort of two summary questions
12   for you, sir.  And that is to again sort of make
13   sure that we're all clear about the scope of your
14   testimony.  It's not your testimony, is it, sir,
15   that there was no commingling of funds between the
16   Master Fund and any of the Michael Kenwood funds, is
17   it?
18        A.   I haven't done any procedures that would
19   address anything related to commingling.
20        Q.   And similarly, it's not your testimony that
21   there was no fraud in connection with the Master
22   Fund?
23        A.   It's not my testimony that there was no
24   fraud, that is correct.
25             MS. SHIELDS:  Thank you.  I have no
```

```
 1   it's about 70 years if it got to be -- you know,
 2   there is a column and a line and I'm not --
 3        Q.   So the right side of the line?
 4             MR. WITNESS:  I'm sorry?
 5             THE COURT:  The grid.
 6             THE WITNESS:  Exactly, the grid.
 7        Q.   So, on the far end of the grid is 70 years;
 8   to the best of your knowledge?
 9        A.   Correct, correct.
10        Q.   As a result of the fraud you've pled guilty
11   to, the liabilities for the funds that you managed
12   exceeded the assets to pay those liabilities by
13   hundreds of millions of dollars, right?
14        A.   That's being calculated, as I understand
15   it, but my understanding is that yes, that would be
16   about adequate.
17        Q.   You've referred to this as the hole in your
18   plea allocution?
19        A.   Yes, I believe so.
20        Q.   And the hole could, in your estimation, be
21   in excess of $300 million?
22        A.   I believe so, yes.
23        Q.   During the time you committed this fraud,
24   from say 2005 through 2010, you were managing
25   principal at Highview Point Partners, right?
```

1      Q.   Can you talk a little bit about how the
2  circumstances in which the fraud began, when what
3  you referred to as the hole started to develop?
4      A.   In approximately mid-October 2005, I was in
5  Venezuela to enter into supposedly a transaction to
6  purchase a credit linked note from a Venezuelan
7  financial institution through the arbitrage that I
8  have described in my testimony in answering to Mr.
9  Loewenson's questions.  And as a result of that,
10 because of a number of issues, the bank that was
11 purchasing the note from us backed out of the
12 transaction, and because of market events that
13 resulted in us, or me, having to sell the security
14 at a much lower price than I had intended initially,
15 and a loss being effectively incurred, in part by
16 Highview Point Master Fund, or at the time it wasn't
17 Master Fund, it was just Highview Point Offshore,
18 and in part by others, that contributed to the
19 transaction.  And it's a lot more elaborate than
20 that.  In the interest of time, I could go into a
21 lot more detail, but I don't want to either -- I
22 don't know if it's relevant to do that.  You can
23 tell me.
24           THE COURT:  That's how it started.
25 We'll go on from October '05.

1  Q.   The only question I have about the hole is
2  how much it was at that time?
3  A.   When all was said and done in that first
4  part of it, I believe the hole was approximately
5  $5 million, but it wasn't from -- the hole from the
6  transaction.
7  Q.   At some point did you disclose the
8  existence of the hole to any of your partners who
9  were principals?
10 A.   At a later date, after I had tried to
11 recover the money and had failed to do so, thereby
12 larging -- or increasing -- I don't think larging is
13 a word, I'm sorry -- increasing the amount of the
14 mismanagement between assets and liabilities to
15 approximately $30 million, I described -- I
16 disclosed the situation to Mr. Lopez.  I don't know,
17 that may have been, you know, at the end of the
18 summer of 2006 perhaps.
19 Q.   Can you talk a little bit more about that
20 conversation.
21 A.   It was -- after reaching that point I
22 decided to approach first my father and then Mr.
23 Lopez, and eventually both of them together, to
24 discuss the matter and to get advice on what would
25 be the best course of action.

```
 1      Q.    What did you say to Mr. Lopez exactly?
 2      A.    That through -- because of that transaction
 3   initially, and my subsequent actions to try and
 4   recover the money, I had reached a point where, due
 5   to market transactions and other things that had --
 6   it's a long story, so I can discuss it whenever you
 7   guys want, but I want to be as efficient as possible
 8   -- there had been a significant hole, let's call it,
 9   creator, differential creator, loss created by me,
10   and the circumstances that totaled approximately
11   $30 million, part of which was money that
12   essentially was Highview Point's money and part of
13   which was money from other investors that
14   participated in transactions with us.
15      Q.    And how did you -- how did you describe
16   this to Mr. Lopez?
17      A.    Well, it was a few years ago, but I believe
18   I just told him, look, I messed up.  I, you know,
19   lost this money in this transaction where Calyon
20   backed out of the trade, and then I tried to make it
21   up through doing options trading and other
22   transactions, and they didn't go well and,
23   unfortunately, you know, the loss is growing.
24      Q.    How did Mr. Lopez react?
25      A.    He was very taken aback.  He was not happy.
```

1  And we discussed at that time whether or not we
2  should approach first the lead investor, or the
3  investors, and my father recommended that we
4  approach the lead investor to disclose to him what
5  had happened, and then Frank asked me that him and I
6  should go to the office and leave my father. We
7  were meeting, at a hotel at a restaurant in a hotel
8  in Manhattan near where I lived, and we went to the
9  office and we discussed it, and he felt it would be
10 a very bad thing for his reputation, for a number of
11 things, and myself as well, and, you know, so he
12 asked that we try to figure out a different way of
13 fixing the problem and that I work to fix the
14 problem.
15      Q.   And by the way, you mentioned before that
16 Mr. Lopez had been your boss. What was his title at
17 Credit Suisse; if you know?
18      A.   Over the years when I first arrived at
19 Credit Suisse Frank, was a director of Latin America
20 Group. So without necessarily having a reporting
21 line direct to him, he was a superior member of the
22 team. Subsequent to that, over the years he became
23 head of Latin America, Latin American Investment
24 Banking, or the Emerging Markets Group. We were
25 never really clear on what the exact titles were at

1  Credit Suisse, but he was head of the team I worked
2  in.
3       Q.   Pretty high up at Credit Suisse?
4       A.   Well, as high as you can get without going
5  into I think management of the firm in terms of --
6  you know.
7       Q.   So, you indicated that he was of the view
8  that the Master Fund couldn't disclose the loss to
9  investors.  Is that what you testified to just now?
10              MR. LOEWENSON:  Your Honor, consistent
11 with your prior ruling, I'll object to the leading.
12              THE COURT:  Sustained.
13      Q.   What happened -- how did you react to Mr.
14 Lopez's directive that the investor should not be
15 told about the loss the fund had sustained?  Did you
16 respond?
17      A.   I agreed that I would do everything, my
18 best efforts and everything in my power to resolve
19 the situation.  I -- how I reacted?  Are you asking
20 me to qualify my reaction?  Because it wasn't a very
21 good one.
22      Q.   Did he ask you to do anything specifically
23 other than to just keep on keeping on?  Did he ask
24 you to do anything?
25      A.   I don't recall the exact details of the

1  conversation, but, you know, we'll have to figure
2  out how we, you know, fix it.  And, you know -- fix
3  it, basically.  And then he -- obviously we agreed
4  that I would never tell anybody about it, and then
5  -- I'm sorry, I didn't know these were going to be
6  the circumstances under which this was going to be
7  discussed, but I think under the circumstances I
8  can't honor that commitment.  But I think that was
9  the extent of it.  And then essentially I went to
10 work on trying to solve the problem, which obviously
11 didn't work out very well.
12      Q.   How did you and Mr. Lopez go about trying
13 to keep this loss concealed?
14      A.   Well, it's not that we went about together
15 trying to keep the loss concealed.  Once he was
16 informed and once I agreed that I would, you know,
17 try to work through it, we didn't talk much about it
18 except on occasion, you know.  And the idea was I
19 would try to raise as much money as possible to be
20 able to make it so that the gains from those -- from
21 that additional money would eventually cover the
22 loss, and that I would use everything in my power,
23 you know, all the people I knew in government in
24 Venezuela or other investors to see if I could raise
25 enough money.

1             But I think that at some point in
2   time -- because this resulted in what I call kind of
3   the third bucket of investors, or the investors who
4   were not Michael Kenwood investors or Highview Point
5   Master Fund, being essentially created, you know,
6   that existed or growing, at some points some
7   investors participated in that that he brought in
8   and that were in and out of the transactions, or the
9   pot, as I would call it.
10      Q.   You just used the term "third bucket."  Can
11  you -- and I believe you said that it was investors
12  who were neither Highview nor Michael Kenwood; is
13  that right?
14      A.   It was either investors that were neither
15  Highview nor Michael Kenwood, or additional money
16  from investors that were in Highview or that were in
17  Michael Kenwood that that money was not subscribed
18  to either Highview or Michael Kenwood.  I don't know
19  if that clarifies.
20      Q.   What was the -- what was the reason for
21  getting those investors from what you called the
22  third bucket?  Why did you need the money from them?
23      A.   The way that I tried to solve the problem
24  was to run what I called a unified, let's say,
25  treasury function where the money, no matter where