# EXHIBIT G

Copy No. _____

**CONFIDENTIAL EXPLANATORY MEMORANDUM**

# HIGHVIEW POINT OFFSHORE, LTD.

(a Cayman Islands exempted company)

May 2005

THIS CONFIDENTIAL EXPLANATORY MEMORANDUM (THE "MEMORANDUM") IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN COMMON SHARES OF HIGHVIEW POINT OFFSHORE, LTD., A CAYMAN ISLANDS EXEMPTED COMPANY (THE "FUND").   DUE TO THE CONFIDENTIAL NATURE OF THIS MEMORANDUM, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE LEGAL CONSEQUENCES. CONSEQUENTLY, THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON (OTHER THAN YOUR FINANCIAL ADVISOR) WITHOUT THE PRIOR WRITTEN CONSENT OF THE FUND'S DIRECTORS.

Illarramendi, Francisco

Offer for sale of initially two classes of common shares, par value $0.01 (U.S.) per share ("Common Shares" or "Shares", which terms include all classes and series of Common Shares unless otherwise indicated), of Highview Point Offshore, Ltd., an exempted company incorporated and existing under the laws of the Cayman Islands (the "Fund").  The required minimum initial subscription (which is subject to change in the sole discretion of the board of directors of the Fund (the "Directors") but not below $50,000 (U.S.)) is currently $5,000,000 (U.S.).

<div style="margin-left: 2em">

Price:  Initially $100 (U.S.) per Common Share and thereafter at the then Offering Price (as defined in Section 10) per Common Share.

</div>

The Common Shares of the Fund are speculative securities intended for a limited number of experienced and sophisticated investors.  Common Shares of the Fund will be offered only to persons who are neither citizens nor residents of the United States and to a limited number of U.S. investors, consisting of qualified pension, profit sharing and other retirement trusts, charities and other tax-exempt entities.  The Common Shares will not be offered to members of the public resident in the Cayman Islands (which does not include an exempted or ordinary non-resident company in the Cayman Islands).

THIS MEMORANDUM HAS BEEN PREPARED IN CONNECTION WITH THE OFFER AND SALE OUTSIDE OF THE UNITED STATES, ITS TERRITORIES OR POSSESSIONS OF COMMON SHARES OF THE FUND TO PERSONS WHO ARE NOT MEMBERS OF THE PUBLIC IN THE CAYMAN ISLANDS AND WHO ARE NEITHER CITIZENS NOR RESIDENTS OF THE UNITED STATES OF AMERICA AND WITHIN THE UNITED STATES TO A LIMITED NUMBER OF UNITED STATES INVESTORS CONSISTING OF TAX-EXEMPT INVESTORS.  THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON (OTHER THAN YOUR FINANCIAL ADVISOR) WITHOUT THE PRIOR WRITTEN CONSENT OF THE FUND'S DIRECTORS.

NO REGISTRATION STATEMENT HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES AUTHORITY WITH RESPECT TO THIS OFFERING.  THE COMMON SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY ONLY BE OFFERED, SOLD OR OTHERWISE TRANSFERRED DIRECTLY OR INDIRECTLY TO ANY UNITED STATES CITIZEN OR RESIDENT OR TO ANY CORPORATION, PARTNERSHIP, TRUST OR OTHER ENTITY CHARTERED OR ORGANIZED UNDER THE LAWS OF ANY JURISDICTION IN THE UNITED STATES OF AMERICA, ITS TERRITORIES OR POSSESSIONS IN PRIVATE PLACEMENTS EXEMPT FROM REGISTRATION PURSUANT TO REGULATION D OF THE ACT.

THESE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THESE OFFERING MATERIALS.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE COMMON SHARES IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW.  THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY COMMON SHARES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER IN ANY JURISDICTION.  NO ACTION HAS BEEN OR WILL BE TAKEN TO PERMIT A PUBLIC OFFERING IN ANY JURISDICTION WHERE ACTION WOULD BE REQUIRED FOR THAT PURPOSE. ACCORDINGLY, THE COMMON SHARES MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND THIS MEMORANDUM MAY NOT BE DISTRIBUTED, IN ANY JURISDICTION, EXCEPT IN ACCORDANCE WITH THE LEGAL REQUIREMENTS APPLICABLE IN SUCH JURISDICTION.    PURCHASERS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS WITHIN THEIR OWN COUNTRIES FOR THE PURCHASE OF COMMON SHARES AND TO ANY TAXATION OR EXCHANGE CONTROL LEGISLATION APPLICABLE TO THEM.

                           Illarramendi, Francisco

AN INVESTMENT IN THE FUND MAY BE DEEMED SPECULATIVE AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM.  IT IS DESIGNED ONLY FOR EXPERIENCED AND SOPHISTICATED PERSONS WHO ARE ABLE TO BEAR THE RISK OF THE SUBSTANTIAL IMPAIRMENT OR LOSS OF THEIR INVESTMENT IN THE FUND.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, INVESTMENT OR TAX ADVICE.  EACH INVESTOR SHOULD CONSULT HIS PERSONAL COUNSEL, ACCOUNTANTS AND OTHER ADVISERS AS TO THE LEGAL, TAX, ECONOMIC AND RELATED ASPECTS OF THE INVESTMENT DESCRIBED HEREIN AND AS TO ITS SUITABILITY FOR SUCH INVESTOR.

THE FUND IS A REGULATED MUTUAL FUND FOR THE PURPOSES OF THE MUTUAL FUNDS LAW (2003 REVISION) OF THE CAYMAN ISLANDS.  THE FUND IS REGISTERED WITH THE CAYMAN ISLANDS MONETARY AUTHORITY PURSUANT TO SECTION 4(3) OF THAT LAW AND THE PRESCRIBED DETAILS IN RESPECT OF, AND A COPY OF THIS MEMORANDUM HAVE BEEN FILED WITH THE MONETARY AUTHORITY.  SUCH REGISTRATION DOES NOT IMPLY THAT THE MONETARY AUTHORITY OF THE CAYMAN ISLANDS OR ANY OTHER REGULATORY AUTHORITY IN THE CAYMAN ISLANDS HAS APPROVED THIS MEMORANDUM OR THE OFFERING OF COMMON SHARES HEREUNDER.  FOR A SUMMARY OF THE CONTINUING REGULATORY OBLIGATIONS OF THE FUND AND A DESCRIPTION OF THE REGULATORY POWER OF THE CAYMAN ISLANDS MONETARY AUTHORITY, SEE SECTION 18 OF THIS MEMORANDUM.

THE COMMON SHARES ARE OFFERED ONLY ON THE BASIS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM.  ANY FURTHER INFORMATION OR REPRESENTATIONS GIVEN OR MADE BY ANY DEALER, BROKER OR OTHER PERSON SHOULD BE DISREGARDED AND ACCORDINGLY SHOULD NOT BE RELIED UPON.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE OFFERING OF THE COMMON SHARES OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE FUND, THE DIRECTORS, THE INVESTMENT MANAGER, THE PRIME BROKER OR THE ADMINISTRATOR.  NEITHER THE DELIVERY OF THIS MEMORANDUM NOR THE ISSUE OF COMMON SHARES WILL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION OR CONSTITUTE ANY REPRESENTATION THAT THE AFFAIRS OF THE FUND HAVE NOT CHANGED SINCE THE DATE HEREOF.

THE DIRECTORS OF THE FUND WHOSE NAMES APPEAR IN THIS MEMORANDUM ACCEPT RESPONSIBILITY FOR THE INFORMATION CONTAINED IN THIS DOCUMENT.  TO THE BEST OF THE KNOWLEDGE AND BELIEF OF THE DIRECTORS (WHO HAVE TAKEN ALL REASONABLE CARE TO ENSURE THAT SUCH IS THE CASE) THE INFORMATION CONTAINED IN THIS DOCUMENT IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION.  THE DIRECTORS ACCEPT RESPONSIBILITY ACCORDINGLY.

WHENEVER THE MASCULINE OR FEMININE GENDER IS USED IN THIS MEMORANDUM, IT WILL EQUALLY, WHERE THE CONTEXT PERMITS, INCLUDE THE OTHER, AS WELL AS INCLUDE ENTITIES.

SPECIAL NOTICE TO FLORIDA, U.S.A. INVESTORS:

UPON THE ACCEPTANCE OF FIVE (5) OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE U.S. INVESTMENT COMPANY ACT OF 1940, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE U.S. SECURITIES ACT OF 1933), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF COMMON SHARES TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR EITHER WITHIN THREE DAYS

AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE FLORIDA INVESTOR, WHICHEVER OCCURS LATER.

iv

## TABLE OF CONTENTS

Page

1.  SUMMARY ................................................................................................................. 1

2.  DIRECTORY ............................................................................................................. 4

3.  INTRODUCTION ....................................................................................................... 6

4.  INVESTMENT PROGRAM ........................................................................................ 6

5.  BACKGROUND OF THE INVESTMENT MANAGER ............................................... 7

6.  INVESTMENT MANAGEMENT AGREEMENTS ...................................................... 9

7.  RISK FACTORS ..................................................................................................... 11

8.  EXPENSES ............................................................................................................ 17

9.  DESCRIPTION OF THE FUND'S COMMON SHARES .......................................... 18

10. OFFERING OF COMMON SHARES ...................................................................... 21

11. PAYMENTS TO SPONSORS OF THE FUND ........................................................ 22

12. REDEMPTIONS ..................................................................................................... 22

13. BROKERAGE AND CUSTODY .............................................................................. 25

14. BOARD OF DIRECTORS ....................................................................................... 26

15. ADMINISTRATOR .................................................................................................. 27

16. TAXATION AND ERISA MATTERS ....................................................................... 28

17. FISCAL YEAR AND FISCAL PERIODS; FINANCIAL STATEMENTS; AUDITORS ... 30

18. GENERAL COMMENTS ......................................................................................... 31

19. PROCEDURES TO PURCHASE COMMON SHARES ........................................... 32

v

F01334-E00184242

Illarramendi, Francisco

1.    **SUMMARY**

The following is a summary of the more detailed information contained elsewhere in this Confidential Explanatory Memorandum ("Memorandum") and other documents relating to the Fund and is qualified in its entirety by reference to the full text of this Memorandum and such related documents.

| | |
|---|---|
| **The Fund** | Highview Point Offshore, Ltd. (the "Fund") is an exempted company incorporated and existing under the laws of the Cayman Islands. |
| **Investment Objective and Method of Operation** | The Fund's investment objective is to generate total returns by utilizing macroeconomic trades.  To achieve this objective, the Investment Manager (as defined below) will actively trade investment grade and emerging market bonds and credit default swaps.  The Fund will also participate in local markets, foreign exchange, and to a lesser degree options, structured products, and equities when attractive opportunities present themselves. |
| **The Investment Manager** | The co-investment managers of the Fund are Highview Point Partners, LLC ("HPP"), a limited liability company organized under the laws of the State of Delaware, U.S.A., and Quadrant International Inc., a company incorporated under the laws of Nassau, Bahamas ("Quadrant", and, together with HPP, the "Investment Manager"). Francisco A. Illarramendi, Frank H. López and Christopher H. Luth are the managing members of HPP and Luis Bethart is the investment advisor to Quadrant.  HPP and Quadrant will both provide investment advisory services to the Fund; however, HPP will have exclusive authority to execute trades and open accounts on behalf of the Fund. |
| **Minimum Initial Investment** | The minimum initial investment is $5,000,000 (U.S.), subject to waiver or reduction at the sole discretion of the Directors, but not below $50,000 (U.S.). |
| **Risk Factors** | An investment in the Fund involves significant risks and is suitable only for those persons who can bear the economic risk of the loss of their investment and who have limited need for liquidity in their investment. There can be no assurance that the Fund will achieve its investment objective. An investment in the Fund carries with it the inherent risks associated with macroeconomic investments and the use of leverage and short sales. See "Risk Factors" - Section 7.  Each prospective shareholder should carefully review this Memorandum and the documents referred to herein before deciding to invest in the Fund. |
| **Management Fee** | The Investment Manager will receive a quarterly management fee calculated at the annual rate of 2.0% of the net assets of the Fund (the "Management Fee"), which fee will be divided between HPP and Quadrant in accordance with the terms of the investment management agreements by and between each entity and the Fund. The Management Fee is paid quarterly in advance, based on the value of the net assets of the Fund as of the first "Business Day" of each calendar quarter (for purposes of this Memorandum, a "Business Day" will mean any day on which banks are open in New York and the Cayman Islands).  The Management Fee is prorated for any period that is less than a full calendar quarter and will be adjusted for subscriptions occurring during the quarter.  HPP and Quadrant each may elect to defer receipt of all or a part of the Management |

1

Illarramendi, Francisco

Fee.

**Incentive Fee**

The Investment Manager will receive an annual incentive fee equal to 20% of the net profits (including unrealized gains), if any, allocable to each Common Share of the Fund, subject to a loss carryforward provision (the "Incentive Fee"), which fee will be divided between HPP and Quadrant in accordance with the terms of the investment management agreements by and between each entity and the Fund. HPP and Quadrant each may elect to defer receipt of all or a part of the Incentive Fee.

**Expenses**

The Investment Manager renders its services to the Fund at its own expense, including the following overhead expenses: office rent; furniture and fixtures; stationery; secretarial/administrative services; salaries; entertainment expenses; employee insurance and payroll taxes.  All other expenses are paid by the Fund and include the fees payable to the Investment Manager; legal, audit and accounting expenses (including third party accounting services); organizational expenses; investment expenses such as commissions, research fees and expenses (including research-related travel expenses); interest on margin accounts and other indebtedness; borrowing charges on securities sold short; custodial fees; administrator fees and expenses; middle-office and back-office fees and expenses; Directors' fees and expenses; and any other expenses reasonably related to the purchase, sale or transmittal of Fund assets.   Organizational expenses of the Fund will be paid by the Fund and may, for net asset value purposes, be amortized over a period of 60 months from the commencement of the Fund's operations.

**The Offering**

Initially, two classes of Common Shares will be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States and to a limited number of United States investors consisting of tax-exempt entities.  The Common Shares will not be offered to members of the public resident in the Cayman Islands (which does not include an exempted or ordinary non-resident company in the Cayman Islands).  The Fund may admit new shareholders and accept additional subscriptions by existing shareholders ("Shareholders") on the first Business Day of each calendar quarter; however, the Fund reserves the right, in its sole discretion, to accept subscriptions at other times.

**Redemptions**

A Shareholder may, upon at least 90 days' prior written notice, redeem Common Shares as of the last Business Day of any calendar quarter; provided, however, that (i) Common Shares redeemed within one year of the date such Common Shares were first purchased shall be subject to a redemption charge of up to 5% of the amount sought to be redeemed, payable to the Fund, (ii) Common Shares redeemed within two years of the date such Common Shares were first purchased shall be subject to a redemption charge of up to 3% of the amount sought to be redeemed, payable to the Fund, and (iii) Common Shares redeemed within three years of the date such Common Shares were first purchased shall be subject to a redemption charge of up to 1% of the amount sought to be redeemed, payable to the Fund, unless otherwise agreed to by the Investment Manager and the Shareholder.

F01334-E00184242

Illarramendi, Francisco

| | |
|---|---|
| **Valuation** | Fund investments will generally be valued as set forth in Section 12 below. |
| **Reports** | Each Shareholder will receive unaudited reports of the performance of the Fund quarterly and audited year-end financial statements annually. |
| **Tax Matters** | The Fund should not be subject to any Cayman Islands or United States income taxes (other than United States withholding taxes on dividends and certain interest income derived from United States sources).  Shareholders of the Fund who are not otherwise subject to United States taxation by reason of their residence, nationality or other particular circumstances should not become subject to any such taxation by reason of the ownership, transfer or redemption of Common Shares.  Shareholders should consult their own advisors as to the tax consequences to them of an investment in the Fund. |

3

## 2.   DIRECTORY

| | |
|---|---|
| **Principal Office** | Highview Point Offshore, Ltd.<br>c/o GlobeOp Financial Services (Cayman) Limited<br>Walker House, Mary Street<br>George Town<br>P.O. Box 10201 APO<br>Grand Cayman, Cayman Islands<br>British West Indies<br>Attention: Investor Relations Department |
| **Registered Office** | Highview Point Offshore, Ltd.<br>c/o Ogier Fiduciary Services (Cayman) Limited<br>Queensgate House<br>South Church Street<br>P.O. Box 1234 GT<br>Grand Cayman, Cayman Islands<br>British West Indies |
| **Administrator** | GlobeOp Financial Services (Cayman) Limited<br>Walker House, Mary Street<br>George Town<br>P.O. Box 10201 APO<br>Grand Cayman, Cayman Islands<br>British West Indies |
| **Co-Investment Manager** | Highview Point Partners, LLC ("HPP")<br>909 Third Avenue<br>5th Floor – Suite 520<br>New York, New York 10022<br>United States of America |
| **Co-Investment Manager** | Quadrant International Inc. ("Quadrant")<br>C/O SG Hambros Bank & Trust Limited<br>West Bay Street<br>P.O. Box N-7788<br>Nassau, Bahamas |
| **Auditors** | PricewaterhouseCoopers<br>P.O. Box 258 GT<br>Strathvale House 90 North Church Street<br>George Town<br>Grand Cayman, Cayman Islands<br>British West Indies |
| **United States Counsel to HPP and the Fund** | Seward & Kissel LLP<br>One Battery Park Plaza<br>New York, New York 10004<br>United States of America |
| **Special Counsel to Quadrant** | Aleman, Cordero, Galindo & Lee Trust (Panama) S.A.<br>Segundo Piso, Torre Swiss Bank<br>Calle 53 Este, Marbella<br>Apartado Postal 6-1014<br>El Dorado, Panama<br>República de Panama |

F01334-E00184242

Illarramendi, Francisco

**Cayman Islands Counsel**       Ogier & Boxalls
                                 Queensgate House
                                 South Church Street
                                 P.O. Box 1234 GT
                                 Grand Cayman, Cayman Islands
                                 British West Indies

**Prime Broker**                 Citigroup Global Prime Brokerage
                                 390 Greenwich Street
                                 New York, New York 10013
                                 United States of America


    Written inquiries relating to the Fund should be addressed to Highview Point Offshore, Ltd. at the address of the Administrator set forth above.

F01334-E00184242                                    Illarramendi, Francisco

3.    **INTRODUCTION**

Highview Point Offshore, Ltd. (the "Fund") is an exempted company incorporated under the laws of the Cayman Islands on September 2, 2004 for the purpose of investing its assets in accordance with the investment objective set forth in this Confidential Explanatory Memorandum (the "Memorandum"). The Fund's principal office is located at c/o GlobeOp Financial Services (Cayman) Limited, Walker House, Mary Street, George Town, P.O. Box 10201 APO, Grand Cayman, Cayman Islands, BWI Attention: Investor Relations Department.  Its co-investment managers are Highview Point Partners, LLC ("HPP"), a Delaware, U.S.A. limited liability company, and Quadrant International Inc., a company incorporated under the laws of Nassau, Bahamas ("Quadrant", and, together with HPP, the "Investment Manager"). The managing members of HPP are Francisco A. Illarramendi, Frank H. López and Christopher H. Luth and the investment advisor to Quadrant is Luis Bethart.  HPP and Quadrant will both provide investment advisory services to the Fund; however, HPP will have exclusive authority to execute trades and open accounts on behalf of the Fund.   The Fund's administrator is GlobeOp Financial Services (Cayman) Limited (the "Administrator").

The Fund may, in the future, reorganize into a "master-feeder" structure.  The reorganization would be effected by the Fund contributing all of its assets to a master fund (the "Master Fund"), which would be a Cayman Islands corporation (or similar vehicle).  All portfolio investments would then be held at the Master Fund level and the Fund would be allocated its pro rata share of the Master Fund's gains and losses.

This Memorandum sets forth the investment objective and method of operation of the Fund, the material terms of the Fund's Memorandum and Articles of Association and its services agreements and certain other pertinent information.  However, the Memorandum is not a disclosure of all of the material provisions of the Fund's Memorandum and Articles of Association and its services agreements that may be significant to a particular prospective Shareholder. Each prospective Shareholder should examine this Fund's Memorandum, the Memorandum and Articles of Association, the services agreements and the Subscription Agreement accompanying this Memorandum in order to assure itself that the Fund's investment program is satisfactory to it.

Prospective Shareholders are invited to review any materials available to the Fund, relating to the Fund, the operations of the Fund and any other matters regarding this Memorandum.  All such materials are available at the principal office of the Fund, at any reasonable hour, after reasonable prior notice. The Fund will afford prospective Shareholders the opportunity to ask questions of and receive written answers from its representatives concerning the terms and conditions of the offering and to obtain any additional information to the extent that the Fund possesses such information or can acquire it without unreasonable effort or expense.

4.    **INVESTMENT PROGRAM**

<u>Investment Objective</u>

The Fund's investment objective is to generate total returns by utilizing macroeconomic trades. The Investment Manager will utilize its extensive knowledge and experience in the international capital markets to identify arbitrage opportunities in order to increase returns on an ongoing basis.

<u>Investment Strategy</u>

To achieve its objective, the Investment Manager will actively trade investment grade and emerging market bonds and credit default swaps.  The Fund will also participate in local markets, foreign exchange, and to a lesser degree options, structured products, and equities when attractive opportunities present themselves.  The Fund will utilize leverage when macro trends align and it is attractive to lever up, but the Fund will not exceed 2x leverage at any time.  The Fund's financial analysis will focus on market direction, net exposure, and investment selection based on core fundamental ideas.  The

F01334-E00184242                                                                                                    Illarramendi, Francisco

Investment Manager will trade the Fund's core positions based on this analysis as well as relative value between assets.

The exposure of the Fund will be limited by country and industry concentrations. The Fund will aim to have no more than 30% of assets (measured at cost) in one sovereign country or in one industry (e.g., energy, telecom, etc.). Leverage will be utilized modestly without exceeding 2x. For sovereign assets, the Investment Manager will analyze, among other factors, a country's international reserves, debt service, external debt, debt/GDP ratio, current acct/GDP ratio, export/GDP ratio, and international reserves/debt service ratio, as well as perform in-depth analysis of historical trends of the political environment. For corporate assets, the Investment Manager will analyze, among other factors, operating and free cash flow, interest coverage, leverage, market-share, barriers to entry, and competitive advantages versus peers using tools such as economic value added (EVA) to enhance performance evaluation.

The risk will be managed by gauging the market direction, exposure levels, and fundamental credit analysis. The Investment Manager will follow the direction of the market (net long in bull markets, net short in bear markets). The Investment Manager will only utilize leverage in a modest way and monitor overall exposure on a daily basis backed by technical analysis. The Investment Manager will allow winning positions to run, and cut losing positions quickly. All trades will be with technical stop-outs establishing appropriate technical stop-loss levels from each investment's inception.

## Flexibility

The Investment Manager intends to pursue the investment strategy described above as long as such strategy is in accord with the Fund's investment objective. In addition, it may also formulate and implement new approaches to carry out the investment objective of the Fund.

While the Fund invests primarily in global financial instruments, the Fund has broad and flexible investment authority. Accordingly, the Fund's investments may at any time include long or short positions in U.S. or non-U.S. publicly traded or privately issued or negotiated common stocks, preferred stocks, stock warrants and rights, corporate debt, bonds, notes or other debentures or debt participations, convertible securities, fixed income securities, swaps, options (purchased or written), futures contracts, commodities, forward contracts and other derivative instruments, partnership interests and other securities or financial instruments including those of investment companies. However, the Fund will not purchase, hold, sell or otherwise deal in commodities, commodity contracts, commodity futures, financial futures or options thereon until, to the extent required, the Investment Manager has registered with the Commodity Futures Trading Commission or is advised by counsel that registration is not required. The Fund may also invest in new issues of securities ("new issues"), provided that the Fund first complies with all of the rules and regulations pertaining to such investments, including the Conduct Rules of the U.S. National Association of Securities Dealers, Inc. (the "NASD"). The Investment Manager may utilize leverage generally within the parameters of Regulation T of the U.S. Federal Reserve Board's margin rules (i.e., under Regulation T, a customer must deposit cash or eligible securities equal to at least 50% of the purchase price of securities if purchases, and the balance of the purchase price, is then loaned to the customer).

THE FUND MAY BE DEEMED TO BE A HIGHLY SPECULATIVE INVESTMENT AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM. IT IS DESIGNED ONLY FOR SOPHISTICATED PERSONS WHO CAN BEAR THE ECONOMIC RISK OF THE LOSS OF THEIR INVESTMENT IN THE FUND AND WHO HAVE A LIMITED NEED FOR LIQUIDITY IN THEIR INVESTMENT. THERE CAN BE NO ASSURANCE THAT THE FUND WILL ACHIEVE ITS INVESTMENT OBJECTIVE.

## 5.    BACKGROUND OF THE INVESTMENT MANAGER

The Fund's portfolio is managed by its co-investment managers, Highview Point Partners, LLC ("HPP"), a Delaware, U.S.A. limited liability company, and Quadrant International Inc, a company incorporated under the laws of Nassau, Bahamas ("Quadrant", and, together with HPP, the "Investment

Manager"). An investment committee comprised of members from HPP and Quadrant will be established to provide investment advice to the Fund  The managing members of HPP are Francisco A. Illarramendi, Frank H. López and Christopher H. Luth. The investment advisor to Quadrant is Luis Bethart.  HPP and Quadrant will both provide investment advisory services to the Fund; however, HPP will have exclusive authority to execute trades and open accounts on behalf of the Fund.  Biographies of the managing members are set forth below.

### Francisco A. Illarramendi

Prior to joining the Investment Manager, Francisco A. Illarramendi was a Director in the Emerging Markets Coverage Group of Credit Suisse First Boston ("CFSB") from 1994 until May 2004, when he left the firm to accept a temporary position as Senior Advisor to PDV USA, Inc. the international financial advisory arm of Petróleos de Venezuela, S.A. ("PDVSA"). During his ten years of experience at CSFB, Mr. Illarramendi was responsible for all of CSFB's fixed income coverage responsibilities in the Andean/Central America/Caribbean region. He was also responsible for the fixed income coverage of the Southern Cone from 1999 to 2001. In these roles, Mr. Illarramendi was a leading member of the teams that helped restructure both Argentina's and Venezuela's debt profiles, and was also one of the key people responsible for more than US$5 billion of new debt issuance from the region.

Most recently, Mr. Illarramendi served as a special financial advisor to PDVSA and its affiliates around the world in connection with the company's ongoing restructuring of operations and its liability management program.  At PDVSA, Mr. Illarramendi was the leader of the team that completed the recent repurchase of more that US$2.5 billion of PDVSA finance bonds.

Mr. Illarramendi received his B.A. in Social and Political Studies and his M.A. in Economics from the University of Navrra in Pamplona, Spain.

### Frank H. López

Prior to joining the Investment Manager, Frank H. López was a Managing Director, member of the Chairman's Board and member of the Executive Board of the Investment Banking Division of Credit Suisse First Boston ("CFSB"). Mr. López joined CFSB in 1986 and served in a number of roles during his tenure at the firm.  From April 2002 until June 2004, he was Head of Investment Banking for Latin America, and during the last decade, Mr. López was the primary account officer for some of the firm's largest clients in that region.

During his many years at CFSB, Mr. López has participated in a broad range of transactions in Latin America including project finance, corporate and sovereign debt issues, structured financings and derivatives, liability management, equity offerings, merger and acquisitions and privatizations.  Prior to assuming his position as Head of Investment Banking for Latin America in 2002, Mr. López was Head of the Andean/Central America/Caribbean region.   Prior to that, he headed the Firm's merger and acquisition advisory business and the financial institutions practice in Latin America.

Mr. López received his B.B.A. in Finance from the University of Notre Dame and his M.B.A. in Finance from New York University.

### Christopher H. Luth

Prior to joining the Investment Manager, Christopher H. Luth was a Director in the Global Financial Markets group of ABN Amro in NY from 2003 until 2004.  At ABN Amro, he was responsible for all primary bond syndication of international borrowers, as well as US domestic corporations.  Prior to working at ABN Amro, Mr. Luth worked in similar capacities at Credit Suisse First Boston, Deutsche Bank Securities, and Dresdner Kleinwort Wasserstein where he engaged in primary and secondary trading, risk management, and deal execution for emerging market and investment grade issues.  Mr. Luth has extensive international experience having worked two international stints overseas in London with CSFB and DrKW.

8

Mr. Luth received his B.A. in Economics from Colgate University.

**Luis Bethart**

Luis Bethart is currently the Treasurer and Investment Manager of Intercontinental Property Investment, Inc., with responsibility for that company's investments in a large number of sectors. Throughout his twenty year career in the securities industry, Mr. Bethart has been involved as a principal and as a sales & trading specialist for both fixed income and equity securities, as well as derivatives and commodities for Shearson American Express, Prudential Securities and BAC Corp. Securities (of which he as a founding member). Mr. Bethart has a B.A. in Economics with a Minor in Finance from the University of Miami and is a registered investment advisor with the U.S. Securities and Exchange Commission.

**6.      INVESTMENT MANAGEMENT AGREEMENTS**

Under an investment management agreement between HPP and the Fund and an investment management agreement between Quadrant and the Fund (collectively, the "Management Agreements"), the Investment Manager will invest and reinvest the assets of the Fund in accordance with the investment objective and policies of the Fund set forth above. HPP and Quadrant will both provide investment advisory services to the Fund; however, HPP will have exclusive authority to execute trades and open accounts on behalf of the Fund. Under the terms of the Management Agreements, the Fund will pay to HPP and Quadrant, for their services as Investment Manager, a quarterly "Management Fee" and an annual "Incentive Fee" as described below.

**Management Fee**

The Management Fee is calculated at the annual rate of 2.0% of the net assets of the Fund, which fee will be divided between HPP and Quadrant in accordance with the terms of the Management Agreements. The Management Fee will be paid quarterly in advance based on the value of the net assets of the Fund as of the first "Business Day" of each calendar quarter, adjusted for subscriptions made during the quarter and without accrual of the Incentive Fee, if any (a "Business Day" is any day on which banks are open in New York and the Cayman Islands). The Fund will pay the Management Fee in U.S. dollars promptly after the first Business Day of each calendar quarter, unless HPP and/or Quadrant elects to defer receipt of the Management Fee as further described below. The Management Fee will be prorated for any period that is less than a full calendar quarter, and will be deducted in computing the net profit or net loss of the Fund. The Investment Manager, with the consent of the Fund's Directors, may, in effect, waive or modify the Management Fee for Shareholders that are employees or affiliates of the Investment Manager, relatives of such persons, and for certain large or strategic investors. In such circumstances, the Fund may, for administrative convenience, issue a separate sub-class of Common Shares to any such person.

**Incentive Fee**

The Incentive Fee for any fiscal year will be an amount equal to 20% of the net profits (including realized and unrealized gains), if any, during such fiscal year allocable to each Common Share, subject to a loss carryforward. The Incentive Fee will be divided between HPP and Quadrant in accordance with the terms of the Management Agreements. If a Common Share has a loss chargeable to it during any fiscal year, and during a subsequent fiscal year there is a profit allocable to such Common Share, there will be no Incentive Fee payable with respect to such Common Share until the amount of the loss previously allocated to such Common Share has been recouped. In order to ensure that the Incentive Fee is properly charged only to those Common Shares that have appreciated in value, Common Shares will be issued in series, with Series One Shares of the relevant class being issued on the first subscription day in respect of each class and on the first subscription day in each fiscal year, and further separate series of the relevant class on each separate subscription day during the fiscal year, all as further described in Section 9 below. The Investment Manager, with the consent of the Fund's Directors, may, in effect waive or modify the Incentive Fee for Shareholders that are employees or affiliates of the Investment

9

Manager, relatives of such persons, and for certain large or strategic investors. In such circumstances, the Fund may, for administrative convenience, issue a separate sub-class of Common Shares to any such person. The fiscal year of the Fund will end on December 31 of each year.

The Management Agreements provide that the Investment Manager is paid the Incentive Fee within 30 days after the end of the fiscal year, unless HPP and/or Quadrant elects to defer receipt of the Incentive Fee as further described below. The amount of any Incentive Fee attributable to any Common Shares being redeemed will be payable to the Investment Manager following such redemption.

**Deferral of Fees**

HPP may elect to defer payment of its Management Fee and/or Incentive Fee to the first day of any fiscal year following the quarter or year such fee was earned. If HPP elects to defer payment of all or part of the Management Fee and/or Incentive Fee, any such deferred amounts payable to HPP will be treated, and the amounts eventually payable at the end of such deferral periods will be determined, as if such deferred amounts had been invested in Common Shares of the Fund (or in such "Alternative Investments" as to which the Fund and such party agree), without any charge for the Management Fee or Incentive Fee, immediately after the particular fee would otherwise be payable and redeemed as of the last day of the deferral period. The deferred fees and any appreciation or depreciation thereon will be paid promptly after the end of the deferral period.

**Other Provisions of the Management Agreements**

In the event that a Management Agreement is terminated or redemptions are made prior to the last day of the fiscal year, the Incentive Fee will be computed as though the termination date or redemption date, as the case may be, were the last day of the fiscal year.

Each Management Agreement provides that it will continue until the close of business on December 31, 2035, except that either the Fund or the respective Investment Manager may terminate the respective Management Agreement effective at the close of business on the last day of any fiscal year by giving the other party not less than 60 days' written notice. The Fund must, however, receive unanimous consent of all Shareholders to terminate either Management Agreement.

Each of the Management Agreements recognizes that each of the Investment Managers and its directors, members, partners, shareholders, officers, employees, agents and affiliates (hereinafter referred to as the "Affiliated Parties") are associated with other investment entities and engage in investment management for others. Except to the extent necessary to perform its obligations under the applicable Management Agreement, the Affiliated Parties are not limited or restricted from engaging in or devoting time and attention to the management of any other business, whether of a similar or dissimilar nature, or rendering services of any kind to any other corporation, firm, individual or association. See discussion in Section 7 under "Potential Conflicts of Interest."

Under each of the Management Agreements, the Fund will, to the fullest extent legally permissible under the laws of the State of Delaware, indemnify and hold harmless the Affiliated Parties, against any loss, liability or expense (including, without limitation, judgments, fines, amounts paid or to be paid in settlements and reasonable attorney's fees and expenses) incurred or suffered by an Affiliated Party in connection with the good faith performance of his, her or its responsibilities to the Fund; provided, however, that an Affiliated Party will not be indemnified for losses resulting from his, her or its gross negligence, willful misconduct or violation of applicable laws. An Affiliated Party will, upon request, and to the extent legally permissible, be advanced amounts in connection with the Fund's indemnification obligation; provided, however, that if it is later determined that such party was not entitled to indemnification, then such party will promptly reimburse the Fund for all advanced amounts.

10

7.     **RISK FACTORS**

The Fund may be deemed to be a highly speculative investment and is not intended as a complete investment program.  It is designed only for sophisticated persons who are able to bear the economic risk of the loss of their investment in the Fund and who have a limited need for liquidity in their investment.  The following risks should be carefully evaluated before making an investment in the Fund:

**Nature of Investments**

The Investment Manager has broad discretion in making investments for the Fund.  Investments will generally consist of equity securities and other assets that may be affected by business, financial market or legal uncertainties.  There can be no assurance that the Investment Manager will correctly evaluate the nature and magnitude of the various factors that could affect the value of and return on investments.  Prices of investments may be volatile, and a variety of factors that are inherently difficult to predict, such as domestic or international economic and political developments, may significantly affect the results of the Fund's activities and the value of its investments.  In addition, the value of the Fund's portfolio may fluctuate as the general level of interest rates fluctuates.  No guarantee or representation is made that the Fund's investment objective will be achieved.

**Emerging Market Assets**

Investing in emerging markets and the securities of non-U.S. companies which are generally dominated in non-U.S. currencies, involves certain considerations comprising both risk and opportunity not typically associated with investing in other more established economies or securities markets or in the securities of U.S. companies.  Such considerations include (i) the risk of nationalization or expropriation of assets or non-U.S. taxation; (ii) social, economic and political uncertainty; (iii) dependence on exports and the corresponding importance of international trade; (iv) price fluctuations, less liquidity and smaller capitalization of securities markets; (v) changes in exchange rates and exchange control regulations; (vi) rates of inflation; (vii) controls on non-U.S. investment and limitations on repatriation of invested capital and on the Fund's ability to exchange local currencies for U.S. dollars; (viii) governmental involvement in and control over the economies; (ix) that governments may decide not to continue to support economic reform programs generally and could impose centrally planned economies; (x) differences in auditing and financial reporting standards which may result in the unavailability of material information about issuers and less available information than is generally the case in the United States; (xi) less extensive government supervision of the securities markets, brokers and issuers; (xii) the settlement period of securities transactions in emerging markets may be longer; (xiii) less developed corporate laws regarding fiduciary duties of officers and directors and the protection of investors; (xiv) higher transaction costs and greater price volatility; (xv) imposition of foreign taxes; (xvi) difficulty in enforcing contractual obligations; and (xvii) less available information than is generally the case in the United States.  The performance of the Fund will be measured in U.S. dollars.

The Fund may also invest in "distressed" sovereign and corporate debt obligations.  There are additional, particular risks relating to the investment and trading of these instruments.  These risks include the uncertainties involved in enforcing and collecting debt obligations against sovereign nations.  The ability to enforce and collect obligations against foreign sovereigns may be affected by world events, changes in U.S. foreign policy, and other factors outside the control of the Fund.

**Investment Grade Corporate Obligations**

The Fund may invest in corporate debt obligations, including bonds, loans, commercial paper and other instruments, but normally such investments will be accompanied by an offsetting investment in credit derivatives.  Corporate debt obligations are subject to the risk of the issuer's inability to meet principal and interest obligations. Instruments that are rated Baa3/BBB- or higher may have superior risk characteristics than those rated below Baa3/BBB-, but such instruments still bear risk of significant adverse price movements, lack of liquidity and default. Each of these risks may be exacerbated by

F01334-E00184242                                                                                  Illarramendi, Francisco

adverse publicity, investor perceptions, accounting issues, corporate malfeasance, credit downgrade and extreme market conditions.

## Credit Default Swap Agreements

The "buyer" in a credit default contract is obligated to pay the "seller" a periodic stream of payments over the term of the contract in return for a contingent payment upon the occurrence of a credit event with respect to an underlying reference obligation. Generally, a credit event means bankruptcy, failure to pay or obligation acceleration. If a credit event occurs, the seller typically must pay the contingent payment to the buyer, which is typically the "par value" (full notional value) of the reference obligation. The contingent payment may be a cash settlement or by physical delivery of the reference obligation in return for payment of the face amount of the obligation. The Fund may be either the buyer or seller in the transaction. If the Fund is a buyer and no credit event occurs, the Fund may lose its investment and recover nothing. However, if a credit event occurs, the buyer typically receives full notional value for a reference obligation that may have little or no value. As a seller, the Fund receives a fixed rate of income throughout the term of the contract, which typically is between one month and five years, provided that no credit event occurs. If a credit event occurs, the seller may pay the buyer the full notional value of the reference obligations.

Credit default swaps involve greater risks than if the Fund had invested in the reference obligation directly. In addition to general market risks, credit default swaps are subject to liquidity risk and credit risk. A buyer also may lose its investment and recover nothing should no credit event occur. If a credit event were to occur, the value of the reference obligation received by the seller, coupled with the periodic payments previously received, may be less than the full notional value it pays to the buyer, resulting in a loss of value to the Fund.

## Credit Derivatives

Credit derivatives are contracts that transfer price, spread and/or default risks of debt and other instruments from one party to another. Such instruments may include one or more debtors. Payments under credit derivatives may be made during the exercise period of the contracts. Payments under many credit derivatives are triggered by credit events such as bankruptcy, default, restructuring, failure to pay, cross default or acceleration, etc. Such payments may be for notional amounts, actual losses or amounts determined by formula.

The market for credit derivatives is relatively illiquid and there are considerable risks that it may be difficult to either buy or sell the contracts as needed or at reasonable prices. Sellers of credit derivatives carry the inherent price, spread and default risks of the debt instruments covered by the derivative instruments. Buyers of credit derivatives carry the risk of non-performance by the seller due to inability to pay. There are also risks with respect to credit derivatives in determining whether an event will trigger payment under the derivative and whether such payment will offset the loss or payment due under another instrument. In the past, buyers and sellers of credit derivatives have found that a trigger event in one contract may not match the trigger event in another contract, exposing the buyer or the seller to further risk.

## Counterparty Credit Risk

Transactions entered into by the Fund involve credit risk to the extent that its market counterparties are unable or unwilling to fulfill their contractual obligations. These obligations may occur from investments in swaps, "synthetic" or derivative instruments, repurchase agreements, certain types of options or other customized financial instruments, or, in certain circumstances, non-U.S. securities. This risk also includes the risk of settlement default.

F01334-E00184242                                                                                 Illarramendi, Francisco

**Custody Risk**

There are risks involved in dealing with the custodians or brokers who settle the Fund's trades, particularly with respect to non-U.S. investments.  It is expected that all securities and other assets deposited with custodians or brokers will be clearly identified as being assets of the Fund and hence the Fund should not be exposed to a credit risk with respect to such parties.  However, it may not always be possible to achieve this segregation and there may be practical or timing problems associated with enforcing the Fund's rights to its assets in the case of an insolvency of any such custodian or broker.

**Use of Leverage**

As noted in Section 4 above, the Fund may utilize leverage.  This results in the Fund controlling substantially more assets than the Fund has equity.  Leverage increases the Fund's returns if the Fund earns a greater return on investments purchased with borrowed funds than the Fund's cost of borrowing such funds.  However, the use of leverage exposes the Fund to additional levels of risk, including (i) greater losses from investments than would otherwise have been the case had the Fund not borrowed to make the investments, (ii) margin calls or interim margin requirements which may force premature liquidations of investment positions and (iii) losses on investments where the investment fails to earn a return that equals or exceeds the Fund's cost of borrowing such funds.  In the event of a sudden, precipitous drop in value of the Fund's assets, the Fund might not be able to liquidate assets quickly enough to repay its borrowings, further magnifying its losses.

**Special Situations**

The Fund may invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in or undergoing work-outs, liquidations, spin-offs, reorganizations, bankruptcies or other catalytic changes or similar transactions.  In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, will take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Fund of the security or other financial instrument in respect of which such distribution is received.  Similarly, if an anticipated transaction does not in fact occur, the Fund may be required to sell its investment at a loss.  Because there is substantial uncertainty concerning the outcome of transactions involving financially troubled companies in which the Fund may invest, there is a potential risk of loss by the Fund of its entire investment in such companies.

**Portfolio Turnover**

The investment strategy of the Fund may require the Investment Manager to actively trade the Fund's portfolio, and as a result, turnover and brokerage commission expenses of the Fund may significantly exceed those of other investment entities of comparable size.

**Small to Medium Capitalization Companies**

The Fund may invest a portion of its assets in the stocks of companies with small-to medium-sized market capitalizations.  While the Investment Manager believes these investments often provide significant potential for appreciation, those stocks, particularly smaller-capitalization stocks, involve higher risks in some respects than do investments in stocks of larger companies.  For example, prices of such stocks are often more volatile than prices of large-capitalization stocks.  In addition, due to thin trading in some such stocks, an investment in these stocks may be more illiquid than that of larger capitalization stocks.

**Non-U.S. Securities**

Investing in securities of non-U.S. governments and companies that are generally denominated in non-U.S. currencies and utilization of options on non-U.S. securities involves certain considerations

13

comprising both risks and opportunities not typically associated with investing in securities of the United States Government or United States companies.  These considerations include changes in exchange rates and exchange control regulations, political and social instability, expropriation, imposition of foreign taxes, less liquid markets and less available information than is generally the case in the United States, higher transaction costs, foreign government restrictions, less government supervision of exchanges, brokers and issuers, greater risks associated with counterparties and settlement, difficulty in enforcing contractual obligations, lack of uniform accounting and auditing standards and greater price volatility.

### High Yield Securities

The Fund may invest in "high yield" bonds and preferred securities which are rated in the lower rating categories by the various credit rating agencies (or in comparable non-rated securities).  Securities in the lower rating categories are subject to greater risk of loss of principal and interest than higher-rated securities and are generally considered to be predominately speculative with respect to the issuer's capacity to pay interest and repay principal.  They are also generally considered to be subject to greater risk than securities with higher ratings in the case of deterioration of general economic conditions. Because investors generally perceive that there are greater risks associated with the lower-rated securities, the yields and prices of such securities may tend to fluctuate more than those for higher-rated securities.  The market for lower-rated securities is thinner and less active than that for higher-rated securities, which can adversely affect the prices at which these securities can be sold.  In addition, adverse publicity and investor perceptions about lower-rated securities, whether or not based on fundamental analysis, may be a contributing factor in a decrease in the value and liquidity of such lower-rated securities.

### Currency Risks

The Fund's investments that are denominated in non-U.S. currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies.  Among the factors that may affect currency values are trade balances, the level of short-term interest rates, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments.

### Market Risks

The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of movements in interest rates, currencies and other investments.  There can be no assurance that the Investment Manager will be able to predict accurately these price movements.

### Convergence Risk

The Fund may pursue relative value strategies by taking long positions in securities believed to be undervalued and short positions in securities believed to be overvalued.  In the event that the perceived mispricings underlying the Fund's trading positions were to fail to converge toward, or were to diverge further from, the Investment Manager's expectations, the Fund may incur a loss.

### Lack of Diversification

The Fund's portfolio may not be widely diversified among sectors, industries, geographic areas or types of securities.  Further, the Fund's portfolio may not necessarily be diversified among a wide range of issuers.  Accordingly, the Fund's portfolio may be subject to more rapid change in value than would be the case if the Fund were required to maintain a wide diversification among companies or industry groups.

F01334-E00184242

Illarramendi, Francisco

## Interest Rate Risk

Generally, the value of fixed income securities will change inversely with changes in interest rates.  As interest rates rise, the market value of fixed income securities tends to decrease.  Conversely, as interest rates fall, the market value of fixed income securities tends to increase.  This risk will be greater for long-term securities than for short-term securities.  The Fund may attempt to minimize the exposure of the portfolios to interest rate changes through the use of interest rate swaps and/or interest rate options.  However, there can be no guarantee that the Fund will be successful in fully mitigating the impact of interest rate changes.

## Corporate Debt Obligations

The Fund may invest in corporate debt obligations, including commercial paper.  Corporate debt obligations are subject to the risk of an issuer's inability to meet principal and interest payments on the obligations (credit risk). The Fund may intend to actively expose the Fund to credit risk.  However, there can no guarantee that the Fund will be successful in making the right selections and thus fully mitigate the impact of credit risk changes on the Fund.

## Options

The purchase or sale of an option involves the payment or receipt of a premium by the investor and the corresponding right or obligation, as the case may be, to either purchase or sell the underlying security, commodity or other instrument for a specific price at a certain time or during a certain period.  Purchasing options involves the risk that the underlying instrument will not change price in the manner expected, so that the investor loses its premium.  Selling options involves potentially greater risk because the investor is exposed to the extent of the actual price movement in the underlying security rather than only the premium payment received (which could result in a potentially unlimited loss).  Over-the-counter options also involve counterparty solvency risk.

## Derivatives

To the extent that the Fund invests in swaps, derivative or synthetic instruments, repurchase agreements or other over-the-counter transactions or, in certain circumstances, non-U.S. securities, the Fund may take a credit risk with regard to parties with whom it trades and may also bear the risk of settlement default.  These risks may differ materially from those entailed in exchange-traded transactions that generally are backed by clearing organization guarantees, daily marking-to-market and settlement, and segregation and minimum capital requirements applicable to intermediaries.  Transactions entered directly between two counterparties generally do not benefit from such protections and expose the parties to the risk of counterparty default.  It is expected that all securities and other assets deposited with custodians or brokers will be clearly identified as being assets (directly or indirectly) of the Fund, and hence the Fund should not be exposed to a credit risk with regard to such parties.  However, it may not always be possible to achieve this segregation, and there may be practical or time problems associated with enforcing rights to its assets in the case of an insolvency of any such party.

## Short Sales

Short sales can, in certain circumstances, substantially increase the impact of adverse price movements on the Fund's portfolio.  A short sale involves the risk of a theoretically unlimited increase in the market price of the particular investment sold short, which could result in an inability to cover the short position and a theoretically unlimited loss.  There can be no assurance that securities necessary to cover a short position will be available for purchase.

F01334-E00184242   Illarramendi, Francisco

**Limited Redemption and Transfer Rights**

A Shareholder generally will be permitted to redeem all or any portion of its Common Shares on a quarterly basis, subject to varying redemption fees for redemption of Common Shares occurring prior to the third anniversary of the purchase of such Common Shares.  Transfers of the Common Shares will be permitted only with the written consent of the Fund.  Accordingly, the Common Shares should only be acquired by investors willing and able to commit their funds for an appreciable period of time.

**Incentive Fee**

The payment of a percentage of the Fund's net profits to the Investment Manager may cause the Investment Manager to make investments that are riskier or more speculative than would be the case if this payment were not made.  Since the fee is calculated on a basis that includes unrealized appreciation of assets, such fee may be greater than if it were based solely on realized gains.

**No Separate Counsel**

Seward & Kissel LLP acts as United States counsel to HPP and the Fund.  Aleman, Cordero, Galindo & Lee Trust (Panama) S.A. acts as special counsel to Quadrant.  Ogier & Boxalls acts as Cayman Islands counsel to the Fund.  No separate counsel has been retained to act on behalf of the Shareholders.

**Lack of Operating History**

The Fund is a newly formed entity and has no operating history upon which investors can evaluate its likely performance.  The Investment Manager also has no operating history upon which investors can evaluate its likely performance.  Accordingly, an investment in the Fund entails a significant degree of risk.

**Absence of U.S. Regulatory Oversight**

While the Fund may be considered similar to an investment company, it does not intend to register as such under the U.S. Investment Company Act of 1940, as amended, in reliance upon an exemption available to privately offered investment companies, and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and regulate the relationship between the adviser and the investment company) will not be afforded to the Fund or the Shareholders.  It should be noted that HPP may register as an investment adviser with the U.S. Securities and Exchange Commission in the near future.

**Non-Disclosure of Positions**

In an effort to protect the confidentiality of its positions, the Fund generally will not disclose all of its positions to Shareholders on an ongoing basis, although the Investment Manager, in its sole discretion, may permit such disclosure on a select basis to certain Shareholders, if it determines that there are sufficient confidentiality agreements and procedures in place.

**Potential Conflicts of Interest**

The Investment Manager will use its best efforts in connection with the purposes and objectives of the Fund and will devote so much of its time and effort to the affairs of the Fund as may, in its judgment, be necessary to accomplish the purposes of the Fund.  Under the terms of each of the Management Agreements, each of the Investment Managers and its directors, members, partners, shareholders, officers, employees, agents and affiliates (herein referred to as the "Affiliated Parties") may

16

conduct any other business, including any business within the securities industry, whether or not such business is in competition with the Fund. Without limiting the generality of the foregoing, any of the Affiliated Parties may act as investment adviser or investment manager for others, may manage funds, separate accounts or capital for others and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms. Such other entities or accounts may have investment objectives or may implement investment strategies similar or different to those of the Fund. In addition, the Affiliated Parties may, through other investments, including other investment funds, have interests in the securities in which the Fund invests as well as interests in investments in which the Fund does not invest. The Affiliated Parties may give advice or take action with respect to such other entities or accounts that differs from the advice given with respect to the Fund. To the extent a particular investment is suitable for both the Fund and other clients of the Affiliated Parties, such investments will be allocated between the Fund and the other clients pro rata based on assets under management or in some other manner that the Affiliated Parties determine is fair and equitable under the circumstances to all clients, including the Fund.

As a result of the foregoing, the Affiliated Parties may have conflicts of interest in allocating their time and activity between the Fund and other entities, in allocating investments among the Fund and other entities and in effecting transactions for the Fund and other entities, including ones in which the Affiliated Parties may have a greater financial interest.

In addition, purchase and sale transactions (including swaps) may be effected between the Fund and the other entities or accounts subject to the following guidelines:  (i) such transactions shall be effected for cash consideration at the current market price of the particular securities, and (ii) no extraordinary brokerage commissions or fees (i.e., except for customary transfer fees or commissions) or other remuneration shall be paid in connection with any such transaction.

From the standpoint of the Fund, simultaneous identical portfolio transactions for the Fund and the other clients may tend to decrease the prices received, and increase the prices required to be paid, by the Fund for its portfolio sales and purchases. Where less than the maximum desired number of shares of a particular security to be purchased is available at a favorable price, the shares purchased will be allocated among the Fund and the other clients in an equitable manner as determined by the Affiliated Parties. Further, it may not always be possible or consistent with the investment objectives of the various persons or entities described above and of the Fund for the same investment positions to be taken or liquidated at the same time or at the same price, however all transactions will be made on a "best execution" basis.

Frank H. López, a managing member of HPP, and Luis Bethart the investment advisor to Quadrant, will also act as directors of the Fund and may have conflicts of interest in this regard.

It is noted that Andrew Eastabrook, David Sargison and Vijayabalan Murugesu serve as directors of other investment vehicles. Accordingly, to the extent that the interests of the Fund and such other investment vehicles are inconsistent, Messrs. Eastabrook, Sargison and Murugesu may have a conflict of interest.

## 8.    EXPENSES

The Investment Manager renders its services to the Fund at its own expense, including the following overhead expenses: office rent; utilities; furniture and fixtures; stationery; secretarial/administrative services; salaries; entertainment expenses; employee insurance and payroll taxes. All other expenses are paid by the Fund and include: the fees payable to the Investment Manager; legal, audit and accounting expenses (including third party accounting services); organizational expenses; investment expenses such as commissions, research fees and expenses (including research-related travel expenses); interest on margin accounts and other indebtedness; borrowing charges on securities sold short; custodial fees; Administrator fees and expenses; middle-office and back-office fees and expenses; Directors' fees and expenses and any other expenses reasonably related to the purchase, sale or transmittal of Fund assets.

F01334-E00184242                                                       Illarramendi, Francisco

The organizational expenses of the Fund (including expenses incurred in connection with the initial offer and sale of Common Shares in the Fund) will be paid by the Fund and may, for net asset value purposes, be amortized over a period of 60 months from the date the Fund commences operations.

## 9.   DESCRIPTION OF THE FUND'S COMMON SHARES

The authorized share capital of the Fund consists of 5,000,000 Common Shares having a par value of $0.01 (U.S.) per share. As described below, the Fund's Common Shares will initially be divided into two classes, Class A Common Shares ("Class A shares") and Class B Common Shares ("Class B shares"). The Fund may, in the sole discretion of the Directors, issue additional classes of Common Shares to reflect, without limitation, terms and conditions that differ from the Common Shares being offered hereunder (including the offering of Common Shares with a different operational currency). Additionally, the Fund may, for administrative convenience, issue sub-classes of Common Shares to effect the foregoing, and in this Memorandum, unless the context requires otherwise, the term "class" shall include "sub-class". Common Shares of each class are generally issuable quarterly in series. Series One of the relevant class of Common Shares will be sold at the end of the Fund's initial offering for that class and at the beginning of each fiscal year (provided there is no loss carryforward then existing in respect of such Series One Shares) and the remaining series will generally be sold on a quarterly basis during a fiscal year. The reason for the different series is to equitably reflect the differing incentive fees attributable to each series (because of the differing issue dates throughout the fiscal year). At the end of each fiscal year the other series of each class will be converted into Series One Shares of the applicable class of Common Shares so that at the beginning of the following fiscal year all Shares will be Series One Shares unless a loss carryforward attributable to the Series One Shares or the Shares being converted remains outstanding, in which case all Shares of the relevant class not subject to a loss carryforward will be converted into the first series of Shares of the relevant class not subject to a loss carryforward. The Fund may, in the sole discretion of the Directors, issue additional series of Common Shares if needed in connection with additional issuance dates or for other reasons.

Except as set forth below, each series and class of Common Shares has equal voting rights and within each class and series has equal dividend, distribution and liquidation rights. The Fund does not anticipate paying any dividends on its Common Shares. The Fund shall establish in its books a separate record with its own distinct designation for each class and series of Common Shares. The proceeds from the allotment and issue of each class and series of Common Shares shall be applied in the books of the Fund to the record established for that class and series of Common Shares. The assets, profits, gains, income and liabilities, losses and expenses attributable to a particular class, sub-class and series shall be applied to the record relating to such class, sub-class and series at the end of each fiscal period - see Section 17 below. In the case of any asset or liability (including any expense) of the Fund that the Directors do not consider is attributable to a particular record, the Directors will allocate such asset or liability among the records in proportion to the net asset value of each class and series.

### Allocation of New Issues

From time to time, the Fund may, to the extent permitted by the Rules of the U.S. National Association of Securities Dealers, Inc., as may be amended from time to time (the "NASD Rules"), purchase equity securities that are part of an initial public offering (sometimes referred to as "IPOs" or "New Issues"). Under the NASD Rules, brokers generally may not sell such securities to a private investment fund if the fund has investors who are "Restricted Persons", which includes persons employed by or affiliated with a broker and portfolio managers of hedge funds and other registered and unregistered investment advisory firms, unless the Fund has a mechanism in place that excludes such Restricted Persons from receiving allocations of profits from New Issues ("Restricted Persons" will be issued Class B shares, while other investors will be "Unrestricted Persons" and will be issued Class A shares). The profits and losses from New Issues will generally be allocated to investors in the Fund that are Unrestricted Persons. The Fund may, however, avail itself of a "de minimis" exemption pursuant to which a portion of any profits and losses from New Issues may be allocated to Restricted Persons. The Fund's Articles of Association provide that the Directors are authorized to determine, among other things: (i) the manner in which New Issues are purchased, held, transferred and sold by the Fund and any adjustments with

F01334-E00184242                                                                                 Illarramendi, Francisco

respect thereto; (ii) the Shareholders who are eligible and ineligible to participate in the profits and losses from New Issues; (iii) the method by which profits and losses from New Issues are to be allocated among Shareholders in a manner that is permitted under the Rules (including whether the Fund will avail itself of the "de minimis" exemption or any other exemption); and (iv) the time at which New Issues are no longer considered as such under the Rules.

Each subscriber for and each transferee of Common Shares will be required to complete and execute a statement representing to the Fund that he does not fall within the proscription of the NASD Rules. Persons who do not fully complete and execute such statement as required by the Fund may not be permitted to participate in the profits and losses from New Issues to any extent, until they establish their eligibility to participate in the profits and losses from New Issues to the Fund's satisfaction. Shareholders may also be requested to provide periodic updates of such information and failure to do so may result in the Shareholder's Class A shares being converted into Class B shares.

The Fund may permit holders of Class B shares who are eligible to own Class A shares to convert their Class B shares to Class A shares based upon their relative net asset values at the time of conversion, and any such holder will be required to execute a statement regarding his eligibility to participate in New Issues.

If the Fund determines to its satisfaction that an owner of Class A shares falls within the proscription of the NASD Rules, the Fund will give notice to the Shareholder who will have 10 days from the date of such notice to respond and in the absence of any response or if the Fund is not satisfied with the response, it may by further notice redeem the Class A shares of such Shareholder as of the date specified in such notice and apply the redemption proceeds to the purchase of an equivalent value of Class B shares in the Fund on the date specified in such notice.

## Special Designation as Non-Voting Common Shares

While the Fund's Common Shares generally have voting rights ("Voting Common Shares"), the Fund, at its discretion, may designate certain Common Shares as non-voting ("Non-Voting Common Shares") in order to avoid certain adverse tax, filing or other requirements. In particular, Non-Voting Common Shares shall be issued for new subscriptions by U.S. Shareholders if at the time of the subscription the Fund determines, at its discretion, that issuing the shares as Non-Voting Common Shares is necessary or advisable to avoid these possible adverse consequences. The status of the shares as non-voting will, of course, be fully disclosed to the investor at the time of his subscription and any such investor will be allowed to revoke his subscription upon notification of such classification. In addition, existing Shareholders who have been issued Voting Common Shares may have such shares converted to Non-Voting Common Shares if the Fund determines, at its discretion, that such conversion is necessary or advisable; provided that the Shareholder will be granted the right to redeem such shares prior to conversion. Except with regard to voting rights, Non-Voting Common Shares shall be identical in all respects to Voting Common Shares and, accordingly, references herein to Shares or Common Shares shall mean both Voting Common Shares and Non-Voting Common Shares unless otherwise indicated. Although Non-Voting Common Shares shall not have the right to vote at general meetings of the Fund or class meetings, in the event of any proposed variation or abrogation of rights affecting Non-Voting Common Shares as a class, each holder of Non-Voting Common Shares will receive notice of the proposed change and an opportunity to redeem his shares prior to the change taking effect.

Common Shares that are designated as Non-Voting Common Shares may be deemed to constitute a separate class of Common Shares. Due to uncertainty in the current state of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Fund intends to treat any Non-Voting Common Shares as a "class" of equity securities when calculating the 25% test described in Section 16 of this Memorandum. In the circumstances described in that Section, a Benefit Plan Investor may be required to redeem all or a portion of its Common Shares in order to prevent the Fund from becoming subject to ERISA.

F01334-E00184242                                                                    Illarramendi, Francisco

**Rights of Shareholders**

All Shareholders are entitled to the benefit of, are bound by and are deemed to have notice of the provisions of the Memorandum and Articles of Association of the Fund.

Under the terms of the Fund's Memorandum and Articles of Association, the liability of the shareholders of the Fund is limited to any amount unpaid on their Common Shares.  As the Common Shares can only be issued if they are fully paid, the shareholders will not be liable for any debt, obligation or default of the Fund beyond their interest in the Fund.

The Fund's Articles of Association have been drafted in broad and flexible terms to allow the Directors:

(a)    the flexibility to reorganize the Fund into a master-feeder structure, if they consider it advantageous to do so; and

(b)    the authority to, in their discretion, determine a number of issues including the period of notice to be given for redemptions and whether or not to charge subscription or redemption fees, generally or in any particular case.  In approving the offering of Common Shares on the terms set out in this Memorandum, the Directors have exercised a number of these discretions in accordance with the Fund's Articles of Association.

General meetings of the voting Shareholders may be called by the Directors and will be called at the request of the Shareholders holding a simple majority of the outstanding voting Common Shares.  All Shareholders' meetings will be held in the Cayman Islands, or such other location as the Directors will determine.  All Shareholders' meetings require 7 days' prior notice.  Notice may be sent by hand, mail, fax or email, or alternatively, where the recipient has agreed, by posting the notice on a secure nominated web-site.

Subject to the exceptions set forth below and except where a special resolution is otherwise required by the Cayman Islands Companies Law, all decisions of the Shareholders will be made by the holders of a simple majority of the outstanding Voting Common Shares represented at a meeting, provided that a quorum of the holders of one-third of the outstanding Voting Common Shares is present by proxy or in person.  Notwithstanding the foregoing, (i) the dismissal of a Director must be adopted by an affirmative vote of two-thirds of the votes cast at a meeting of Shareholders at which more than one-half of the total number of Voting Common Shares then issued and outstanding are represented; (ii) any investment management contract entered into by the Fund (other than an investment advisory or investment management contract which the Investment Manager is authorized to enter into pursuant to the applicable Management Agreement) may not be terminated by the Fund unless such termination is approved by a unanimous vote cast at a meeting at which all the issued and outstanding Voting Common Shares are represented; (iii) amendments to the Memorandum of Association and the Articles of Association must be approved by three-quarters of the votes cast at a meeting at which not less than one-half of the issued and outstanding Voting Common Shares are represented, except that any amendment to decrease the vote required to terminate an investment advisory or investment management contract requires approval by a unanimous vote cast at a meeting at which all of the issued and outstanding Voting Common Shares are represented; and (iv) the merger or consolidation of the Fund with another corporation or the dissolution of the Fund requires the affirmative vote of the holders of three-quarters of the Voting Common Shares outstanding.  Any matter referred to herein may also be adopted by resolution in writing of all the voting Shareholders.

The rights attaching to any class of Common Shares (unless otherwise provided by the terms of issue of the Common Shares of that class) may, whether or not the Fund is being wound up, be varied with the consent in writing of the holders of two-thirds of the issued Common Shares of that class, or with the sanction of a resolution passed by a two-thirds majority of the holders of the issued Common Shares of that class at a separate meeting of the holders of the Common Shares of that class.

F01334-E00184242                                                            Illarramendi, Francisco

Notwithstanding the foregoing, the Fund shall have the absolute discretion to agree with a Shareholder to waive or modify the application of any provision of the offering terms herein with respect to such Shareholder (including those relating to the Management Fee, the Incentive Fee and redemptions) without obtaining the consent of any other Shareholder; provided, however, that any waiver or modification of the Management Fee and/or Incentive Fee shall require the consent of the Investment Manager.  For administrative convenience, the Fund may issue a separate class or sub-class of Common Shares for such Shareholder.  Such Shareholders may be members, employees or affiliates of the Investment Manager, relatives of such persons, and large or strategic investors.

Except for such rights of conversion as are set forth above with respect to the conversion of Class A shares to Class B shares (or Class B shares to Class A shares) and in Section 12, "Redemptions," the Common Shares have no conversion or pre-emptive rights.  All Common Shares of the Fund, when duly issued, will be fully paid and nonassessable.  By subscribing for shares other than Series One of any class, a subscriber will have irrevocably authorized and directed the Fund to convert such Shares (insofar as they are not redeemed) into Series One Shares of the relevant class (or, if applicable, Shares of the first series of the applicable class of Common Shares that were profitable in the prior year) as set forth in the paragraph in Section 12 entitled "Conversion of Shares."

Common Shares will be registered in the name of the Shareholder and held in book form unless otherwise requested in writing.  Generally, a Shareholder may only elect to receive a certificate representing its Common Shares only if it demonstrates to the Fund that it is legally required to hold certificated shares or the Fund otherwise approves of such issuance.

From time to time, the Fund, by a resolution passed by a simple majority of the Shareholders, may increase its authorized share capital in order to have a substantial number of shares available at all times for issuance.

<u>Transfers</u>

Common Shares may be transferred only if the proposed transferee of the Common Shares obtains the prior written approval of the Fund.  In this regard, the proposed transferee will be required to make the representations and warranties required of a subscriber in form and substance satisfactory to the Fund.  The Fund will have full discretion to approve or disapprove any proposed transferee, and no proposed transfer will be recognized until the documents relating to it, including, but not limited to, certain subscription documents, have been approved by the Fund.

10.     **OFFERING OF COMMON SHARES**

The Fund is conducting an offering of its Common Shares to a limited number of experienced and sophisticated investors who are neither citizens nor residents of the United States and to a limited number of United States investors consisting of qualified pension, profit sharing and other retirement trusts, charities and other tax-exempt entities.  The Common Shares will not be offered to members of the public resident in the Cayman Islands (which does not include an exempted or ordinary non-resident company in the Cayman Islands).  The purchase of Common Shares in the Fund is not open to the general public and Shares will be privately offered only to investors who meet the requirements set forth in the "Subscription Agreement and Revocable Proxy" accompanying this Memorandum.

The minimum initial subscription of each investor is $5,000,000 (U.S.), subject to change at the sole discretion of the Directors, but not below $50,000 (U.S.).  Subscriptions for Common Shares will be made in cash or, in the sole discretion of the Fund, in securities or partly in cash and partly in securities. Shares generally may be purchased on the first Business Day of each quarter and at such other times as the Fund determines in its sole discretion.

The number of Shares to be purchased will be based on the offering price per Share (the "Offering Price").  For Shares of a new series purchased during and after the initial offering, the Offering

F01334-E00184242

Illarramendi, Francisco

Price is $100 (U.S.) per Share.  The Offering Price for Common Shares of an existing series is the prevailing net asset value per share for a Common Share of the relevant series as determined on the last Business Day of the immediately preceding month or quarter, as applicable.

Investors interested in subscribing for Common Shares should follow the procedures set forth in Section 19, "Procedures to Purchase Common Shares."

## 11.    PAYMENTS TO SPONSORS OF THE FUND

The Investment Manager may pay (or cause to be paid) fees to persons (whether or not affiliated with the Investment Manager) who are instrumental in the sale of shares in the Fund.  Any such fees will in no event be payable by or chargeable to the Fund or any Shareholder or prospective Shareholder, unless there is an offsetting credit or fee reduction given by the Investment Manager on either or both fees.

## 12.    REDEMPTIONS

A Shareholder may redeem any of its Common Shares as of the last Business Day of any calendar quarter; provided, however, that (i) Common Shares redeemed within one year of the date such Common Shares were first purchased shall be subject to a redemption charge of up to 5% of the amount sought to be redeemed, payable to the Fund, (ii) Common Shares redeemed within two years of the date such Common Shares were first purchased shall be subject to a redemption charge of up to 3% of the amount sought to be redeemed, payable to the Fund, and (iii) Common Shares redeemed within three years of the date such Common Shares were first purchased shall be subject to a redemption charge of up to 1% of the amount sought to be redeemed, payable to the Fund.  A redeeming Shareholder will redeem his Shares at net asset value as of the close of business on such redemption date (the "Redemption Price") (as determined in accordance with the provisions contained in the Fund's Articles of Association and the valuation principles set forth below).  The net asset value is computed after deduction of any accrued Incentive Fee payable to the Investment Manager attributable to the Common Shares redeemed.  The Shareholder must request such redemption by written notice that must be received by the Administrator at least 90 days prior to the redemption date.  Such notice must indicate (i) the Shareholder's intention to make such redemption and (ii) the amount of such redemption or the manner in which such redemption is to be determined.  Common Shares will be redeemed on a first-in, first-out basis.  A redemption request, once given, may not be withdrawn without the consent of the Directors, except upon a declaration of the suspension of the determination of net asset value.

The payment of the Redemption Price will be subject to the retention of a reserve for Fund liabilities and for other contingencies in such amount as will be determined by the Fund in its discretion.  If the reserve (or a portion thereof) is later found to be excessive, such amount will be returned to the redeeming Shareholder with interest (at the then-existing U.S. federal funds rate).  In the case of a complete redemption, the foregoing will be in addition to any other applicable holdbacks.

Redemption requests may be made by mail or facsimile (with original to follow by mail).  However, if the Shareholder has elected to have share certificates sent to him, the redemption request must be accompanied by delivery to the Fund of the certificates for the Shares to be redeemed.  The Shareholder's request should be made by letter addressed to the Fund, c/o GlobeOp Financial Services (Cayman) Limited Walker House, Mary Street, George Town, P.O. Box 10201 APO, Grand Cayman, Cayman Islands, BWI, Attention: Investor Relations Department, or by facsimile to the Fund to 345-946-7652 (with the original to follow by mail, as payment will not be made until the original redemption request is received by mail).  Neither the Fund nor the Administrator shall be responsible for any mis-delivery or non-receipt of any redemption request, whether sent by facsimile or mail.  The Administrator will confirm via phone and in writing all faxed redemption requests that are received in good order.  Shareholders failing to receive verbal confirmations within five (5) Business Days should contact the Administrator at 345-946-7652 to confirm receipt.  Failure by a Shareholder to ensure the receipt of a redemption request may render faxed instructions or orders invalid.

F01334-E00184242

Illarramendi, Francisco

On partial redemptions of less than 90% of a Shareholder's holdings of Common Shares, the Redemption Price will generally be paid within 30 days.  Payment of the Redemption Price on the redemption of 90% or more of a Shareholder's holdings of Common Shares will generally be made as soon as practicable but, except in cases where share certificates and share transfers are not delivered, the Shareholder will receive at least 90% of the estimated Redemption Price generally within 30 days following the date of redemption.  Promptly after the Fund has determined the net asset value of the Common Shares as of the date of redemption (which in the Fund's discretion may be after the Fund's annual audit), the Fund will pay to such Shareholder the balance, if any, of the amount to which such Shareholder is entitled, or such Shareholder will be obligated to repay the Fund the excess, if any, of the amount previously paid over the amount to which such Shareholder is entitled, in each case together with interest thereon, to the extent permitted by applicable law.  Redemption payments will be made in cash (in U.S. dollars) or, in the discretion of the Fund, in securities or partly in cash and partly in securities, as further described below.  Such interest shall accrue from the date of such redemption to the date of the payment of such excess at an annual rate equal to the then-existing U.S. federal funds rate.

**Mandatory Redemptions**

If the Directors determine that any of the representations given by any holder of Common Shares as set forth in the Subscription Agreement and Revocable Proxy were not true or have ceased to be true or that the continuing ownership of Common Shares by a Shareholder would cause an undue risk of adverse tax or other consequences to the Fund or any of its Shareholders, the Fund may compulsorily redeem all or any part of his Common Shares at a date specified in the notice of such redemption by the Fund to the Shareholder, which date will be not less than 5 days from the date of such notice.  In addition, the Fund will be entitled to require the redemption of all or any part of a Shareholder's Common Shares, with or without cause, at any time upon 10 days' notice.  Payment will be made in accordance with the procedure applicable to Common Shares that are redeemed at the request of the holder.

**Suspension of Redemptions**

The Directors may suspend the determination of net asset value and the right of the holders of the Fund's Common Shares to require the Fund to redeem Common Shares during any period when:

(a)      any stock exchange on which a substantial part of securities owned by the Fund are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended;

(b)      there exists any state of affairs that constitute a state of emergency or period of extreme volatility or illiquidity as a result of which (i) disposal of some or all of the investments of the Fund would not be reasonably practicable or cannot be completed in a timely fashion to meet redemption requirements and might seriously prejudice the Shareholders or the Fund or (ii) it is not reasonably practicable for the Fund to determine fairly the value of its net assets;

(c)      there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Fund; or

(d)      none of the requests for redemption that have been made may be lawfully satisfied by the Fund in U.S. dollars.

**Conversion of Shares**

If, during a particular fiscal year, Common Shares of any series, other than Series One Common Shares of the relevant class will have been issued, the Shares thereof held by a particular holder will be converted immediately after the close of business on the last Business Day of such fiscal year for Series One Common Shares of the applicable class (or, if applicable, Shares of the applicable class of the first series that were profitable in the prior year) on the basis of the relative net asset value per share of the

23

particular series and class of Common Shares being converted and of Series One Common Shares of the applicable class (or, if applicable, Shares of the applicable class of the first series that were profitable in the prior year); provided, however, that no such conversion will occur while any loss carryforward attributable to the Shares being converted or the Series One Shares of the applicable class remains outstanding. Such conversion will be effected by the Fund redeeming the Shares to be converted from the holder of such Shares and applying the proceeds of such redemption in paying for the relevant class of new Series One Common Shares.

### Payments in Cash or in Kind

Payment of the Redemption Price to a Shareholder on redemption will be made in cash or, in the discretion of the Directors (following consultation with the Investment Manager), in securities (which may include short positions, as well as long positions) selected by the Directors (following consultation with the Investment Manager), or partly in cash and partly in securities (which may include short positions, as well as long positions) selected by the Directors (following consultation with the Investment Manager). In-kind distributions may be made directly to the redeeming Shareholder or, alternatively, in certain limited circumstances, distributed into a liquidating account and sold for the benefit of such redeeming Shareholder, in which case (i) payment to such Shareholder of that portion of his redemption attributable to such securities will be delayed until such time as such securities can be liquidated and (ii) the amount otherwise due such Shareholder will be increased or decreased to reflect the performance of such securities through the date on which the liquidation of such securities is effected.

### Net Asset Value

The net asset value of a Common Share at any date will be the total net assets of the Fund attributable to the relevant series within the relevant class divided by the number of Common Shares of that series within the relevant class then outstanding. The total net assets of the Fund at any date will be determined on the accrual basis of accounting utilizing generally accepted accounting principles applied in the United States as a guideline and in accordance with the following:

      (a)     No value will be assigned to goodwill;

      (b)     Organizational expenses will be written off over 60 months beginning on the date the Fund commences operations;

      (c)     Accrued investment management fees and other fees will be treated as liabilities;

      (d)     Dividends payable on the Common Shares, if any, after the date as of which the total net assets are being determined to Shareholders of record prior to such date will be treated as liabilities;

      (e)     Fund investments will be valued at fair value and will include realized and unrealized gains and losses. The value of positions held in the Fund on any day shall be calculated by the Fund in the following manner: securities listed on a national securities exchange or national market will be valued at their last sale price on the principal exchange or market on the date of determination, or if no sales occurred on such day, at the mean between the "bid" and "asked" prices on such day, so long as the principal-to-principal market is the primary market for the security on the valuation date. When a security is not traded in the principal exchange, the last quoted sales price on the next most active market will be used unless the Investment Manager determines that such price is not representative of fair value, in which case quotations from financial publications, or recognized pricing services will be used. When available, closing and/or average prices shall be obtained from broker-dealers and exchanges; however, such prices may be adjusted if a more accurate value can be obtained from recent trading activity or by incorporating other relevant information that may not have been reflected in pricing obtained from external sources. In addition, values may be adjusted to reflect bid-offer pricing spreads and

F01334-E00184242

Illarramendi, Francisco

parametric pricing (i.e., pricing at the close of a single selected market) for strategies in which markets close at different times. When bid-offer pricing spreads are substantially different, quotations for several days will be reviewed in determining whether the last quoted price is representative of fair value.  For positions in which there is no readily available third party pricing, such as certain derivative and structured finance transactions, the fair value estimates should reflect the amount at which the investment could be exchanged in a current transaction between willing parties other than in forced or liquidation sale.  The fair value of these positions may be estimated by the Investment Manager in valuation models in a manner consistent with that of other externally priced securities or market indicators. These indicators may include specific yield curves or volatility quotes and may be adjusted when necessary to reflect fair values more accurately.  Valuation of these positions shall reflect any credit risk associated with such positions where believed to be appropriate.

      (f)     Securities contributed to the Fund as subscription proceeds shall be treated as if purchased by the Fund at market value on the date of contribution, and securities distributed from the Fund as redemption proceeds will be treated as if sold by the Fund at market value on the date of distribution;

      (g)     Net profits and net losses from New Issues will be credited or debited to the net asset value of the Class A shares unless the Fund utilizes the "de minimis" exemption (see "Description of the Fund's Common Shares — Allocation of New Issues" above) in which case up to 10% of such profits and losses may be created or debited to the net asset value of the Class B shares, as determined by the Investment Manager; and

      (h)     All other assets (including securities) of the Fund will be valued in the manner determined by the Investment Manager to reflect their fair market value.

The Fund has retained the Investment Manager, pursuant to the Investment Management Agreement, to determine the value of the Fund's assets in accordance with the principles set out above and has also retained the Administrator, pursuant to the Administration Agreement (as defined below), to, amongst other things, calculate the net asset value of the Common Shares and to disseminate that information to the Fund and its Shareholders. In connection with the determination of the value of the assets of the Fund, the Investment Manager may consult with and is entitled to rely upon the advice of the Fund's brokers, custodians or other advisers and in calculating the net asset value of the Common Shares, the Administrator is entitled to rely on the advice of the Investment Manager, the Fund's brokers, custodians or other advisers. In no event and under no circumstances will the Board of Directors, the Administrator or the Investment Manager incur any individual liability or responsibility for any determination made, advice given or other action taken or omitted by them in good faith with respect to the determination of the value of the Fund's assets or the net asset value of the Common Shares of the Fund, as the case may be.

## 13.    BROKERAGE AND CUSTODY

The Investment Manager is authorized to determine the broker or dealer to be used for each securities transaction for the Fund.  In placing orders, it is the Investment Manager's policy to obtain the best price and execution for its transactions.  Where best price and execution may be obtained from more than one dealer, the Investment Manager may purchase and sell securities through dealers who provide research, statistical and other information, although the Fund may not necessarily, in any particular instance, be the direct or indirect beneficiary of the research services provided.  Research and related services furnished or paid for by brokers may include, but is not limited to: (i) written information and analyses concerning specific securities, companies or sectors; (ii) market, financial and economic studies and forecasts; (iii) financial and trade publications; (iv) statistical and pricing services; (v) discussions with research personnel and consultants; and (vi) hardware, software, databases and other technological, technical and telecommunication services (including wireless services), lines and equipment utilized in the investment management process (including updates, modifications, improvements, product testing, maintenance, offsite or onsite backup, repairs and replacements).  Research and related services obtained

by the use of commissions arising from the Fund's portfolio transactions may be used by the Investment Manager in its other investment activities.

All other services obtained by the use of commissions arising from the Fund's investment transactions will be limited to services that would otherwise be a Fund expense (which expenses are set forth in Section 8 of this Memorandum, including research-related travel expenses). Certain of the foregoing commission arrangements may be outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended, which permits use of commissions or "soft dollars" to obtain "research and execution" services.

Additionally, from time to time, the Fund may request and receive cash rebates when there is a soft dollar commission credit built up at an executing broker.

In selecting brokers and negotiating commission rates, the Investment Manager will take into account the financial stability and reputation of brokerage firms and the brokerage and research services provided by such brokers, although the Fund may not, in any particular instance, be the direct or indirect beneficiary of the research services provided. The Investment Manager may also consider the referral of investors, consistent with best execution.

The Investment Manager may also hire separate independent trading firms in order to obtain better price and/or execution, and such trading firms will be paid through additional commissions to be borne by the Fund.

The Fund maintains accounts at Citigroup Global Prime Brokerage, which serves as the Fund's prime broker and custodian (the "Prime Broker"). The Investment Manager reserves the right, in its sole discretion, to change or add prime brokers and/or custodians without further notice to the Shareholders.

## 14.    BOARD OF DIRECTORS

The Directors are responsible for the overall management and control of the Fund in accordance with its Memorandum and Articles of Association. However, the Directors are not responsible for the day-to-day operations and administration of the Fund, nor are they responsible for making or approving any investment decisions, having delegated such responsibilities to the Investment Manager pursuant to the terms of the Management Agreements and the day-to-day administrative functions to the Administrator pursuant to the Administration Agreement in accordance with its powers of delegation as set out in the Articles of Association. The Directors will review the performance of the Investment Manager and Administrator on a periodic basis. The Directors of the Fund consists of Frank H. López, Luis Bethart, David Sargison, Andrew Eastabrook and Vijayabalan Murugesu. Messrs. López and Bethart serve as Directors without compensation, while Ogier Fiduciary Services (Cayman) Limited is paid a fee for providing the services of Mr. Sargison, Mr. Eastabrook and Mr. Murugesu. If additional Directors are elected, the Fund may compensate such Directors (other than the Investment Manager or any persons affiliated with the Investment Manager) with respect to services rendered in that capacity.

The Articles of Association do not stipulate a retirement age for the Directors and do not provide for retirement of the Directors by rotation. There is no shareholding qualification for the Directors. The Directors are empowered to exercise all of the borrowing powers of the Fund. In addition, the Articles of Association provide certain rights of indemnification in favor of Directors and officers of the Fund against legal liability and expenses if such persons did not, in connection with the matter giving rise to particular claim, engage in gross negligence or willful default in the performance of their duties. With the exception of the Investment Manager, the Directors may change any of the Fund's service providers, including the Fund's auditors, without the consent of the Shareholders. Biographical information for Mr. Sargison, Mr. Eastabrook and Mr. Murugesu is set forth below. For the biographies of Mr. López and Mr. Bethart, see Section 5, "Background of the Investment Manager" above.

26

F01334-E00184242                                                                    Illarramendi, Francisco

**David Sargison** has over 22 years of experience of working in the offshore financial industry and is Managing Director of Ogier Fiduciary Services (Cayman) Limited.  From 1989 to 2003, he was Managing Director of another leading licensed bank and trust company in the Cayman Islands, with responsibilities including corporate administration and banking with principal focus on investment funds and structured finance vehicles.  He was an Assistant General Manager at The Bank of Butterfield in Cayman from 1986 to 1989, after having worked for the bank since 1981.  Mr. Sargison was an Audit Supervisor for Peat Marwick & Mitchell (now KPMG) from 1979 to 1981.  From 1975 to 1979, he worked for Deloitte & Co.  Mr Sargison was admitted as a member of the Institute of Chartered Accountants in England and Wales in 1979.

**Andrew Eastabrook** is a UK qualified attorney and worked for two leading international law firms in London, Norton Rose and Simmons & Simmons, advising on corporate and structured finance transactions from 1997 until 2001. From 2001 until 2003 he worked at Maples Finance Limited in Cayman where he served as a director of vehicles involved in structured finance and capital markets transactions in Cayman.  For Ogier Fiduciary Services (Cayman) Limited he acts as a director of investment funds and entities established for capital markets transactions.

**Vijayabalan ("Balan") Murugesu** is the senior manager of Fund Services at Ogier Fiduciary Services (Cayman) Limited and has over 17 years of experience in the offshore financial services industry.  He holds a Masters of Science degree and is an Associate of the Canadian Institute of Bankers. From 1996 to December 2004 Mr. Murugesu worked for a leading bank & trust company licenced in the Cayman Islands, initially as Head of Treasury Function and from 1999 as Assistant Managing Director with principal responsibility for Banking and Private Clients.  He has served on the boards of several internationally recognised fund groups and structured finance vehicles.

## 15.    ADMINISTRATOR

### Administrator

The Fund has entered into an agreement (the "Services Agreement") with GlobeOp Financial Services (Cayman) Limited (the "Administrator", which term shall include affiliates of the Administrator) pursuant to which the Fund has engaged the Administrator to perform certain day-to-day administrative services on its behalf.  The Fund has also entered into an agreement with the Administrator to perform certain middle-office and/or back-office support activities for the Fund and the Investment Manager (the "Middle/Back Office Agreement", and, together with the Services Agreement, the "Administration Agreement").

The Administration Agreement provides that the Fund will indemnify and hold harmless the Administrator, its affiliates and any of their respective officers, directors, members, shareholders, employees, and agents, or any of their successors or assigns (each, an "Administrator Indemnified Party"), from and against any and all losses, judgments, liabilities, expenses incurred (including, without limitation, attorney's fees) and amounts paid in settlement of any claims arising out of, or in connection with, any action taken or omitted by any of the foregoing Administrator Indemnified Parties, unless such action or omission resulted from the fraud, gross negligence or willful misconduct by such Administrator Indemnified Party in connection with the performance of its duties and obligations under the Administration Agreement.

The Administrator will receive a monthly fee from the Fund, subject to a monthly minimum fee. Certain other out-of-pocket expenses of the Administrator, as well as applicable data, communication and technology-related charges may also be charged to the Fund in accordance with the Administration Agreement.

The Administration Agreement may generally be terminated at any time without penalty by the Fund on 60 days' notice or by the Administrator on 120 days' notice, except that it may be terminated upon less notice in certain instances.

F01334-E00184242                                                                                                  Illarramendi, Francisco

The Administrator may have relationships with providers of technology, data or other services to the Fund and/or the Investment Manager and may receive economic and/or other benefits in connection. The Administrator may subcontract with agents selected by the Administrator in good faith for administrative and certain other services.

The Administrator does not act as a guarantor of the Common Shares. Moreover, the Administrator is not responsible for any of the trading or investment decisions of the Fund (all of which are made by the Investment Manager) or the effect of such trading decisions on the performance of the Fund.

## 16.    TAXATION AND ERISA MATTERS

The tax status of the Fund and its Shareholders under the tax laws of the Cayman Islands and the United States is summarized below.  The summary is based on the assumption that the Fund is owned, managed and operated as contemplated.  The summary is considered in the opinion of the attorneys indicated below to be a correct interpretation of existing laws as applied at the date of this Memorandum, but no representation is made or intended by the Fund (i) that changes in such laws or their application or interpretation will not be made in the future or (ii) that the United States Internal Revenue Service will agree with the above-described interpretation as applied to the method of operation of the Fund.  Persons interested in subscribing for the Fund's Common Shares should consult their own tax advisers with respect to the tax consequences, including the income tax consequences, if any, to them of the purchase, holding, redemption, sale or transfer of Common Shares.

<u>Cayman Islands Taxes</u>

<u>Fund Level</u>.  The Fund is not subject to any income, withholding or capital gains taxes in the Cayman Islands.  The Fund has applied for, and is expected to receive, an undertaking from the Governor-in-Council of the Cayman Islands pursuant to the Tax Concessions Law  (1999 Revision) of the Cayman Islands that for a period of twenty years from the date of the grant of the undertaking, no law which is thereafter enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations will apply to the Fund or its operations; and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax will be payable on or in respect of the shares, debentures or other obligations of the Fund, or by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of The Tax Concessions Law (1999 Revision).  No capital or stamp duties are levied in the Cayman Islands on the issue, transfer or redemption of Common Shares.

<u>Shareholder Level</u>.  Shareholders will not be subject to any income, withholding or capital gains taxes in the Cayman Islands, with respect to the Common Shares of the Fund owned by them and dividends received on such Common Shares, nor will they be subject to any estate or inheritance taxes in the Cayman Islands.

<u>United States Taxes</u>

<u>Fund Level - Capital Gains</u>.  In general, the Fund intends to conduct its affairs such that it will not be deemed to be engaged in a trade or business in the United States.  Accordingly, under present law, the Fund is not subject to any United States Federal income tax on its capital gains from the sale of securities to the extent that such securities are not classified as "United States real property interests" within the meaning of section 897 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"). In this connection, the Fund does not presently intend to buy any securities which would be classified as "United States real property interests."

<u>Fund Level - Interest and Other Income</u>.  The Fund will be subject to a 30% United States Federal withholding tax payable with respect to items of "fixed or determinable annual or periodical" income considered to be from sources within the United States, which term includes, among other things, certain interest income, dividends, rents and royalties.  Generally, interest received by the Fund upon

28

obligations issued after July 18, 1984 which are either in registered form or in bearer form where there are arrangements reasonably designed that the obligations will be sold only to non-United States persons is exempt from this withholding tax.

Shareholder Level. Shareholders, as long as they are neither citizens nor residents of the United States nor engaged in a trade or business in the United States, are not subject to any United States Federal income, withholding, capital gains, estate or inheritance taxes with respect to the Common Shares owned by them or dividends received on such Common Shares.

## Other Taxes

Depending on the tax laws of any other jurisdiction, there may be withholding taxes imposed on dividends, interest income or capital gains received by the Fund on securities issued by governments or corporations of those jurisdictions.

## U.S. Shareholders - Special Considerations

PFIC Status. As noted above, Common Shares in the Fund may be sold to a limited number of United States investors which are pension and profit sharing trusts or other tax-exempt organizations ("U.S. Exempt Shareholders"). The Fund is a "passive foreign investment company" ("PFIC") as defined in Code section 1297. The Fund does not furnish information necessary for a United States person to treat the Fund as a "qualified electing fund" in the event that a United States person that is not a U.S. Exempt Shareholder is considered to own Common Shares in the Fund under the constructive ownership rules of Code section 1298.

No Unrelated Business Taxable Income. While the Fund may purchase securities on margin, borrow money and otherwise utilize leverage in connection with its investments, under current law such leverage should not be attributed to, or otherwise flow through to, U.S. Exempt Shareholders in the Fund. Accordingly, assuming a U.S. Exempt Shareholder does not borrow money or otherwise utilize leverage to purchase its Common Shares in the Fund, any dividends from the Fund or gain on the sale or redemption of Common Shares in the Fund should not constitute "unrelated debt-financed income" as defined in Code section 514 or "unrelated business taxable income" as defined in Code section 512 to the U.S. Exempt Shareholder and should not be subject to United States Federal income tax under the PFIC provisions of the Code.

Controlled Foreign Corporation Status. The Investment Manager and/or the Administrator will monitor the Shareholders in an attempt to ensure that at all times the ownership of the Fund by U.S. Exempt Shareholders is below the threshold amounts set forth in Code section 957 and therefore that the Fund will not be classified as a "controlled foreign corporation" as defined in Code section 957, although there can be no assurance that the Fund will be able to do so.

Information Reporting. U.S. Exempt Shareholders may be subject to certain U.S. Internal Revenue Service filing requirements. For example, pursuant to Code section 6038B, a United States person which transfers property (including cash) to a foreign corporation in exchange for stock in the corporation is in some cases required to file an information return with the U.S. Internal Revenue Service with respect to such transfer. Accordingly, a U.S. Exempt Shareholder may be required to file an information return with respect to its investment in the Fund. Additional reporting requirements may be imposed on a U.S. Exempt Shareholder that acquires Common Shares with a value equal to at least 10% of the aggregate value of all the Common Shares. Shareholders should consult their own tax advisers with respect to any applicable filing requirements.

## ERISA Matters

The following is a summary of certain aspects of the laws and regulations applicable to retirement plan investments as in existence on the date hereof, all of which are subject to change. This summary is

F01334-E00184242                                                                                                     Illarramendi, Francisco

general in nature and does not address every issue under ERISA that may be applicable to the Fund or a particular investor.

The Fund may accept subscriptions from individual retirement accounts ("IRAs"), Keogh plans, pension or profit-sharing plans, governmental plans, entities that invest the assets of such accounts or plans and/or other benefit plan investors (all such entities are herein referred to as "Benefit Plan Investors"). The Fund does not anticipate that its assets will be subject to ERISA, because it intends to limit the investments in the Fund by Benefit Plan Investors (both U.S. and non-U.S.) to less than 25% of the value of any class of equity interests of the Fund, excluding from this calculation any non-Benefit Plan Investor interest of that class held by the Investment Manager, persons affiliated with the Investment Manager or their employees. No subscriptions for Common Shares made by Benefit Plan Investors will be accepted and no transfers of Common Shares will be permitted to the extent that the investment or transfer would result in the Fund exceeding this 25% limit. In addition, because the 25% limit is to be calculated by the Administrator upon every subscription to or redemption from the Fund, the Fund, or the Administrator on its behalf, has the authority to require the redemption of all or some of the Common Shares held by any Benefit Plan Investor if the continued holding of such Common Shares, in the opinion of the Directors, could result in the Fund being subject to ERISA (See "Mandatory Redemptions"- Section 12).

ERISA and the Code impose certain duties, obligations and responsibilities on persons who serve as fiduciaries with respect to employee benefit plan ("Plans") or IRAs and prohibit acts of fiduciary self-dealing and certain transactions between Plans or IRAs and "parties-in-interest" or "disqualified persons" (as such terms are defined in ERISA and the Code). In the Fund's Subscription Agreement and Revocable Proxy, each Plan and IRA will be required to represent that its fiduciary has independently made the decision to invest in the Fund and has not relied as a primary basis for its investment decision on any advice from the Investment Manager, any placement agent associated with the Fund or any affiliate of either with respect to the investment in the Fund. Accordingly, fiduciaries of Plans or IRAs should consult their own investment advisors regarding the prudence of the investment and their own legal counsel regarding the consequences under ERISA and the Code of the investment in the Fund.

The above statements are based on advice received by the Fund as to United States taxes and ERISA matters from Seward & Kissel LLP, New York, New York and as to Cayman Islands taxes from Ogier & Boxalls, Cayman Islands.

## 17.    FISCAL YEAR AND FISCAL PERIODS; FINANCIAL STATEMENTS; AUDITORS

The fiscal year of the Fund will end on December 31 of each year.

Since Common Shares may be issued and redeemed by the Fund and dividends declared on Common Shares during the course of a fiscal year, the Fund's Articles of Association provide for fiscal periods, which are portions of a fiscal year, for the purpose of allocating net profits and net losses to the records maintained for each series of Common Shares. A new fiscal period will commence on each of the first day of each fiscal year, the date next following the date of any redemption of Common Shares, the date of any issuance of Common Shares and the date established by the Directors for determining the record ownership of Common Shares for the payment of dividends, and the prior fiscal period will terminate on the date immediately preceding the first day of a new fiscal period.

The books and records of the Fund will be audited at the end of each fiscal year by auditors selected by the Investment Manager. The Fund will seek to furnish the shareholders with audited year-end financial statements (within 90 days of the end of each fiscal year) including a statement of profit or loss for such fiscal year and of an unaudited status of such Shareholder's holdings in the Fund at such time. The Fund's first audit will be for the period from the commencement of the Fund's operations through December 31, 2005. The Fund's financial statements will be prepared using generally accepted accounting principles ("GAAP") as a guideline, unless otherwise deemed appropriate in the sole discretion of the Investment Manager. Organizational expenses may, for net asset value purposes, be amortized over a period of 60 months from the date the Fund commences operations because the Fund believes that such treatment is

more equitable than expensing the entire amount during the first year of operations, as is required by GAAP.  As a result, the Fund's financial statements may contain a qualification reflecting this treatment.

PricewaterhouseCoopers are the auditors for the Fund, and the Directors may change the Fund's auditors without prior notice to the Shareholders.

## 18.      GENERAL COMMENTS

The summary set forth herein does not purport to be and should not be construed as a complete description of the Memorandum and Articles of Association of the Fund, the Administration Agreement or the Management Agreements, copies of which will be furnished on request made to the Fund at its principal office.  Additionally, prospective investors should be aware of certain anti-money laundering requirements and regulatory issues.

### Prevention of Money Laundering

United States: In order to comply with applicable laws aimed at the prevention of money laundering and terrorist financing, each prospective investor that is an individual will be required to represent in the Subscription Agreement and Revocable Proxy that, among other things, he is not, nor is any person or entity controlling, controlled by or under common control with the prospective investor, a "Prohibited Person" as defined in the Subscription Agreement and Revocable Proxy (generally, a person involved in money laundering or terrorist activities, including those persons or entities that are included on any relevant lists maintained by the U.S. Treasury Department's Office of Foreign Assets Control, any senior foreign political figures, their immediate family members and close associates, and any foreign shell bank).  Further, each prospective investor which is an entity will be required to represent in the Subscription Agreement and Revocable Proxy that, among other things, (i) it has carried out thorough due diligence to establish the identities of its beneficial owners, (ii) it reasonably believes that no beneficial owner is a "Prohibited Person", (iii) it holds the evidence of such identities and status and will maintain such information for at least five years from the date of its complete redemption from the Fund, and (iv) it will make available such information and any additional information that the Fund may require upon request that is required under applicable regulations.

Cayman Islands: To ensure compliance with applicable statutory requirements relating to anti-money laundering and anti-terrorism initiatives, the Administrator on behalf of the Fund will require verification of identity and source of funds from all prospective investors.

As mentioned above, the Fund and/or the Administrator reserves the right to request such evidence as is necessary to verify the identity and source of funds of a prospective investor.  The Fund and/or the Administrator also reserves the right to request such verification evidence in respect of a transferee of Common Shares.  In the event of delay or failure by the prospective investor or transferee to produce any evidence required for verification purposes, the Fund and/or the Administrator may refuse to accept the application or (as the case may be) to register the relevant transfer, and (in the case of a subscription of Common Shares) any funds received will be returned without interest to the account from which such funds were originally debited.

The Fund and/or the Administrator also reserves the right to refuse to make any redemption payment or distribution to a Shareholder if any of the Directors of the Fund or the Administrator suspects or is advised that the payment of any redemption or distribution moneys to such shareholder might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, its Directors or the Administrator with any such laws or regulations in any relevant jurisdiction.

If, as a result of any information or other matter which comes to his attention, any person resident in the Cayman Islands (including the Fund, its Directors and the Administrator) knows or suspects that

31

payment to the Fund (by way of subscription or otherwise) is the proceeds of criminal conduct, such person is required to report such information or other matter pursuant to the Proceeds of Criminal Conduct Law (2001 Revision) of the Cayman Islands and such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by law or otherwise.

**Regulation.**  The Fund falls within the definition of a "mutual fund" under the Mutual Funds Law (2003 Revision) of the Cayman Islands and accordingly, is regulated under the Mutual Funds Law. However, the Fund is not required to be licensed or to employ a licensed mutual fund administrator since the minimum interest purchasable by a prospective investor in the Fund is at least $50,000(U.S.) or its equivalent in any other currency.  Accordingly, the obligations of the Fund are (a) to register the Fund with the Cayman Islands Monetary Authority, (b) to file with the Monetary Authority prescribed details of this Memorandum and any changes to it, (c) to file annually with the Monetary Authority accounts audited by an approved auditor and (d) to pay a prescribed initial registration fee and   annual fee (currently $2,440(U.S.)).

The Fund is subject to the supervision of the Monetary Authority and the Monetary Authority has wide supervisory powers under The Mutual Funds Law in that regard including the power to instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies.  Failure to comply with any supervisory requirements by the Monetary Authority may result in substantial fines.  In addition, the Monetary Authority has wide powers to take action if certain events occur, such as the Fund not being able to meet its obligations when they come due or the Fund carrying on its business in a manner that is prejudicial to its investors or creditors.  The powers of the Monetary Authority in these circumstances include the power to require the substitution of a Director and, at the expense of the Fund, to appoint a person to advise the Fund on the proper conduct of its affairs; and, at the expense of the Fund, to appoint a person to assume control of the affairs of the Fund including, but not limited to, having the ability to terminate the business of the Fund.  There are other remedies available to the Monetary Authority including the ability to apply to the courts of the Cayman Islands for approval of other actions or requiring the Fund to reorganize its affairs in a manner specified by the Monetary Authority.

## 19.      PROCEDURES TO PURCHASE COMMON SHARES

Persons interested in purchasing Common Shares of the Fund should inform themselves as to (i) the legal requirements within their own countries for the purchase of such shares, and (ii) any foreign exchange restrictions which they might encounter.

Any person desiring to subscribe for Common Shares of the Fund is requested to execute the Subscription Agreement and Revocable Proxy furnished by the Fund, offering in the Subscription Agreement to purchase a specified dollar amount of Common Shares, and fax the completed and executed copy and mail or courier the original to: Highview Point Offshore, Ltd., c/o GlobeOp Financial Services (Cayman) Limited, Walker House, Mary Street, George Town, P.O. Box 10201 APO, Grand Cayman, Cayman Islands, BWI, Attention: Investor Relations Department.

With respect to certain countries, special requirements may have to be observed with respect to subscriptions.

The Fund will advise each subscriber promptly of the Fund's acceptance of an offer to subscribe for Common Shares.  Payment in the amount of the subscription in United States dollars should be made in accordance with the terms of the Subscription Agreement.

The subscription documents to be executed and delivered by prospective subscribers contain the subscriber's agreement to indemnify and hold harmless the Fund, the Investment Manager, the Administrator and their respective affiliates, directors, members, partners, shareholders, officers, employees and agents against any and all losses, liabilities, damages, penalties, costs, fees and expenses (including legal fees and disbursements) that may result, directly or indirectly, from any

F01334-E00184242                                                                                                          Illarramendi, Francisco

inaccuracy in or breach of any representation, warranty, covenant or agreement set forth therein or in any other document delivered by the subscriber to the Fund.

The acceptance or nonacceptance of any subscription is solely at the discretion of the Fund and no reason need be given for the nonacceptance of any subscription. Any subscription amounts not accepted by the Fund will be promptly returned without interest.

Generally, a Shareholder may only elect to receive a certificate representing its Common Shares only if it demonstrates to the Fund and to the Administrator that it is legally required to hold certificated shares or the Fund otherwise approves of such issuance. All shares issued in the Fund will generally be issued as registered shares.

The form of "Subscription Agreement and Revocable Proxy" grants a proxy to the Administrator of the Fund from time to time with full power of substitution, authorizing it or its designee to vote the shares subscribed for on behalf of the subscriber at any meeting of Shareholders. Such proxy may be revoked by the Shareholder giving written notice to the Administrator, including any replacement administrator at its office as listed in the directory. Any such revocation will be effective upon its receipt by the Administrator, including any replacement administrator.

## HIGHVIEW POINT OFFSHORE, LTD.

23108.0002 #567397v2

33