UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　Plaintiff,<br>v.<br><br>FRANCISCO ILLARRAMENDI, HIGHVIEW POINT PARTNERS, LLC and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC,<br><br>　　　　　　　　　　Defendants,<br><br>and<br><br>HIGHVIEW POINT MASTER FUND, LTD., HIGHVIEW POINT OFFSHORE, LTD., HIGHVIEW POINT LP, MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP,<br>　　　　　　　　　　Relief Defendants. | 11-CV-00078 (JBA)<br><br><br>ECF CASE |

**MEMORANDUM OF LAW IN SUPPORT OF RECEIVER'S EMERGENCY MOTION FOR AN ORDER TO CLARIFY THE SCOPE OF THE MAY 12, 2011 ASSET FREEZE ORDER TO INCLUDE THE HIGHVIEW POINT PARTNERS, LLC INCENTIVE SAVINGS TRUST**

　　　　　John J. Carney, Esq. (the "Receiver"), as Receiver for the Michael Kenwood Group, LLC

(the "MK Group"), Highview Point Partners, LLC ("HVP") and certain affiliated entities[1] in the

_____

[1] To date, the following entities have been placed into the Receivership: MK Group; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC; MK Special Opportunity Fund; MK Venezuela, Ltd.; Short Term

above captioned matter, by and through his undersigned counsel respectfully moves pursuant to

paragraphs 14 and 47 of the January 4, 2012 Amended Order Appointing Receiver (Dkt. No.

423) (the "Amended Order") for an Order to Clarify the Scope of the May 12, 2011 Asset Freeze

Order (the "Asset Freeze Order") to include all funds in the HVP Incentive Savings Trust (the

"HVP Plan" or the "Plan").  As set forth below, all of the funds contributed to the Plan came

directly from the assets of HVP.  Furthermore, evidence has established that the assets of the

HVP Plan were obtained fraudulently even before they were contributed to the HVP Plan, as

HVP was insolvent since at least October 2005.[2]  As funds under the direct control of HVP,

these funds are subject to the Asset Freeze Order and accordingly, cannot be distributed.

Frank Lopez ("Lopez"), Christopher Luth ("Luth"), and Victor Chong ("Chong")

(together the "HVP executives")—all former employees of HVP—received actual notice of the

Asset Freeze Order and therefore knew that distribution of HVP assets would be improper.

Nonetheless, the HVP executives submitted Plan benefit distribution requests to the Plan

Administrator seeking disbursement of funds in the Plan.  These HVP executives have been sued

by the Receiver and accused of wrongdoing related to the underlying fraud.  The HVP Plan

funds must be frozen to preserve the assets of HVP.  Each of the HVP executives separately

submitted claims against the Receivership Estate for the same Plan benefit.

The Plan Administrator must respond to two of the HVP executives' appeals of the denial

of their requests for a plan distribution by May 25, 2012.  For this reason, the Receiver

---

Liquidity Fund, I, Ltd.; Highview Point Partners, LLC; MK Master Investments LP; MK
Investments, Ltd., and MK Oil Ventures LLC (collectively, "the Receivership").

[2] *See* Dkt. No. 447 at 9.  On February 2, 2012, the Receiver filed a Motion to Expand the
Receivership, seeking to include Highview Point Master Fund, Ltd., Highview Point Offshore
Fund, Ltd., and Highview Point LP in the Receivership.  More details regarding the extensive
involvement of the HVP entities is detailed therein.

respectfully requests that this Motion to Clarify the Asset Freeze Order be considered on an expedited basis. The SEC has indicated that it will join in this motion.

For the reasons set forth below, for those provided in any further pleadings or hearings on the Motion, and based upon the Declaration of Jonathan B. New ("New Dec.") and the Declaration of Jonathan Zambelli ("Zambelli Dec.") submitted herewith and incorporated by reference herein, the Receiver respectfully requests that this motion be GRANTED.

## **FACTUAL BACKGROUND**

On May 12, 2011, the Court entered a Temporary Restraining Order, Order Freezing Assets and Order for Temporary Relief as to Highview Point Partners (Dkt. No. 200) (the "Asset Freeze Order"). Then, on June 22, 2011, the Court entered an Amended Order Appointing the Receiver, which placed HVP and its assets under Receivership and required the Receiver to preserve and prevent the improper dissipation or concealment of all HVP assets. (Dkt. No. 279) (June 22, 2011 Amended Order Appointing Receiver ¶ 14(G)).[3] Shortly after the May 2011 hearings regarding placing HVP in Receivership, the HVP executives submitted requests to the Administrator of the HVP Plan for distributions. New Dec. at ¶ 3. Separately, the HVP executives submitted claims to the Receiver for the same distribution. Even in those claims, the HVP executives question the inclusion of the HVP Plan funds in the Receivership Estate. New Dec. at ¶ 4.

---

[3] While the June 22, 2011 Amended Order Appointing the Receiver was the effective document at the time when the HVP executives made their initial distribution requests, the identical language is in the current Amended Order Appointing the Receiver, entered on January 4, 2012.

## A.   ALL ASSETS CONTRIBUTED TO THE HVP INCENTIVE SAVINGS TRUST CAME DIRECTLY FROM HVP, WHICH WAS INSOLVENT

Between 2007 and 2011, every contribution to the HVP Plan came from the HVP JPMorgan checking account which was the sole source of funds for the HVP Plan.  Zambelli Dec at ¶ 4; HVP Annual Contribution Payment Analysis, attached to Zambelli Dec. as Ex A; Chart of Payments from HVP JPMorgan Account, attached to Zambelli Dec. as Ex B.  In total, $837,384 was transferred into the HVP Plan directly from the HVP JPMorgan checking account.  Zambelli Dec. at ¶ 5; Exs. A-B.  This total amount represents the entire plan contributions for Lopez, Luth, Chong, Francisco Illarramendi ("Illarramendi") and Belinda Hill.[4]  Zambelli Dec. at ¶ 6.  Based on the Hearing Evidence and as further elaborated on in the Receiver's February 2, 2012 Motion to Expand the Receivership, seeking to include Highview Point Master Fund, Ltd., Highview Point Offshore Fund, Ltd., and Highview Point LP in the Receivership (the "HVP Funds"), HVP and the HVP Funds were insolvent since at least October 2005.  (Dkt. No. 447).

## B.   THE HVP EXECUTIVES ARE DEFENDANTS IN A LAWSUIT FILED BY THE RECEIVER IN CONNECTION WITH THE FRAUD COMMITTED BY ILLARRAMENDI

At the time of the fraud committed by Illarramendi, the HVP executives were all key executives of HVP.  Specifically, Lopez was a managing member and one-third owner of HVP, with Luth and Illarramendi; Luth was a managing member and one-third owner of HVP; and Chong was the chief compliance officer and chief financial officer of HVP.  New Dec. at ¶ 5.  Each has been sued by the Receiver for breaches of their fiduciary duty, which allowed Illarramendi to continue the fraud, as further described below.  New Dec. at ¶ 6.

---

[4] Ms. Belinda Hill (formerly known as Pereira-Ribeiro) and Francisco Illarramendi are members of the HVP Plan as well but are not seeking any distributions at this time.

On March 7, 2011 Illarramendi pleaded guilty to a Ponzi-like fraud in which assets from the funds managed by HVP and Michael Kenwood Capital Management, LLC ("MKCM") were commingled, fraudulently diverted and lost.  He pleaded guilty to felony violations of wire fraud (18 U.S.C. § 1343), securities fraud (15 U.S.C. §§ 78j(b) and 78ff), investment adviser fraud (15 U.S.C. §§ 80b-6 and 80b-17) and conspiracy to obstruct justice (18 U.S.C. § 371).  In pleading guilty, Illarramendi admitted to operating the hedge funds he helped manage to execute an overarching, fraudulent, Ponzi-like scheme in which he "used money provided by new investors to the Funds to pay out the returns he promised to earlier investors." *Stipulation of Offense Conduct*; Criminal Information, *United States v. Illarramendi*, 3:11 Cr. 41 (SRU), attached to New Dec. as Ex. 1 at 1.  Illarramendi likewise admitted that in executing this Ponzi scheme he disregarded the corporate formalities of the funds he managed and "commingled the investments in each individual hedge fund with investments in the other hedge funds without regard to their structure, stated purpose or investment limitations and thus, treated all investments in the Funds as a single source to provide returns to investors." *Id.*  Illarramendi acknowledged under oath that he began this fraudulent scheme in an effort to conceal from the investors and creditors a "hole" that existed between the fund assets and liabilities, which he estimated as exposing investors to potential losses in the "hundreds of millions of dollars." *See* Transcript of Plea Allocution, attached to New Dec. as Ex. 2 at 40:12-41:6, 44:15-21.  Notwithstanding that the funds managed by HVP had experienced hundreds of millions of dollars of losses which were covered up through fraud and improper commingling, HVP continued to pay itself management fees based upon fraudulently reported earnings.  *See* Dkt. No. 447 at 23-24, 30.  These management fees funded by commingled assets based upon fraudulently reported earnings and

net asset values, were utilized to fund the HVP Plan.  *Id.*  In essence, the HVP Plan was funded with the proceeds of the fraud to which Illarramendi pleaded guilty.

Following Illarramendi's guilty plea, on May 10, 2011, the Commission filed an amended complaint against him and added several parties as defendants and relief defendants. The Commission sought to expand the Receivership to include HVP and the HVP Funds.  New Dec. at ¶ 7.  The Court held a three-day hearing on the motion in May 2011 (the "May Hearing"), and heard the testimony of, among others, one of the Receiver's forensic accountants, Matthew Greenblatt of FTI Consulting, Inc., Sofia Hussain of the Commission, and Illarramendi (collectively, the "Hearing Evidence").  New Dec. at ¶ 8.  Collectively, the Hearing Evidence established the following key facts: (1) Illarramendi's Fraudulent Scheme began with the concealment of trading losses by manipulating the books and records of the HVP Offshore Fund; (2) the assets of the HVP Funds, other entities, and the MK Entities[5] were massively and pervasively commingled; (3) Illarramendi operated the HVP Funds and MK Entities without regard for corporate formalities and structure; and (4) Illarramendi expanded the fraud that began at the HVP Funds to include the MK Funds, from which more than $180 million dollars was fraudulently transferred to the Master Fund to facilitate and conceal the overall fraud.  New Dec. at ¶ 9.

---

[5] The term "MK Entities" as used herein include the MK Group; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC.

The term "MK Funds" refers to the following:  MK Special Opportunity Fund ("MK SOF"); MK Venezuela, Ltd. ("MKV") and Short Term Liquidity Fund, I, Ltd. ("STLF").

The Hearing Evidence also showed that Lopez knew about the "hole" and encouraged
Illarramendi to cover it up:

> **MS. KELLY:  At some point did you disclose the existence of the hole
> to any of your partners who were principals?**
>
> ILLARRAMENDI. At a later date, after I had tried to recover the money
> and had failed to do so…increasing the amount of the mismanagement
> between assets and liabilities to approximately $30 million…I disclosed
> the situation to Mr. Lopez… It was -- after reaching that point I decided to
> approach first my father and then Mr. Lopez, and eventually both of them
> together, to discuss the matter and to get advice on what would be the best
> course of action.
>
> **MS. KELLY: What did you say to Mr. Lopez exactly?**
>
> ILLARRAMENDI. That… there had been a significant hole…and the
> circumstances that totaled approximately $30 million, part of which was
> money that essentially was Highview Point's money and part of which was
> money from other investors that participated in transactions with us.
> …
> **MS. KELLY: How did Mr. Lopez react?**
>
> ILLARRAMENDI. He was very taken aback. He was not happy.  And we
> discussed at that time whether or not we should approach first the lead
> investor, or the investors, and my father recommended that we approach
> the lead investor to disclose to him what had happened, and then Frank
> asked me that him and I should go to the office and leave my
> father….[Frank] felt it would be a very bad thing for his reputation….so
> he asked that we try to figure out a different way of fixing the problem and
> that I work to fix the problem….And then he -- obviously we agreed that I
> would never tell anybody about it….

Hearing Evidence Tr. at 360:7-364:4, attached to New Dec. as Ex. 3.

In addition, prior to the May Hearing the Receiver's legal and forensic team conducted an
extensive investigation into the origin, nature and operation of the fraudulent scheme, including,
among other things, the depositions of HVP executives.  Each of them refused to testify,
asserting their Fifth Amendment rights not to incriminate themselves.  Even without their
potentially incriminating testimony, the Receiver's forensic investigation revealed a staggering
amount of additional evidence linking the HVP executives to the fraud.  Notwithstanding the

sufficiency of the Hearing Evidence, the Receiver's legal and forensic team has continued its investigation into the connection between the HVP executive and the fraud.

As a result, on February 3, 2012, the Receiver filed a lawsuit in the United States District Court for the District of Connecticut against the HVP executives, among others. *Carney v. Lopez, et al.*, 3:12-cv-00182-SRU ("HVP Partners Complaint"), attached to New Dec. as Ex. 4. In the HVP Partners Complaint the Receiver alleges that each of the defendants received fraudulent transfers, totaling approximately $29.7 million, from Receivership Entities under a variety of guises, including "bonus" payments and investments in entities controlled by the defendants. Ex. 4 at ¶ 2. The Receiver's causes of action include fraudulent transfer (both actual and constructive), common law fraudulent transfer, unjust enrichment, constructive trust, conversion and accounting against all of the defendants. New Dec. at ¶ 10; Ex. 4 at ¶¶ 91-130, 145-167. In addition, because their actions prolonged the fraud and personally enriched themselves, the Receiver asserted claims against Lopez, Luth and Chong for breach of fiduciary duties owed to HVP and breach of the Connecticut Unfair Trade Practices Act. New Dec. at ¶ 11; Ex. 4 at ¶¶ 131-144. In connection with these additional causes of action, the Receiver is seeking to recover salaries and bonus payments paid to Lopez, Luth, and Chong and compensatory damages, in an amount representing the total amount of victims' losses. New Dec. at ¶ 12; Ex. 4 at ¶¶ i-x.

### C.   THE HVP EXECUTIVES MADE DISTRIBUTION REQUESTS OUTSIDE OF THE RECEIVERSHIP CLAIMS PROCESS

Despite the clear language in the Asset Freeze Order, from June to July 2011, the HVP executives sent Plan benefit distribution requests directly to the Plan Administrator. *See* Chong Plan Distribution Request dated June 2, 2011, attached to New Dec. as Ex. 5; Lopez Plan Distribution Request dated July 28, 2011, attached to New Dec. as Ex. 6; Luth Plan Distribution

Request dated June 2, 2011, attached to New Dec. as Ex. 7.  The Plan Administrator, along with the Receiver's counsel, reviewed the requests and ultimately denied them based upon the Amended Receiver Order and the Asset Freeze Order.  *See* Chong Denial Letter dated November 28, 2011, attached to New Dec. as Ex. 8 at 1; Lopez Denial Letter dated January 23, 2012, attached to New Dec. as Ex. 9 at 1; Luth Denial Letter dated November 28, 2011, attached to New Dec. as Ex. 10 at 1.  Counsel for the Receiver, on behalf of the Plan Administrator, explained the Receiver's duty to preserve and prevent the dissipation of the HVP assets pursuant to the Court's mandate.  *See* Chong Denial Letter dated November 28, 2011, attached to New Dec. as Ex. 8 at 3; Lopez Denial Letter dated January 23, 2012, attached to New Dec. as Ex. 9 at 3; Luth Denial Letter dated November 28, 2011, attached to New Dec. as Ex. 10 at 3.

In further support of the denial, counsel for the Receiver, on behalf of the Plan Administrator, noted that certain members and employees of HVP were charged with or suspected of various violations of federal securities and criminal laws.  *See* Chong Denial Letter dated November 28, 2011, attached to New Dec. as Ex. 8 at 1; Lopez Denial Letter dated January 23, 2012, attached to New Dec. as Ex. 9 at 1; Luth Denial Letter dated November 28, 2011, attached to New Dec. as Ex. 10 at 1.  Nonetheless, the HVP executives submitted appeals of the determination to the Plan Administrator.  *See* Chong Appeal Letter dated January 26, 2012, attached to New Dec. as Ex. 11; Lopez Appeal Letter dated March 22, 2012, attached to New Dec. as Ex. 12; Luth Appeal Letter dated January 26, 2012, attached to New Dec. as Ex. 13. The Plan Administrator responded, notifying Chong and Luth that their appeals would be

determined by May 25, 2012.[6]  *See* Chong Appeal Response Letter dated March 13, 2012, attached to New Dec. as Ex. 14 at 2; Luth Appeal Response Letter dated March 13, 2012, attached to New Dec. as Ex. 15 at 2.

> **D.   THE HVP EXECUTIVES SUBMITTED CLAIMS QUESTIONING THE INCLUSION OF THE HVP PLAN FUNDS IN THE RECEIVERSHIP ESTATE**

At the end of December 2011, the HVP executives also submitted claims against the Receivership Estate for the funds in each of their HVP Incentive Savings Trust Accounts.  Luth submitted a claim for $167,357.53.  In that claim, Luth notes "This claim is included in an abundance of caution, since it is unclear that Highview Point Partners, LLC Incentive Savings Trust is part of the Receivership Estate."  Luth Proof of Claim form dated December 28, 2011, attached to New Dec. as Ex. 16 at Tab A.  Lopez submitted a claim to for $191,289.49.  In that claim, Lopez notes "This claim is being submitted to preserve two claims that we believe are not part of the Receivership Estate . . . ."  Lopez Proof of Claim form dated December 28, 2011, attached to New Dec. as Ex. 17 at Tab A.  Chong submitted a claim for $181,000.  In that claim, Chong notes "It is Mr. Chong's understanding that neither of these matters falls within the scope of the Receivership Estate . . . ."  Chong Proof of Claim form dated December 28, 2011, attached to New Dec. as Ex. 18 at Tab A.

---

[6] The Plan Administrator has not yet responded to Lopez.  The Plan Administrator, however, will respond to his appeal by May 25, 2012 or seek an extension of time to respond within the prescribed time limits.

# ARGUMENT

The Court should grant the present motion because (1) the clear language of the Asset Freeze Order applies to the HVP Plan, preventing distribution; and (2) equity requires that the HVP executives await the resolution of the litigations against them.

### A.    THE ASSET FREEZE ORDER AND AMENDED ORDER APPOINTING THE RECEIVER APPLY TO THE HVP PLAN FUNDS

1.    *The Asset Freeze Order Prevents Distribution of Funds from the HVP Plan and the HVP Executives All Received Notice of the Asset Freeze Order.*

The assets in the HVP Plan are subject to the Asset Freeze Order, and the HVP executives each received actual notice of the Asset Freeze Order.  The Asset Freeze Order states:

**IT IS HEREBY ORDERED** that:

> A. **The Defendant and each of its agents, servants, employees** and attorneys and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, including via facsimile or email transmission, or overnight delivery service, **shall hold and retain funds and other assets of the Defendant presently held by it, for its direct or indirect benefit, under its direct or indirect control or over which it exercises actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located,** including but not limited to assets held in the accounts identified in the attached Exhibit A, **and shall prevent any withdrawal, removal, sale, purchase, trade, transaction, payment** (including, but not limited to, any charges on any credit card or draws on any other credit arrangement), **transfer, dissipation, assignment, pledge, alienation, encumbrance, disposal, or diminution in value of any such funds or other assets, which are hereby frozen;**

(Asset Freeze Order at IV. A.) (emphasis added).  It is undisputed that HVP—a defendant—and each of the HVP executives—all agents and/or employees of HVP—all received actual notice of the Asset Freeze Order.  HVP received notice of the asset freeze order via a letter dated March 21, 2011.  *See* HVP Notice Letter dated March 21, 2011, attached to New Dec. as Ex. 19.

Furthermore, as a defendant in the proceeding, it had actual notice.  Lopez and Luth received notice letters via their counsel, dated April 1, 2011, informing them of the asset freeze order in place at that time.  *See* Lopez Notice Letter dated April 1, 2011, attached to New Dec. as Ex. 20; Luth Notice Letter dated April 1, 2011, attached to New Dec. as Ex. 21.  In addition, Chong was sent a letter in June 2011, after the entry of the Amended Order Appointing Receiver, informing him of the Asset Freeze Order and terminating his employment with HVP.  *See* New Dec. at ¶ 13.

Pursuant to the Asset Freeze Order, HVP and the HVP executives must not transfer or dissipate any of the funds held by HVP, in "whatever form such assets may presently exist and wherever located."   This language applies to the funds in the HVP Plan because all of contributions to the HVP Plan came directly from HVP.  Each transfer into Lopez, Luth and Chong's account in the HVP Plan came from the HVP JPMorgan checking account.  Zambelli Dec at ¶ 4; HVP Annual Contribution Payment Analysis, attached to Zambelli Dec. as Ex A; Chart of Payments from HVP JPMorgan Account, attached to Zambelli Dec. as Ex B.  As noted above, HVP was insolvent at the time of the transfers to the HVP Plan.  Additionally, HVP directly controlled all of the assets in the HVP Plan because the company itself was empowered to authorize distributions at the time of the first request.  *See* New Dec., Exs. 5-7.  As a result, the HVP executives are not entitled to a distribution from the Plan.

Moreover, based on the forensic evidence to date, the funds within the HVP Plan were never legitimately Plan assets because even prior to being contributed to the Plan, they were not properly HVP assets.  The contributions made to the plan were made beginning in 2007, long after the funds of HVP were hopelessly commingled.  *See* Zambelli Dec at ¶ 4, 5; Dkt. No. 447 at 23.  The HVP executives could not have legitimately made pre-tax deferral contributions to

the Plan because HVP never realized any profits or made legitimate membership distributions from which they could have made such contributions.

Notably, after the May 27, 2011 hearing where the Receivership was expanded to include HVP, Lopez, Luth and Chong submitted requests for distribution of the money in the HVP Plan. *See* New Dec., Exs. 5-7.  In a transparent attempt to circumvent the Court's decision appointing the Receiver over HVP, Chong and Luth each signed the other's name in the section titled "employer authorization" in order to obtain distributions from the HVP Plan.  *See* New Dec., Exs. 5, 7.  As detailed, counsel for the Receiver, on behalf of the Plan Administrator denied these requests because the funds were in the control of HVP, which is subject to the Asset Freeze Order.

**B.      EQUITY REQUIRES LOPEZ, LUTH AND CHONG WAIT**

While the HVP executives assert rights to immediate distributions of funds from the HVP Plan, beyond the aforementioned sheer impropriety of the request under the Order, equity dictates otherwise.  Luth and Lopez were founding and managing members of HVP.  Chong was chief compliance officer and chief financial officer of HVP.  Until July 31, 2010 when he withdrew from HVP, Illarramendi was a managing member of HVP.  The allegations against the HVP executives and HVP are serious.  The Commission's complaint and the Receiver's complaint allege that Illarramendi "caused [HVP] and the [HVP Funds] to engage in scores of extraordinarily complex and multi-layered transactions as part of a fraudulent scheme," (Dkt. No. 190 at 4) which involved "the use of various offshore entities and bank accounts and a complex web of transfers, loans and transactions with numerous persons and entities that were often poorly or falsely documented on the books and records of HVP [and the HVP Funds]." New Dec., Ex. 4 at ¶ 6.

Many claims have been filed by individuals and entities, including victims of the fraud who have not been accused of any bad faith acts.  It would be inequitable to permit the HVP executives, all accused of serious wrongdoing in their leadership positions at HVP, to dissipate assets that properly belong in the Receivership Estate by obtaining immediate payouts from the Plan.  As this Court observed in its ruling on the Commission's Motion for a Temporary Restraining Order, an Order Freezing Assets, and an Order for Other Equitable Relief, "[o]nce the equity jurisdiction of the district court properly has been invoked, the Court has the power to order all equitable relief necessary under the circumstances."  (Dkt. No. 276 at 11).  *See also SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).

## CONCLUSION

Based on the foregoing, the Receiver respectfully requests that the Court GRANT the Receiver's Motion for an Order to Clarify the Scope of the May 12, 2011 Asset Freeze Order to include all funds in the HVP Incentive Savings Trust.  The Receiver respectfully requests that the Court additionally order that the Plan Administrator is not authorized to distribute any funds from the Highview Point Partners, LLC Incentive Savings Trust pending further order from this Court.

## NOTICE

Notice of this Motion has been given to all parties by electronic filing of this motion. The Commission has no objection to the relief requested.

In light of the nature of the relief requested, the Receiver submits that such notice is good and sufficient, and no other or further notice is necessary or required.

WHEREFORE, the Receiver respectfully requests that the Court enter an order substantially in the form of Exhibit A hereto: (a) granting this Motion; (b) clarifying that the May 12, 2011 Asset Freeze Order applies to the funds in the Highview Point Partners, LLC Incentive Savings Trust; (c) ordering that the Plan Administrator of the Highview Point Partners, LLC Incentive Savings Trust is not authorized to approve any distributions from the Highview Point Partners, LLC Incentive Savings Trust; and (d) granting the Receiver such other and further relief as is just and proper.

Respectfully submitted this 23rd day of May, 2012.

/s/ Jonathan B. New
Jonathan B. New
Naima J. Garvin
BAKER & HOSTETLER LLP
45 Rockefeller Plaza, 11th Floor
New York, NY 10111
jnew@bakerlaw.com
ngarvin@bakerlaw.com
Tel: (212) 589-4200
Fax: (212) 589-4201

*Attorney for Receiver John J. Carney*