UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FRANCISCO ILLARRAMENDI, HIGHVIEW POINT PARTNERS, LLC and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC,<br><br>Defendants,<br><br>and<br><br>HIGHVIEW POINT MASTER FUND, LTD., HIGHVIEW POINT OFFSHORE, LTD., HIGHVIEW POINT LP, MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP,<br><br>Relief Defendants. | 11-CV-00078 (JBA)<br><br>ECF CASE<br><br>**DECLARATION OF BRIAN ONG** |

I, Brian Ong, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am a Senior Managing Director at FTI Consulting ("FTI"), where I have worked for approximately nine years.

2.  My relevant professional experience includes over 20 years of providing accounting, financial analysis, business valuation and corporate transactional advisory services to a variety of clients including numerous corporate clients, corporate boards of directors, "C-level" executives, in-house legal counsel and external legal counsel. Prior to joining FTI, I was a partner with the international accounting firm KPMG LLP. I am a Certified Public Accountant, licensed in New York and Texas. Additionally, I am a Certified Fraud Examiner.

3. FTI Consulting is the financial advisor to the Court-appointed receiver John J. Carney, Esq. (the "Receiver"), assisting him in his investigation (the "Investigation") mandated by the Amended Order Appointing Receiver dated June 22, 2011. I make this declaration based on my personal knowledge and upon information ascertained by FTI during the Investigation, except where indicated, and in support of the Receiver's Emergency Motion for an Order Freezing Assets, for an Accounting, for a Summary Proceeding, and for Contempt Sanctions.

**Summary of Facts**

4. Documents demonstrate that a total of $4,050,000 was transferred, in two installments in September and October 2010, from Michael Kenwood Group, LLC ("MKG") and Michael Kenwood Asset Management, LLC ("MKAM") to a bank account bearing the name of defendant Francisco Illarramendi ("Illarramendi"). The assets of MKG and MKAM at all relevant times were funds misappropriated from investors. The memo notations for the wire transfers characterized these transfers as "advances" or "loans" to Illarramendi for the purpose of paying Illarramendi's taxes. Illarramendi has confessed to orchestrating a massive fraud utilizing entities including MKG and MKAM, both of which are now in the Receivership.[1]

5. Illarramendi used $770,919 of funds commingled in that same bank account with the monies received from MKG and MKAM to pay Connecticut state taxes.

6. The State of Connecticut issued a refund to Illarramendi on January 20, 2012 for the overpayment of taxes. On information and belief, Illarramendi has spent the majority of that

---

[1] Documents also demonstrate that $1,000,000 was transferred to the same Illarramendi bank account in September 2010 from Ontime Overseas Inc. ("Ontime Overseas"), also containing a notation characterizing the transfer as a loan for tax payments. On October 19, 2010, a payment in the amount of $1.01 million was made to Ontime Overseas by Short Term Liquidity Fund I, Ltd. out of an account maintained at Deutsche Bank. It appears as though this payment may have been the repayment for the $1 million advance made to Illarramendi.

money as if it were his own, for including removing a lien on a Mercedes-Benz automobile, personal loans or gifts to family members, and a $300,000 retainer for a civil lawyer to represent him and his wife in connection with a civil litigation brought by the Receiver.

**Transfers of Receivership Property Used to Pay Taxes**

7.   Documents demonstrate that, on September 16, 2010, $3 million was transferred from MKG to an account at JPMorgan Chase Bank, N.A. bearing the names of Illarramendi and his wife (the "Chase Account"). The wire transfer instrument contains a note reading "Advance for est. tax pmt," and the note accompanying the transfer in MKG's bank account statement states, "Advance from MKG for est. ax [*sic.*] pmt." Attached hereto as Exhibits A, B and C are true and correct copies of, respectively, the Chase Account statement for September 2010, the September 16, 2010 wire transfer instrument, and the September 2012 statement of MKG's bank account.

8.   A check in the amount of $590,000, signed by Illarramendi, was paid to the "Connecticut Revenue Service" that same day from the Chase Account. A $3.3 million check signed by Illarramendi was subsequently paid to the United States Treasury from the Chase Account as well, on September 22, 2010. *See* Exhibit A.

9.   As of September 1, 2010, the balance in the Chase Account was approximately $237,000. During the month of September 2010, deposits of approximately $58,000, excluding the transfer from MKG and the transfer from Ontime Overseas referenced in footnote 1 above, were made into the Chase Account. As tax payments totaling nearly $3.9 million were made during September 2010, it is clear that, but for the transfer of funds from MKG and Ontime Overseas, there were insufficient funds in the Chase Account to make the tax payments.

10.   On October 15, 2010, $1.05 million was transferred from MKAM to the Chase Account. The note accompanying the transfer in MKAM's bank account statement reads, "loan

3

to Francisco Illarramndi [*sic.*]." Attached hereto as Exhibits D, E and F are true and correct copies of, respectively, the Chase Account statement for October 2010, the October 15, 2010 wire transfer instrument, and the October 2012 statement of MKAM's bank account.

11. On October 19, 2010, a payment in the amount of $180,919 was sent by wire from the Chase Account to the Connecticut Department of Revenue. On the same day, $940,920 was also sent by wire from the Chase Account to the Internal Revenue Service. *See* Exhibit D.

12. As of October 1, 2010, the balance in the Chase Account was approximately $146,000. During the month of October 2010 and prior to the payment of the taxes by Illarramendi, deposits of approximately $70,000, excluding the transfer from MKAM were made into the Chase Account. As tax payments totaling nearly $1.1 million were made during October 2010, it is clear that, but for the transfer of funds from MKAM, there were insufficient funds in the Chase Account to make the tax payments.

**Connecticut State Tax Refund**

13. On Friday, July 6, 2012, I met with Illarramendi and others (the "July 6 Meeting"). Illarramendi informed me at the July 6 Meeting that (1) in December 2011, he filed a return for the tax year 2010 with the Connecticut Department of Revenue claiming entitlement to a tax refund, and (2) in January 2011, he received a refund from the state of Connecticut in an amount totaling $637,576, deposited into an account at TD Bank, N.A. bearing the name of Illarramendi's wife, and over which Illarramendi appears to exercise *de facto* control (the "TD Account").

14. According to Illarramendi and documents I have reviewed, Connecticut made the refund based on Illarramendi's assertion, contained in his Connecticut state tax return for the year 2010, that he received no income from any Michael Kenwood entity in 2010, despite having

4

paid estimated taxes on expected income. Illarramendi stated that he submitted the return based on advice that any such income may eventually be disgorged to the Receiver.

15. Illarramendi recounted during the July 6 Meeting that the balance of the TD Account, which includes the Connecticut state tax refund, was included in his financial disclosure to the Court in connection with his application for counsel pursuant to the Criminal Justice Act. Further, Illarramendi stated that the Connecticut state tax refund was not disclosed to the Receiver.

**Transfers Subsequent to the Tax Refund**

16. Immediately prior to receiving the Connecticut state tax refund, the TD account had a balance of $11.82, less "returned items fees" (*i.e.*, overdraft charges) of $70.00, making the actual balance of the account negative, specifically ($58.18).

17. Illarramendi informed me at the July 6 Meeting that, subsequent to receiving the refund, he caused a transfer in the amount of $300,000 to be made from the TD account to the law firm of McCarter & English, LLP, as a retainer for legal services, and specifically so Thomas J. Finn, Esq., a partner in that firm, would represent Illarramendi and his wife in connection with the pending civil clawback action brought by the Receiver.

18. Illarramendi also informed me at the July 6 Meeting that, subsequent to receiving the refund and transferring money into the TD Account, he caused a transfer to be made from that account to Mercedes-Benz Financial Services in the amount of approximately $28,000. This transfer was made explicitly so Mercedes-Benz Financial Services would remove a lien on a Mercedes-Benz automobile possessed by Illarramendi. Attached hereto as Exhibit G is a true and correct copy of a TD Bank check in the amount of $28,541.71 provided by Mercedes-Benz Financial Services.

19.     Illarramendi also informed me at the July 6 Meeting that, subsequent to receiving the refund and transferring money into the TD Account, he caused transfers to be made from that account to his father, Ramon Illarramendi, to his brother, Pablo Illarramendi, and to a friend by the name of Dale Garner, in the amounts of $75,000, $12,000 and $25,000, respectively.

20.     During the course of the July 6 Meeting, Illarramendi indicated that his household expenditure levels may be considered to be excessive in light of his personal circumstances. Illarramendi informed me at the July 6 Meeting that he is spending cash on various living expenses, including babysitting and cleaning services, at a rate of $4,000 to $5,000 per month. Pursuant to a review of the TD Account monthly statements for the months December 2011 through May 2012, ATM/debit card purchases alone averaged approximately $17,000 per month. This figure does not include spending from other sources, or non-ATM/debit card transfers from the TD Account, which average approximately $20,000 per month over that same time period, exclusive of the transfers described in the paragraphs above.

**Undeclared Loans**

21.     Also at the July 6 Meeting, Illarramendi admitted the existence of over $1.4 million in outstanding loans payable personally to him.

22.     Specifically, Illarramendi admitted that four individuals owe him a total of approximately $1,410,000 to $1,515,000, based on loans made to those individuals from 2004 through 2010.

23.     Illarramendi further admitted that at least some of the loans were originally made

6

from Receivership Entities.

    I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 23, 2012.

                                                                _____
                                                                Brian Ong