UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : | CIVIL ACTION NO.: 3:11 CV 00078 (JBA) |
| Plaintiff, | : : | |
| v. | : : | |
| FRANCISCO ILLARRAMENDI et al. | : : | |
| Defendants, | : : | |
| and | : : | |
| HIGHVIEW POINT MASTER FUND, LTD. et al., | : : | |
| Relief Defendants. | : | SEPTEMBER 25, 2012 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR MODIFICATION OF MODIFIED TEMPORARY ORDER FREEZING ASSETS**

McCARTER & ENGLISH, LLP
Thomas J. Finn
Federal Bar No.: ct 20929
tfinn@mccarter.com
Paula Cruz Cedillo
Federal Bar No.: ct 23485
pcedillo@mccarter.com
CityPlace I, 36th Floor
185 Asylum Street
Hartford, Connecticut 06103
Tel.: 860.275.6700
Fax: 860.724.3397

## INTRODUCTION

Pursuant to Rule 7(a) of the Local Civil Rules of the United States District Court for the District of Connecticut, the defendant, Francisco Illarramendi ("Mr. Illarramendi"), submits this Memorandum of Law in support of his Motion for Modification of Modified Temporary Order Freezing Assets, dated September 25, 2012 ("Motion").  Mr. Illarramendi respectfully requests that the Court modify its Modified Temporary Order Freezing Assets, dated February 2, 2011, ECF No. 59 ("Asset Freeze Order"), to allow for the payment of reasonable attorneys fees and living expenses.

Nearly two (2) years after the appointment of John J. Carney, Esq. as Receiver for various entities (collectively the "Receivership Entities")[1] in the instant matter, his involvement has failed to provide much of any discernible benefit to investors or any other party, while the Receiver's own team of legal and professional advisors has billed millions in fees and expenses. The Receiver was appointed to serve as an independent officer of the Court charged with the responsibility of marshaling and conserving the assets of the existing estate.  Yet, hungry with the prospect of touting his work in connection with what has been referred to as, albeit erroneously, the largest Ponzi scheme in Connecticut history, the Receiver has been everything but neutral or independent.

The Receiver's particularly aggressive behavior directed toward Mr. Illarramendi coupled with his failure to provide the requisite accounting of assets and liabilities of the receivership -- which loss calculation will also guide the determination of Mr. Illarramendi's criminal sentence

---

[1] The Receivership Entities are:  Highview Point Partners, LLC; MK Master Investments, LP; MK Investments, Ltd.; MK Oil Ventures, LLC; The MK Group; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKG-Atlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MK Capital Merger Sub, LLC; MK Special Opportunities Fund; MK Venezuela, Ltd.; and Short Term Liquidity Fund, I, Ltd.

under the Sentencing Guidelines -- necessitates an order allowing Mr. Illarramendi access to funds to be able to retain and pay for legal counsel. In addition, nearly twenty (20) months have passed since the Court first issued the initial temporary order which immediately froze his assets. No longer able to subsist on the financial generosity of friends and family, Mr. Illarramendi also requires access to funds to pay for basic living expenses in order to care for his wife and two (2) young children.

In direct contravention of the Receiver's responsibilities as a neutral officer of the Court, he has instead pursued the predetermined goal of leaving Mr. Illarramendi without any assets, regardless of his ability to prove that they are all tainted. Rather than attempt to discern and uncover the true facts and circumstances surrounding the transactions and events at issue, all the Receiver has done is summarily conclude and adhere to the erroneous notion that Mr. Illarramendi did nothing but operate a Ponzi scheme. In doing so, the Receiver has continually pointed to Mr. Illarramendi's guilty plea in the related criminal action entitled, United States v. Illarramendi, 3:11-cr-00041 (SRU), as justification for the Receiver's course of conduct and evident failure to produce the work with which he was charged at the time of his appointment. Indeed, nearly two (2) years later, and despite having had Mr. Illarramendi's unfettered cooperation, the Receiver has failed to provide any meaningful accounting of the Receivership's assets and liabilities or determined the validity of claims made by third party investors. The Receiver's blanket reliance on Mr. Illarramendi's guilty plea and supposed Ponzi scheme cannot serve to excuse the Receiver from fulfilling his obligations under this Court's appointment.

Since Mr. Illarramendi's attempt to retain legal counsel earlier this year, the Receiver has been particularly aggressive in his campaign against Mr. Illarramendi, most recently by wasting time and resources issuing subpoenas to and/or interrogating various individuals who could have

potentially been sources of loans for Mr. Illarramendi to pay for legal fees and/or living expenses. Such conduct, clearly designed to intimidate those individuals and impede Mr. Illarramendi's ability to retain counsel, is a blatant abuse of the Receiver's position and power, and should not be countenanced by the Court.

Fundamental principles of justice and equity as well as the integrity of the judicial process require that Mr. Illarramendi be permitted access to funds to retain legal counsel in order to defend against not only the allegations in this action, but also against the unduly oppressive and antagonistic conduct of the Receiver himself. Additionally, as was made clear and reinforced by the Receiver's recent harassment of Mr. Illarramendi's friends and family, Mr. Illarramendi has no means to provide for his wife and two (2) young children, ages five (5) and seven (7), and thus requires access to funds to pay basic monthly living expenses.

Accordingly, Mr. Illarramendi respectfully requests that the Court grant the instant Motion and provide him access to funds in the amount of $800,000 for the payment of legal fees on an hourly basis, or an amount determined by the Court, as well as for the payment of monthly living expenses in an amount to be determined by the Court. Legal representation will finally provide Mr. Illarramendi the opportunity to properly defend himself against the conclusory allegations asserted in the civil actions filed against him, the repressive actions of the Receiver, and work towards arriving at a proper loss calculation that the Receiver has failed to thus far provide.

## FACTS

The Securities and Exchange Commission ("SEC") commenced the instant civil enforcement action on January 14, 2011, against Mr. Illarramendi and other relief defendants. The SEC also sought and obtained, <u>inter alia</u>, an order freezing all assets and the appointment of

a receiver. Mr. Illarramendi's assets were immediately frozen by way of a Temporary Order Freezing Assets dated January 28, 2011, which order was later modified by the current Asset Freeze Order and incorporated into the Court's February 3, 2011, Preliminary Injunction Order. See Temporary Order Freezing Assets, January 28, 2011, ECF No. 36; Asset Freeze Order, ECF No. 59; Preliminary Injunction Order, February 3, 2011, ECF No. 67. The Receiver was also appointed on February 3, 2011. See Order Appointing Receiver, February 3, 2011, ECF No. 66. The current order issued by the Court governing the Receiver's appointment and duties was issued on January 4, 2012.[2] See Amended Order Appointing Receiver ("Receiver Order"), January 4, 2012, ECF No. 423.

On March 7, 2011, a criminal information was filed against Mr. Illarramendi by the United States Attorney's Office for the District of Connecticut, entitled United States v. Illarramendi, 3:11-cr-00041 (SRU). That same day, Mr. Illarramendi waived prosecution by indictment and entered a guilty plea to an information charging him with violations of the federal securities laws and other offenses. Specifically, Mr. Illarramendi entered into a plea agreement with the U.S. Attorney, wherein he pled guilty to wire fraud, securities fraud, investment advisor fraud, and conspiracy to obstruct justice, obstruct an official proceeding, and defraud the SEC. See Plea Agreement, March 7, 2011, 3:11-cr-00041 (SRU), ECF No. 10. As set forth in the Stipulation of Offense Conduct of the Plea Agreement, Mr. Illarramendi stipulated that he lost millions of dollars while acting as an investment manager to certain hedge funds. Rather than disclose the losses that were incurred to investors, he instead attempted to generate additional profits sufficient to fill the resulting hole. See id. He did not, however, plead guilty to having operated a Ponzi scheme. See id.

---

[2] While a request for a modification of an asset freeze order of the nature sought in this Motion would typically involve the Plaintiff SEC more directly, the Receiver has essentially supplanted the SEC's role in litigating the merits of this civil enforcement action.

The Plea Agreement and the Receiver Order both provide that Mr. Illarramendi is to work with the Receiver and assist him in connection with his duties and obligations. See Plea Agreement at 4; Receiver Order at ¶ 19. Mr. Illarramendi's cooperation in this regard has been exceptional. Mr. Illarramendi has met with over twenty-five (25) different people, including the Receiver, members of his legal team, members of the investigation and enforcement divisions of the SEC, members of the Receiver's accounting firm, FTI Consulting, Inc. ("FTI"), as well as with the business advisor appointed by the Court. See Declaration of Francisco Illarramendi in Support of Motion for Modification of Modified Temporary Order Freezing Assets, dated September 21, 2012 ("Illarramendi Decl.") at ¶ 3. Mr. Illarramendi has met or had telephone conversations with the Receiver and/or any number of his representatives well in excess of fifty (50) times, and has never refused a meeting. See Illarramendi Decl. at ¶¶ 3-4. During these meetings or discussions, Mr. Illarramendi never restricted any topics from discussion nor did he ever refuse to answer a question. See id. at ¶ 4. Mr. Illarramendi spent countless hours discussing and educating the Receiver's team on various investments and financing transactions, such as highly-sophisticated international arbitrage financing, specifically, U.S. dollar-Venezuelan bolivar currency swaps, as well as the Venezuelan financial markets and international capital markets. See Illarramendi Decl. at ¶ 5. Numerous times, the same questions would be answered on several different occasions to several different groups of individuals. See id.

On February 2, 2012, the Receiver commenced a civil action against Mr. Illarramendi, Maria Josephina Gonzalez-Miranda, and Adela Illarramendi, his wife and sister respectively, entitled Carney et al. v. Illarramendi et al., Civil Action No.: 3:12-cv-00165 (SRU), seeking to recover alleged fraudulent transfers (the "Receiver Action"). See Complaint, February 2, 2012,

3:12-cv-00165 (SRU), ECF No. 1 (attached hereto as Exhibit A).  The defendants in the Receiver Action filed a Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  See Motion to Dismiss, July 12, 2012, 3:12-cv-00165 (SRU), ECF No. 41 (attached hereto as Exhibit B).  The Receiver's response is currently due by October 1, 2012.[3]

**ARGUMENT**

I. **The Asset Freeze Order Should be Modified to Allow Access to Funds for the Retention and Payment of Legal Counsel**

It is well established that a district court has the discretion and authority to enter freeze orders in an SEC enforcement action to facilitate the enforcement of any disgorgement remedy that may ultimately issue in the matter.  See, e.g., SEC v. Dowdell, 175 F. Supp. 2d 850, 854 (W.D. Va. 2001) (citing SEC v. Int'l Loan Network, Inc., 770 F. Supp. 678, 696 (D.D.C. 1991)).  "If the court has the authority to freeze personal assets temporarily, it logically has the corollary authority to release frozen personal assets, or lower the amount frozen.  Courts are called upon to weigh the disadvantages and possible deleterious effect of a freeze against the considerations indicating the need for such relief."  Dowdell, 175 F. Supp. 2d at 854 (quoting SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1105 (2d Cir. 1972)) (internal quotation omitted); see, e.g., SEC v. Duclaud Gonzalez de Castilla, 170 F. Supp. 2d 427 (S.D.N.Y. 2001) ("the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief") (quoting Manor Nursing Ctrs., 458 F.2d at 1105).

As a preliminary matter, it has never been established that some or all of the assets subject to the Asset Freeze Order are not rightfully Mr. Illarramendi's assets.  As is discussed more fully below, all the Receiver has done is improperly attempt to transform Mr.

---

[3] The Receiver's counsel recently requested consent to amend the Complaint, which consent was given by Mr. Illarramendi's counsel.  Thus, it is expected that the response to the Motion to Dismiss will be an amended complaint.

6

Illarramendi's guilty plea into an unequivocal admission that he did nothing but operate a Ponzi scheme. See Complaint. However, the Receiver has failed to ever come forth with any actual evidence to establish the existence of a Ponzi scheme. To the contrary, the Receiver is well aware of countless examples of legitimate business and financial transactions conducted by Mr. Illarramendi that refute such an assertion.

A continuation of the Asset Freeze Order without modification to allow Mr. Illarramendi access to funds to retain legal counsel to represent him in the pending civil matters will have serious deleterious effects. Mr. Illarramendi's expertise and knowledge of the transactions, as well as his familiarity with the entities and individuals involved, are essential to an accurate and meaningful accounting of the Receivership's assets and liabilities and, in turn, to the resolution of the claims made by third party investors. The unfortunate reality of how this matter has progressed, however, is that the Receiver has directed his focus and resources at building the SEC's case against Mr. Illarramendi, rather than towards fulfilling his obligations as receiver to, inter alia, provide a neutral analysis of events and independent accounting. For example, during the process of his cooperation, it became apparent to Mr. Illarramendi that he was mistaken about the factors used to determine the loss calculation and, therefore, had grossly overestimated that potential losses could approach $300,000,000. See Illarramendi Decl. at ¶ 6. Despite communicating this belief to the Receiver's team on numerous occasions, Mr. Illarramendi has been met with hostility whenever he disagreed with the Receiver's view or understanding of certain issues. See Illarramendi Decl. at ¶¶ 6, 8.

Having hung his proverbial hat on the conclusion that there was a purported $300,000,000 loss, the Receiver has been acutely intolerant of Mr. Illarramendi's explanation of certain transactions and events if the information did not comport with this notion of having run

7

nothing but a Ponzi scheme for personal gain.[4]  See Illarramendi Decl. at ¶ 8.  Indeed, nearly two (2) years since his appointment and despite having had the benefit of Mr. Illarramendi's unparalleled cooperation, the Receiver has done nothing to substantively advance the resolution of claims made by third party investors.  Both Interim Reports filed by the Receiver expressly disclaim that "**[f]iled claims have not yet been fully analyzed and no determinations have been made**," despite having incurred $21,959,224 of "Administrative Expenses" as of July 31, 2012, an approximate $9,000,000 increase over the course of just six (6) months.  Compare Interim Report, January 30, 2012, ECF No. 444 (listing Administrative Expenses of $12,944,303) with Second Interim Report, July 31, 2012, ECF No. 521 (listing Administrative Expenses of $21,959,224) (emphasis in originals).

Not only is such information required for the entry of any disgorgement or restitution order, but more importantly, the ultimate loss calculation is absolutely critical to Mr. Illarramendi's imminent sentencing in the related criminal action.  See U.S.S.G. § 2B1.1(b)(1) (providing for an increase to the base offense level depending upon the amount of loss involved); U.S.S.G. § 2B1.1(b)(2) (providing for an increase to the base offense level depending upon the number of victims involved).  Indeed, the Government is awaiting the determination from the Receiver of the ultimate loss figure and number of purported investors who have actually been harmed.  Thus, a true and accurate calculation of the losses involved is crucial to ensure the

---

[4] Indeed, the Receiver has blatantly ignored and discounted Mr. Illarramendi's disclosure that he was extorted by various individuals associated with the Venezuelan government and was threatened with bodily harm if certain payments were not made to Venezuelan officials or their alleged intermediaries.  See Illarramendi Decl. at ¶ 9.  As a result, Mr. Illarramendi was forced to pay out millions of dollars for fear of his safety and the safety of his colleagues and family, some of whom are in Venezuela.  See Illarramendi Decl. at ¶ 10.  These circumstances led to accounting losses being incurred in connection with various transactions that otherwise would have been profitable but for the extortion payments.  See id.  Such instability and prevalent corruption is an unfortunate but well known reality of doing business in Venezuela.  See id. at ¶ 11.  Despite his awareness of such information, the Receiver has disregarded the reality of why certain accounting losses were incurred and its impact on the calculation of such losses, choosing instead to blindly push forward with the conclusory and erroneous assertion that Mr. Illarramendi did not nothing more than run a Ponzi scheme.

proper application of the Sentencing Guidelines and to the imposition of an appropriate, fair, and just sentence.  See id.

It is paramount that Mr. Illarramendi be allowed to retain and pay for legal representation to ensure that the Receiver is performing his duties adequately and equitably without being further battered in the process.  The Receiver has failed to come forward with any valid accounting, failed to produce any financial statements of the Receivership Entities, and has failed to validate the claims submitted by investors.  All he has done is point to Mr. Illarramendi's guilty plea to summarily label his conduct a Ponzi scheme.  However, as is more fully set forth in the Memorandum of Law filed by Mr. Illarramendi in support of a Motion to Dismiss filed in the Receiver Action, the Receiver has made the critical and erroneous legal assumption that the sum of Mr. Illarramendi's various and complex business transactions amounted to nothing more than the operation of a Ponzi scheme.[5]  See Memorandum of Law in Support of Motion to Dismiss ("Memorandum" or "Memo."), July 12, 2012, 3:12-cv-00165 (SRU), ECF No. 42 (attached hereto as Exhibit B).  The purpose of an asset freeze is to ensure enforcement of a disgorgement order if one is ultimately ordered, and should not be allowed to serve as a sword to cripple Mr. Illarramendi's ability to defend himself and advance the SEC's position regardless of the true

---

[5] The Receiver is well aware of numerous transactions and investments that render the existence of a Ponzi scheme implausible.  The United States Court of Appeals for the Second Circuit has defined a Ponzi scheme as "one in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity."  MLSMK Inv. Co. v. JPMorgan Chase & Co., 651 F.3d 268, 269 n.1 (2d Cir. 2011) (quoting SEC v. Credit Bancorp. Ltd., 290 F.3d 80, 89 (2d Cir. 2002)); see also In re Carrozzella & Richardson, 286 B.R. 480, 483-84 (D. Conn. 2002) (describing a Ponzi scheme as the use of funds that were not regularly invested or used in any legitimate business enterprise that could produce returns to instead merely pay new investors their promised returns).  A Ponzi scheme, or pyramid scheme, will ultimately collapse given its dependency on money received from newly attracted investors to pay earlier investors, rather than from money generated from a legitimate business venture.  See, e.g., Eberhard v. Marcu, 530 F.3d 122, 132 n.7 (2d Cir. 2008) (explaining that a Ponzi scheme is a pyramid scheme where earlier investors are paid from the investments of more recent investors "rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses").  Contrary to having run a Ponzi scheme, Mr. Illarramendi has provided the Receiver with countless examples of transactions and investments performed in financial markets and international capital markets.  Tellingly, the Receiver has failed to come forth with any actual evidence to demonstrate the validity to his assertion that Mr. Illarramendi did nothing more than operate a Ponzi scheme, improperly and repeatedly pointing instead to Mr. Illarramendi's guilty plea.

9

underlying circumstances. See SEC v. Prater, 289 F. Supp. 2d 39, 54 (D. Conn. 2003) (noting that an asset freeze is required to ensure funds will be available to compensate investors or provide disgorgement). Mr. Illarramendi's ability to have legal representation is of critical importance to the validity of this process and to the ultimate determination of claims of those truly effected investors.

"This court's central concern is the fairness of the proceedings." Dowdell, 175 F. Supp. 2d at 856 (granting request for payment of reasonable attorneys fees given that "[t]his is a complex legal matter, and lawyers are essential to the presentation of issues related to it"). Thus, courts have allowed for the payment of attorney's fees where defendants have presented a possible challenge to the SEC's evidence and where substantial legal work had already been performed in doing so. See Dowdell, 175 F. Supp. 2d at 856 (citing SEC v. Duclaud Gonzalez de Castilla, 170 F. Supp. 2d 427 (S.D.N.Y. 2001)); Memo. This is true regardless of Mr. Illarramendi's prior guilty plea. See United States v. Petters, No. 08-5348, 2009 WL 803482, *3 (D. Minn. Mar. 25, 2009) (granting defendant's request for the payment of attorneys' fees from Receivership funds even after the entry of a guilty plea because it serves the public interest to allow counsel to complete their representation and be reasonably compensated for their effort). Mr. Illarramendi, through counsel, has already challenged the Receiver by filing the Motion to Dismiss in the Receiver Action, and given the opportunity -- which the Receiver clearly desires to prevent -- Mr. Illarramendi is confident that he can demonstrate that the actual loss calculation at issue is nowhere near the original $300,000,000 estimation. Thus, Mr. Illarramendi should be allowed access to funds for legal representation. See Duclaud Gonzalez de Castilla, 170 F. Supp. 2d at 430) (granting defendants' request to modify the asset freeze to pay for legal fees incurred as a result of the action, including the filing of summary judgment motions) (citations omitted).

10

"The basis of our adversary system is threatened when one party gains control of the other party's defense as appears to have happened here." Fed. Sav. & Loan Ins. Corp. v. Dixon, 835 F.2d 554, 565 (5th Cir. 1987) (citation omitted) (directing district court to modify asset freeze to permit defendants to pay reasonable attorneys' fees). Throughout this process, the Receiver's conduct of cherry-picking favorable evidence and blocking other potentially exonerating information that is inconsistent with his characterization of Mr. Illarramendi as just another Madoff-type criminal, has gone unchecked. Without legal representation, Mr. Illarramendi is at a crippling disadvantage up against the SEC and its Receiver, and he does not have the ability to navigate these complex legal matters.

Accordingly, Mr. Illarramendi requests that the Court modify the Asset Freeze Order to allow access to $800,000 or other such amounts determined by the Court to pay legal fees on an hourly basis for use in the defense of the instant civil enforcement action and the Receiver Action. Mr. Illarramendi respectfully submits that the $800,000 amount requested to be available for the payment of attorneys' fees is very reasonable given counsel's anticipated representation in two (2) very active and complex civil actions, and given that thirteen (13) attorneys have appeared on the Receiver's behalf (and a group comprised of approximately twenty (20) attorneys primarily work on the matter), and the Receiver has assembled a legal and professional team that has spent 57,940.3 hours and incurred $19,591,744 in fees and expenses only as of December 31, 2011.[6] See First Interim Application for Fees and Expenses by the Receiver and his Advisors, May 23, 2011, ECF No. 243, at ¶¶ 4-5 (representing that the Receiver's counsel and accountants, FTI, expended 7,860 hours and incurred fees and costs of $2,966,550); Second Interim Application for Fees and Expenses by the Receiver and his

---

[6] At that rate, one can estimate that the legal and other professional fees and expenses that will be incurred by the professionals retained by the Receiver to work on this matter will approximately be an additional $19,029,608 through the end of September 2012, for a total of nearly $39,000,000.

11

Advisors, November 29, 2011, ECF No. 408, at ¶¶ 4-6 (representing that the Receiver's counsel and accountants expended 17,259 hours and incurred fees and costs of $6,257,260); Third Interim Application for Fees and Expenses by the Receiver and his Advisors, July 27, 2012, ECF No. 519, at ¶¶ 4-7 (representing that the Receiver's counsel and accountants expended 32,821.3 hours and incurred fees and costs of $10,367,934).

## II.    The Asset Freeze Order Should be Modified to Allow Access to Funds for the Payment of Monthly Living Expenses

Nearly two (2) years after his assets were initially frozen, Mr. Illarramendi can no longer provide for his family's basic needs.  The Asset Freeze Order does not allow for the payment of living expenses and, thus, Mr. Illarramendi has been forced thus far to rely on the kindness and generosity of friends and family who have loaned him funds to live.

In addressing requests for living expenses, courts generally look for evidence of the defendant's overall assets or income.  See Dowdell, 175 F. Supp. 2d at 854 (W.D. Va. 2001) (citing Duclaud Gonzalez de Castilla, 170 F. Supp. 2d 427).  In circumstances such as these, where there is no alternate source of funds, courts have allowed defendants access to funds to pay basic living expenses.  See Dowdell, 175 F. Supp. 2d at 854-55 (granting request for modification of asset freeze for payment of living expenses because defendants did not have alternate source of income and sought funds for "those types of bills which would be ordinary such as phone companies, the electric company, life insurance companies, and doctors").  Moreover, courts commonly allow defendants funds for the payment of living expenses as a means to be able to live while subject to a freeze order.  See, e.g., Dixon, 835 F.2d at 565 (noting that defendant subject to asset freeze in receivership action received $3,500 monthly personal expense allowance); SEC v. Pinez, 989 F. Supp. 325, 337 n.12 (D. Mass. 1997) (providing that

the Court allowed modification of freeze order to allow defendant fees for civil defense and household expenses); SEC v. Coates, No. 94 Civ. 5361, 1994 WL 455558, at *2 (S.D.N.Y. Aug. 23, 1994) (discussing that defendant subject to asset freeze in SEC enforcement action received $11,814 monthly allowance).

Equity requires that Mr. Illarramendi be afforded access to funds to pay living expenses and care for his wife and two (2) young children, ages five (5) and seven (7). Currently, Mr. Illarramendi's only source of income is $1,000 per month he earns as a part time consultant. See Illarramendi Decl. at ¶ 13. He has no source of income. See id. Having endured the burden of the Asset Freeze Order for nearly twenty (20) months now without requesting funds, Mr. Illarramendi will not be able to provide for his family and pay for basic living expenses without access to funds. See Illarramendi Decl. at ¶ 12. Accordingly, Mr. Illarramendi respectfully requests that the Court exercise its equitable discretion and allow him access to funds for the payment of monthly living expenses in an amount to be determined by the Court.[7]

## CONCLUSION

Based on the foregoing, the defendant, Francisco Illarramendi, respectfully requests that the Court grant the Motion for Modification of Modified Temporary Order Freezing Assets, dated September 25, 2012, in its entirety, and modify the order to provide him access to funds in the amount of approximately $800,000 for the payment of legal fees, or an amount determined by the Court, and for the payment of monthly living expenses in an amount to be determined by the Court.

---

[7] Mr. Illarramendi recently prepared a Declaration of Net Worth & Cash Flow Statements, executed on August 29, 2012, which was submitted to Probation in connection with the related criminal matter. Mr. Illarramendi has no objection to providing the Declaration to the Court for in camera review.

Dated: September 25, 2012  RESPECTFULLY SUBMITTED,
       Hartford, Connecticut

THE DEFENDANT,
FRANCISCO ILLARRAMENDI

By:   /s/  Thomas J. Finn
     Thomas J. Finn
     Federal Bar No.: ct 20929
     tfinn@mccarter.com
     Paula Cruz Cedillo
     Federal Bar No.: ct 23485
     pcedillo@mccarter.com
     McCARTER & ENGLISH, LLP
     CityPlace I, 36th Floor
     185 Asylum Street
     Hartford, Connecticut 06103
     Tel.: 860.275.6700
     Fax: 860.724.3397

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 25th day of September 2012, a copy of the foregoing Memorandum of Law in Support of Motion for Modification of Modified Temporary Order Freezing Assets was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

           /s/  Thomas J. Finn
           Thomas J. Finn

ME1 14052946v.1