UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | CIVIL ACTION NO.: 3:11 CV 00078 (JBA) |
| Plaintiff, | : | |
| v. | : | |
| FRANCISCO ILLARRAMENDI et al. | : | |
| Defendants, | : | |
| and | : | |
| HIGHVIEW POINT MASTER FUND, LTD. et al., | : | |
| Relief Defendants. | : | SEPTEMBER 21, 2012 |

**DECLARATION OF FRANCISCO ILLARRAMENDI IN SUPPORT OF MOTION FOR MODIFICATION OF MODIFIED TEMPORARY ORDER FREEZING ASSETS**

I, Francisco Illarramendi, of full age, do hereby declare pursuant to 28 U.S.C. § 1746 the following:

1.      I am the defendant in the above-captioned action.  I submit this Affidavit in support of the Motion for Modification of Modified Temporary Order Freezing Assets ("Motion").

2.      On March 7, 2011, I entered into a Plea Agreement with the United States Attorney's Office for the District of Connecticut whereby I waived prosecution by indictment and entered a guilty plea to an information charging me with violations of the federal securities

laws and other offenses.  Pursuant to the Plea Agreement, I agreed to provide my cooperation to the receiver appointed in this action, John J. Carney, Esq. ("Receiver"), including working with and assisting his team in connection with his duties and obligations.

3.      I have never refused a meeting with the Receiver or any of his many representatives.  I have met or had telephone conversations with over twenty-five (25) different people which include the Receiver, members of his legal team, members of both the investigation and enforcement divisions of the Securities and Exchange Commission ("SEC"), members of the Receiver's accounting firm, FTI Consulting, Inc., as well as with the business advisor appointed by the Court.

4.      I have met or had telephone conversations with the Receiver and/or any number of his representatives well in excess of fifty (50) times to assist them with their work.  During these meetings or discussions, I never refused to answer a question or discuss a topic and never imposed any restrictions on the subject matter of their inquiries or our discussions.

5.      During the course of our meetings, I spent countless hours discussing and educating the Receiver and/or his representatives about various investments and financing transactions, such as international arbitrage financing, specifically, U.S. dollar-Venezuelan bolivar currency swaps, as well as the Venezuelan financial markets and international capital markets.  I would regularly answer the same questions or explain various transactions on different occasions to several different groups of individuals.

6.      As a result of the assistance I provided during my cooperation, it became apparent to me that I had been mistaken about what the basis was for the determination of the loss calculation.  As a result of my initial lack of knowledge about these factors, I had mistakenly conceded that the amount that I had originally estimated in potential losses could approach

$300,000,000. Despite communicating this information to the Receiver's team on numerous occasions, however, the Receiver has disregarded my realization that losses may in reality be much less.

7.      In my view, which I have conveyed to the Receiver and his team, any determination of the financial reality of the Receivership Estate should begin by the validation of the claims that have been made against the Receivership Estate, in order to truly determine which persons or entities are actually owed money. For example, as a result of our discussions and the documents in his possession, the Receiver is aware that the largest claim against the Receivership Estate, a claim of approximately $1,300,000,000 filed by Highview Point Offshore, cannot be supported. The total subscriptions into Highview Point, at its highest watermark level, was never more than $250,000,000. In addition, Highview Point had been made whole at the time I left Highview Point in July 2010. Thus, without opining on the validity of any other claims, the difference between assets and liabilities set forth in the Receiver's Interim Reports is grossly overstated.

8.      Numerous times, I have been met with hostility if I disagreed with the Receiver's view or understanding of certain issues. Regardless of this hostility, however, my obligation is to communicate my knowledge of transactions and information accurately, regardless of whether it comports with the Receiver's perceived version of events.

9.      For example, the Receiver has disregarded my accounts of having been extorted on multiple occasions by various individuals associated with the Venezuelan government. My life and the lives of my family were threatened with bodily harm if certain payments were not made to Venezuelan officials or their alleged intermediaries. At the time of my plea and the commencement of this action, I was unsure about disclosing such information and was afraid to

do so.  However, as my cooperation progressed, it became apparent to me that disclosure was necessary in order to provide an accurate account and explanation of various transactions.

10.     As disclosed numerous times to the Receiver's team, I was forced to pay out millions for fear of my safety and the safety of my colleagues and family, some of whom are in Venezuela.  These circumstances led to accounting losses being incurred in connection with various transactions that otherwise would have been profitable but for the extortion payments.

11.     The wide-spread corruption currently present in Venezuela and the extortion that I endured is an unfortunate but well-known reality of conducting business there.  Despite making the Receiver aware of this information, the Receiver has not, to my knowledge, taken into account the reality of why certain accounting losses were incurred and its impact on the calculation of such losses.

12.     I am unable to financially provide for my family and pay for basic living expenses without access to funds that were frozen by the Court's temporary asset freeze order, which froze all my assets nearly twenty (20) months ago.  My wife and I have been married for ten (10) years and we have two (2) young children, ages five (5) and seven (7).

13.     Currently, I have no source of income other than $1,000 per month that I earn as a part time consultant.  Until now, I have relied on the kindness and generosity of friends and family from whom I have incurred significant loans in order to have money to live.

I do hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: September 21, 2012

_____
Francisco Illarramendi