UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, *Plaintiff*, | Civil No. 3:11cv78 (JBA) |
| *v.* | |
| FRANCISCO ILLARRAMENDI, *et al.*, *Defendants*. | December 6, 2013 |

**ORDER GRANTING RECEIVER'S MOTION TO ESTABLISH CLAIM ADMINISTRATION PROCEDURES**

The Receiver has moved [Doc. # 709] to Establish Claim Administration Procedures for the distribution of recovered assets (the "Plan"). Claimants Fractal Fund Management, Ltd., Fractal P Holding, Ltd. and Rowberrow Trading Corp. (collectively, "Fractal") have objected [Doc. # 730] to the Plan, and Defendant Illarramendi moves [Doc. # 748] "for the Inclusion of Qualifying and Clarifying Considerations in Any Order of the Court" regarding the Plan. For the reasons that follow, the Receiver's motion is granted, Fractal's objection is overruled, and Defendant's motion is denied.

## I. Background

### A. Net Investment Method

The Receiver proposes to use the Net Investment Method to compensate claimants of the Receivership. For each claim that is determined to be valid, the Receiver will calculate an "Allowed Amount." Under the Net Investment Method, a claimant's Allowed Amount is the principal balance deposited with the Receivership entities reduced

by any funds the claimant has previously received, including interest, earnings, and return of principal or capital. (Plan ¶ 13.)

This "Allowed Amount" represents the starting point for a claimant's ultimate award, but likely does not reflect the amount that will be distributed. Rather, once the Receiver determines the total amount of funds available for distribution to victims, he will develop a pro rata multiplier based on the aggregate value of all claimants' Allowed Amounts and the amount of funds available for distribution. *See S.E.C. v. Credit Bancorp, Ltd.*, No. 99-cv-11395 (RWS), 2000 WL 1752979, at *96 (S.D.N.Y. Nov. 29, 2000) ("Since the distribution is pro rata, the amount of the total distribution to which a given customer is entitled is based on the proportion represented by the customer's claim (valued as of the date of investment) as compared to the total funds available for distribution.").

For example, if:

> Investor A had a gross investment of $100,000 and received a cash distribution of $20,000. His net investment amount would be $80,000. Assuming a pro rata multiplier of 10%, Investor A's distribution would be $8,000.

*S.E.C. v. Byers*, 637 F. Supp. 2d 166, 171–72 (S.D.N.Y. 2009).

The Receiver will calculate a claimant's net investment on a consolidated basis, so that if a claimant has multiple accounts, any fictitious profits withdrawn from one account will be subtracted from the claimant's Allowed Amount in another account. (Plan ¶ 14.) For example, if an investor withdrew $50,000 in fictitious profits from Account A, but had an Allowed Amount of $100,000 in Account B, the $100,000 Allowed

Amount for Account B would be reduced by the $50,000 in false profits that the investor received from Account A.

The Receiver has not yet developed a distribution plan. The plan, to be developed in consultation with the various stakeholders, including presumably the SEC, will be filed with the Court for its consideration, and "will set forth the Receiver's view of how classes of creditors should be grouped, prioritized and potentially subordinated as well as the extent to which they will receive distributions in order to achieve a fair and equitable distribution of the Receivership Estate's assets among all Claimants." (*Id.* ¶ 12.)

## II. Discussion

"District courts possess broad equitable discretion to craft remedies" for violations of federal securities laws. *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 81 (2d Cir. 2006). Within that broad authority lies the power to approve a plan of distribution proposed by a federal receiver. *See SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 82–83 (2d Cir. 2002) (affirming approval of distribution plan as "within the equitable discretion of the District Court"). The Court has the authority to approve any plan provided it is "fair and reasonable." *SEC v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991) (distribution plan should be "reviewed under [the District Court's] general equitable powers to ensure that it is fair and reasonable").

The judgment of the SEC and/or a federal receiver may be given weight in crafting a remedy. *Byers*, 637 F. Supp. 2d at 174 ("The SEC's judgment is entitled to deference from this Court. In addition, the Receiver fully supports the Plan, and the Court may give weight to the Receiver's judgment." (internal citations omitted)).

"Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." *Credit Bancorp, Ltd.*, 290 F.3d at 88–89. It is "has been deemed especially appropriate for fraud victims of a 'Ponzi scheme,'" because whether at any given moment a particular customer's assets are traceable is "a result of the merely fortuitous fact that the defrauders spent the money of the other victims first." *Id.* at 89 (internal quotation marks omitted).

The Second Circuit has repeatedly endorsed the Net Investment Method in Ponzi schemes. *See Byers*, 637 F. Supp. 2d at 175 (Chin, *J.*) *aff'd sub nom. S.E.C. v. Orgel*, 407 F. App'x 504 (2d Cir. 2010) and *aff'd sub nom. S.E.C. v. Malek*, 397 F. App'x 711 (2d Cir. 2010) ("There does not appear to be any difference between the Plan at issue in this case and the plan Judge Sweet approved in a decision affirmed in its entirety by the Second Circuit. Both call for the liquidation of assets under the control of a federal receiver, with the understanding that when the receiver assumes control over additional assets, they too will be distributed." (footnoted omitted)); *Credit Bancorp*, 290 F.3d at 89 (affirming Net Investment Method plan of the district court, Sweet, *J.*); *see also SEC v. Infinity Group Co.,* 226 F.. App'x. 217, 218 (3d Cir. 2007) ("[T]he Courts of Appeals repeatedly have recognized that pro rata distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion in approving such distributions.").

**A. Fractal's Objections**

*1. Personal Jurisdiction*

Fractal objects to the Plan, contending, first, that the Court does not have personal jurisdiction over it, because its contracts with the Receivership entities are governed by foreign law and contain forum selection clauses that provide for adjudication outside the United States.[1] (Fractal's Obj. [Doc. # 730] at 2.) The Receiver contends that Fractal has submitted to this Court's jurisdiction by "by filing a Claim and/or an objection to a Claim determination" and by filing a previously denied [Doc. # 628] motion to intervene. (Receiver's Reply to Fractal's Obj. [Doc. # 740] at 4–5.)

The Court concludes that Fractal has consented to this Court's jurisdiction by seeking to participate in this claims procedure process. In the bankruptcy context, the Second Circuit and Supreme Court have held that a party submits to a court's personal jurisdiction by filing a claim. *See In re Manville Forest Products Corp.*, 896 F.2d 1384, 1389 (2d Cir. 1990) ("By filing a proof of claim, Gulf submitted itself to the equitable power of the bankruptcy court to disallow its claim."); *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 707 (2d Cir. 1995) ("Invoking equitable jurisdiction in the bankruptcy context might be analogized to invoking a court's jurisdiction by filing a complaint. The Supreme Court and this court have consistently held that in filing a proof of claim the

[1] Fractal filed two appeals in this matter in which, among other issues, it challenged this Court's personal jurisdiction over it. On September 12, 2013, the Second Circuit dismissed both appeals with prejudice upon Fractal's motion. (*See* Mandate of USCA [Doc. # 755] dismissing No. 12-4640 and No. 12-4753.)

petitioner submits to the bankruptcy court's equitable jurisdiction.").[2] No principled reason is offered suggesting a distinction between the consequences of participating in this claims process and one in bankruptcy court.

*2. Net Investment Method*

Fractal also objects to the Plan "to the extent that its application may in any way discount the amounts owed to Objecting Claimants under the various contracts they entered into with the receivership entities." (Fractal's Obj. at 2.) The Receiver maintains that the Net Investment Method is appropriate here, because "the amounts claimed by Fractal do not relate to legitimate business activities but instead are funds of other investors obtained through fraud, [and] allowing Fractal to profit from that fraud would unfairly penalize other investors and would legitimate the Ponzi scheme." (Receiver's Reply to Fractal's Obj. at 3.)

Fractal does not advocate for any particular alternative to the Net Investment Method, but one option frequently advocated by victims is "tracing," in which a party is given priority in distribution of recovered assets "upon definite proof that specific funds are traceable" to the specific funds or assets invested by that party. *S.E.C. v. P.B. Ventures*, No. 90-cv-5322, 1991 WL 269982, at *3 (E.D. Pa. Dec. 11, 1991). Where funds are

---

[2] It is less clear, however, that Fractal's unsuccessful motion to intervene could subject it to this Court's jurisdiction. If granted, such a motion subjects an intervenor to personal jurisdiction, *see County Sec. Agency v. Ohio Dept. of Commerce*, 296 F.3d 477, 483 (6th Cir. 2002); *John v. Sotheby's, Inc.*, 141 F.R.D. 29, 37 (S.D.N.Y. 1992), but Fractal's motion was denied potentially distinguishing authorities that have found personal jurisdiction on the basis of successful intervention. Moreover, at least one court has concluded that an unsuccessful motion to intervene does not subject a party to personal jurisdiction that does not otherwise exist. *See U.S. Fire Ins. Co. v. Milton Co.*, 938 F. Supp. 56, 57 (D.D.C. 1996).

comingled, however, tracing is often not possible or practicable. Even when funds can be traced to the specific investment of a customer, courts of equity can reject the method in favor of the Net Investment Method, to avoid arbitrarily rewarding certain victims at the expense of others based on the fortuity of whose money Defendant spent first. *See Credit Bancorp, Ltd.*, 290 F.3d at 89; *see also Byers*, 637 F. Supp. 2d at 177 ("The alternatives to pro rata distribution that have been proposed would create unfair results by rewarding certain investors over others based on arbitrary factors. Tracing analysis—proposed by a number of objectors—in particular has been almost universally rejected by courts as inequitable." (internal citations omitted) (citing cases)); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) ("No one can dispute that tracing would have been permissible under the circumstances of this case. . . . However, the court, in exercising its discretionary authority in equity, was not obliged to apply tracing.").

In sum, the Net Investment Method is the superior method for distributing recovery to victims in this case, and the Receiver's Plan will be approved and adopted.

**B. Illarramendi's Motion**

Illarramendi has filed a "Motion for the Inclusion of Qualifying and Clarifying Considerations in Any Order of the Court" regarding the Plan [Doc. # 748]. In his Reply [Doc. # 753], Illarramendi clarifies that he does not oppose the Receiver's motion, but wanted to bring certain factors to the Court's attention given his ill-used expertise in the financial machinations producing the losses. (Def.'s Reply at 1–2, 13.) First, Illarramendi asserts that it "is necessary to clarify the date range to which the Receiver intends to apply the Net Investment Method (NIM) to include as a start date the de facto inception date for the activities of the oldest of the Receivership entities" in May 2005. (Def.'s Mot. at 4.)

While the Plan does not provide a specific date range for applying the Net Investment Method, by definition the start date would be the date on which claimants first invested assets with Receivership entities, which would be determined by the Receiver. *See Credit Bancorp, Ltd.*, 2000 WL 1752979, at *29 (under the Net Investment Method "[e]ach investor's claim is valued as of the date the investor deposited its assets").

Next, Illarramendi asserts that Petróleos de Venezuela, S.A. (PDVSA), the Venezuelan state-owned oil and natural gas company with $573.46 million in claims, should be treated as the same economic entity as the Venezuelan government, that PDVSA overstated its net investment, that the Venezuelan government realized significant gains from its investments, and that the Venezuelan government has already pledged to cover the PDVSA pension fund's loses. (Def.'s Reply at 8.) He has also maintains that PDVSA's claims should be denied due to "unclean hands" that resulted from "extortionate" payments to the Venezuelan government by the Receivership entities, which should be factored into the calculation of their net investment. (*Id.*)

Illarramendi references a motion for a protective order granted in the criminal case, which prohibits "the defendant from disclosing the identities of certain individuals who have submitted a self-styled victim impact statement in connection with the sentencing in this case," (Gov.'t's Mot. for Protective Order, *United States v. Illarramendi*, 11cr41 (SRU) [Doc. # 78] at 1), specifically, PDVSA pensioners "harmed by the defendant's fraudulent scheme in connection with transactions with various pension funds managed by a Venezuelan corporation that has filed a claim in the SEC case." (*Id.* at 2.) The motion represented that the Government's investigation revealed and Defendant stipulated in his plea agreement that as part of his scheme, Defendant "paid

bribes and kickbacks to senior-level personnel within the Venezuelan corporation who were responsible for managing the pension funds' investments." (*Id.*) This Court anticipates that PDVSA's claim will be fully and carefully examined in the course of the claims administration process, and, therefore, Defendant's motion is denied.

Finally, Defendant seeks to stay implementation of the Plan until after his sentencing in the criminal case, because sentencing "may resolve, narrow or moot certain of the issues" before the Court. (Def.'s Mot. at 8.) Defendant's criminal sentencing, which may include an intended or actual loss computation and a restitution calculation, is apart from the process for compensating Defendant's victims with assets recovered by the Receiver, which is intended to distribute payments to victims as soon as practicable.[3] Therefore, Defendant's request to stay commencement of the Plan and this process is also denied.

[3] For example, 18 U.S.C. § 3663A(c)(3)(B) provides an exception to the general rule that a sentencing court must impose a restitution order to compensate victims when "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."

## III. Conclusion

For the reasons discussed above, the Receiver's motion [Doc. # 709] is GRANTED the Plan is approved, and the process shall be initiated forthwith. Fractal's objection [Doc. # 730] is OVERRULED, and Defendant's motion [Doc. # 748] is DENIED.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 6th day of December, 2013.