UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>       *Plaintiff*,<br>       *v.*<br>FRANCISCO ILLARRAMENDI *et al*,<br>       *Defendants*. | Civil No. 3:11cv78 (JBA)<br><br>February 10, 2014 |

**ORDER ON MOTIONS FOR ADVANCEMENT OF ATTORNEY'S FEES**

Movants Christopher Luth, Victor Chong, and Frank Lopez, former principals and officers of Highview Point Partners, LLC (the "HVP Defendants" or "Movants"), have each filed motions [Doc. ## 700, 703, and 705, respectively] seeking an order from this Court requiring the Receiver to provide for advancement of their legal fees to defend against an action that the Receiver has filed against them, *Carney v. Lopez, et al.*, No. 3:12-cv-00182 (SRU) (the "HVP Lawsuit"). The Receiver opposes these motions, contending that advancement is not warranted given the limited funds available to compensate defrauded investors and because Movants have acted inequitably and engaged in self-help.[1] The Court concludes that Movants have made a *prima facie* showing of contractual entitlement to advancement of their attorneys' fees but that an evidentiary hearing is needed to expand the record on the issue of whether this relief should be barred on the equitable grounds of unclean hands.

---

[1] Balanchine Corporation, Brentwood Services Inc., and Edenwood Holding, S.A. ("BB&E") has also submitted a memorandum in opposition [Doc. # 712], advocating against advancement of fess on substantially the same grounds as the Receiver. Movants have each submitted separate memoranda of law, all seeking relief on the same grounds.

I.      **Facts**

On January 14, 2011, the SEC commenced this action against Defendant Francisco Illarramendi, alleging that he ran a Ponzi scheme and defrauded investors.  The Court has issued various orders in aid of recovering assets for the benefit of the fraud victims, including the Asset Freeze Order [Doc. # 200], which provides that:

> the Defendants . . . shall hold and retain funds and other assets of the Defendants and Relief Defendants presently held by them . . . and shall prevent any withdrawal, removal, sale, purchase, trade, transaction, payment (including, but not limited to, any charges on any credit card or draws on any other credit arrangement), transfer, dissipation, assignment, pledge, alienation, encumbrance, disposal, or diminution in value of any such funds or other assets, which are hereby frozen;

On February 3, 2011, the Court appointed John J. Carney as Receiver, authorizing and directing him to marshal, preserve, and manage assets that were under the control of Illarramendi, Michael Kenwood Capital Management, LLC, and multiple relief defendants that were part of the Michael Kenwood Group (the "MK Defendants").  (*See* Amended Order Appointing Receiver (the "Receivership Order") [Doc. # 666].)

One of the Receivership Entities is Highview Point Partners, LLC ("HVP Partners"), which was founded in 2004 by Lopez, Luth, and Illarramendi, who also served as its principals and managing members.  Chong was the Chief Financial and Chief Compliance Officer.  HVP Partners was the investment manager of the Offshore Fund, a hedge fund nominally based in the Cayman Islands (which, the Receiver alleges, was completely dominated and controlled by HVP Partners, with Lopez as one of its directors).  By January 2006, HVP Partners controlled over $72 million in assets in the Offshore Fund and decided to establish a "master-feeder" structure.  To do so, they

created the Master Fund, which was incorporated in the Cayman Islands, turned the Offshore Fund into an offshore feeder fund, and created Highview Point L.P., a domestic feeder fund.  Lopez was made a director of the Master Fund and the HVP Defendants assumed control over it.  *See Carney v. Lopez, et al.*, No. 3:12-cv-00182 (SRU), Ruling on Mots. to Dismiss and Strike [Doc. # 94] at 5–6.

In October 2005, Illarramendi entered into a failed deal on behalf of the Offshore Fund that generated substantial losses, which he attempted to conceal from investors. Shortly thereafter, he transferred proceeds from the transaction to each of the investors except for the Offshore Fund, which absorbed the entire loss that Illarramendi fraudulently concealed on its books.  The shortfall was approximately $5.2 million, or roughly ten percent of the net asset value reported on the Offshore Funds' books.  *See id.* at 6.

On February 3, 2012, the Receiver filed the HVP Lawsuit alleging "that, at the very least, Lopez, Luth and Chong profited from Illarramendi's fraudulent scheme, while ignoring and actually concealing conduct that was inconsistent with legitimate securities activities."[2]  (Receiver's Consolidated Opp'n [Doc. # 714] at 6); *see also Carney v. Lopez, et*

---

[2] At an evidentiary hearing held before this Court on May 25, 2011, Illarramendi testified that in the summer of 2006, he informed Lopez about the failed transaction that precipitated the cover-up and fraudulent scheme, and in response Lopez instructed him that the loss should not be disclosed to investors.  Illarramendi agreed that he would use his "best efforts" and do "everything in [his] power to resolve the situation."  After this conversation, however, Illarramendi and Lopez "didn't talk much about" the situation, or how Illarramendi would cover-up the losses.  (*See* May 25, 2011 Hg'r Tr. [Doc. # 260] at 360–64.)  Movants have each invoked their Fifth Amendment rights and refused to cooperate with the Receiver's investigation.  *See Carney v. Lopez, et al.*, No. 3:12-cv-00182 (SRU), Ruling on Mots. to Dismiss and Strike at 4.

3

*al.*, No. 3:12-cv-00182 (SRU), Complaint [Doc. # 1] ¶ 3.  The HVP Defendants allegedly controlled the HVP Funds and had a clear view of the flow of money among the Receivership entities, other third party individuals and entities, and in some cases, facilitated these fraudulent transactions.  *See Carney v. Lopez, et al.*, No. 3:12-cv-00182 (SRU), Complaint ¶¶ 56–78.  The HVP Defendants also allegedly ignored off-the-books transactions, falsified investment valuations, and executed private transactions wrongfully benefitting family members with investment funds.  *Id.* ¶¶ 50–52, 56–60, 102–04.

The Receiver has sought to recover over $25 million from the HVP Defendants, more than $15.8 million of which is alleged to be gratuitous payments, as opposed to salary or bonus payments from HVP Partners, including millions of dollars of payments originating from other Receivership entities.  In addition to the claimed fraudulent transfers, the Receiver asserted claims against the HVP Defendants for breach of fiduciary duty, unjust enrichment, constructive trust, conversion, and accounting.  (Receiver's Opp'n at 6.)

Movants assert that under the investment management agreements ("IMAs") between HVP Partners and each of the HVP Funds, the HVP Funds were required to indemnify them for legal fees and expenses should they prevail in a legal action brought against them and provide advance payment of funds necessary for their defense.  Each of the IMAs provide:

> [I]t is agreed as an inducement to the Investment Manager's undertaking these services that the Fund shall, to the fullest extent legally permissible under the laws of the State of Delaware, indemnify and hold harmless the Affiliated Parties against any loss, liability or expense (including without limitation, judgments, fines, amounts paid or to be paid in settlement and reasonable attorney's fees and expenses) incurred or suffered by an

4

Affiliated Party in connection with the good faith performance by the Affiliated Party of its responsibilities to the Fund; provided, however, that nothing herein shall be deemed to protect an Affiliated Party against any liability to which it otherwise would be subject by reason of his, her or its gross negligence, willful misconduct or violations of applicable law. The Fund shall, upon request of an Affiliated Party, advance amounts in connection with its indemnification obligation; provided, however, that if it is later determined that such party was not entitled to be indemnified, then such party shall promptly reimburse the Fund for all advanced amounts.

(Am. & Restated Inv. Mgmt Agreement, Dec. 22, 2008, Ex. B to Butts Decl. [Doc. # 707-2] § 7.)

In July 2012, the Receiver negotiated a settlement with putative intervenors BB&E, and Relief Defendants, the HVP Funds. The HVP Defendants objected to the settlement on the grounds that it did not provide for the protection and enforcement of their indemnification and advancement rights. (*See* Ruling on Jt. Mot. for Approval of Settlement ("Ruling on Settlement") [Doc. # 634] at 6.) On October 15, 2012, the Court heard oral argument on the proposed settlement, and discussed its impact on advancement rights. Counsel for the HVP Funds spoke in support of the proposed settlement and explained that if the Court were to accept it, "the Receiver will be stepping into the directors' shoes. So, the Highview funds will continue, but in the Receivership. So, if they entered into a contract like the [IMA], the funds would have to continue to honor that contract. . . . If that contract is breached, [Movants] can sue for that breach." (Oct. 15, 2012 Hr'g Tr. [Doc. # 619] at 48.)

Counsel for the Receiver explained that "there is nothing in the settlement stipulation that in any way abrogates any rights that anyone may have," and "ultimately if

[Lopez, Luth, and Chong] submit a claim to the Receiver, whether pursuant to the [claim] process or otherwise, . . we'll look at it and the Receiver will make a determination." (*Id.* at 52.)  "If [the Receiver] thinks it's appropriate, he'll ask your Honor for authority to make that advancement." (*Id.* at 55.)

On November 27, 2012, the Court issued a ruling approving the settlement and overruling the HVP Defendants' objections.  After discussing the representations made by the Receiver and counsel for the HVP Funds regarding Movants' rights under the IMAs, the Court concluded that "[t]he concerns of Lopez, Luth and Chong that these contractual provisions will not be honored are premature or speculative and do not warrant delaying the approval of this Settlement." (Ruling on Settlement at 8.)

Thereafter, Movants have made multiple requests for advancement of legal fees from the Receiver starting in early December 2012.  The Receiver responded that these initial requests were premature as the HVP Funds were not yet part of the Receivership Estate.  On March 22, 2013, after the HVP Funds were brought into the Receivership Estate, Luth resubmitted his request for advancement, but the Receiver did not seek the Court's leave to modify the Asset Freeze Order, because he determined that advancement was inconsistent with his duty to preserve Receivership assets.  (Receiver's Opp'n at 12–13.)

## II.   Discussion

### A.   Movants' Contractual Rights to Advancement

The decision whether to modify a preliminary injunction, here the Asset Freeze Order, involves an exercise of the same discretion that a court employs in an initial decision to grant or deny a preliminary injunction.  *See Weight Watchers Int'l, Inc. v.*

*Luigino's, Inc.*, 423 F.3d 137, 141 (2d Cir. 2005).   A party seeking relief bears the burden of establishing that there has been a change of circumstances that warrants relief.   *See Horne v. Flores*, 557 U.S. 433, 447 (2009) ("[Under Fed. R. Civ. P. 60(b)(5)] the party seeking relief bears the burden of establishing that changed circumstances warrant relief." (internal citations omitted)).   "The Second Circuit has established that in considering whether to unfreeze assets frozen in securities fraud proceedings, 'the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.'"  *S.E.C. v. Prater*, 296 F. Supp. 2d 210, 218–19 (D. Conn. 2003) (quoting *S.E.C. v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1106 (2d Cir. 1972)).

The Receiver does not dispute that the HVP Defendants are "Affiliated Parties" under the IMA and that these contracts generally provide for indemnification and advancement.  Instead, the Receiver contends that it would be inequitable to modify the Asset Freeze Order and distribute the limited assets of the Receivership Estate to Movants for several reasons.  First, the Receiver contends that the currently operative versions of the IMAs were executed by Lopez on behalf of each of the HVP Funds and Luth on behalf of HVP Partners in December 2008 more than two years after Lopez was specifically informed by Illarramendi about the failed transaction and the resulting fraud.  (Receiver's Opp'n at 8.)

Second, the HVP Defendants have refused to cooperate with the Receiver's investigation and efforts as required by the Receiver Order, invoking their rights against self-incrimination.  Finally, the Receiver contends that the HVP Defendants engaged in impermissible self-help when in early May 2011, they withdrew more than $2.9 million

from the Master Fund to satisfy outstanding legal fees and to provide retainers to law firms representing them.   The Receiver contends that these withdrawals took place without notice to or authorization from the Fund's directors, and just days after the SEC sent HVP Partners a Wells notice, advising that an enforcement action was imminent. (*Id.* at 9.)  Then-counsel for the HVP Funds, the Ogier law firm based in the Cayman Islands, has repeatedly demanded that the money be returned, but Movants have refused absent modification of the Asset Freeze Orders out of concern that it would prevent the HVP Funds from later paying advancement.   *Id.*   Movants contend that they are contractually entitled to indemnification and advancement, and that because the Receiver stands in the shoes of the HVP Funds, the Court should modify the Asset Freeze Order, and require the Receive to advance the fees to defend the court case he brought against them.

The IMAs provide for indemnification "to the fullest extent legally permissible under the laws of the State of Delaware."   Delaware law permits a corporation to indemnify a director, officer, or employee against lawsuits "by or in the right of the corporation" so long as "the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."  8 Del. Code § 145(b).   If the director or employee is ultimately found liable to the corporation, however, indemnification is generally not permitted.  *Id.*

The question of whether to advance attorney's fees is distinct, however, from whether the director or officer is ultimately entitled to indemnification. *See Morgan v. Grace*, No. Civ. A. 20430, 2003 WL 22461916, at *3 (Del. Ch. Ct. Oct. 29, 2003) ("Delaware law is well settled that the right to indemnification and the right to

advancement are distinct."). In the event that it is ultimately determined that the officer or employee is not entitled to indemnification because he acted in bad faith, the proper remedy is for any amount advanced to be repaid to the corporation. 8 Del. Code. § 145(e).

Advancement is determined as a matter of contractual right and is generally determined without regard to the merits of the underlying suit.[3] *See Ridder v. CityFed Fin. Corp.*, 47 F.3d 85, 87 (3d Cir. 1995) ("Under Delaware law, appellants' right to receive the costs of defense in advance does not depend upon the merits of the claims asserted against them, and is separate and distinct from any right of indemnification they may later be able to establish.")

There is no dispute that Delaware law, which governs the IMAs, favors indemnification and the advancement of attorney's fees for public policy reasons. *See VonFeldt v. Stifel Fin. Corp.*, 714 A.2d 79, 84 (Del. 1998) ("We have long recognized that Section 145 serves the dual policies of: (a) allowing corporate officials to resist unjustified lawsuits, secure in the knowledge that, if vindicated, the corporation will bear the expense

---

[3] Advancement is only available for lawsuits that arise "in connection with the good faith performance by the Affiliated Party of its responsibilities to the Fund." (IMA § 7.) Based on this limitation, the Receiver contends that because the majority of the claims are for fraudulent transfers, indemnification is not available on these claims. (Receiver's Opp'n at 22.) As the court noted in *Reddy v. Elec. Data Sys. Corp*, however, the problem with this argument "is that it has no logical stopping point. It is not uncommon for corporate directors, officers, and employees to be sued for breach of the fiduciary duty of loyalty, and to have to defend claims that they took official action for the primary purpose of diverting corporate resources to their own pocketbooks-in the form of contractual compensation benefits (*e.g.,* severance payments or stock options) or an unfair return on a self-dealing transaction." No. Civ. A. 19467, 2002 WL 1358761, at *4 (Del. Ch. June 18, 2002).

9

of litigation; and (b) encouraging capable women and men to serve as corporate directors and officers, secure in the knowledge that the corporation will absorb the costs of defending their honesty and integrity.").

### B.       Advancement in an Equity Receivership

The parties recognize the paucity of case law addressing the issue of advancement in an equity receivership.  The Receiver contends that the Court should analogize to federal bankruptcy law and the concept of administration expenses, but under that analysis, it should reject Movants' claims as non-administrative expenses.  Movants dispute that bankruptcy law is applicable, and contend that Delaware's policy strongly favoring indemnification justifies prioritizing their claims for advancement over other claims against the Receivership Estate.

Under federal bankruptcy law, the filing of a bankruptcy petition significantly impairs the ability of a creditor to obtain payment of defense costs from a debtor corporation.  Such payments are only permitted if they constitute administrative expenses under section 503(b) of the Bankruptcy Code.  To qualify as an administrative expense, the expense must have arisen from a post-petition transaction between the creditor and the trustee/debtor-in-possession and the transaction must have substantially benefited the estate in the post-petition period.  *In re Tribune Co.*, 464 B.R. 126, 190 (Bankr. D. Del. 2011).  If claims are not administrative expenses, they are treated as ordinary pre-petition claims not subject to priority payment.

The justification for granting priority to administrative expenses over general creditor claims is "to facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all the estate's creditors.  Congress reasoned

that unless the debts incurred by the debtor in possession could be given priority over the debts which forced the estate into bankruptcy in the first place, persons would not do business with the debtor in possession, which would inhibit rehabilitation of the business and thus harm the creditors." *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (internal citations omitted).

Citing *State Comm'r of Soc. Servs. v. 3030 Park Fairfield Health Ctr., Inc.*, No. CV-054018220, 2006 WL 3360589 (Conn. Super. Ct. Nov. 2, 2006), the Receiver contends that Movants' claims are not administrative expenses because they arose before the commencement of the Receivership and provide no benefit to the estate.   In *Park Fairfield*, a nursing home was being run under the control of a receiver, who removed all the company's directors and officers.   Thereafter, a group of creditors gave notice that they intended to commence legal action against the former officers for, among other things, breach of contract, misrepresentation, and fraud.   *Id.* at *1 n.6.   A former officer filed a claim for indemnification for these claims pursuant to Conn Gen. Stat. § 33-1118, which provides for indemnification for a director who is "wholly successful, on the merits or otherwise, in the defense of any proceeding to which he was a party because he was a director of the corporation."   *Id.* at *1 & n.7.[4]

Analyzing the indemnification claim under the administrative expense principles of federal bankruptcy law, the court reasoned that the justification for differentiating between administrative expenses and general creditor claims in the bankruptcy context—

---

[4] The former director apparently did not seek advancement but rather submitted a claim to the receiver to reserve funds for her indemnification should she prevail on the merits of the underlying suit and therefore be entitled to indemnification.   *Id.* at *1.

facilitating rehabilitation of an insolvent business—also applied to the receivership. *Id.* at *2. Given that the former director's claim related to her "prepetition activities," and she "took no actions for the corporations once the receiverships were created," the court concluded that any claims for attorney's fees—should she prevail in the underlying action—"must be treated as prepetition unsecured claims that are not entitled to administrative priority." *Id.* at *4.

The *Park Fairfield* court distinguished three cases which "all provided for indemnification for expenses *after* suit by the *receiver,*" *id.* at *2, and which Movants contend are more analogous to the circumstances presented in this case.  While in *Lawson v. Young*, 21 Ohio App. 3d 190 (1984), *Fleischer v. Fed. Deposit Ins. Corp.*, 70 F. Supp. 2d 1238 (D. Kan. 1999), and *Weingarten v. Gross,* 264 Va. 243, 249 (2002), indemnification was awarded to former officers and directors after they prevailed in suits brought against them by a receiver, these cases did not present the issue of advancement where, as here, a former officer's liability to the corporation has not yet been resolved.

In *Weingarten*, the receiver brought suit against the former directors of an insurance company alleging, *inter alia*, violations of federal and state securities laws, breach of fiduciary duty, negligence, various forms of fraud, unjust enrichment, disbursement of illegal dividends, and fraudulent or voidable transfers.  *See Gross v. Weingarten*, 217 F.3d 208, 214 (4th Cir. 2000) (discussing facts of the receiver's lawsuit). After the directors prevailed in the suit brought by the receiver, they sought indemnification from the receiver under state law, which provided that "a corporation shall indemnify a director who entirely prevails in the defense of any proceeding to which he was a party because he is or was a director of the corporation."  Va. Code § 13.1-698.

Interpreting state law that prioritized the payment of expenses for "administration" of a receivership without defining that term, the Virginia Supreme Court rejected the analogy to federal bankruptcy law and its requirement that such claims must benefit the estate. *Weingarten*, 264 Va. at 248. The court reasoned that the indemnification claim did not arise until after the commencement of the receivership, and not "until the Directors 'entirely prevail[ed]' in the action brought against them by the Deputy Receiver" to recover funds on behalf of the insolvent corporation. *Id.* at 249 (quoting Va. Code § 13.1-698). Thus, the court concluded that the indemnification claim was incurred "in the administration of the estate," because when the receiver brought suit against the former directors, he "knew that the 'costs' to the estate would include his legal fees and the Directors' fees by indemnification if they 'entirely prevail[ed].'" *Id.* at 249–50 ("The Deputy Receiver is charged with knowledge of Virginia's strong public policy of mandatory indemnification.").

Likewise, in *Lawson*, the Ohio Court of Appeals held that former company directors were entitled to priority preference of their $1,500 in legal fees after they prevailed in a suit brought against them by a receiver accusing them of attempting to defraud creditors. 21 Ohio App. 3d at 190. The court rejected treating the former directors as "general creditors," and observed that the denial of indemnification and priority payment "would have serious adverse implications for corporations facing insolvency," because there "would be a general reluctance to serve as an officer or director . . . out of fear that good faith business judgments and decisions made in an attempt to revive the sagging financial fortunes of a corporation could later become the target and subject of legal action by a receiver. The officers and directors would then face the

13

prospect of having to defend their actions at their own costs without the opportunity to recover their expenses should they successfully defend those actions." *Id.* at 192; *see also Fleischer*, 70 F. Supp. 2d at 1243 ("The court concludes that the receiver of a financial institution, who brings suit against directors or officers of the corporation for which it is a receiver, is bound by the mandatory indemnification provision . . . to indemnify such directors or officers.").

In the context of the strong Delaware policy of indemnification and advancement of attorney's fees, the reasoning of *Weingarten* and *Lawson* is persuasive, even though the former directors there had already prevailed in the receivers' actions against them, because the same policy considerations that favor indemnification after a director prevails on the merits also favor the advancement of legal fees to defend a claim. *See Advanced Min. Sys., Inc. v. Fricke*, 623 A.2d 82, 84 (Del. Ch. 1992) ("The decision to advance litigation expenses is in some respects similar to the decision to extend indemnification rights—it also might act as an incentive to serve as a director.").[5]

Although there are parallels between the goals of receiverships and bankruptcy courts to distribute limited assets, the goal of this Receivership is to wind up operations of

---

[5] The Court is not persuaded by Movants' contention that the Receiver is judicially estopped from denying them advancement by his representations to the Court regarding the BB&E settlement. (*See, e.g.,* Lopez Mem. Supp. [Doc. # 706] at 11.) Judicial estoppel only applies when a party makes "contradictory argument[s]" in two different phases of a case. *New Hampshire v. Maine,* 532 U.S. 742, 749 (2011). It has no application here, because the Receiver only represented to the Court that he would "make a determination" whether advancement was warranted, and not that Movants had an unqualified right to advancement. He specifically noted that under the settlement, Movants retained their rights to seek relief from this Court—as they have now done—if he denied their claims. (*See* Oct. 15, 2012 Hr'g Tr. at 48, 52.)

the Estate and compensate the victims of Illarramendi's fraud, not to promote the rehabilitation of a business. *See Trustees of Amalgamated Ins. Fund*, 789 F.2d at 101. Further, the Second Circuit warns that a "receivership should not be used as an alternative to bankruptcy," and has "disapproved of district courts using receivership as a means to process claim forms and set priorities among various classes of creditors." *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008). Therefore, implementing the Delaware policy of advancement should supplant any contradictory analysis drawn form bankruptcy law.

Even applying the administrative expense doctrine, viewed broadly, the advancement of attorneys' fees could be considered an administrative expense. Although the HVP Lawsuit addresses pre-Receivership conduct, it was filed after the commencement of the Receivership. Depending on the temporal point of reference, therefore, Movants' claims could be considered post-Receivership claims. *Compare Park Fairfield*, 2006 WL 3360589, at *3 ("conduct forming the basis of the litigation arose out of prepetition work"), *with Weingarten*, 264 Va. at 249 ("[T]he claim for statutory mandatory indemnification for directors did not arise until the Directors 'entirely prevail[ed]' in the action brought against them by the Deputy Receiver." (second alteration in original)).

Taking a broad view of the benefit to the estate, advancement could also qualify if it is necessarily attendant to the Receiver's ability to exercise his discretion to bring the HVP Lawsuit. The Receiver presumably determined that despite the administrative costs attendant to pursuing the lawsuit—including his own fees and potentially those advanced to Movants—the potential recovery will produce a net economic benefit for the

15

Receivership Estate.   *See* SEC's Billing Instructions for Receivers in Civil Actions ("Charges for litigation will be paid [to a receiver] only if the litigation is reasonably likely to produce a net economic benefit to the estate.").   Should the Receiver be required to advance fees to Movants in the suit in which he ultimately prevails, Movants will have to refund the advanced fees, and thus, at least theoretically, advancement will result in no economic detriment to the estate.   *See Fricke*, 623 A.2d at 84 ("[T]he decision to extend advancement rights should ultimately give rise to no net liability on the corporation's part.   The corporation maintains the right to be repaid all sums advanced, if the individual is ultimately shown not to be entitled to indemnification.   Thus the advancement decision is essentially simply a decision to advance credit.").

The Receiver contends that here, however, should he prevail against Movants in the HVP action, "it is extremely unlikely" that they could provide assurances of their ability to repay both the legal fees advanced and a $25 million judgment.   (Receiver's Opp'n at 20.)   Delaware law allows, but does not require, corporations to "specify by bylaw or contract the terms and conditions upon which employees and agents may receive advancement, which could include an undertaking and more onerous pre-requisites to advancement."   *Reddy*, 2002 WL 1358761, at *4.   Where, as here, no conditions were placed upon advancement, no such preconditions will be read into the bylaws.   *See id.* ("Having been accorded the freedom to craft its bylaws as it wished, EDS cannot point to its own drafting failures as a defense to Reddy's advancement claim.").

As the Receiver notes, despite this omission, he has a separate duty under the Receivership Order to "take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership

16

Property." (Receivership Order ¶ 13.G.) Given this mandate and the overall goal of recovering assets on behalf of the fraud victims, the Court may require Movants to provide the Receiver with an undertaking or reasonable assurances that they have the ability to repay fees advanced. To prevent a "blank check" mentality if advancement is granted, a limit on the sums that can be advanced might also be appropriate. The IMA does not require an undertaking, and thus the size of such an undertaking should not be so large as to nullify Movants' rights nor be influenced by the amount demanded in the underlying suit. *See Reddy*, 2002 WL 1358761, at *5 ("To [judge the merits of the underlying lawsuit] would be to largely vitiate the protections afforded by § 145 and contractual advancement rights.").

### C.    The Equities

The Receiver advances three arguments for denying advancement on equitable grounds, only one of which the Court finds to be potentially applicable. First, the Receiver contends that the equities weigh against advancement because the operative IMAs were signed after Lopez was aware of Illarramendi's fraud. But as Movants note, earlier versions of the IMAs contained the same provision for indemnification and advancement and were executed well before Lopez allegedly became aware of the fraud and were approved by directors not involved in the HVP Lawsuit. (Lopez Reply [Doc. # 723] at 3.) Second, the Receiver cites Movants' refusal to cooperate with the Receiver's investigation based on the invocation of their constitutional right against self-incrimination. Although an adverse inference can be drawn against Movants' in the HVP Lawsuit based on this assertion of their Fifth Amendment rights, *see Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012) ("The Supreme Court has

explained 'that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'" (quoting *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976)), it does not necessarily require the Court to exercise its equitable discretion to deny advancement.

The Receiver's third contention merits further examination.  The Receiver asserts that even if Movants satisfy the requirements for advancement, it should nevertheless be denied because they "come to the Court with unclean hands" by having "already engaged in plainly wrongful self-help, arranging unauthorized transfers of almost $3 million from the HVP Funds just prior to the commencement of the Enforcement Action and the Receivership, to pay their personal defense costs and evade the Asset Freeze Orders." (Receiver's Opp'n at 20, 22.)

As the Receiver notes, both *Nakahara v. NS 1991 Amer. Trust*, 739 A.2d 770, 791 (Del. Ch. 1998) and *Tafeen v. Homestore, Inc.*, No. 023-N, 2004 WL 556733 (Del. Ch. Mar. 22, 2004) held that even where advancement is contractually required, it can be denied if a litigant has acted in inequitably "in making the advancement claim itself." *Tafeen*, 2004 WL 556733, at *6.  Thus in *Nakahara*, the court held that advancement should be denied where the claimant engaged in self-help by transferring $700,000 from a trust account to his law firm in violation of a "standstill" agreement to preserve the trust's assets and mere days after a foreign court concluded that a Delaware court should determine if advancement was warranted before any funds were transferred.  *See* 739 A.2d at 775.  In *Tafeen*, the court held that there remained a disputed issue of fact as to whether the claimant had attempted to shelter assets in bad faith before seeking

18

advancement "in a way to avoid a potential obligation to repay advanced funds" should repayment be required.  *See* 2004 WL 556733, at *7.[6]

In evaluating the unclean hands doctrine, courts look only to whether a party has engaged in inequitable conduct in seeking advancement, and not whether its conduct in the underlying suit was inequitable.  *See Tafeen*, 2004 WL 556733, at *6.  The parties dispute whether the May 2011 transfers were authorized.  The Receiver contends that days after HVP Partners received the SEC's Wells notices, Movants "misappropriated" more than $2.9 million from the Master Fund "without notice to or authorization by the directors of the Fund" and refused to return the funds when counsel for the HVP funds demanded that they do so.  (Receiver's Opp'n at 9; *see also* June 17, 2011 Ltr. Folpp to Loewenson, Ex. D to Hirschfield Decl. [Doc. # 715-4].)  Movants contend that advancement was contractually mandated, authorized by the Board of Directors of Highview Point Offshore, and done with the "knowledge and consent of the Receiver." (Lopez Reply at 5.)

According to Movants, a February 18, 2011 resolution from the Offshore Fund board of directors to wind up the fund and return proceeds to investors reserved 1.5% of assets "for audit, legal and other potential fees, liabilities and/or contingencies (as provided for by the Funds' governing documents)," and thus authorized payment of their legal expenses.  (Feb. 18, 2011 Ltr. Lopez & Luth to Highview Point Investors, Ex G to Butts Decl. [Doc. # 726-7] at 1.)  Movants further contend that such expenses were being

---

[6] Following trial, the court ruled that the defendant corporation had failed to meet its burden of persuasion of establishing that the claimant had intended to shelter assets from potential creditors.  *See*  2004 WL 3053129 (Del. Ch. Oct. 27, 2004)

paid from the Master Fund since 2010 without objection from the directors and that the February 2011 board resolution provided a blanket authorization without requiring "specific approval for each transfer."  (June 21, 2011 Ltr. Loewenson to Carney, Ex. F to Butts Decl. [Doc. # 726-6] at 3–4.)  In contrast, counsel for the HVP Fund contends that the provision for legal fees in the board resolution was intended to cover the Fund's own legal expenses, not Movants' personal legal fees.  (June 17, 2011 Ltr. Folpp to Loewenson at 6.)

Further, while the IMAs entitled Movants to advancement of their fees, the IMAs provided that such payments would be made only "upon request."  Movants do not point to any specific request that they made for advancement; only that the fees were authorized by the February 2011 board resolution.  The actual circumstances here are thus unlike *Nakahara* in that there was no agreement or court order that specifically prohibited Movants from transferring funds, and are unlike the circumstances of *Tafeen*, in that there has been no apparent effort to shelter assets and frustrate the Receiver's ability to recoup expenses, if necessary.

Thus, the Court concludes that this record is insufficient to make a determination as to whether Movants' entitlement to advancement is barred by their conduct, and an evidentiary hearing is required.

### D.    Evidentiary Hearing

Although the HVP Defendants requested oral argument on their motions, they contend that an evidentiary hearing is not warranted.  They contend that discovery is also not needed, because the Receiver has already taken over the operation of HVP Partners and HVP Funds and analyzed Movants' requests for advancements prior to the filing of

these motions.  Movants contend that an evidentiary hearing would be akin to a "partial adjudication of the claims asserted" in the HVP Lawsuit.  (Lopez Reply at 10.)

Movants are incorrect that an evidentiary hearing would focus on the merits of the Receiver's underlying claims in the HVP Lawsuit.  Rather the actual focus of such a hearing will be exclusively Movants' entitlement to advancement.  Generally, disputes over advancement and indemnification are resolved by separate lawsuits brought by directors against corporations that refuse to indemnify or advance fees, although such proceedings are "usually summary in nature and limited to determining the issue of entitlement in accordance with the corporation's own uniquely crafted advancement provisions."  *Tafeen*, 888 A.2d at 213; *see also* 8 Del. Code § 145(k) ("The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees)."). Consistent with this approach, the Court determines that an evidentiary hearing is needed to adjudicate the limited issue of whether the Receiver can satisfy his burden of establishing that the unclean hands affirmative defense should apply.

Although the Receiver has requested the opportunity to conduct additional discovery prior to the hearing (Receiver's Opp'n at 27–28), given the summary nature of the hearing, the already substantially developed factual record, the Receiver's extensive access to relevant documents as the successor to the relevant entities, and the need to contain costs incurred by the Receivership, no further discovery will be permitted.

The hearing will be limited to the following issues:

    1.  The circumstances surrounding the May 2011 transfers that the Receiver contends demonstrate unclean hands.

2. The circumstances surrounding the February 18, 2011 Offshore Fund board resolution, and Movants' contention that this resolution provided authorization for their $2.9 million transfer.

3. Any other communications or transactions that Movants contend demonstrate that the May 2011 transfers were done with consent of fund directors, the Receiver, and/or the SEC.

4. Undertakings and limits on the funds to be advanced, if any, should the Court grants Movants' motions and modify the Asset Freeze Order to provide for such payments.

The hearing on these motions will be held on February 27, 2014 from 9:00 a.m. to 1:00 p.m., February 28, 2014 from 10:00 a.m. to 5:00 p.m., and, if needed, on March 5, 2014 from 1:00 p.m. to 5:00 p.m.


IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 10th day of February, 2014.