UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, *Plaintiff*, | Civil No. 3:11-cv-78 (JBA) |
| *v.* | April 13, 2017 |
| FRANCISCO ILLARRAMENDI, *et al.*, *Defendants.* | |

## RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") moves [Doc. # 1017] for Summary Judgment against Defendant Francisco A. Illarramendi ("Mr. Illarramendi") on Claims for Relief Two, Three, and Four of the Second Amended Complaint [Doc. # 190] for violations of the antifraud provisions of the Investment Advisers Act of 1940 ("Advisers Act") and seeks an order enjoining him from future violations of the Advisers Act, requiring disgorgement, and imposing a civil penalty.[1] For the reasons that follow, the Court GRANTS the Commission's Motion for Summary Judgment and imposes injunctive relief, disgorgement, and a civil penalty as set forth below.

### I. Background

---

[1] The SEC's Second Amended Complaint [Doc. # 190] names three defendants, Francisco Illarramendi, Highview Point Partners, LLC, and Michael Kenwood Capital Management, LLC, as well as six corporate Relief Defendants and advances five claims for relief. The first claim alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Highview Point Partners. The Fifth Claim for Relief seeks "other equitable relief, including unjust enrichment and constructive trust" from the Relief Defendants. The SEC's Motion [Doc. # 1017] is directed only at Mr. Illarramendi and addresses only Claims for Relief Two, Three, and Four. It is silent on the other Defendants and does not mention Claims for Relief One or Five.

The SEC argues that Mr. Illarramendi's guilty plea to violation of the same provisions of the Advisers Act before Judge Stefan Underhill in the companion criminal case, *United States v. Illarramendi*, 11-cr-41 (SRU), should collaterally estop him from challenging liability in this case, including the material facts presented as undisputed. In the alternative, the SEC argues that Mr. Illarramendi's sworn testimony in this case given in the preliminary injunction proceedings in connection with the asset freeze concedes the material facts necessary to establish liability.

In his D. Conn. L. Civ. R. 56(a)2 statement ("56(a)2 Stmt."), Mr. Illarramendi denies many of the factual allegations set forth by the SEC but neglects to point to supporting evidence in the record, as required by Local Rule 56(a)(3). *See* D. Conn. L. Civ. R. 56(a)3 ("Each denial in Plaintiff's Local Rule 56(a)2 Statement must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."). The rule specifically states that "Counsel and *pro se* parties are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted." *Id.*

Notwithstanding Defendant's failure to comply with Local Rule 56(a)3, given his *pro se* status, the Court has independently reviewed the summary judgment record to determine whether it contains support for Mr. Illarramendi's denials, but found only conclusory, speculative and self-serving denials of his admissions made at his criminal plea allocution or unparticularized references to threats and extortion not supported by evidence.[2] This is insufficient to defeat a

---

[2] Mr. Illarramendi's 56(a)2 statement contains three kinds of denials. In the first kind, he agrees with the description of his conduct, but claims to have acted under duress. For example, while he does not contest that he "attempted to hide the fact that one of the MK Funds was missing assets by providing the Commission staff with a false letter from an accountant in Venezuela," he asserts that "any actions that could be considered wrong as a matter of law . . . were derived from

motion for summary judgment, especially where Defendant has admitted these material facts either before this Court or in the court of his criminal prosecution. Plaintiff "cannot create a triable issue of fact merely by stating in an affidavit the very proposition [he is] trying to prove." *Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (The nonmoving party "may not rely on conclusory allegations or unsubstantiated

---

being subjected to either direct or indirect extortion by PDVSA officials under color of official right." (56(a)2 Stmt. ¶ 11.) Likewise, he claims that his attempts to conceal the financial "hole" and to use options trading to recoup losses were not voluntary because he "was acting out of duress and necessity generated from direct and indirect threats by PDVSA officials." (*Id.* ¶¶ 22-25.) Mr. Illarramendi does not substantiate these claims that he was threatened. He points to no actual evidence beyond his own statements to support his claims.

In the second group of denials, Mr. Illarramendi simply denies the effects of his previous admissions. For example, Mr. Illarramendi asserts that his guilty plea was not an admission of criminal allegations, "which it was not, nor was it ever intended to be; particularly as it refers to interpretations regarding the financial reality of the Receivership Companies." (Mem. Opp'n. [Doc. # 1040] ¶ 8.)

The third type is Mr. Illarramendi's insistence that the Receiver has consistently over-estimated the amount of money lost through Mr. Illarramendi's conduct, primarily as the result of over-valued PDVSA and Cheyne Funds claims, and that this overestimation has been accepted by both this Court and his sentencing court without proper evidentiary scrutiny. Mr. Illarramendi claims that any prior testimony he gave about the amount of loss was mistaken and that the size of the "hole" was inaccurate because it was based on a mistaken legal understanding about what was owed to investors. Mr. Illarramendi asserts that he did not understand "the rights that investors and counterparties might have to receive any money above their net principal amount invested." (*Id.* ¶¶ 13-19.) However unlikely it may be that a manager of a hedge fund does not understand the rights of his investors to money they have invested, the dispute is immaterial as it does not reach the elements of the violations on which the SEC now seeks summary judgment.

In short, Mr. Illarramendi's claims in his 56(a)2 Statement either lack evidentiary support necessary to raise a question of fact material to the dispute, or they raise questions of fact with respect to issues that are not material to the dispute.

speculation") (internal quotation marks and citations omitted); *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor.").

After review of the summary judgment record, the Court has found the following facts established, either through Defendant's admissions before this Court, or at his guilty plea. The Court separates these two sets of admissions because, although it finds summary judgment would be appropriate based solely on the admissions made in proceedings in this case, the admissions Mr. Illarramendi made in his criminal case provide additional and independent grounds to find Mr. Illarramendi liable for the violations claimed here.

### A. Admissions to this Court

In testimony before this Court at the hearing on the SEC's motion seeking to freeze Defendants' assets, including funds controlled by Highview Point Partners, Mr. Illarramendi stated that he spent the first ten years of his career in the securities industry at Credit Suisse, worked for a year as a financial adviser to Petroleos de Venezuela, S.A. ("PDVSA"), and in the early 2000s moved to Highview Point Partners and the Michael Kenwood Group, where he managed funds including the Highview Point Master Fund. (*See* Ex. H ("05/25/2011 TRO Tr.") to Mot. for Summ. J. [Doc. # 1017-12] at 319:11-19.) While at Credit Suisse, he developed a form of financial transaction that enabled participants to exploit the difference between the official Venezuelan Bolivar - U.S. Dollar exchange rate and the unofficial rate, called the "permuta" exchange rate. (*Id.* at 320:21-321:8.)

After moving to the Michael Kenwood Group, Mr. Illarramendi directed the funds under its advisement to engage in the same kind of foreign exchange arbitrage transactions. (*Id.* at 329:11-21.) He explained how the transaction worked to his co-workers and to investors in the fund, including the lead investor, and he solicited new investors on the basis of representations about this transaction. (*Id.* at 327:24-328:24; 335:21-336:7.)

Mr. Illarramendi testified that in October 2005, after a counterparty backed out of part of an arbitrage transaction, he was forced to sell an instrument at a much lower price than anticipated, thereby incurring a $5 million loss for Highview Point Master Fund. (*Id.* at 359:4-23.) He did not disclose this loss to investors or to his partners and principals. (*Id.* at 360:10-25.) Instead of disclosing the loss, he "tried to recover the money and . . . failed to do so, thereby . . . increasing . . . the amount of the mismanagement between assets and liabilities to approximately $30 million." He later explained that he tried to cover the loss "through options trading and other transactions, and they didn't go well." (*Id.* at 360:10-25; 361:20-23.) Mr. Illarramendi stated that the $30 million "hole" was "created by me" and that "part of [the hole] was money that essentially was Highview Point's money and part of which was money from other investors that participated in transactions with us." (*Id.* at 361:9-14.) Mr. Illarramendi conceded that the "hole" may have grown to as much as $300 million. (*Id.* at 355:10-22.)[3]

Mr. Illarramendi testified that he agreed with his supervisor that they would conceal the loss and not disclose it to investors, and that Mr. Illarramendi would try to "raise as much money

---

[3] In his 56(a)2 Statement, Mr. Illarramendi contests this concession, now claiming that it was based on a misunderstanding of the law governing fund liabilities to investors and that he did not understand "the rights that investors and counterparties might have to receive any money above their net principal amount invested." (56(a)2 Stmt. ¶¶ 22-25.)

as possible to be able to make it so that the gains from . . . the additional money would eventually cover the loss." (*Id.* at 364:3-25.) He explained that "the way I tried to solve the problem was to run . . . a unified treasury function . . . where the money, no matter where it came from, was used either to invest in transactions or to pay . . . investors that were lending to the pot." (*Id.* at 365:23-366:3.)

Mr. Illarramendi admitted that he used a "commingling account" "for paying off other investors that the pot owed money to . . . [or] for making investments in a private equity venture so it would generate a gain to cover the hole." (*Id.* at 398:19-24).

At the hearing, Mr. Illarramendi tried to excuse his actions while still accepting some quantum of responsibility for them: "I'm going to use certain terms that describe a frame of mind . . . . obviously, you are not forced to do any of the things you did, but essentially the circumstances compelled me to do or to act in a way that I shouldn't have acted in." (*Id.* at 368:1-5.) Mr. Illarramendi did not testify that he was extorted into entering any transactions or that his life or the lives of people he loved had been threatened.

Mr. Illarramendi admitted that he received more in management fees than he was entitled to and that the management fees paid to Highview Point partners were "inflated." (*Id.* at 385.) He explained that these fees were calculated on the Net Asset Value ("NAV") of each of the funds and that "the NAVs as calculated . . . included profits from transactions that I had the Master Fund enter into which I—which were fictitious." (*Id.* at 384.) "At the end of each year we would discuss what were the numbers. We had meetings with the team . . . and we would discuss what numbers were going to be shown, and normally at the end of each year we would essentially modify the numbers so that we would receive more compensation than we were really entitled to if you looked at it under strict terms." (*Id.* at 387-88.)

**B. Defendant's Guilty Plea**

Earlier, on March 27, 2011, Mr. Illarramendi pleaded guilty to a five count criminal information, including counts for investment advisor fraud in violation of 15 U.S.C. §§ 80b-6 & 80b-17, securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff, and 17 C.F.R. § 240.10b-5, as well as two counts of wire fraud and one count of conspiracy to obstruct justice, to obstruct an official proceeding, and to defraud the SEC. (Ex. C ("Plea Agreement") to Mot. Summ. J. [Doc. # 1017-7] at 1.) He was sentenced to 156 months' imprisonment on the wire fraud and securities fraud charges, and 60 months on the advisers act and conspiracy charges, to run concurrently, as well as an amount of restitution later determined to be $370,482,716.54, and a special assessment of $500.00.

As part of his plea agreement, Mr. Illarramendi stipulated that he (1) acted as an investment adviser; (2) employed a device, scheme or artifice to defraud clients or prospective clients, or engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a client or prospective client, or engaged in an act, practice, or course of business which was fraudulent, deceptive or manipulative; (3) acted willfully and knowingly and with intent to defraud; and (4) used the mails or another instrumentality of interstate commerce. (*Id.* at 2.) The stipulation of offense conduct appended to the plea agreement and signed by Mr. Illarramendi sets forth facts to which Mr. Illarramendi pleaded:

> The defendant acted as an investment adviser to certain hedge funds. In or about 2006, the defendant lost millions of dollars of the money he was charged with investing. Rather than disclose to his investors the truth about the losses incurred, the defendant intentionally chose to conceal this information by engaging in a scheme and artifice to defraud and mislead his investors and creditors to prevent the truth about the losses from being discovered.
> ...
> [Mr. Illarramendi] made materially false and misleading representations and omissions to investors, creditors and the SEC about the true performances of the hedge funds (the "Funds") the assets under management by the Funds and the

transactions being conducted by the Funds and related entities. The defendant: (a) used money provided by new investors to the Funds to pay out the returns he promised to earlier investors ... [and] (c) made false representations to his investors and creditors in an effort to obtain investments from them and to prevent them from seeking to liquidate their investments.

... During 2010, the defendant used approximately $53 million from two funds he managed and controlled, by transferring the money to entities affiliated with the Michael Kenwood Group, LLC ("MK Group"), an entity that he also controlled, without disclosing the use of this money to all of the investors. Thereafter, in an effort to generate a sufficient return to fill the hole in the Funds' assets, the defendant used the approximately $53 million to invest in private equity companies. The investments were made in the name of entities affiliated with the MK Group, and not in the name of the Funds.

(Plea Agreement at 13-14.)

At his plea and waiver of indictment hearing, Mr. Illarramendi agreed that the statements set forth in the stipulation of offense conduct were "true and accurate." (Ex. E ("Waiver and Plea Tr.") at 37:18-19.) Judge Underhill asked the prosecutor to summarize how he would prove that Mr. Illarramendi engaged in the charged illegal conduct and after hearing the prosecutor's summary, Mr. Illarramendi agreed "with everything that [the prosecutor] says that [Mr. Illarramendi] did." (*Id.* 44:19-21.)

During the hearing, Mr. Illarramendi stated that he understood that entering a guilty plea would waive his right to trial (*id.* at 17:19-22) and that pleading guilty meant "there will be no trial of any kind and there will be no jury that decides any issue in your case." (*Id.* at 18:6-11.) Immediately following Mr. Illarramendi's agreement to plead guilty and forego trial, Judge Underhill emphasized, "[j]ust to be sure, if there are disputed issues in your case, for example, what is the amount of loss, what is the amount payable as restitution, so forth, those types of factual issues are issues that I, as the sentencing judge, will decide at the time of your sentencing, and it's

easier for the government to prove a fact to me than to prove that same fact to a jury for three reasons." Mr. Illarramendi then agreed with Judge Underhill's statement that "if you plead guilty today, any issues of fact that need to be resolved at your sentencing are issues that I will decide . . . without regard to the rules of evidence and by a preponderance of the evidence standard." (*Id.* at 18:16-19:22.)

Mr. Illarramendi stated that no one sought to coerce him, intimidate him, or force him in any way to sign the plea agreement. (*Id.* at 38.) He further stated that no one had tried to force him or coerce him into pleading guilty at the hearing and that it was Mr. Illarramendi's own decision to plead guilty. (*Id.* at 38:19-24.) He agreed that he had decided to plead guilty because he had, in fact, committed each of the five offenses set forth in the criminal information. (*Id.* at 38:25-39:3.)

## II. Legal Standard

The SEC moves for summary judgment on Counts Two, Three, and Four of its Second Amended Complaint. On the basis of both Mr. Illarramendi's admissions to this Court, as well as the preclusive effect of his guilty plea, the Court finds that there are no genuine issues of material fact remaining.[4] Mr. Illarramendi's Opposition, like his 56(a)2 Statement, relies on unsupported

---

[4] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for

assertions of fact to attempt to raise such issues, but an opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586. "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) (citing *Celotex*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 586).

### A. Section 206 of the Advisers Act (15 U.S.C. §§ 80(b)-6(1), (2) & (4))

The SEC alleges that Mr. Illarramendi violated Section 206 of the Investment Advisers Act of 1940 (the "Advisers Act"), which prohibits an investment adviser from using the mails or any means of interstate commerce, directly or indirectly, "(1) to employ any device, scheme or artifice to defraud, (2) to engage in any act, transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client. . . .[or] (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." *See* 15 U.S.C. §§80b-6(1), (2), (4); *Aaron v. SEC*, 446 U.S. 680, 691-93, 697 (1980). These antifraud provisions apply equally to registered and unregistered investment advisers. *See* 15 U.S.C. § 80(b)-2(11) (defining 'investment adviser'). Scienter is required for a claim under § 206(1) but not 206(2). *See SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004).

Section 206(4) directs the SEC to promulgate rules and regulations that define and prescribe means for preventing such acts, practices or business. 15 U.S.C. §80b-6(4). Consequently, the SEC promulgated Rule 206(4)-8, which provides that it shall constitute a fraudulent, deceptive,

---

summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

or manipulative act, practice or course of business within the meaning of Section 206(4) of the Act

for an adviser to a pooled investment vehicle to

> (1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or

> (2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

17 C.F.R. §275.206(4)-(8)(a)(1) & (2). Rule 206(4)-8 provides an expansive definition of a "pooled

investment vehicle," defining the term to mean any investment company as defined in Section 3(a)

of the Investment Company Act of 1940 (15 U.S.C. §80a-3(a)) (the "40 Act") or any company that

would fit the definition of a pooled investment vehicle but for an exclusion under Section 3(c)(1)

or Section 3(c)(7) of the '40 Act. The Highview Funds and Michael Kenwood Funds that Mr.

Illarramendi advised both satisfy this definition of "pooled investment vehicle" because they would

constitute investment companies but for the exclusion under Section 3(c)(7) of the '40 Act.

Section 206 of the Advisers Act "establishes a statutory fiduciary duty for investment

advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith

in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid

misleading clients." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979).

### B. Collateral Estoppel

"[W]hen an issue of ultimate fact has once been determined by a valid and final judgment,

that issue cannot again be litigated between the same parties in any future lawsuit." *Schiro v. Farley*,

510 U.S. 222, 232 (1994) (citation and internal quotation marks omitted); *see also Parklane Hosiery

Co. v. Shore*, 439 U.S. 322, 329 (1979). Generally, for collateral estoppel to apply, four prerequisites

must be satisfied: (1) the issues in both proceedings must be identical; (2) the issue must have been actually litigated and actually decided in the prior proceeding; (3) there must have been a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the resolution of the issue must have been necessary to support a valid and final judgment on the merits.

The Second Circuit has "long held that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. U.S. Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 172 (2d Cir. 2002) (*citing United States v. Podell*, 572 F.2d 31, 35 (2d Cir.1978); *see also SEC v. Opulentica*, 479 F.Supp.2d 319, 326 (S.D.N.Y.2007) ("[defendant] was convicted by guilty plea on securities-fraud charges related to the same activities at issue here. Thus, all questions of fact material to and underlying [defendant's] criminal conviction, as established during the plea allocution, bind [defendant] in this subsequent civil action").)

The rationale for this rule is that

> [t]he Government bears a higher burden of proof in the criminal than in the civil context and consequently may rely on the collateral estoppel effect of a criminal conviction in a subsequent civil case. Because mutuality of estoppel is no longer an absolute requirement under federal law, a party other than the Government may assert collateral estoppel based on a criminal conviction.

*Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 43 (2d Cir. 1986). Although the SEC is not the same party as the United States, it has been permitted to rely on the estoppel effect of criminal convictions secured by the United States in seeking summary judgment in securities actions. *S.E.C. v. Tzolov*, No. 08-cv-7699 (SAS), 2011 WL 308274 (S.D.N.Y. Jan. 26, 2011); *see also S.E.C. v. Freeman*, 290 F.Supp. 2d 401, 405 (S.D.N.Y. 2003) (*citing Podell*, 572 F.2d at 35).

By contrast, "precluding relitigation on the basis of [sentencing] findings should be presumed improper." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 306 (2d Cir. 1999) (noting absence of chance to litigate certain questions during sentencing but declining to announce a *per se* rule barring estoppel effect of sentencing findings).

## III. Discussion

### A. Preclusive Effect of Guilty Plea

Although the Motion for Summary Judgment could be granted on the basis of Mr. Illarramendi's admissions to this Court alone, collateral estoppel on the basis of Mr. Illarramendi's guilty plea provides additional and independent grounds for granting the Motion. Mr. Illarramendi argues that collateral estoppel is inappropriate in his case because of his pending habeas action. (*See* Mem. Opp'n [Doc. # 1040] ¶ 8; the habeas action is 16-cv-1853-SRU.) In making this claim, he advances two arguments, which can be summarized as: (1) he denies that he intended his guilty plea as an admission of the criminal allegations, "which it was not, nor was it ever intended to be; particularly as it refers to interpretations regarding the financial reality of the Receivership Companies;" and (2) the "entire criminal matter is vitiated because [his] Sixth Amendment right to be represented by Counsel of [his] Choice was violated by the TRO imposed in this case before its inception." (Mem. Opp'n [Doc. # 1040] ¶ 8 and ¶ 8 n. 3).

With respect to the first argument, Mr. Illarramendi's claim that his guilty plea was not intended as an admission that his conduct was wrongful is contradicted by the colloquy between Mr. Illarramendi and Judge Underhill regarding the nature of his guilty plea at the Plea and Waiver hearing:

> Q: I also want to make sure you understand if you plead guilty today, that's going
> to end the question of your guilt or innocence, so that if you receive a sentence

you're not happy with, you're not going to be able to come back into court for that reason and withdraw your guilty plea and ask for a trial. Do you understand?

A: I do.

(Plea and Waiver Tr. 19:22-20:5.) Mr. Illarramendi further agreed that the "statements set forth in the stipulation of offense conduct [were] true and accurate." (*Id.* at 37:16-19.) He also agreed that he committed each of the acts listed by the prosecutor at the Plea and Waiver hearing, including that Mr. Illarramendi acted as an investment adviser and, in that capacity, that he willfully and knowingly perpetrated a scheme to defraud clients as set forth in the Information, and that he used the mail and wires to do so. (Plea and Waiver Tr. 42:7-14 (description of conduct); 44:15-24 (admission that description is true and accurate).) Second, Mr. Illarramendi argues that this guilty plea is "vitiated" because it was taken in violation of his Sixth Amendment right to counsel. This latter argument is the subject of his pending habeas petition, in which he argues that the asset freeze instituted by this Court made it impossible for him to hire counsel of his choice in the criminal matter and that, under the holding and circumstances in *Luis v. United States*, an asset freeze that blocks a defendant's access to assets untainted by the alleged wrongdoing violates the Sixth Amendment right to counsel. *Luis v. United States*, -- U.S. --, 136 S.Ct. 1083, 1096 (2016). In addition, Mr. Illarramendi asserts that the criminal case has not reached a final adjudication and that, lacking finality, his criminal conviction should not have any preclusive effect in this matter.

While Mr. Illarramendi continues to challenge his criminal conviction through his habeas petition, his direct appeals in the criminal case have been denied. On May 11, 2016 the Second Circuit affirmed the substantive and procedural reasonableness of the sentence imposed on Mr. Illarramendi. (Case No. 15-526 [Doc. # 97.]) On February 22, 2017, the Second Circuit affirmed

the district court's restitution order in the criminal matter. (Case No. 15-4160 [Doc. # 80] (Mr. Illaramendi is currently seeking en banc review of this panel decision).)

Notwithstanding Mr. Illarramendi's argument that his criminal conviction is "vitiated" because the asset freeze entered in this case deprived him of funds to pay for counsel of his choice and therefore violated his Sixth Amendment right to counsel in his criminal proceedings, the pendency of Mr. Illarramendi's habeas petition and *en banc* action do not undermine the preclusive effect of his sworn admissions, on which his criminal conviction was based. *See, e.g. In re Bennett Funding Group, Inc.*, 367 B.R. 269, 286 (N.D.N.Y. 2007) (applying doctrine of collateral estoppel despite pending habeas petition). "It is well-established that the pendency of a criminal appeal generally does not deprive a criminal judgment of its preclusive effect." *City of N.Y. v. Venkataram*, No. 06 CIV. 6578(NRB), 2009 WL 1938984, at *7 (S.D.N.Y. July 7, 2009), *aff'd*, 396 F. App'x 722 (2d Cir. 2010); *see also Chariot Plastics, Inc. v. United States*, 28 F.Supp.2d 874, 881 (S.D.N.Y. 1998) (citing *Petrella v. Siegel*, 843 F.2d 67, 90 (2d Cir. 1988)); *United States v. Int'l Brotherhood of Teamsters*, 905 F.2d 610, 621 (2d Cir. 1990).

Because Mr. Illarramendi pleaded guilty to violation of the same statutory provisions under which the SEC seeks summary judgment here, the first and second requirements for issue preclusion (identity of issues, actual decision of those issues) are met. However, Mr. Illarramendi challenges the third element—that he had a "full and fair opportunity for litigation" in the prior proceeding. He again advances his argument that the asset freeze impaired his ability to select and hire a lawyer, thus invalidating his guilty plea for purposes of estoppel. (Mem. Opp'n. ¶ 14.) Second, he asserts that there has never been a full evidentiary hearing of the facts underlying his guilty plea. However, this argument misunderstands the import and function of his guilty plea.

The stipulation of offense conduct, which Mr. Illarramendi signed, and the facts he admitted to in his plea hearing establish the facts in place of an evidentiary hearing.

Mr. Illarramendi has not presented any reason for collateral estoppel not to be applied to disposition of this summary judgment motion. He forewent his opportunity for jury trial in his criminal case and has made no demonstration that the factual issues there were not identical to those in the civil enforcement action. Thus, Defendant is collaterally estopped from denying his admissions that:

- The statements set forth in the stipulation of offense conduct are true and accurate. (Ex. E ("Waiver & Plea Tr.") to Mot. Summ. J. [Doc. # 1017-6] 37:16-19.)

- He acted as an investment adviser to hedge funds. (Ex. C (Plea and Stipulation) to Mot. Summ. J. [Doc. # 1017-4] at 12.)

- He made materially false and misleading representations to investors in the hedge funds to conceal that he had lost money on certain investments. (*Id.*)

- He engaged in a scheme to defraud investors rather than disclosing the loss. (*Id.*)

- He used the mails or wire transmission to communicate in interstate or foreign commerce fraudulent documents including bogus debt instruments and a fictitious asset verification letter. (*Id.*)

- He made materially false and misleading statements to investors, creditors, and the SEC about the performance of the funds under his advisement. (*Id.*)

- He used money from new investors to pay out returns promised to old investors. (*Id.*)

- He created fraudulent documents to mislead investors. (*Id.*)

- He made false representations to investors in order to obtain new investments. (*Id.*)

- He commingled the monies in various funds under his advisement. (*Id.*)

- He engaged in transactions that were not in the best interests of the Funds and agreed to pay kickback to persons connection to those transactions. (*Id.*)

### B. Mr. Illarramendi's Concessions in this Court

Furthermore, Defendant admitted to the substance of the allegations in Claims for Relief Two through Four in testimony under oath before this Court.

In his testimony on May 25, 2011, Mr. Illarramendi admitted that he managed money from different funds and that he helped to advise people and funds in the management of their money. (TRO Tr. 357:20-23.) He testified that a failed investment caused an initial $5 million loss, the "hole," and he testified that he "would never tell anybody about [the hole]" and that while concealing its existence, he would "try to raise as much money as possible to be able to make it so that the gains from . . . that additional money would eventually cover the loss. . . ." (*id.* 364:3-22.) Mr. Illarramendi further admitted that he comingled investors' money (*id.* 364:20-22), used some investors' money to make payments to other investors and creditors (*id.* 368:6-8), misrepresented how he was using the Funds' money (*id.* 367:15-22), misrepresented the net asset value of the Funds (384:18-385:5), and took deceptive actions to delay the discovery of his fraud (*id.* 368:6-8). These admissions establish the elements of violations of Section 206 of the Advisers Act. Accordingly, even without applying the doctrine of collateral estoppel, Mr. Illarramendi is shown to have violated Section 206(1), (2), (4) and Rule 206(4)-8.[5]

---

[5] As the Second Circuit has recently stated in summary of § 206 of the Investment Advisers Act, "an investment adviser can violate this provision by engaging in one of four types of conduct: (1) a 'device, scheme, or artifice to defraud,' (2) a 'transaction, practice, or course of business which operates as a fraud or deceit,' (3) a knowing sale or purchase of a security to or from a client, while acting on the behalf of someone other than the client (including oneself), without disclosing the transaction and obtaining the client's consent, or (4) an 'act, practice, or course of business which is fraudulent, deceptive, or manipulative.'" § 80b–6. *United States v. Tagliaferri*, 820 F.3d 568, 573

### C. Affirmative Defenses

In his Answer, Mr. Illarramendi advances the affirmative defenses of in pari delicto and necessity and duress. (Answer [Doc. # 1006] ¶¶ 20-22.) Mr. Illarramendi states that "with respect to any wrongdoing alleged . . . which may be supported by events or evidence in the case, I hereby reiterate . . . that they are the sole result of my intent to avoid the danger stemming from the permanent situation of duress to which I was subjected by representatives of PDVSA and then further, "I invoke necessity and duress as affirmative defenses." (*Id.* ¶ 22.)

Mr. Illarramendi provides no evidentiary support for these allegations and asserts that: "this situation could not be generally disclosed at any time until certain individuals were removed from Government positions in Venezuela and there was public disclosure of certain corrupt bargains undertaken by PDVSA and Venezuela." (*Id.* ¶ 21.) Mr. Illarramendi requests that the Court permit him to disclose the relevant details "under Seal of the Court or through other means, such that said disclosure will not further endanger my life or the lives of others." (*Id.* ¶ 22.) In his Opposition to the SEC's Motion for Summary Judgment, he likewise provides insufficient supporting detail.

With respect to the transaction that created the initial $5 million that Mr. Illarramendi sought to hide, he states that "it was a choice between death for myself, my family and others, or non-disclosure. The evidence incontrovertibly shows that disclosure was not possible without risking harm . . . ." (Opp'n ¶ 19.) Similarly, Mr. Illarramendi explains that he only disclosed the

---

(2d Cir. 2016). Mr. Illarramendi's admissions before this Court establish that he acted as an investment adviser and that his admitted conduct violates Subsections (1), (2) and (4) of Section 206 of the Advisers Act.

fictitious asset letter to the U.S. government because "people outside the Receivership Companies . . . were kidnapped in Venezuela due to the blocking of money transfers by the SEC." (*Id.*) Mr. Illarramendi suggests that he presented the fictitious asset letter to the SEC "with the sole intention that the transaction would close in timely fashion and people in Venezuela would be released unharmed." (*Id.*) These generalities lack sufficient detail, much less are they accompanied by any supporting evidence.

"[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin*, 467 F.3d at 272. Mr. Illarramendi insists the first threat occurred with the transaction that caused the initial $5 million loss in 2005, but he does not tell the Court who threatened him, how he was threatened, when or where it occurred, nor does he provide any evidence beyond his own word that such threat ever occurred. Such allegations do not suffice, and self-serving allegations without evidentiary support fare no better. Absent evidence of these threats, or even any specificity in the pleadings as to their nature, the Court cannot entertain them as showing the existence of genuine issues of material fact such that summary judgment should be denied.

For the foregoing reasons, the Court grants Plaintiff's Motion for Summary Judgment.

## IV. Penalties sought

The SEC seeks an injunction barring Mr. Illarramendi from future violations of Sections 206(1), (2) and (4) of the Advisers Act, disgorgement in the amount of $370,482,716.54, and a civil penalty in an amount to be determined by the Court but capped by statute at the greater of $130,000 or the gross amount of pecuniary gain to that person. 15 U.S.C. § 80b-9; 17 C.F.R. 201.1003.

### A. Injunctive relief

Section 209 of the Advisers Act [15 U.S.C. § 80b-9] allows the Commission to obtain permanent injunctive relief upon a showing that the defendant has violated the securities laws and there is a reasonable likelihood that the defendant will violate the securities laws in the future. *SEC v. Commonwealth Chemical Secs., Inc.,* 574 F.2d 90, 99 (2d Cir. 1978) (injunction should be granted if the defendant's past conduct indicates "a reasonable likelihood of further violation in the future"); *see also S.E.C. v. Rabinovich & Assocs., LP,* No. 07-cv-10547(GEL), 2008 WL 4937360, at *5 (S.D.N.Y. Nov. 18, 2008). In evaluating that likelihood, a court may consider such factors as the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the recurrent or isolated nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; and the likelihood, given defendant's occupation, that future violations may occur. *SEC v. Universal Major Indus. Corp.,* 546 F.2d 1044, 1048 (2d Cir. 1976).

Although Mr. Illarramendi contends that an injunction is not necessary because he has already agreed to a voluntary, lifetime ban from the securities industry and that under his current conditions of incarceration, he could not work in such a capacity anyway (Opp'n at 23), the factors above point to the propriety of such an injunction. While at sentencing, Mr. Illarramendi accepted responsibility for his actions on the basis of which Judge Underhill granted him a downward departure "notwithstanding that the government believed that you had not accepted responsibility." (Sentencing Tr. [11-cr-41: Doc. # 167] 163:5-9). The reality is that his violations extended over a five-year timeframe. Moreover, despite Mr. Illarramendi's assurances that he will not engage in future wrongful conduct, he elected to circumvent the Court's asset freeze order after he had pled guilty but before sentencing, prompting the court in his criminal case to hold him in contempt. Given this background information, the Court is not persuaded that he will not engage in such conduct again unless enjoined.

**B. Disgorgement**

The Second Circuit has long held that district courts may exercise their discretion to impose disgorgement of proceeds received in connection with violations of the securities laws. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972). "Disgorgement is an equitable remedy designed to deprive the wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *see also SEC v. Universal Express, Inc.*, 475 F.Supp.2d 412, 428 (S.D.N.Y. 2007), *aff'd*, No. 07–2407–cv (2d Cir. Nov. 13, 2008). The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," and "any risk of uncertainty . . . should fall on the wrongdoer." *Universal Express*, 475 F.Supp.2d at 428, quoting *SEC v. Patel*, 61 F.3d 137, 139–40 (2d Cir. 1995) (internal citations and quotation marks omitted).

The Commission seeks an order requiring Mr. Illarramendi to pay disgorgement in the amount of $370,482,716.54, which it claims represents "net moneys gained by him and the entities he controlled." It then offsets this amount by the total restitution paid in the criminal case, i.e. the amount paid by the Receiver to the victims identified in the restitution order (although the SEC's request leaves unclear if administrative expenses and attorneys fees not paid to victims should be offset or not). The SEC argues that this amount of disgorgement would then be "identical to the restitution figure in the Criminal Case, arrived at after an evidentiary hearing before Judge Underhill during which the defendant had the opportunity to cross-examine witnesses." (Mem. Supp. Mot. Summ. J. at 14.)

Mr. Illarramendi argues that entering an order of disgorgement is inappropriate at this time because his criminal matter is not yet final. However, the Second Circuit has affirmed the district

court's order of restitution in the amount of $370,482,716.54, the amount of disgorgement sought in this case.[6]

Nonetheless, as noted above, the purposes of restitution and disgorgement diverge, and disgorgement aims to "deprive the wrongdoer of his unjust enrichment." In calculating the applicable Sentencing Guidelines sentence, Judge Underhill found that it was difficult to determine the amount of investor loss and instead relied on Mr. Illarramendi's gains from his fraudulent scheme, totaling over $25,844,834. (Ex. A to Government's Supplemental Request for Restitution [11-cr-441: Doc. # 177] at 5; *see also* Sentencing Tr. [11-cr-41: Doc. # 167] 163:14-18.)[7] This calculation strikes the Court as the clearest statement of Mr. Illarramendi's unjust enrichment and therefore the appropriate amount of disgorgement.

### C. Civil penalty

Section 209 of the Advisers Act authorizes the district courts to assess civil penalties against persons who violate the Act and creates three tiers of penalties in increasing level of severity. 15 U.S.C. 80b-9(e)(2) (A) – (C). A first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement;" and a third-tier penalty may be imposed when, in

---

[6] Mr. Illarramendi's fundamental claim, made in his sentencing memorandum [11-cr-41: Doc. # 154], his lengthy restitution memorandum [11-cr-41: Doc. # 190] and at both his sentencing and restitution hearings, is that the Receiver has mis-valued two claims, the Petroleos de Venezuela, S.A. ("PDVSA") claim and the Cheyne claim, and that if these two claims were appropriately valued, the receivership companies would have enough assets to pay all claims at 100%.

[7] Originally, the government cited a lower figure at the sentencing hearing, but submitted a corrected accounting. The figure represents the total amount of salary and other remuneration Mr. Illarramendi received during the relevant time period. (*See* Sentencing Tr. 80:17-18; 81:2-4.)

addition to meeting the second-tier requirements, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *See In re Reserve Fund Securities and Derivative Litigation*, No. 09 MD 2011 (PGG), 2013 WL 5432334, (S.D.N.Y. Sept. 30, 2013); *see also S.E.C. v. Tourre*, 4 F. Supp. 3d 579, 592 (S.D.N.Y. 2014).[8]

The statute states that the amount of the penalty shall be determined by the Court "in light of the facts and circumstances." As one court has noted with respect to imposing civil penalties, "[d]isgorgement alone . . . is plainly an insufficient remedy. To limit the penalty for fraud to disgorgement is to tell a violator that he may commit fraud with virtual impunity: if he gets away undetected, he can keep the proceeds, but if caught, he simply has to give back the profits of his wrong." *S.E.C. v. Rabinovich & Assocs., LP*, No. 07-cv-10547(GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008). For this reason, civil penalties provide an added civil remedy.

This punitive aspect of a civil penalty conforms with legislative intent to go beyond mere disgorgement of ill-gotten gains in discouraging securities laws violations. The House Committee that recommended the amendments to Section 209 of the Investment Adviser's Act noted

> Disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engaging in securities fraud. A violator who avoids detection is able to keep the profits resulting from illicit activities. . . . The Committee therefore concluded that authority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator.

H.R. Rep. No. 101-616, 101st Cong., 2d Sess., *reprinted in* 1990 U.S. Code Cong. & Admin. News 1379, 1384. Courts considering the imposition of civil monetary penalties have noted that "the

---

[8] Although *Tourre* involved violations of the Securities Act and the Exchange Act, the provisions of law regarding civil penalties are identical to those in the Advisers Act.

purpose of civil penalties is not only to deter, but also to punish." *SEC v. Coldicutt*, No. CV1301865RGKVBKX, 2014 WL 12561072, at *8 (C.D. Cal. Aug. 8, 2014); *see also S.E.C. v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) ("by enacting the Penalty Act, Congress sought to achieve the dual goals of punishment of the individual violator and deterrence of future violations.").

The factors a court looks to in order to determine whether a penalty should be imposed and the amount of the penalty include: (1) the egregiousness of the defendant's conduct; (2) the degree of defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) the defendant's financial condition. *Haligiannis*, 470 F. Supp. 2d at 386 (imposing $15 million penalty equal to amount of defendant's ill-gotten gains).

For violations occurring after February 14, 2005, the third tier of penalties for a natural person for "each violation" shall not exceed the greater of $130,000 *or* the gross amount of pecuniary gain to that person. 17 C.F.R. §201.1003. The Advisers Act and implementing regulations provide for higher penalties for non-natural persons.

The penalty sections of the Investment Advisers Act authorize maximum penalties "for each violation," but do not define the term "violation." *See* 15 U.S.C. § 80b–9(e)(2)(A)-(C). "Case law indicates, however, that district courts have the discretion to calculate penalties based on each violative act. Courts may look to either the number of violative transactions or the number of investors to whom illegal conduct was directed." *In re Reserve Fund Sec. & Derivative Litig.*, No. 09 CIV. 4346 PGG, 2013 WL 5432334, at *20 (S.D.N.Y. Sept. 30, 2013). In other instances, courts have focused on the fact that there was one fraudulent scheme, even though there were many individual violations. *See SEC v. Shehyn*, No. 04-cv-2003 (LAP), 2010 WL 3290977, at *2, *8 (S.D.N.Y. Aug. 9, 2010) (although Defendant made fraudulent representation to a "minimum of 700 investors,"

court found that defendant committed five statutory violations and imposed $120,000 for each violation); *Rabinovich*, 2008 WL 4937360, at *6 ("Although [the defendant] engaged in repeated violations of the securities laws, they all arose from a single scheme or plan. A [single third tier penalty] is therefore appropriate in this case.").

The SEC argues that the size of Mr. Illarramendi's fraud merits a stiff penalty and argues that his refusal to accept responsibility for his conduct, which the SEC infers from his repeated attempts to recharacterize his conduct as innocent or to deny the effects of his guilty plea, and his violation of court orders, "including but not limited to cashing a $600,000 check from state tax authorities in violation of this Court's asset freeze order," merit a third-tier penalty. Mr. Illarramendi again reiterates his unsuccessful arguments that his criminal matter has not been finally adjudicated as well as that his financial condition during incarceration makes it impossible for him to pay a penalty as well as the disgorgement order.

Clearly a third-tier penalty is appropriate under the five factors enumerated in *Halagiannis*. Mr. Illarramendi's conduct was egregious: when faced with disclosing a relatively minor $5 million dollar loss to investors or covering it up, he chose the latter. When the loss worsened, he elected again not to disclose. As the hole grew larger and larger, he sought to hide it from investors by recruiting new investors and using their money to pay old investors promised returns. At each turn, in an indication of his level of *scienter*, Mr. Illarramendi consciously chose to further deceive investors and to reap the profits (in the form of management fees, salary, and the like) from their investments. His conduct created at the very least the risk of substantial losses to each of the investors. Even though it was only one fraudulent scheme, this conduct recurred over the course of five years and involved solicitation of new clients on the basis of misrepresentation about how their money was being managed. However, as an incarcerated person, Mr. Illarramendi has little

25

means to pay any penalty. Further, he has spent his entire career in the securities industry. His voluntary withdrawal from that industry, and this Court's injunction from future violation of the Advisers Act will require him to learn a new trade in order to have the wherewithal to pay any penalty.

The S.E.C. requests a third-tier penalty, but it does not seek imposition of a separate penalty for each misrepresentation or for each victim of Mr. Illarramendi's scheme.[9] There is a wide gap between the $130,000 penalty specified in the regulations and the much larger alternative maximum $25,844,834 representing "the gross amount of pecuniary gain to [Mr. Illarramendi]." 17 C.F.R. §201.1003. Where such a gap exists, the court must be mindful that "[d]espite the severity of [Defendant's] violations and the extent to which those violations should be punished, however, the court also considers the extent to which other aspects of the relief and/or judgment issued in this matter will have the desired punitive effect." *S.E.C. v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009), *aff'd*, 438 F. App'x 23 (2d Cir. 2011) (imposing $1 million third-tier penalty in excess of $130,000 enumerated by statute but less than total illicit gain of $13 million); *see also S.E.C. v. Nadel*, No. 11-cv-215 (WFK) (AKT), 2016 WL 639063 (Feb. 11, 2016) (Magistrate Judge's recommendation that court impose $1 million third-tier civil penalty in excess of $130,000 enumerated in statute but less than $10.9 million in illicit profits).

Having ordered disgorgement in the amount of $25,844,834 and considering the egregiousness and risk of loss created by Mr. Illarramendi's conduct, as well as the actual loss to

---

[9] The Receiver's Second Interim Report listed ninety-seven claimants, but some are only creditors, not victims of Mr. Illarramendi's securities law violations.

each of his investors, the Court finds that an additional $1,000,000 third-tier civil penalty is appropriate.

## V. Conclusion

For the foregoing reasons, the SEC's Motion for Summary Judgment is GRANTED. The Court permantly enjoins Mr. Illarramendi from violating Sections 206(1), (2) and (4) of the Advisers Act, orders him to disgorge his gains of $25,844,834 and orders him to pay a penalty of $1,000,000.00.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 13th day of April 2017.