UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>FRANCISCO ILLARRAMENDI, HIGHVIEW POINT PARTNERS, LLC and MICHAEL KENWOOD CAPITAL MANAGEMENT, LLC,<br><br>     Defendants,<br><br>and<br><br>HIGHVIEW POINT MASTER FUND, LTD., HIGHVIEW POINT OFFSHORE, LTD., HIGHVIEW POINT LP, MICHAEL KENWOOD ASSET MANAGEMENT, LLC, MK ENERGY AND INFRASTRUCTURE, LLC, and MKEI SOLAR, LP,<br><br>     Relief Defendants. | CASE NO. 11-CV-00078 (JBA)<br><br><br><br><br><br>**TENTH INTERIM APPLICATION FOR FEES AND EXPENSES BY THE RECEIVER AND HIS ADVISERS**<br><br><br><br><br><br>**November 16, 2018** |

John J. Carney, Esq. Receiver

And

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212-589-4200
Facsimile: 212-589-4201
*Attorneys for Receiver*, JOHN J. CARNEY, ESQ.

TO:    THE HONORABLE JANET B. ARTERTON
          UNITED STATES DISTRICT JUDGE

John J. Carney, Esq., Court-Appointed Receiver for Highview Point Partners, LLC; The Michael Kenwood Group, LLC; Michael Kenwood Capital Management, LLC; Michael Kenwood Asset Management, LLC; MK Energy and Infrastructure, LLC; MKEI Solar, LP; MK Automotive, LLC; MK Technology, LLC; Michael Kenwood Consulting, LLC; MK International Advisory Services, LLC; MKGAtlantic Investment, LLC; Michael Kenwood Nuclear Energy, LLC; MyTcart, LLC; TUOL, LLC; MKCM Merger Sub, LLC; MK Special Opportunity Fund, Ltd.; MK Venezuela Fund, Ltd.; Short Term Liquidity Fund, I, Ltd.; MK Master Investments, LP; MK Investments, Ltd.; MK Oil Ventures, LLC; Highview Point Master Fund, Ltd.; Highview Point Offshore, Ltd.; and Highview Point LP (collectively, the "Receivership Entities"), and Baker & Hostetler LLP ("B&H"), as counsel for the Receiver, hereby submit this Application for allowance of compensation and reimbursement of expenses incurred by the Receiver, B&H, and FTI Consulting, Inc. ("FTI"), accountants for the Receiver, during the period from January 1, 2017 through June 30, 2018 (the "Compensation Period")[1] and for Higgs & Johnson ("H&J"), Cayman Islands counsel for the Receiver, during the period from October 1, 2014 through June 30, 2018.

**SUMMARY OF PROFESSIONAL FEES AND REIMBURSEMENT OF EXPENSES REQUESTED**

1.      This Application has been prepared in accordance with the Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (the "SEC Guidelines").

---

[1] Capitalized terms are used as they are defined in the Receiver Order and prior fee applications.

2.      Pursuant to the Initial Receiver Order dated February 3, 2011, upon motion of the SEC, the Court appointed John J. Carney, Esq. the Receiver over all assets "under the direct or indirect control" of Defendant MKCM, LLC and Relief Defendants, MKAM, LLC, MK Energy and Infrastructure, LLC, and MKEI Solar, LP.

3.      On March 1, 2011, June 22, 2011, and January 4, 2012, this Court entered Amended Orders Appointing the Receiver ("Amended Receiver Orders"), adding entities to the Receivership and changing certain reporting requirements.

4.      On March 1, 2013, this Court entered an Amended and Restated Order Appointing Receiver (the "Receiver Order") in connection with the Highview Point Settlement. The Receiver Order supersedes the Initial Receiver Order and the Amended Receiver Orders.

5.      The Receiver and B&H attorneys and paraprofessionals have expended more than 1,450 hours working on this matter during the Compensation Period.  The Receiver and B&H seek allowance of compensation for services rendered during the Compensation Period with respect to the Receivership Estate in the amount of $782,274 and reimbursement of actual and necessary expenses in the amount of $17,980 (both subject to a 20% holdback).  Applying the 20% holdback, the total fees and expenses sought at this time are $625,819 for legal services and $14,384 for expenses.[2]

6.      The Receiver retained FTI as the forensic accountants for the Receivership Estate. FTI professionals expended a total of more than 790 hours working on this matter during the Compensation Period, and seek allowance of compensation for services rendered in the amount of $309,908 and reimbursement of actual and necessary expenses in the amount of $303,106

---

[2] The amounts sought reflect significant discounts from the cost of the work performed, as the Receiver and FTI took significant additional voluntary reductions on top of those negotiated and agreed to at the time of the Receiver's appointment. The amount of these discounts and reductions is set forth in Paragraphs 11 through 14.

(both subject to a 20% holdback).  Applying the 20% holdback, the total fees and expenses sought at this time are $247,926 for financial advisory services and $242,485 for expenses.

7.     The Receiver retained H&J, a Cayman Islands-based law firm, to assist in legal matters related to the Cayman Islands.  H&J professionals seek an allowance for services rendered in the amount of $21,396 (representing an 18% discount from customary billing rates) and reimbursement of actual and necessary expenses in the amount of $2,293 (both of which are subject to the 20% holdback as required by the SEC guidelines).  Applying the 20% holdback, the total fees sought at this time are $17,117 for legal services and $1,834 for expenses.

8.     The SEC has orally informed the Receiver that they have no objection to this application and will be filing a response pursuant to the Court's Order dated January 16, 2014. (Dkt. No. 817.)

A.     _STANDARDIZED REDUCTIONS AND DISCOUNTS_

9.     At the time of the Receiver's appointment, the Receiver, B&H and FTI agreed to several additional reductions and discounts beyond those specified in the SEC Guidelines:

a.     The Receiver and B&H agreed to a capped hourly rate of $495 for the Receiver and for partner Patrick Hannon, a significant discount from their standard billing rates. The Receiver and B&H also agreed, at the time of their appointment, to an 18% reduction in the hourly rates of all New York-based B&H attorneys and paraprofessionals.

b.     At the time of FTI's appointment, FTI agreed to a capped hourly rate of $495 for Phil Daddona, a significant discount from his standard billing rate.  FTI also agreed, at the time of its appointment, to an 18% reduction in the hourly rates of all of its professionals. FTI also reduced its Ringtail document hosting expense by $16,000 per month, for a total of $256,000 in document hosting cost savings during the Compensation Period.

c.     At the time of H&J's appointment, H&J also agreed to an 18% reduction in the hourly rates of all of its professionals.  The H&J invoices reflect that discount.

10.     Pursuant to the SEC Guidelines, B&H, FTI and H&J seek reimbursement only for the actual costs of their expenses.  B&H, FTI and H&J have not included the amortization of any investment, equipment or capital outlay in any request for expense reimbursement.  B&H, FTI

and H&J have not sought reimbursement for any travel expenses during the Compensation Period including mileage, taxis or car service.[3] Nor does B&H, FTI or H&J seek the reimbursement of overtime meals, secretarial time, word processing, proofreading or document preparation expenses (other than by professionals or paraprofessionals), data processing and other staff services (exclusive of paraprofessional services) or clerical overtime.

      B.     *COST SAVINGS TO THE ESTATE*

      11.     In total, the Receiver and B&H seek $782,274 in fees and $17,980 in expenses, and have agreed to a 20% holdback of $156,455 in fees and $3,596 in expenses. B&H recognizes the public service nature of the engagement, and accordingly has discounted all New York-based professionals' and paraprofessionals' rates.  In the Compensation Period, the Receiver and B&H provided combined discounts and additional credits totaling approximately $952,066 -- or 55% -- in relation to their standard fees and expenses.

      12.     In total, FTI seeks $309,908 in fees and $303,106 in expenses, and has agreed to a 20% holdback of $61,982 in fees and $60,621 in expenses.  FTI recognized the public service nature of the engagement, and accordingly discounted all of its professionals' and paraprofessionals' rates.  In the Compensation Period, FTI provided combined discounts and credits of $259,531 -- or 45.6% -- in relation to its standard fees and expenses and an additional $256,000 in savings in relation to the Ringtail document hosting platform.

      13.     H&J seeks $21,396 in fees and $2,293 in expenses for this Compensation Period, and has agreed to a 20% holdback of $4,279 in fees and $459 in expenses.  H&J recognized the public service nature of the engagement, and accordingly discounted all of its professionals' and

---

[3] There was no reimbursable travel billed by B&H, FTI or H&J during the Compensation Period.

paraprofessionals' rates.  In the Compensation Period, H&J provided a discount of $4,696 in relation to its fees.

14.     Accordingly, these discounts and credits have collectively saved the Estate $1,472,293 in the Compensation Period when compared to B&H's, H&J's, and FTI's standard billing rates and standard practices for charging expenses.

15.     Pursuant to the SEC Guidelines, the following exhibits are attached:

a.     a Certification regarding compliance by the Receiver and B&H with the SEC Guidelines (attached as Exhibit A);

b.     a Certification regarding compliance by FTI with the SEC Guidelines (attached as Exhibit B);

c.     a Certification regarding compliance by H&J with the SEC Guidelines (attached as Exhibit C);

d.     a Fee Schedule setting forth all B&H professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed by B&H, each individual's customary hourly billing rate; the hourly billing rate charged by B&H for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit D);

e.     a Fee Schedule setting forth all FTI professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed by FTI, each individual's customary hourly billing rate; the hourly billing rate charged by FTI for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit E);

f.     a Fee Schedule setting forth all H&J professionals and paraprofessionals who have performed services in this case during the Compensation Period, the capacity in which each individual is employed, each individual's customary hourly billing rate; the hourly billing rate charged by H&J for services performed by each individual, the aggregate number of hours expended in this matter, and the fees billed (attached as Exhibit  F);

g.     a schedule specifying the categories of expenses for which the Receiver and B&H seek reimbursement, and the total amount for each such expense category (attached as Exhibit G);

h.     a schedule specifying the categories of expenses for which FTI seeks reimbursement, and the total amount for each such expense category (attached as Exhibit H);

i.     a schedule specifying the categories of expenses for which H&J seek reimbursement, and the total amount for each such expense category (attached as Exhibit I);

       j.    all B&H time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order with respect to each category, and **filed under seal** to protect privileged, confidential and/or sensitive information (attached as Exhibit J);

       k.    all FTI time records billed during the Compensation Period by activity categories and a description of the services rendered, arranged in chronological order with respect to each category, and **filed under seal** to protect privileged, confidential and/or sensitive information (attached as Exhibit K); and

       l.    all H&J time records billed during the Compensation Period with a description of the services rendered, arranged in chronological order, and **filed under seal** to protect privileged, confidential and/or sensitive information (attached as Exhibit L).

16.    This is the Receiver's tenth application for fees and expenses. The Court approved the fees and expenses sought in the First through Ninth Applications by the Receiver, B&H, FTI, and H&J (where sought) minus the holdback of both fees and expenses.

17.    At least 30 days before this and previous fee applications were filed, the Receiver provided the SEC with copies of the B&H, FTI and H&J detailed time records for their review and consent.

18.    B&H, FTI and H&J do not object to a holdback of 20% of fees and expenses for this Compensation Period. The fees and expenses for which payment is sought were incurred in connection with the discharge of the Receiver's duties as specified in the Amended Receiver Order. We believe that the charges are necessary and appropriate, and that the Receiver's efforts have resulted in a significant benefit to the Receivership Estate, as set forth in Paragraphs 27 through 46, *infra*.

**BACKGROUND**[4]

19.     The Receivership Entities are a group of interrelated corporations, partnerships, funds and other entities, all of which were either controlled or owned directly or indirectly by Defendant Francisco Illarramendi and others.

20.     On January 14, 2011, after months of investigation, the SEC commenced a civil enforcement action against the Defendants and Relief Defendants.  The SEC's complaint alleges that the Defendants misappropriated investor assets in violation of Section 206(1), (2) and (4) of the Investment Advisers Act of 1940 and Rule 206(4)-(8) thereunder.  The SEC also sought equitable relief, including injunctions against future violations of the securities laws, disgorgement, prejudgment interest, and civil monetary penalties.

21.     Simultaneously with the filing of its complaint, the SEC sought emergency relief, including a preliminary injunction, in the form of an order freezing the assets of the Receivership Defendants.  The SEC also sought the appointment of a receiver over those assets.

22.     On February 3, 2011, the Court appointed John J. Carney, Esq. as Receiver over all assets "under the direct or indirect control" of Defendant Michael Kenwood Capital Management, LLC and Relief Defendants Michael Kenwood Asset Management, LLC, MK Energy and Infrastructure, LLC, and MKEI Solar, LP.  As the Receiver's investigation commenced, the Receiver and his counsel learned that the Defendants were only a subset of the interrelated entities that had commingled investor funds and assets, and had engaged in multiple transactions that were either poorly documented or not documented at all.

23.     On or about March 7, 2011, the United States Attorney's Office for the District of Connecticut filed a criminal information against Illarramendi alleging that Illarramendi, with

---

[4] Prior proceedings are described in more detail in the previous fee applications.

others, had engaged in a massive Ponzi scheme involving hundreds of millions of dollars of money supplied primarily by foreign institutional and individual investors.  The primary purpose of the Ponzi scheme was to conceal the existence of the gap between the commingled assets and liabilities of the Receivership Entities.  On March 7, 2011, Illarramendi pleaded guilty to two counts of wire fraud, one count of securities fraud, one count of investment adviser fraud, and one count of conspiracy to obstruct justice, to obstruct an official proceeding and to defraud the SEC.  On January 29, 2015, Illarramendi was sentenced to thirteen years in prison.

24.    On March 1, 2013, the Court entered the Receiver Order in connection with the Highview Point Settlement.  The Receiver Order incorporated and restated all of the Receiver's duties and powers, and expanded the Receivership to include the Highview Point Funds.

25.    The Receiver Team has been cooperating with the United States Attorney's Office and SEC to locate, gather and preserve assets, both domestically and internationally and those efforts, while still ongoing, have largely been completed.

26.    The Receiver Order directs the Receiver to: (a) use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entities which the Receivership Entities own, possess, have a beneficial interest in, or control directly or indirectly ("Receivership Property"); (b) take custody, control and possession of all Receivership Property and records relevant thereto, including selling or exchanging assets as necessary to achieve that objective; (c) manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Property; (d) use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver; (e) take any action which, prior to the entry of the Amended

Receiver Order, could have been taken by the officers, directors, partners, managers, trustees and agents of the Receivership Entities; (f) engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities; (g) take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property; (h) issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure; (i) bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver; (j) pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and (k) take such other action as may be approved by the Court.

## SUMMARY OF STEPS TAKEN BY THE RECEIVER DURING THE COMPENSATION PERIOD

The bulk of the work performed during the Compensation Period relates to additional litigation concerning motions and appeals brought by Illarramendi and Ramon Illarramendi ("R. Illarramendi").  During the Compensation Period Illarramendi filed and the Receiver briefed two appeals to the Second Circuit as detailed below.  In addition, the Receiver continued the wind-down of the remaining Receivership Entities both in the U.S. and abroad and management and liquidation of the remaining Receivership assets.

### A. *CLAIMS PROCESS & RAMON ILLARRAMENDI*

27.     During the Compensation Period, the Receiver resolved Claim No. 14-1, a disputed claim filed by Illarramendi's sister, Adela Illarramendi, as well as the Receiver's recovery action against her.  After settlement negotiations, the Receiver entered into a settlement

agreement with Ms. Illarramendi pursuant to which, among other things, Ms. Illarramendi released, waived, and surrendered any and all current or future claims under the Plan.

28.     On June 12, 2017, the Receiver filed a motion to affirm the Receiver's determination denying R. Illarramendi's claims after the Receiver was unable to resolve them on a consensual basis.  R. Illarramendi opposed the Receiver's motion on September 6, 2017.  On March 1, 2018, the Court affirmed the Receiver's determination denying the claims of R. Illarramendi.  On March 9, 2018, R. Illarramendi filed a motion for reconsideration of the court's ruling, which the Receiver opposed and the Court denied on March 29, 2018.  There are no other disputed claims remaining in the Receivership.

29.     On December 11, 2017, R. Illarramendi filed a motion for modification of the Court's order affirming the Plan in an attempt to invalidate PDVSA's approved claims.  On January 16, 2018 the Receiver filed an opposition to R. Illarramendi's motion and on February 7, 2018, the Court denied the motion.

30.     On January 5, 2017, Illarramendi filed a notice of appeal of the district court's order granting the Receiver's motion for approval of a third subsequent distribution.  The Receiver filed his brief with the Second Circuit on July 27, 2017 and on January 23, 2018, the Second Circuit issued a mandate affirming the district court's order.

### B.   *SUMMARY OF OTHER ACTIVITIES*

31.     After unsuccessful settlement negotiations with Illarramendi to settle the Receiver's recovery action, the Receiver filed a motion for partial summary judgment on June 20, 2017.  On October 10, 2017, Illarramendi filed an opposition and on October 27, 2017, the Receiver filed a reply.  The Receiver's motion included a detailed declaration tracing all of the proceeds paid to or for the benefit of Illarramendi during the fraud.  The Court granted the

Receiver's motion on March 26, 2018 but ordered the Receiver to elect between entry of Count One or Count Ten of the complaint.  On April 5, 2018, the Receiver elected to pursue his claim for Conversion under Count Ten and on April 25, 2018 the Court entered a judgment against Illarramendi for $25,013,716.25, the full amount sought by the Receiver.

32.      The SEC also moved for summary judgment against Illarramendi on July 14, 2016.  On November 8, 2016, Illarramendi filed a motion seeking a stay of all proceedings until Illarramendi's Habeas petition was resolved.  On November 28, 2016 the SEC filed an opposition to Illarramendi's motion and on November 29, 2016 the Receiver filed an opposition. The Court denied Illarramendi's motion on April 13, 2017, the same day it granted the SEC's motion for summary judgment.  The Court entered final judgment against Illarramendi on May 24, 2017.  Illarramendi appealed both the order granting summary judgment, the order denying his motion for a stay of proceedings and the final judgment to the Second Circuit.

33.      On August 12, 2016, Illarramendi filed a motion requesting modification of the Temporary Restraining Order to allow the use of frozen funds to pay for appellate counsel.  The Receiver opposed this motion on September 12, 2016 and on July 20, 2017 the Court denied Illarramendi's motion.  Illarramendi filed a notice of appeal on August 10, 2017.  This appeal was consolidated with Illarramendi's appeal of the SEC's summary judgment motion.  The Receiver filed a brief with the Second Circuit on December 18, 2017 addressing Illarramendi's appeal of the order denying the modification of the Temporary Restraining Order.  On June 18, 2018 the Second Circuit issued a mandate affirming the district court's order.

34.      On September 7, 2017, the SEC and the Receiver moved jointly for a final judgment as to the Receivership Entities.  On September 8, 2017, the Court entered a final judgment against the Receivership Entities entering a permanent injunction and foregoing a civil

penalty or disgorgement in light of the distributions made by the Receiver.  On September 29, 2018, R. Illarramendi filed a motion for reconsideration of the final judgment entered against the Receivership Entities and a request for a stay of the final judgment.  Both the SEC and Receiver opposed R. Illarramendi's motion and the Court denied the motion on March 29, 2018.

35.    The Receiver's counsel continued to assess the Receivership's tax liabilities and obligations.  During the Compensation Period this included the timely filing of returns with federal and state authorities as appropriate, the filing of Foreign Bank and Financial Accounts Reports (FBAR) with the Internal Revenue Service and providing advice and counsel regarding other tax related matters concerning the Receivership assets and the Receivership Entities.

### C. PRIVATE EQUITY INVESTMENTS AND OTHER ASSETS

36.    As part of ongoing efforts to manage Receivership assets and private equity investments of the Receivership, B&H reviewed and analyzed corporate documents for the purpose of maintaining corporate formalities of the following United States Receivership Entities: Highview Point Partners, LLC, Highview Point, LP, Michael Kenwood Capital Management, LLC, Michael Kenwood Consulting LLC, Michael Kenwood Nuclear Energy, LLC, MK Automotive, LLC, MK Energy and Infrastructure, LLC, MK Oil Ventures LLC, MK Technology, LLC, MKCM Merger Sub, LLC, MKEI Solar, LP, MKG-Atlantic Investments, LLC, MyTcart, LLC, The Michael Kenwood Group, LLC and TUOL, LLC for the purpose of determining the Receivership's ownership structure, jurisdictions of formation and ultimately for the orderly dissolution of these entities.  The Receiver's counsel worked with FTI to ensure that taxes and filing fees were timely paid for each of the foregoing Receivership Entities.

37.    As part of ongoing efforts to manage the Receivership, counsel for the Receiver analyzed corporate documents for the purpose of maintaining corporate formalities of the

following Cayman Islands Receivership Entities: MK Special Opportunities Fund Ltd., Highview Point Offshore, Ltd., MK Venezuela Fund Ltd., Highview Point Master Fund, Ltd., Short Term Liquidity Fund I, Ltd., MK Investments, Ltd. and MK Master Investments, L.P. for the purpose of determining the Receivership's ownership structure and ensuring compliance with Cayman Islands Monetary Authority Regulations and placing certain Cayman Islands entities into "license under termination" status to ensure compliance with other applicable laws.

38.    Counsel for the Receiver continued consultations with the Business Advisor to value the Receivership's remaining private equity investments and prospects for liquidation. The remaining investments included Vetra, Nerveda, Proterra and the remaining Cheyne fund.

39.    After consultations with the Business Advisor, the Receiver filed a motion seeking an order approving the sale of the Receivership Estate's shares of Proterra, Inc. to Lake Partners, LLC on June 8, 2018. On June 12, 2018 the Court granted the Receiver's motion. On June 18, 2018, Illarramendi filed a motion to vacate or stay the Court's order, which the Receiver opposed on June 26, 2018 and the Court denied on August 22, 2018.  The sale of the Receivership Estate's shares of Proterra, Inc. to Lake Partners, LLC is expected to close in 2018.

40.    For Vetra, the Receiver's counsel worked with the Business Advisor to continue monitoring the Receivership Estate's interest and to consider possibilities for liquidating what remains of the those interests.

41.    For Nerveda, the Receiver's counsel worked with the Business Advisor to track investments made by Nerveda and continues to look for opportunities to liquidate the position. In addition, the Receiver's counsel worked with the Business Advisor to continue monitoring the Cheyne position for opportunities to liquidate the illiquid portions that remain.

42.     On March 13, 2017 pursuant to the Receiver's partial settlement with Illarramendi, the Receivership Estate sold a condominium located in Bethesda, Maryland previously owned by Illarramendi for $348,000.

43.     The Receiver's counsel also worked to ensure that all the Receivership's tax filings were up to date and filed properly.

44.     Notwithstanding the foregoing, the Receiver and his team recognize that the resources of the Receivership Estate are limited, and have thus sought to minimize the time spent on the assignment without compromising their ability to properly discharge the Receiver's duties under the Receiver Order.

45.     During the Compensation Period, FTI assisted the Receiver in responding to discovery requests from R. Illarramendi.  FTI also assisted the Receiver's legal team in preparing tax returns for the Receivership Estate, assisted the Business Advisor and Receiver's legal team in valuing Receivership Estate investments and the potential sale of these investments and managed certain Receivership accounts.  FTI also provided assistance in preparing the motion for summary judgment in the Receiver's recovery action against Illarramendi.  This included preparation of the detailed tracing declaration and voluminous supporting documentation submitted by Brian Ong in support of the Receiver's successful summary judgment motion.

46.     During the Compensation Period, H&J ensured certain Cayman-registered Receivership Entities were observing corporate formalities and maintained proper corporate governance and compliance with Cayman law.  H&J has provided advice and counsel concerning the process for de-registering and liquidating certain Cayman-registered Receivership Entities as part of the overall wind-down of the Receivership.

**CASE STATUS - KEY FINANCIAL DATA**

47.     As of July 31, 2018, the Estate had on hand cash and/or cash equivalents totaling $30,608,418, acquired through multiple litigation settlements, consolidation of Receivership Entity bank accounts both domestically and abroad, redemption and sale of assets, interest income, and collection of outstanding receivables.  These liquid assets represent a majority of the Estate's assets.

48.     In the Compensation Period, the Receiver made disbursements of $7,792,004, the majority of which consisted of claims distributions of $5,800,000 made in accordance with the Plan.  The Receiver also paid professional fees and expenses in connection with the Ninth Fee Application and 50% of the holdback for professional fees and expenses incurred from February 3, 2011 through December 31, 2016.

**FEES AND EXPENSES REQUESTED**

49.     In connection with the Compensation Period, the Receiver and B&H request compensation for services in the amount of $782,274 and reimbursement of expenses in the amount of $17,980. The Receiver and B&H request authorization to pay $625,819 for services rendered and reimbursement of $14,384 in expenses, which reflects the full amount due less the 20% holdback.

50.     In connection with the Compensation Period, FTI requests compensation for services in the amount of $309,908 and reimbursement of expenses in the amount of $303,106. FTI requests authorization to pay $247,926 for services rendered and reimbursement of $242,485 in expenses, which reflects the full amount due less the 20% holdback.

51.     In connection with the Compensation Period, H&J requests compensation for services in the amount of $21,396 and reimbursement of expenses in the amount of $2,293.  H&J

requests authorization to pay $17,117 for services rendered and reimbursement of $1,834 in expenses, which reflects the full amount due less the 20% holdback.

52.     These amounts reflect the hours worked by the Receiver and his attorneys, accountants and legal assistants, and the hourly rates in effect at the time that the services were rendered, as modified by the significant discounts provided by the Receiver, B&H, FTI and H&J, and additional voluntary write-offs and discounts of attorney time. These amounts also take into account all relevant circumstances and factors as set forth in the New York Lawyer's Code of Professional Responsibility, where applicable, and the SEC Guidelines, including the nature of the services performed, the amount of time spent, the experience and ability of the lawyers and legal assistants working on this engagement, the novelty and complexity of the specific issues involved, the time limitations imposed by the circumstances, and the responsibilities undertaken by the Receiver and B&H under the Receiver Order and the Amended Receiver Orders.

53.     Pursuant to the Receiver Order, the public service discount and additional fees and write-offs as described in Paragraphs 9 through 14, the fees and costs of the Receiver and B&H for the Compensation Period have been reduced from approximately $1,734,340 to $782,274, a reduction of $952,066.

54.     The work described in this Application was performed primarily by a group of approximately 8-10 B&H attorneys, who were assisted primarily by one legal assistant.[5]

55.     As more fully discussed in Paragraphs 27 through 46, *supra*, a significant portion of the professional fees in the Compensation Period relate to work done: 1) dealing with Illarramendi's various motions and appeals and the recovery action against him; 2) addressing

---

[5] The remainder of the timekeepers consist of B&H professionals and paraprofessionals working in specialized capacities, such employee benefits, international trade and information technology, who were consulted for a limited purpose and who charged limited time to the Estate.

issues raised by R. Illaramendi's claims objection including the litigation of several motions; 3) monitoring the Receivership Estate's investments and assets and evaluating potential sales of those investments; and 4) tax related issues.

56.     The Receiver, B&H, FTI and H&J submitted detailed invoices to the SEC for their review and comment in July and August of 2018. The SEC has informed the Receiver orally that they have no objection to this application and will be filing a response pursuant to the Court's Order dated January 16, 2014. (Dkt. No. 817.)

57.     The Receiver and B&H have submitted nine previous fee applications in this case, all of which were approved by this Court, subject to the agreed-upon holdbacks of both fees and expenses.  B&H has not received a retainer in this case.

58.     As required by the SEC Guidelines, the Receiver, B&H professionals, FTI professionals and H&J professionals recorded all services performed in time increments of one-tenth of an hour. All services by B&H legal assistants and other paraprofessionals were professional in nature.

59.     In accordance with the SEC Guidelines, this Application does not seek payment for time spent preparing the Application or any documentation in support.


**SUMMARY OF SERVICES RENDERED BY THE RECEIVER AND B&H,
BY ACTIVITY CODE, DURING THE COMPENSATION PERIOD**

60.     Pursuant to the SEC Guidelines, B&H has segregated its time during the Compensation Period into separate activity categories. Narrative summaries of these activity categories are provided below.

    *D.*  *Asset Analysis and Recovery (01)*           *AMOUNT: $372,360.20.*

    61.    The activities in this category consist of efforts to identify, locate and recover assets of the Receivership Estate and to recover, secure and prevent dissipation of those assets. Specifically, the activities in this category include efforts taken by the Receiver, his counsel, and his advisors to analyze the financial transactions between and among the Receivership Entities, to litigate and resolve the asset recovery actions pending before Judge Underhill, and investigations of and settlement discussions with individuals and entities that received potentially fraudulent transfers from the Receivership Entities.   During the Compensation Period this involved filing a successful motion for summary judgment in the Receiver's only remaining recovery action as well as litigation related to various motions and appeals brought by Illarramendi and his father.

    62.    The fees associated with this activity category going forward will primarily be limited to addressing any additional motion practice or appeals brought by Illarramendi or his father.  All the recovery actions commenced by the Receiver have now been concluded subject to Illarramendi's pending appeal of the district court's order granting the Receiver summary judgment.

    *E.*  *Asset Disposition and Business Operations (02, 03)  AMOUNT: $170,816.30.*

    63.    The activities in this category consist of efforts to evaluate, transfer and/or liquidate the private equity investments of the Receivership Estate.  Specifically, the activities in this category include communications with investors, investment managers, representatives of the private equity investments, and purported creditors to evaluate steps to maximize the value of and monetize the private equity investments.   For the Compensation Period, this includes time

spent negotiating and finalizing the sale of Proterra and monitoring the remaining private equity investments.

64.     This category also included efforts to sell a condominium in connection with the Receiver's partial settlement with Illarramendi.

F.  *Case Administration (04, 11)*                    *AMOUNT: $55,923.70.*

65.     The activities in this category during the Compensation Period consist primarily of administrative and procedural tasks related to the asset recovery litigations, such as management and tracking of dockets and filing deadlines, preparation of documents for filing, and attending to procedural matters in connection with the asset recovery litigations.

G.  *Claims Administration and Objection (05)*          *AMOUNT: $49,157.40.*

66.     The activities in this category during the Compensation Period consist primarily of addressing the discovery demands of R. Illarramendi, his claim dispute, and attempts to settle the various issues raised by him and Illarramendi after the Receiver filed a motion to authorize a third subsequent distribution.   This included briefing to the Second Circuit in response to Illarramendi's appeal of the district court's order authorizing a third subsequent distribution. This category also includes time spent on the distribution made to claimants.

H.  *Employee Benefits/Pension (06)*                    *AMOUNT: $6,311.60.*

67.     The activities in this category are related to the administration of the retirement plans for HVPP and compliance with regulatory requirements regarding the same.

*I.  Tax Issues (14)*                               AMOUNT: $127,705.40.

68.     The activities in this category consist of internal consultations and review with tax professionals to review and comply with domestic and international tax requirements for contemplated activities and transactions of the Receivership Estate and Receivership Entities.

## SUMMARY OF SERVICES RENDERED BY FTI DURING THE COMPENSATION PERIOD[6]

*A.  Data Acquisition, Document Review and Analysis (FTI Code 12)*
    *AMOUNT: $16,214.*

69.     The activities in this category include the preservation of records and documents of the Receivership Entities, document review, and the maintenance of the Ringtail environment, an electronic litigation support environment that facilitates document management, document review and production, and electronic discovery. The Receiver and his team have processed a significant volume of hard copy and electronic documents representing approximately over 6 million documents and more than 60 million pages. The activities in this category were necessary to manage the volume of documents collected from the Receivership Entities and third parties.  During the Compensation Period, work in this category primarily included document review to assist with the Receiver's motion for summary judgment against Illarramendi and document review and production to R. Illarramendi.

70.     As of May 2018 there will be no additional fees charged to the Receivership Estate related to the Ringtail environment as the hosting has been terminated.

---

[6] The subtotals below do not reflect an additional $64,756 discount applied by FTI.

B.  *Background Investigation and Forensic Analysis (FTI Codes 4, 5)*
    *AMOUNT: $252,214.*

71.     The activities in this category consist of steps taken by FTI to understand the background and relationships among the Receivership Entities, their officers and directors and other related entities and persons and the transactions in which they engaged.  Specifically, FTI reviewed bank, brokerage, and other records of the Receivership Entities, as well as public records and documents produced by third parties pursuant to voluntary document requests and subpoenas, in order to facilitate the identification and preservation of assets and records of the Receivership Entities and the tracing of funds among the Receivership Entities and others.  Fees and expenses in this category for the Compensation Period pertained primarily to certain analyses and the detailed tracing declaration submitted by FTI in connection with the Receiver's successful motion for summary judgment against Illarramendi.  Fees and expenses in this category also related to background searches and investigative research on potential investors interested in purchasing Receivership assets.

C.  *Business Operations (FTI Code 2)               AMOUNT: $106,236.*

72.     The activities in this category consist of managing the operational aspects of the Receivership Estate.  This includes managing tax filings, banking and accounting operations, ongoing private equity investments and Receivership filings.  For this Compensation Period, costs in this task code primarily relate to managing the remaining Receivership assets and efforts to liquidate these assets.

**SUMMARY OF SERVICES RENDERED BY H&J DURING THE COMPENSATION PERIOD**

    A.   *Asset Analysis, Recovery and Disposition*        *AMOUNT: $21,396.*

73.     Activities in this category include providing advice on Cayman Island-based legal issues.  The representation was not only limited to litigation advice but also included corporate legal advice pertaining to Cayman-registered Receivership Entities.  Specifically, during the Compensation Period, this category included management of the various Cayman-registered Receivership Entities including compliance with periodic filing, fee and disclosure obligations.

**EXPLANATION OF EXPENSES AND RELATED POLICIES**

74.     The Receiver and B&H seek reimbursement for their out-of-pocket costs in the amount of $17,980.  Exhibit G sets forth the various categories of expenses for which reimbursement is sought. In accordance with the SEC Guidelines, B&H charged its internal photocopying expenses at a rate of $0.15 per page for black and white and $0.50 per page for color copies.  B&H made 2,463 black and white internal photocopies for a total of $369 during the Compensation Period at the above-listed rates.[7]

75.     B&H will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Guidelines and will provide the SEC with copies upon request.

76.     FTI seeks reimbursement for its out-of-pocket costs in the amount of $303,106.  Exhibit H sets forth the various categories of expenses for which reimbursement is sought.  FTI did not charge for its internal photocopying.  FTI will retain the documentation supporting these

---

[7] The other charges in the "Copying (E101)" category include copy center services such as binding and preparation of documents for filings and exhibits.

expenses for a period of seven years in accordance with the SEC Guidelines and will provide the SEC with copies upon request.

77.     H&J incurred out-of-pocket costs in the amount of $2,293.   Exhibit I sets forth the various categories of expenses that were incurred during the Compensation Period.   In accordance with the SEC Guidelines, H&J charged its internal photocopying expenses at a rate of $0.15 per page for black and white and $0.50 per page for color copies.   H&J will retain the documentation supporting these expenses for a period of seven years in accordance with the SEC Guidelines and will provide the SEC with copies upon request.

**THE REQUESTED COMPENSATION SHOULD BE ALLOWED**

78.     The Court has discretion to determine the Receiver's compensation and the fees and expenses of the Receiver's professionals.   In determining the reasonableness of fees and expenses requested, the Court should consider the complexity of the problem faced, the benefit of the services to the Receivership Estate, the quality of the work performed and the time records presented.   SEC v. Fifth Ave. Coach Lines, Inc., 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973); see also SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir. 1992) (per curiam) (if a receiver reasonably discharges his duties, the receiver is entitled to compensation; the circumstances surrounding the receivership, including the results, are relevant).

79.     Although case law provides guidelines and standards for determining compensation requests, the unique facts and situations of the case make direct reliance on such guidelines impossible.   SEC v. W.L. Moody & Co., 374 F. Supp. 465, 485 (S.D. Tex. 1974), aff'd, 519 F.2d 1087 (5th Cir. 1975).

80.     As set forth *supra*, in the instant case, the Receiver, B&H, FTI and H&J respectfully submit that the services for which they seek compensation in this Application were necessary for, and beneficial to, the orderly administration of the Receivership Estate.

81.     The issues addressed by the Receiver and B&H have been and continue to be highly complex, requiring investigation of an alleged fraud that spanned many years, consisted of thousands of poorly-documented transactions, and involved numerous offshore entities and foreign financial institutions.  During the Compensation Period the Receiver recovered additional assets for distribution through the settlement of recovery actions, the sale of Receivership assets and the success of the Receiver's summary judgment motion against Illarramendi.  In addition, the Receiver has taken significant steps towards winding down the Receivership in an orderly fashion and in a manner that serves the best interests of the Receivership Estate.  We respectfully submit that compensation for the foregoing services as requested is commensurate with the complexity, importance and nature of the problems, issues or tasks involved.  The cost to recovery ratio to date, has been extremely favorable both in absolute terms and also when compared to other enforcement actions in which a receiver has been appointed.  The professional services were performed expediently and efficiently.  Accordingly, the Receiver and B&H submit that the compensation requested herein is reasonable and warranted in light of the nature, extent and value of such service to the Receivership Estate and all parties in interest.

**RELIEF REQUESTED**

WHEREFORE, the Receiver and B&H respectfully request that this Application be granted and that they be allowed compensation for legal services rendered during the Compensation Period in the amount of $782,274, and reimbursement of expenses in the amount of $17,980 (both subject to a 20% holdback); that FTI be allowed compensation for services

rendered during the Compensation Period in the amount of $309,908 and reimbursement of expenses in the amount of $303,106 (both subject to a 20% holdback); and that H&J be allowed compensation for legal services rendered during the Compensation Period in the amount of $21,396, and reimbursement of expenses in the amount of $2,293 (both subject to a 20% holdback).

WHEREFORE, the Receiver and B&H respectfully request that an Order be entered:

a) authorizing the Receivership Estate to pay B&H $625,819 for legal services and $14,384 in expenses, both of which reflect the 20% holdback;

b) authorizing the payment of $247,926 in fees and $242,485 in expenses to FTI, both of which reflect the 20% holdback;

c) authorizing the payment of $17,117 in fees and $1,834 in expenses to H&J, both of which reflect the 20% holdback; and

e) such other and further relief as necessary and proper.

Dated:  New York, New York
        November 16, 2018

                                By:  ___/s/ Jimmy Fokas_____
                                     Jimmy Fokas (phv04556)
                                     BAKER & HOSTETLER LLP
                                     45 Rockefeller Plaza
                                     New York, NY 10111
                                     Telephone: 212-589-4200
                                     Facsimile: 212-589-4201
                                     Email: jfokas@bakerlaw.com

                                     *Attorneys for Receiver John J. Carney, Esq.*
                                     And John J. Carney, Esq., Receiver